IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNDERHILL INVESTMENT CORPORATION, *by and through Stephen D. Peskoff as successor in interest*, and STEPHEN D. PESKOFF, *individually*, | : : : : | |
| Plaintiffs | : : | Civil Action No. 06-0099-SLR |
| v. | : : : | |
| FIXED INCOME DISCOUNT ADVISORY COMPANY, | : : : | |
| Defendant. | : : | |

## AMENDED COMPLAINT

1. Plaintiffs Underhill Investment Corporation, *by and through Stephen D. Peskoff as successor in interest* ("Underhill"), and Stephen D. Peskoff, *individually* ("Peskoff"), with the written consent of Defendant, file this Amended Complaint against Defendant Fixed Income Discount Advisory Company ("FIDAC" or "Defendant") for Defendant's refusal to pay Plaintiffs for services Plaintiffs performed for FIDAC with the reasonable expectation that FIDAC would compensate Plaintiffs for the fair market value of the services rendered.

### Jurisdiction and Venue

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because FIDAC is a resident of this district.

### Factual Background

4. Underhill, at all times relevant to this litigation, was an Ohio corporation with its principal place of business in McLean, Virginia.

5. Until its voluntary dissolution, Underhill was in the business of providing business and financial consulting services to private and publicly held businesses, including FIDAC.

6. Peskoff is an adult individual and a citizen of Virginia.

7. At all relevant times, Peskoff was the president, and the sole director, shareholder and employee of Underhill.

8. Peskoff, as sole shareholder, officer and director, caused Underhill to be legally dissolved on or about November 1, 2004.

9. Following dissolution, Underhill distributed and assigned to Peskoff, among other things, all of its rights, interests and claims against FIDAC.

10. Peskoff is the successor in interest to all of Underhill's claims against FIDAC, including the claims set forth in this Amended Complaint.

11. FIDAC is a Delaware corporation with its principal place of business located in New York, New York and a registered agent, United Corporate Services, Inc., located in Dover, Delaware.

12. FIDAC is a fee-based capital management business.

13. FIDAC's President and Chief Executive Officer is Michael A.J. Farrell ("Farrell") and its Vice-President is Ronald D. Kazel ("Kazel").

14. In early 2004, FIDAC was purchased by Annaly Mortgage Management, Inc. ("Annaly") and remains a wholly owned subsidiary of Annaly.

15. Annaly's stock trades on the New York Stock Exchange under the symbol "NLY."

16. According to Securities and Exchange Commission ("S.E.C.") filings, Farrell owns 2.19 million shares of Annaly's common stock and in 2005 earned compensation of $4.6 million.

17. FIDAC and Underhill entered into a Consulting Agreement dated February 15, 2000 (the "Agreement"), which was drafted by FIDAC but failed to provide a definite price term.

18. A true and correct copy of the Agreement is attached hereto as Exhibit "A."

19. The Agreement memorialized the parties' understanding that Underhill, by and through Peskoff, would provide certain consulting services to FIDAC and FIDAC would pay Plaintiffs for such services.

20. The Agreement provides that it will remain in effect during the life of the accounts unless the parties mutually agree to terminate the Agreement.

**Plaintiffs Rendered Consulting Services with the Reasonable
Expectation of Payment under the Agreement**

21. Plaintiffs provided numerous types of consulting services to FIDAC with the reasonable expectation they would be paid for their services under the Agreement including, without limitation, introducing FIDAC to new business partners and facilitating the new business relationships established as a result of Plaintiffs' introductions.

22. In the money management industry, consultants are typically paid a fee for services of the type provided by Plaintiffs based on a fair percentage of the management company's (here, FIDAC's) management fee on a go forward basis during the life of the relevant investment vehicle.

23. Among others, Plaintiffs brought FIDAC together with (i) Emmanuel Friedman of Friedman, Billings, Ramsey & Co. ("FBR"), (ii) Ernie Baptista of Gen Advisors LLC, and (iii) Raniero Corsini of Sentry Select ("Sentry") (collectively, the "Introductions").

24. In a letter to Underhill dated April 20, 2004, FIDAC, through Kazel, admitted that FIDAC's business relationships with Gen Advisors and Sentry are the result of Plaintiffs' Introductions.

25. A true and correct copy of the April 20, 2004 letter from FIDAC to Underhill is attached hereto as Exhibit "B."

26. At the time of the Introductions and all subsequent consulting services provided by Plaintiffs with respect to FBR, Gen Advisors and Sentry, the parties had not terminated the Agreement; in fact, as of the date of this filing, the parties still have never terminated the Agreement.

27. In reliance on the Agreement and the parties' course of dealings, Plaintiffs made the Introductions and rendered all subsequent consulting services with the reasonable expectation FIDAC would pay Plaintiffs for their services.

28. Plaintiffs' introduction of FBR resulted in FIDAC's retention as manager of a FBR affiliated real estate investment trust (the "FBR REIT") for a period of approximately two years.

29. FIDAC recognized that it had an obligation to pay Plaintiffs for the services rendered in connection with FBR and the FBR REIT.

30. FIDAC, in fact, made at least ten payments to Underhill between May 2000 and May 2002, with each payment representing twenty percent (20%) of the management fees received by FIDAC from its business relationship with the FBR REIT.

31. As a result of Plaintiffs' introduction of Baptista, FIDAC and Gen Advisors created Premier, an investment vehicle for banks, life insurance companies and other institutional investors from which FIDAC continues to receive substantial management fees.

32. During the discussions that led directly to the launching of Premier, Gen Advisors, through Baptista, questioned how Plaintiffs would be compensated for their services in putting the parties together and facilitating the development of their new business relationship.

33. FIDAC, acting through Farrell, represented to Gen Advisors and Plaintiffs that FIDAC would compensate Plaintiffs pursuant to an agreement already in place between Underhill and FIDAC.

34. Upon information and belief, FIDAC subsequently raised the issue of Plaintiffs' compensation to Gen Advisors on a second occasion and specifically directed Gen Advisors not to compensate Plaintiffs for their services in connection with Premier because FIDAC, alone, was responsible for paying Plaintiffs and FIDAC did not want Plaintiffs "double dipping," *i.e.*, being paid twice for the same services.

35. Absent FIDAC's repeated representations that it, alone, was responsible for paying Plaintiffs and FIDAC's instructions that Gen Advisors not pay Plaintiffs, Gen Advisors would have paid Plaintiffs for bringing FIDAC and Gen Advisors together and fostering their new business relationship.

36. At FIDAC's insistence, however, Gen Advisors refrained from itself compensating Plaintiffs for their services in bringing Gen Advisors and FIDAC together and facilitating the development of their business relationship.

SL1 679453v1/100409.00001

37. In justifiable reliance on the Agreement with FIDAC and FIDAC's representation to Gen Advisors that FIDAC was responsible for paying Plaintiffs, Plaintiffs did not pursue compensation from Gen Advisors.

38. As a result of Plaintiffs' introduction of Sentry in or about July 2003, FIDAC and Sentry created a series of mortgage backed securities trusts called MBS Trusts I, II, III and IV (the "MBS Trusts") and from which FIDAC continues to receive substantial management fees.

39. Plaintiffs' introduction of Sentry gave FIDAC its first entry into the Canadian market for asset management services.

40. Without the services of Plaintiffs, FIDAC would not have established business relationships with either Gen Advisors or Sentry.

41. On December 22, 2003, FIDAC sent Underhill an unsolicited check for $30,000, representing ten percent (10%) of the $300,000 in management fees FIDAC anticipated receiving during its first year managing MBS Trust I.

42. Other than this initial payment, however, FIDAC has failed to pay Plaintiffs any fees in connection with the substantial management fees FIDAC has received from its ongoing business relationship with Sentry and its investment vehicles, MBS Trusts I, II, III and IV.

43. Furthermore, without justification or excuse, FIDAC has never paid Plaintiffs anything with respect to its business relationship with Gen Advisors and the Premier fund, despite collecting millions of dollars in management fees for managing the Premier fund.

44. In an attempt to justify its non-payment, Defendant, through Farrell and Kazel, complained to Peskoff that the Premier fund had not been profitable. Whether or not that

6

statement was true when made, ultimately, the Premier fund has resulted and will in the future result in Defendant's collection of millions of dollars in management fees.

45. In his letter dated April 20, 2004, Kazel informed Plaintiffs that FIDAC would not make any further payments to Plaintiffs in connection with either the MBS Trusts or Premier. [*See* Exhibit "B"].

46. The Premier and each of the MBS Trusts accounts remained in effect on April 20, 2004, and still remain in effect and under FIDAC's management at the time of this filing.

47. FIDAC is currently receiving approximately $10,800,000 per year in management fees from Premier and the MBS Trusts as a result of Plaintiffs' Introductions of Gen Advisors and Sentry, and these revenues are increasing each year.

48. Plaintiffs cannot determine their exact entitlements without a full current and annual accounting of FIDAC's revenues.

## COUNT I - QUANTUM MERUIT

49. Each preceding paragraph above is hereby incorporated by reference.

50. FIDAC has been unjustly enriched through its failure to pay Plaintiffs the fair market value of their services in connection with Premier and the MBS Trusts.

51. Plaintiffs provided such services to FIDAC with the expectation that FIDAC would pay for the services.

52. Plaintiffs did not provide these services to FIDAC as a gratuity.

53. FIDAC has received the full (and substantial) benefit of Plaintiffs' services without paying Plaintiffs for the same.

54. FIDAC will be unjustly enriched and Plaintiffs will be unfairly deprived of the value of their services if FIDAC is not required to pay Plaintiffs the fair market value of their services.

55. Injustice can only be avoided by a Court order requiring FIDAC to pay Plaintiffs the fair market value of their services provided in connection with Premier and the MBS Trusts.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor and against FIDAC in an amount to be determined at trial, together with an award of costs incurred in connection with this action, interest, and such other relief as the Court deems equitable and just.

## COUNT II – PROMISSORY ESTOPPEL

56. Each preceding paragraph above is hereby incorporated by reference.

57. FIDAC represented to Ernie Baptista of Gen Advisors and to Plaintiffs that FIDAC would compensate Plaintiffs under the Agreement for the introduction of FIDAC to Gen Advisors.

58. FIDAC specifically directed Baptista that Gen Advisors should not compensate Plaintiffs for their services facilitating the FIDAC-Gen Advisors relationship.

59. Upon information and belief, Gen Advisors refrained from compensating Plaintiffs because FIDAC instructed that payment by Gen Advisors would constitute "double dipping" by Plaintiffs in light of the fact FIDAC was responsible for paying Plaintiffs for their services.

60. Absent this instruction by FIDAC, Gen Advisors would have paid Plaintiffs a fair percentage fee, representing the reasonable value of Plaintiffs' services resulting in the creation and management of Premier by FIDAC.

61. In justifiable reliance on FIDAC's promise to pay, Plaintiffs did not pursue compensation from Gen Advisors.

62. Injustice can only be avoided by a Court order requiring FIDAC to pay Plaintiffs the fair market value of their services.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against FIDAC in an amount to be determined at trial, together with an award of costs incurred in connection with this action, interest, and such other relief as the Court deems appropriate.

## COUNT III – DECLARATORY JUDGMENT

63. Each preceding paragraph above is hereby incorporated by reference.

64. For the reasons stated above, Plaintiffs are entitled to receive the fair market value of their services provided to FIDAC in connection with Premier and the MBS Trusts.

65. Plaintiffs are entitled to the present value of the expected revenues, as established at trial, in a lump sum. In the alternative, Plaintiffs are entitled to a fair percentage of the management fees received by FIDAC as result of these funds on a rolling basis as the revenues are received by FIDAC.

66. FIDAC contends that Plaintiffs are not entitled to any additional further compensation in connection with the MBS Trusts or Premier.

67. Thus, there is an actual controversy regarding FIDAC's obligations to make payments to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against FIDAC and award a lump sum of the projected fees Plaintiffs are entitled to receive resulting from FIDAC's future management fees or, in the alternative, enter judgment:

    (a)  Requiring annual accountings performed by an independent auditor at FIDAC's expense to determine the revenues received by FIDAC as a result of the Premier, MBS Trust I, II, III and IV funds;

    (b)  Preventing FIDAC from manipulating its business so as to avoid payments to Underhill and Peskoff;

    (c)  Requiring FIDAC to pay to Plaintiffs a fair percentage of the management fees received by FIDAC as the result of the Premier and MBS Trust I, II, III and IV funds, as determined by the accountings, within ten (10) business days of the completion of each accounting;

    (d)  Awarding Plaintiffs interest and costs incurred in connection with this action; and

    (e)  Such other relief as the Court deems equitable and just.

Dated:  December 30, 2006    STEVENS & LEE, P.C.

    By:  */s/ Joseph Grey*
    Joseph Grey (DE Bar No. 2358)
    G. Thompson Bell, III, *pro hac vice*
    Pa. Attorney I.D. No. 32649
    1105 North Market Street
    Seventh Floor
    Wilmington, DE 19801
    TEL: (302) 654-5180
    FAX: (302) 654-5181
    EMAIL: jg@stevenslee.com
      gtb@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP

Robert L. Ruben, *pro hac vice*
D.C. Attorney I.D. No. 414580
Marshall F. Berman, *pro hac vice*
D.C. Attorney I.D. No. 020743
4800 Montgomery Lane, Suite 150
Bethesda, MD 20814
TEL: (301) 951-9696
FAX: (301) 951-9636
EMAIL: rruben@randalaw.com
    mberman@randalaw.com

*Attorneys for Plaintiffs*
*Underhill Investment Corp. and Stephen D. Peskoff*

11

# EXHIBIT A

SL1 113271v1/099999.09999

# FIDAC
*Fixed Income Discount Advisory Company*



February 15, 2000

Mr. Steve Peskoff
Underhill Investment Corp.
7414 Old Maple Square
McLean, VA 22102

Re: Consulting Engagement

Dear Mr. Peskoff:

This letter will confirm our engagement regarding the provision of consulting services by Underhill Investment Corp. ("Underhill") to Fixed Income Discount Advisory Company ("FIDAC").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Underhill and FIDAC agree as follows:

1. **Consulting Services.** Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the "Accounts").

2. **Compensation.** FIDAC shall pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC to Underhill monthly and calculated in accordance with the formula described in the (the "Accounts Agreements").

3. **Term; Termination.** Unless earlier terminated in ordinance with this paragraph, this Agreement shall be for an initial term of one year, commencing on February 15, 2000, and ending on February 15, 2001. Upon expiration of the initial term, and provided that neither party shall be in default hereunder, this Agreement shall be automatically renewed under the same terms and conditions for successive one-year terms, each expires and ending on the same date one year later. Either Underhill or FIDAC may terminate this Agreement by delivering written notice to the other party; provided, however, that neither party shall terminate this Agreement without written consent of the other party so long as any of the Account Agreements remain in effect.

4. **Notices**. Unless otherwise directed, all communications or notices required or permitted hereunder will be directed to Underhill at the address set forth above. Likewise, if you wish to communicate with us or serve any notice required or permitted under this Agreement, please contact us at:

> Fixed Income Discount Advisory Company
> 12 E. 41st Street
> Suite 700
> New York, NY 11021

5. **Assignability**. Our relationship is a personal one and cannot be assigned, sold or in any manner hypothecated or pledged by either of us without the written consent of the other party. No merger, sale, or consolidation will effect the transfer of this Agreement.

6. **Amendment**. This Agreement may be amended only by a writing executed by both parties.

7. **Binding Affect**. This Agreement shall be binding upon, and shall insure the benefit of, the parties hereto and their respective heirs, successors, and assigns.

8. **Governing Law**. This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware.

9. **Independent Contractor**. Underhill is and shall hereafter be an independent contractor vis-à-vis FIDAC, and nothing herein may be interpreted or construed so as to create any employment, partnership, joint venture, or other relationship, between Underhill and FIDAC or their respective employees, representatives and agents.

10. **Best Efforts; Liability**. Underhill shall exercise its best efforts and judgement in the performance of its duties hereunder. Neither Underhill nor its owners, officers, directors, or employees, shall incur, any liability in connection with the performance of such duties, and obligations, except, in the case of bad faith, willful misfeasance and gross negligence.

If the foregoing accurately states our agreement, please signify your acceptance by signing and dating below where indicated.

Very truly yours,

FIXED INCOME DISCOUNT
ADVISORY COMPANY

By _____
Michael A. J. Farrell, Chairman

ACCEPTED AND AGREED
To as of the February 15, 2000

Underhill Investment Corp.

_____ President
Steve Peskoff

# EXHIBIT B

# FIDAC

*Fixed Income Discount Advisory Company*



April 20, 2004

Mr. Steve Peskoff
Underhill Investment Corporation
1660 International Drive
Suite 400
McLean, VA 22102

Dear Steve:

I received your letter dated as of the 12th of this month and wanted to respond to you in a timely manner.

During the last two years FIDAC has successfully grown its business through the launch of five different investment vehicles which are marketed in China, Japan, Latin America, Canada (MBS Trust) and the US life insurance market (Premier). The latter two of which you provided the initial introduction to the principals involved in their formation. Although I understand that you have a personal relationship with Mr. Baptista, you should realize that not only is the information he provided you incorrect, but it is in direct violation of the terms of the Confidentiality Agreement entered into between us and his organization. Based upon the extensive development time and costs involved for launching Premier, and the nominal level of assets currently in the fund, we have yet to see a positive return on our investment. While we have a dedicated team of investment professionals involved in the daily management of the fund who are responsible for its above market returns, we are dedicating limited resources to the further marketing of this product.

On numerous prior occasions Mike has mentioned to you that the least successful of products we launched in the past two years have been MBS Trust and Premier. Nonetheless, Mike discussed with you in December 2003 that he would compensate you for your limited involvement in these products and a check was issued to you on December 22, and cashed by you, for $30,000. It was also explicitly explained that there would be no further consideration paid to you and this letter serves as a further reiteration of that position.

Regards,

Ronald D. Kazel

1211 Avenue of the Americas • 29th Floor • New York, NY 10036 • 1-800-487-9947 • Tel: 212-696-0100 • Fax: 212-696-9809

## **CERTIFICATE OF SERVICE**

I, Joseph Grey, hereby certify that on this 6th day of December, 2006, and in addition to the service provided under the Court's CM/ECF filing system, I caused true and correct copies of the foregoing Amended Complaint to be served by first class United States mail, postage prepaid, addressed to Defendant's counsel as follows:

> John L. Reed, Esquire
> Denise Seastone Kraft, Esquire
> EDWARD'S ANGELL PALMER & DODGE LLP
> 919 North Market Street, 15th Floor
> Wilmington, DE 19801
>
> Gerald A. Novack, Esquire
> KIRKPATRICK & LOCKHART
> NICHOLSON GRAHAM LLP
> 599 Lexington Avenue
> New York, New York 10022

> _/s/ Joseph Grey_
> Joseph Grey