# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNDERHILL INVESTMENT **CORPORATION**, *by and through* *Stephen D. Peskoff as successor in interest* and **STEPHEN D. PESKOFF**, *individually*, | : : : : : | |
| Plaintiffs, | : : : | C.A. No. 06-99-SLR |
| v. | : : : | |
| **FIXED INCOME DISCOUNT ADVISORY COMPANY**, | : : : | |
| Defendant. | : : | |

### DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S OPENING BRIEF IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>

**EDWARDS ANGELL PALMER & DODGE LLP**
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770 (Phone)
302.777.7263 (Fax)

OF COUNSEL:
Gerald A. Novack (*pro hac vice*)
Sarah P. Kenney (*pro hac vice*)
**KIRKPATRICK & LOCKHART**
    **PRESTON GATES ELLIS** LLP
599 Lexington Avenue
New York, New York 10022
212.536.3900 (Phone)
212.536.3901 (Fax)

DATED:  May 29, 2007

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

NATURE AND STAGE OF THE PROCEEDING............................................................1

SUMMARY OF ARGUMENT ....................................................................................2

STATEMENT OF THE FACTS ..................................................................................4

A.   The Parties ...................................................................................................4

B.   The Parties' Prior Dealings Before The Introductions Sued Upon.........................5

  (1)   The Annaly Investment Banking Services....................................................6

  (2)   The FBR REIT And February 2000 Letter ..................................................7

  (3)   The Baseless claim Based On The February 2000 Letter...........................10

C.   The Introductions Here Sued Upon ...............................................................11

  (1)   Gen Advisors ......................................................................................11

     (a)   The January 2002 Introduction ......................................................11

     (b)   The Development And Launch Of Premier ....................................12

     (c)   Peskoff's Role ...........................................................................15

  (2)   Sentry Select .....................................................................................15

     (a)   The Introduction........................................................................15

     (b)   Development And Launch Of The MBS Trusts ..........................16

     (c)   Peskoff's Role ...........................................................................17

D.   No Pre-Litigation Claims By Peskoff Of Any Entitlement To
     Compensation .........................................................................................17

E.   The Dissolution Of Underhill Without Any Provision For Any Claim.................20

PESKOFF'S ADMITTEDLY BASELESS BREACH OF CONTRACT CLAIM ...........22

THE AMENDED COMPLAINT ...............................................................................23

SUMMARY JUDGMENT STANDARD..........................................................................24

ARGUMENT....................................................................................................................25

I.      THE CLAIMS IN THE AMENDED COMPLAINT ARE BARRED BY
        NEW YORK'S STATUTES OF FRAUDS...........................................................25

        A.      New York Law Applies ............................................................................26

        B.      The Statute Of Frauds Bars Plaintiffs' Claims ........................................28

II.     THE CLAIMS IN THE AMENDED COMPLAINT FAIL TO STATE A
        CLAIM..................................................................................................................30

CONCLUSION.................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                        **PAGE**

*Chrysler Corp. v. Chaplake Holdings, Ltd.*,
   822 A.2d 1024 (Del. 2003) ......................................................................31

*Committee to Save St. Brigid v. Egan*,
   30 A.D.3d 356, 819 N.Y.S.2d 7 (N.Y. App. Div. 2006) .............................31

*Ellis v. Provident Life & Accident Ins. Co.*,
   3 F. Supp. 2d 399 (S.D.N.Y. 1998), *aff'd*, 172 F.3d 37 (2d Cir. 1999) .................29, 30

*Feinberg v. Saunders, Karp & Megrue, L.P.*,
   1998 U.S. Dist. LEXIS 19144 (D. Del. Nov. 13, 1998) ..................................26, 30, 31

*Freedman v. Chemical Const. Corp.*,
   372 N.E.2d 12,  401 N.Y.S.2d 176  (1977)............................................28, 30

*Freedman v. Pearlman*,
   271 A.D2d 301, 706 N.Y.S.2d 405 (N.Y. App. Div. 2000) .......................30

*Hitchens v. Washington Group, Int'l, Inc.*,
   __ F.Supp.2d __, No. 05-379,
   2007 WL 935602 (D. Del. Mar. 29, 2007) ..................................................24

*In re Alu*,
   302 A.D.2d 520, 755 N.Y.S.2d 289 (N.Y. App. Div. 2003) .......................30

*Int'l* Trading & Sales, Inc. v. Phillip Brothers, Inc.,
   99 A.D.2d 983, 468 N.Y.S.2d 123 (N.Y. App. Div. 1984) ........................28

*Landis v. Science Management Corp.*,
   No. 7483, 1991 Del. Ch. LEXIS 19 (Del. Ch. Feb. 14, 1991)....................27

*Meyer v. Shearson Lehman Brothers, Inc.*,
   211 A.D.2d 541, 621 N.Y.S.2d 346 (N.Y. App. Div. 1995) .......................28

*Minichiello v. Royal Business Funds Corp.*,
   223 N.E.2d 793, 18 N.Y.2d 521 (1966)......................................................29

*Olsen v. T.A. Tyre Gen. Contr., Inc.*,
   No. 523, 2005, 2006 Del. LEXIS 474 (Del. 2006) .....................................31

*Ostrove v. Michaels*,
   289 A.D.2d 211, 734 N.Y.S.2d 199, (N.Y. App. Div. 2001) ......................28

*Philo Smith & Co. v. USLife Corp.*,
    554 F.2d 34 (2d Cir. 1977).............................................................................29

*Prestige Caterers v. Kaufman*,
    290 A.D.2d 295, 736 N.Y.S.2d 335, (N.Y. App. Div. 2002) .....................................31

*Reisner v. Recco Temporary Servs., Inc.*,
    136 A.D.2d 686, 524 N.Y.S.2d 102  (N.Y. App. Div. 1988) .....................................30

*Sugerman v. MCY Music World, Inc.*,
    158 F.Supp.2d 316 (S.D.N.Y. 2001).....................................................27, 29

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) ...............................................................................26

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
    454 F.Supp.2d 62 (E.D.N.Y. 2006) ................................................................31

## STATUTES

17 C.F.R. § 275.206(4)-3 .........................................................................................5

N.Y. Gen. Oblig. Law § 5-701(a)(10) ....................................................................25

## TREATISES

3 Williston on Contracts § 533A, at 801 (3d ed. 1960) ...............................................29

## OTHER AUTHORITIES

Restatement (Second) Conflict of Law § 188(2) .......................................................26

Restatement (Second) Conflict of Laws § 188(2).......................................................26

Restatement (Second) of Conflict of Laws § 188(2) ..................................................26

Restatement (Second) of Conflict of Laws § 196.......................................................26

## NATURE AND STAGE OF THE PROCEEDING

This is the opening brief in support of a motion for summary judgment by defendant Fixed Income Discount Advisory Company ("FIDAC"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of Plaintiffs' Amended Complaint, dated December 30, 2006 (the "Amended Complaint").  The parties have completed all fact and expert discovery.  FIDAC's motion and accompanying opening brief have been filed pursuant to the Court's scheduling order dated May 16, 2006, as amended by its Order dated May 2, 2007 extending the filing deadlines.

## SUMMARY OF ARGUMENT

This is an action to recover millions of dollars in "finder's fees."  The Plaintiff Stephen D. Peskoff ("Peskoff") sues individually and as the alleged successor to his now-dissolved closely-held corporation, Underhill Investment Corporation ("Underhill"). (Peskoff and Underhill are sometimes collectively referred to as "Peskoff.")

FIDAC is a registered investment adviser, which earns fees for managing the assets of its clients.  FIDAC's fees from its clients are generally calculated as a percentage of the value of its clients' assets under FIDAC's management.  As is customary in the industry, from time-to-time FIDAC will pay a "finder's fee" to a party who introduces a client to FIDAC where, as a result of the introduction, the client deposits money with FIDAC to manage.  Under the typical finder's fee agreement, FIDAC pays the finder a specified percentage of the advisory fees that FIDAC earns from managing the client's funds.

Peskoff does not claim that he introduced any clients to FIDAC and is thus entitled to a finder's fee on this basis.  Rather, Peskoff claims that he earned finder's fees because he introduced FIDAC to two companies so that they might discuss whether there existed any mutually advantageous business opportunities they might together pursue. The names of these two companies are Gen Advisors LLC ("Gen Advisors") and Sentry Select Capital Corp. ("Sentry Select").  Peskoff concedes that he was not asked to make these introductions, and that he was never promised that he would be paid for doing so.

After several years of collaborative effort, FIDAC and these companies created and marketed new investment vehicles that were managed by FIDAC, and from which FIDAC has earned management fees.  Peskoff and Underhill played no role in the

creation, development, marketing or implementation of these new investment vehicles. Instead, Peskoff's role was limited to making these introductions.

Peskoff originally sued FIDAC claiming that a February 2000 letter constituted a written contract entitling Underhill to 10% of all fees that FIDAC earned from these two ventures. After being closely questioned during his deposition, Peskoff conceded that he had no basis for this contract claim, and filed an Amended Complaint, dropping the breach of contract claim. The Amended Complaint continues, however, to assert the quantum meruit and promissory estoppel counts found in the original Complaint.

There are two reasons why these remaining two claims should be dismissed as a matter of law. First, both claims are barred by New York's Statute of Frauds. Second, even if the Statute of Frauds were not a bar, accepting as true all the factual allegations made by Peskoff, Plaintiffs' allegations do not state a claim for relief under either a quantum meruit or promissory estoppel theory. Peskoff has conceded that:

- FIDAC never asked Peskoff to make any introductions regarding the business opportunities at issue here. Instead, Peskoff acted as a volunteer, introducing FIDAC to potential business partners to explore possible business opportunities entirely on his own initiative. (A-149; Peskoff, p. 285).[1]

- Before making the introductions, (a) Peskoff never asked if FIDAC would compensate Peskoff; (b) Peskoff never told FIDAC that he expected to be paid for making any introductions; and (c) FIDAC never promised to pay Peskoff anything for making such introductions. (A-149, A-182; Peskoff, pp. 285, 427).

---

[1] Submitted in support of this opening brief is an Appendix with attached transcripts of the depositions of Peskoff, Michael Farrell (Chairman, President and CEO of FIDAC), Ronald D. Kazel (Executive Vice-President of FIDAC at that time) and Ernest P. Baptista, one of the businessmen introduced to FIDAC by Peskoff. The citations to the transcripts provide the name of the deponent and the page number of the testimony. The exhibits referred to herein are given the same designation used at the depositions.

## STATEMENT OF THE FACTS

**A.    The Parties**

FIDAC is a registered investment adviser.  Although incorporated in Delaware, FIDAC's only offices have been in New York City.  Prior to June 2004, FIDAC was privately held, with virtually all of its stock owned by Michael A.J. Farrell ("Farrell"), FIDAC's Chairman, CEO and President.  (A-263, A-272-A-273; Farrell, pp. 5, 44-45). In June 2004, FIDAC was acquired by Annaly Capital Management, Inc., formerly known as Annaly Mortgage Management, Inc. ("Annaly"), a publicly-traded company. At the time, Farrell was the founder, Chairman and CEO of Annaly. (A-263; Farrell, p. 6).  Since June 2004, FIDAC has been a wholly-owned subsidiary of Annaly.  Both before and after the Annaly acquisition, FIDAC's business has been the same.

As a registered investment adviser, FIDAC manages pools of capital provided by its clients.  The funds may be managed in a separate account at a brokerage firm in the individual client's name, with FIDAC having authority to direct trades in that account. (A-285; Farrell, p. 96).  Or, a client's funds may be invested in a particular fund or investment vehicle that FIDAC manages, where the assets of a number of investors are combined.  (A-285-A-286; Farrell, pp. 96-97).  FIDAC's basic investment strategy is the same, irrespective of the form in which the funds subject to its management are held. FIDAC earns a monthly fee that is a percentage of the value of its assets under management.  In return, FIDAC provides the investment advisory services necessary to implement its strategy.  With the exception of the two vehicles at issue here, FIDAC does not design investment vehicles.  (A-279; Farrell, p. 69).

Like many other investment advisers, FIDAC occasionally enters into finder's fee arrangements with intermediaries who solicit clients to deposit their funds with FIDAC to manage.  (A-237; Kazel, pp. 9-10).  Federal law permits such arrangements, although it requires that they be in writing, describe the nature and content of the solicitations to be made and contain specific provisions relating to disclosures to be made to prospective clients, including the fee that the finder will be paid by the investment adviser.  17 C.F.R. § 275.206(4)-3.  Typically, a finder will receive a percentage of the management fees earned on the funds provided by the client that finder introduced to FIDAC.  (A-237; Kazel, pp. 9-10).

Peskoff is a resident of Virginia, who at all relevant times maintained his business offices in Virginia.  (A-52, A-53; Pesk. Ex. 30, ¶¶ 4 and 6; A-88; Peskoff, p. 54).  Peskoff has styled himself as a "consultant" who provides services to investment banking firms, among others.  (A-87-A-88; Peskoff, pp. 53-55).  During the period in question here, Peskoff often used Underhill as the vehicle for conducting the consulting services that he personally provided.  (A-53; Pesk. Ex. 30, ¶¶ 5, 7; A-88; Peskoff, p. 57).  Until its dissolution in November 2004, Underhill was a closely-held corporation for which Peskoff was the sole shareholder, officer and director.  (A-53; Pesk. Ex. 30, ¶ 7).  Other than secretarial help, Peskoff was Underhill's only employee.  (A-80; Peskoff, p. 25).

**B.    <u>The Parties' Prior Dealings Before The Introductions Sued Upon</u>**

Prior to the introductions that were sued upon here, Peskoff had been involved in several business dealings with Farrell, and the two men had become casual friends as well as business associates.  (A-102-A-104, A-85, A-123; Peskoff, pp. 112-18, 42, 180; A-263-A-264; Farrell, pp. 8, 10-12; A-38 and A-39; Pesk. Exs. 7 and 8).  This brief will

review those dealings to demonstrate that nothing in their prior dealings – which were very different from the situation presented here – supports any claim for a finder's fee, even if the Statute of Frauds were not a bar.  Since Peskoff originally – and baselessly – brought this action based upon the February 2000 letter signed in connection with one of these earlier transactions (A-43-A-51; Pesk. Ex. 21), it is important that the Court be fully aware of the prior dealings and not be misled by any further effort by Peskoff to rely upon this letter.

### (1)    The Annaly Investment Banking Services

In 1996 or 1997, Peskoff was working as a consultant to the Virginia-based investment banking firm of Friedman Billings Ramsey, which was doing a project for Annaly.  (A-87-A-88, A-102-A-103; Peskoff, pp. 53-54, 113-14).  It was around this time that Farrell first met Peskoff, who maintained an office in the Friedman Billings Ramsey suite of offices.  (A-88, A102-A-103; Peskoff, pp. 54, 113-14; A-263; Farrell, p. 6).  During the next four years, Friedman Billings Ramsey did a number of financing projects for Annaly.  (A-102-A-103; Peskoff, pp. 113-17).  These projects earned Peskoff consulting fees of approximately $1 million, which were paid to him by Friedman Billings Ramsey.  (A-102; Peskoff, p. 113).

Over this period of time, Peskoff and Farrell became casual friends, as well as business associates.  (A-85, A-102-A-103; Peskoff, pp. 42, 112-17; A-263, A-264; Farrell, pp. 8, 10-12; A-38 and A-39; Pesk. Exs. 7 and 8).  In his deposition, Peskoff described their relationship as "very close."  (A-85, A-123; Peskoff, pp. 42, 180; *see* A-94, A-100, A-145; Peskoff, pp. 78, 102, 268).

### (2)    The FBR REIT And February 2000 Letter

In early 2000, Peskoff called Farrell, at the request of Friedman Billings Ramsey's management, to see whether Farrell would meet with executives at Friedman Billings Ramsey to discuss FIDAC becoming the investment adviser to a real estate investment trust or REIT that it ran (the "FBR REIT").  (A-92-A-93; Peskoff, pp. 73-75).  Peskoff, admittedly, had not solicited this work for FIDAC.   (A-92-A-93; Peskoff, pp. 73-75).

Shortly thereafter, Farrell met with the Friedman Billings Ramsey management and, in February 2000, it was agreed that FIDAC would begin acting as the investment adviser to the FBR REIT.   (A-93; Peskoff, pp. 75-77).   During a brief telephone conversation after this meeting, Farrell told Peskoff that he would be sending him a letter that would reflect Farrell's decision to arrange for Underhill to be paid a portion of FIDAC's fees from managing the FBR REIT.  (A-93; Peskoff, pp. 75-77).  The two men did not discuss any terms at all.   (A-91, A-181-A-182; Peskoff, pp. 75-77, 426-27).  When Peskoff reviewed the February 2000 Letter he noticed that it did not specify any percentage that Underhill was to be paid.   (A-155; Peskoff, p. 309).   Peskoff was completely unconcerned by this omission, however, because he understood that FIDAC's decision to make some payment based upon the fees it earned from the FBR REIT account was entirely "voluntary" on Farrell's part.   (A-99-A-100, A-155; Peskoff, pp. 100-03, 309).

Farrell then sent Peskoff a letter, dated February 15, 2000 (the "February 2000 Letter" or the "Letter").   (A-35-A-37; Pesk. Ex. 6; A-93; Peskoff, p. 77).   The Letter referred to Underhill being engaged to provide FIDAC with "such consulting services as

they shall agree from time to time . . . ."   (A-35; Pesk. Ex. 6, ¶ 1).   The Letter also provided that FIDAC would pay Underhill an unspecified percentage of the fees that FIDAC earned from managing any client for which Peskoff was asked to provide such consulting services.  (A-181-A-182; Peskoff, pp. 426-27; A-35; Pesk. Ex. 6, ¶ 2).

Peskoff has admitted that the reference to being paid this percentage was a reference to the fees FIDAC was to earn for managing the FBR REIT.  (A-159, A-181-A-182; Peskoff, pp. 325-26, 426-27).

It is undisputed that the February 2000 Letter makes no reference to Peskoff or Underhill receiving any fees for introducing FIDAC to any potential business opportunities or potential business partners.   (A-181-A-182; Peskoff, pp. 426-27). Peskoff admitted during his deposition that this Letter could only be interpreted as referring to the FBR REIT, and the consulting services that Peskoff was to provide with respect to it.  (A-159, A-182; Peskoff, pp. 325, 427).  Peskoff also admitted that there was no promise by Farrell to pay him fees for finding future business partners or opportunities for FIDAC.  (A-182; Peskoff, pp. 427, 429).  Nor did Farrell ever make any such promise at any time thereafter.  (A-182; Peskoff, p. 427).

During his deposition, Peskoff was asked about all the conversations that led up to the February 2000 Letter.   (A-82; Peskoff, pp. 30-31).   He admitted that he never discussed any terms with Farrell.  (A-82, A-93-A-94, A-181-A-182; Peskoff, pp. 31, 75-78, 426-27).  Then, he was asked if there was any other time when Farrell promised to pay him anything.   (A-182; Peskoff, pp. 427).   He admitted there was no such conversation:

> Q.   And you understood at the time you
>      got it that the letter was intended to provide a

(written record as to what was the reason you were being paid money by FIDAC in connection with the investment management fees it was earning from FBR REIT; right?

A.   That is correct.

Q.   And there was no discussion at all at about the time this letter was sent to you by Mr. Farrell other than what you previously testified to; correct?

A.   That is correct.

Q.   **And there was no later oral agreement that you reached with Mr. Farrell at any time in which he said, "I will pay you X or Y or anything else for bringing me new business from somebody"; isn't that correct?**

A.   **That is correct.**

(A-182; Peskoff, p. 427) (emphasis added)

FIDAC began managing the FBR REIT in February 2000, and continued managing it until May 2002.  (A-93, A-104-A-105; Peskoff, pp. 75-77, 121-22).  During that period, FIDAC paid Peskoff, through Underhill, consulting fees in excess of $580,000, approximating 20% of the related management fees received by FIDAC from the FBR REIT during that period.  (A-79, A-100; Peskoff, pp. 18-19, 102; A-31; Pesk. Ex. 5, p. 2).

Peskoff testified that until he began receiving these monthly payments in the first half of 2000 he did not have any idea how much Farrell would decide to pay Underhill. (A-122-A123; Peskoff, pp. 179-80).  It was a matter that Peskoff felt was entirely within Farrell's discretion and completely voluntary on his part.  (A-99-A-100; Peskoff, pp. 98-103).

After receiving the February 2000 Letter, Peskoff simply filed it away; he never again mentioned it to Farrell.  The Letter only emerged after Peskoff retained counsel in the Fall of 2005 and began asserting the spurious claims made in this lawsuit.  (A-97, A-

82, A-94-A-95, A-132-A-133, A-143, A-182; Peskoff, pp. 31-32, 80-85, 219-20, 262, 427; A-41; Pesk. Ex. 15; A-278 – A-279; Farrell, pp. 68-69).

###### (3)    The Baseless Claim Based On The February 2000 Letter

The idea that the February 2000 Letter constituted a contract entitling Underhill to the millions that he is claiming in this action first appeared in a September 2005 letter to FIDAC written by Peskoff's counsel in this litigation.  (A-30-A-34; Pesk. Ex. 5; A-143; Peskoff, p. 262).   In that September 2005 letter, Peskoff's counsel wrote that in the February 2000 Letter the parties had agreed that FIDAC would pay Underhill 10% of any management fees earned as a result of any introductions that Peskoff might make to future business partners of FIDAC.  (A-30-A-31; Pesk. Ex. 5, pp. 1-2).  This September 2005 letter also stated that the parties had a course of dealing pursuant to which Underhill had previously been paid 10% of FIDAC's management fees earned in connection with the FBR REIT.  (A-31; Pesk. Ex. 5, p. 2).

As previously mentioned, Peskoff admitted during his deposition that: (a) the Letter was written to document the fees paid in connection with the FBR REIT (A-159; Peskoff, p. 325); (b) the Letter does not contain any provision stating that Underhill would be paid any specified percentage (A-139, A-181-A-182; Peskoff, pp. 246-47, 426-27); and (c) in fact there was no course of dealing as alleged by Peskoff's counsel in his September 2005 demand letter.  (A-140, A-180, A-181; Peskoff, pp. 249-50, 419-21, 423-24).  As Peskoff conceded during his deposition, he was not paid 10% of any ongoing account, ever.  (A-79; Peskoff, pp. 18-19).  In connection with the FBR REIT – the only transaction in which FIDAC and Plaintiffs ever dealt – the fee paid for

consulting services was 20% of the management fees FIDAC received. (A-79, A-160-A-161; Peskoff, pp. 18-19, 331-32).

Peskoff's 10% course of dealing claim, and his claim that the Letter listed a specified percentage to be paid, were completely unfounded based upon the undisputed facts known to Peskoff. Therefore, these claims were made in bad faith. (A-79, A-122, A-160-A-161; Peskoff, pp. 18-19, 178, 331-32, 419).

As discussed more fully below, following the taking of his deposition where Peskoff was forced to admit under oath that there was neither a 10% fee specified in the February 2000 Letter nor any 10% course of dealing, the Plaintiffs dropped their baseless breach of contract claim. (See pp. 24-25 below).

C.    **The Introductions Here Sued Upon**

    (1)    **Gen Advisors**

        (a)    **The January 2002 Introduction**

In the Fall of 2001, more than 18 months after the FBR REIT transaction first was discussed, Peskoff made the acquaintance of Ernest P. Baptista ("Baptista") at an investment banking conference that they both happened to be attending. (A-100, A-148; Peskoff, pp. 104, 280-81; A-193; Baptista, pp. 26-27). Baptista is an insurance broker affiliated with a nationwide association of brokers. (A-187-A-188, A-198; Baptista, pp. 5-6, 48). In conjunction with several business partners, Baptista develops and implements private placement products for the insurance industry. (A-188, A-191; Baptista, pp. 6, 9, 18). After Baptista described for Peskoff some potential financial products for the insurance industry, Peskoff decided that he would introduce Baptista to Farrell by arranging a meeting between the two men. (A-148; Peskoff, pp. 280-82).

Peskoff did not attend this meeting, which took place in FIDAC's offices in New York in or around November 2001.  (A-193; Baptista, pp. 27, 29).

Prior to scheduling that meeting, Farrell had never heard of Baptista.  (A-148; Peskoff, pp. 281-82).  Peskoff concedes that no one at FIDAC ever asked for any introduction to Baptista.  (A-149; Peskoff, pp. 284-85).  Peskoff does not claim that, before this introduction was made, he had been promised that he would be paid anything for making the introduction.  (A-149, A-182; Peskoff, pp. 285, 427).

### (b)     <u>The Development And Launch Of Premier</u>

After their initial meeting, Farrell and Baptista assembled their colleagues, in or around January 2002, for a brainstorming session in FIDAC's New York offices. (A-196; Baptista, pp. 39-40; A-242; Kazel, 32; A-84, A-110; Peskoff, pp. 41, 144-45). Baptista explained how investment vehicles fit within the insurance industry, and this led to consideration of how FIDAC might create a product that could be marketed in that industry.  Peskoff attended the meeting, but made no contribution because he admittedly was completely without knowledge in that area. (A-100, A-160, A-177; Peskoff, pp. 104, 329-30, 410; A-243; Kazel, p. 33).  After the conclusion of that meeting, which took place after Peskoff had on his own initiative arranged the introduction between Baptista and Farrell, Peskoff overheard Farrell tell Baptista not to be concerned about paying Peskoff.  But, Peskoff admits, Farrell did not tell Baptista that Peskoff was entitled to compensation or that FIDAC would pay Peskoff.  (A-182; Peskoff, p. 429).  Peskoff further admits that this statement by Farrell comprises the entire universe of the evidence upon which Plaintiffs base their promissory estoppel claim.  (A-177-A-179; Peskoff, pp. 409-15).

After the initial meetings, Baptista basically handed off all the FIDAC dealings to his business partner, Jeffrey Messner, who had some expertise in this area and connections within the insurance industry. (A-189-A-190; Baptista, pp. 12-17). At about this time, Baptista and Messner formed Gen Advisors, it being their customary practice to form single purpose entities with respect to each separate venture of this type. (A-189; Baptista, p. 10).

FIDAC representatives met with Messner numerous times in FIDAC's offices leading up to the development and launch of the investment vehicle, Premier. (A-199, A-201; Baptista, pp. 50, 58-59; A-243; Kazel, pp. 35-36). With the exception of the January 2002 brainstorming session, and possibly one other early meeting, Peskoff did not attend any of these meetings. (A-85; Peskoff, p. 44).

To understand just how irrelevant Peskoff was to the development of Premier, it is important to understand the product and where it fits within the marketplace. Banks and large corporations purchase insurance for their senior executives. These policies have as an option the ability to invest some of the premium money in a tax-advantaged way. As part of their product line, the insurance companies want investment vehicles that will be attractive to these policy beneficiaries and their employers. The basic concept was to create an innovative new product for FIDAC to offer to insurance companies that would involve tax-advantaged investments in mortgage-backed securities. (A-194, A-198, A-200; Baptista, pp. 31-32, 47-49, 56-57).

There are several steps in this process. As an initial matter, the investment vehicle has to be designed to satisfy the various state insurance regulators, meet the tax and other legal requirements, and be commercially competitive with other financial

products.  Then, the product has to be marketed to the various insurance companies to persuade them to make it one of a limited number of options they offer for investment of premium funds.  Finally, it is necessary to market this investment vehicle to the banks and insurance companies, and their executives, to persuade them to choose this investment option for premium funds.  (A-198; Baptista, pp. 46-49).

From the time of the introduction to Baptista in or around November 2001, it took approximately two years of effort and expense on the part of FIDAC (and Gen Advisors) to develop and launch Premier, and the first funds were not placed in Premier until December 2003.  (A-279; Farrell, pp. 70-71; A-101, A-128; Peskoff, pp. 107-08, 201; A-72; F 00292).  During this two-year period, as Farrell explained to Peskoff during a meeting in FIDAC's offices, it cost FIDAC approximately $600,000 to develop Premier.  (A-84-A-85; Peskoff, pp. 40-43).  Much of this money was paid as the fees of attorneys and accountants who had to deal with the complex insurance, tax and other legal issues involved in creating this wholly new product.  (A-279; Farrell, p. 70; A-247; Kazel, pp. 49-52).  FIDAC executives also spent considerable time and effort marketing the product to insurance company executives to persuade them to elect Premier as one of their investment options.  (A-257; Kazel, pp. 91-92).  Finally, Gen Advisors' network of insurance agents and brokers was mobilized to market Premier to the executives at banks and large corporations who decided what insurance policies to purchase and which investment vehicles to make available as options to their employees.  (A-198; Baptista, pp. 48-49).

Premier did not launch until late-December 2003, and FIDAC did not receive management fees from Premier until January 2004.  (A-72; F00292).

### (c)    Peskoff's Role

Peskoff concedes that he did not play any role in conceptualizing, developing, financing or marketing Premier.  (A-85, A-100, A-107; Peskoff, pp. 44, 104, 131-32; A-210; Baptista, pp. 94-95; A-247-A-248; Kazel, pp. 52-53).  Nor did Peskoff attend the countless meetings that occurred over this two-year period.  (A-85; Peskoff, p. 44).  In fact, Peskoff even admits that he lacked expertise in this area.  (A-100, A-160; Peskoff, pp. 104, 329-30).

### (2)    Sentry Select

### (a)    The Introduction

Around the beginning of 2002, Peskoff met Raniero Corsini ("Corsini"), Sentry Select's Senior Vice-President of Global Structured Products, in Sentry Select's offices in Canada.  (A-148; Peskoff, pp. 282-83).  During the course of that meeting, Peskoff suggested to Corsini that he do some research into FIDAC and, if he was interested, call Farrell.  (A-276; Farrell, p. 57).

Peskoff concedes that he never discussed Sentry Select with anyone at FIDAC before that meeting in Canada.  Peskoff also concedes that no one at FIDAC ever asked him to make any introductions to anyone from Sentry Select.  Nor did anyone at FIDAC ever promise to pay him anything for such introductions.  No one at FIDAC was even aware of the existence of Sentry Select prior to the introduction.  (A-99, A-149; Peskoff, pp. 101, 284-85).

Corsini subsequently decided to call Farrell, who invited him to visit FIDAC's offices in New York, which he did.  Peskoff did not attend this meeting.  (A-276; Farrell, pp. 57-58).

### (b)    Development And Launch Of The MBS Trusts

At the time of the meeting between Corsini and Farrell, neither Sentry Select nor FIDAC had a FIDAC-managed product that could be marketed in the Canadian market, where Sentry Select operated.  Over the course of the next year, employees from FIDAC and Sentry Select worked together to design, structure, market and implement a series of unique investment products – the MBS Trusts – for the Canadian market.  (A-249, A-250; Kazel, pp. 58-59, 61-63).  Peskoff played no role in any aspect of this enterprise beyond setting in motion the initial call by Corsini to Farrell.  (A-250; Kazel, p. 62).

The MBS Trusts were an innovative concept.  The idea was to create a series of trusts whose units would be sold to the investing public in Canada, but where the investment of the funds would take place in the United States.  To accomplish this, the funds received by the trusts would be invested in a newly-formed Delaware partnership for investment in U.S. mortgage-backed securities.  FIDAC would be the investment adviser for this newly-formed Delaware partnership.  The profits from the partnership would be remitted to the trusts, for distribution to the public investors who held units in the trusts.  (A-108; Peskoff, pp. 134-35; A-249; Kazel, p. 57; A-277; Farrell, p. 61).

As with Premier, FIDAC and its business partner, Sentry Select, spent a considerable amount of time, money and effort developing the concept and product and in a joint marketing effort in Canada.  (A-276-A-279; Farrell, pp. 60-62, 68-69; A-84, A-86; Peskoff, pp. 39, 47).

The first of the MBS Trusts did not launch until mid-April 2003.  (A-71; F00291).

(c)     **Peskoff's Role**

Other than putting in motion the initial introduction, Peskoff had absolutely no involvement with the MBS Trusts.  (A-108; Peskoff, pp. 136-37; A-250; Kazel, p. 62).  He did not even attend any of the related meetings.  (A-250; Kazel, p. 62).  Peskoff even admitted during his depositions that he really did not understand the structure.  (A-107-A-108, A-160; Peskoff, pp. 133-37, 329-30).

D.     **No Pre-litigation Claims By Peskoff Of Any Entitlement To Compensation**

Although Peskoff has now conceded that he had no contract right to any share of FIDAC's management fees from Premier or the MBS Trusts (A-181; Peskoff, pp. 425-26), after the MBS Trusts began generating management fees Peskoff began asking Farrell for compensation for the introductions.  (A-127, A-129; Peskoff, pp. 199, 204).  Peskoff made these requests both during phone calls and in person when visiting Farrell at FIDAC's offices.  (A-84, A-127; Peskoff, p. 41, 199; A-278-A-279; Farrell, pp. 68-69).  Farrell repeatedly told Peskoff that he was not going to be paid anything, especially since it had cost FIDAC so much time, money and effort to create and market Sentry Select and Premier, and Premier had not yet even brought in any management fees.  (A-84, A-128, A-141, A-142, A-154, A-158; Peskoff, pp. 40-41, 200, 254-55, 259, 305-06, 322; A-279; Farrell, p. 69).

During these conversations with Farrell, Peskoff sometimes remarked, appealing to Farrell's friendship, that Peskoff had been through a bad year, financially and personally, and could use some money.  Peskoff also apparently decided to put further pressure on Farrell by enlisting the aid of Spencer Brown ("Brown").  Brown was an independent member of Annaly's Board of Directors, and was close friends with Peskoff.

In late 2003, Brown put pressure on Farrell to pay Peskoff something, given Peskoff's personal problems. (A-127, A-129; Peskoff, pp. 199, 204; A-273, A-277-A-279, A-281-A-283, A-288; Farrell, pp. 46-47, 63-69, 80-82, 84-85, 105).

These continuing entreaties by Peskoff, the pressure from Brown, and Farrell's sense of friendship led Farrell to pay Peskoff something. In mid-December 2003, Farrell had a telephone conversation with Peskoff in which Farrell told Peskoff that he would be paid a _one-time_ fee, for his involvement in introducing FIDAC to Gen Advisors (Premier) and Sentry Select (the MBS Trusts). (A-83, A-128-A-130; Peskoff, pp. 35-37, 203-04, 209-10; A-282-A-283; Farrell, pp. 84-85). That same day Farrell wrote an e-mail to Ronald D. Kazel ("Kazel"), FIDAC's Executive Vice-President at that time, with a copy sent to FIDAC's Chief Financial Officer, confirming the conversation. (A-29; Farr. Ex. 2).

Peskoff admits that this conversation with Farrell occurred in December 2003, and that he was told he would be paid a one-time fee, but insists that there was no mention of Gen Advisors or Premier. (A-83, A-129-A-130, A-142; Peskoff, pp. 35, 37, 204-05, 210, 256-57).

Peskoff concedes that during this conversation in mid-December 2003, when Farrell said that he would pay something, Peskoff never once said that he had any _right_ to be paid anything (A-83-A-84, A-130-A-132; Peskoff, pp. 37-38, 211-12, 216-17), and Peskoff does not claim that Farrell ever said anything indicating that Peskoff or Underhill had any right to be paid anything. (A-83-A-84, A-130-A-132; Peskoff, pp. 37-38, 211, 219-20).

Around the end of December 2003, Peskoff received a check from FIDAC for $30,000, which Peskoff promptly cashed without any protest. (A-130; Peskoff, p. 211; A-40; Pesk. Ex. 12).

Peskoff admits that he did not request any more money regarding the MBS Trusts until the onset of this litigation. (A-132-A-133; Peskoff, pp. 219-20). (FIDAC has pleaded a separate accord and satisfaction defense based upon this conversation and the cashing of the $30,000 check, but is not moving for summary judgment on this ground, due to the factual dispute as to whether the payment was intended to cover Premier as well as the MBS Trusts.)

About four months later, on April 12, 2004, after FIDAC had finally begun earning management fees, Peskoff wrote to Kazel now asking that he be paid something for Premier. (A-41; Pesk. Ex. 15). In this letter, Peskoff made no reference to the MBS Trusts. (A-132; Peskoff, p. 217). Peskoff did, however, ask Kazel to discuss the possibility of paying Peskoff something in connection with Premier. The April 12 letter contained no statement that Peskoff had been promised that he would be paid or that he was entitled to anything. The letter merely states that Farrell's "intention" was for Peskoff to be compensated.

Kazel showed the letter to Farrell, and then wrote back to Peskoff _reminding him that he was not entitled to anything_ and that he would be paid nothing more for either Premier or the MBS Trusts. (A-42; Pesk. Ex. 16; _see_ A-283; Farrell, pp. 87-88; A-256-A-257; Kazel, pp. 88-90; A-141; Peskoff, pp. 252-55). Peskoff _never_ disputed this statement. (A-143; Peskoff, p. 262).

19

Peskoff does not claim that he ever said to anyone at FIDAC, during the 17-month period from the time of the first introduction of Baptista, up through the time Peskoff retained counsel to send his demand letter in September 2005, that Peskoff was entitled *to any money for these introductions*.  (A-132-A-133; Peskoff, pp. 219-20).

**E.**  **The Dissolution Of Underhill Without Any Provision For Any Claim**

Further evidence of the absence of any expectation by Peskoff of payment by FIDAC for these introductions is found in Peskoff's dealings regarding the dissolution of Underhill.  In May 2004, Peskoff began having detailed discussions with his accountants and tax advisers about dissolving Underhill because its tax loss carry-forward was no longer useful.  (A-154; Peskoff, p. 307).   Peskoff spoke about this with his regular accountant, a tax expert and a lawyer.  (A-155-A-156; Peskoff, pp. 310-12; A-1; Cocke Ex. 6).

Peskoff has admitted that during these discussions he instructed these professionals to do whatever had to be done to marshal and distribute, after the payment of creditors, Underhill's assets.  (A-166-A-167, A-168-A-169; Peskoff, pp. 366-67, 374-75).  Since Peskoff had a sizeable loan receivable from Underhill, that meant that all the assets of the corporation would be transferred to Peskoff in partial satisfaction of his loan to the corporation.  (A-104, A-170-A-171; Peskoff, pp. 119, 382-83).

Peskoff admits that in none of these discussions did he mention to any of these professionals that Underhill supposedly had an asset in the form of some claim against FIDAC.  (A-156, A-168-A-169; Peskoff, pp. 313-14, 374-76).   Nor does any of the dissolution documentation prepared by the professionals, and signed by Peskoff prior to this litigation, refer to any alleged claim against Underhill, or purport to transfer to

Peskoff as a creditor any such alleged claim. (A-172; Peskoff, p. 388). Yet, Peskoff did execute documentation to distribute another asset from Underhill to himself. (A-2-A-28; Devlin Ex. 2).

Peskoff blamed his professional advisers for not doing their job correctly. (A-175; Peskoff, p. 402). But, he provided no other explanation as to why he never mentioned to any of them that Underhill had any alleged claim against FIDAC. (A-168-A-169; Peskoff, pp. 374-77).

**F.**    **Peskoff's Reaffirmation That Farrell Is A "Generous" and "Good Friend"**

Although Peskoff is now claiming that as of 2003 Farrell was supposedly wrongfully refusing to pay Peskoff millions of dollars as Peskoff's share of the management fees from Premier and the MBS Trusts, Peskoff's course of dealing thereafter is entirely inconsistent with his current claim that he was wronged by Farrell.

In late March or early April 2005, Peskoff sent a hand-written note to Farrell's home. (A-38; Pesk. Ex. 7; A-123, Peskoff, p. 182). In this note, Peskoff thanked Farrell for his generous contribution after Peskoff's mother passed away, and added that Farrell had "always been a good and generous friend." Peskoff testified that up until that time Farrell had done nothing to make Peskoff think that Farrell was not a good and generous friend. (A-123; Peskoff, pp. 182-83). In a second typewritten letter to Farrell sent shortly thereafter, Peskoff described personal problems from which he had suffered throughout the previous year, and again thanked Farrell for his generosity. (A-39; Pesk. Ex. 8). Around that same time, Peskoff and Farrell spoke over the telephone about personal matters. In neither these notes nor this conversation did Peskoff claim that he

21

either was entitled to anything or was asking for any more money. (A-95; Peskoff, pp. 82-84).

## PESKOFF'S ADMITTEDLY BASELESS BREACH OF CONTRACT CLAIM

The very first time that Farrell ever was told that Peskoff was claiming that he had some sort of right to be paid for either Premier or the MBS Trusts was Plaintiffs' counsel's September 2005 letter. (A-82, A-94-A-95, A-132-A-133, A-143; Peskoff, pp. 30-32, 80-85, 219-20, 262; A-30-A-34; Pesk. Ex. 5). The letter threatened a suit for breach of the February 2000 Letter, as well as claims for quantum meruit and promissory estoppel. (A-33; Pesk. Ex. 5, p. 4). FIDAC retained counsel to respond to this letter, and the demands were rejected.

In February 2006, Underhill and Peskoff commenced this action. (A-43-A-51; Pesk. Ex. 21). Their original Complaint contained three counts: breach of contract, quantum meruit and promissory estoppel. The breach of contract claim asserted that in the February 2000 Letter the parties agreed, and that there was a course of dealing establishing, that Underhill would be paid 10% of the management fees FIDAC earned over the years from managing the MBS Trusts and Premier products. (A-44; Pesk. Ex. 21, ¶ 10). FIDAC answered the Complaint, asserting a variety of defenses, and discovery began. That discovery included the deposition of Peskoff, where he was forced to concede that his contract claim and his claim of a course of dealing establishing his entitlement to 10% of FIDAC's fees were both without any factual foundation whatsoever. (A-98-A-101, A-134, A-159, A-160-A-161; Peskoff, pp. 96-106, 225-26, 325, 330-33).

## THE AMENDED COMPLAINT

In December 2006, the Plaintiffs filed their Amended Complaint. (A-52-A-70; Pesk. Ex. 30). The Amended Complaint dropped the breach of contract claim, but continued to assert the quantum meruit and promissory estoppel counts.

## __SUMMARY JUDGMENT STANDARD__

The standard for entry of summary judgment is well known to this Court and was recently set forth in *Hitchens v. Washington Group, Int'l, Inc.*, __ F.Supp.2d __, No. 05-379, 2007 WL 935602, at *4 (D. Del. Mar. 29, 2007).  For the reasons that follow, that standard has been met here.

## ARGUMENT

**I.    THE CLAIMS IN THE AMENDED COMPLAINT ARE BARRED BY NEW YORK'S STATUTE OF FRAUDS**

New York's Statute of Frauds provides, in pertinent part, that no agreement for compensation for services rendered in "procuring an introduction to a party to [a] transaction" is enforceable unless in writing and that this requirement cannot be circumvented by asserting a quantum meruit or "implied in fact" contract claim for reasonable compensation:

> a.    Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . .
>
> 10.    Is a contract to pay **compensation for services rendered in . . . negotiating** the purchase, sale, exchange, renting or leasing of **any . . . business opportunity . . . . "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . .**

N.Y. Gen. Oblig. Law § 5-701(a)(10) (emphasis added).

Here, of course, there is no claim that there was any oral agreement to pay a finder's fee. Therefore, the Statute of Frauds bars Peskoff's claim as an *a fortiori* matter.

Before discussing the Statute of Frauds in detail, we first deal with the conflicts of law issue. Having chosen to sue in Delaware, which has no corresponding statutory provision, Peskoff may argue that Delaware law applies. In the following section we demonstrate that New York law applies to all of Peskoff's claims.

25

## A.    New York Law Applies

As a diversity action, Delaware choice of law principles apply here. *Feinberg v. Saunders, Karp & Megrue, L.P.*, 1998 U.S. Dist. LEXIS 19144, at *21 (D. Del. Nov. 13, 1998).  As this case involves quantum meruit and promissory estoppel claims, Delaware law requires the Court to apply the law of the state with the most significant relationship to the claims. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del. 1991); *see Feinberg*, 1998 U.S. Dist. LEXIS 19144, at *21-22 (most significant relationship test applies to claims for unjust enrichment and promissory estoppel); Restatement (Second) of Conflict of Laws § 188(2), cmt. e (describing how to perform a contacts analysis).  The weight of each contact depends on its relative importance to the issue.  Restatement (Second) Conflict of Laws § 188(2).  The Restatement (Second) Conflict of Laws, which Delaware has adopted, creates a general presumption that the state where services are to be rendered is the state whose law should be applied when the issue involves a claim arising from the rendition of services.  Restatement (Second) of Conflict of Laws § 196.

Delaware has no contacts with this dispute and no interest in its resolution.  There is no choice of Delaware law agreement governing this controversy.  No events occurred in Delaware.  Nor was any performance intended to take place in Delaware.  The only Delaware contact is that FIDAC is incorporated here.

New York, unlike Delaware, has substantial contacts with this dispute.  FIDAC's offices are in New York.  The meetings and introductions giving rise to the claims all occurred in New York.  Moreover, Peskoff's dealings with Farrell all took place in New York.  *See* Restatement (Second) Conflict of Law § 188(2) (listing contacts to consider).

Not only is New York the only state with meaningful contacts, but it has a substantial interest in the outcome of this action.  The Southern District of New York has explained that New York has a particularly strong interest in finder's fee claims.  The policy embodied in its Statute of Frauds is particularly compelling given New York's "traditional role as an international clearinghouse and market place."  *Sugerman v. MCY Music World, Inc.*, 158 F.Supp.2d 316, 322-23 (S.D.N.Y. 2001) (internal citation omitted).

In *Sugerman*, the court relied on this public policy concern to find that New York had the greatest interest in the litigation even though:  (a) the plaintiff resided in California; (b) the defendant's president approached the plaintiff in California; (c) the defendant's president was seeking an introduction to a California resident; and (d) initial meetings took place in California.  The court recognized California's interest in the action, but held that New York's policy interest was more significant:

> [T]his general policy . . .  must yield to New York's unique concern for the problems associated with oral finder's-fee arrangements.  New York's status as an international clearing house and market place would be severely eroded were the more general interests . . . held to govern the relationships at issue here.

*Id.* at 323, n. 5 (ellipses in original) (internal citation omitted).

The Delaware Court of Chancery has also confronted this issue.  *Landis v. Science Management Corp.*, No. 7483, 1991 Del. Ch. LEXIS 19, at *8-10 (Del. Ch. Feb. 14, 1991).  In *Landis*, plaintiffs were seeking a finder's fee for introductions that led to the sale of a New York corporation where the corporation's principal place of business, and sole shareholder, were located in New York.  Despite those contacts, plaintiffs argued that New Jersey law should apply because the buyer's principal place of business

was located, and an important meeting occurred, in New Jersey. The Delaware court held New York law applicable, explaining that not only did New York have stronger contacts with the transaction, but New York has a strong interest in applying its Statute of Frauds to finder's fee claims in order to "enhance its attractiveness as a business center". *Id*. at *9.

**B.    The Statute Of Frauds Bars Plaintiffs' Claims**

The New York Statute of Frauds is broadly applied and covers transactions, such as those present here, where the alleged finder claims to have introduced two people who ultimately do business together. *See, e.g., Freedman v. Chemical Const. Corp.*, 372 N.E.2d 12, 16, 401 N.Y.S.2d 176, 181 (1977) (explaining that interpreting the Statute of Frauds narrowly would "defeat the purpose of the legislation" and "ignore the many situations which in common parlance are described as 'business opportunities.'"); *see, e.g., Ostrove v. Michaels*, 289 A.D.2d 211, 213, 734 N.Y.S.2d 199, 200 (N.Y. App. Div. 2001) (Statute of Frauds barred plaintiff's claim for commission when the efforts of plaintiff, an insurance broker, were limited to telling defendant, an insurance salesman, about an opportunity to do business with a hospital); *Meyer v. Shearson Lehman Brothers, Inc.*, 211 A.D.2d 541, 542, 621 N.Y.S.2d 346, 348 (N.Y. App. Div. 1995) (applying the Statute of Frauds when plaintiff sought a finder's fee for introducing pension fund business to Shearson Lehman Brothers); *Int'l Trading & Sales, Inc. v. Phillip Brothers, Inc.*, 99 A.D.2d 983, 983-84, 468 N.Y.S.2d 123, 124-25 (N.Y. App. Div. 1984) (Statute of Frauds applies to oral agreement for commission earned by introducing two principals for the purpose of doing business together).

As previously mentioned, by its terms the Statute itself provides that it bars claims in quantum meruit, or contracts implied-in-fact. *See Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 410 (S.D.N.Y. 1998), *aff'd*, 172 F.3d 37 (2d Cir. 1999); *Sugerman v. MCY Music World, Inc.,* 158 F.Supp.2d 316, 326 (S.D.N.Y. 2001); *Minichiello v. Royal Business Funds Corp.*, 223 N.E.2d 793, 18 N.Y.2d 521 (1966).

In *Minichiello*, the New York Court of Appeals explained that, absent a writing, "to allow recovery for the reasonable value of [finders'] services is to substantially defeat the writing requirement." 223 N.E.2d at 796, 18 N.Y.2d at 527 (although plaintiff, pursuant to defendants' request, performed services that improved defendants' business position, plaintiff's quantum meruit claim was barred).

Similarly, a party cannot overcome the Statute of Frauds by pleading promissory estoppel unless the plaintiff can prove "unconscionable injury." *See Philo Smith & Co. v. USLife Corp.*, 554 F.2d 34, 36 (2d Cir. 1977). The Second Circuit has explained this policy:

> The strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result. For this reason, the doctrine of promissory estoppel is properly reserved for that limited class of cases where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied.

*Philo Smith & Co. v. USLife Corp.*, 554 F.2d 34, 36 (2d Cir. 1977) (quoting 3 Williston on Contracts § 533A, at 801 (3d ed. 1960)).

It is well-established that neither a lost finder's fee nor a claim for an uncertain prospective benefit constitutes an "unconscionable injury." *Id*. at 36 (explaining that a lost finder's fee and failure to seek an uncertain prospective benefit are "not the kind of

[substantial] injury contemplated by New York law"); *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 410-11 (S.D.N.Y. 1998), *aff'd*, 172 F.3d 37 (2d Cir. 1999); *Feinberg*, 1998 U.S. Dist. LEXIS 19144, at *57-58 (dismissing promissory estoppel claim because plaintiff's injuries were limited to injuries suffered as a result of the nonperformance of a consulting agreement and thus did not qualify as unconscionable).

Here, Plaintiffs' promissory estoppel claim is based on a lost finder's fee. (*See* A-59-A-60; Pesk. Ex. 30, ¶¶ 57-65) Therefore, plaintiffs cannot establish an "unconscionable" injury and their promissory estoppel claim is barred by the Statute of Frauds.

## II. THE CLAIMS IN THE AMENDED COMPLAINT FAIL TO STATE A CLAIM

Even if the Statute of Frauds was not a bar, and it is, the Plaintiffs cannot state a claim based upon the undisputed facts.

To establish a claim for quantum meruit under New York law, a plaintiff must prove: (1) it provided services to the defendant in good faith; (2) the defendant accepted those services; (3) the plaintiff expected compensation; and (4) the reasonable value of the services. *In re Alu*, 302 A.D.2d 520, 520, 755 N.Y.S.2d 289, 290 (N.Y. App. Div. 2003); *Freedman v. Pearlman*, 271 A.D.2d 301, 304, 706 N.Y.S.2d 405, 405 (N.Y. App. Div. 2000).

It is well-established that a plaintiff cannot expect compensation for services conferred gratuitously upon another. *Reisner v. Recco Temporary Servs., Inc.*, 136 A.D.2d 686, 687, 524 N.Y.S.2d 102, 103 (N.Y. App. Div. 1988); *see In re Alu*, 302 A.D.2d 520, 520, 755 N.Y.S.2d 289, 289-90 (N.Y. App. Div. 2003) (denying plaintiff's claim because plaintiff had failed to present evidence that she expected payment when

she performed the services at issue, and reasoning that compensation would not be expected given the parties' relationship).   Proving a reasonable expectation of compensation requires more than a showing that the defendant benefited from plaintiff's services; instead, a plaintiff must establish that it rendered services at the behest of the defendant.  *Prestige Caterers v. Kaufman*, 290 A.D.2d 295, 295, 736 N.Y.S.2d 335, 335 (N.Y. App. Div. 2002).

The elements of a promissory estoppel claim under New York law are: (1) the defendant made a clear and unambiguous promise; (2) the plaintiff reasonably and foreseeably relied on that promise; and (3) the plaintiff sustained injuries in reliance on that promise.  *Feinberg*, 1998 U.S. Dist. LEXIS 19144, at *57; *see Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F.Supp.2d 62, 73-74 (E.D.N.Y. 2006) (no promissory estoppel absent a clear, unambiguous promise); *Committee to Save St. Brigid v. Egan*, 30 A.D.3d 356, 357, 819 N.Y.S.2d 7, 8 (N.Y. App. Div. 2006) (promise must be specific).

Thus, an essential element – lacking in both of the Plaintiffs' claims here – is proof that FIDAC  made a request or a promise inducing Peskoff's action *before* he made the introductions that serve as the basis for his claims.  Peskoff cannot do this on the undisputed facts.  Peskoff has conceded that, *prior* to introducing FIDAC to Baptista and telling Corsini to call Farrell: (a) no one had told Peskoff that FIDAC would pay Plaintiffs for introducing FIDAC to business partners or business opportunities; (b) no one at FIDAC asked him to make any such introductions; and (c) Peskoff acted entirely on his own initiative.

Given that Peskoff has conceded that he was never promised that he would be paid for these introductions, and he acted entirely on his own initiative in arranging them, he cannot possibly state a claim for quantum meruit or promissory estoppel.[2]

---

[2] Even if Delaware law applied, the outcome would be the same. Under Delaware law, an essential element of both quantum meruit and promissory estoppel claims is a reasonable expectation of compensation at the time the services are rendered. *See Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (promissory estoppel claim requires proof of defendant's reasonable expectation to induce plaintiff's action or forbearance); *Olsen v. T.A. Tyre Gen. Contr., Inc.*, No. 523, 2005, 2006 Del. LEXIS 474, at *8 (Del. 2006) (quantum meruit claim requires proof that plaintiff performed services with an expectation of compensation as well as proof that defendant had notice of that expectation). As shown above, there were no such expectations here.

## CONCLUSION

For all the foregoing reasons, FIDAC respectfully requests that this Honorable Court grant FIDAC's motion for summary judgment, dismissing all of plaintiffs' claims.

DATED: May 29, 2007                    **EDWARDS ANGELL PALMER & DODGE LLP**

_/s/ John L. Reed_
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 N. Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770
302.777.7263 (fax)
jreed@eapdlaw.com
jcicero@eapdlaw.com

- and -

Gerald A. Novack (_pro hac vice_)
Sarah P. Kenney (_pro hac vice_)
**KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
212.536.3918 (Phone)
212.536.3901 (Fax)

_Attorneys for Defendant_
_Fixed Income Discount Advisory Company_

<u>**CERTIFICATE OF SERVICE**</u>

I, John L. Reed, hereby certify that on May 29, 2007 the attached **DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was hand delivered to the following persons and electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

> Joseph Grey, Esq.
> Stevens & Lee, P.C.
> 1105 North Market Street, Seventh Floor
> Wilmington, DE 19801

DATED: May 29, 2007          **EDWARDS ANGELL PALMER & DODGE LLP**

>   */s/ John L. Reed*
> John L. Reed (I.D. No. 3023)
> Joseph B. Cicero (I.D. No. 4388)
> 919 N. Market Street, 15th Floor
> Wilmington, DE 19801
> 302.777.7770
> 302.777.7263
> jreed@eapdlaw.com
> jcicero@eapdlaw.com