

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT
CORPORATION, *by and through*
*Stephen D. Peskoff as successor in*
*interest*, and STEPHEN D. PESKOFF,
*individually*,

              Plaintiffs

   v.

FIXED INCOME DISCOUNT
ADVISORY COMPANY,

             Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 06-0099-SLR

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

**This document is not to be opened or its**
**contents displayed, copied, or revealed except**
**by Court Order or by agreement of the parties**
**to this action.**

## OPENING BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

STEVENS & LEE, P.C.
Joseph Grey (DE Bar No. 2358)
G. Thompson Bell, III, *pro hac vice*
Todd J. Cook, *pro hac vice*
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
TEL: (302) 654-5180
FAX: (302) 654-5181
EMAIL: jg@stevenslee.com
       gtb@stevenslee.com
       tjc@stevenslee.com

OF COUNSEL:
RUBEN & ARONSON, LLP
Robert L. Ruben, *pro hac vice*
Marshall F. Berman, *pro hac vice*
4800 Montgomery Lane, Suite 150
Bethesda, MD 20814
TEL: (301) 951-9696
FAX: (301) 951-9636
EMAIL: rruben@randalaw.com
mberman@randalaw.com

*Attorneys for Plaintiffs Underhill Investment Corp.*
*and Stephen D. Peskoff*

Table of Contents

Page

I. INTRODUCTION................................................................................................1

II. STATEMENT OF NATURE AND STATE OF PROCEEDINGS..........................2

III. SUMMARY OF ARGUMENT.............................................................................2

IV. UNDISPUTED FACTUAL BACKGROUND........................................................4

V. QUESTION PRESENTED.................................................................................10

VI. ARGUMENT....................................................................................................10

    A. Legal Standard for Motion for Summary Judgment.....................................10

    B. Delaware Law Governs Plaintiffs' Claims.................................................11

    C. Plaintiffs Are Entitled to Summary Judgment as to Liability on Their Claim for Quantum Meruit...............................................................................................18

    D. Plaintiffs Are Entitled to Summary Judgment as to Liability on Their Claim for Promissory Estoppel.....................................................................................24

VII. CONCLUSION................................................................................................26

# TABLE OF AUTHORITIES

CASES

*Athletes and Artists, Inc. v. Millen,*
    1999 WL 587883, No. 96-Civ.-9996 (S.D.N.Y. Aug. 4, 1999) ..................................... 17

*Bellanca Corp. v. Bellanca,*
    169 A.2d 620 (Del. 1961) ................................................................................ 19, 21, 22

*Cheeseman v. Grover,*
    490 A.2d 175 (Del. Super. 1984) ......................................................................... 22

*Chrysler Corp. v. Chaplake Holdings, Ltd.,*
    822 A.2d 1024 (Del. 2003) ........................................................................ 17, 24, 25

*Clifford R. Gray, Inc. v. Le Chase Constr. Servs., LLC,*
    819 N.Y.S.2d 182 (N.Y. App. Div. 2006) ............................................................... 17

*Construction Systems Group, Inc. v. The Council of Sea Colony,*
    1995 WL 622421, No. 449, 1994 (Del. Sept. 28, 1995) ........................................... 19

*Davis & Mamber v. Adrienne Vittadini, Inc.,*
    622 N.Y.S.2d 706 (N.Y. App. Div. 1995) ............................................................... 18

*Daystar Sills, Inc. v. Anchor Investments, Inc.,*
    2007 WL 1098129, No. 04L-03-001 (Del. Super. Apr. 12, 2007) .............................. 19

*Feinberg v. Saunders, Karp & Megrue, L.P.,*
    1998 U.S. Dist. LEXIS 19144, No. 97-207-SLR (D. Del. Nov. 13, 1998) ..................... 12

*Finnish Fur Sales Co., Ltd. v. Juliette Shulof Furs, Inc.,*
    770 F.Supp. 139 (S.D.N.Y. 1991) ........................................................................ 15

*Flammia v. Mite Corp.,*
    401 F.Supp. 1121 (E.D.N.Y. 1975) ...................................................................... 17

*In re Fleming Cos., Inc.,*
    347 B.R. 163 (Bankr. D. Del. 2006) ..................................................................... 12

*Gruppo, Levy & Co. v. ICOM Info. & Communs., Inc.,*
    2004 U.S. Dist. LEXIS 27320, No. 01-Civ.-8922 (S.D.N.Y. Jun. 28, 2004) .................. 18

*Haft v. Dart Group Corp.,*
    841 F.Supp. 549 (D. Del. 1993) ..................................................................... 12, 14

*Hammersmith v. TIG Ins. Co.,*
    480 F.3d 220 (3d Cir. 2007) .......................................................................... 15, 16

Table of Contents
(continued)

Page

*Horowitz v. Fed. Kemper Life Assurance Co.,*
    57 F.3d 300 (3d Cir. 1995) ............................................................................................ 11

*Huber v. Taylor,*
    469 F.3d 67 (3d Cir. 2006) ....................................................................................... 15, 16

*Intercontinental Planning, Ltd. v. Daystrom, Inc.,*
    24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969) ..................................... 14, 15

*J-Squared Technologies, Inc. v. Motorola, Inc.,*
    364 F. Supp. 2d 449 (D. Del. 2005) ................................................................................ 12

*Klaxon Co. v. Stentor Mfg. Co.,*
    313 U.S. 487 (1941) ...................................................................................................... 11

*Lord v. Souder,*
    748 A.2d 393 (Del. 2000) ......................................................................................... 24, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...................................................................................................... 10

*Morris Cohon & Co. v. Russell,*
    245 N.E.2d 712 (N.Y. 1969) .......................................................................................... 17

*Muller Boat Works, Inc. v. Unnamed 52' House Barge,*
    464 F. Supp. 2d 127 (E.D.N.Y. 2006) ........................................................................... 16

*Nakhleh v. Chem. Construction Corp.,*
    359 F.Supp. 357 (S.D.N.Y. 1973) ............................................................................. 14, 15

*On Air Entm't Corp. v. Nat'l Indem. Co.,*
    210 F.3d 146 (3d Cir. 2000) ......................................................................................... 15

*Pa. Coal Ass'n v. Babbitt,*
    63 F.3d 231 (3d Cir. 1995) ........................................................................................... 11

*Rimmax Wheels LLC v. RC Components, Inc.,*
    477 F.Supp.2d 670 (D. Del. 2007) ................................................................................. 16

*State ex rel. Structa-bond, Inc. v. Mumford & Miller Concrete, Inc.,*
    2002 WL 31101938, No. 98C-10-327-JEB (Del. Super. Sept. 17, 2002) ............. 16, 19, 23

*Stoltz Realty Co. v. Paul,*
    1995 WL 654152, No. 94C-02-208 (Del. Super. Sept. 20, 1995) .................................. 19

iii

Table of Contents
(continued)

Page

*Stone & Webster, Inc. v. Shaw Group, Inc.,*
    354 B.R. 686 (D. Del. 2006) ........................................................................... 12

*Suburban Trust & Savs. Bank v. Univ. of Delaware,*
    910 F.Supp. 1009 (D. Del. 1995) .............................................................. 11, 12, 13

*Ware v. Ball Plastic Container Corp.,*
    432 F.Supp.2d 434 (D. Del.,2006) .............................................................. 10, 11

*Weiss v. Northwest Broad, Inc.,*
    140 F.Supp.2d 336 (D. Del. 2001) ................................................................... 12

*Williams v. Stone,*
    109 F.3d 890 (3d Cir.1997) ............................................................................ 16


**STATUTES, RULES & REGULATIONS**

6 Del. C. § 2714 ........................................................................................... 17

FED. R. CIV. P. 56 ......................................................................................... 10

N.Y. Gen. Oblig. Law 5-701(a)(10) ....................................................... 14, 15, 17, 18


**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 ......................... 12, 13, 14, 15, 18

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 ................... 12, 13, 14, 15, 16, 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT              :
CORPORATION, *by and through Stephen*   :
*D. Peskoff as successor in interest,* and   :
STEPHEN D. PESKOFF, *individually,*   :
                                  :     Civil Action No. 06-0099-SLR
            Plaintiffs            :
                                  :
                                  :
        v.                        :
                                  :
FIXED INCOME DISCOUNT             :
ADVISORY COMPANY,                 :
                                  :
            Defendant.            :

## OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Underhill Investment Corporation and Stephen D. Peskoff (collectively, "Peskoff" or "Plaintiffs") file this memorandum of law in support of Plaintiffs' motion for partial summary judgment as to liability on Counts I (quantum meruit) and II (promissory estoppel) of Plaintiffs' Amended Complaint. On the undisputed facts, Plaintiffs are entitled to judgment on the issue of liability as to Counts I and II as a matter of law.

## I. INTRODUCTION

This is a case for recovery of the value of Peskoff's consulting services rendered to FIDAC under quasi-contract theories of quantum meruit and promissory estoppel.[1] It is undisputed that Peskoff delivered extraordinary value to FIDAC in two separate transactions. However, Peskoff has only been paid a small fraction of the market value of his services for one transaction, and absolutely nothing for the second transaction.

---

[1] The only reason Plaintiffs are not suing under express contract is that the writing signed by the parties, which was drafted by FIDAC's president without the assistance of counsel, lacked a sufficiently definitive price term.

SL1 724928v1/100409.00001

Peskoff introduced FIDAC to Sentry Select and Gen Advisors.

# REDACTED

Despite

acknowledging that Peskoff made the introductions, despite a course of dealings between FIDAC

and Peskoff whereunder Peskoff was paid for similar introductions (20% of FIDAC's resultant

revenues), despite the industry custom and FIDAC's own practice of paying finders such as

Peskoff, and despite the fact that FIDAC authored, signed and sent a letter to Peskoff by which

FIDAC and Peskoff agreed FIDAC would pay Peskoff for his services, FIDAC has refused to

pay Peskoff the reasonable value of his services for making these extremely valuable

introductions.

## II.  STATEMENT OF NATURE AND STATE OF PROCEEDINGS

Plaintiffs have asserted three claims based on the breakdown of Peskoff's and

FIDAC's consulting relationship:  quantum meruit (Count I), promissory Estoppel (Count II) and

declaratory judgment (Count III).  [See Docket No. 31 (Amended Complaint)].  FIDAC has

answered the Amended Complaint and the pleadings are closed.  [Docket No. 36].  Fact

discovery closed on December 31, 2006.  [Docket No. 11 ¶ 2(b)].  Expert discovery was

completed in March 2007.  In accordance with the stipulated summary judgment briefing

schedule [Docket No. 43 (stipulation approved by Court on May 2, 2007)], Plaintiffs now move

for summary judgment on the issue of liability on Counts I and II.

## III.  SUMMARY OF ARGUMENT

Plaintiffs' quasi-contract, quantum meruit and promissory estoppel claims arise from

Peskoff's consulting services performed in reliance on a written consulting agreement drafted by

FIDAC's president, Michael Farrell, and executed on or about February 15, 2000.  In the

SL1 724928v1/100409.00001

2

Consulting Agreement, the parties agreed that their consulting relationship would be governed by the substantive law of the state of Delaware.  [*See* Consulting Agreement ¶ 8].  Under Delaware's choice of law rules and in the absence of any actual conflict of laws, the Court must apply Delaware law as the parties selected.  Applying Delaware law to the undisputed facts, Peskoff is entitled to judgment as a matter of law on the issue of liability for Peskoff's quasi-contract claims in Counts I and II.

A quantum meruit claim requires that the plaintiff performed services with an expectation that the defendant would pay for them, and that the services were performed under circumstances which should have put the defendant on notice that the performing party expected to be paid by the defendant.  Peskoff made extremely valuable client introductions to FIDAC with the expectation that he would be paid for his services, as is customary in the industry and the parties' past course of dealings.  FIDAC clearly was on notice that Peskoff expected to be paid for his services.  Accordingly, FIDAC is liable to pay Peskoff the fair value of his services under the theory of quantum meruit.

A promissory estoppel claim requires that (i) the defendant made a promise (ii) with the reasonable expectation that its promise will induce action or forbearance, (iii) the plaintiff detrimentally relied on the promise, and (iv) injustice can be avoided only by enforcement of the promise.  FIDAC made numerous promises to pay Peskoff.  As was expected, Peskoff reasonably relied to his detriment on FIDAC's promises.  Under the circumstances, injustice can be avoided only if this Court enforces FIDAC's promises.  The undisputed facts establish that Peskoff is entitled to judgment as a matter of law as to the issue of liability on his promissory estoppel claim.

3

## IV.  UNDISPUTED FACTUAL BACKGROUND

The material facts establishing FIDAC's liability for Counts I and II are straight forward and undisputed.

FIDAC is a money manager.  [*See* Exhibit "1" at 69:12-13 (excerpts of the Deposition of Michael A.J. Farrell, December 15, 2007) (explaining FIDAC's business and testifying "We manage accounts.  We manage direct capital.  That's what we do.") (hereinafter Exhibit "1" will be cited as "Farrell Dep.")].[2]  Peskoff is, among other things, an independent consultant operating in the financial services and investment banking industries.  Underhill was a corporation wholly-owned by Peskoff through which Peskoff provided his consulting services.  Prior to the transactions giving rise to the instant claims, Peskoff had a personal and business relationship with Mike Farrell ("Farrell"), who is, and since founding the company in 1994 has been, the President, Chief Executive Officer and Chairman of the board of directors of FIDAC.  [Farrell Dep. at 5, 8, 11-12].  Peskoff and Farrell first met and worked together in the 1990s when Peskoff, working as a consultant for Friedman, Billings, Ramsey & Company ("FBR"), helped Farrell raise capital for and eventually take public Farrell's other company, Annaly Capital Management, Inc. (f/k/a Annaly Mortgage Management, Inc.).  [*See* Farrell Dep. at 6-8].

FBR had a real estate investment trust (the "FBR REIT") that prior to 2000 was managed by another money manager, Blackrock, Inc.  [*See* Exhibit "2" at 73-74 (excerpts of the Deposition of Stephen D. Peskoff, October 10, 2006 and December 12, 2006) (hereinafter Exhibit "2" will be cited as "Peskoff Dep.")].

# REDACTED

---

[2] Unless otherwise noted, all references to exhibits are to the Index of Exhibits to Plaintiffs' Motion for Partial Summary Judgment filed concurrently herewith.

4

FIDAC took over the management of the FBR REIT in or about May 2000. [Peskoff Dep. at 73-75; Farrell Dep. at 22:7-17].

Farrell recognized that FIDAC had an obligation to pay Peskoff for the services rendered in connection with the FBR transaction. Therefore, on or about February 15, 2000, Farrell drafted and sent to Peskoff at Underhill's office in McLean, Virginia, a letter agreement to govern the consulting relationship between Peskoff and FIDAC going forward. [*See* Exhibit "3" (hereinafter cited as the "Consulting Agreement"); *see also* Peskoff Dep. 75:18-76:3]. In the Consulting Agreement, FIDAC promised that "FIDAC shall pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC to Underhill monthly." [Consulting Agreement ¶ 2]. Pursuant to the Consulting Agreement, FIDAC paid Underhill twenty percent (20%) of the management fees received by FIDAC from its business relationship with the FBR REIT. [*See* Exhibit "4"; Farrell Dep. at 16:14-17:4].

Although executed by the parties during the FBR transaction, the Consulting Agreement is forward looking and contemplates its application to future accounts. [Consulting Agreement at 1 ("Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the 'Accounts')."); *see also* Farrell Dep. at 16:20-22 (testifying that Farrell "gave [Peskoff] something in writing to cover payments that might be made from time to time, but – as a consultant")]. In fact, the Consulting Agreement does not even make reference to the FBR transaction [*see generally id.*], but instead refers to "accounts."[3]

---

[3] FIDAC only ever had one account with FBR, the FBR REIT.

SL1 724928v1/100409.00001

FIDAC and Peskoff agreed that the Consulting Agreement would be terminable during the life of the accounts only with the written consent of both parties. [*Id.* ¶ 3]. FIDAC has never provided notice of termination and Peskoff has never consented, orally or in writing, to the termination of the Consulting Agreement. [Farrell Dep. at 32; Peskoff Dep. at 95].

With the Consulting Agreement in hand, and in light of the past course of dealings wherein Peskoff was paid twenty percent of FIDAC's management fees for the FBR REIT account, Peskoff introduced FIDAC to Ernie Baptista, who is a principal of Gen Advisors. [*See* Exhibit "5"; Exhibit "6" at 37 (excerpts of deposition of Ernest P. Baptista, December 12, 2006 (hereinafter Exhibit "6" will be cited to as "Baptista Dep."); Exhibit "7" at 32-33 (excerpts of deposition of Ronald D. Kazel, December 14, 2006 (hereinafter Exhibit "7" will be cited to as "Kazel Dep."); Peskoff Dep. at 94]. Baptista and his partners in Gen Advisors had special knowledge regarding insurance-based investment vehicles. [*See* Farrell Dep. at 43-44]. Peskoff thought that Baptista and his company would make good business partners for FIDAC. [*See* Baptista Dep. at 37:8-21].

Peskoff first introduced and arranged for a meeting between Baptista and Farrell. [*See* Farrell Dep. at 40; Baptista Dep. at 37]. After the initial meeting, Peskoff arranged for and attended a second meeting with Baptista, his partner Jeff Messner, Farrell and Kazel, which took place in January or February of 2002. [*See* Kazel Dep. at 32; Baptista Dep. at 52, 94 (testifying that Peskoff "ran the first full meeting with everyone, getting everyone on board")]. The purpose of the meeting was for Baptista and his partner to explain the insurance industry to FIDAC to explain "how investment vehicles fit within the insurance industry and to determine whether it was an opportunity for FIDAC to manage a product that fit inside the insurance industry." [*See* Kazel Dep. at 32-33]. At the close of this meeting, Baptista asked Farrell how Peskoff would be

6

compensated for putting FIDAC and Gen Advisors together. Farrell responded that Peskoff was FIDAC's responsibility and Gen Advisors should not pay Peskoff. [*See* Peskoff Dep. at 145; Farrell Dep. at 55-56].

After several subsequent discussions, FIDAC and Gen Advisors, on October 10, 2002, signed an agreement to work together on an insurance-based investment product. [*See* Exhibit "8" (Gen Advisors-FIDAC agreement dated October 10, 2002)]. Again, prior to signing the agreement Baptista asked Farrell about Peskoff's compensation for the deal. Again, Farrell said Peskoff was FIDAC's responsibility and Gen Advisors should not pay Peskoff. [*See* Baptista Dep. at 79]. Farrell wanted to make certain that Peskoff did not "double-dip" with both FIDAC and Gen Advisors paying him for putting the parties together for the transaction. [*See id.*; Farrell Dep. at 56].

The insurance-based fund FIDAC and Gen Advisors planned to launch was a ground-breaking and unique investment product. [*See* Farrell Dep. at 69:21-24; Baptista Dep. at 56; Kazel Dep. at 52]. Therefore, it took several more months after signing the FIDAC-Gen Advisors agreement before the product went to market. [*See* Kazel Dep. at 38-39]. During the course of those months, Peskoff received frequent calls from Farrell about the Gen Advisors deal wherein Farrell would voice his frustrations with the deal. For example, Peskoff was called in to help resolve interpersonal issues between FIDAC and Gen Advisors. [*See* Baptista Dep. at 94-95 (testifying that Peskoff "acted as . . . Mike Farrell's representative when there was a problem that Mike Farrell didn't want to call [Baptista]. For about a year, when Mike got pissed off, pardon the language, about the cost or the time and this wasn't happening [fast] enough, so on and so forth, [Baptista] got a call from Steve [Peskoff], and that's usually every two weeks or at least once a month for a year.")]. Farrell also frequently shared his frustrations with Peskoff regarding

7

the start-up costs associated with launching the insurance-based investment product. In response, Peskoff offered to reimburse Farrell for half of the start-up costs FIDAC had incurred in connection with the Gen Advisors transaction. [Peskoff Dep. at 196; Baptista Dep. at 176:7-9].

Ultimately, FIDAC and Gen Advisors successfully created the Premier fund, which FIDAC has managed since December 2003.

# REDACTED

[*Id*]. Despite acknowledging that Peskoff made the vital introduction and promising to pay him for the same, FIDAC has refused to pay Peskoff a single dime for his crucial role in bringing Gen Advisors and Premier to FIDAC. [*See* Farrell Dep. at 56]. Unfortunately, FIDAC's failure to pay Peskoff the fair value of his services was not limited to the Gen Advisors transaction.

In mid-2002, several months after the Gen Advisors introduction, Peskoff introduced FIDAC to Raniero Corsini of Sentry Select Capital Corp ("Sentry Select"). [*See* Kazel Dep. at 58; Farrell Dep. at 57; *see also http://www.sentryselect.com/index.cfm?bioid=7&pagepath=About_us/Executive_team&id=237* (Sentry Select web-biography for Raniero Corsini) (last viewed May 26, 2007)]. Sentry Select is a Canadian wealth management company that designs and markets investment vehicles for the Canadian market.

Peskoff met Corsini while traveling in Canada. After discussing Sentry Select's business with Corsini, Peskoff thought that Sentry Select would make a good business partner

SLI 724928v1/100409.00001

for FIDAC and would afford FIDAC an entry point into the Canadian money management market. Accordingly, Peskoff put Corsini in contact with Farrell. *[See Farrell Dep. at 57; see also Kazel Dep. at 58* (testifying that Peskoff spoke to Kazel about Sentry Select before Kazel met with Corsini)]. By September 2002, Sentry Select and FIDAC had executed an agreement to work together. *[See Exhibit "10"]*.

# REDACTED

Ultimately, the Corsini introduction resulted in FIDAC serving as the manager of four investment vehicles -- (i) MBS Trust, (ii) Adjustable Rate Income Fund I, (iii) Adjustable Rate Income Fund II, and (iv) Sentry Select FIDAC Mortgage Income Fund (SSF) (collectively, "MBS Trusts" and respectively, MBS Trusts I-IV) -- that Sentry Select created and markets in Canada. *[See Kazel Dep. at 59]*. As Peskoff had envisioned, the MBS Trusts represented FIDAC's first entry into the Canadian money management market. *[See Farrell Dep. at 63]*.

# REDACTED

Nevertheless, FIDAC has paid Peskoff only a single payment of $30,000 for a single year of managing MBS Trust I and nothing at all for MBS Trusts II-IV. By way of contrast, FIDAC paid Peskoff twenty percent of the fees it earned from the FBR transaction, but has paid Peskoff less than one-half of one percent of the management fees FIDAC has earned from the Sentry Select transaction. *[See Exhibit "9"]*.

9

## V. QUESTION PRESENTED

A. WHETHER PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR CLAIM FOR QUANTUM MERUIT WHERE THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFFS INTRODUCED NEW BUSINESS OPPORTUNITIES TO FIDAC WITH AN EXPECTATION OF BEING PAID FOR THE INTRODUCTIONS AND RELATED CONSULTING SERVICES AND UNDER CIRCUMSTANCES WHICH PUT DEFENDANT ON NOTICE THAT PLAINTIFFS EXPECTED TO BE PAID FOR THE SERVICES?

SUGGESTED ANSWER: Yes.

B. WHETHER PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR CLAIM FOR PROMISSORY ESTOPPEL WHERE THE UNDISPUTED FACTS DEMONSTRATE THAT FIDAC NOT ONLY PROMISED TO PAY PLAINTIFFS BUT ALSO DISSUADED ANOTHER PARTY FROM PAYING PLAINTIFFS FOR INTRODUCING FIDAC TO GEN ADVISORS WITH THE REASONABLE EXPECTATION THAT PLAINTIFFS WOULD RELY ON THE PROMISE AND PLAINTIFFS IN FACT REASONABLY RELIED ON THE PROMISE TO THEIR DETRIMENT?

SUGGESTED ANSWER: Yes.

## VI. ARGUMENT

### A. *Legal Standard for Motion for Summary Judgment*

The legal standard governing summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure is well-established. A court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). It is the moving party's burden to demonstrate that no genuine issue as to any material fact is present. *Ware v. Ball Plastic Container Corp.*, 432 F.Supp.2d 434, 437 (D. Del. 2006) (Robinson, C.J.) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986)).

10

A fact is "material" if it could alter the outcome of the case. A factual dispute is "genuine" if "evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ware*, 432 F.Supp.2d at 437 (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party meets its burden, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Ware*, 432 F.Supp.2d at 437 (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting FED. R. CIV. P. 56(e))). In making this assessment, the Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Ware*, 432 F.Supp.2d at 437 (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)).

Applying this standard, it is evident there are no genuine issues of material fact necessitating a trial on the issue of FIDAC's liability to Peskoff under Counts I and II.

## B. *Delaware Law Governs Plaintiffs' Claims*

The first issue a court sitting in diversity must determine is what law governs the rights and liabilities of the parties before it.[4] *Suburban Trust & Savs. Bank v. Univ. of Delaware*, 910 F.Supp. 1009, 1013 (D. Del. 1995). Here, under applicable choice of law principles, Delaware law, the law chosen by the parties, governs Peskoff's claims against FIDAC.

A federal district court sitting in diversity must apply the forum state's choice of law rules to determine what state's law governs the case. *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S.

---

[4] FIDAC has informed Plaintiffs that it believes New York law governs this case. A choice of law analysis is not necessary because there is no actual conflict between Delaware and New York law as applied to this case. Nevertheless, because FIDAC has contended that New York law applies, Peskoff will address the argument. Consistent with applicable choice of law rules, the Court should apply Delaware law because the parties specifically agreed their relationship should be governed by Delaware law.

11

487, 496 (1941); *Stone & Webster, Inc. v. Shaw Group, Inc.*, 354 B.R. 686, 691 (D. Del.

2006) (Robinson, C.J.). Thus, Delaware's choice of law rules apply in this action.

      Delaware has adopted Restatement (Second) of Conflict of Laws[5] §§ 187 and 188 to

determine the governing law in cases sounding in contract, including cases involving quasi-

contract, quantum meruit and promissory estoppel claims. *See Weiss v. Northwest Broad, Inc.*,

140 F.Supp.2d 336, 342 (D. Del. 2001) (finding that Delaware has adopted Restatement §§ 187

and 188, and analyzing the parties' breach of contract and promissory estoppel claims under the

law agreed-upon by the parties); *Feinberg v. Saunders, Karp & Megrue, L.P.*, 1998 U.S. Dist.

LEXIS 19144 *22, No. 97-207-SLR (D. Del. Nov. 13, 1998) (stating that, in the absence of an

agreed-upon choice of law by the parties, Delaware has adopted the "most significant

relationship test" under Restatement § 188 to govern choice of law questions involving breach of

contract, unjust enrichment and promissory estoppel claims); *Suburban Trust & Savs. Bank v.

Univ. of Delaware*, 910 F.Supp. 1009, 1013 (D. Del. 1995) (stating that Delaware generally

applies the parties' choice of law and citing Restatement § 187); *Haft v. Dart Group Corp.*, 841

F.Supp. 549, 563 (D. Del. 1993) (applying law chosen by parties and citing Restatement § 187);

*see also In re Fleming Cos., Inc.*, 347 B.R. 163, 168-69 (Bankr. D. Del. 2006) (agreeing with

defendant that a quantum meruit claim is considered a contract claim for choice of law purposes

and applying Restatement § 188 to determine which state's law governs).

      A fundamental policy embodied in Restatement §§ 187 and 188 is the protection of

the justified expectations of the parties. *See J-Squared Technologies, Inc. v. Motorola, Inc.*, 364

F. Supp. 2d 449, 452 n.7 (D. Del. 2005) (finding that promissory estoppel claim must be

governed by law chosen by the parties in a related contract to "protect the expectations of the

---

[5] Unless otherwise noted, all references to the "Restatement" are to the Restatement (Second) of Conflict of Laws.

parties . . . and to ensure uniform adjudication of plaintiffs' claims"); *see also* RESTATEMENT § 188 cmt. b (stating that "the protection of the justified expectations of the parties is of considerable importance in contracts" (as opposed to in tort actions) and therefore courts should apply the law chosen by the parties subject to the qualifications in Restatement § 187). Accordingly, subject to Restatement § 187, Delaware courts generally apply the law selected by the parties. *Suburban Trust*, 910 F.Supp. at 1013.

Restatement § 187 provides that the law chosen by the parties will govern their rights and duties unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

RESTATEMENT § 187(2).

Turning to the facts of this case, Peskoff's quantum meruit and promissory estoppel claims arise from Peskoff's consulting services performed in reliance on a written consulting agreement wherein the parties agreed their rights and liabilities would be governed by Delaware law. *See* Consulting Agreement ¶ 8. Moreover, neither of the exceptions in § 187(2)(a)-(b) applies here.

Delaware shares a material connection to this transaction because FIDAC is incorporated under Delaware law. It is well-settled that a state has a "substantial relationship to the parties or the transaction" if one of the parties is incorporated under the laws of the chosen state. *See Suburban Trust*, 910 F.Supp. at 1013 (finding that substantial relationship requirement

is "clearly" satisfied because the defendant was incorporated in Delaware); *Haft*, 841 F.Supp. at 563 (same). As noted, the substantial relationship requirement is clearly satisfied here because FIDAC, the party who drafted the agreement selecting Delaware law, is incorporated under Delaware law. [See Docket No. 36 (Answer to Amended Complaint ¶ 3 (admitting that FIDAC is a resident of the District of Delaware))].

Furthermore, application of Delaware law is not contrary to a fundamental policy of a state which has a materially greater interest than Delaware and which, under the rule of Restatement § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties. Therefore, the exception set forth in Restatement § 187(2)(b) does not apply to trump the parties' agreed-upon choice of Delaware law.

With respect to this issue, it is anticipated that FIDAC will argue that (i) New York law would have applied under Restatement § 188 had the parties not agreed their relationship would be governed by Delaware law and (ii) New York's statute of frauds, specifically N.Y. Gen. Oblig. Law 5-701(a)(10), constitutes a fundamental policy sufficient to trump the parties' agreed-upon choice of Delaware law. If made, both of these arguments would lack merit.

Taking the second issue first, New York courts have determined that § 5-701(a)(10) is not a fundamental policy sufficient to trump an agreed-upon choice of law provision. *See Nakhleh v. Chem. Construction Corp.*, 359 F.Supp. 357, 360 (S.D.N.Y. 1973). In *Nakhleh*, the Court had to determine what law governed an oral business broker/finder's fee agreement that included an oral choice of law agreement favoring the law of Saudi Arabia. Assuming the parties had agreed to apply the law of Saudi Arabia, the court considered whether § 5-701(a)(10) is a fundamental policy of New York sufficient to negate the parties' choice of law under Restatement § 187(2)(b). *See id.* at 360. Citing *Intercontinental Planning, Ltd. v.*

14

*Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), the court noted New York has a "strong interest" in enforcing § 5-701(a)(10). *Id.* Nevertheless, the court concluded this interest is not "so fundamental that a New York court would not apply the parties' choice of law to the question of the validity of an oral finders' contract." *Id.; see also Finnish Fur Sales Co., Ltd. v. Juliette Shulof Furs, Inc.*, 770 F.Supp. 139, (S.D.N.Y. 1991) (citing *Nakhleh* with approval and finding that § 5-701(a)(2) does not trump parties' choice of law). In support of its conclusion, the *Nakhleh* court quoted the comments to Restatement § 187 that specifically address this situation:

> To be "fundamental," a policy must in any event be a substantial one. Except perhaps in the case of contracts relating to Wills, a policy of this sort will rarely be found in a requirement, such as the statute of frauds, that relates to formalities.

RESTATEMENT § 187 cmt. g.

Even if § 5-701(a)(10) had not already been determine not to be a fundamental policy, New York's interest in its statute of frauds does not trigger the exception in Restatement § 187(2)(b) because New York law would not apply under Restatement § 188 had the parties not specifically chosen Delaware law.

Before undertaking a choice of law analysis under Restatement § 188, the Court must determine if there is an actual conflict between the laws of Delaware and New York. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007); *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) ("Before a choice of law question arises, there must first be a true conflict between the potentially applicable bodies of law") (citing *On Air Entm't Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000)). The Third Circuit has held that "[u]nder general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law

15

question." *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997); *see also Hammersmith*, 480 F.3d at 230 (redefining conflicts terminology and finding that the first step is determining whether there is an "actual conflict" as opposed to "no conflict" at all, the latter of which was previously referred to as a "false conflict"). If the same result will occur under either law, the court need not engage in a conflicts of law analysis. *See, e.g., Rimmax Wheels LLC v. RC Components, Inc.*, 477 F.Supp.2d 670, 674 nn.12 & 13 (D. Del. 2007) (Robinson, C.J.) (stating that the court need not address the choice of law question where there is no material difference between the two states' laws and then proceeding to apply Delaware law to dispose of defendants' statute of frauds argument); *see also Huber*, 469 F.3d at 74 (stating that, if a true conflict does not exist, the court can refer interchangeably to the law of either state).

Here, either Delaware or New York law would yield the same result. Therefore, had the parties not already agreed that Delaware law governed their relationship, the Court would not analyze Restatement § 188.

The substantive elements of quantum meruit and promissory estoppel claims are essentially the same under Delaware and New York law. *E.g., compare State ex rel. Structa-bond, Inc. v. Mumford & Miller Concrete, Inc.*, 2002 WL 31101938, *3, No. 98C-10-327-JEB (Del. Super. Sept. 17, 2002) (under Delaware law, a quantum meruit "plaintiff must show that it performed services with an expectation that the defendant would pay for them, and that the services were performed under circumstances which should have put the defendant on notice that the performing party expected to be paid by the defendant"), *with Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 141 (E.D.N.Y. 2006) (under New York law, a quantum meruit "plaintiff must establish (1) the performance of services in good faith; (2) the acceptance of those services by the person to whom they are rendered; (3) an expectation of

16

compensation therefor[e]; and (4) the reasonable value of the services."; and *compare Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (under Delaware law, a promissory estoppel plaintiff must show "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise"), *with Clifford R. Gray, Inc. v. Le Chase Constr. Servs., LLC*, 819 N.Y.S.2d 182, 186 (N.Y. App. Div. 2006) (under New York law, the "party relying upon promissory estoppel must demonstrate that there was a clear and unambiguous promise upon which it reasonably and detrimentally relied").

The only noteworthy difference between Delaware and New York law is that New York has a statute of frauds that applies to quantum meruit and promissory estoppel claims based on finder's fee agreements, *see* N.Y. GEN. OBLIG. LAW 5-701(a)(10), and Delaware does not require finder's fee agreements to be in writing. *See, e.g.*, 6 Del. C. § 2714. However, this is a distinction without a difference because Peskoff and FIDAC have a written agreement (and several other writings) that satisfies New York's statute of frauds. [*See, e.g.*, Consulting Agreement; Exhibit "5"]. Therefore, § 5-701(a)(10) would not bar Peskoff's claim and applying either Delaware or New York law would yield the same outcome.

Section 5-701(a)(10) bars quasi-contract claims only "where there is a complete absence of any memorandum." *Flammia v. Mite Corp.*, 401 F.Supp. 1121, 1130 (E.D.N.Y. 1975) (citing *Morris Cohon & Co. v. Russell*, 245 N.E.2d 712 (N.Y. 1969)); *Athletes and Artists, Inc. v. Millen*, 1999 WL 587883, *7, No. 96-Civ.-9996 (S.D.N.Y. Aug. 4, 1999) (same). The statute of frauds is satisfied with respect to a quasi-contract claim so long as there is any "writing that evidences that the plaintiff was engaged by the defendant to assist in a transaction that was

17

later consummated." *Gruppo, Levy & Co. v. ICOM Info. & Communs., Inc.*, 2004 U.S. Dist.

LEXIS 27320, *36, No. 01-Civ.-8922 (S.D.N.Y. Jun. 28, 2004); *see also Davis & Mamber v.*

*Adrienne Vittadini, Inc.*, 622 N.Y.S.2d 706, 707 (N.Y. App. Div. 1995) (stating that "a sufficient

memorandum need only evidence the fact of plaintiff's employment by defendant to render the

alleged services").

      In the case *sub judice*, there is a series of writings, each signed by FIDAC, that

individually and/or collectively satisfy New York's statute of frauds. *[See* Consulting

Agreement; Exhibit "5" (Letter dated April 12, 2004 from Ron Kazel to Stephen Peskoff

acknowledging Peskoff's role in MBS Trusts transactions and Premier transaction and FIDAC's

intent to compensate Peskoff for same); Exhibit "10" (Correspondence dated September 25,

2002 from Ron Kazel to Stephen Peskoff **REDACTED**

**REDACTED** Thus, § 5-701(a)(10) is irrelevant to the outcome of Peskoff's claims and

does not present an actual conflict.

      Because New York law would not apply under Restatement § 188, in the absence of

the parties' agreed-upon choice of Delaware law, Restatement § 187(2)(b) does not apply. Since

neither of subsection (2)'s exceptions apply, the Court must honor the parties' choice of law and

apply Delaware law to Peskoff's quantum meruit and promissory estoppel claims.

### C. *Plaintiffs Are Entitled to Summary Judgment as to Liability on Their Claim for Quantum Meruit*

      Peskoff is entitled to summary judgment on the issue of liability on his quantum

meruit claim in Count I of the Amended Complaint. In Delaware, "[t]o prevail on a *quantum*

*meruit* claim, a plaintiff must show that it performed services with an expectation that the

defendant would pay for them, and that the services were performed under circumstances which

should have put the defendant on notice that the performing party expected to be paid by the

18

defendant." *State ex rel. Structa-bond, Inc. v. Mumford & Miller Concrete, Inc.*, 2002 WL

31101938, *3 & n.9, No. 98C-10-327-JEB (Del. Super. Sept. 17, 2002) (citing *Construction*

*Systems Group, Inc. v. The Council of Sea Colony*, 1995 WL 622421, No. 449, 1994 (Del. Sept.

28, 1995); *Bellanca Corp. v. Bellanca*, 169 A.2d 620, 623 (Del. 1961)); *see Daystar Sills, Inc. v.*

*Anchor Investments, Inc.*, 2007 WL 1098129, *5, No. 04L-03-001 (Del. Super. Apr. 12,

2007) (citing the same elements). "*Quantum meruit*" is a quasi-contract claim and it "means

literally 'as much as he deserves.'" *Stoltz Realty Co. v. Paul*, 1995 WL 654152, *10, No. 94C-

02-208 (Del. Super. Sept. 20, 1995). Under a quantum meruit cause of action, where the parties'

express agreement is rendered unenforceable, "the plaintiff may recover the reasonable value of

the services it provided to the defendant." *Stoltz Realty*, 1995 WL 654152, *10 (citations

omitted).

It is undisputed that Peskoff and FIDAC entered into the Consulting Agreement

under which Peskoff would provide consulting services to FIDAC and, for those services, would

be paid an undefined percentage of the management fees FIDAC earned from the relevant

accounts. [*See* Consulting Agreement]. At the time the Consulting Agreement was executed,

the only consulting services Peskoff had performed was to bring FIDAC together with FBR so

FIDAC could manage the FBR REIT. For his role in the FBR transaction, FIDAC paid Peskoff

twenty percent of FIDAC's management fees during the life of the account. [*See* Exhibit "4";

Farrell Dep. at 16:14-17:4].

The Consulting Agreement by its terms was not limited to the FBR REIT

transaction. In fact, the Consulting Agreement did not reference the FBR REIT transaction

whatsoever. Rather, the Consulting Agreement was forward looking and indicated that Peskoff

would be paid an unidentified percentage fee from all "accounts." [*See* Consulting Agreement

¶¶ 1, 3]. Thus, Peskoff had a reasonable expectation that he would be paid, like he was for the FBR transaction, for each of the accounts he brought to FIDAC.

It is undisputed that Peskoff was a necessary catalyst for the Sentry Select and Gen Advisors transactions. Peskoff has relationships with Ernie Baptista of Gen Advisors and Raniero Corsini of Sentry Select. Before Peskoff's introductions, FIDAC did not have relationships with either Sentry Select or Gen Advisors. After executing the Consulting Agreement, Peskoff recognized the potential for FIDAC to engage in lucrative business ventures with Gen Advisors and Sentry Select. Therefore, Peskoff brought FIDAC together with both Baptista and Corsini. With respect to the Gen Advisors transaction, Peskoff also personally flew to New York to participate in at least one joint meeting with FIDAC and Gen Advisors and took innumerable telephone calls from both Baptista and Farrell as the parties hashed out the terms of the deal. [*See* Kazel Dep. at 32; Baptista Dep. at 52, 94-95].

As a result of these introductions, FIDAC became the manager of five new accounts (MBS Trusts I-IV with Sentry Select and Premier with Gen Advisors), all of which FIDAC still manages today.

# REDACTED

It is undisputed that, without Peskoff, the Gen Advisors and Sentry Select transactions never would have occurred. [*See* Exhibit "5"].

20

The only remaining question is whether, under the circumstances, FIDAC was on notice that Peskoff expected to be paid for his services in bringing FIDAC together with Gen Advisors and Sentry Select. Clearly, FIDAC was. [*See, e.g.*, Farrell Dep. at 72:13-73:5 (testifying that Farrell understood Peskoff tried to add value to deals to convince FIDAC that Peskoff should be paid for his contributions)].

In analyzing this question, *Bellanca Corp. v. Bellanca*, 169 A.2d 620 (Del. 1961), is instructive. In *Bellanca Corp.*, the Delaware Supreme Court reviewed a jury award under a theory of quantum meruit. The plaintiff located and introduced a purchaser for one of Bellanca Corp.'s plants. It was clear that the plaintiff had rendered the services and had done so with the expectation of being paid. Therefore, the question was whether the circumstances were sufficient to put Ballanca Corp. on notice that the plaintiff expected to be paid for acting as a finder. *See id.* at 623. The court held that "[i]f . . . the officials of Bellanca knew, or should have known, of the procuring of the purchaser by [the plaintiff], the law will imply a promise on their part, and through them Bellanca, to compensate [the plaintiff] for his services." *Id.* The court reviewed the evidence submitted to the jury and determined that at least four of Bellanca Corp.'s directors and officers had knowledge of the plaintiff's involvement in procuring the purchaser. *Id.* at 625. The court held: "the knowledge that [the plaintiff] had [procured the purchaser] was sufficient to give notice to the four officials of Bellanca that [the plaintiff] expected to be compensated for his efforts." *Id.* As further support for the jury verdict, the Court noted that the plaintiff was present at a meeting at which confidential details of Bellanca Corp.'s financial condition were discussed. *Id.* On these facts, the court determined that the evidence supported the jury's determination as to liability under the theory of quantum meruit.[6]

---

[6] The court proceeded to also affirm the award of damages.

The facts in the instant case are more compelling than in *Bellanca*. FIDAC admits that Peskoff put FIDAC together with Gen Advisors and Sentry Select. [*See* Exhibit "5"]. Unlike in *Bellanca*, there is a writing drafted by FIDAC specifically stating that it will pay Peskoff for his consulting services. [*See* Consulting Agreement]. Although the Consulting Agreement is unenforceable by an action for breach of contract (due to Farrell's failure to include a sufficiently specific price term), it demonstrates that Peskoff did not act gratuitously. *Accord Cheeseman v. Grover*, 490 A.2d 175, 177 (Del. Super. 1984). Indeed, Peskoff performed almost identical services in connection with the Sentry Select and Gen Advisors transactions as he performed in the FBR transaction for which FIDAC paid Peskoff twenty percent of its fees for the life of the account. FIDAC knew it had never terminated the Consulting Agreement at the time Peskoff made the Gen Advisors and Sentry Select introductions.

# REDACTED

Peskoff also fielded numerous telephone calls from both parties regarding the Gen Advisors transaction and personally attended at least one meeting between FIDAC and Gen Advisors. [*Id.*]. In fact, Peskoff even offered to reimburse FIDAC $300,000, representing half of FIDAC's alleged start-up costs for the Gen Advisors transaction. [Peskoff Dep. at 196; Baptista Dep. at 176:7-9].

The course of dealings between Peskoff and FIDAC also clearly put FIDAC on notice that Peskoff expected to be paid for the Sentry Select and Gen Advisors introductions.

SL1 724928v1/100409.00001

Peskoff previously brought FIDAC together with FBR so FIDAC could manage the FBR REIT. For the FBR transaction, FIDAC paid Peskoff twenty percent of its management fees for the life of the account pursuant to the Consulting Agreement.

# REDACTED

Finally, after the Gen Advisors and Sentry Select transactions were both consummated, FIDAC acknowledged the role Peskoff played in both deals and promised to pay Peskoff. *[See Exhibit "5"].* Under the circumstances, FIDAC clearly was on notice that Peskoff made the Sentry Select and Gen Advisors introductions with the expectation of being paid for his services. *See State ex rel. Structa-bond,* 2002 WL 31101938, *3 & n.9.

In summary, the facts clearly demonstrate that FIDAC knew Peskoff intended to be paid for his services:

- FIDAC drafted the Consulting Agreement specifically providing that FIDAC will pay Peskoff for his services *[see Consulting Agreement];*

- FIDAC in fact paid Peskoff for identical services under the Consulting Agreement *[see, e.g.,* Exhibit "4"];

- As is the custom in the money management industry, FIDAC pays others for introductions leading to new accounts under management *[see Exhibit "11";* Kazel Dep. at 34];

# REDACTED

- FIDAC specifically told Baptista that it would pay, and therefore Gen Advisors should not pay, Peskoff for putting FIDAC and Gen Advisors together [*see* Baptista Dep. at 79; Farrell Dep. at 56].

The undisputed facts of record establish as a matter of law that Peskoff has satisfied each of the elements to prove FIDAC's liability under the quasi-contract theory of quantum meruit. Accordingly, the Court should grant Peskoff's motion and enter judgment on the issue of liability as to Count I and set a trial date to determine the appropriate measure of Peskoff's damages.

### D. *Plaintiffs Are Entitled to Summary Judgment as to Liability on Their Claim for Promissory Estoppel*

The Court should enforce FIDAC's multiple promises to pay Peskoff for the Gen Advisors introduction under the quasi-contractual theory of promissory estoppel. The undisputed facts establish each of the elements for liability under the theory of promissory estoppel as a matter of law. Therefore, the Court should grant Peskoff's motion for partial summary judgment on Count II.

To establish a promissory estoppel claim, the "plaintiff must demonstrate . . . that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (*quoting Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)). "The purpose of the promissory estoppel doctrine is to prevent injustice." *Lord*, 748 A.2d at 398.

FIDAC promised to pay Peskoff for his services concerning Gen Advisors multiple times. First, FIDAC promised in the Consulting Agreement that it would pay Peskoff for his consulting services. FIDAC's reasonable expectation in making this promise was to induce

Peskoff to act – *i.e.*, to provide the consulting services. In fact, the promise of payment in the Consulting Agreement did just that. As a result of FIDAC's promise, Peskoff dedicated his time and energies marketing FIDAC's services and capabilities to Ernie Baptista and persuading Baptista to pursue a business venture with FIDAC. Peskoff then introduced FIDAC to Baptista, attended meetings and took telephone calls trying to help create and maintain a new business relationship between Gen Advisors and FIDAC.

After the Baptista introduction, FIDAC made a second promise of payment. During a meeting involving Baptista, Mike Farrell and Peskoff (and possibly others), Baptista asked Farrell how Peskoff would be compensated for his role in putting the parties together. Farrell responded that Peskoff was FIDAC's responsibility and that Gen Advisors should not compensate Peskoff for bringing the parties together. [*See* Peskoff Dep. at 145; Farrell Dep. at 55-56]. This promise reasonably prompted further action and reliance by Peskoff. Specifically, Peskoff continued to make himself available to both FIDAC and Gen Advisors to help maintain the relationship and ease problems that arose prior to consummation of the transaction. [*See* Baptista Dep. at 94-95]. Furthermore, Peskoff refrained from seeking any compensation from Gen Advisors, a party who (by the very nature of its inquires to Farrell) clearly believed Peskoff was entitled to compensation.

In light of Peskoff's reasonable reliance on FIDAC's promises of payment for the Gen Advisors transaction, and Farrell's insistence that Gen Advisors not pay Peskoff in order to avoid "double dipping" [*see* Farrell Dep. at 56; Baptista Dep. at 79], injustice can be avoided only by enforcement of FIDAC's promises. *Chrysler Corp.*, 822 A.2d at 1032; *Lord*, 748 A.2d at 398. Accordingly, the Court should grant Peskoff's motion for partial summary judgment on the issues of liability as to Count II.

SL1 724928v1/100409.00001

## VII. CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for partial summary judgment and issue an order entering summary judgment on the issue of liability on Counts I and II in favor of Plaintiffs and against Defendant, and awarding such other relief as the Court deems appropriate.

26

Dated: May 29, 2007

STEVENS & LEE, P.C.

By: /s/
    Joseph Grey (DE Bar No. 2358)
    G. Thompson Bell, III, *pro hac vice*
    Pa. Attorney I.D. No. 32649
    Todd J. Cook, *pro hac vice*
    Pa. Attorney I.D. No. 89041
    1105 North Market Street
    Seventh Floor
    Wilmington, DE 19801
    TEL: (302) 654-5180
    FAX: (302) 654-5181
    EMAIL: jg@stevenslee.com
            gtb@stevenslee.com
            tjc@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP

    Robert L. Ruben, *pro hac vice*
    D.C. Attorney I.D. No. 414580
    Marshall F. Berman, *pro hac vice*
    D.C. Attorney I.D. No. 020743
    4800 Montgomery Lane, Suite 150
    Bethesda, MD 20814
    TEL: (301) 951-9696
    FAX: (301) 951-9636
    EMAIL: rruben@randalaw.com
    mberman@randalaw.com

*Attorneys for Plaintiffs Underhill Investment Corp.*
*and Stephen D. Peskoff*

27

SLI 724928v1/100409.00001

## CERTIFICATE OF SERVICE

I, Joseph Grey, hereby certify that on this 5th day of June, 2007, I caused a true and

correct copy of the foregoing PLAINTIFFS' REDACTED OPENING BRIEF IN SUPPORT OF

MOTION FOR PARTIAL SUMMARY JUDGMENT to be served by the means indicated below

addressed to Defendant's counsel as follows:

> John L. Reed, Esquire
> Denise Seastone Kraft, Esquire
> EDWARD'S ANGELL PALMER & DODGE LLP
> 919 North Market Street, 15th Floor
> Wilmington, DE 19801
> BY HAND DELIVERY

_/s/ Joseph Grey_ _____
Joseph Grey