## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **UNDERHILL INVESTMENT CORPORATION**, *by and through Stephen D. Peskoff as successor in interest* and **STEPHEN D. PESKOFF**, *individually*, <br><br> Plaintiffs, <br><br> v. <br><br> **FIXED INCOME DISCOUNT ADVISORY COMPANY**, <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

C.A. No. 06-99-SLR

**REDACTED PUBLIC VERSION**

## APPENDIX TO DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S MOTION FOR SUMMARY JUDGMENT
### (Pages A-1 through A-288)

**EDWARDS ANGELL PALMER & DODGE LLP**
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770 (Phone)
302.777.7263 (Fax)

**OF COUNSEL:**
Gerald A. Novack (*pro hac vice*)
Sarah P. Kenney (*pro hac vice*)
**KIRKPATRICK & LOCKHART
    PRESTON GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
212.536.3900 (Phone)
212.536.3901 (Fax)

DATED:        June 5, 2007

## INDEX OF DEFENDANT'S EXHIBITS AND TRANSCRIPTS

|  | DEPOSITION EXIBITS | PAGE NUMBERS |
|---|---|---|
| 1 | Cocke Ex. 6<br><br>Memo from Stephen D. Peskoff to Charles Cocke and John Devlin, dated August 10, 2004. | A-1 |
| 2 | Devlin Ex. 2<br><br>Letter from Stephen D. Peskoff to FBR Investment Management, Inc., dated January 3, 2005, requesting transfer of investment from Underhill Investment Corporation to Stephen D. Peskoff, individually | A-2-A-28 |
| 3 | Farrell Ex. 2<br><br>E-mail from Michael Farrell to Ronald D. Kazel, dated December 16, 2003. | A-29 |
| 4 | Peskoff Ex. 5<br><br>Letter from Robert L. Ruben to Michael Farrell, dated September 9, 2005. | A-30-A-34 |
| 5 | Peskoff Ex. 6<br><br>Letter from Michael Farrell to Stephen D. Peskoff, dated February 15, 2000. | A-35-A-37 |
| 6 | Peskoff Ex. 7<br><br>Hand-written note from Stephen D. Peskoff to Michael Farrell, undated. | A-38 |
| 7 | Peskoff Ex. 8<br><br>Letter from Stephen D. Peskoff to Michael Farrell, dated April 7, 2005. | A-39 |
| 8 | Peskoff Ex. 12<br><br>Check payable to Underhill Investments issued by FIDAC in the amount of $30,000.00, dated December 22, 2003. | A-40 |

| 9 | Peskoff Ex. 15 <br><br> Letter from Stephen D. Peskoff to Ronald D. Kazel, dated April 12, 2004. | A-41 |
|---|---|---|
| 10 | Peskoff Ex. 16 <br><br> Letter from Ronald D. Kazel to Stephen D. Peskoff, dated April 20, 2004. | A-42 |
| 11 | Peskoff Ex. 21 <br><br> Complaint | A-43-A-51 |
| 12 | Peskoff Ex. 30 <br><br> Amended Complaint | A-52-A-70 |
| | **DOCUMENT PRODUCTION** | |
| 13 | F 00291 <br><br> FIDAC Overview of Advisory Fees April '03 – November '03 | A-71 |
| 14 | F 00292 <br><br> FIDAC Overview of Advisory Fees December '03 – July '04 | A-72 |
| | **DEPONENTS** | |
| 15 | Steven D. Peskoff – 10/10/06, 10/11/06, 12/12/06 | A-73-A-185 |
| 16 | Ernest P. Baptista – 12/12/06 | A-186-A-234 |
| 17 | Ronald D. Kazel – 12/14/06 | A-235-A-261 |
| 18 | Michael Farrell – 12/15/06 | A-262-A-288 |

08/08/2006 16:54 FAX  7033912580        COCKE,SZPANKA&TAYLOR                    ☑006/012
Aug 10 04 11:55a    UNDERHILL    INVESTMEN  7032874235              P.2

1660 International Drive, Suite 400
703-287-4234 – phone
703-287-4235 – fax

**Underhill Investment Corporation**

# Memo

**To:**   Charles Cocke
        John Devlin

**From:**  Steve Peskoff

**Date:**  August 10, 2004

**Re:**   Liquidation of Underhill Investment Corporation

It is the beginning of August and I would like to begin the process of transferring assets from PB Partners to me and get the ball rolling on the liquidation of UIC. I have not had a response from Paul O'Reilly but contacted Patrick Vaughan to work with Charles to handle the legal side. My suggestion is that we arrange a conference call the week of August 16th so we can follow the outline in Charles' memo and assign responsibilities. My goal is to have the liquidation completed by early October. In the next day or so, contact my office and let us know your availability for that week.

1



CST 00007

**A-1**



January 3, 2005

Kristin Knoll
FBR Investment Management, Inc.
1001 Nineteenth Street, North
Arlington, VA 22209

To Whom It May Concern:

Please be aware of this official notification to request the transfer of ownership of my investment in FBR TVP II from my company (where I am the sole shareholder), Underhill Investment Corporation, to myself. The company is currently being liquidated. If you have any questions regarding this request, do not hesitate to contact me at 703-287-4234 (day) or 703-356-7445 (evening).

Sincerely,

Stephen D. Peskoff

A-2

U  00048

# FBR Technology Venture Partners II

### SUBSCRIPTION MATERIALS

U 00049

# FBR Technology Venture Partners II

## SUBSCRIPTION INSTRUCTIONS

The enclosed materials are being made available to prospective investors in FBR Technology Venture Partners II (the *"Fund"*) to enable prospective investors to subscribe for limited partnership interests in one of the two partnerships that comprise the Fund (each, *a "Partnership"; collectively, the "Partnerships"*): (1) FBR Technology Venture Partners II, L.P., a Delaware limited partnership (the *"AI Partnership"*); or (2) FBR Technology Venture Partners II (QP), L.P., a Delaware limited partnership (the *" QP Partnership"*). The minimum commitment for individuals is $2,000,000 and for institutions is $5,000,000 unless otherwise agreed by the General Partner.

Prospective investors will elect to subscribe for limited partnership interests in one of the Partnerships. Investors that are "qualified purchasers," within the meaning of sections 2(a)(51) and 3(c)(7) of the Investment Company Act of 1940, as amended and the regulations promulgated there under, should subscribe for limited partnership interests in the QP Partnership, and investors that are not "qualified purchasers" should subscribe for limited partnership interests in the AI Partnership. Prospective investors in each Partnership will be required to certify that they are "accredited investors" within the meaning of Rule 501 (a) of Regulation D promulgated under the Securities Act of 1933, as amended. The Partnerships will be operated and will invest in tandem in Portfolio Companies in proportion to their respective capital commitments.

The enclosed Subscriber's Certificate will ask you to certify a number of statements that will provide the General Partner with information to assist it in determining whether you are an "accredited investor" or a "qualified purchaser." Please answer every question. *Annex A to this Subscription Instructions sets forth some general guidelines to assist individual investors in determining whether they meet the qualification standards for admission to the Fund, and, if eligible, to assist them in determining whether to subscribe for limited partnership interests in the AI Partnership or the QP Partnership.*

### General Instructions

These subscription materials include (i) a Subscription Agreement with two signature pages, (ii) a Subscriber's Certificate, and (iii) a power of attorney for each of the Partnerships appointing FBR TVP Management Company, LLC, Inc., the general partner of the Partnerships (the *"General Partner"*) as attorney-in-fact for the subscriber to execute on behalf of the subscriber, among other things, the limited partnership agreement of the Partnership for which subscriber is subscribing. Subscribers must complete and execute all of the above-mentioned documents for the named limited partner making the investment.

### Subscription Agreement

The materials include two copies of the signature page. For the limited partner in whose name the investment is made, the person completing the materials must make the election in the Subscription Agreement indicating which of the Partnerships is being subscribed for, and enter on each of the two enclosed copies of the signature page to the Subscription Agreement:

(a)    the date on which you have signed the agreement,
(b)    the amount of the subscriber's Commitment,
(c)    your signature (or, in the case of an authorized representative signing on behalf of an entity, your signature and your title as an authorized representative),
(d)    your printed name,
(e)    your mailing address,
(f)    your daytime telephone number,
(g)    your daytime facsimile number (if any), and
(h)    your e-mail address (if any).

-ii.

U 00050

<u>Subscriber's Certificate</u>

Complete the certificate by checking or initialing, as appropriate, all applicable statements and signing and dating the certificate as indicated on the signature page.

<u>Power of Attorney</u>

There are powers of attorney enclosed for each of the Partnerships. Please complete, date and execute the power of attorney for the Partnership for which you are subscribing as indicated on the signature page thereof.

### Tender of Subscription Documents

All subscription documents (including all applicable signature pages) must be returned to the following address:

> Friedman, Billings, Ramsey & Co, Inc.
> 1001 19th Street North Arlington,
> Virginia 22209 Attn: Neal Wilson

The General Partner *reserves* the right to accept or reject, in its sole discretion, all or any portion of any subscription tendered to it. The General Partner will endeavor to inform

subscribers promptly whether and to what extent their subscriptions have been accepted. If a subscription is rejected in its entirety, all subscription documents will be returned to the subscriber. If a subscription is accepted, the subscriber will receive an executed original of the accepted Subscription Agreement, a copy of the executed limited partnership agreement for which the subscription is made, and copies of any other closing documents promptly after this subscription closing.

### Contact Persons

A prospective subscriber who has any questions regarding the terms and provisions of this offering or regarding the subscription procedure should direct questions to Mr. Neal Wilson in writing at FBR Investment Management, Inc., c/o Friedman, Billings, Ramsey & Co., Inc., 1001 19th Street North, Arlington, Virginia 22209 or by telephone at (703) 312-9700.

-iii-

U  00051

**A-5**

*Annex A to Subscription Instructions*

**General Guidelines for Individual Subscribers**

The following guidelines are intended to assist individuals in determining whether they meet the qualification standards for admission to the Fund, and in addition, if eligible, to assist them in determining whether to subscribe for limited partnership interests in FBR Technology Venture Partners II, L.P. (the *"AI Partnership"*) or FBR Technology Venture Partners II (QP), L.P. (the *"QP Partnership"*).

*FUND ELIGIBILITY*

*First,* each investor in the Fund (regardless of which partnership they invest through) must be an "accredited investor" as defined in Rule 501(a) of the Securities Act of 1933, as amended. Individuals will be accredited investors if at the time they are admitted to the Fund they either –

(1)  have a net worth (either individually or jointly with their spouse) in excess of $1,000,000,

**OR**

(2)  have individual income in excess of $200,000 in each of the two most recent years **OR** joint income with their spouse in excess of $300,000 in each of the two most recent years

**AND**

have a reasonable expectation of reaching that same income level (i.e., above $200,000 or $300,000, as applicable) in the current year.

*Second,* each investor in the Fund (regardless of which partnership they invest through) must, for purposes of the Investment Advisers Act of 1940, as amended, be a "qualified client" under the rules promulgated there under. Individuals are qualified clients if at the time they are admitted to the Fund they either –

(1)   have a net worth in excess of $1,500,000,

*OR*

(2)   have subscribed for a Commitment of at least $750,000 (which, you will notice, is less than the minimum subscription amount being requested by the General Partner).

-iv-

U 00052

**A-6**

## SELECTION OF PARTNERSHIP

If a prospective investor meets the two tests above, he or she will be eligible to subscribe for interests in the Fund. Investors that are "qualified purchasers" under the Investment Company Act of 1940, as amended, will be asked to subscribe for interests in the QP Partnership; investors that are not "qualified purchasers" will be asked to subscribe for interests in the AI Partnership. Individuals are "qualified purchasers" if at the time they are admitted to the Fund they -

(1)     own not less than $5,000,000 in "Investments" as defined in the applicable rules (which includes generally cash and cash equivalents held for investment purposes (including bank deposits, certificates of deposit, other similar bank instruments and the cash surrender value of insurance policies), publicly traded securities, securities issued by publicly traded companies and securities issued by certain private issuers, interests in mutual funds, "hedge" funds and commodity pools, real estate held for investment purposes, and certain other financial instruments held for investment purposes,

<u>OR</u>

(2)     are acquiring a joint, community property or other <u>similar</u> shared ownership interest in the Fund with a spouse, and the spouse satisfies the test in (1) above.

Generally, if prospective investors seek to invest together in a group, each member of the group will have to separately satisfy the foregoing tests; however, the application of these rules may be different depending on the circumstances. Investors that intend to invest as a group should consult their legal advisor regarding their eligibility to participate in the Fund.

*PLEASE NOTE: THIS ANNEX IS INTENDED TO PROVIDE GENERAL GUIDANCE ONLY. EACH INVESTOR IS RESPONSIBLE FOR DETERMINING WHETHER HE OR SHE SATISFIES THE STANDARDS SET FORTH IN THE ACCOMPANYING SUBSCRIPTION MATERIALS. IF YOU HAVE ANY QUESTIONS AS TO WHETHER YOU SATISFY SUCH CRITERIA, PLEASE CONTACT YOUR LEGAL ADVISOR.*

-v-

U 00053


Name of the Subscriber
(Please Print or Type)

## SUBSCRIPTION AGREEMENT

1.   <u>Subscription.</u> The undersigned *(the "Subscriber")* hereby agrees to become a limited partner in the following limited partnership (check one):

    ✓    FBR Technology Venture Partners II, L.P., a Delaware limited partnership (the *"AI Partnership"*);

    _____    FBR Technology Venture Partners II (QP), L.P., a Delaware limited partnership (the *"QP Partnership"*);

The limited partnership selected by the Subscriber above is referred to herein as the *"Partnership."* Subscriber hereby agrees to make capital contributions and other payments to the Partnership (or to the General Partner, as appropriate) a from time to time as required to be made pursuant to the amended and restated limited partnership agreement of the Partnership (the *"Partnership Agreement"*), in an aggregate amount not to exceed such Subscriber's capital commitment (as specified on the signature page hereto below the Subscriber's name), except as otherwise provided in the Partnership Agreement. The Subscriber agrees to remit cash to the Partnership (or to the General Partner, as appropriate) in such amounts as called for by FBR TVP Management Company, LLC, Inc., a Delaware limited liability company and the general partner of the Partnership (the *"General Partner"*), in accordance with the terms of the Partnership Agreement.

2.   <u>Representations and Warranties.</u> The Subscriber represents, warrants and agrees as follows:

(a) If the Subscriber is a natural person, the Subscriber is 21 years of age or over. If the Subscriber is a corporation, limited liability company, partnership, trust or other entity, the Subscriber is authorized, empowered and qualified to execute this Subscription Agreement (this *"Agreement"*) and to make an investment in the Partnership as herein contemplated. Each of this Agreement, the Power of Attorney being executed in connection therewith and (upon execution thereof by the General Partner on behalf of Subscriber pursuant to the Power of Attorney) the Partnership Agreement is valid, binding and enforceable against the Subscriber in accordance with its terms, except as enforceability maybe limited by bankruptcy, insolvency and other laws affecting the rights of creditors generally and by general principles of equity (whether considered in a proceeding at law or in equity). The Subscriber is not aware of any laws or regulations that might be the basis for releasing the Subscriber from the obligations created by this Agreement, the Power of Attorney and the Partnership Agreement. The address set forth on the Subscriber's signature page to this Agreement is the Subscriber's correct principal place of business, and the Subscriber has no present intention to move its principal place of business to any other domestic or foreign jurisdiction.

(b) The Subscriber understands and acknowledges that the limited partner interest subscribed for hereunder (the *"Interest"*) has *not* been and will not be registered under the Securities Act of 1933, as amended (the *"Securities Act"*), or the securities laws of any state of the United States of America (*"State Acts"*) or the securities laws of any other nation, state or territory, and is being offered and sold in the United States in reliance upon federal and state exemptions for transactions not involving any public offering and outside the United States of America in reliance upon similar exemptions. The Subscriber recognizes that reliance upon such exemptions is based in part upon the representations of the Subscriber contained herein. The Subscriber represents and warrants that the Interest will be acquired by the Subscriber solely for the account of the Subscriber, for investment purposes only and not with a view to any distribution, resale, subdivision, or fractionalization hereof in violation of the Securities Act, any State Acts or any other applicable domestic or foreign securities laws. The Subscriber represents and warrants that the Subscriber (i) is a sophisticated investor with such knowledge and experience in business and financial matters as will enable the Subscriber to evaluate the merits and risks of investment in the Partnership, (ii) is able to bear the economic risk and lack of liquidity of an investment in the Partnership, and (iii) is able to bear the risk of loss of its entire investment in the Partnership.

U 00054

A-8



(c) The Subscriber is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act, and the certifications made by the Subscriber in the Subscriber's Certificate attached as *Appendix I* to this Agreement (or by any person, required by the terms of the Subscriber's Certificate to submit a separate Certificate in connection with the Subscriber's subscription, in such separate Certificate) regarding its "accredited investor" status are true and complete, and the certifications made by the Subscriber in the Subscriber's Certificate attached as *Appendix I* to this Agreement (or by any person, required by the terms of the Subscriber's Certificate to submit a separate Certificate in connection with the Subscriber's subscription, in such separate Certificate) regarding its non-U.S. Person status are true and complete.

(d) The Subscriber has received and read a copy of the Confidential Private Placement Memorandum dated as of March 1, 1999 (collectively, the *"Confidential Memorandum"*), the Power of Attorney and this Agreement. The Subscriber acknowledges that the Subscriber has been given the opportunity to (i) ask questions and receive satisfactory answers concerning the terms and conditions of the offering, and (ii) obtain additional information in order to evaluate the merits and risks of an investment in the Partnership and to verify the accuracy of the information contained in the Partnership Agreement, the Confidential Memorandum and this Agreement. No statement, printed material or other information that is contrary to the information contained in the Confidential Memorandum has been given or made by or on behalf of the General Partner to the Subscriber. The Subscriber has carefully considered and has discussed with its legal, tax, accounting and financial advisors the suitability of an investment in the Partnership for its particular tax and financial situation and has determined that its investment in the Partnership is a suitable investment for it.

(e) The Subscriber recognizes that (i) an investment in the Partnership involves certain risks, (ii) the Interest will be subject to certain restrictions on transferability under the Partnership Agreement and under U.S., state, local and foreign securities laws, and (iii) as a result of the foregoing, the transferability of the Interest will be limited. The Subscriber agrees that it will not transfer, sell or otherwise dispose of the Interest in any manner that will violate the Partnership Agreement, the Securities Act or any State Acts or subject the Partnership to regulation under the Investment Company Act of 1940, as amended (the *"Investment Company Act"*), the rules and regulations of the Securities and Exchange Commission or the laws and regulations of the State of Delaware, as applicable, or any other nation, state or municipality having jurisdiction thereof.

(f) The Subscriber is aware that: (i) the Partnership has no financial or operating history; (ii) the General Partner will receive substantial compensation in connection with the management of the Partnership; (iii) no federal, state, local or foreign agency has passed upon the Interests or made any finding or determination as to the fairness of this investment; (iv) the Subscriber is not entitled to cancel, terminate or revoke this subscription or any of the powers conferred herein (subject to the Subscriber's rights under the Partnership Agreement upon being admitted as a Limited Partner); and (v) investment returns set forth in the Confidential Memorandum or in any supplemental letters or materials thereto are not necessarily comparable to the returns, if any, which may be achieved on investments made by the Partnership.

(g) The execution and delivery of this Agreement and the Power of Attorney, the consummation of the transactions contemplated hereby and the performance of the Subscriber's obligations hereunder and under the Partnership Agreement will not conflict with, or result in any violation of or default under, any provision of any charter, bylaws, trust agreement, partnership agreement, or other organizational document, as the case may be, of the Subscriber, or any agreement or other instrument to which the Subscriber is a party or by which the Subscriber or any of its properties are bound, or any foreign or domestic permit, franchise, judgment, decree, statute, rule or regulation applicable to the Subscriber or the Subscriber's business or properties.

(h) The Subscriber understands that, in the event of a change in the tax laws of the United States or any other jurisdiction applicable to the Partnership or the ownership of Interest, or a change in the interpretation or application of these laws (through legislative or administrative pronouncements or otherwise), the Subscriber's distributions with respect to the Interests may be reduced as a result of such changes. The Subscriber will be liable for the payment of any stamp duties, transfer or other taxes imposed in connection with the subscription for or transfer of the Interest. The tax certifications made by the Subscriber *in Appendix I* delivered to the General Partner in connection with this subscription are true and complete.

2

U  00055

A-9

(i) If the Subscriber is a partnership, a limited liability company or other person treated as a partnership for federal income tax purposes, a grantor trust, within the meaning of sections 671679 of the Internal Revenue Code of 1986, as amended (the *"Code"*), or an S corporation, within the meaning of section 1361 of the Code (each *a "flow-through entity"*), the Subscriber represents and warrants either that: (i) no person will own, directly or indirectly through one or more flow-through entities, an interest in the Subscriber where more than 70% of the value of the person's interest in the Subscriber is attributable to the Subscriber's investment in the Partnership; or (ii) if one or more persons will own, directly or indirectly through one or more flow-through entities, an interest in the Subscriber where more than 70% of the value of the person's interest in the Subscriber is attributable to the Subscriber's investment in the Partnership, neither the Subscriber nor any such person has or had any intent or purpose to cause such person or persons to invest in the Partnership indirectly through the Subscriber in order to enable the Partnership to qualify for the 100-partner safe harbor under U.S. Treasury Regulation § 1.7704-1(h).

(j) The Subscriber represents and warrants that (i) except as disclosed in writing to the General Partner on the statement attached hereto, no part of the funds used by the Subscriber to acquire the Interest constitutes assets of any "employee benefit plan" within the meaning of section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended (*"ERISA"*), or other "benefit plan investor," as defined in U. S. Department of Labor Regulations §§2510.3-101 *et seq.*, as amended (the "plan assets *regulations"*), *or* assets allocated to any insurance company separate account or general account in which any such employee benefit plan or benefit plan investor (or related trust) has any interest, and (ii) if Interest is being acquired by any such employee benefit plan, benefit plan investor or separate account (any such purchaser being referred to herein as a *"Benefit Plan Partner"*), such acquisition of the Interest meets the requirements of the governing documents of such Benefit Plan Partner.

> **Note: If any part of the funds used by the Subscriber to acquire the Interest constitutes assets of any "employee benefit pl an" within the meaning of section 3(3) of ERISA, or other "benefit plan investor" (as defined in the plan assets regulations) or assets allocated to any insurance company separate account or general account in which any such employee benefit plan or benefit plan investor (or related trust) has any interest, the Subscriber must attach a separate sheet to this Agreement describing that interest, which description the Subscriber represents as true and complete.**

(k) The Subscriber (a) understands that the Partnership will not be registered as an "investment company" under the Investment Company Act, and (b) represents that the certifications made by the Subscriber in the Subscriber's Certificate attached as *Appendix I to* this Agreement (or by any person, required by the terms of the Subscriber's Certificate to submit a separate Certificate in connection with the Subscriber's subscription, in such separate Certificate) regarding its status with respect to the Investment Company Act are true and complete.

3. <u>Acceptance of Subscription.</u> This subscription when executed by the Subscriber shall be irrevocable but is not binding unless and until accepted in writing by the General Partner after the General Partner's receipt of all subscription documents, properly completed and executed. The General Partner may accept or reject the Subscriber's subscription, in whole or in part, in the General Partner's sole and absolute discretion. Acceptance will be given to the Subscriber either by delivery of this Agreement signed by the General Partner or by notice of such execution. If so accepted, this Subscription Agreement (a) will be binding upon the Subscriber's heirs, successors, legal representatives and assigns, and (b) may not be canceled, terminated or revoked by the Subscriber (subject to the Subscriber's rights under the Partnership Agreement) upon being admitted as a Limited Partner). By signing this Agreement, the Subscriber is agreeing to be bound by all the terms and conditions of the Partnership Agreement.

4. <u>Legal Counsel.</u> The General Partner has retained Kirkland & Ellis and local Delaware counsel, as applicable, in connection with the formation of the Partnerships (collectively, *"Legal Counsel"*). Legal Counsel is not representing and will not represent the Subscriber or any other limited partner of the Partnership in connection with the formation of the Partnership, the offering of the Interests, the management and operation of the Partnership, or any dispute which may arise between any limited partner on one hand and the General Partner or the Partnership on the other hand (the *"Partnership Legal Matters"*). The Subscriber will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and will pay all fees and expenses of such independent counsel.

3

U 00056

5. <u>GOVERNING LAW.</u> THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES.

6. <u>Definitions.</u> Capitalized terms not otherwise defined herein shall have the meanings specified in the Partnership Agreement.

[END OF PAGE]

[SIGNATURE PAGES FOLLOW]

4

U  00057

A-11

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement as of the date written below.

x _Stephen D Peskoff_

_Name of Subscriber_

Commitment Amount:

U.S. $ _100,000.00_

Date: _January 3, 2005_ ~~2004~~

Name: _Stephen D. Peskoff_

Title: _____

Mailing Address: _____

_7414 Old Maple Square_

_McLean, VA 22102_

Home or Business Address (if different from above):

_____

_____

Telephone Number:
_703-356-7445_

Facsimile Number:
_703-356-7456_

E-mail:
_speskoff@underhillinvestment.com_

[Note: Subscribers must complete the attached Annex I1]

FBR TVP Management Company, LLC, Inc., the general partner of the Partnership, hereby accepts the foregoing subscription for the Commitment amount of the Subscriber set forth opposite the signature of the Subscriber above as well as the Subscriber's obligation to make Capital Contributions and other payments to the Partnership (or the General Partner, as appropriate) pursuant to the terms of the Partnership Agreement.

Dated: _____, 2004

FBR TVP MANAGEMENT COMPANY, LLC, INC.

By: _____
Name:
Title:

7

U 00058

A-12

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement as of the date written below.

x _Stephen D Peskoff_

Name of Subscriber

**Commitment Amount:**

U.S. $ _100,000.00_

Date: _January 3, 2005_, 2004

_Stephen D. Peskoff_

Name:

Title:

Mailing Address:

_7414 Old Maple Square_

_McLean, VA 22102_

Home or Business Address (if different from above):

Telephone Number:

_703·356·7445_

Facsimile Number:

_703·356·7956_

E-mail:

_SPeskoff@underbillinvestment.com_

[Note: Subscribers must complete the attached Annex 11]

FBR TVP Management Company, LLC, Inc., the general partner of the Partnership, hereby accepts the foregoing subscription for the Commitment amount of the Subscriber set forth opposite the signature of the Subscriber above as well as the Subscriber's obligation to make Capital Contributions and other payments to the Partnership (or the General Partner, as appropriate) pursuant to the terms of the Partnership Agreement.

Dated: _____, 2004

FBR TVP MANAGEMENT COMPANY, LLC, INC.

By: _____

Name:

Title:

6

U 00059

A-13

<u>ANNEX I</u>

**Primary Contact Person for this Account:**

Name: _Stephen D. Peskoe_

Address: _744 Old Maple Square_

_Mclean, VA 22102_

Telephone: _703-356-7465_

Fax: _703-356-7956_

E-mail: _Speskoe@underbillinvestment.com_

**Contact Person(s) for this Account for Financial Information and Reporting (including quarterly and annual financial reports and capital account statements), if different from primary contact person:**

| | |
|---|---|
| Name: _____ | Name: _____ |
| Address: _____ | Address: _____ |
| _____ | _____ |
| Telephone: _____ | Telephone: _____ |
| Fax: _____ | Fax: _____ |
| E-mail: _____ | E-mail: _____ |

**Contact Person(s) for this Account for Legal Documentation, if different from primary contact person:**

| | |
|---|---|
| Name: _____ | Name: _____ |
| Address: _____ | Address: _____ |
| _____ | _____ |
| Telephone: _____ | Telephone: _____ |
| Fax: _____ | Fax: _____ |
| E-mail: _____ | E-mail: _____ |

8

U 00060

A-14

*Appendix I*
*to Subscription Agreement*

Stephen D. Peskoff
Name of Subscriber (Please Print or Type)

### SUBSCRIBER'S CERTIFICATE

The undersigned ("*Subscriber*"), a subscriber under the Subscription Agreement (the "Subscription *Agreement*"), among Subscriber and FBR TVP Management Company, LLC, Inc. (the "*General Partner*"), hereby certifies to the Partnership (as defined in the Subscription Agreement) and the General Partner as follows (please complete all sections):

1.    Regulation D Exemption.

(a)    The Subscriber is an "*Accredited Investor*" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities *Act*").

True    ✓        False _____

(b)    If the Subscriber has certified that the statement in paragraph 1(a) above is true, the Subscriber qualifies as an Accredited Investor as a result of the status indicated below (check all that apply)

NO _____ (1)  a bank as defined in section 3(a)(2) of the Securities Act, or a savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity;

NO _____ (2)  a broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934, as amended;

NO _____ (3)  an insurance company as defined in section 2(13) of the *Securities* Act;

NO _____ (4)  an investment company registered under the Investment Company Act of 1940, as amended (the "*Investment Company Act*");

NO _____ (5)  a business development company as defined in section 2(a)(48) of the Investment Company Act;

NO _____ (6)  a Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958, as amended;

NO _____ (7)  a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

NO _____ (8)  an employee benefit plan within the meaning of Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), if either:

NO _____ (A)  the investment decision is made by a plan fiduciary, as defined in section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment adviser,

NO _____ (B)  the employee benefit plan has total assets in excess of

U  00061

A-15



$5,000,000, or

___ (C) such a plan is a self-directed plan with investment decisions made solely by persons that are Accredited Investors;

___ (9) a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940, as amended;

___ (10) an organization described in section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), or a corporation, partnership, Massachusetts or similar business trust, not formed for the specific purpose of making an investment in the Partnership, with total assets in excess of $5,000,000;

___ (11) a director, executive officer, or general partner of the issuer of the limited partnership interests being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

___ (12) a natural person whose individual net worth (or joint net worth with his or her spouse) exceeds $1,000,000;

___ (13) a natural person who had an individual income in excess of $200,000 in each of the two most recent years and who reasonably expects to have an individual income in excess of $200,000 in the current year or who had "joint income" in excess of $300,000 in each of the two most recent years and who reasonably expects to have 'joint income' in excess of $300,000 in the current year;

___ (14) a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of making an investment in the Partnership whose purchase of the limited partnership interests offered is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D; or

___ (15) an entity in which all of the equity owners are *Accredited* Investors.

(c)    If Subscriber is a natural person, Subscriber certifies as to the accuracy and completeness of the following information:

(1)    Subscriber's Occupation:

_Self employed_

(2)    Subscriber's Employer:

_____

(3)    Subscriber's Business Address (if different from mailing address appearing on Subscription Agreement):

_Hdd International Dr. #400, McLean, VA 22102_

(d)    If Subscriber is a corporation, partnership or other entity, Subscriber certifies as to the truth of the statement indicated with an "X" below (of which (1) or (2) must be marked):

_____ (1) it was not organized or reorganized for the purpose of making an investment in the Partnership; or

2

U 00062

A-16

_____ (2) It was organized or reorganized for the purpose of making an investment in the Partnership, and the number of stockholders, members or partners, direct or indirect, of the undersigned (all of whom are Accredited Investors) is _____

(e) If Subscriber is an Accredited Investor for the reason described in paragraph I(b)(8)(C) above, Subscriber has submitted a separate certificate (in substantially the same form as this Subscriber's Certificate) for each person making investment decisions for the undersigned. If Subscriber is an Accredited Investor for the reason described in paragraph I(b)(15) above, Subscriber has submitted a separate certificate (in substantially the same form as this Subscriber's Certificate) for each stockholder, member or partner of the undersigned. If Subscriber is described in paragraph I (d)(2) immediately above, Subscriber has submitted a separate certificate (in substantially the same form as this Subscriber's Certificate) for each direct or indirect stockholder, member or partner of the undersigned.

2.    Investment Company Act Matters.

(a)    The Subscriber is a natural person

True  ✓    False _____

(If "true," proceed to paragraph 2(g); if "false," please respond to paragraphs 2(b) through 2(f) as well.)

(b)    The Subscriber is not

(i)    an investment company registered or required to be registered under the Investment Company Act:

True  ✓    False _____

(ii)    a business development company, as defined in section 2(a)(48) of the Investment Company Act:

True  ✓    False _____

(c)    Subscriber would be defined as an "investment company" under section 3(a) of the Investment Company Act but for the exception provided to that definition by section 3(c)(1) or 3(c)(7) of the Investment Company Act:

True _____    False _____

(d)    The Subscriber was not organized or reorganized (as interpreted under the Investment Company Act) for the *purpose* of acquiring limited partnership interests of the Partnership:

True _____    False _____

(e)    The Subscriber has made a capital commitment to the Partnership constituting less than forty percent (40%) of the undersigned's committed capital:

True _____    False _____

(f)    The stockholders, members, partners or other beneficial owners of the Subscriber participate in each of Subscriber's investments in the same proportion and do not have the power to vary the amount of their participation relative to each other among investments made by the Subscriber:

True _____    False _____

4

U  00063

A-17

(g)    The Subscriber is a "*Qualified Purchaser*" within the meaning of section 2(a)(51) and section 3(c)(7) of the Investment Company Act and the regulations promulgated there under:

          True   __✓__       False   _____

(h)    If Subscriber has certified that the statement in paragraph 2(g) is true, Subscriber certifies that it is a Qualified Purchaser as a result of the status indicated below (check all that apply):

__✓__ (1) a natural person if either:

       __✓__ (A) Subscriber owns not less than $5,000,000 in "*Investments*" (within the meaning of section 2(a)(51) of the Investment Company Act and the regulations promulgated there under), or

       _____ (B) Subscriber is acquiring a joint, community property or other similar shared ownership interest in the Partnership with the Subscriber's spouse, and the Subscriber's spouse is a person described in paragraph 2(h)(I)(A) above;

_____ (2) a "company" (within the meaning of section 2(a)(8) of the Investment Company Act) that owns not less than $5,000,000 in Investments and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons (a "*Family Group*");

_____ (3) a trust that is not described in paragraph 2(h)(2) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in either paragraph 2(h)(1) or 2(h)(2) above or paragraph 2(h)(4) below;

_____ (4) a person, acting for its own account or for the accounts of other Qualified Purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in Investments; or

_____ (5) a person that is a "qualified institutional buyer," as defined in Rule 144A under the Securities Act (a "QIB"), that acts for its own account, the account of another QIB or the account of a Qualified Purchaser, *provided first*, that if the Subscriber is a QIB by reason of being a "dealer" described in paragraph (a)(1)(ii) of Rule 144A, the Subscriber must own and invest on a discretionary basis at least $25 million in securities of issuers that are not affiliated persons of the Subscriber; and *provided, second*, that if the Subscriber is a QIB by reason of being a "plan" referred to in paragraph (a)(1)(i)(D) or paragraph (a)(1)(i)(E) of Rule 144A, or a "trust fund" referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, such plan will not, for purposes of this paragraph 2(h)(5), be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

5

A-18

U 00064

<u>If the Subscriber is a Qualified Purchaser for the reason described in paragraph 2(h)(3) above</u>, the Subscriber must submit a separate certificate (in substantially the same form as this Subscriber's Certificate) for each trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust. <u>If the Subscriber is a Qualified Purchaser for the reason described in paragraph 2(h)(1)(B) above</u>, the Subscriber must submit a separate certificate (in substantially the same form as this Subscriber's Certificate) for such Subscriber's spouse, which supports the representation made by the Subscriber above.

(i) If Subscriber has certified that the statements in paragraphs 2(e) and 2(g) are both true, the Subscriber hereby certifies that either: (i) there are no direct or indirect beneficial owners, as determined in accordance with section 2(a)(5 1)(C) of the Investment Company Act and Rule 2a51-2 there under ("*Beneficial Owners*"), of the outstanding securities of the Subscriber that acquired such securities on or before April 30, 1996; or (ii) all Beneficial Owners of the Subscriber, that acquired such securities on or before April 30, 1996, have consented, to the extent required by section 2(a)(5 1)(C) of the Investment Company Act and Rule 2a51-2 there under to the treatment of the Subscriber as a qualified purchaser:

True _____          False _____

3.    <u>Investment Advisers Act Matters.</u>

Subscriber has a net worth (together, in the case of a natural person, with assets held jointly with a spouse) of more than $1,500,000:

True __✓__          False _____

4.    <u>Tax Matters.</u>

(a)    <u>Substitute Form W-8 (Certificate of Foreign Status).</u>

(1) US. taxpayer identification number (if any): ___116·54·1056___

(2) Subscriber certifies below, under penalties of perjury, whether Subscriber is a nonresident alien, a foreign corporation, a foreign partnership, a foreign trust or a foreign estate (as those terms are used in the Code and the regulations promulgated there under) as indicated by checking one of the following boxes:

☐    Subscriber is such a foreign person

☑    Subscriber is not such a foreign person

(3) Subscriber's complete address in country of permanent residence for income tax purposes (if different from mailing address in Subscription Agreement):

_____

_____

_____

(4) NOTE: The above certification generally will remain in effect for three calendar years or until the Subscriber's information changes. To avoid backup withholding, a foreign Subscriber should provide a new Form W-8 whenever the foreign Subscriber's information changes and at the end of three calendar years.

6

A-19

U 00065

(b)    <u>Substitute Form W-9 -- Request for Taxpayer Identification Number and Certification</u>
(optional for Subscribers who certify on substitute Form W-8 above that they are foreign persons).

    (1)    Subscriber is (check appropriate box):

        ☑    an individual/sole proprietor.
        ☐    a corporation.
        ☐    a partnership.
        ☐    other_____

    (2)    <u>U.S. Taxpayer Identification Certification</u> (if not applicable, or if number has been applied for, please indicate in space provided): Subscriber certifies, under penalties of perjury, that Subscriber's U.S. taxpayer identification number (U.S. social security number for an individual and U.S. employer identification number, for an entity) is

        _____

    (3)    <u>Backup Withholding Certification</u> (check one):

        ☑    Subscriber is subject to backup withholding.

        ☐    Subscriber certifies, under penalties of perjury, that Subscriber is not subject to backup withholding because: (a) Subscriber is exempt from backup withholding, or (b) Subscriber has not been notified by the Internal Revenue Service that Subscriber is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified Subscriber that Subscriber is no longer subject to backup withholding.

The undersigned hereby represents and warrants that all statements and information set forth in this Subscriber's Certificate are true and correct on the date hereof and will be true and correct on the date of the closing of the subscription of the Partnership interest in connection with which this Subscriber's Certificate is being executed. The undersigned hereby agrees to provide such additional information as requested by the General Partner.

7

U  00066

**A-20**

IN WITNESS WHEREOF, the undersigned has executed this Subscriber's Certificate on the date set forth below.

Dated: _January 3, 2005_ ~~2004~~

_Stephen D. Peskoff_
(Please print or type Subscriber's name)

By: _____

Its: _____
(Please print or type title)

U 00067

A-21



Name of the Subscriber
(Please Print or Type)

## POWER OF ATTORNEY

FBR Technology Venture Partners II, L.P.

The undersigned (the *"Subscriber"*) hereby constitutes, appoints and grants FBR TVP Management Company, LLC, Inc., a Delaware limited liability company, and each of its members, managers and officers, and each other person or entity that is or becomes a general partner of FBR Technology Venture Partners II, L.P., a Delaware limited partnership (the *"Partnership"*) after the Closing Date (the *"General Partner"*), with full power to act as its true and lawful representative and attorney-in-fact, in its name, place and stead, to make, execute, sign, acknowledge and deliver, record or file (so long as such person or entity continues to be a general partner of the Partnership):

(a)    the Amended and Restated Agreement of Limited Partnership (the *"Agreement"*) substantially in the form provided to the Subscriber and all amendments to the Agreement made in accordance therewith;

(b)    all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership;

(c)    any bills of sale or other appropriate transfer documents necessary to effectuate transfers of a Regulated Partner's or a Defaulting Partner's (as defined in the Agreement) interest in the Partnership pursuant to Section 7.7 or 7.9 of the Agreement;

(d)    all instruments, documents and certificates which maybe required to effectuate the dissolution and termination of the Partnership in accordance with the terms of the Agreement;

(e)    such other documents or instruments as maybe required under the laws of any state, the United States, any other country, territory or jurisdiction; and

(f)    all other instruments, documents and certificates the General Partner shall consider advisable in connection with the exercise of the authority granted to the General Partner in this Power of Attorney.

The Subscriber hereby empowers each attorney-in-fact acting pursuant hereto to determine in its sole discretion the time when, purpose for and manner in which any power herein conferred upon it shall be exercised, and the conditions, provisions and covenants of any instruments or documents which may be executed by it pursuant hereto; *provided* that the powers of attorney granted herein shall only be exercised in accordance with the Agreement and clauses (a) through (f) above. The powers of attorney granted herein will be deemed to be coupled with an interest, will be irrevocable and will survive, and will not be affected by, the death, incompetency, incapacity, disability or dissolution of the Subscriber. Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Agreement.

This power of attorney shall be governed by the laws of the State of Delaware.

-1-

U 00068

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the date written below.

_Stephen D. Peskoff_
Name of the Subscriber.

Signed, sealed and delivered by:

Name: _Stephen D. Peskoff_

Title: _____

Date: _11/04/05_

Address: _7414 Old Maple Square_
_McLean VA 22102_

IN THE PRESENCE OF:

_Josie Zellers_

Name of Witness:

_Josie Zellers_

-ii-

U 00069

**A-23**

# FBR TECHNOLOGY VENTURE PARTNERS II, L.P.

## LIMITED PARTNERSHIP TRANSFER AGREEMENT

THIS TRANSFER AGREEMENT (the "*Agreement*"), dated as of January 3, 2005 (the "*Effective Date*"), is by and between Underhill Investment Corporation (the "*Transferor*") and Steve Peskoff (the "*Transferee*").

WHEREAS, the Transferor is a party to that certain Amended and Restated Limited Partnership Agreement of FBR Technology Venture Partners II, L.P. (the "*Fund*"), dated February 26, 2000, as the same may be amended from time to time (the "*Partnership Agreement*"), and a Subscription Agreement, pursuant to which the Transferor became a limited partner (the "*Limited Partner*") in the Fund; and

WHEREAS, the Transferor desires to transfer and assign, and the Transferee desires to assume, all of the Transferor's rights and obligations under the Partnership Agreement and the Transferor's obligations under the Subscription Agreement to fund the Transferor's capital commitment in accordance with the terms of the Partnership Agreement (the "*Interest*").

NOW, THEREFORE, in accordance with the terms and conditions of the Partnership Agreement, the Transferor requests the consent of FBR TVP Management Company, LLC, a Delaware corporation and the general partner of the Fund (in its capacity as general partner, the "*General Partner*"), for such transfer and assignment.

The parties hereto agree as follow:

1.    *Representations and Warranties of the Transferor.*  The Transferor hereby represents and warrants to the Transferee and the General Partner, as of the date of this Agreement, as follows:

(a)    The Transferor has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and this Agreement has been duly executed and delivered by the Transferor.

(b)    The Transferor agrees and acknowledges that, as a result of the transfer and assignment contemplated by Section 3 hereof, the Transferor will no longer have any interest in the Fund.

(c)    The Transferor holds good and valid title to the Interest, and there are no liens against the Interest nor has the Interest been pledged as security for any obligation.

(d)    The execution and delivery of this Agreement does not (i) violate any provision of law applicable to the Transferor, (ii) conflict with any document, agreement or instrument to which the Transferor is a party, or (iii) except for (A) the consent of the General Partner, which consent is set forth herein, and (B) notices, approvals and consents that have been made or obtained, require that the Transferor obtain any consent or approval of, or that the Transferor give notice to, any person.

U 00070

**A-24**

2.    *Representations and Warranties of the Transferee.*  The Transferee hereby represents and warrants to the Transferor and the General Partner, as of the date of this Agreement, as follows:

(a)    The Transferee has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and this Agreement has been duly executed and delivered by the Transferee.

(b)    The Transferee acknowledges receipt of, has read, and is familiar with, the Partnership Agreement; the Transferee has had full access to such information regarding the Fund and its securities portfolio as it has deemed appropriate and has made its own assessment of value.

(c)    The Transferee understands that the Interest is a speculative investment which involves a high degree of risk of loss by the Transferee of its entire investment; the Interest has not been registered for sale under the Securities Act of 1933, as amended ("1933 Act"), or registered or qualified under state securities laws, and the Fund does not intend to register or qualify the Interest, or any other interest in the Fund, under the 1933 Act or state securities laws at any time in the future.

(d)    The Transferee is an "accredited investor" as such term is defined under Rule 501(a) under Regulation D of the 1933 Act and a "qualified client" as that term is defined under Rule 205-3 under the Investment Advisers Act of 1940, as amended.

(e)    The Transferee understands that there are substantial restrictions on the transferability of the Interest, and it may be transferred only under the limited circumstances described in Section 7 of the Partnership Agreement and the Transferee has no present intention to transfer the Interest.

(f)    The Transferee is not an employee benefit plan within the meaning of Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended.

(g)    The Federal Tax Identification Number of the Transferee is _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_

3.    *Transfer and Assignment by Transferor.*

(a)    For good and valuable consideration, the Transferor hereby transfers and assigns to the Transferee the Interest as of the Effective Date.

(b)    The transfer contemplated herein shall be effective as of the Effective Date as to the Transferee upon satisfaction of the following conditions:  (i) the Transferee shall have delivered the consideration referenced in Section 3(a) herein, if any is required, and (ii) the Transferor, the Transferee and the General Partner shall have signed this Agreement in the spaces provided below.

2

U 00071

A-25

(c)  As of the Effective Date, the Transferor shall be relieved of all obligations to the Fund and the General Partner under the Partnership Agreement and the Subscription Agreement with respect to the Interest, except for any obligations arising, or relating to events occurring, prior to the Effective Date.

(d)  As of the Effective Date, the Transferee accepts the transfer and assignment to it described herein and agrees to be subject to all of the rights and obligations with respect to the Interest and to be bound by all of the terms and conditions of the Partnership Agreement in the place of the Transferor as if the Transferee had been party thereto originally (including, without limitation, the Transferor's obligation to contribute the unpaid portion of its capital commitment with respect to the Interest in accordance with the terms of the Partnership Agreement and the Subscription Agreement).  In addition, the Transferee agrees that if a distribution to the Transferee results in taxable income or gain to the Partnership, then such taxable income or gain shall be allocated, to the extent permitted under the Partnership Agreement and pursuant to Section 704(b) of the Internal Revenue Code of 1986, as amended and the regulations promulgated thereunder, to the Transferee.

(e)  As of the Effective Date, the General Partner shall cause the books and records of the Fund to reflect the Transferee's Capital Commitment to the Fund with respect to the Interest.

4.  *Indemnification.*

The Transferor and the Transferee hereby agree to indemnify and hold the General Partner and the Fund harmless from any damage, loss, claim or expense resulting from any breach of this Agreement.

5.  *Miscellaneous.*

(a)  This Agreement shall be governed by the internal laws (and not the law of conflicts) of the State of Delaware.

(b)  This Agreement may be executed in one or more counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(c)  All capitalized terms used herein but that are not defined herein shall have the meanings assigned thereto in the Partnership Agreement.

3

U 00072

A-26

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

TRANSFEROR:

Underhill Investment Corporation

By: _Steph D Peskoff_
Name:
Title: _President_

TRANSFEREE:

Steve Peskoff, individual

By: _Steph D Peskoff_
Name:
Title:

4

U 00073

A-27

## GENERAL PARTNER'S CONSENT

The General Partner hereby consents to the transfer and assignment set forth above, on the terms and subject to the conditions described above, and waives the requirement in Section 7 of the Partnership Agreement that Transferor deliver an opinion of counsel with respect to the matters set forth in said Section 7.

GENERAL PARTNER:

FBR TVP Management Company, LLC

By: _____
    Name:
    Title:

5

A-28

U 00074

**Kathryn Fagan**

| | |
|---|---|
| **From:** | Michael AJ Farrell [mfarrell@annaly.com] |
| **Sent:** | Tuesday, December 16, 2003 11:34 AM |
| **To:** | Ron Kazel |
| **Cc:** | kfagan@annaly.com |
| **Subject:** | re: steve peskoff |

fyi, i spoke to steve this morning and i made it clear that he would not be getting paid anything on insurance and that i would probably make a small, one time payment to him on canada in the first quarter. no dollar amount was committed to, and i estimate that it will be less than 50K.

A-29

F 00184



LAW OFFICES

# RUBEN & ARONSON, LLP

4800 Montgomery Lane • Suite 150
Bethesda, MD 20814
(301) 951-9696 • Facsimile (301) 951-9636

Robert L. Ruben
(301) 986-4201

September 9, 2005

**Via Federal Express**

Michael A.J. Farrell, Chairman
Fixed Income Discount Advisory Company
1211 Avenue of the Americas, 29th Floor
New York, NY 10036

Re:    **Underhill Investment Corporation v. FIDAC**
       **(MBS Trust and Premier—Finder's Fees)**

Dear Mr. Farrell:

Congratulations on Annaly's recent report of earnings for the three and six months ended June 30, 2005! You are to be particularly congratulated for your ability – principally through the growth of FIDAC's fee-based capital management business – to continue "to deliver competitive results, despite the persistence of current market conditions" that have decimated the performance of many of your competitors.

This office, together with Stevens & Lee of Wilmington, Delaware, represents Underhill Investment Corporation, which has not been compensated for its undeniably crucial role in FIDAC's, and thus Annaly's, success. As detailed below, we believe that Underhill is entitled to payments, whether by express contract or to prevent your unjust enrichment, in excess of $1,000,000 per year. And, because the Account Agreements in question (as that term is used in FIDAC's February 15, 2000 consulting agreement with Underhill) remain in effect, Underhill's entitlement to compensation is ongoing.

**FIDAC and Underhill's February 15, 2000 Consulting Agreement to Find Accounts for FIDAC's Asset Management Business**

As you know (you drafted and signed it), FIDAC and Underhill entered a Consulting Agreement dated February 15, 2000. Though styled a consulting agreement and calling for Underhill to perform "such consulting services as [the parties] shall agree from time to time," it is plain from the reference to "the assets managed by FIDAC for those clients" that Underhill's compensation was to be "a fee equal to [a percentage] per annum of the fees paid [to FIDAC] by the Accounts." FIDAC and Underhill agreed that Underhill would act as a finder and be paid 10% of FIDAC's revenues from deals



A-30                                    F 00187

Michael A.J. Farrell
September 9, 2005
Page 2

resulting from Underhill's introductions. The course of dealing of the parties confirms that FIDAC was looking to Underhill as a finder that would earn 10% of the management fees FIDC collected from the Accounts for the duration of FIDAC's relationship with those Accounts.

### Underhill Fully Performed: FBR Asset, Gen Advisors LLC, and Sentry Select

It is undisputed that Underhill was the "but for" or procuring cause of FIDAC's relationships with a Friedman, Billings Ramsey affiliated REIT, Gen Advisors LLC, and Sentry Select. With respect to the FBR Asset REIT, FIDAC provided asset management services from the spring of 2000 through the spring of 2002. Together with Gen Advisors, FIDAC created Premier, an investment vehicle for banks, life insurance companies, and other institutions, and for which FIDAC continues to receive fees for providing asset management services. Finally, together with Sentry Select, FIDAC created MBS Trust I, II, and III, which was FIDAC's entry into the Canadian market for asset management services.

In an April 20, 2004 letter to Underhill's Stephen Peskoff, Mr. Ronald Kazel, referring to the launch of Premier and MBS Trust as two of the five investment vehicles responsible for the successful growth of FIDAC's business since 20002, acknowledged: "[Y]ou provided the initial introduction to the principals involved in their formation." As no other services were required or requested of Underhill as a mere finder, it has fully performed its obligations under the contract.

### FIDAC Has Breached the Contract and Violated Annaly's Code of Business Conduct and Ethics

We have no issue concerning the FBR REIT: FIDAC collected some $5.85 million in management fees as a result of Underhill's introduction and paid Underhill $585,000, or 10% of FIDAC's fees, through a series of checks delivered as and when FIDAC collected from the REIT – all precisely as contemplated by the February 2000 agreement. Despite Mr. Kazel's admission of Underhill's performance, the course of dealing established by the FBR Asset relationship, and the lack of any substantive difference between the FBR relationship and the arrangements with Premier and MBS Trust, FIDAC has failed and refused to pay Underhill the agreed upon fees. Underhill has not received any payment in connection with Premier and only $30,000 (10% of only FIDAC's first installment of management fees) in connection with MBS Trust I and nothing for MBS Trust II and III.

There is simply no justification or excuse for FIDAC's refusal to pay. In his April 20, 2004 letter, Mr. Kazel attempts to justify non-payment solely by claiming that Premier and MBS Trust – alone among FIDAC's five new investment vehicles – have been unsuccessful, unprofitable, or even disappointing because of allegedly excessive development time and costs. This explanation, even if it were true, would not be a

**A-31**

F 00188

Michael A.J. Farrell
September 9, 2005
Page 3

legally sustainable defense to FIDAC's obligation to pay Underhill. When FIDAC drafted Underhill's agreement, it did not condition the obligation to pay fees on profitability. Rather, the parties agreed that Underhill's fees were to be based on FIDAC's gross revenue from management fees. FIDAC exercised its business judgment to invest its time and effort into these projects with full knowledge of its obligation to Underhill. FIDAC could have passed on the opportunities if it believed the potential return, when burdened by the finder's fee, would be insufficient.

Likewise, assuming Mr. Kazel's letter was truthful, FIDAC was entitled, in the exercise of its business judgment (provided it was acting in good faith), to limit the resources dedicated to the further marketing of these products without regard for the impact on Underhill. Of course, in retrospect, notwithstanding limited marketing, the growth of these products bailed Annaly out of what would have otherwise been a lackluster performance and literally saved the quarter. As you reported to the investment community on July 26, 2005 by way of direct quotation in a press release and current report on Form 8-K, commenting on FIDAC's growth to $27.8 billion in gross assets under management:

> With strong momentum in the second quarter, FIDAC's net and gross assets under management have grown since year-end 2004 by 63% and 75%, respectively. Growth has come in both existing funds and new funds, as we continue to work to deliver high current income using high credit-quality assets. This investment proposition is finding acceptance with investors in the U.S. and around the world, and we believe we are well positioned to continue to grow our asset management business.

Apparently, these products must have sold themselves. Whether through Herculean effort by FIDAC's talented team or market forces acting alone, FIDAC has and continues to derive growing revenues as a result of the introductions made by Underhill. FIDAC has breached the parties' contract by failing and refusing to pay Underhill 10% of the fees it has received and will receive for the management of Premier and MBS Trust.

In addition to breaching the contract, FIDAC has violated Annaly's Code of Business Conduct and Ethics. Section 5 of the Code, entitled "Fair Dealing," provides that:

> Each employee, officer and director should deal fairly with all counter-parties, vendors, competitors, and other employees at all times. It is the obligation of the employee officer, and director to conduct business in a manner that avoids even the appearance of ethical or legal impropriety and is consistent with all applicable laws and regulations.

**A-32**

F 00189

Michael A.J. Farrell
September 9, 2005
Page 4

The Code is not merely aspirational boilerplate. It is required by the Sarbanes-Oxley Act of 2002 (Item 406 of SEC Regulation S-K) and the listing standards of the New York Stock Exchange. It is to be taken seriously. FIDAC's refusal to honor a valid contract violates the Code. Similarly, Mr. Kazel's attempt (also in the April 2004 letter) to terminate unilaterally a contract that by its terms cannot be terminated as to existing Accounts without Underhill's written consent also violates the Code.

Section 10 of the Code requires accurate financial reporting. We believe that Annaly may have also violated this section of the Code, as well as Item 303(a)(5)(i) of Regulation S-K, by failing to include FIDAC's liability to Underhill in the Contractual Obligations table included in its Annual Report on Form 10-K. As detailed below, FIDAC's long-term contractual obligation to Underhill could exceed $10 million.

**Amounts Due Underhill**

It is our understanding that of the $27.8 billion in gross assets under FIDAC's management, Premier and the MBS Trusts account for approximately $7.2 billion in gross assets. Assuming FIDAC is earning 15bps (your press release reports between 10 and 20), its annual fee attributable to Premier and the MBS Trusts would be $10,080,000. Underhill's 10% fee would be $1,080,000. Assuming only 10% annual growth in FIDAC's gross assets under management attributable to Premier and the MBS Trusts (a disappointing increase given your comments in the press release), over a ten-year period, Underhill's fees would total $17.2 million ($13.3 million discounted to net present value) and many times that amount if Annaly's future performance more closely follows recent past performance. Without an accounting and access to documents and records, we cannot know the exact amount due.

We would welcome the opportunity to discuss this matter with you, your counsel and CFO to determine the amount currently due and to put in place a mechanism for assuring your compliance with this obligation as amounts become due in the future. Underhill is willing to receive its fees as and when FIDAC receives its management fees as provided by the contract or negotiate a payment or series of payments in full satisfaction of the obligations. Should litigation be necessary, Underhill's complaint will allege breach of contract, unjust enrichment, and estoppel (based on your representing to Mr. Baptista that Gen Advisors need not pay Underhill because FIDAC would pay Underhill under their own agreement). We will also seek a full accounting and third-party monitoring to assure future payments.

You are specifically cautioned to preserve all formal and informal documents, reports, e-mails, computer entries, hard drives, and all other discoverable materials relating to this matter. In recent cases, spoliation has been harshly penalized by the courts.

F 00190

**A-33**

Michael A.J. Farrell
September 9, 2005
Page 5


    If you wish to discuss this matter before a complaint is filed and discovery
demands issued, please contact the undersigned before the close of business on
September 26, 2005.


                                        Very truly yours,



                                        Robert L. Ruben

cc:     Stephen D. Peskoff, President, Underhill Investment Corporation
        Kathryn F. Fagan, Chief Financial Officer, Annaly
        R. Nicholas Singh, Executive Vice President & General Counsel, Annaly


F 00191

**A-34**

# FIDAC

*Fixed Income Discount Advisory Company*



*File in Contract File*

February 15, 2000

Mr. Steve Peskoff
Underhill Investment Corp.
7414 Old Maple Square
McLean, VA 22102

Re: Consulting Engagement

Dear Mr. Peskoff:

This letter will confirm our engagement regarding the provision of consulting services by Underhill Investment Corp. ("Underhill") to Fixed Income Discount Advisory Company ("FIDAC").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Underhill and FIDAC agree as follows:

1. **Consulting Services.** Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the "Accounts").

2. **Compensation.** FIDAC shall pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC to Underhill monthly and calculated in accordance with the formula described in the (the "Accounts Agreements").

3. **Term; Termination.** Unless earlier terminated in ordinance with this paragraph, this Agreement shall be for an initial term of one year, commencing on February 15, 2000, and ending on February 15, 2001. Upon expiration of the initial term, and provided that neither party shall be in default hereunder, this Agreement shall be automatically renewed under the same terms and conditions for successive one-year terms, each expires and ending on the same date one year later. Either Underhill or FIDAC may terminate this Agreement by delivering written notice to the other party; provided, however, that neither party shall terminate this Agreement without written consent of the other party so long as any of the Account Agreements remain in effect.

P - 17

Peskoff
DEPOSITION
EXHIBIT
6
t.m 10/11/06

12 E. 41st Street • Suite 700 • New York, NY 10017 • 1-800-487-9947 • Tel: 212-696-0100 • Fax: 212-696-9809

A-35

4.  **Notices** . Unless otherwise directed, all communications or notices required or permitted hereunder will be directed to Underhill at the address set forth above.  Likewise, if you wish to communicate with us  or serve any notice required or permitted under this Agreement, please contact us at:

> Fixed Income Discount Advisory Company
> 12 E. 41st Street
> Suite 700
> New York, NY 11021

5.  **Assignability**.  Our relationship is a personal one and cannot be assigned, sold or in any manner hypothecated or pledged by either of us without the written consent of the other party.  No merger, sale, or consolidation will effect the transfer of this Agreement.

6.  **Amendment**.  This Agreement may be amended only by a writing executed by both parties.

7.  **Binding Affect**.  This Agreement shall be binding upon, and shall insure the benefit of, the parties hereto and their respective heirs, successors, and assigns.

8.  **Governing Law**.  This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware.

9.  **Independent Contractor**.  Underhill is and shall hereafter be an independent contractor vis-à-vis FIDAC, and nothing herein may be interpreted or construed so as to create any employment, partnership, joint venture, or other relationship, between Underhill and FIDAC or their respective employees, representatives and agents.

10.  **Best Efforts: Liability** .  Underhill shall exercise its best efforts and judgement in the performance of its duties hereunder.  Neither Underhill nor its owners, officers, directors, or employees, shall incur, any liability in connection with the performance of such duties, and obligations, except, in the case of bad faith, willful misfeasance and gross negligence.

*P - 18*

**A-36**

If the foregoing accurately states our agreement, please signify your acceptance by signing and dating below where indicated.

Very truly yours,

FIXED INCOME DISCOUNT
ADVISORY COMPANY

By _____
Michael A. J. Farrell, Chairman

ACCEPTED AND AGREED
To as of the February 15, 2000

Underhill Investment Corp.

Steve Peskoff

P - 19

**A-37**



PENGAD 800-631-6989

DEPOSITION
EXHIBIT
7  10/11/06

Dear Mike,

Thank you for your generous
contribution on behalf of my mother
Seela Braun Piestoff. You have
always been a good and generous
friend and I miss the lack of
communication over the past months.

The last 6 months have been
medically trying on myself on top
of the loss of my mom.

I hope your Asian trip is successful
& we can see other during the next
month.

Sincerely,
SDP

A-38

April 7, 2005

Michael Farrell
30 Beekman Terrace
Summit, NJ 07901

Dear Mike:

The last time we were in contact, you made a nice contribution on behalf of my mother's passing. Unfortunately, the past year has been plagued with difficulty. I've had to deal with personal health issues, family health issues and many close friends being sick. I am feeling much better now and am moving forward again.

Congratulations on your successes in Toronto and your opening the Toronto Stock Exchange on April 6th. I am also happy that your business relationship with Sentry Select is successful and Ernie Baptista and Jeff Messner have finally delivered in a substantial way for FIDAC/Annaly.

I would like to meet with you in the next ten days for breakfast, lunch, etc. to catch up.

I hope you and your family are all well and am looking forward to our meeting.

Sincerely,


Stephen D. Peskoff

A-39

P - 145



APR-12-2005    Image System - Check Printing Window    Page 2 of 2

4/12/2005 0:53 PM

FIXED INCOME DISCOUNT ADVISORY COMPANY    0245
1211 AVENUE OF THE AMERICAS
SUITE 2902
NEW YORK, NY 10036

CHECK NO.    DATE    AMOUNT
0245    Dec 22, 2003    ***$30,000.00

Memo:
PAY    Thirty Thousand and 00/100 Dollars
TO THE
ORDER    Underhill Investments
OF    1660 International Drive
Suite 400
McClean, VA : 22102

AUTHORIZED SIGNATURE

**REDACTED**

For Deposit only

PROCESSED
3-5
2300259338    3700846685

**REDACTED**

| Account | Serial | Sequence | Paid Date | Amount |
|---------|--------|----------|-----------|--------|

**REDACTED**

Page 2 of 2

F 00176

DESPAFF
DEPOSITION
EXHIBIT

# Underhill Investment
## Corporation

April 12, 2004

Mr. Ron Kazel
Executive Vice President
Annaly Mortgage Management
1211 Avenue of the Americas
Suite 2902
New York, NY 10036

Dear Ron:

I hope that you had a good Easter holiday and that Valerie & the kids are doing well.  My family is good although Jonathan is investigating other opportunities since he's in the midst of suing his partner. A most unfortunate situation but his partner is totally dishonest.

**REDACTED**

**REDACTED**

Sincerely

*SDP*

Steve Peskoff

A-41

P - 138

Peskoff
DEPOSITION
EXHIBIT
15

# FIDAC
*Fixed Income Discount Advisory Company*

April 20, 2004

Mr. Steve Peskoff
Underhill Investment Corporation
1660 International Drive
Suite 400
McLean, VA 22102

Dear Steve:

I received your letter dated as of the 12th of this month and wanted to respond to you in a timely manner.

During the last two years FIDAC has successfully grown its business through the launch of five different investment vehicles which are marketed in China, Japan, Latin America, Canada (MBS Trust) and the US life insurance market (Premier). The latter two of which you provided the initial introduction to the principals involved in their formation. Although I understand that you have a personal relationship with Mr. Baptista, you should realize that not only is the information he provided you incorrect, but it is in direct violation of the terms of the Confidentiality Agreement entered into between us and his organization. Based upon the extensive development time and costs involved for launching Premier, and the nominal level of assets currently in the fund, we have yet to see a positive return on our investment. While we have a dedicated team of investment professionals involved in the daily management of the fund who are responsible for its above market returns, we are dedicating limited resources to the further marketing of this product.

On numerous prior occasions Mike has mentioned to you that the least successful of products we launched in the past two years have been MBS Trust and Premier. Nonetheless, Mike discussed with you in December 2003 that he would compensate you for your limited involvement in these products and a check was issued to you on December 22, and cashed by you, for $30,000. It was also explicitly explained that there would be no further consideration paid to you and this letter serves as a further reiteration of that position.

Regards,

Ronald D. Kazel



PESKOFF
DEPOSITION
EXHIBIT  16
Lm 10/11/06

P - 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT CORPORATION                  :
and STEPHEN D. PESKOFF,                            :
                                                   :
                        Plaintiff                  :
                                                   :       Civil Action No. _____ 0 6 - 9 9
            v.                                     :
                                                   :
FIXED INCOME DISCOUNT ADVISORY                     :
COMPANY,                                           :
                                                   :
                        Defendant                  :

## COMPLAINT

### NATURE OF ACTION

1. Plaintiffs Underhill Investment Corporation ("Underhill"), and Stephen D. Peskoff ("Peskoff") bring this action against Defendant Fixed Income Discount Advisory Company ("FIDAC" or "Defendant") for Defendant's repudiation of a contract with Plaintiffs and its failure and refusal to pay the ongoing fees due Plaintiffs. The sums due to Plaintiffs are expected to approximate $10,000,000 to $17,000,000 or more over the next ten (10) years.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because defendant is a resident of this district.

### BACKGROUND

4. Underhill, at all times relevant to this litigation, was an Ohio corporation with its principal place of business in McLean, Virginia 22102. Until its voluntary dissolution on

SL1 589928v3/100409.00001

1



PESKOFF
DEPOSITION
EXHIBIT
21

November 1, 2004, Underhill was in the business of providing business and financial consulting services to private and publicly held businesses.

5. Peskoff is an adult individual and a citizen of Virginia. Peskoff was the president, sole director and sole shareholder of Underhill. Peskoff is the successor in interest to Underhill.

6. FIDAC is a Delaware corporation with its principal place of business at 1211 Avenue of the Americas, 29th Floor, New York, New York 10036. Its President and Chief Executive Officer is Michael A.J. Farrell ("Farrell") and its Vice-President is Ronald D. Kazel ("Kazel"). FIDAC is a fee-based capital management business. FIDAC may be served with process at the offices of its registered agent in the State of Delaware, United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, DE 19904.

7. In early 2004, FIDAC was purchased by Annaly Mortgage Management, Inc. ("Annaly") and remains a wholly owned subsidiary of Annaly. Farrell, according to Securities and Exchange Commission filings, owns 2.1 million shares of Annaly's common stock and in 2004 earned compensation of $4.5 million. Annaly's stock trades on the New York Stock Exchange under the symbol "NLY."

8. FIDAC and Underhill entered into a Consulting Agreement dated February 15, 2000 (the "Agreement"), which was drafted by FIDAC.

9. A true and correct copy of the Agreement is attached hereto as Exhibit A.

10. The language of the Agreement and the parties' course of dealing demonstrate the parties' joint intent that Underhill was to receive ten percent (10%) of the revenues received by FIDAC which resulted from Underhill's efforts to find or facilitate business for FIDAC.

11. Paragraph 3 of the Agreement specifies that either party may terminate the Agreement by written notice to the other, "provided, however, that neither party shall terminate this Agreement without written consent of the other party so long as any of the account agreements resulting from Underhill's services remain in effect."

12. Underhill has never consented, orally or in writing, to terminate the Agreement.

13. Underhill introductions were the cause of FIDAC's relationships with (i) a Friedman. Billings. Ramsey affiliated Real Estate Investment Trust ("FBR REIT"). (ii) Gen Advisors LLC, and (iii) Sentry Select.

14. FIDAC recognized that under the Agreement it had an obligation to pay Underhill 10% of all revenues received from its business relationship with the FBR REIT. Acting pursuant to the Agreement, FIDAC made 10 payments to Underhill between May 2000 and May 2002, with each payment representing 10% of the revenues received by FIDAC from its business relationship with the FBR REIT.

15. With Gen Advisors, FIDAC created Premier, an investment vehicle for banks, life insurance companies and other institutional investors for which FIDAC continues to receive revenues for providing asset management services.

16. During the discussions that led directly to the launching of Premier, Gen Advisors raised the question of how and to what extent it should compensate Underhill for its services in putting the parties together. FIDAC, specifically Farrell, represented to Gen Advisors, Peskoff and Underhill that FIDAC would compensate Underhill pursuant to an agreement already in place between Underhill and FIDAC. In justifiable reliance on FIDAC's

3

**A-45**

representation, and its Agreement with FIDAC, Underhill and Peskoff did not pursue further compensation for itself from Gen Advisors.

17.  In or about July of 2003, Underhill provided services to FIDAC that resulted in a business relationship between FIDAC and Sentry Select. With Sentry Select, FIDAC created MBS Trusts I, II, III and IV which gave FIDAC entry into the Canadian market for asset management services and for which FIDAC continues to receive revenues for providing services.

18.  Without the services of Underhill, FIDAC would not have established business relationships with either Gen Advisors or Sentry Select.

19.  On December 22, 2003, in preparation for its merger with Annaly, and, upon information and belief, in an effort to avoid having to disclose to Annaly its contractual relationship with, and substantial ongoing financial obligations to, Underhill, FIDAC sent Underhill a check for $30,000, representing 10% of the $300,000 revenue it anticipated it would receive for its first year from its business relationship with Sentry Select and its investment vehicle, MBS Trust I.

20.  Other than this initial payment, however, FIDAC has not paid Underhill anything with respect to the other substantial revenues FIDAC has received from its ongoing business relationship with Sentry Select and its investment vehicles, MBS Trusts I, II, III and IV.

21.  Furthermore, without justification or excuse, FIDAC has never paid Underhill anything with respect to its business relationship and Gen Advisors, despite collecting millions of dollars in revenue from the Premier fund Gen Advisors and FIDAC launched as a result of that business relationship.

22.  In a letter to Underhill dated April 20, 2004, FIDAC informed Underhill that it would not make any further payments to Underhill.

4

23. FIDAC's repudiation specifically contravened Section 3 of the Agreement, which bars unilateral termination "so long as any of the Account Agreements remain in effect."

24. The Premier and MBS Trusts (I, II, III and IV) accounts, each derived from the business relationship between FIDAC and both Gen Advisors and Sentry Select, were fully in effect on April 20, 2004, and remain in effect at this time.

25. A true and correct copy of the April 20, 2004 letter from FIDAC to Underhill is attached hereto as Exhibit B.

26. FIDAC is currently receiving approximately $10,800,000 per year in revenues from the business relationships procured by Underhill with Gen Advisors and Sentry Select (through the investment vehicles of Premier and the MBS Trusts), and these revenues are increasing each year. Plaintiff cannot determine its exact entitlements without a full current and annual accounting of FIDAC's revenues.

## COUNT I – BREACH OF CONTRACT

27. Paragraphs 1-26 above are hereby incorporated by reference.

28. The Agreement is a valid and binding contract.

29. Under the Agreement, FIDAC is required to pay Underhill and/or Peskoff 10% of revenues it receives as a result of introductions of FIDAC by Underhill.

30. FIDAC has breached the Agreement by failing and refusing to pay Underhill or Peskoff 10% of all revenues it has received as a result of its management of the Premier and MBS Trust I, II, III and IV funds, which resulted from Underhill introductions.

31. Underhill has sustained damages as a result of FIDAC's breach of the Agreement in an amount to be determined at trial.

WHEREFORE, Underhill and Peskoff respectfully request that the Court enter judgment in their favor and against FIDAC in an amount to be determined at trial, together with

5

**A-47**

an award of costs, including reasonable attorneys' fees incurred in connection with this action, interest, and such other relief as the Court deems appropriate.

## COUNT II – PROMISSORY ESTOPPEL

32. Paragraphs 1-26 above are hereby incorporated by reference.

33. Defendant represented to Gen Advisors and Underhill that it would compensate Underhill under the Agreement for the introduction of FIDAC to Gen Advisors.

34. Underhill justifiably relied on this promise to its detriment and did not pursue other compensation from Gen Advisors.

WHEREFORE, Underhill and Peskoff respectfully request that the Court enter judgment in their favor and against FIDAC in an amount to be determined at trial, together with an award of costs, including reasonable attorneys' fees incurred in connection with this action, interest, and such other relief as the Court deems appropriate.

## COUNT III - QUANTUM MERUIT

35. Paragraphs 1-26 above are hereby incorporated by reference.

36. In the alternative, and to the extent the acts and omissions of FIDAC of which Underhill now complains are deemed to be outside the express and implied terms of the Agreement, FIDAC has been unjustly enriched through its failure to pay Underhill or Peskoff the fair value of their services.

37. Underhill and Peskoff provided services to FIDAC with the expectation that they would be paid for the services in accordance with the Agreement, discussions between the parties, and industry custom. Underhill and Peskoff did not provide these services to FIDAC as a gratuity.

38. FIDAC has received the full benefit of Underhill's and Peskoff's services without paying Underhill or Peskoff.

6

39. FIDAC will be unjustly enriched and Underhill and Peskoff will be unfairly deprived of the value of their services if FIDAC is not required to pay Underhill and/or Peskoff the fair value of their services.

40. An injustice can only be avoided by a Court order requiring FIDAC to pay Underhill or Peskoff the fair value of their services.

WHEREFORE, Underhill and Peskoff respectfully request this Court to enter judgment in their favor and against FIDAC in an amount to be determined at trial, together with an award of costs, including reasonable attorneys' fees incurred in connection with this action interest, and such other relief as the Court deems equitable and just.

## COUNT IV – DECLARATORY JUDGMENT

41. Paragraphs 1-26 above are hereby incorporated by reference.

42. For the reasons stated above, Underhill and/or Peskoff are entitled to receive 10% of the revenues received by FIDAC from the Premier and MBS Trust I, II, III and IV funds. Theses funds and FIDAC's receipt of revenues therefrom are ongoing and are expected to continue for years.

43. Underhill and Peskoff aver they are entitled to the present value of the expected revenues, as established at trial, in a lump sum. In the alternative, Underhill and Peskoff aver they are entitled to 10% of the revenues received by FIDAC as result of these funds as the revenues are received by FIDAC.

44. FIDAC contends that Underhill and Peskoff are not entitled to any additional revenues received by FIDAC as result of the Premier and MBS I, II, III and IV Trust funds.

45. Thus, there is an actual controversy regarding FIDAC's obligations to make payments to Underhill and/or Peskoff.

SL1 589028v3/100409.00001

**A-49**

WHEREFORE, in the event the Court determines Underhill and/or Peskoff are not entitled to a lump sum payment of projected fees they are entitled to receive resulting from future revenues to FIDAC, but rather should receive its fees as and when FIDAC receives the corresponding revenues, Underhill and Peskoff respectfully request this Court to enter judgment in their favor and against FIDAC:

(a)  Requiring annual accountings performed by an independent auditor at FIDAC's expense to determine the revenues received by FIDAC as a result of the Premier, MBS Trust I, II, III and IV funds;

(b)  Preventing FIDAC from manipulating its business so as to avoid payments to Underhill and Peskoff;

(c)  Requiring FIDAC to pay to Underhill and/or Peskoff 10% of the revenues received by FIDAC as the result of the Premier and MBS Trust I, II, III and IV funds, as determined by the accounting, within ten (10) business days within the completion of each accounting;

(d)  Awarding Underhill and/or Peskoff interest and costs, including reasonable attorneys' fees incurred in connection with this action; and

(e) Such other relief as the Court deems equitable and just.


Dated: February 13, 2006          STEVENS & LEE, P.C.


By: _____

Joseph Grey (De. Bar # 2358)
1105 North Market Street
Seventh Floor
Wilmington, DE 19801
TEL: (302) 654-5180
FAX: (302) 654-5181
EMAIL: jg@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP

   Robert L. Ruben (DC Bar #414580)
   Marshall F. Berman (DC Bar #020743)
   4800 Montgomery Lane, Suite 150
   Bethesda, MD 20814
   TEL: (301) 951-9696
   FAX: (301) 951-9636
   EMAIL: rruben@randalaw.com

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT CORPORATION,
*by and through Stephen D. Peskoff as successor in
interest*, and STEPHEN D. PESKOFF, *individually*,

                         Plaintiffs

        v.

FIXED INCOME DISCOUNT ADVISORY
COMPANY,

                      Defendant.

Civil Action No. 06-0099-SLR



### AMENDED COMPLAINT

    1.  Plaintiffs Underhill Investment Corporation, *by and through Stephen D. Peskoff as successor in interest* ("Underhill"), and Stephen D. Peskoff, *individually* ("Peskoff"), with the written consent of Defendant, file this Amended Complaint against Defendant Fixed Income Discount Advisory Company ("FIDAC" or "Defendant") for Defendant's refusal to pay Plaintiffs for services Plaintiffs performed for FIDAC with the reasonable expectation that FIDAC would compensate Plaintiffs for the fair market value of the services rendered.

### Jurisdiction and Venue

    2.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

    3.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because FIDAC is a resident of this district.

### Factual Background

    4.  Underhill, at all times relevant to this litigation, was an Ohio corporation with its principal place of business in McLean, Virginia.

DKT. NO. 31
DT. FILED 12/6/06

5.  Until its voluntary dissolution, Underhill was in the business of providing business and financial consulting services to private and publicly held businesses, including FIDAC.

6.  Peskoff is an adult individual and a citizen of Virginia.

7.  At all relevant times, Peskoff was the president, and the sole director, shareholder and employee of Underhill.

8.  Peskoff, as sole shareholder, officer and director, caused Underhill to be legally dissolved on or about November 1, 2004.

9.  Following dissolution, Underhill distributed and assigned to Peskoff, among other things, all of its rights, interests and claims against FIDAC.

10.  Peskoff is the successor in interest to all of Underhill's claims against FIDAC, including the claims set forth in this Amended Complaint.

11.  FIDAC is a Delaware corporation with its principal place of business located in New York, New York and a registered agent, United Corporate Services, Inc., located in Dover, Delaware.

12.  FIDAC is a fee-based capital management business.

13.  FIDAC's President and Chief Executive Officer is Michael A.J. Farrell ("Farrell") and its Vice-President is Ronald D. Kazel ("Kazel").

14.  In early 2004, FIDAC was purchased by Annaly Mortgage Management, Inc. ("Annaly") and remains a wholly owned subsidiary of Annaly.

15.  Annaly's stock trades on the New York Stock Exchange under the symbol "NLY."

16. According to Securities and Exchange Commission ("S.E.C.") filings, Farrell owns 2.19 million shares of Annaly's common stock and in 2005 earned compensation of $4.6 million.

17. FIDAC and Underhill entered into a Consulting Agreement dated February 15, 2000 (the "Agreement"), which was drafted by FIDAC but failed to provide a definite price term.

18. A true and correct copy of the Agreement is attached hereto as Exhibit "A."

19. The Agreement memorialized the parties' understanding that Underhill, by and through Peskoff, would provide certain consulting services to FIDAC and FIDAC would pay Plaintiffs for such services.

20. The Agreement provides that it will remain in effect during the life of the accounts unless the parties mutually agree to terminate the Agreement.

### Plaintiffs Rendered Consulting Services with the Reasonable Expectation of Payment under the Agreement

21. Plaintiffs provided numerous types of consulting services to FIDAC with the reasonable expectation they would be paid for their services under the Agreement including, without limitation, introducing FIDAC to new business partners and facilitating the new business relationships established as a result of Plaintiffs' introductions.

22. In the money management industry, consultants are typically paid a fee for services of the type provided by Plaintiffs based on a fair percentage of the management company's (here, FIDAC's) management fee on a go forward basis during the life of the relevant investment vehicle.

23.  Among others, Plaintiffs brought FIDAC together with (i) Emmanuel Friedman of Friedman, Billings, Ramsey & Co. ("FBR"), (ii) Ernie Baptista of Gen Advisors LLC, and (iii) Raniero Corsini of Sentry Select ("Sentry") (collectively, the "Introductions").

24.  In a letter to Underhill dated April 20, 2004, FIDAC, through Kazel, admitted that FIDAC's business relationships with Gen Advisors and Sentry are the result of Plaintiffs' Introductions.

25.  A true and correct copy of the April 20, 2004 letter from FIDAC to Underhill is attached hereto as Exhibit "B."

26.  At the time of the Introductions and all subsequent consulting services provided by Plaintiffs with respect to FBR, Gen Advisors and Sentry, the parties had not terminated the Agreement; in fact, as of the date of this filing, the parties still have never terminated the Agreement.

27.  In reliance on the Agreement and the parties' course of dealings, Plaintiffs made the Introductions and rendered all subsequent consulting services with the reasonable expectation FIDAC would pay Plaintiffs for their services.

28.  Plaintiffs' introduction of FBR resulted in FIDAC's retention as manager of a FBR affiliated real estate investment trust (the "FBR REIT") for a period of approximately two years.

29.  FIDAC recognized that it had an obligation to pay Plaintiffs for the services rendered in connection with FBR and the FBR REIT.

30.  FIDAC, in fact, made at least ten payments to Underhill between May 2000 and May 2002, with each payment representing twenty percent (20%) of the management fees received by FIDAC from its business relationship with the FBR REIT.

31. As a result of Plaintiffs' introduction of Baptista, FIDAC and Gen Advisors created Premier, an investment vehicle for banks, life insurance companies and other institutional investors from which FIDAC continues to receive substantial management fees.

32. During the discussions that led directly to the launching of Premier, Gen Advisors, through Baptista, questioned how Plaintiffs would be compensated for their services in putting the parties together and facilitating the development of their new business relationship.

33. FIDAC, acting through Farrell, represented to Gen Advisors and Plaintiffs that FIDAC would compensate Plaintiffs pursuant to an agreement already in place between Underhill and FIDAC.

34. Upon information and belief, FIDAC subsequently raised the issue of Plaintiffs' compensation to Gen Advisors on a second occasion and specifically directed Gen Advisors not to compensate Plaintiffs for their services in connection with Premier because FIDAC, alone, was responsible for paying Plaintiffs and FIDAC did not want Plaintiffs "double dipping," *i.e.*, being paid twice for the same services.

35. Absent FIDAC's repeated representations that it, alone, was responsible for paying Plaintiffs and FIDAC's instructions that Gen Advisors not pay Plaintiffs, Gen Advisors would have paid Plaintiffs for bringing FIDAC and Gen Advisors together and fostering their new business relationship.

36. At FIDAC's insistence, however, Gen Advisors refrained from itself compensating Plaintiffs for their services in bringing Gen Advisors and FIDAC together and facilitating the development of their business relationship.

SL1 679453v1/100409.00001

37.  In justifiable reliance on the Agreement with FIDAC and FIDAC's representation to Gen Advisors that FIDAC was responsible for paying Plaintiffs, Plaintiffs did not pursue compensation from Gen Advisors.

38.  As a result of Plaintiffs' introduction of Sentry in or about July 2003, FIDAC and Sentry created a series of mortgage backed securities trusts called MBS Trusts I, II, III and IV (the "MBS Trusts") and from which FIDAC continues to receive substantial management fees.

39.  Plaintiffs' introduction of Sentry gave FIDAC its first entry into the Canadian market for asset management services.

40.  Without the services of Plaintiffs, FIDAC would not have established business relationships with either Gen Advisors or Sentry.

41.  On December 22, 2003, FIDAC sent Underhill an unsolicited check for $30,000, representing ten percent (10%) of the $300,000 in management fees FIDAC anticipated receiving during its first year managing MBS Trust I.

42.  Other than this initial payment, however, FIDAC has failed to pay Plaintiffs any fees in connection with the substantial management fees FIDAC has received from its ongoing business relationship with Sentry and its investment vehicles, MBS Trusts I, II, III and IV.

43.  Furthermore, without justification or excuse, FIDAC has never paid Plaintiffs anything with respect to its business relationship with Gen Advisors and the Premier fund, despite collecting millions of dollars in management fees for managing the Premier fund.

44.  In an attempt to justify its non-payment, Defendant, through Farrell and Kazel, complained to Peskoff that the Premier fund had not been profitable.  Whether or not that

statement was true when made, ultimately, the Premier fund has resulted and will in the future result in Defendant's collection of millions of dollars in management fees.

45. In his letter dated April 20, 2004, Kazel informed Plaintiffs that FIDAC would not make any further payments to Plaintiffs in connection with either the MBS Trusts or Premier. [*See* Exhibit "B"].

46. The Premier and each of the MBS Trusts accounts remained in effect on April 20, 2004, and still remain in effect and under FIDAC's management at the time of this filing.

47. FIDAC is currently receiving approximately $10,800,000 per year in management fees from Premier and the MBS Trusts as a result of Plaintiffs' Introductions of Gen Advisors and Sentry, and these revenues are increasing each year.

48. Plaintiffs cannot determine their exact entitlements without a full current and annual accounting of FIDAC's revenues.

## COUNT I - QUANTUM MERUIT

49. Each preceding paragraph above is hereby incorporated by reference.

50. FIDAC has been unjustly enriched through its failure to pay Plaintiffs the fair market value of their services in connection with Premier and the MBS Trusts.

51. Plaintiffs provided such services to FIDAC with the expectation that FIDAC would pay for the services.

52. Plaintiffs did not provide these services to FIDAC as a gratuity.

53. FIDAC has received the full (and substantial) benefit of Plaintiffs' services without paying Plaintiffs for the same.

54. FIDAC will be unjustly enriched and Plaintiffs will be unfairly deprived of the value of their services if FIDAC is not required to pay Plaintiffs the fair market value of their services.

55. Injustice can only be avoided by a Court order requiring FIDAC to pay Plaintiffs the fair market value of their services provided in connection with Premier and the MBS Trusts.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor and against FIDAC in an amount to be determined at trial, together with an award of costs incurred in connection with this action, interest, and such other relief as the Court deems equitable and just.

## COUNT II – PROMISSORY ESTOPPEL

56. Each preceding paragraph above is hereby incorporated by reference.

57. FIDAC represented to Ernie Baptista of Gen Advisors and to Plaintiffs that FIDAC would compensate Plaintiffs under the Agreement for the introduction of FIDAC to Gen Advisors.

58. FIDAC specifically directed Baptista that Gen Advisors should not compensate Plaintiffs for their services facilitating the FIDAC-Gen Advisors relationship.

59. Upon information and belief, Gen Advisors refrained from compensating Plaintiffs because FIDAC instructed that payment by Gen Advisors would constitute "double dipping" by Plaintiffs in light of the fact FIDAC was responsible for paying Plaintiffs for their services.

60. Absent this instruction by FIDAC, Gen Advisors would have paid Plaintiffs a fair percentage fee, representing the reasonable value of Plaintiffs' services resulting in the creation and management of Premier by FIDAC.

61. In justifiable reliance on FIDAC's promise to pay, Plaintiffs did not pursue compensation from Gen Advisors.

62. Injustice can only be avoided by a Court order requiring FIDAC to pay Plaintiffs the fair market value of their services.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against FIDAC in an amount to be determined at trial, together with an award of costs incurred in connection with this action, interest, and such other relief as the Court deems appropriate.

## COUNT III – DECLARATORY JUDGMENT

63. Each preceding paragraph above is hereby incorporated by reference.

64. For the reasons stated above, Plaintiffs are entitled to receive the fair market value of their services provided to FIDAC in connection with Premier and the MBS Trusts.

65. Plaintiffs are entitled to the present value of the expected revenues, as established at trial, in a lump sum. In the alternative, Plaintiffs are entitled to a fair percentage of the management fees received by FIDAC as result of these funds on a rolling basis as the revenues are received by FIDAC.

66. FIDAC contends that Plaintiffs are not entitled to any additional further compensation in connection with the MBS Trusts or Premier.

67. Thus, there is an actual controversy regarding FIDAC's obligations to make payments to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against FIDAC and award a lump sum of the projected fees Plaintiffs are entitled to receive resulting from FIDAC's future management fees or, in the alternative, enter judgment:

(a)  Requiring annual accountings performed by an independent auditor at FIDAC's expense to determine the revenues received by FIDAC as a result of the Premier, MBS Trust I, II, III and IV funds;

(b)  Preventing FIDAC from manipulating its business so as to avoid payments to Underhill and Peskoff;

(c)  Requiring FIDAC to pay to Plaintiffs a fair percentage of the management fees received by FIDAC as the result of the Premier and MBS Trust I, II, III and IV funds, as determined by the accountings, within ten (10) business days of the completion of each accounting;

(d)  Awarding Plaintiffs interest and costs incurred in connection with this action; and

(e)  Such other relief as the Court deems equitable and just.

Dated:  December 30, 2006                STEVENS & LEE, P.C.


By: _____
   Joseph Grey (DE Bar No. 2358)
   G. Thompson Bell, III, *pro hac vice*
   Pa. Attorney I.D. No. 32649
   1105 North Market Street
   Seventh Floor
   Wilmington, DE 19801
   TEL: (302) 654-5180
   FAX: (302) 654-5181
   EMAIL: jg@stevenslee.com
          gtb@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP

Robert L. Ruben, *pro hac vice*
D.C. Attorney I.D. No. 414580
Marshall F. Berman, *pro hac vice*
D.C. Attorney I.D. No. 020743
4800 Montgomery Lane, Suite 150
Bethesda, MD 20814
TEL: (301) 951-9696
FAX: (301) 951-9636
EMAIL: rruben@randalaw.com
        mberman@randalaw.com

*Attorneys for Plaintiffs*
*Underhill Investment Corp. and Stephen D. Peskoff*

# EXHIBIT A

# FIDAC

**Fixed Income Discount Advisory Company**



February 15, 2000

Mr. Steve Peskoff
Underhill Investment Corp.
7414 Old Maple Square
McLean , VA  22102

Re:  <u>Consulting Engagement</u>

Dear  Mr. Peskoff :

This letter will confirm our engagement regarding the provision of consulting services by  Underhill Investment Corp.  ("Underhill") to Fixed Income Discount Advisory Company ("FIDAC").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Underhill and FIDAC agree as follows:

1. **<u>Consulting Services</u>**.  Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the "Accounts").

2. **<u>Compensation</u>**.  FIDAC shall pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC to Underhill monthly and calculated in accordance with the formula described in the (the "Accounts Agreements").

3. **<u>Term; Termination</u>**.  Unless earlier terminated in ordinance with this paragraph, this Agreement shall be for an initial term of one year, commencing on February 15, 2000, and ending on  February 15, 2001.  Upon expiration of the initial term, and provided that neither party shall be in default hereunder, this Agreement shall be automatically renewed under the same terms and conditions for successive one-year terms, each expires and ending on the same date one year later.  Either Underhill or FIDAC may terminate this Agreement by delivering written notice to the other party; provided, however, that neither party shall terminate this Agreement without written consent  of the other party so long as any of the Account Agreements remain in effect.

12 E. 41st Street • Suite 700 • New York, NY 10017 • 1-800-487-9947 • Tel: 212-696-0100 • Fax: 212-696-9809

A-64

4. __Notices__ . Unless otherwise directed, all communications or notices required or permitted hereunder will be directed to Underhill at the address set forth above. Likewise, if you wish to communicate with us or serve any notice required or permitted under this Agreement, please contact us at:

Fixed Income Discount Advisory Company
12 E. 41st Street
Suite 700
New York, NY 11021

5. __Assignability__. Our relationship is a personal one and cannot be assigned, sold or in any manner hypothecated or pledged by either of us without the written consent of the other party. No merger, sale, or consolidation will effect the transfer of this Agreement.

6. __Amendment__. This Agreement may be amended only by a writing executed by both parties.

7. __Binding Affect__. This Agreement shall be binding upon, and shall insure the benefit of, the parties hereto and their respective heirs, successors, and assigns.

8. __Governing Law__. This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware.

9. __Independent Contractor__. Underhill is and shall hereafter be an independent contractor vis-à-vis FIDAC, and nothing herein may be interpreted or construed so as to create any employment, partnership, joint venture, or other relationship, between Underhill and FIDAC or their respective employees, representatives and agents.

10. __Best Efforts: Liability__ . Underhill shall exercise its best efforts and judgement in the performance of its duties hereunder. Neither Underhill nor its owners, officers, directors, or employees, shall incur, any liability in connection with the performance of such duties, and obligations, except, in the case of bad faith, willful misfeasance and gross negligence.

If the foregoing accurately states our agreement, please signify your acceptance by signing and dating below where indicated.

Very truly yours,

FIXED INCOME DISCOUNT
ADVISORY COMPANY

By _____

Michael A. J. Farrell, Chairman

ACCEPTED AND AGREED
To as of the February 15, 2000

Underhill Investment Corp.

Steve Peskoff

A-66

# EXHIBIT B



# FIDAC

**Fixed Income Discount Advisory Company**

April 20, 2004

Mr. Steve Peskoff
Underhill Investment Corporation
1660 International Drive
Suite 400
McLean, VA 22102

Dear Steve:

I received your letter dated as of the 12th of this month and wanted to respond to you in a timely manner.

During the last two years FIDAC has successfully grown its business through the launch of five different investment vehicles which are marketed in China, Japan, Latin America, Canada (MBS Trust) and the US life insurance market (Premier). The latter two of which you provided the initial introduction to the principals involved in their formation. Although I understand that you have a personal relationship with Mr. Baptista, you should realize that not only is the information he provided you incorrect, but it is in direct violation of the terms of the Confidentiality Agreement entered into between us and his organization. Based upon the extensive development time and costs involved for launching Premier, and the nominal level of assets currently in the fund, we have yet to see a positive return on our investment. While we have a dedicated team of investment professionals involved in the daily management of the fund who are responsible for its above market returns, we are dedicating limited resources to the further marketing of this product.

On numerous prior occasions Mike has mentioned to you that the least successful of products we launched in the past two years have been MBS Trust and Premier. Nonetheless, Mike discussed with you in December 2003 that he would compensate you for your limited involvement in these products and a check was issued to you on December 22, and cashed by you, for $30,000. It was also explicitly explained that there would be no further consideration paid to you and this letter serves as a further reiteration of that position.

Regards,

Ronald D. Kazel

1211 Avenue of the Americas • 29th Floor • New York, NY 10036 • 1-800-487-9947 • Tel: 212-696-0100 • Fax: 212-696-9809

A-68

## CERTIFICATE OF SERVICE

I, Joseph Grey, hereby certify that on this 6th day of December, 2006, and in addition to the service provided under the Court's CM/ECF filing system, I caused true and correct copies of the foregoing Amended Complaint to be served by first class United States mail, postage prepaid, addressed to Defendant's counsel as follows:

John L. Reed, Esquire
Denise Seastone Kraft, Esquire
EDWARD'S ANGELL PALMER & DODGE LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801

Gerald A. Novack, Esquire
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York 10022

Joseph Grey

## Complaints and Other Initiating Documents
1:06-cv-00099-SLR Underhill Investment Corporation et al v. Fixed Income Discount Advisory Company
MEDIATION

### U.S. District Court

### District of Delaware

### Notice of Electronic Filing

The following transaction was entered by Grey, Joseph on 12/6/2006 at 3:30 PM EST and filed on 12/6/2006

| | |
|---|---|
| **Case Name:** | Underhill Investment Corporation et al v. Fixed Income Discount Advisory Company |
| **Case Number:** | 1:06-cv-99 |
| **Filer:** | Underhill Investment Corporation |
| **Document Number:** | 31 |

**Docket Text:**
AMENDED COMPLAINT against Fixed Income Discount Advisory Company- filed by Underhill Investment Corporation. (Attachments: # (1) Exhibit A# (2) Exhibit B# (3) Certificate of Service)(Grey, Joseph)

#### 1:06-cv-99 Notice has been electronically mailed to:

Joseph Benedict Cicero    jcicero@eapdlaw.com

Joseph Grey    jg@stevenslee.com

Gerald A. Novack    gnovack@klng.com, skenney@klng.com

John Leonard Reed    jreed@eapdlaw.com

#### 1:06-cv-99 Notice has been delivered by other means to:

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=12/6/2006] [FileNumber=312011-0]
[745710f021996c18423c524dbb0976687b7ec9b3f499c1f94e50f54b0427b8804b12
a20f88f04746887fe88475c445c85b08805e4b44cefed22a23b16ac1445b]]
**Document description:** Exhibit A

### A-70

F 00291

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

REDACTED

CONFIDENTIAL

F 00292

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

REDACTED

CONFIDENTIAL

A-72



**WILCOX & FETZER LTD.**

In the Matter Of:

# Underhill Investment Corporation and Peskoff

v.

# Fixed Income Discount Advisory Company

## C.A. # 06-99 SLR

Transcript of:

# Stephen D. Peskoff

## Volume # 1
## October 10, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-73

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT CORPORATION:

and STEPHEN D. PESKOFF,

                                      :

                Plaintiffs,

                                        :

           vs.                      Civil Action No.

                                      :      06-99 SLR

FIXED INCOME DISCOUNT ADVISORY

COMPANY,                          :

                Defendant.    :

                        - - -

          Deposition of STEPHEN D. PESKOFF,
taken pursuant to notice in the law offices of Edwards
Angell Palmer & Dodge LLC, Suite 1500, 919 North
Market Street, Wilmington, Delaware, on Tuesday,
October 10, 2006, at 1:12 p.m., before Lorraine B.
Marino, Registered Diplomate Reporter and Notary
Public.

                        - - -

**A-74**

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 2

```
 1  APPEARANCES:
 2      G. THOMPSON BELL, III, ESQ.
        Stevens & Lee
 3      111 North Sixth Street
        Reading, PA  19603-0679
 4           -and-
        ROBERT L. RUBEN, ESQ.
 5      Ruben & Aronson, LLP
        4800 Montgomery Lane - Suite 150
 6      Bethesda, MD  20814
            for Plaintiffs
 7
        JOHN L. REED, ESQ.
 8      Edwards Angell Palmer & Dodge LLP
        919 North Market Street - Suite 1500
 9      Wilmington, DE  19801
             -and-
10      GERALD A. NOVACK, ESQ.
        SARAH P. KENNEY, ESQ.
11      Kirkpatrick & Lockhart Nicholson
        Graham LLP
12      599 Lexington Avenue
        New York, NY  10022-6030
13          for Defendant
14  ALSO PRESENT:
15      R. NICHOLAS SINGH, ESQ.
        FIDAC General Counsel
16
            ---
17
18
19
20
21
22
23
24
```

Page 3

```
 1          STEPHEN D. PESKOFF, having been first
 2  duly sworn, was examined and testified as follows:
 3          MR. NOVACK:  Robert, we will have the
 4  same stipulations we did at the depositions of
 5  Mr. Cocke and Mr. Devlin?
 6          MR. RUBEN:  That's right.  Do you have
 7  any extras?
 8          MR. BELL:  No.  I mean, I think just
 9  to be clear on what those are, objections are reserved
10  until the time of trial, except to the form of the
11  question.
12          MR. NOVACK:  And privilege issues.
13          MR. BELL:  And privilege issues.  And
14  we do want the witness to read and sign.  I don't know
15  whether that was one of your stipulations.
16          MR. NOVACK:  Yes, we want him to do it
17  also.
18          MR. BELL:  Okay.
19          MR. NOVACK:  And it can be sworn to
20  before any notary.  And are we waiving any filing of
21  the deposition at this time --
22          MR. BELL:  Yes.
23          MR. NOVACK:  -- to the extent it is
24  required?
```

Page 4

```
 1          MR. BELL:  Yes.
 2          MR. NOVACK:  Mr. Bell, do you want to
 3  make any statement at the outset as to what your
 4  current position is with regard to what the
 5  plaintiffs' claim is in this lawsuit?
 6          MR. BELL:  Well, I don't know whether
 7  I would characterize it quite that way, but I will put
 8  on the record that it is our intention to amend the
 9  complaint to correct an inaccuracy which we discovered
10  since filing the complaint, which is that the
11  percentage of FIDAC's fees that Underhill was paid by
12  FIDAC in connection with the FBR REIT transaction was
13  not 10 percent, as stated in paragraph 14 of the
14  complaint, but 20 percent.
15          MR. NOVACK:  And is there going to be
16  any amendment of the complaint to allege that the
17  agreement was that there would be 20 percent paid
18  versus 10 percent, as currently alleged in the
19  complaint?
20          MR. BELL:  That will probably not be
21  the -- there will probably be an amendment of what the
22  agreement provided, but it probably will not be that
23  it was 20 percent.
24
```

Page 5

```
 1  BY MR. NOVACK:
 2  Q.      Mr. Peskoff, have you ever been deposed
 3  before today?
 4  A.      Yes.
 5  Q.      How many times?
 6  A.      I don't recall.
 7  Q.      Was it more than three?
 8  A.      Probably.
 9  Q.      Was it more than five?
10  A.      No.
11  Q.      Somewhere between three and five times?
12  A.      Yes.
13  Q.      Was it in civil litigation --
14  A.      Yes.
15  Q.      -- as opposed to criminal?
16  A.      Yes.
17  Q.      Was it in connection with any commercial
18  matters versus a matrimonial or personal injury case?
19  A.      Yes.
20  Q.      How many times was it in connection with
21  commercial matters?
22  A.      One.
23  Q.      Can you generally tell me what the subject
24  matter was, without details?
```

2 (Pages 2 to 5)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 6

1    A.    It would be difficult, I mean, without
2    details, because it was a very complicated lawsuit.
3    Q.    Were you a party to it?
4    A.    Yes.
5    Q.    Were you a plaintiff or defendant?
6    A.    I was a plaintiff.
7    Q.    Did you assert claims against someone for
8    money damages?
9    A.    Yes.
10    Q.    Did you testify at a trial?
11    A.    Yes.
12    Q.    Did the case go to a decision by either a
13    judge or a jury?
14    A.    I don't recall.
15    Q.    Do you recall whether the case was
16    settled --
17    A.    Yes.
18    Q.    -- ultimately?
19    A.    Yes, it was ultimately settled.
20    Q.    Do you recall whether or not it was settled
21    after there was a decision by a judge, even if not
22    embodied in a formal document, something stated from
23    the bench?
24    A.    I think -- I don't recall.

Page 7

1    Q.    How long ago was this?
2    A.    1990.
3    Q.    If you recall, did the judge make any
4    findings with respect to anyone's testimony in that
5    case?
6    A.    I don't recall.
7    Q.    Which court was it in?
8    A.    It was in federal court in Toledo, Ohio.
9    Q.    Who was your counsel?
10    A.    If I remember his name. I don't remember
11    his name offhand. First name was Bill.
12    Q.    Do you think --
13    A.    Still practicing.
14    Q.    I am sorry. I didn't mean to cut you off.
15    Can you repeat what you said?
16    A.    His first name was William. I don't
17    remember his last name. I haven't talked to him in
18    years.
19    Q.    Did that claim involve Underhill Investment
20    Corporation?
21    A.    I don't -- I don't recall, but I don't -- I
22    don't recall it was Underhill or not.
23    Q.    Do you recall who the plaintiff was?
24    A.    I think the plaintiff -- I think the

Page 8

1    plaintiff was me.
2    Q.    Individually?
3    A.    That's correct.
4    Q.    All right. In connection with that case
5    were there any documents filed with the court? And do
6    you know -- can you tell us how we could find out the
7    name of the case, some record you have?
8    A.    I am sure I can get you the information.
9    Q.    Okay? I don't have it in my -- I don't have it
10    obviously at my fingertips. It has been 16 years,
11    and, you know, I can get it to my lawyers, who can get
12    it to you.
13    Q.    Did the case involve a finder's fee claim?
14    A.    No.
15    Q.    Did the case involve a contract claim,
16    breach of contract claim?
17    A.    I don't think so. I don't -- I don't recall
18    specific -- it was a very complicated case.
19    Q.    You have given us everything you can recall
20    about what the case --
21    A.    Yes.
22    Q.    -- entailed?
23    A.    Right.
24    Q.    When did you first learn that you were going

Page 9

1    to be deposed in this action? You can give me an
2    approximate time.
3        MR. BELL: In this action? You are
4    referring to the current case as opposed to the Ohio
5    action?
6        THE WITNESS: This case?
7        MR. NOVACK: This action. I have now
8    shifted to the current action, yes. Thank you for the
9    clarification.
10        THE WITNESS: Probably -- let's see --
11    five weeks ago, six weeks ago, something of that. I
12    don't remember exactly, but --
13    BY MR. NOVACK:
14    Q.    Tell me what steps you took to prepare for
15    giving testimony. And I don't want you to tell me the
16    substance of any conversations with your counsel. I
17    just want to know what steps you took generally.
18    A.    What steps I took. I reviewed various
19    documents between myself and FIDAC, reviewed
20    communications and meetings that had happened from 19
21    -- let's see. From 2000 to the present. Looked at
22    trips, expenses, notes, that kind of thing.
23    Q.    Did you do any of that before you first went
24    to see counsel in June 2005 with respect to this

3 (Pages 6 to 9)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 10

1  matter, referring to the Hogan & Hartson firm?
2  **A.    Did I do any of that before?**
3  Q.    Yes.
4  **A.    No.**
5  Q.    Did you look at any documents relating to
6  FIDAC before you went to the Hogan & Hartson firm to
7  speak to them in June of 2005?
8  **A.    Yes.**
9  Q.    What did you look at then?
10  **A.    I looked at the original contract between**
11  **FIDAC and myself.**
12  Q.    What else did you look at?
13  **A.    That's all.**
14  Q.    After you spoke to the Hogan & Hartson firm
15  in June of 2005, were they ever engaged by you?
16  **A.    No.**
17  Q.    You then, I believe, spoke to Mr. Ruben's
18  firm?
19  **A.    Correct.**
20  Q.    That was Mr. Ruben that you knew at the
21  firm?
22  **A.    Yes.**
23  Q.    And when you spoke to Mr. Ruben, he wrote a
24  letter afterwards which was sent in September of 2005.

Page 11

1  Do you recall that letter?
2  **A.    Unless I look at it. I don't remember, you**
3  **know, anything in the back of my head. I would like**
4  **to see the letter.**
5  Q.    Do you recall whether or not Mr. Ruben wrote
6  a letter to FIDAC laying out your request for
7  compensation from FIDAC?
8  **A.    That was the pre filing of the lawsuit.**
9  **Yes, I remember seeing it.**
10  Q.    Do you remember reading it before it went
11  out?
12  **A.    I am sure I read it before it went out.**
13  Q.    My question to you now is: Before that
14  letter was sent out, did you review any other
15  documents to give information to Mr. Ruben?
16  **A.    Did I review any documents?**
17  Q.    You have told us you looked at what you
18  allege is the contract. Did you look at another piece
19  of paper before Mr. Ruben's letter went out?
20  **A.    I am sure I did.**
21  Q.    Do you know what you looked at?
22  **A.    Yes.**
23  Q.    What did you look at?
24  **A.    I asked my secretary and myself to put**

Page 12

1  **together a, quote, time line of information.**
2  Q.    What month did you do that? His letter went
3  out in September.
4  **A.    I don't recall, but it had to be before**
5  **that.**
6  Q.    Did you do the time line for yourself in
7  order to enable yourself to recall what had occurred
8  in connection with the FIDAC matter?
9  **A.    Yes.**
10  Q.    Did you do it before you went to see
11  Mr. Ruben?
12  **A.    Before I went to see -- no.**
13  Q.    You did it after you first saw him?
14  **A.    Yes.**
15  Q.    And who is the person that assisted you in
16  creating that time line?
17  **A.    My assistant, Josie Zellars.**
18  Q.    Could you spell that for the reporter?
19  **A.    J-O-S-I-E Z-E-L-L-A-R-S.**
20  Q.    In putting together the time line, did you
21  look at any of your financial records reflecting how
22  much you had received from FIDAC?
23  **A.    Yes.**
24  Q.    Did you look at your notes that you had

Page 13

1  taken of your dealings with FIDAC during the period
2  2000 through 2005?
3  **A.    Repeat the question.**
4       MR. NOVACK:  Could you read it back,
5  please?
6       (The court reporter read back as
7  follows:
8       "Question:  Did you look at your notes
9  that you had taken of your dealings with FIDAC during
10  the period 2000 through 2005?")
11       THE WITNESS:  Yes.
12  BY MR. NOVACK:
13  Q.    Did you -- after you met with Mr. Ruben and
14  after his letters went out, did you then look at
15  additional documents with regard to this matter?
16  **A.    Yes.**
17  Q.    When was that?
18  **A.    I don't recall. I mean --**
19  Q.    Give me a month.
20  **A.    You know, I mean, I don't have a chart in**
21  **front of me, but obviously, I reviewed -- let's see.**
22  **I can't give you a specific time, I mean.**
23  Q.    Well, between the time the letter went out
24  from Mr. Ruben and the time this complaint was filed

4 (Pages 10 to 13)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 14

1  in this action, did you review additional documents?
2  A.    Yes.
3  Q.    What are those documents?
4  A.    I looked at every bill, every travel
5  voucher, every phone conversation, every note that I
6  had ever taken from February 2000 up until the
7  present, which was at that time. And I put it in a
8  time line.
9  Q.    You furnished all those documents to
10  Mr. Ruben?
11  A.    Yes.
12  Q.    After the complaint was filed did you then
13  look at additional documents that you had in your
14  files that you had not looked at previously?
15  A.    Yes.
16  Q.    What were those documents?
17  A.    Repeat that question.
18  Q.    What were those documents?
19  A.    Those documents were additional pieces of
20  the FIDAC/Annaly file that were there. That we
21  essentially just overturned, just flipped over all the
22  wallets that I had, annual reports, news reports,
23  clippings, anything that related to FIDAC/Annaly
24  during that period of time.

Page 15

1  Q.    Well, you have described publicly available
2  documents to me so far. What else? Anything else?
3  A.    Yes. I found the contract that I received
4  from Ron Kazel that had to do with the Sentry matter.
5  It was the contract between FIDAC and Sentry.
6  Q.    What else? Any other document that you
7  looked at for the first time after the complaint was
8  filed?
9  A.    No, not any document of that kind of
10  magnitude or relevance.
11  Q.    Just tell me, did you look at any document
12  that related to the FIDAC matter after the complaint
13  was filed that you haven't described for us in your
14  testimony so far, whether you regard it of magnitude
15  or relevance?
16  A.    Nothing that I am aware of.
17  Q.    Did you look at any records that reflected
18  the compensation that was paid to Underhill by FIDAC?
19  A.    Yes.
20  Q.    Did you look at that before you went to see
21  Mr. Ruben?
22  A.    Before I went to see Mr. Ruben.
23  Q.    Let me rephrase it.
24  A.    Yes.

Page 16

1  Q.    Before Mr. Ruben sent out his letter, had
2  you reviewed documents reflecting amounts paid to
3  Underhill by FIDAC?
4  A.    Yes.
5  Q.    And you had that information in your head
6  and you knew what it was before the letter was sent;
7  right?
8  A.    No. I had -- no, that's not correct. I had
9  it in part of a time line package of communication. I
10  hadn't really reviewed every document that was there.
11  We were just trying to put together some information
12  that -- from year 2000 up until the time that I
13  thought would be helpful to Mr. Ruben.
14  Q.    Describe this time line. You refer to it as
15  a package sometimes; then you call it a time line. Is
16  it a series of documents that you arranged in
17  chronological order or is it something else?
18  A.    Just a series -- it was a combination of a
19  document, a contract that was signed in February of
20  2000, phone conversations, other materials, just
21  general information that was put together in a time
22  line.
23  Q.    Did you take existing documents that you had
24  and arrange them in some sequence and that's the time

Page 17

1  line that you are referring to or was it more than
2  that?
3  A.    It was taking existing papers, documents
4  that I had, and put them into a time line so that
5  Mr. Ruben could understand.
6  Q.    When you say a time line, you mean a
7  sequence? You arranged them in a sequence?
8  A.    That's correct.
9  Q.    Okay.
10  A.    I said that before.
11  Q.    You didn't write a memorandum to Mr. Ruben,
12  did you?
13  A.    No.
14  Q.    Did you write any notes to him when you were
15  delivering this time line?
16  A.    Any notes to him? Not that I recall.
17  Q.    All right. Was it your belief that --
18  withdrawn.
19  After the complaint was filed you have told
20  us you looked at some documents for the first time
21  that related to this matter.
22  A.    Mm-hmm.
23  Q.    When did you look at documents that caused
24  you to take the position that 20 percent had been paid

5 (Pages 14 to 17)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                    C.A. # 06-99 SLR                          October 10, 2006

Page 18

1  rather than 10 percent?  What month of what year did
2  you look at those documents?
3      A.      Month, what year.  I can't answer with
4  specificity.  I mean, but it was after the initial
5  meeting and after giving Mr. Ruben the time line
6  package.  There was a request -- I don't remember who
7  made the request, quite frankly -- to review
8  everything that was in my file.  And I went through
9  everything in the file, and then I realized that I
10 thought I was getting paid 10 percent, and when I
11 looked at the numbers on the check stubs, which I had
12 no reason to look at before, that number was 20
13 percent of whatever FIDAC's fee was.
14     Q.      Did you produce the documents that you
15 looked at that you have now described in connection
16 with --
17     A.      Yes.
18     Q.      -- this litigation?
19     A.      Yes.
20     Q.      All right.  We will show you those later.  I
21 think we have them.
22     A.      Yes.
23     Q.      Can you tell me, was it within the first
24 month after the complaint was filed?  Was it the

Page 19

1  second month?  The complaint was filed in February
2  2006.  When did you first discover this?
3      A.      You know, I really don't remember.
4      Q.      Well, let's try to help you.  Was it in
5  March?  Can you rule out March 2006?
6      A.      You know, I don't remember whether it was
7  March, April or May.  I went through a bunch of
8  documents, and I had a chance to really go through all
9  the details for my own personal reasons, and, you
10 know, and I discovered that, you know, that FIDAC had
11 paid me 20 percent, where I thought it was 10
12 originally.
13     Q.      You can't tell us whether you discovered
14 this in March, April, May, June, July or August 2006?
15     A.      It was during that time, obviously.
16     Q.      You can't tell us which of those months?
17     A.      I can't tell you which of those months,
18 because I worked -- I can't tell you which of those
19 months.
20     Q.      When you found out this fact, did you notify
21 counsel?
22     A.      Yes.
23     Q.      I am not asking you the substance.  I am
24 asking you when you notified counsel.  Do you remember

Page 20

1  when you notified them?
2      A.      No.
3      Q.      Was it right after you found out?
4      A.      Yes.
5      Q.      How quickly did you notify them?
6              MR. BELL:  Objection to form.
7              THE WITNESS:  Excuse me?
8  BY MR. NOVACK:
9      Q.      How soon after you found out did you notify
10 them?
11     A.      Almost immediately.
12     Q.      Within the same day?
13     A.      Maybe not the same day.  I don't know
14 whether I was traveling or not.  But certainly within
15 a 24 to 48-hour period.
16     Q.      Were you shocked when you discovered you had
17 been paid 20 percent?
18     A.      Yes.
19     Q.      Why were you shocked?
20     A.      Because historically all the conversations
21 that I have had in the past with Mike Farrell, let's
22 put it -- the last compensation contract, discussion I
23 had with him dealt with 10 percent.
24     Q.      Is that all you have to say why you were

Page 21

1  shocked?  Nothing more?
2      A.      Nothing more.
3      Q.      When was this last compensation
4  conversation, as you described it?

**REDACTED**

18     Q.      You remember this conversation took place in
19 December 2003?
20     A.      Yes.
21     Q.      Do you remember because you have an
22 independent recollection or because you have looked at
23 something that has refreshed your memory?
24     A.      No.  I remember the conversation.

6 (Pages 18 to 21)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                    C.A. # 06-99 SLR                    October 10, 2006

Page 22

1    Q.      You remember December 2003 but you can't
2    remember what was happening in March, April, May,
3    June, July or August of 2006?
4            MR. BELL: Objection.
5            MR. NOVACK: You can answer the
6    question, if you can.
7            THE WITNESS: It is simple to remember
8    a telephone conversation. With all the legal
9    documents that have been passed and all the
10   requirements to produce this, that and the other,
11   phone calls from my lawyers and miscellaneous stuff, I
12   don't have a time map in front of me. So, I mean --
13   so it is easier to remember the one phone conversation
14   on a specific matter than, you know, all the legal
15   details and papers that have been pushed around, you
16   know, over the last -- since the complaint had been
17   filed.
18           MR. NOVACK: Would you look at --
19   let's mark as Peskoff Exhibit 1 the answers to
20   interrogatories that were furnished to us by
21   Mr. Peskoff and Underhill's counsel. The reporter
22   will mark it, and then she will give you a copy,
23   Mr. Peskoff.
24           THE WITNESS: Okay, great.

Page 23

1            (Peskoff Deposition Exhibit No. 1 was
2    marked for identification.)
3    BY MR. NOVACK:
4    Q.      Mr. Peskoff, these are the answers to
5    interrogatories that were furnished by your counsel
6    and Underhill's counsel. If you turn to the last,
7    next to the last page, you will see a verification
8    that you signed. Am I correct that's your signature?
9    A.      I will get there.
10   Q.      Continue turning the page. Are you at the
11   next to the last page now?
12   A.      Yes.
13   Q.      Is that your signature?
14   A.      Yes.
15   Q.      Was it signed on August 29, 2006?
16   A.      Yes.
17   Q.      How long before you signed this verification
18   did you make the shocking discovery that the
19   compensation paid was 20 percent?
20           MR. BELL: Objection. You can answer
21   that if you can.
22           THE WITNESS: Please repeat the
23   question.
24           MR. NOVACK: Could you read it back,

Page 24

1    please?
2            (The court reporter read back as
3    follows:
4            "Question: How long before you signed
5    this verification did you make the shocking discovery
6    that the compensation paid was 20 percent?")
7            THE WITNESS: Probably several months,
8    several months before that.
9    BY MR. NOVACK:
10   Q.      I would like to read to you a portion of the
11   verification. Before I do, I just want to ask you,
12   were you in Pennsylvania when you signed this?
13   A.      Excuse me?
14   Q.      Were you in Pennsylvania when you signed the
15   verification?
16   A.      I don't think so.
17   Q.      Where do you think you were when you signed
18   it? What state?
19   A.      The State of Virginia.
20   Q.      Okay. The verification states in part that
21   the foregoing was "based upon facts of which I have
22   personal knowledge or is based upon information
23   furnished to me by counsel or by other employees of
24   Underhill Investment Corporation."

Page 25

1            Now, do you know what facts are based on
2    your personal knowledge and what facts were based upon
3    information given to you by employees of Underhill
4    Investment Corporation?
5    A.      Yes.
6    Q.      What were the facts given to you by the
7    employees?
8            MR. BELL: Are you asking him to go
9    through the interrogatories and identify every fact --
10           MR. NOVACK: If he recalls by subject
11   what facts in here were given to you by the employees
12   as opposed to things that you knew from your own
13   knowledge. And then the next question will be, of
14   course, who were the employees.
15           THE WITNESS: Most of the information
16   here was gathered by myself and my assistant, Josie
17   Zellars, who is the only employee. She is not an
18   employee. She is a consultant to Underhill, was a
19   consultant to Underhill, period. There are no other
20   employees.
21   BY MR. NOVACK:
22   Q.      Actually, there were no employees but you, I
23   guess, at the time?
24   A.      That's correct.

7 (Pages 22 to 25)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 26

1  Q.    And so this verification is inaccurate in
2  that respect?
3  A.    I can't comment on it legally. I mean, I
4  don't know the answer.
5  Q.    No. I am asking you factually, not legally.
6  It is inaccurate when it says that you had employees
7  at Underhill that furnished you information. There
8  were no other employees; correct?
9  A.    Technically, Josie Zellars was an employee
10 of Underhill Corporation up through the time the
11 company was liquidated. Once the company was
12 liquidated, I then gave her the option of being either
13 a consultant to Renaissance Corporation or being an
14 employee. She chose to be a consultant.
15 Q.    To Renaissance Corporation?
16 A.    That's correct.
17 Q.    Renaissance Corporation is not the same as
18 Underhill Investment Corporation, is it?
19 A.    No, it is not. No, it is not.
20 Q.    So I am correct. This verification is
21 wrong. There was no employee of Underhill who gave
22 you any information. Am I not correct?
23 A.    That would be correct then, yes. Yes.
24 Q.    Okay. Now, you state in here in the

Page 27

1  verification, "The facts set forth in the foregoing
2  document are true and correct to the best of my
3  knowledge, information and belief. I understand that
4  the statements herein are made subject to the
5  penalties of perjury and 18 Pa.C.S.A. Section 4904
6  relating to unsworn falsification to authorities."
7  Am I correct that you read this portion of
8  the verification before you signed it?
9  A.    I am not -- portion of the verification.
10 Q.    The language I just read you --
11 A.    Yes.
12 Q.    -- that appears four lines above your
13 signature. Did you read it before you signed the
14 verification?
15 A.    Yes, I read it. But I --
16 Q.    Did you -- I am sorry. Go ahead.
17 A.    I must have read it, yes.
18 Q.    Did you believe that the information in the
19 document, the foregoing document that was referred to,
20 was true and correct?
21 A.    Yes.
22 Q.    Did you carefully read each of the answers
23 that you were swearing to before you signed the
24 verification?

Page 28

1  A.    Yes.
2  Q.    Have you looked at the response before today
3  to see if there is anything you now want to change in
4  it? I am referring now when I say "response" to
5  Peskoff Exhibit 1.
6  MR. BELL:  So your question, so that I
7  am clear, is whether he has looked at this between the
8  time he signed the verification and today --
9  MR. NOVACK:  Yes.
10 MR. BELL:  -- to see whether there was
11 anything that was incorrect.
12 MR. NOVACK:  Yes. If that was not
13 clear, I will say that again.
14 BY MR. NOVACK:
15 Q.    After you signed the verification and before
16 today, did you reread it to see if anything in it was
17 incorrect?
18 A.    I have not.
19 Q.    Did you read the answers to the
20 interrogatories, which are Peskoff Exhibit 1, in order
21 to assist you in preparing for the deposition?
22 A.    No.
23 Q.    Did anyone -- withdrawn. Let's go to page 5
24 of the exhibit, please. There is a series here of

Page 29

1  requests which are numbered, which are the requests
2  that the defendants' counsel propounded, and then we
3  have the responses which were prepared by you and your
4  counsel. Do you remember having seen this response at
5  some time before you signed the verification or did
6  you sign the verification without having read the
7  response?
8  MR. BELL:  Objection to form.
9  MR. NOVACK:  What is wrong with the
10 form?
11 MR. BELL:  Well, I think that the
12 second thing doesn't necessarily follow from the first
13 thing.
14 MR. NOVACK:  Okay. You can answer my
15 question.
16 Do you want it read back?
17 Mr. Peskoff, do you need it read back?
18 THE WITNESS:  Yes, yes, please.
19 MR. NOVACK:  Please read it back.
20 (The court reporter read back as
21 requested.)
22 THE WITNESS:  I read the response.
23 BY MR. NOVACK:
24 Q.    You read the response before you signed the

8 (Pages 26 to 29)

Underhill Investment Corporation and Peskoff         v.         Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                C.A. # 06-99 SLR                    October 10, 2006

Page 30

1    verification?
2    A.    Yes.
3    Q.    And you believed it was 100 percent true and
4    accurate --
5    A.    That's correct.
6    Q.    -- and complete?
7    A.    Otherwise, I wouldn't have signed it.
8    Q.    The question that you responded to was:
9    "Identify all oral communications in which you or
10   anyone else referred to the letter dated February 15,
11   2000." You understood that was a request to list all
12   oral communications between either you or Underhill on
13   the one hand and anyone else on the other hand in
14   which the letter dated February 15, 2000 that you are
15   basing your lawsuit on was mentioned?
16   A.    Correct.
17   Q.    Okay. Did you consult any documents before
18   you verified this response as to what those oral
19   communications were?
20   A.    Yes, I did.
21   Q.    What did you consult?
22   A.    I went through every document, every bill,
23   every memo from February 2000 to the present.
24   Q.    And you are sure that other than what is

Page 31

1    described in this response, there were no other
2    conversations that occurred which are responsive to
3    this request?
4    A.    Not that I am aware of.
5    Q.    You are pretty certain of that?
6    A.    Yes.
7    Q.    In the second paragraph of the response to
8    Question 1 it states, "In addition, Peskoff and
9    Farrell had two telephone conferences in 2005
10   regarding Peskoff's demand to be paid in accordance
11   with the parties' consulting agreement dated
12   February 15, 2000. The exact dates of the telephone
13   conferences are unknown to plaintiffs. However, the
14   first occurred in approximately April or May 2005, and
15   the second occurred after plaintiffs' demand letter to
16   FIDAC dated September 9, 2005, but before filing of
17   the complaint."
18        You are 100 percent certain that's accurate
19   and complete?
20   A.    That I had -- to the best of my knowledge.
21   Q.    You have no reason to doubt that at all?
22   A.    No.
23   Q.    And you have come to this conclusion after a
24   careful review of all the documents?

Page 32

1    A.    Yes.
2    Q.    And you have come to this conclusion after
3    searching your memory as best you can to recall every
4    single conversation in which the February 15, 2000
5    letter was mentioned?
6    A.    Yes.
7    Q.    Let's go to Question 4, please. Take a
8    moment to read the response to Question 4 and the
9    question itself to yourself, please.
10   A.    (Pause) Okay.
11   Q.    You refer here to the conversation with
12   Mr. Farrell and the $30,000 payment. Was that the
13   same conversation that you were alluding to earlier
14   that occurred in December 2003?
15   A.    That's correct.
16   Q.    Before testifying today did you review any
17   documents that were furnished to your counsel by FIDAC
18   in connection with discovery in this lawsuit?
19   A.    Repeat the question, please.
20        MR. NOVACK:  Will you read it back,
21   please?
22        (The court reporter read back as
23   requested.)
24        THE WITNESS:  That was by FIDAC, that

Page 33

1    was given by FIDAC? The answer is no, I have not.
2    BY MR. NOVACK:
3    Q.    Have you seen any documents relating to this
4    dispute that have not come from your files?
5    A.    I have.
6    Q.    What documents have you seen?
7    A.    I have seen a stack of papers that FIDAC
8    answered my lawyers. I have not looked at them. They
9    are sitting on the desk, because they came in the
10   other day.
11   Q.    You have not looked at any of them?
12   A.    Haven't looked at one of them.
13   Q.    Not a one?
14   A.    Not a one.
15   Q.    Has anyone told you what is in any of those
16   documents?
17   A.    No, they haven't.
18   Q.    So have you asked anyone what is in those
19   documents?
20   A.    No, I have not.
21        MR. BELL:  Objection to the extent
22   that calls for attorney-client communications.
23        MR. NOVACK:  Well, since he has
24   answered -- I don't think that is going over the line,

9 (Pages 30 to 33)

Underhill Investment Corporation and Peskoff　　　v.　　　Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1　　　　　C.A. # 06-99 SLR　　　October 10, 2006

Page 34

1　but since we are beyond it, I am not going to --
2　BY MR. NOVACK:
3　Q.　　You have had no curiosity that you wanted
4　satisfied as to what might have come in from the other
5　side's documents? You weren't curious at all?
6　A.　　I was curious, but I was told by counsel --
7　　　　MR. NOVACK: No, no.
8　　　　MR. BELL: Objection.
9　　　　MR. NOVACK: I will object for you.
10　　　　MR. BELL: Thank you.
11　　　　MR. NOVACK: I don't want you to tell
12　me what your counsel has told you, at least in this
13　particular instance.
14　　　　THE WITNESS: No.
15　　　　MR. NOVACK: There may be other
16　occasions --
17　　　　THE WITNESS: No, no. That's not what
18　I was going to tell you. Okay? What I was saying is
19　that there were documents that arrived to my counsel's
20　office that were on a table -- okay? -- in response to
21　their request from FIDAC. I did not have a chance to
22　look at them nor look at the request, period.
23　BY MR. NOVACK:
24　Q.　　And you haven't asked anybody what, if

Page 35

1　anything, was of interest in those documents?
2　A.　　That is correct.
3　Q.　　Okay. And am I correct that no one has told
4　you anything about what is in those documents?
5　A.　　That is correct.
6　Q.　　Okay. Go to the answer to Question 4 on
7　Peskoff Exhibit 1, please.
8　A.　　Mm-hmm.
9　Q.　　Can you tell me when, if you can pin down
10　the date, in December 2003 you had this conversation
11　with Mr. Farrell in which he referred to the
12　10 percent that you testified to earlier?
13　A.　　I don't remember exactly the date, but it
14　was in December sometime 2003.
15　Q.　　Was it a few weeks before Christmas perhaps?
16　A.　　I don't recall whether it was before or
17　after, but it was in December, because the transaction
18　that he was working on had just gotten completed, I
19　assume.
20　Q.　　What transaction are you referring to?
21　A.　　The Sentry transaction.
22　Q.　　S-E-N-T-R-Y?
23　A.　　Right.
24　Q.　　Can you tell me whether this conversation

Page 36

1　with Mr. Farrell was in person or by phone?
2　A.　　By phone.
3　Q.　　Do you know if anything else was on the line
4　besides you and Mr. Farrell?
5　A.　　If they were, I didn't know about it.
6　Q.　　How long did the conversation last?
7　A.　　Five minutes.
8　Q.　　Could it have been only two minutes?
9　A.　　Could have.
10　Q.　　Who initiated the call?
11　A.　　You know, I don't remember who initiated the
12　call.
13　Q.　　Can you tell me everything that you can
14　remember that was said by either you or Mr. Farrell
15　during this conversation?

# REDACTED

Page 37

1　one it was.
2　Q.　　What else was said, if anything?
3　A.　　He mentioned -- he said that, you know,
4　that, you know, this should be considered, you know, a
5　one-time payment.
6　Q.　　What else was said?
7　A.　　And that was -- and then I sort of laughed
8　at that, you know, just said, "That's nice."
9　Q.　　What else was said, if anything?
10　A.　　That was 99 percent of what was said.
11　Q.　　Think for a moment. Take as much time as
12　you want. Was anything else said?
13　A.　　If there was, I don't remember.
14　Q.　　Certainly nothing important was said that
15　you don't remember?
16　A.　　I mean, it was a very short conversation,
17　and it dealt with what we just discussed.
18　Q.　　Are there any documents you could look at
19　that would help you refresh your recollection as to
20　anything else that might have been said? And I am not
21　suggesting anything else was said. I am just asking
22　are there any documents that exist that you are aware
23　of in your files that would assist you to refresh your
24　recollection.

10 (Pages 34 to 37)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 38

1  A.    There may be. You know, not that I recall.
2  Q.    You looked through your documents in the
3  course of bringing this lawsuit and you have tried to
4  recollect what happened in that December conversation,
5  have you not?
6  A.    No. The December conversation -- no. The
7  December conversation was very clear. It was short
8  and to the point. All right? So there, you know, I
9  recall mostly all of it.
10  Q.    Other than what you testified to, there is
11  no document or anything else -- well, let me withdraw
12  that.
13        Am I correct you can't recall a single other
14  fact about this conversation?
15  A.    No, I really can't.
16  Q.    Did you make any memo of the conversation
17  when it occurred?
18  A.    I don't remember. Possible.
19  Q.    When you went through your files, you didn't
20  see any memo of this conversation, did you?
21  A.    I didn't need my memos of this conversation.
22  Q.    I am sorry. Did you hear my question?
23  A.    Yes.
24  Q.    What did I ask you?

Page 39

1  A.    Did I make any notations in my files of
2  this. Okay? Conversation with him was very clear and
3  we were sort of in a hostile mode?
4  Q.    Why were you in a hostile mode?

**REDACTED**

17  Q.    When was the first event in the series of
18  events that led to this hostile situation existing in
19  December 2003? From your point of view what started
20  the ball rolling in creating the hostility?
21  A.    That's a difficult question to answer.
22  Q.    Take your time. My client will be pleased
23  that I was able to ask one difficult question.
24        Do you want the question read back again?

Page 40

1  A.    Please.
2        MR. NOVACK: Please read it back.
3        (The court reporter read back as
4  follows:
5        "Question: When was the first event
6  in the series of events that led to this hostile
7  situation existing in December 2003? From your point
8  of view what started the ball rolling in creating the
9  hostility?")
10        THE WITNESS: The first event was the
11  time that it took for him to sign a contract and
12  finalize, you know, the details of a marketing program
13  with GenCorp.
14  BY MR. NOVACK:
15  Q.    When was that occurring? When did this time
16  begin that he began to have to work out the details of
17  this agreement with GenCorp? Was it in 2002?
18  A.    I think so.
19  Q.    Go ahead.
20  A.    Yes. I introduced them it was either
21  January or February 2002, and it took nine months to
22  get a contract signed. And during that time Mike
23  became very upset at the cost of getting the ball off
24  the ground and that I guess there may have been also

Page 41

1  some changes in the law at the time that compounded
2  that. But he confronted me with, you know, that
3  sometime six months later, seven months later, that
4  GenCorp, the guys weren't doing their job; he had
5  $600,000 of expenses out of his pocket, and, you know,
6  he was angry that, you know, that this deal was
7  brought in to him. Okay?
8  Q.    So this would be something he communicated
9  to you six months or so after he first met with
10  GenCorp, which if you would say January or February
11  2002 is when he was first introduced, it would put it
12  sometime in July, August, September?
13  A.    I would say that's correct, yes. They
14  signed a contract sometime in October sometima.
15  Q.    Of 2002?
16  A.    I believe that's the case, yes.
17  Q.    So were there telephone exchanges between
18  you during this period January-February 2002 through
19  August-September 2002 in which Mike Farrell was
20  explaining how unhappy he was with the GenCorp
21  situation?
22  A.    I am sure there might have been.
23  Q.    You don't recall any specifically either
24  way?

11 (Pages 38 to 41)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1          C.A. # 06-99 SLR          October 10, 2006

Page 42

1  A.    No.  But I do recall meeting with him at one
2  time and him barraging me with how upset he was with
3  it.  And I said, "Show me the bills." I took out my
4  checkbook.  I said, "I will pay my proportionate share
5  of the bills.  If you show me 600,000, I will give you
6  a check for $300,000."  And he looked at me and just
7  said nothing and --
8  Q.    Where were you when you took out your
9  checkbook?
10  A.    I was in his office.
11  Q.    In New York City?
12  A.    Right.
13  Q.    That was FIDAC's office in New York City?
14  A.    It was Annaly's FIDAC office, yes.
15  Q.    You travel with your checkbook?
16  A.    Yes.
17  Q.    And did he actually show you the bills?
18  A.    No.  He didn't have to.
19  Q.    Well, I thought you just said, "Show me the
20  bills" and then --
21  A.    I just -- what I am saying is he and I had a
22  very unusual relationship, a very close relationship
23  for many years.  And, you know, if he said something,
24  you know, it generally was accurate.

Page 43

1  Q.    Okay.
2  A.    Okay?
3  Q.    So you understood when you were in the
4  offices in New York City with Mike Farrell that there
5  was something like $600,000 in expenses that FIDAC had
6  incurred in connection with trying --
7  A.    That's correct.
8  Q.    -- to move the GenCorp transactions along?
9  A.    That's correct.
10  Q.    Isn't it correct that there was also a
11  problem; that the original manner in which this
12  transaction contemplated to take place involving I
13  think it was bank-owned life insurance did not go
14  forward?  They refer to that as BOLI, B-O-L-I.
15  A.    I think they discussed three or four
16  different concepts of which the rules and laws
17  changed, and that's possibly correct.
18  Q.    Is it correct that you understood as of
19  August or September 2002 that Mike Farrell was not
20  only upset about the fact that he had or -- excuse
21  me -- FIDAC had sunk some $600,000 in expenses and
22  that he had spent significant time on it but also that
23  the transaction that they were working on doing was
24  not doable, that they had to come up with a new way to

Page 44

1  do things?
2  A.    That -- I am not sure he ever shared that
3  with me.
4  Q.    You understood that the laws had changed and
5  that the transaction could not be done as originally
6  contemplated by the time you were having this
7  conversation in the New York office of Annaly or
8  FIDAC?
9  A.    That's correct.  But he and the GenCorp
10  people talked about several different marketing
11  alternatives that I was not privy to.  I was at the
12  first two meetings, you know.  After that, you know,
13  they met, you know, directly.  So, I mean, I was not
14  kept, you know, informed step by step.
15  Q.    Between August or September 2002 and the
16  time you had the conversation in I guess December
17  2003 -- do I have those dates right?  Let me go back.
18  A.    I don't know what you are referring to.
19  Q.    I just want to make sure I have the dates
20  right.  You introduced him to GenCorp in January or
21  February 2002?
22  A.    I think that's correct.
23  Q.    And nothing was signed up between GenCorp
24  and FIDAC and Annaly until, you think, the fall of

Page 45

1  2002?  You said about nine months.
2  A.    I think that's correct.
3  Q.    And you told us about some of the reasons
4  why Mr. Farrell was hostile, as you described it, in
5  December 2003.  You told us about the delay in
6  reaching an agreement with GenCorp.  You told us about
7  changes in the law which made it necessary to change
8  the manner in which they were going to go about
9  creating whatever the product was.  You told us about
10  the time that Mr. Farrell had been spending, so far
11  unsuccessfully, on coming up with a product.  You told
12  us about the $600,000 in expenses.
13          Is there anything else that you were told
14  about by Mr. Farrell after -- either before September
15  2002 or after and prior to December 2003 that
16  contributed to the hostility that existed then?
17  A.    I think it was a combination of the GenCorp
18  relationship starting slowly and then picking up
19  tremendous momentum beyond, you know, what they
20  thought possible; and secondly, the disappointment
21  with the marketing of the Sentry transaction.  Okay?
22          So those two things -- okay? -- didn't meet,
23  from what I can remember, the timing or the goals that
24  Farrell and Sentry had set out together, because the

12 (Pages 42 to 45)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1          C.A. # 06-99 SLR          October 10, 2006

Page 46

1  deal was supposed to be substantially larger; right?
2  And it was cut. And simultaneously with that, which
3  also helped agitate him, was, you know, what happened
4  in 9/11. You know --
5  Q.   Well, that was two years before this
6  conversation --
7  A.   I understand.
8  Q.   -- in December 2003.

**REDACTED**

18  Q.   I am trying to understand. In December 2003
19  you said that Mike Farrell's agitation and his
20  hostility was also based in part on the Sentry Select
21  transaction, not just GenCorp? Is that what you just
22  testified to?
23  A.   What I said, there was two separate parts --
24  Q.   Right.

**REDACTED**

Page 47

4  Q.   I understand that.
5  A.   Okay.
6  Q.   My question is, in December 2003 you
7  described how agitated and hostile he was, and I am
8  asking whether or not that which you are now
9  testifying to about Sentry Select was one of the
10  things that was contributing --
11  A.   I think so.
12  Q.   -- to the hostility.
13  A.   I think it was, yes, yes.
14  Q.   Okay. Is there anything else that you can
15  recall that was contributing to his hostility in
16  December 2003?

**REDACTED**

Page 48

1         MR. NOVACK:   We only have two minutes
2  or less of tape remaining, so this would be a good
3  time for a short break.
4         MR. BELL:   That's fine.
5         (Recess taken.)
6  BY MR. NOVACK:
7  Q.   Mr. Peskoff, during the break did you think
8  of anything that you wanted to change in your prior
9  testimony?
10  A.   No.
11  Q.   Let me go back to this conversation in
12  December 2003. You told us everything you can recall
13  about what was said, and I think you told us that you
14  didn't make a note or a memorandum of the
15  conversation; right?
16  A.   You know, I didn't think there was anything
17  to make a memorandum of specifically.
18         You know what? There possibly could have
19  been. I could have dictated something to my secretary
20  that Mike and I talked. There could have been a this
21  (indicating). I don't remember. But it is possible.
22  Q.   The fact that I asked you whether or not
23  there was a memo was not meant to imply one way or the
24  other that you should or should not have. Okay? Just

Page 49

1  so you understand that.
2  A.   No, no, no.
3  Q.   You don't have to tell me why --
4         MR. RUBEN:   One at a time.
5         MR. BELL:   Yes. Steve, let him finish
6  your question.
7  BY MR. NOVACK:
8  Q.   I want to make it easier for you because the
9  questioning will go faster, if I ask you did you make
10  a memo or a note, if you simply say yes, no, I don't
11  know, or whatever the facts are. That is all I am
12  asking about.
13  A.   I understand.
14  Q.   I am not asking you why you didn't, unless I
15  ask you.
16  A.   Okay.
17  Q.   Okay? So let's practice. Did you make a
18  memo of the conversation?
19  A.   No.
20  Q.   Did you tell anybody about the conversation
21  at about the time it occurred?
22  A.   Not that I recall.
23  Q.   Did you ever tell anybody about that
24  conversation before this lawsuit was begun?

13 (Pages 46 to 49)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 50

1  A.    Yes.
2  Q.    Other than counsel, who did you tell, if
3  anyone?
4  A.    Probably my assistant, Josie Zellars.
5  Q.    You say probably your assistant. Is that
6  because you are speculating that you would have told
7  her but you don't actually know that you did? You
8  have no recollection of actually doing so?
9  A.    I am sure I must have either told her
10  verbally or there could be something there that -- I
11  don't recall the specific situation. This is three
12  years ago. Whether I took a memo or I didn't take a
13  memo or, you know, it was a serious enough
14  conversation that I mentioned it to her.
15  Q.    Why did you tell her?
16  A.    Because not only is she involved with my
17  corporate stuff; she is involved with all my personal
18  stuff.
19  Q.    Why does she have to know? Why did you
20  think at the time you should tell her this?
21  A.    She represents myself and knows all my
22  business negotiations that goes on and the details of
23  them. She -- period.
24  Q.    Did you expect her to do anything?

Page 51

1  A.    No.
2  Q.    Did you expect her to watch out for the
3  check?
4  A.    No.
5  Q.    You just told her then because as a matter
6  of course you would repeat to her what is going on in
7  your business; is that it?
8  A.    That is correct.
9  Q.    When you signed the February 2000 letter
10  that you are suing on in this lawsuit -- do you recall
11  that letter?
12  A.    The February 2000 letter.
13  Q.    The February 15, 2000 letter which you have
14  referred to in your complaint and in Mr. Ruben's
15  letter --
16  A.    Yes.
17  Q.    -- and which is part of the basis of your
18  lawsuit. Do you recall that letter without me showing
19  it to you?
20  A.    No, I don't, quite frankly.
21  Q.    Do you remember there is a letter that was
22  signed by you and Mr. Farrell that you are relying on
23  in this lawsuit?
24  A.    I would like to see what you are talking

Page 52

1  about.
2  Q.    I am asking you if you remember sitting
3  here --
4  A.    I don't. I don't remember.
5  Q.    You don't remember the terms of it or you
6  don't remember even if there is a letter that you are
7  relying on in this lawsuit to establish your claim?
8  A.    I don't remember any letter that you are
9  talking about. Okay? If there is a letter, I would
10  like to see it. My lawyer --
11  Q.    If you would just answer my questions and
12  not look to your lawyer for help right now.
13  A.    I don't -- I don't remember a letter. Okay?
14  Q.    Okay. As far as you are concerned, this
15  letter, if it does exist, is of no importance to you?
16  A.    It would be of importance to me if it
17  exists.
18  Q.    Well, if it was important, would you know it
19  exists?
20      MR. BELL:  Objection to the form.
21      THE WITNESS:  Jesus.
22  BY MR. NOVACK:
23  Q.    Don't look to your counsel for help, please.
24  A.    I am not looking to my counsel; okay?

Page 53

1  Q.    The camera will show where you are looking.
2  I am telling you, to me it looks like you are looking
3  at counsel.
4  A.    I am not looking at counsel.
5  Q.    Perhaps you are looking at the reporter.
6  A.    Repeat your question, please.
7  Q.    If there were a letter between you and
8  Mr. Farrell that was important to your case, you would
9  be aware of its existence; is that correct?
10  A.    I should be, yes.
11  Q.    And you are telling us as you sit here today
12  you are not aware of any letter between you and
13  Mr. Farrell that is important to your case; is that
14  correct?
15  A.    That's correct. Okay?
16  Q.    In 2000 what was your connection to the
17  Freedman, Billings, Ramsey firm?
18  A.    I was a consultant to Freedman, Billings &
19  Ramsey.
20  Q.    Was there a time when you were an employee?
21  A.    Never.
22  Q.    You are 100 percent certain of that?
23  A.    I am 100 percent certain.
24  Q.    Did you ever occupy office space at the

14 (Pages 50 to 53)

Underhill Investment Corporation and Peskoff         v.         Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                 C.A. # 06-99 SLR                              October 10, 2006

Page 54

1    offices of Friedman, Billings & Ramsey?
2    A.    Yes, I did.
3    Q.    Excuse me. Were you ever an employee of any
4    Friedman, Billings, Ramsey entity, whether it is
5    investment manager, broker dealer?
6    A.    No.
7    Q.    Of any sort?
8    A.    No.
9    Q.    And you are 100 percent certain of that?
10   A.    I am 100 percent certain.
11   Q.    Did you occupy space or any of your
12   corporations occupy space in any Friedman, Billings,
13   Ramsey offices in Washington?
14   A.    Yes. I had headquarters in Virginia in
15   their corporate headquarters, the tenth floor.
16   Q.    Okay. That's where the FBR -- I am going to
17   refer to it as FBR.
18   A.    Fine.
19   Q.    That is okay?
20   A.    Yes.
21   Q.    And did you pay rent?
22   A.    No.
23   Q.    They gave it to you as a gift?
24   A.    No.

Page 55

1    Q.    Okay. What were the terms on which you
2    occupied the space?
3    A.    I had a consulting contract with the entity
4    and the chairman of the board.
5    Q.    You had two separate contracts or was it one
6    contract with both?
7    A.    It was one contract with both, if I remember
8    correctly.
9    Q.    You don't remember which way it went,
10   whether it was with both or with one or the other?
11   A.    I don't remember at this point.
12   Q.    What was the consulting contract about?
13   What did it provide? In the most general terms tell
14   me.
15   A.    It provided space, a secretary. It provided
16   compensation on a monthly basis, reimbursement of
17   expenses used for bringing in new business. It also
18   provided stock options and other fringe benefits,
19   certain fringe benefits.
20   Q.    Who signed for FBR, if you remember?
21   A.    I don't -- I have to check the contract. I
22   don't remember who signed for FBR.
23   Q.    Did you ever enter into a finder's fee
24   agreement with any FBR entity?

Page 56

1    A.    No.
2    Q.    You are certain of that?
3    A.    Positive.
4    Q.    Did there come a time when you moved out of
5    the space that FBR gave you?
6    A.    Yes.
7    Q.    Yes?
8    A.    What was your question?
9    Q.    Did there come a time when you moved out of
10   the space that FBR gave you?
11   A.    Yes, there was.
12   Q.    When was that?
13   A.    I think I left in -- let's see. We
14   terminated business, I think, in January '03. It may
15   have been December of '02. And I physically left, had
16   my separate office space in March.
17   Q.    What was the reason that you left?
18   A.    FBR during that period of time for the six
19   months was downsizing dramatically.
20   Q.    Did the consulting agreement continue?
21   A.    Yes.
22   Q.    Has it continued -- well, is it still in
23   force?
24   A.    Yes.

Page 57

1    Q.    Have the terms been changed?
2    A.    Yes.
3    Q.    When were the terms changed?
4    A.    When I left.
5    Q.    And the new terms continued in force since
6    that time up until the present?
7    A.    As far as I know, yes.
8    Q.    You would know if they had changed, wouldn't
9    you?
10   A.    The terms have changed from the original
11   contract.
12   Q.    Yes. I asked you whether after the first
13   change occurred, when you moved out, or about that
14   time --
15   A.    Yes.
16   Q.    -- it has changed again.
17   A.    Not that I am aware of.
18   Q.    Okay. Who are the parties that are actually
19   named in the agreement? Is it between you personally
20   and some FBR entity or is it one of your companies?
21   A.    It was Underhill. Underhill was always the
22   recipient of the checks.
23   Q.    I asked who is on the contract, the
24   agreement. Who was named as being the consultant on

15 (Pages 54 to 57)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 58

1  the agreement?
2  A.    I would have to check it to be specific. It
3  was either myself or Underhill or both. I don't
4  remember.
5  Q.    When Underhill was dissolved --
6  A.    Yes.
7  Q.    -- did you look to see whether or not the
8  contract, the consulting contract had to be changed?
9  A.    No, did not.
10  Q.    Did you ask someone else to look?
11  A.    No.
12  Q.    Has Underhill continued to receive any
13  payments under the -- withdrawn.
14      Has Underhill received any payments under
15  this consulting agreement --
16      MR. BELL:  Ever?
17      MR. NOVACK:  -- with FBR?
18      Yes, I am starting with ever and then
19  I will --
20      MR. BELL:  Okay.
21      THE WITNESS:  The answer is -- I am
22  trying to remember if I left in 2'02, at the start of
23  2'03.  In 2'03 Underhill received substantial payments
24  from Friedman, Billings & Ramsey.

Page 59

1  BY MR. NOVACK:
2  Q.    Did Underhill receive any payments in 2004
3  from FBR?
4  A.    It is possible that they did as a carryover
5  from 2'03.
6  Q.    Did Underhill receive any payments in 2005
7  from FBR?
8  A.    Not that I am aware of.
9  Q.    Is there any reason why they should have?
10  A.    No.
11  Q.    And you can't tell us whether or not
12  Underhill is a party to any consulting agreement with
13  FBR, either the original one or --
14  A.    I can. I have the contracts. I just
15  don't -- I can't --
16  Q.    All right. Okay. Thank you. Thank you.
17  A.    Yes.
18  Q.    How can you be so sure you never entered
19  into any other finder's fee agreement, which, by the
20  way, that was one of the questions we asked you --
21  just so you know, it is one of the questions we asked
22  you in this discovery. Let me show you where it is.
23  A.    The question you are referring to is --
24  Q.    I am going to show it to you so you will

Page 60

1  have it in front of you.
2  A.    Okay. Good.
3      MR. NOVACK:  Is it in the answers to
4  interrogatories or the document request or -- excuse
5  my associate's lack of preparation for this case.
6      MR. SINGH:  It was Question 10 in the
7  interrogatories.
8      MR. NOVACK:  Thank you.
9  BY MR. NOVACK:
10  Q.    You have the interrogatory, which is Peskoff
11  Exhibit 1, in front of you. Let's go to Question 10.
12  It reads, "Identify any finder's fee agreements that
13  you were a party to at any time beginning January 1,
14  1998 through the present." And you recall that the
15  word "you" there is a defined term. It means either
16  you personally or Underhill Investment Corporation.
17  A.    Yes.
18  Q.    And it refers, as -- you can read the
19  response to yourself. It refers to the consulting
20  agreement dated February 15, 2000 attached to the
21  complaint. (Pause)
22      Do you see that? Right? That is a
23  reference to that.
24      And did you check your files to make sure

Page 61

1  there were no other finder's fee agreements that
2  either you personally or Underhill was a party to?
3  A.    I am sure I did.
4  Q.    Okay. Is there some reason why you are so
5  certain that there was no other finder's fee agreement
6  that either you or Underhill entered into with anyone
7  else besides FIDAC?
8  A.    Because the nature of essentially what we do
9  is, it is -- essentially most of my work is investment
10  banking, and there is usually consulting contracts or
11  specific contracts and not delineated as finder's
12  fees.
13  Q.    How do you distinguish between the two in
14  terms of your describing what you customarily do and
15  the finder's fee situation?
16  A.    Well, the difference is in an investment
17  banking situation you may have identified a customer
18  and brought them together with the investment bank and
19  you are part of the process step by step to help guide
20  either party, depending upon who you represent, you
21  know, till the execution of the strategy that is --
22  okay.
23      In a finder's fee relationship, the main
24  responsibility is bringing either an idea or a

16 (Pages 58 to 61)

Underhill Investment Corporation and Peskoff       v.       Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                 C.A. # 06-99 SLR                        October 10, 2006

Page 62

1   customer to some institution that will utilize that
2   customer by either -- the customer will either deposit
3   money with that institution or will do something, you
4   know, with that customer, but you are not a part of
5   the the details of the negotiations.
6   Q.       Would you consider just introducing A and B
7   in a hypothetical case and doing no more than just
8   saying, "Mr. A, I would like you to meet Mr. B" to be
9   all you would have to do to earn a finder's fee?
10  A.       No.
11  Q.       Something more would be required than simply
12  introducing them?
13  A.       I would think so, but not much more.
14  Q.       I want to direct your attention to this
15  privilege log.  We received from your counsel a fax
16  which had attached to it what we call a privilege log.
17  A privilege log lists certain documents that your side
18  hasn't turned over, and it identifies them in certain
19  ways, and the lawyers have to then decide whether they
20  are going to go to the judge or whether they agree it
21  is privileged.
22  A.       I see.
23  Q.       I am going to ask you questions about some
24  of the documents that are described on it.  Why don't

Page 63

1   we mark as Peskoff Exhibit 2 --
2   A.       May I have a copy of that?
3   Q.       Certainly.  I am going to mark it.
4   A.       Okay.
5           MR. NOVACK:  Mark as Peskoff Exhibit 2
6   the fax transmittal sheet from Stevens & Lee, the
7   October 6, 2006 letter from Mr. Cook to Sarah Kenney,
8   and the one page which constitutes the privilege log.
9           (Peskoff Deposition Exhibit No. 2 was
10  marked for identification.)
11  BY MR. NOVACK:
12  Q.       Mr. Peskoff, just look at the last page of
13  Peskoff Exhibit 2.  You probably have not seen this
14  document before today.  You may have, but I don't
15  think you would have.  I just want to go over a few
16  things on here.  Do you have it in front of you, the
17  third page of the privilege log?
18  A.       Yes.
19  Q.       Okay.  You see there are various columns.
20  It gives the author of a document that we have not
21  seen, who the recipients are, the date the document
22  was created, what the subject matter was, and whether
23  a privilege claim is being asserted.
24          I want to ask you some questions about some

Page 64

1   of these documents that are referred to here.  If you
2   go down to the second item, it refers to damages
3   projections if you look under subject matter, dated
4   August 4, 2005.  Are those damages projections that
5   you received from Mr. Ruben?  It says that the author
6   is Mr. Ruben.  See the first column?
7   A.       Yes.
8   Q.       Did you receive those from Mr. Ruben?  It
9   indicates under recipients you did.
10  A.       Right.
11  Q.       It is not a trick question.  I just wanted
12  to make sure --
13  A.       No, no, no.  I must have.  I don't remember,
14  but that's fine.
15  Q.       My question is this:  Before you received
16  those damages projections, had you given Mr. Ruben all
17  of the financial information you had about moneys that
18  had been paid to Underhill by FIDAC?
19  A.       I would think certainly.
20  Q.       Let's go down to the next document.  It
21  lists you as the author.
22  A.       It lists me as the author, yes.
23  Q.       And it goes to Mr. Ruben and Mr. Bell.
24  A.       Yes.

Page 65

1   Q.       And it is undated, and it is
2   correspondence -- it reads, "Correspondence including
3   article and Mr. Peskoff's notes re FIDAC/Annaly
4   profits from MBS Trusts and Premier Fund."
5   A.       Yes.
6   Q.       Is that information which you sent before
7   Mr. Ruben sent out his September 2005 letter?
8   A.       I think that probably was after.
9   Q.       After the letter?
10  A.       I would think so.
11  Q.       Is that information you gave him before the
12  complaint was filed?
13  A.       You know, I would have to check my notes,
14  but I don't remember offhand the timing of it.
15  Q.       Go down the next line.  Another document
16  which is comprised of two pages, which is described
17  basically the same way.  Did you send that to
18  Mr. Ruben and Mr. Bell before Mr. Ruben's letter of
19  September 2005 was sent out?
20  A.       I really don't remember.
21  Q.       Do you recall whether or not it was
22  definitely sent to him before the complaint was filed?
23  A.       Definitely before the complaint was filed.
24  Q.       Yes.  Are you saying yes, it was?

17 (Pages 62 to 65)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 66

1 A.    No.
2 Q.    Oh, you are asking?
3 A.    I am asking --
4 Q.    You are repeating my question. This is like
5 a gospel.
6 A.    Before the complaint was filed, yes. They
7 would have received that before the complaint was --
8 Q.    Okay. So when the complaint was filed, all
9 the financial information about Annaly and FIDAC, MBS
10 Trusts and Premier Funds had been given to you by your
11 counsel; correct?
12    MR. BELL: Objection.
13    THE WITNESS: I am not sure all,
14 but --
15 BY MR. NOVACK:
16 Q.    Well, let me restate it. All the financial
17 information you had had been given to your counsel by
18 the time the complaint was filed?
19 A.    What you see here -- I am answering your
20 question specifically -- was public information that I
21 wanted to make sure my lawyers had.
22 Q.    Okay.
23 A.    Okay? Period.
24 Q.    That's in regard to both items --

Page 67

1 A.    That's correct.
2 Q.    -- that we have talked about.
3 A.    This is not anything. This is public
4 information regarding the trusts as the information
5 became available to the public.
6 Q.    Okay. Let's go to -- and you were referring
7 on this list to the third and fourth items down on the
8 list, which are identified with Bates-stamps P-342
9 through 43 and P-344 through 345; correct?
10 A.    That's correct.
11 Q.    Okay. Let's go down to the document that is
12 P-346. This says, "Correspondence re time line of
13 events underlying claims against FIDAC." Do you see
14 that?
15 A.    Yes.
16 Q.    Can you tell us whether that was a
17 single-page document which the Bates number indicates?
18 A.    Whether it was a single-page document?
19 Q.    Yes. Do you see the Bates number column,
20 the extreme left column here?
21 A.    Yes. This is 346.
22 Q.    And that's a number we put at the bottom of
23 the page so we can identify it later.
24 A.    It was a single -- if it were a single page

Page 68

1 and it says single page, it was the time line, the
2 original time line that I put together with my
3 assistant, Josie, prior to the filing of the
4 complaint. If that's what it was.
5 Q.    Okay.
6 A.    I have not seen this -- Okay? --
7 Q.    Okay.
8 A.    -- you know, before, so I can't, you know --
9 if you show me what 346, you know, looked like, I can
10 tell you. But you don't have it because it is
11 privileged. Okay.
12 Q.    Well, it is alleged to be privileged.
13 A.    It is alleged to be privileged.
14 Q.    Let's go on to something else.
15 A.    Okay.
16 Q.    Let's go back to your favorite topic.
17 A.    My favorite topic.
18 Q.    Let's talk about the December 2003
19 conversation with Mr. Farrell. Okay?
20 A.    Here is the tape.
21 Q.    If you have it -- do you have a tape?
22 A.    No.
23 Q.    I have been in lawsuits where people have
24 tapes.

Page 69

1 A.    I bet you have.
2    MR. BELL: Me, too.
3 BY MR. NOVACK:
4 Q.    Did you ever write a letter to anyone other
5 than counsel referring to this December 2003
6 conversation with Mr. Farrell?
7 A.    I have written lots of letters, and I can't
8 answer that specifically. I don't remember.
9 Q.    Let me ask it a different way.
10 A.    Okay.
11 Q.    You have no recollection of ever writing a
12 letter to anyone telling them about the conversation
13 that you had in December 2003 with Mr. Farrell; is
14 that right?
15 A.    I don't remember.
16 Q.    Have you spoken to Ernie Baptista about the
17 dispute you are having with FIDAC?
18 A.    Yes.
19 Q.    When did you first begin speaking with
20 Mr. Baptista about the dispute you had with FIDAC?
21 A.    Probably December, January of -- it would be
22 December 2'04, January 2'05, that there were --
23 Q.    Why -- I am sorry. Finish your answer.
24 A.    I am finished.

18 (Pages 66 to 69)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                    C.A. # 06-99 SLR                    October 10, 2006

Page 70

1  Q.    I thought you said that date, and I cut you
2  off inadvertently.
3  A.    I believe it would be -- the original
4  conversation probably was December 2'04. It started
5  in January 2'05.
6  Q.    I want to go back to February 2000. It was
7  around February 2000 that one of the FBR entities
8  hired FIDAC as an investment advisor. Do you recall
9  that?
10  A.    Certainly.
11  Q.    Do you -- can you -- withdrawn. Let me ask
12  it a different way.
13        Would you please describe for us which FBR
14  entities were involved and what the arrangement was
15  between FIDAC and whatever FBR entities were involved?
16  A.    FIDAC was involved with FBR Asset, which was
17  a separate public company where FBR owned I don't know
18  how much stock in, but they were a significant
19  shareholder.
20  Q.    What was the business of FBR Asset?
21  A.    FBR was a REIT, a financial REIT, mortgage
22  REIT.
23  Q.    Go ahead.
24  A.    That's what it was.

Page 71

1  Q.    I understand. I am asking you to describe
2  for me who the players were in the transaction
3  involving FIDAC and whatever FBR entities were
4  involved. Can you do that?
5  A.    Yes.
6  Q.    Okay. Do it.
7  A.    The key player was Bill Swanson.
8  Q.    No, not the individuals. I am sorry. I
9  meant give me the corporate or entities that were
10  involved. FBR Asset was the public REIT. It had
11  assets.
12  A.    That's correct.
13  Q.    Okay. Did somebody make a contract with
14  FIDAC with regard to the management of those assets?
15  A.    Yes.
16  Q.    What was the entity?
17  A.    F -- that I can't tell you because I wasn't
18  part of the negotiation process.
19  Q.    You don't know who the contract was between
20  in terms of who FIDAC contracted with?
21  A.    As far as I know, as far as I knew, FIDAC
22  was managing assets for FBR Asset. That's what I
23  knew. I didn't know if there was -- if they had a
24  special company that they were working through, but

Page 72

1  they were managing the assets of the REIT.
2  Q.    Did you have any understanding in 2000 as to
3  whether or not the REIT had any kind of investment
4  manager?
5  A.    Yes.
6  Q.    Who was the investment manager?
7  A.    The investment manager was a subsidiary of
8  PNC, which is -- I forgot the name of the -- but it
9  was a very large, very large company.
10  Q.    Well, tell me, if you know, whether or not
11  the investment manager for FBR Asset was a Friedman,
12  Billings, Ramsey entity.
13  A.    I think -- you know, I would have to check.
14  I don't remember -- Friedman, Billings & Ramsey -- it
15  might have been a Friedman, Billings, Ramsey entity
16  that was managing the REIT. That would have been
17  logical.
18  Q.    And it is not the PNC subsidiary that you
19  were talking about?
20  A.    That's correct. They had an -- I don't know
21  whether you call it a submanager or whatever,
22  ~~REDACTED~~
23  Q.    The investment manager for the REIT you
24  believe was an FBR entity; correct?

Page 73

1  A.    I wouldn't call it the F -- you know, I
2  wouldn't call it -- there may have been an FBR entity
3  that was responsible for the management of the REIT.
4  Stop.
5  Q.    Okay.

REDACTED

REDACTED

19 (Pages 70 to 73)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1     C.A. # 06-99 SLR     October 10, 2006

Page 74

REDACTED

Page 75

REDACTED

Page 76

1  good word in for him, et cetera, et cetera, and, you
2  know, he would take care of me financially, putting
3  together a contract for me.
4     Q.     All right.  And then what is the next
5  time -- what is the next event that occurred in FIDAC
6  being retained as the subadvisor for --
7     A.     I don't know what you mean.  I don't know
8  what you mean by the question.
9     Q.     Well, we talked about the meeting that
10  occurred --
11     A.     Right.
12     Q.     -- when Mike came in to see FBR.
13     A.     Right.
14     Q.     And he reports back to you and had the
15  conversation you have just described.  What is the
16  next event in the sequence of events that led to FIDAC
17  actually entering into an agreement with the
18  investment manager for the REIT?
19     A.     There obviously was a meeting with Farrell.
20     Q.     Another meeting with Farrell?
21     A.     A meeting.  You know, I don't know whether
22  there is one, two or three meetings with him.
23     Q.     Right.
24     A.     But it was done very quickly.

Page 77

REDACTED

          And he was very thankful
5  and told me that, you know, he negotiated, you know, a
6  contract, you know, with them, and that he was going
7  to put in the mail to me a contract that was, you
8  know, reasonable and consistent with what was done in
9  that business, and, you know, that he would take care
10  of me.
11     Q.     And what is the next conversation you had
12  with him about this contract that you have referred
13  to?
14     A.     I got, I think, a day or two later I got a
15  contract in the mail, which I signed, and I sent back
16  to him.
17     Q.     What did you do with the contract, your copy
18  of it?
19     A.     What did I do with it?
20     Q.     Did you keep it?
21     A.     Yes, sure.
22     Q.     Did you put it in a file?
23     A.     Yes.
24     Q.     Did you read it?

9     Q.     Did that meeting take place?
10     A.     Yes.
11     Q.     When was that in relation to when you called
12  Mike?
13     A.     Certainly within a week after that.
14     Q.     Where did the meeting take place?
15     A.     My understanding, my understanding --
16  okay? -- was that -- I wasn't there -- it was at
17  Friedman, Billings & Ramsey.
18     Q.     How did you learn about the meeting having
19  occurred, not that it was going to happen but that it
20  did occur?
21     A.     Because Mike and I talked, you know, after,
22  and he said -- he told me that he has got the
23  management responsibility and that he appreciated
24  everything that I, you know, that I did, putting a

20 (Pages 74 to 77)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 78

1    A.    Absolutely.
2    Q.    When did you read it; when you got it before
3    you signed it?
4    A.    Yes.
5    Q.    Is it correct that you wouldn't sign
6    anything like that unless you read it first?
7    A.    Generally.
8    Q.    Is it correct that you wouldn't sign
9    anything like that unless you read it and you had no
10    problems with it?
11    A.    Correct.
12    Q.    And you had no problem with the contract
13    that was sent to you by Mr. Farrell; right?
14    A.    I didn't have any problems with it because
15    of two things: A, our relationship, which was rather
16    intimate --
17    Q.    Right.
18    A.    -- in the sense how close we were because of
19    my work for Annaly; and B, because I trusted him
20    implicitly and his word of assurance that I would, you
21    know, take care of you appropriately and something
22    that is consistent that we do all the time within our
23    industry. You know, I took that as a, you know --
24    Q.    Okay.

Page 79

1    A.    I had no reason ever to --
2    Q.    Finish your sentence, please. You said, "I
3    had no reason to" --
4    A.    I had no reason at that particular time to
5    question anything he said.
6    Q.    What is the next conversation you had with
7    Mr. Farrell, if you had another one --
8    A.    I don't remember.
9    Q.    -- about the agreement?
10    A.    I don't remember. I don't remember that we
11    had any future conversations, particularly as close to
12    after I signed it, whatever. You know, just --
13    Q.    Are there any documents in your files that
14    you are aware of that would refresh your recollection
15    as to whether you had any conversations with him about
16    that February 15 letter?
17    MR. BELL: Are you talking about after
18    he signed it and sent it back?
19    THE WITNESS: Oh, God.
20    MR. NOVACK: No, I didn't think I said
21    that. I am sorry if it was unclear.
22    BY MR. NOVACK:
23    Q.    Are there any documents -- I will ask it
24    again. Your counsel has --

Page 80

1    A.    Okay.
2    Q.    -- stated a fair question.
3    A.    Yes.
4    Q.    Are you aware of any documents that reflect
5    any conversations with Mr. Farrell relating to this
6    contract that you have been testifying to?
7    A.    He and I had many conversations, not
8    necessarily about that, but about business
9    opportunities and different things, and there could be
10    notes and stuff, you know, in the file, you know, that
11    discuss various things. I don't -- there is no
12    specific contract or document that stands out like
13    that that I recall.
14    Q.    Stated simply, you are not aware of any
15    document that refers to any conversations with
16    Mr. Farrell about this contract he sent you; is that
17    right?
18    A.    That's correct.
19    Q.    Now, in your answers to interrogatories you
20    state in the answer to paragraph 1 -- this is your
21    Peskoff Exhibit 1, please. Could you take a look at
22    that again. You have it in front of you still, I
23    believe.
24    A.    Okay.

Page 81

1    Q.    Go to page 5.
2    A.    Page 5.
3    Q.    Let me know when you are there, please.
4    A.    Page 5. Okay.
5    Q.    In the second paragraph, which we read into
6    the record before, so I won't do it out loud again,
7    you refer to two telephone conferences in 2005
8    regarding your demand to be paid in accordance with
9    the parties' consulting agreement dated February 15,
10    2000. That reference to the consulting agreement
11    dated February 15, 2000 is a reference to the contract
12    that Mr. Farrell sent you which you are talking about
13    in your testimony now; is that right?
14    A.    That's correct.
15    Q.    Okay. Now, in the April conversation or May
16    2005 conversation, because you are not sure which one
17    it was, who participated?
18    A.    It would have been he and I.
19    Q.    If you would not say, "It would have been"
20    and try to give me what you actually recall. If you
21    don't recall something, say, "I don't recall,
22    actually."
23    A.    If we had --
24    Q.    So let me just finish my -- we have to do it

21 (Pages 78 to 81)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 82

1  one at a time because the reporter is miraculous but
2  not extraterrestrial. So when I ask you who
3  participated, if you don't recall the conversation,
4  you can say, "I don't recall it." Then I will ask you
5  do you think you know who it would have been because
6  of other things. That way I can follow up. But this
7  way we have a clear record if you actually recall
8  something or you are speculating or reconstructing.
9  And I am just trying to be fair to everybody to have a
10  clear record.
11      So do you recall the April or May 2005
12  conversation?
13  A.    Yes.
14  Q.    Okay. Was it on the phone or was it in
15  person?
16  A.    The phone.
17  Q.    Who participated, as far as you were aware?
18  A.    Myself and Mike Farrell.
19  Q.    How long did the conversation last?
20  A.    Not very long.
21  Q.    Would you say it would be within a minute or
22  two?
23  A.    Longer.
24  Q.    Okay. Can you tell me, as best you can

Page 83

1  recall, everything you said and everything he said to
2  the extent you can recall it in sequence in terms of
3  how the conversation went?
4  A.    I really can't at this point.
5  Q.    Tell me everything you can remember about
6  the conversation that you said and that he said. And
7  if you can't remember anything about what either of
8  you said, then you can say so.
9  A.    I can't -- I can't remember the nature of
10  the telephone conversation, but I think there may be
11  some reference to something in a file or that I
12  dictated something to Josie about the conference.
13  Q.    We will come to that, I assure you, if it
14  exists. And I am not saying one way or another if it
15  does.
16  A.    Right.
17  Q.    I don't want to mislead you. If it does
18  exist, we will find it.
19      My question is: As you sit here today, can
20  you independently recall what was said in that
21  conversation?
22  A.    Yes, I can remember part of it. I will tell
23  you why. We really didn't talk about business. We --
24  I was suffering a loss of a business partner --

Page 84

1  Q.    Right.
2  A.    -- who was dying, who had died April 21.
3  All right? And we talked before that happened and
4  then we talked after. Now I remember very clearly.
5  It was Spencer Browne and --
6  Q.    He is the one who died?
7  A.    He is the one who died.
8  Q.    Okay. Go ahead.
9  A.    He was also a director of Annaly, and he was
10  the architect of the merger between FIDAC and Annaly
11  for the board. And we basically discussed that and --
12  Q.    About the death of Mr. Browne?
13  A.    Well, in April he hadn't died yet. Okay?
14  He died April 21. Then we talked about the funeral in
15  May. There was another basis. Okay? And, you know,
16  but we never got into talking about contracts or
17  anything else at that point in time.
18  Q.    So in your answer to interrogatory which is
19  on page 5, which is Peskoff Exhibit 1, when you refer
20  to a conversation about the parties' consulting
21  agreement dated February 15, 2000 occurring in April
22  or May 2005, to the best of your present independent
23  recollection, that is incorrect.
24  A.    That is incorrect.

Page 85

1  Q.    It did not -- okay.
2  A.    That is incorrect. Okay.
3  Q.    Okay. Thank you. Let's go to the next
4  conversation that you referred to.
5  A.    Yes.
6  Q.    In it you refer to a conversation with
7  Mr. Farrell that occurred after Mr. Ruben's famous
8  September 9 letter, 2005.
9  A.    Okay.
10  Q.    You have an independent recollection of that
11  conversation?
12  A.    Yes, I do.
13  Q.    And in that conversation were you and
14  Mr. Farrell trying to resolve the existing dispute to
15  see if you could settle the dispute without
16  litigation?
17  A.    I guess that was the basis for him calling
18  me.
19      MR. NOVACK: Can we go off the record
20  a moment?
21      (Discussion off the record.)
22      (Recess taken.)
23  BY MR. NOVACK:
24  Q.    Mr. Peskoff, before we broke you told me

22 (Pages 82 to 85)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1              C.A. # 06-99 SLR                        October 10, 2006

Page 86

1  that you had a conversation with Mr. Farrell sometime
2  after the September 9, 2005 letter sent by Mr. Ruben
3  went out. Can you tell me whether this conversation
4  was in person or by phone?
5  A.      By phone.
6  Q.      Who was on the conversation? Who was on the
7  call?
8  A.      Myself and I assume Mike, and there was
9  nobody else, I assume. I don't know that, if he had
10 other people there with him.
11 Q.      When you say you assume Mike, you mean you
12 know it was Mike.
13 A.      I know it was Mike, but I don't know if
14 there was anybody else with him.
15 Q.      How long was the conversation?
16 A.      A few minutes.
17 Q.      Two minutes, three minutes?
18 A.      Maybe more, maybe four or five.
19 Q.      Okay. Tell me what you said and what he
20 said, as best you can recall.
21 A.      He called me and he said to me, "Do you
22 realize what you are doing?" So I said, "In what
23 respect?" He said, "You know, you are preparing to
24 sue or are suing a company that's got tons of lawyers,

Page 87

1  lots of assets, and, you know, there is no reason why
2  this should happen."
3          I said to him, "Well, you know, you would
4  never sit down. You would never talk about, you know,
5  certain things that I wanted to talk about, dismissed
6  them. So it is not personal, Mike." I said, "It is
7  not personal. It is strictly business. You know, if
8  you had called me into your office and we had talked,
9  we probably could have settled this thing. But, you
10 know, your denial that I had anything to do with some
11 of this major pieces of business just I can't accept."
12         And he said, "Well, I just want you to know
13 that it is not personal either." And that's how the
14 phone conversation ended.
15 Q.      Was anything else said?
16 A.      Not that I recall.
17 Q.      Did you take any notes of the conversation?
18 A.      I doubt it.
19 Q.      Did you write to anyone describing the
20 conversation, any letters?
21 A.      I don't remember. I may have called Rob
22 and --
23 Q.      Don't tell me what you said to your lawyers.
24 A.      No, I am not telling you what I said. I

Page 88

1  said I may have. I don't remember. It was, you know,
2  it was sort of shocking to have it happen then in the
3  way that it happened, and, you know, it was somewhat
4  starting and upsetting.
5  Q.      This conversation took place before the
6  complaint was filed; is that right?
7  A.      I am not sure it was after the letter was
8  sent and then he called or after the complaint was
9  filed. I don't remember the dates. Okay?
10 Q.      Was anything else said that you can recall?
11 A.      At that time, no.
12 Q.      Did you have a subsequent conversation with
13 Mr. Farrell?
14 A.      No.
15 Q.      When you just said, "At that time, no," what
16 were you referring to? Were you referring to some
17 other time?
18 A.      No. I was referring to that specific phone
19 conversation.
20 Q.      Okay. Now, in that phone conversation it
21 was really very general, as I heard you testify to it;
22 is that right?
23 A.      I would assume so.
24         MR. BELL: I am going to object to the

Page 89

1  form.
2          MR. RUBEN: Yes.
3  BY MR. NOVACK:
4  Q.      Well, was anything more specific said than
5  what you have told us?
6  A.      No.
7  Q.      And you think you have told us everything
8  that was important that was said in that conversation?
9  A.      I think so.
10 Q.      And you can't think of a single other thing
11 that was said other than what you have testified to;
12 is that right?
13 A.      That's correct.
14         MR. NOVACK: Would you mark as Peskoff
15 Exhibit 3, please, a document dated December 19, 2001,
16 which was produced by the plaintiffs. It has Bates-
17 stamp No. P-8.
18         (Peskoff Deposition Exhibit No. 3 was
19 marked for identification.)
20 BY MR. NOVACK:
21 Q.      Mr. Peskoff, I am having the exhibit put in
22 front of you. Is that your signature at the bottom of
23 the page?
24 A.      Yes.

23 (Pages 86 to 89)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

| Page 90 | Page 92 |
|---|---|
| 1 Q.    Did you sign it in or around December 2001? | 1 identified only one document, which is not Peskoff |
| 2 A.    Yes. | 2 Exhibit 3. Do you believe your answer was truthful? |
| 3 Q.    Is this a finder's fee agreement that was | 3 A.    Yes. |
| 4 entered into? | 4    MR. BELL: Well, I object to the |
| 5 A.    This is what they labeled it. I called it | 5 question, but he has answered it. |
| 6 an extension of our consulting agreement, but that's | 6    MR. NOVACK: What is the basis of the |
| 7 the way they labeled it. | 7 objection? |
| 8 Q.    Is it correct that you do not consider this | 8    MR. BELL: Because I think it |
| 9 to be a finder's fee agreement? | 9 mischaracterizes his answer to the interrogatory. |
| 10 A.    I consider this, if you -- well, all you | 10    MR. NOVACK: I didn't ask him to |
| 11 have to do is look at the second paragraph as to the | 11 characterize anything. I only asked him whether or |
| 12 details and how I got paid and what percentage I got | 12 not he believes his answer to Question 10 was |
| 13 paid. This was similar to the -- this was a better | 13 truthful. |
| 14 transaction for me than what I got paid when I worked | 14    MR. BELL: Well, no. You |
| 15 for Friedman, Billings & Ramsey. My compensation in | 15 characterized the answer to the interrogatory as a |
| 16 this agreement was two or three times what I got paid, | 16 predicate to that question. |
| 17 so I don't look at it as a finder's fee, because when | 17    MR. NOVACK: All right. Let me ask |
| 18 this thing was signed, I also got seven months of | 18 it -- I will deal with the objection. |
| 19 compensation when I left. All my stock options were | 19 BY MR. NOVACK: |
| 20 vested. Okay? And if you call that a finder's fee, | 20 Q.    Do you believe that your answer to Question |
| 21 that's not what I call it, a finder's fee. All right? | 21 10 is truthful? |
| 22 Q.    I just want to be clear on one thing. Are | 22 A.    Do you want to repeat Question 10? |
| 23 you testifying that you do not believe that the | 23 Q.    Read it. It is on page 10 of Peskoff |
| 24 document marked as Peskoff Exhibit 3 can fairly be | 24 Exhibit 1. |

| Page 91 | Page 93 |
|---|---|
| 1 read as being a finder's fee agreement? | 1 A.    (Pause) Yes, I agree with the response. |
| 2 A.    You can read it any -- you can read it any | 2 Q.    You believe it is truthful? |
| 3 way you want. | 3 A.    Yes. All right? |
| 4 Q.    No. I asked you whether you read this as a | 4 Q.    At the time you verified Peskoff Exhibit 1, |
| 5 finder's fee agreement. | 5 were you aware of the existence of the document which |
| 6    MR. BELL: Right. And he has answered | 6 has been marked Peskoff Exhibit 3? That's this |
| 7 that question. | 7 document here (indicating), which has the heading |
| 8    MR. NOVACK: No, he has not. He has | 8 "Finder's Fee Agreement." |
| 9 given me a long song and dance why it is an | 9 A.    Yes. |
| 10 enlargement of something else. I want a simple | 10 Q.    You were aware of the existence -- |
| 11 answer. | 11 A.    Absolutely. |
| 12    MR. BELL: He -- | 12 Q.    Okay. After you received the February 15, |
| 13    THE WITNESS: I said this is an | 13 2000 contract from Mr. Farrell that you testified to |
| 14 extension of a termination agreement to continue to do | 14 earlier, did you look at it again? After you signed |
| 15 business with FBR based upon my original consulting | 15 it, I mean, and put it in a file, did you look at it? |
| 16 agreement. | 16 A.    Not for a very long time. |
| 17 BY MR. NOVACK: | 17 Q.    When is the next time you looked at it? Was |
| 18 Q.    In your response to our request for -- is it | 18 it after the litigation began? |
| 19 documents? | 19 A.    No. |
| 20    MR. SINGH: The interrogatories, | 20 Q.    When was it? |
| 21 Question 10. | 21 A.    It was about the time that I introduced |
| 22 BY MR. NOVACK: | 22 FIDAC to Sentry and when I had introduced them to |
| 23 Q.    The interrogatories. Excuse me. We asked | 23 Baptista. It was all, you know, within a three, |
| 24 you to identify any finder's fee agreements. You | 24 four-month period of the introduction of both of |

24 (Pages 90 to 93)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 94

1 those.
2 Q.    Do you know the months in which you made the
3 introductions?
4 A.    I don't remember. What, to --
5 Q.    Give me the best you can. Well, you said it
6 is about the time I introduced Sentry and about the
7 time I introduced Baptista.
8 A.    Sentry was in '03, I think the summer of
9 '03. You know, I think I went and saw them April and
10 May, and they met with Kazel in June or July. That
11 was the second part of it.
12    The first part of it is Baptista, I met in
13 December of '01 and set up meetings with the
14 FIDAC/Annaly people in early '02. I believe it was
15 January, February.
16 Q.    It is your testimony that you as you sit
17 here today independently recall that you took out the
18 contract and looked at it each time you made these
19 introductions or about the time you made these
20 introductions?
21 A.    After I made these introductions; correct.
22 Q.    And what did you look for in the contract?
23 Were you looking for something special?
24 A.    No.

Page 95

1 Q.    You just reread the whole contract?
2 A.    Yes.
3 Q.    And after you read the whole contract, did
4 you do anything with respect to the contract?
5 A.    Did I do anything --
6 Q.    Yes.
7 A.    -- with respect to the contract? No. I
8 thought that part of the general consulting contract
9 that I had signed with Mike Farrell covered bringing
10 in customers, just like I brought in FBR REIT, and
11 that I was covered under that agreement because the
12 agreement says specifically that in order for the
13 agreement not to be in effect, we both have to sign
14 and terminate, and any clients or relationships that I
15 bring in -- okay? -- you cannot terminate the contract
16 with them unless we mutually sign.
17    So both clients were brought in. Business
18 was ongoing. And I felt within that paragraph that I
19 was totally covered in terms of a fee arrangement that
20 he and I would, you know, would --
21 Q.    Would work out?
22 A.    Would work out. Correct.
23 Q.    Now, did you think about anything more at
24 the time you read the February 15 letter?

Page 96

1 A.    At that time?
2 Q.    Yes.
3 A.    No.
4 Q.    "That time" meaning that you referred to two
5 times, once at about the time you introduced Sentry --
6 A.    No, no.
7 Q.    -- and once at about the time you introduced
8 GenCorp, or Baptista. Excuse me.
9 A.    Right.
10 Q.    And you told us everything you thought at
11 that time?
12 A.    Well, as I said to you -- you asked me
13 whether I read the contracts. I read the contracts at
14 that time just to make sure what, you know, what the
15 general consulting contract covered. And I felt that
16 I was covered under those for, A, introducing the
17 client and, B, there was a possibility of ongoing
18 business, and that, you know, the deciding factor
19 would be, you know, what kind of business that they
20 brought in, the volume of business they brought,
21 because all these things determine the ultimate price
22 that you get paid.
23 Q.    When you say "you," you mean you,
24 Mr. Peskoff or Underhill, or you meaning FIDAC or

Page 97

1 both?
2 A.    Both.
3 Q.    Okay.
4 A.    Yes.
5 Q.    Now, what are the factors that go into
6 determining what Underhill should get paid?
7 Withdrawn.
8    Did you have any view at the time -- you are
9 laughing. I am glad I have amused you finally,
10 finally.
11 A.    No. You have amused me consistently. But
12 that's --
13 Q.    Thank you. Thank you for the compliment.
14 Maybe I should change careers.
15 A.    No. You are good. But that's -- go ahead.
16 Q.    Whenever I get a compliment, I always
17 look --
18 A.    No. It is -- hey, look.
19 Q.    I know. It is just business.
20 A.    It is.
21 Q.    I know.
22 A.    Believe me, it is.
23 Q.    Let me go back to the time you read the
24 February agreement. Tell you what. We got --

25 (Pages 94 to 97)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1          C.A. # 06-99 SLR          October 10, 2006

Page 98

1   A.    You got notes from Nick.
2   Q.    No. These are two minutes of tape
3   remaining. That's what these notes are.
4   A.    Oh.
5   Q.    Let me ask you, let me go back --
6   A.    Now I know what it is.
7   Q.    Okay. Now, I want to direct your attention
8   to the time you looked at the February 15 letter with
9   relation to Sentry Select and with relation to
10  introduction of Ernie Baptista. At that time what did
11  you believe were the factors that you would want to
12  have Mike Farrell take into account in negotiating a
13  fee for Underhill?
14  A.    Well, the most important factor is
15  introducing a client -- okay? -- where there is a
16  revenue stream, you know, that is developed and that
17  FIDAC/Annaly or any other company that is the
18  recipient of the relationship makes a substantial
19  amount of money, you know, from that relationship, or
20  whether it is substantial or not, you know, amount,
21  that they are willing to enter into the relationship
22  with the client that I introduced.
23  Q.    I understand that. But in addition, in
24  terms of what percentage Underhill would be paid by

Page 99

1   FIDAC of the fees that FIDAC earned --
2   A.    Yes.
3   Q.    -- what were the factors that you
4   anticipated that you and Mr. Farrell would discuss and
5   take into account in negotiating a percent for Sentry
6   Select and for Mr. Baptista or GenCorp?
7   A.    Okay. First of all, it would be, A, the
8   client, the longevity of that client in a
9   relationship. In other words, there are clients --
10  just like when FBR did work for Annaly, drawing an
11  analogy, we did many transactions with that client,
12  many. All right? And we did -- okay? -- both public,
13  private, et cetera.
14        Secondly, until you actually go out and
15  transact the business, the size and volume of the
16  dollars that are in the pot for FIDAC specifically to
17  manage, the larger the pot, the lesser the fee that
18  normally institutions will pay. In other words, if
19  you are managing billions rather than hundreds of
20  millions, like they manage at FBR Asset -- okay? --
21  the fees can't be as large.
22        So the variables are the client, the length
23  of the client relationship --
24        THE VIDEOGRAPHER: We are out of time.

Page 100

1          MR. NOVACK: We will just pause. He
2   will change the tape. Just keep your thought.
3          (Recess taken.)
4   BY MR. NOVACK:
5   Q.    Mr. Peskoff, when we were discussing the
6   factors that would be going into the negotiations
7   between you and Mr. Farrell before with respect to the
8   fee, if any, that would be paid by FIDAC to Underhill,
9   you listed several considerations. We had to go off
10  the tape. Can you continue giving your answer?
11        And could you clarify when you do answer
12  whether you are referring to the fee that was going to
13  be paid to FIDAC or the fee that FIDAC was going to
14  pay to Underhill. You may be referring to both also.
15  I just don't know. But if you could clarify that for
16  me with respect to --
17  A.    Let me just start from the beginning, just
18  to catch my thought.
19  Q.    Okay. Okay. Thank you.
20  A.    First of all --
21  Q.    I want to be clear, my question to you is:
22  What are the factors that you anticipated would go
23  into the negotiations between Mr. Farrell on the one
24  hand and you on the other with respect to the fee that

Page 101

1   you wanted FIDAC to pay Underhill, that fee? Okay?
2   A.    Okay. And in respect to that, you look at
3   the client that you bring in, the size, the amount of
4   money that FIDAC would be managing. Until you know
5   the fee that Mr. Farrell is getting paid, you know,
6   for his management, you know, everything is a
7   hypothesis. All right? Until you know that the deal
8   closes with X amount of money under management, it is
9   a hypothesis, and until you know how much leverage
10  Mr. Farrell is going to use in this transaction,
11  whether it is four or five times the money raised or
12  eight times, because it is his discretion, depending
13  upon the contract that he has with the client and the
14  kinds of returns. So that I am essentially a
15  recipient of those kinds of things down the end. So
16  any fee that I would receive would be subject to the
17  above.
18        Secondly, or equally important, is in the
19  Sentry situation, FIDAC had -- I was the one that
20  unilaterally went to Canada to open up the market for
21  FIDAC. FIDAC never even had an anticipation of going
22  to Canada at that point in time. As far as I know,
23  hadn't had any discussions or anything else. So when
24  I opened up discussions with Sentry on my own buck --

26 (Pages 98 to 101)

Underhill Investment Corporation and Peskoff      v.      Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                    C.A. # 06-99 SLR                      October 10, 2006

Page 102

1  all right? -- because I never got reimbursed from
2  FIDAC for any -- I thought that the Canadian market
3  with these people specifically, because of the type of
4  deals they did and because of what Annaly was, could
5  be appropriate match, period.
6          And since these people managed at that time
7  several billion of assets and those assets were paid
8  out on a monthly basis, that the profiles between
9  FIDAC and Sentry matched perfectly, period. So those
10  were some of the variables that went into my thinking.
11          But my thinking also related back to what is
12  reasonable, you know, for the industry for a deal that
13  is size A that could be 30 million or 300 million or
14  when you start to manage the pot as different from
15  what you raise the money, because that's where the
16  money comes in for myself, just like it did at FBR
17  Asset. It wasn't important what FBR Asset put in the
18  pot. It is what Mike's fees were generating for
19  FIDAC, and he paid me a percentage of those fees,
20  which turned out to be 20 percent. It turned out to
21  be voluntary on his part. There was no negotiation.
22  And I always knew that I would get paid what was fair
23  and reasonable within the industry, and I had a very
24  good relationship with this man, period. Okay? So

Page 103

1  all those variables -- okay? -- went into my thinking.
2          Now, until the deck was cast --
3  Q.      The die was cast.
4  A.      The die and the deck.
5  Q.      The deck was cut. The die was cast.
6  A.      The deck was cut. Okay.
7  Q.      Let's start again. I apologize. I couldn't
8  resist.
9  A.      That's okay.
10  Q.      You said until?
11  A.      Until all those things happen, you know, I
12  mean, a discussion of what the end game is is
13  irrelevant. It is like, you know, trying to bet a
14  ten-team parlay, you know, in basketball. Until the
15  ten teams are in, you don't know where you have been.
16          So, I mean, all these have factors to
17  determine Mike's end, Mike determining what my end
18  would be, with a relevance to what is reasonable
19  within the industry for the size that is managed. The
20  bigger the size -- when you get into the billions --
21  okay? -- which is essentially what he was managing for
22  Sentry on a composite basis, you know, versus what he
23  was managing on, you know, for FBR Asset, you know,
24  the numbers are different, so your expectations would

Page 104

1  be different.
2          Let's talk about Baptista for a second.
3  Okay?
4  Q.      Okay. That's GenCorp.
5  A.      That's GenCorp. Okay? I met him originally
6  in December. I met him at a conference. I was
7  introduced to his management people, et cetera, et
8  cetera. And I introduced him to FIDAC/Annaly January,
9  February of '02. He was a different type of man. He
10  represented banks and insurance companies, which on
11  the surface, you know, appeared to be a different kind
12  of mate for FIDAC, something that they could do a
13  different kind of business. It could be an insurance,
14  as you referred to, you know, a BOLI wrap, a FOLI
15  wrap, stuff that I did not have any particular
16  expertise in, but on the other hand, you know, that it
17  could be done in tens, 50's and hundred-million-dollar
18  tranches from these institutions instead of raising
19  money from individual investors, so --
20          And part of introducing them, their game
21  plan originally as described to me was, you know, that
22  they would hopefully the first full year in operation
23  would do somewhere on the equity side between
24  250 million and 500 million of equity. And if Mike

Page 105

1  leveraged that seven, eight times, he would now be
2  managing 2, 3, 4, 5 billion, and they would do that on
3  a yearly basis, unlike investment banking deals, where
4  you raise a hundred million; the investment bank gets
5  6 or 7 percent; you get your percentage of that. This
6  is totally out of your control until the die is cast
7  or the deck is cut. Okay?
8          On the other hand, I looked back into my
9  contract, and the reason why I read the contract was I
10  just wanted to make sure that I was covered under, A,
11  having brought the customers in, and, B, that they
12  recognize, which they subsequently did through letters
13  and everything else, that I was the one who brought
14  them in, even though they weren't as successful in the
15  initial stages as the FIDAC people would have liked.
16  Q.      Is there or are there -- withdrawn.
17          Are there any other factors that must await
18  the event that you have to consider in determining
19  what Mr. Farrell should offer to pay to Underhill, any
20  other factors besides what you have testified to?
21  A.      I am sure there may be, but what you hope is
22  that your relationship with the FIDACs and the
23  Mr. Farrells is such that they will sit down and
24  discuss it with you as things are happening --

27 (Pages 102 to 105)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1              C.A. # 06-99 SLR              October 10, 2006

Page 106

1  okay? -- and, you know, will shed some light on that
2  so you have an ongoing discussion that, A, you will be
3  taken care of, and, B, if it is this, that or the
4  other, you will sit down at that time and discuss once
5  the deal is done, the money is raised. Okay?
6      Q.    Is it fair to take into consideration in
7  determining when the fees first start coming into
8  FIDAC what expenses and time FIDAC has had to put into
9  developing the product that it is going to be
10  managing?
11     A.    I don't think there is any question about
12  that. I said before yes.
13     Q.    It is fair?
14     A.    Absolutely.
15     Q.    And do you believe that Mr. Farrell could
16  reasonably have concluded when he spoke with you in
17  December 2003 that what he was offering to give you,
18  the $30,000 -- well, the $30,000 you said was
19  reasonable in the circumstances, in his mind. Whether
20  or not you agree is something else.
21     A.    Excuse me. Excuse me. I think you are
22  confusing apples, oranges and tomatoes.
23     Q.    All right. Well, why don't you help me out.
24     A.    Okay. I was going to say the 30,000 that he

Page 107

1  was offering to give me was for a transaction that was
2  just concluded with Sentry, period. It had nothing to
3  do with GenCorp. They were never mentioned. You
4  know, they weren't further along the line where the
5  money was being raised on a substantial basis. He
6  never discussed that with me at all.
7      Q.    With respect to Sentry Select then --
8      A.    That's what that discussion was, for that
9  particular transaction.
10     Q.    All right. With regard to the conversation
11  you had in December 2003 with Mr. Farrell that you
12  have testified to and with respect to Sentry Select,
13  do you think that it would not be unreasonable for
14  Mr. Farrell to take into account all of the expenses
15  and delays and time that had been spent by FIDAC in
16  connection with developing the MBS Trust?
17     A.    The answer is I think you have got the
18  MBS -- all I know is they had a meeting in June and
19  July. The deal was done in November. By normal
20  investment banking standards, that's not a lag. It
21  takes six months to do a deal -- okay? -- if it goes
22  perfect, because of the markets you are dealing with.
23  All right?
24         The difference would be under the GenCorp

Page 108

1  situation, where you start off with two ideas -- you
2  start off with four ideas. Two ideas look like they
3  are going to happen right away. Then there could be a
4  change, and now you are focusing on two other ideas,
5  so you have to change the product. You have to change
6  the marketing mechanism. And what you have is, you
7  know, nine months to getting a contract signed between
8  the two of them and then another 12 to 18 months to
9  raise the money under the new system, under the new
10  deal. And that is typical, especially dealing with an
11  insurance-related product. Not typical for an
12  investment banking deal, but for an insurance-related
13  product it is typical.
14     Q.    All right. Let me go back then to what you
15  said about December 2003. I am going to accept for
16  purposes of our discussion -- may I do that?
17     A.    Sure. Go ahead.
18     Q.    All right. I will give you a moment to
19  collect yourself.
20         Going back to December 2003, you said the
21  conversation only referred to a Sentry Select
22  transaction. Correct?
23     A.    Yes.
24     Q.    And he told you he was going to pay $30,000

Page 109

1  as a one-time finder's fee; correct?
2      A.    Yes.
3      Q.    Did you understand when he said that that he
4  was telling you that was a one-time fee he was going
5  to pay with regard to dealings with Sentry Select?
6      A.    No.
7      Q.    You --

**REDACTED**

28 (Pages 106 to 109)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                C.A. # 06-99 SLR                          October 10, 2006

## REDACTED

Page 110

3   Q.      Right.

4   A.      And remember, one other thing, just so you
5   can -- in the process between GenCorp and Sentry, I
6   probably introduced FIDAC to eight or ten other
7   customers -- all right? -- and other ideas on a
8   continuing basis, where I had out of pocket sizable
9   amounts of money, because they never reimbursed me
10  ever, period, for any of the work that I did. And I
11  never asked them to, because as a finder relationship,
12  part of the finding is that you bear your own
13  expenses -- okay? - continually. And those expenses,
14  you know, sometimes are very expensive; i.e. going
15  down to Florida to represent, you know, Annaly. Okay?
16  Doing stuff for the ex-president, you know, Tim Guba.
17  Okay?

18        I mean, I got involved in some very intimate
19  situations -- okay? -- with this company -- okay? --
20  and with FIDAC and so on and so forth. So I looked at
21  not just two situations here that I might have been
22  entitled to get paid. And I don't use the word
23  "might." That I was entitled to get paid, because I
24  brought them to the table and transactions had

Page 111

1   occurred that were substantial.

2         But it is all the other things -- okay? --
3   that I was involved with as well, you know, that
4   either were too small or didn't happen or whatever.
5   So there is a whole relationship that goes on
6   from the contract in 2000 up until that conversation
7   in December 2003 that involved other transactions that
8   might have been, that time was spent considerably, you
9   know, on my end. So I was looking at all this stuff
10  as an aggregate.

11  Q.      Were you paid any finder's fees by Friedman,
12  Billings, Ramsey for bringing in investment banking
13  business from Annaly?

14  A.      I wasn't paid a finder's fee. I was paid --
15  I was paid an investment banking fee because I was
16  treated as a senior investment banker under a
17  consulting agreement. That's, you know, what you call
18  the finder's fee extension; all right? So I was
19  treated as part of the investment banking pool. In
20  other words, if the company made $10 million in
21  investment banking fee, the investment bankers would
22  get a million and a half, 15 percent of whatever the
23  fee was. And I, if I brought the deal in, I would get
24  my percentage of that pool.

Page 112

1   Q.      Look at Peskoff Exhibit 3, please, what is
2   called the finder's fee agreement.

3   A.      Yes.

4   Q.      It refers to FBR, in its sole discretion.
5   It reads as follows. Excuse me. "FBR, in its sole
6   discretion, may decide to accept or reject a proposed
7   engagement or pay a fee in excess of 8 percent to
8   UIC." That, whether you call it a finder's fee or
9   not, did you receive any fees pursuant to this letter
10  agreement?

11  A.      Yes.

12  Q.      How much did they total? I am referring to
13  Annaly-related transactions.

14  A.      Annaly, zero.

15  Q.      FIDAC?

16  A.      Excuse me?

17  Q.      You said Annaly, zero. Now I am asking you
18  about FIDAC.

19  A.      FIDAC, I never received any money from FBR.
20  Zero.

21  Q.      So you received nothing as a result of any
22  investment banking business that FBR did for -- let me
23  withdraw.

24        Did you receive anything as a result of

Page 113

1   investment banking business that FBR did for either
2   FIDAC or Annaly?

3         MR. BELL: From FBR.

4         THE WITNESS: Of course.

5   BY MR. NOVACK:

6   Q.      Yes, you did. How much?

7   A.      For Annaly, I received fees that I would
8   have to check. For the private deal, because I was
9   the one that gave the go-ahead to do the deal, that's
10  the private placement in '97. And then when we went
11  public with Annaly, I received a fee, and then when we
12  did a secondary, I was part of that. I received a fee
13  as part of my investment banking consulting contract
14  under FBR. I got part of the investment banking pool.
15  No finder's fee, but part of the pool, subject to
16  their discretion.

17  Q.      My question is how much. Give me a range.
18  You have described at least three transactions, I
19  think.

20  A.      Yes. I probably received, you know, close
21  to a million dollars.

22  Q.      Perhaps more?

23  A.      Perhaps.

24  Q.      All right. And what did you do? What did

29 (Pages 110 to 113)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 114

1  you contribute to these three transactions that led
2  FBR to pay you close to a million dollars or more? In
3  general terms tell me.
4  A.    I will tell you in specific terms.
5  Q.    No. In general terms is all I want now.
6  Because I want to get you out of here at a reasonable
7  hour today, not to finish, but get you out today so
8  you can finish --
9  A.    I met Mike Farrell. He was referred in by
10  somebody who worked at Rodman Renshaw. He sat down
11  and talked to me, and I thought his idea of this
12  offshore trust that he was running made some sense. I
13  went into Emanuel Friedman and I said, "Manny, I think
14  this guy is worthy of doing a private placement for."
15  We did a private placement for $35 million -- okay? --
16  144(a) deal. Okay? That was in early 1997.
17  Q.    You introduced Farrell to Manny Friedman and
18  FBR?
19  A.    That's correct.
20  Q.    In terms of carrying the laboring oar on the
21  work and doing the deal documents and due diligence --
22  A.    I was involved with all of it.
23  Q.    You were. Okay.
24  A.    Okay. It was my deal, even though I wasn't

Page 115

1  an employee.
2      So what they did is, they took two or three
3  of the employees beside myself to do the due
4  diligence, road show. All the process of investment
5  banking, I was part of that.
6  Q.    Were you licensed as a --
7  A.    Of course, yes.
8  Q.    Okay. What was I going to ask you?
9          MR. BELL: I was just going to say,
10  let him finish his question.
11          MR. NOVACK: That's why I asked him.
12  I want to just give him a chance to say what he was
13  answering.
14  BY MR. NOVACK:
15  Q.    What was the question you were just
16  answering?
17  A.    I don't know.
18  Q.    I said were you licensed as, and you said of
19  course. Can you tell me what licenses you held at the
20  time?
21  A.    I had an NASD license and I was a consultant
22  to several other companies. Okay?
23  Q.    And you were licensed to provide these
24  investment banking/brokerage type services?

Page 116

1  A.    Yes. I had to be to work for Friedman
2  Billings in the capacity, yes.
3  Q.    Were you licensed as an affiliate of FBR?
4  A.    No.
5  Q.    Did you have to list an employer in order to
6  be licensed?
7  A.    No.
8  Q.    Okay. So go ahead. That's what you did on
9  the first transaction. What did you do on the next
10  transaction?
11  A.    The second transaction, we took it public.
12  Q.    And were you at all instrumental in getting
13  Mr. Farrell to use FBR to take the company public?
14  A.    He didn't have much of a choice, quite
15  frankly. When somebody does a private deal for you --
16  Q.    Right.
17  A.    -- the private investors who go in expect
18  within 12 to 15 months that there will be a public
19  execution so that their investment that is private
20  will become liquid. In that case it was done in less
21  than six months.
22  Q.    My question is: Did Mr. Farrell have the
23  contractual freedom if he chose to have Annaly use
24  another investment bank?

Page 117

1  A.    Not that I am aware of. We had a contract
2  with him.
3  Q.    That said that you would, FBR would?
4  A.    I am positive, yes.
5  Q.    All right. And what was the third
6  transaction?
7  A.    The third transaction was just to raise
8  another 150 or $200 million that he could use for the
9  treasury and buy, manage more money.
10  Q.    What was that an offering of?
11  A.    It was an offering of common stock.
12  Q.    Common stock. What --
13  A.    The second two were both common stock.
14  Q.    And what year was that in?
15  A.    I think it was 2'01 at the beginning. I
16  would have to check. You know, I am not an
17  encyclopedia off the top of my head.
18  Q.    That's okay.
19  A.    Yes.
20  Q.    What was your share of the pool for that?
21  A.    I would have to look at that, but I would --
22  to know. Okay?
23  Q.    Would it be in the several hundred thousand
24  dollars?

30 (Pages 114 to 117)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                C.A. # 06-99 SLR                          October 10, 2006

Page 118

1    A.      Yes.
2    Q.      Or more?
3    A.      **Probably several hundred thousand. It**
4    **wouldn't have been more.**
5    Q.      You took a $6 million capital loss when you
6    liquidated and dissolved Underhill; right?
7    A.      **Correct.**
8    Q.      Did you put $6 million of assets into
9    Underhill?
10   A.      **Sure.**
11   Q.      What form did that take?
12   A.      **Cash, assets, over a period of 20 years.**
13   Q.      Underhill was in existence for over 20
14   years?
15   A.      **Over 20 years, yes.**
16   Q.      And you funded it with cash --
17   A.      **Right.**
18   Q.      -- to the extent of $6 million?
19   A.      **Cash, assets, all kinds of stuff.**
20   Q.      No, no. I want to break it down. Cash, how
21   much?
22   A.      **I don't remember. I have to check the**
23   **books.**
24   Q.      As a proportion of the total capital, how

Page 119

1    much was cash you put in?
2    A.      I don't remember. I would have to -- it was
3    over a period. It's a long period of time.
4    Q.      What kind of assets did you put in?
5    A.      I put in real estate assets. Underhill
6    owned a food company at one time, a food chain. And
7    Underhill owned a part of a stamping plant at one
8    time. Underhill owned thoroughbred horses.
9    Q.      And this was all put in as capital or this
10   was put in as loans?
11   A.      Most of it was put in as capital.
12   Q.      And there was about $6 million owed to
13   you --
14   A.      That's correct.
15   Q.      -- in your capacity as a creditor?
16   A.      As a creditor and sole shareholder; right.
17   Q.      Right. No, no. In your capacity as a
18   creditor?
19   A.      Creditor, yes.
20   Q.      That implies to me that you had made a loan
21   of some $6 million, not made a capital contribution of
22   6 million. Am I incorrect?
23   A.      I think you are correct. I think you are
24   correct, yes.

Page 120

1    Q.      Okay. So you loaned $6 million to the
2    company.
3    A.      Right.
4    Q.      Going back to 2001 and your share of the
5    commissions, the investment banking commissions that
6    you were paid, were you hopeful in 2001 that there
7    would be further investment banking business done by
8    FBR for Annaly and that you would share in further
9    commissions? Were you hopeful?
10   A.      Yes.

REDACTED

Page 121

REDACTED

15   Q.      Had you moved out by then or were you still
16   in FBR?
17   A.      I had moved out. I had moved out in March
18   of '02. No. I had moved out before, but physically I
19   was in my new offices in March of '02.

REDACTED

Wilcox & Fetzer, Ltd.          Professional Court Reporters          A-104          (302)655-0477

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1        C.A. # 06-99 SLR        October 10, 2006

Page 122

# REDACTED

7   Q.      Right. Did you hear from anyone at FBR that
8   FIDAC had cooperated in the transition? When FIDAC
9   ceased to be the subadvisor for the FBR REIT, it still
10  assisted in the transition even though it had no
11  contract obligation to do so?
12  A.      I did not know any of that.
13  Q.      Did anyone at FBR ever express to you one
14  way or the other any sentiment as to whether or not
15  Farrell had handled the disengagement in a fair way?
16  A.      Nobody, nobody expressed that to me, no.
17  Q.      You didn't hear any complaints, I gather?
18  A.      I didn't hear any complaints, no.
19  Q.      Have you continued to this day -- I think
20  you may have answered it. I am sorry if you have --
21  acting with FBR in investment banking transactions
22  where you get a share of the commissions?
23  A.      If I bring a transaction, certainly.
24  Q.      You don't work on transactions you don't

Page 123

1   bring in; is that right?
2   A.      That's correct.
3   Q.      And if you bring a transaction in, must you
4   work on it in order to get the fee?
5   A.      Not necessarily.
6   Q.      And can you tell me the amounts you have
7   been paid were not pursuant to this agreement which is
8   Peskoff Exhibit 3? Is that what you are telling me?
9   A.      Yes. I need you to rephrase your question
10  because --
11  Q.      The amounts you were paid for the three
12  transactions that were described earlier -- well,
13  actually, let me withdraw that, because two of them
14  took place earlier.
15          The last transaction you described may have
16  taken place in 2001; right?
17  A.      With Annaly you are talking about?
18  Q.      Yes.
19  A.      Yes, probably. 2001, yes.
20  Q.      And were you paid in connection with that
21  transaction pursuant to --
22  A.      No.
23  Q.      -- this --
24  A.      No.

Page 124

1   Q.      Were you paid pursuant to any written
2   agreement that you had or was it all oral?
3   A.      Well, you knew -- I told you I had a written
4   contract.
5   Q.      A consulting agreement?
6   A.      A consulting agreement. That's correct.
7   That stood in place till December, January, 2'02,
8   2'03, and they replaced it with that. All right?
9   Q.      You are referring to Peskoff Exhibit 3?
10  A.      That's correct.
11  Q.      Okay. Just let me say that to help you
12  along here on dates, Peskoff Exhibit 3 is dated
13  December 2001. You just said it was changed in 2003
14  and replaced with this.
15  A.      Well, you know what? Then I moved out --
16  Okay. Then I moved out -- that was signed --
17  Q.      So take it -- so let's go slow.
18  A.      I don't remember.
19  Q.      No. I want you to slow down.
20  A.      Yes.
21  Q.      And let's go slow.
22  A.      Yes.
23  Q.      Okay. Is Peskoff Exhibit 3, which is
24  described as a finder's fee agreement -- I don't want

Page 125

1   to excite you by calling it that because you disagree,
2   I know --
3   A.      Call it what you want.
4   Q.      Okay. Let me start again. Is Peskoff
5   Exhibit 3, what is called a finder's fee agreement,
6   the agreement that replaced whatever agreement that
7   you had in existence as of December 2001?
8   A.      Right.
9   Q.      This agreement is between FBR & Co., Inc.
10  and Underhill Investment Corporation. Is this,
11  insofar as you are aware, the agreement that still
12  exists between FBR on the one hand and Underhill on
13  the other?
14  A.      The agreement still exists, but it would be
15  Renaissance today. I would change it --
16  Q.      Okay.
17  A.      -- because there hasn't been any business
18  between FBR and myself since Underhill dissolved. So
19  if I brought them a transaction, that would be
20  changed. It would be Renaissance Corporation.
21  Q.      Am I correct that no one has changed the
22  writing or the written agreement yet?
23  A.      That's correct.
24  Q.      So it still reads Underhill?

32 (Pages 122 to 125)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                          C.A. # 06-99 SLR                        October 10, 2006

Page 126

1   A.    That's correct.
2   Q.    And the commission that you got as your
3   share of the investment banking work that was done on
4   the third Annaly transaction done by FBR, was it paid
5   pursuant to this finder's fee agreement?
6   A.    No.
7   Q.    It was paid pursuant to the prior agreement?
8   A.    That's correct.
9   Q.    All right. I am calling for production of
10  the prior agreement. If you could let me see that, if
11  you can scan and get it to me tomorrow. I don't know
12  if you can or cannot. Maybe Josie can do it. But I
13  am not -- I would like to see it.
14        I am sorry to be so tedious about this, but
15  I couldn't follow the sequence, frankly.
16  A.    That's fine.
17  Q.    Would you look at Peskoff Exhibit 3 for a
18  minute again. Oh, it is right in front of you. I am
19  sorry. Is there anything in that agreement that
20  refers to any obligation on the part of Underhill to
21  actually provide any investment banking services,
22  either due diligence, writing anything, investigating
23  anything?
24  A.    It doesn't deal with that, no.

Page 127

1   Q.    No. In the second paragraph it states, "If
2   FBR is engaged by a company to provide investment
3   banking services as a result of the efforts of UIC,"
4   then it goes on to say, "and FBR management agrees,"
5   blah, blah, blah.
6   A.    Yes.
7   Q.    Okay. You agree, do you not, that this
8   agreement in terms of its literal language is
9   triggered simply because they are engaged as a result
10  of your efforts at UIC? Right? You have persuaded
11  someone to engage FBR. That's all you have to do
12  under the literal language of this agreement to get
13  your fee?
14  A.    Under this, under this, yes. It is
15  different from the original contract.
16  Q.    Does that cause you to reconsider whether or
17  not you consider this a finder's fee agreement?
18  A.    No.
19  Q.    Okay.
20  A.    No.
21  Q.    We talked about three different sets of
22  transactions here today. And I want to try and just
23  make sure we have a common understanding what we are
24  referring to. First we talked about FIDAC being

Page 128

1   engaged as a subadvisor to manage the FBR REIT. So
2   let's put that to one side. Okay? You would like to
3   do that; right? Had enough of that?
4         With respect to the FBR REIT, one question.
5   With respect to the FBR REIT, is it correct that all
6   that FIDAC had to do was undertake to start managing
7   the pool of money that was in the REIT? Is that
8   correct?
9   A.    I wouldn't think so.
10  Q.    You think they had to do more?
11  A.    Yes.
12  Q.    What?
13  A.    I think they had to do an analysis of the
14  existing assets and probably the shortcomings of --
15  the problems that were created by the other management
16  company vis-a-vis FBR and --
17  Q.    Oh, I agree with you. When I say manage, I
18  included analyzing the portfolio, seeing what has to
19  be done and then managing it.
20  A.    Okay. Okay.
21  Q.    So let me --
22  A.    Okay. Just to --
23  Q.    Let me clarify that.
24  A.    Yes.

Page 129

1   Q.    Okay?
2   A.    Because that was part of the problem as I
3   understand it.
4   Q.    Okay. With regard to the FBR REIT, there
5   was a pool of money that was in the REIT, and FIDAC
6   was hired to analyze that portfolio, that pool of
7   money, and then to manage it; correct?
8   A.    Correct.
9   Q.    All right. FIDAC did not have to go out and
10  raise any money from anybody to manage. It already
11  was in --
12  A.    Correct.
13  Q.    -- the REIT.
14  A.    Correct.
15  Q.    Now, let's go to GenCorp. Can you describe
16  for us what eventually was the nature of the
17  transaction and the product that was created which led
18  to fees being earned by FIDAC? Can you tell me what
19  that was? Do you know it?
20  A.    What I recall, since I never got a copy of
21  the prospectus --
22  Q.    But you did get something online, didn't
23  you, reading about -- didn't you get some publicly
24  filed documents?

33 (Pages 126 to 129)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                    C.A. # 06-99 SLR                    October 10, 2006

Page 130

1  A.    That's different. Yes. But that's
2  different. That had to do with news articles and
3  other kinds of stuff.
4  Q.    You didn't get any SEC filings ever?
5  A.    I may have about the trusts, the MBS Trusts.
6  Q.    Okay.
7  A.    But probably not about the other, because
8  the other was private.
9  Q.    Okay.
10 A.    Okay?
11 Q.    And Ernie Baptista didn't tell you about
12 GenCorp and what Premier was?
13 A.    You didn't ask me that question.
14 Q.    Okay. Did Ernie Baptista tell you about
15 them?
16 A.    Yes.
17 Q.    Okay. From Ernie Baptista's description are
18 you able to tell us what Premier was?
19 A.    Premier ended up being an investment fund
20 comprised of insurance companies and banks that put
21 money into a fund that was managed by FIDAC, and the
22 basis was for them to get a minimum yield, I think it
23 was 5 or 6 percent, and hopefully, you know, a yield
24 that, you know, surpassed that, you know, depending

Page 131

1  upon the interest rate environment at the time that it
2  was created.
3  Q.    Let me stop you there for a minute.
4  Let's -- the money that went into the fund, that was
5  money that was contributed or invested, rather, by
6  insurance companies?
7  A.    And savings and loans and banks --
8  Q.    Okay.
9  A.    -- and clients and relationships of Baptista
10 and Messner.
11 Q.    Let's go slowly. Okay?
12 A.    Yes.
13 Q.    In the case of Premier the clients of the
14 fund or FIDAC's clients were insurance companies,
15 savings banks, and what was the third you described?
16 A.    Other institutions, as far as I was -- other
17 large financial institutions.
18 Q.    Am I correct that you did not introduce any
19 of those institutions to FIDAC?
20 A.    You are correct.
21 Q.    Okay. Am I correct that it was either
22 Mr. Baptista or Mr. Messner that did that?
23 A.    That's correct.
24 Q.    All you did was introduce Mr. Baptista

Page 132

1  and/or Mr. Messner. Did you introduce Mr. Messner as
2  well or was it --
3  A.    Yes, it came as a package.
4  Q.    Okay. You introduced Mr. Baptista and
5  Mr. Messner to FIDAC; is that right?
6  A.    Correct.
7  Q.    Okay. And then after you introduced
8  Mr. Baptista and Mr. Messner to FIDAC, there were a
9  series of aborted attempts to create a product, and
10 eventually Premier was created; right?
11 A.    I think that's a fair statement.
12 Q.    Okay. And when Premier was created, it was
13 Mr. Baptista and Mr. Messner that went out and found
14 the clients or the people who invested the money in
15 the fund; correct?
16 A.    Correct.
17 Q.    Okay. Now, with Sentry Select, can you
18 describe for us what the product was or can you
19 describe for us the relationships and what FIDAC was
20 managing?
21 A.    FIDAC was managing -- well, the Sentry
22 Select relationship was a little different. Sentry
23 Select was a relationship of fund distributor,
24 Sentry --

Page 133

1  Q.    Well, do you know the legal structure at
2  all?
3  A.    I am going to try to describe it.
4  Q.    Oh, okay. I am sorry. I thought you
5  were --
6  A.    Yes. FIDAC, which was going to be the
7  advisor to the fund, and then they had an investment
8  banking group that was going to raise the money. So
9  that the money was going to be raised. The money was
10 going to be invested per FIDAC's instructions. It was
11 supposed to provide a monthly income to investors, and
12 that distribution would be handled by Sentry, which is
13 what they do. Okay? They provide monthly income in
14 10, 20 different kinds of funds to investors on a
15 monthly basis.
16 Q.    The MBS Trusts are what was created as a
17 result of the dealings between Sentry and FIDAC?
18 A.    That's correct.
19 Q.    Can you tell us the legal structure of the
20 trusts and this fund and how they relate to each
21 other, or you don't understand that?
22 A.    Well, the simple version is what I gave you.
23 Okay?
24 Q.    I found that hard to follow. It might be

34 (Pages 130 to 133)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1     C.A. # 06-99 SLR     October 10, 2006

Page 134

1  me. You say the fund, the fund, the fund. Is that an
2  LLC? Is it an LLP? Is it a corporation, or you don't
3  know?
4  **A.     You know, I can't tell you. I don't**
5  **remember. That part I don't --**
6  Q.     Is it a separate entity, separate legal
7  entity?
8  **A.     They are all separate entities. The moneys**
9  **are not cross-collateralized.**
10  Q.     So there is --
11  **A.     So there is Fund 1. Let's just call it**
12  **Fund 1, the first one.**
13  Q.     It is a legal entity, though?
14  **A.     It is a legal entity. All right?**
15  Q.     All right.
16  **A.     That legal entity has assets.**
17  Q.     And where does it get the assets from?
18  **A.     It gets the assets -- it raises money from**
19  **retail investors. That's how that happened, because**
20  **that's who Sentry represents, retail investors.**
21  Q.     If you are not clear on this, let me see if
22  I can state it for you. Tell me if you agree. Okay?
23  Sentry creates a partnership. The partnership then
24  manages a separate LLC -- excuse me.

Page 135

1     Sentry creates a trust. The trust then
2  invests in a partnership. The partnership has assets.
3  These assets are managed by FIDAC as the investment
4  manager. The money that eventually finds its way into
5  the pool that is managed by FIDAC comes from many,
6  many, many individuals throughout Canada who invest in
7  the trusts. And Sentry along with the investment
8  bankers raises the money from these many, many, many
9  individuals. Is that right?
10  **A.     You are hired.**
11  Q.     Okay. Now, is it correct that you did not
12  introduce any of these many, many, many individuals to
13  FIDAC and other people found the money that FIDAC was
14  going to be managing as part of this trust?
15  **A.     That's correct.**
16  Q.     Okay.
17  **A.     That's correct.**
18  Q.     Do you have any knowledge as you sit here
19  today of similar transactions to either the Premier or
20  MBS Trusts that you say establishes what is customary
21  in the industry with regard to a fee that should be
22  paid to someone who provided the services that you
23  claim to have provided here?
24     Do you want the question read back? It is a

Page 136

1  long one.
2  **A.     Yes.**
3     MR. NOVACK:  Could you please read it
4  back? See how I know you now.
5     (The court reporter read back as
6  follows:
7     "Question:  Do you have any knowledge
8  as you sit here today of similar transactions to
9  either the Premier or MBS Trusts that you say
10  establishes what is customary in the industry with
11  regard to a fee that should be paid to someone who
12  provided the services that you claim to have provided
13  here?")
14     THE WITNESS:  The answer to that is
15  with Sentry this was new ground. This was new ground,
16  and it was new ground for the manager, being in
17  Canada. And the difference was that they wouldn't
18  have been in Canada and that marketplace wouldn't have
19  opened because that was never even a forethought of
20  the people at FIDAC.
21     So it is one thing to be the -- but to
22  answer your question specifically, there was -- with
23  what I provided there is not a similarity of
24  situation, because I agreed that I didn't provide the

Page 137

1  equity, but I provided the concept and the catalyst to
2  bring together the parties to make this thing happen
3  and build a relationship that is a substantial part of
4  FIDAC's business model today. And if somebody hadn't
5  set foot in Canada, you know, Annaly still -- FIDAC
6  probably still would not have been, you know, in
7  Canada.
8     So the point was going out and having
9  the idea in your head one thing, just like creating
10  an invention, you know, a guy creating an invention.
11  You file a patent. Okay? But my idea wasn't
12  patentable. The idea was that here is a relationship
13  that can really help you in America -- okay? --
14  manage -- the American team manage the money, and all
15  of Canada is now available for this particular
16  concept. And given the spread in interest rates being
17  so attractive, you know, it worked, you know, very,
18  very well.
19     So given the structure that you just
20  described aptly, there wasn't a place for me other
21  than me being willing, and I was turned down
22  consistently to saying that I can provide other kinds
23  of services if you need them to get this deal
24  finalized, Mr. Kazel, Mr. Farrell, whatever. And they

35 (Pages 134 to 137)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1    C.A. # 06-99 SLR    October 10, 2006

Page 138

1  said no, because it is Canadian law and this, that and
2  whatever, and we have bankers to do this, you know,
3  your -- you know, your contribution is stopped right
4  there, period, end of story. And that's how it ended.
5  BY MR. NOVACK:
6  Q.    I take from your answer that you are
7  conceding that you do not know of any similar
8  situations where you could point to services provided
9  similar to those you provided with respect to
10  Sentry --
11  A.    I --
12  Q.    -- and say this is customary in the
13  industry?
14  A.    I would agree. I would agree with that
15  point insofar as the raising of the money and the
16  documentation. But the key element that I provided
17  was finding the concept and opening the marketplace.
18  Okay?
19        There are hundreds of deals that are done in
20  trusts in the United States, real estate trusts. You
21  can shake your hand at them. There is one created
22  every week. But that's, you know, that is a common
23  kind of thing. You buy some real estate. You create
24  a partnership. Somebody manages it. All right? But

Page 139

1  this was a little more than that.
2  Q.    Okay.
3  A.    This was opening up a whole new market,
4  something that wasn't even considered. All right? I
5  went up on my own volition, sat down with people that
6  I thought could fit the profile who were in the same
7  type of business, monthly distributions, quarterly
8  distributions, as Annaly, FIDAC, and matched them
9  together. And in that case that was unique.
10  Q.    Did you ever attempt to have any business
11  dealings with Sentry Select other than those that were
12  directed toward FIDAC, meaning with Friedman,
13  Billings, Ramsey or Underhill or any other company
14  that you were affiliated with?
15  A.    You want to repeat that again, because --
16  Q.    Did you ever attempt --
17  A.    Attempt.
18  Q.    -- attempt to persuade Sentry Select to have
19  any other types of business dealings with either
20  Underhill or Friedman, Billings, Ramsey or anyone else
21  other than FIDAC or Annaly?
22  A.    The answer is yes.
23  Q.    When was that?
24  A.    After I introduced them to FIDAC.

Page 140

1  Q.    Right.
2  A.    Their question, the question -- they called
3  me and said, "Look, we are trying to market" -- the
4  reverse -- "a couple of deals in the United States."
5  Q.    Right.
6  A.    "And one of them is a fund managed by this
7  Canadian professor, and we have an investment bank in
8  the United States raising money. Can you be helpful
9  to us" --
10  Q.    Right.
11  A.    -- "in helping raise money for this fund or
12  introduce us to other investment bankers?"
13        They sent me the information. I looked at
14  it. I couldn't be helpful. It was out of my area of
15  expertise.
16  Q.    Right.
17  A.    You know, I don't know anything about index
18  funds and arbitrage and, you know, what they were
19  doing.
20        And we also discussed, you know, that if
21  this transaction were successful, because it was going
22  to be a monthly or quarterly payment, you know, in an
23  asset structure, that I also had relationships with
24  other real estate investment trusts who might consider

Page 141

1  moving some of their business to Canada; in other
2  words, finding new opportunities in Canada, just like
3  Annaly/FIDAC might if a deal was done.
4  Q.    When you said real estate investment trusts
5  that might move their dealings to Canada, what do you
6  mean? They would acquire assets in Canada or
7  something else?
8  A.    Or they might have an offering in Canada
9  done by Sentry, the same way that was done here. In
10  other words, opening up the United States real estate
11  market to Canadian investors -- all right? -- through
12  this type of mechanism.
13  Q.    So you were interested in seeing if you
14  could put together REITs in the United States with
15  Sentry. Sentry would serve as the --
16  A.    The same structure --
17  Q.    -- the entity that would help raise the
18  money in Canada?
19  A.    The same thing, profile that happened
20  focused on an Annaly, if it worked. It could be
21  reproduced if they found like companies that they felt
22  comfortable with from a credit perspective and from a
23  product perspective that they could market up in
24  Canada.

36 (Pages 138 to 141)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1                    C.A. # 06-99 SLR                              October 10, 2006

Page 142

1  Q.   Did you have particular REITs in mind?
2  A.   Yes, I did.
3  Q.   Did you ever talk to Sentry about them?
4  A.   Not particularly, because I wanted to see
5  how the relationship with Ron Kazel and Mike Farrell
6  went and if a deal would get done.
7  Q.   And did you ever pursue this with Sentry?
8  A.   No.
9  Q.   Okay.
10  A.   No.
11  Q.   Were you expecting to get a fee from either
12  Sentry or the REITs if you did pursue it?
13  A.   If I pursued it with Sentry?
14  Q.   Yes.
15  A.   If, if -- I would assume that that would be
16  a common business thing, to get a fee for it.
17  Q.   Who would you have asked? Would you have
18  asked Sentry for the fee or would you have asked the
19  REIT for the fee or both?
20  A.   No. I would have had to decide that at the
21  appropriate time. Okay? But since it is a conjecture
22  question, it is moot. All right?
23  Q.   Yes.
24  A.   With the Annaly/FIDAC situation, because I

Page 143

1  had an existing contract -- all right? -- I never
2  asked Sentry for a nickel, period. And if I thought
3  that I would have a problem collecting, you know, from
4  FIDAC/Annaly any money, that we hadn't had this
5  relationship, I would have asked, you know, for a
6  finder's fee from Sentry, which is very, very common,
7  because they not only get a piece of the management
8  fee, just like Premier does, off the top.
9      See, it is split three ways, from what I
10  remember. You get -- Mike gets a management fee
11  through FIDAC. Sentry gets an ongoing management fee
12  for handling the monthly payments and distributions.
13  All right? And the investment bankers get paid, you
14  know, for raising the money on a one-time basis.
15  These people get paid continually.
16      And that contract, from what I understand,
17  was a multiyear contract. It wasn't like an
18  investment banking deal. It was totally different.
19  In fact, from what I recall, some of the Sentry deals,
20  the MBA Trusts were ten years in duration, ten years.
21  Q.   You meant MBS Trusts?
22  A.   Yes.
23  Q.   Okay.
24  A.   Okay. So, you know, to answer your question

Page 144

1  specifically again -- all right? -- my comfort level
2  with Mike Farrell and our prior relationship and
3  stuff, I felt if something happened here, that would
4  be the least of my concerns, getting paid properly and
5  reasonably from him. So I never even mentioned it to
6  Sentry.
7  Q.   What about GenCorp? Did you ever have any
8  discussion with GenCorp in which you discussed whether
9  or not they would pay you a fee for anything you did
10  in connection with the FIDAC transactions?
11  A.   Could I answer it in another way?
12  Q.   Be my guest.
13  A.   Okay. Okay.
14  Q.   As long as it is responsive to my question.
15  A.   Okay.
16  Q.   Do you want the question read back?
17  A.   Please. Would you read it back?
18      MR. NOVACK: Would you read the
19  question, please?
20      (The court reporter read back as
21  requested.)
22      THE WITNESS: Okay. In the meeting,
23  second meeting with FIDAC/Annaly -- and it was at the
24  old headquarters.

Page 145

1  BY MR. NOVACK:
2  Q.   Of?
3  A.   Of FIDAC/Annaly, not the new Fox stuff that
4  they have. Okay?
5  Q.   Right.
6  A.   All right? After the meeting was over --
7  and we had several people from Annaly. We had
8  Mr. Diamond there. Mike Farrell came in late to the
9  meeting. Kazel was there. I was there, and Messner,
10  you know, his partner. Baptista said to Mike Farrell,
11  he said "Mike, look, let's get this out of the way. I
12  want to know how Steve is being compensated." Mike's
13  quote: "That's not any of your responsibility. I'm
14  taking care of that. We have a prior relationship and
15  understanding." End of story.
16      If that response was not done, I probably
17  would have pursued some kind of relationship with
18  Baptista from a compensation point of view because it
19  was only logical.
20  Q.   What was the month in which this meeting
21  took place and the year?
22  A.   I think it was February 2'02. It may have
23  been --
24  Q.   You remember it was before FIDAC ceased

37 (Pages 142 to 145)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1          C.A. # 06-99 SLR                    October 10, 2006

Page 146

1   advising the FBR REIT?

REDACTED

16   Q.    Can we simplify it? It occurred in the
17   first three or four months of '02 that you had the
18   meeting with Mr. Baptista in which you state that
19   Mr. Farrell talked about the relationship he had with
20   you?
21   A.    Mr. Baptista asked Mr. Farrell a question.
22   It is not that he didn't talk about it. He asked him
23   specifically, "How is Steve going to be paid? Do I
24   have to pay him?" He said, "It's not your problem.

Page 147

1   We have a prior relationship." Okay? Period. End of
2   story.
3        So he said to me, he turned around, "That's
4   good. You just put extra money in my pocket."
5   Q.    Who turned to you? Mr. Baptista?
6   A.    Yes.
7   Q.    And did Mr. Farrell say, "Period, end of
8   story," or that was just you describing how
9   Mr. Farrell said something and didn't say more? You
10  just said in your answer --
11  A.    I am just telling you what Mr. Farrell
12  said --
13  Q.    Did Mr. Farrell say --
14  A.    He didn't even say it to me. He said it to
15  Baptista.
16  Q.    I understand that.
17        MR. BELL: Let him finish his
18  question, Steve.
19        THE WITNESS: Yes.
20  BY MR. NOVACK:
21  Q.    In your answer before you said, "Mr. Farrell
22  said we have a relationship, period, end of story."
23  Mr. Farrell did or did not say "period, end of story"?
24  A.    He didn't --

Page 148

1   Q.    That's you just --
2   A.    That's correct.
3   Q.    -- showing me that that's all he said,
4   Mr. Farrell; nothing more?
5   A.    Yes. Yes.
6   Q.    Okay.
7   A.    Baptista asked him the question. He
8   answered Baptista's question very unequivocally. Then
9   Baptista looked at me and said, "It's more money in my
10  pocket."
11        MR. NOVACK: We only have a few
12  minutes of tape. I would like to take a break now if
13  we could for about ten minutes, and then we will go
14  for another half hour? Is that okay?
15        MR. BELL: Okay.
16        (Recess taken.)
17  BY MR. NOVACK:
18  Q.    Mr. Peskoff, I want to ask you about the
19  time when you were meeting in the offices of FIDAC or
20  Annaly with Mr. Baptista, Mr. Farrell, Mr. Kazel, that
21  you were referring to just before we broke, in which
22  Mr. Farrell said something about your relationship and
23  Mr. Baptista turns to you and said, "More money for
24  me." My question is this -- do you have that meeting

Page 149

1   in mind? I am going to ask a question --
2   A.    Yes.
3   Q.    -- that relates to what you were thinking at
4   that time.
5   A.    What I was thinking?
6   Q.    Okay. But wait for the question.
7   A.    Yes.
8   Q.    At that time were you anticipating that you
9   would be going out to try to find sources of capital
10  to be invested in whatever product was going to be
11  created by GenCorp and by FIDAC?
12  A.    No.
13  Q.    Okay. I noticed when you said no, you went
14  like this with your head nodding up and down
15  (indicating), which customarily means yes to many
16  people.
17  A.    No, no. Okay. But absolutely not.
18  Q.    Okay. Did you make it clear to anybody at
19  the meeting that you had no intention of going out to
20  try to find any capital for FIDAC to manage in
21  connection with whatever was done with GenCorp? Did
22  you say something, in other words?
23  A.    No.
24  Q.    Okay. Did they have any reason -- well,

38 (Pages 146 to 149)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1              C.A. # 06-99 SLR                     October 10, 2006

Page 150

1  withdrawn.
2         Prior to the meeting had you indicated to
3  Mr. Farrell or Mr. Kazel or anyone at FIDAC that you
4  had no intention of going out trying to find some
5  capital to be invested in the product that would
6  eventually be created by FIDAC and GenCorp?
7  A.      **Prior to the meeting with --**
8  Q.      Yes.
9  A.      **No, the subject never came up. The answer**
10 **is no.**
11 Q.      Okay. Before the meeting with GenCorp, had
12 you brought any other business to FIDAC, with the
13 exception of the FBR REIT?
14 A.      **I think -- let's see. The timing. That was**
15 **'02. So that was '03. The answer -- any other**
16 **business? Had I --**
17 Q.      Any other --
18 A.      **Define "business" for me.**
19 Q.      Did you bring any other capital to FIDAC for
20 it to manage?
21 A.      **I -- the answer is I tried on many different**
22 **occasions, and the clients were either too small or**
23 **the deals didn't happen. I brought many, many. When**
24 **I say, "many, many," ten customers up there.**

Page 151

1  Q.      Over the course of how much time did you
2  bring these ten customers?
3  A.      **Probably over a period of a year or two.**
4  Q.      So for the year or two before the meeting
5  with Mr. Farrell, Mr. Kazel, Mr. Baptista and you
6  which took place in the early or spring part of
7  2002 -- can you read that back for me? I lost my own
8  train of thought. I know my train of thought. I just
9  don't know what spur I took. Go ahead, read it back.
10        (The court reporter read back as
11 requested.)
12        MR. NOVACK: Thank you. That's
13 enough. That's a horrible question. Why didn't you
14 object to the form?
15        MR. BELL: I liked it. I thought it
16 was fine, except that you didn't mention Messner.
17        MR. RUBEN: Or Diamond.
18        MR. BELL: Or Diamond.
19        MR. NOVACK: Okay. Yes. I think that
20 has been a problem with my questions. Thank you.
21 BY MR. NOVACK:
22 Q.      Mr. Peskoff, I have asked you a couple of
23 questions in the last few minutes about the meeting
24 that you attended with Mr. Kazel, Mr. Farrell,

Page 152

1  Mr. Baptista, and you. And I believe you also
2  testified earlier that Mr. Messner and Mr. Diamond
3  were there at that meeting?
4  A.      Yes.
5  Q.      And you understood my questions that I have
6  just been asking you where I didn't also refer to
7  those two gentlemen being at the meeting as referring
8  to that meeting that they attended; right?
9  A.      Yes.
10 Q.      Okay. Now, am I correct that for the year
11 and a half before the meeting you had made perhaps ten
12 attempts to bring capital to FIDAC for it to manage
13 but for one reason or another you were never
14 successful? Is that right?
15 A.      **I think that's a fair statement, yes.**
16 Q.      Okay. Okay. Last area of questioning for
17 today. You testified that you didn't think there was
18 any comparable situation that you could point to in
19 the marketplace with regard to Sentry Select. My
20 question now is, with regard to GenCorp, tell me what
21 facts you have that you say would support the
22 conclusion as to what would be customary or
23 traditional in the marketplace for you to be paid for
24 the services that you claim you provided to FIDAC in

Page 153

1  connection with GenCorp.
2  A.      **Well, it being somewhat consistent with the**
3  **other. The first would be that the introduction of**
4  **GenCorp and their business and their clients, you**
5  **know, to FIDAC. Okay? Which is typically all -- and**
6  **you love this word -- finders are supposed to provide**
7  **in a relationship. And that was number one.**
8         **Number two, that I had spent considerable**
9  **time before the initial meetings with Annaly and FIDAC**
10 **with Baptista, going through -- we met in December of**
11 **'01. I met with him I think in January privately,**
12 **before we met with Mike and those teams.**
13 Q.      Mr. Peskoff, may I interrupt you for a
14 second, and I will let you continue if you want. I am
15 not sure you heard my question. My question was: Can
16 you tell me in the marketplace, not in your dealings,
17 can you tell me in the marketplace of what
18 transactions you are relying on to show what is
19 traditional in the marketplace in terms of what fee to
20 be paid to someone who does what you say you did with
21 regard to GenCorp? I am not asking about what you did
22 now yourself, except as it relates to showing me how
23 it relates to something --
24 A.      **Other reasonable compensation?**

39 (Pages 150 to 153)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1              C.A. # 06-99 SLR              October 10, 2006

Page 154

1  Q.    Yes. I want to know -- give me the other
2  people or transactions outside of this one that you
3  are relying on. So I apologize for interrupting you,
4  but I think you were not answering my question.
5  A.    No, no. I wasn't. Okay.
6        The answer is I am not relying on anybody
7  else's transactions. The word finder's fee for
8  introductions in the real estate business or finder's
9  fees in the traditional -- in the financial services
10  business which we pay when we are introduced
11  traditionally will go this way. Okay? You may be
12  familiar or you may not be.
13       In the financial services business, if I do
14  an equity transaction for Joe Blow --
15  Q.    Who are you? What kind of company are you?
16  A.    I am an investment bank.
17  Q.    Okay.
18  A.    Okay. And I am the finder to the investment
19  bank. In other words, I found it and introduced
20  somebody to Steve Peskoff, who works for Friedman,
21  Billings & Ramsey.
22  Q.    Let me back up to make it so I am following.
23  A.    Okay.
24  Q.    Let's assume that there is an investment

Page 155

1  bank, and Steve Peskoff was acting as a finder for
2  who? The investment bank?
3  A.    Fine. Use that example.
4  Q.    Okay. Let's use Joe Blow as somebody who
5  wants to engage the services of an investment bank.
6  A.    Exactly. Let's do that.
7  Q.    Okay. So let's talk about Joe Blow or --
8  A.    Okay. Right. Okay.
9  Q.    Okay.
10  A.    Let's talk about the basic structure, any
11  way you look at it, is called raising equity. Okay?
12  Q.    Okay.
13  A.    That's the number -- that's the word you
14  used and which I am referring to. So when you raise
15  equity, whether it is during -- for a private
16  placement or it is for a public offering, the standard
17  finder's fee, standard that is used in the industry
18  that investment bankers will pay finders -- and
19  finders being definition only introducing them to the
20  client, having nothing else to do.
21  Q.    In this case introducing someone to Joe
22  Blow.
23  A.    That's correct.
24  Q.    Go ahead.

Page 156

1  A.    Okay. Will be approximately 20 percent of
2  the investment bank's fee that they receive. So if
3  the investment bank -- excuse me. Not 20 percent of
4  the investment bank, not -- excuse me. Not 20 percent of
5  the investment bank's fee. If the investment bank's
6  charges -- let's say he does a hundred-million-dollar
7  deal and there is a 7 percent fee to raise the equity
8  and that --
9  Q.    Do you mean the investment bank charges Joe
10  Blow 7 percent?
11  A.    Charges the company that Joe Blow
12  introduced.
13       MR. RUBEN: No.
14  BY MR. NOVACK:
15  Q.    No, no. In my example --
16  A.    Yes.
17  Q.    Let's go back again, and let's get rid of
18  Joe Blow so it sounds more dignified if we ever have
19  to use this. Okay?
20       I am going to give you a hypothetical.
21  There is an investment bank. Let's put someone in the
22  middle called a finder, and then on the other side is
23  a company that wants to raise cash --
24  A.    Right.

Page 157

1  Q.    -- in the marketplace either as a private
2  offering --
3  A.    Right.
4  Q.    -- or a public offering. In this scenario
5  that I am going to describe as to which you are going
6  to give information, the investment bank will provide
7  the service of doing due diligence and going out and
8  raising the capital, finding the money to either buy
9  the shares or to buy the debentures --
10  A.    That's correct.
11  Q.    -- or to -- okay. Now, now we know what the
12  investment bank is going to do.
13       What is the finder's fee that is customary
14  in that situation, according to you?
15  A.    In that situation, according to my
16  experience in the investment banking business and the
17  many deals that I have been involved with, it is 20
18  percent of the investment banker's fee, not the
19  company.
20  Q.    That is what the finder gets --
21  A.    That's what the finder gets.
22  Q.    -- from the investment banker.
23  A.    Right.
24  Q.    Okay. Okay.

40 (Pages 154 to 157)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1        C.A. # 06-99 SLR        October 10, 2006

Page 158

1  A.    Now, in the real estate business, it is
2  different. You know, I mean --
3  Q.    Tell me.
4  A.    In the real estate business, because the
5  size of the transactions, you know, it can be anywhere
6  from one to three points, depending upon --
7  Q.    Basis points or percent?
8  A.    Points, percent.
9  Q.    Percent.
10  A.    Percent, because it is different. It is a
11  different kind of deal.
12  Q.    I understand that.
13  A.    Okay. So I am just giving you my experience
14  in how finder's are paid. Okay?
15  Q.    And what does the finder do in the scenario
16  involving the real estate?
17  A.    Just -- whether the finder introduces the
18  real estate or just introduces the name to the
19  investment bank, that's where his responsibility
20  stops.
21  Q.    Well, slow down a minute. I thought in the
22  first scenario -- we will call it Scenario 1 -- we are
23  talking about a corporation or an issuer who wants to
24  raise money using an investment bank and will employ

Page 159

1  the investment bank in a public or private offering.
2        Scenario 2 I thought we were talking about
3  is a real estate transaction, where someone is buying
4  real estate and someone is acting as a finder to
5  locate a buyer of the real estate --
6  A.    Yes.
7  Q.    -- or have I misunderstood?
8  A.    You have misunderstood Transaction 1.
9  Q.    Could you explain -- no, Transaction 1 I did
10  understand, I thought.
11  A.    No. Then you confused with me with how you
12  repeat -- okay.
13  Q.    Okay. Well let's go back. The first
14  scenario we talked about was you have an investment
15  bank, you have a finder in the middle, and then you
16  have a corporation that wants to raise money on the
17  private or public market. They hire the investment
18  bank. Let's say they are going to raise, you know,
19  whatever it is, the investment bank, by selling shares
20  in the company or whatever.
21  A.    Right.
22  Q.    And a portion of the investment banking fee,
23  whatever it is, will then be paid to the finder.
24  A.    That's correct.

Page 160

1  Q.    Okay? And that was the 20 percent.
2  A.    That's correct.
3  Q.    Okay. Now, in the second scenario were you
4  talking about a simple real estate transaction or were
5  you talking about --
6  A.    I am not talking about a sale of a home. I
7  am talking about --
8  Q.    A commercial real estate?
9  A.    Commercial real estate involving companies
10  and buying assets and somebody introduces you to a
11  two, $300 million real estate deal. Okay?
12  Q.    Okay. Well, I have to understand who the
13  players are in terms of what the entities are and the
14  nature of this transaction to understand how
15  comparable this finder's fee is with what you are
16  talking about here.
17  A.    What I am trying to explain to you, that
18  depending upon the area, whether it is real estate --
19  Q.    Right.
20  A.    -- whether it is corporate finance --
21  Q.    Right.
22  A.    -- or it is something like the Farrell
23  business, they are all different.
24  Q.    Okay. Now I understand.

Page 161

1  A.    Okay. That's -- and I can only explain to
2  you from my experience.
3  Q.    Well, then that's fine. You have done it.
4  A.    Okay. Yes.
5        MR. NOVACK: We are done for today.
6        THE WITNESS: Okay.
7        MR. BELL: What time do you want to
8  start tomorrow?
9        MR. NOVACK: What would be convenient
10  for the witness, because I am flexible, and you?
11        MR. BELL: Off the record.
12        (Discussion off the record.)
13            ---
14        (Deposition recessed at 5:05 p.m.)
15            ---

41 (Pages 158 to 161)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 1          C.A. # 06-99 SLR                    October 10, 2006

Page 162

```
 1              INDEX
 2   PESKOFF DEPOSITION EXHIBITS        Marked
 3    1  Plaintiffs' objections and responses to
         defendant's first set of interrogatories    23
 4
      2  Fax dated 10/6/06, from Stevens & Lee to
 5       Ms. Kenney, with attachments------------   63
 6    3  Finder's fee agreement, dated 12/19/01,
         between FBR and UIC---------------------   89
 7
                        - - -
 8
     (Exhibits not attached; returned to Edwards Angell
 9   for copying.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Wilcox & Fetzer, Ltd.          Professional Court Reporters          A-115          (302)655-0477

VOL. 1

ATTACH TO DEPOSITION OF: _Stephen D. Reskoff_

DATE TAKEN: _October 10, 2006_

IN THE MATTER OF: _Underhill Investment Corp V Fixed Income_

### ERRATA SHEET

<u>INSTRUCTIONS:</u>  After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet.  <u>Do not make any marks or notations on the transcript itself.</u>  Rule 30(e) governing this procedure is enclosed.  Please sign and date this errata sheet and return it to our office at the address indicated below.  Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 12 | 12 | Change "no" to "yes" – incorrect response |
| 12 | 14 | Change "yes" to "no" – incorrect response |
| 36 | 3 | Change "anything" to "anyone" – error in transcription |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _11/9/06_     _Stephen D. Reskoff_
_____
(Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
             1330 King Street
             Wilmington, DE  19801

**A-116**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Underhill Investment Corporation and Peskoff

## v.

# Fixed Income Discount Advisory Company

### C.A. # 06-99 SLR

Transcript of:

## Stephen D. Peskoff
### Volume # 2
### October 11, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-117

Page 163

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT CORPORATION:

and STEPHEN D. PESKOFF,

:

Plaintiffs,

:

vs.                          Civil Action No.

:          06-99 SLR

FIXED INCOME DISCOUNT ADVISORY

COMPANY,                     :

Defendant.     :

- - -

Continued deposition of STEPHEN D.

PESKOFF, taken pursuant to notice in the law offices

of Edwards Angell Palmer & Dodge LLC, Suite 1500, 919

North Market Street, Wilmington, Delaware, on

Wednesday, October 11, 2006, at 9:35 a.m., before

Lorraine B. Marino, Registered Diplomate Reporter and

Notary Public.

- - -

**A-118**

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2        C.A. # 06-99 SLR        October 11, 2006

Page 164

```
1   APPEARANCES:
2          G. THOMPSON BELL, III, ESQ.
           Stevens & Lee
3          111 North Sixth Street
           Reading, PA  19603-0679
4             -and-
           ROBERT L. RUBEN, ESQ.
5          Ruben & Aronson, LLP
           4800 Montgomery Lane - Suite 150
6          Bethesda, MD  20814
             for Plaintiffs
7
           GERALD A. NOVACK, ESQ.
8          SARAH P. KENNEY, ESQ.
           Kirkpatrick & Lockhart Nicholson
9          Graham LLP
           599 Lexington Avenue
10         New York, NY  10022-6030
             for Defendant
11
    ALSO PRESENT:
12
           R. NICHOLAS SINGH, ESQ.
13         FIDAC General Counsel
14             - - -
15
16
17
18
19
20
21
22
23
24
```

Page 166

```
1   F184, purports to be a December 16, 2003 email from
2   Mr. Farrell to Mr. Kazel, K-A-Z-E-L.
3          Peskoff Exhibit 11 is Bates-stamped
4   P-7.  It appears to be the $30,000 check sent to
5   Underhill Investments in December 2003.
6          Peskoff Exhibit 12, Bates stamp F176,
7   has as part of it the back of the check as deposited.
8          Peskoff Exhibit 13 appears to be a
9   February 27, 2004 memorandum, typewritten memorandum,
10  from Mr. Peskoff's files.  Peskoff Exhibit 14, Bates
11  stamp P-326, handwritten notes from Mr. Peskoff's
12  files.  At the bottom there appears to be a yellow tab
13  that said, "Mike Farrell notes 3/1/04," which I
14  understand was added during the course of the document
15  production and wasn't on it earlier.
16         Peskoff Exhibit 15, Bates stamp P-138
17  is an April 12, 2004 letter to Mr. Kazel from
18  Mr. Peskoff.
19         Peskoff Exhibit 16, Bates stamp P-6,
20  is an April 20, 2004 letter to Mr. Peskoff from
21  Mr. Kazel.
22         Peskoff Exhibit 17, Bates stamp P-136,
23  is a December 22, 2004 typewritten memo with some
24  handwritten notations from Mr. Peskoff's files.
```

Page 165

```
1          (Peskoff Deposition Exhibit Nos. 4
2   through 21 were marked for identification.)
3          STEPHEN D. PESKOFF, having been
4   previously sworn, was examined and testified further
5   as follows:
6          MR. NOVACK:  Peskoff Exhibit 4 is what
7   purports to be the plaintiffs' objections and
8   responses to the defendant's first request for the
9   production of documents directed to plaintiffs.
10         Peskoff Exhibit 5 is a September 9,
11  2005 letter to Mr. Farrell from Mr. Ruben.  And all of
12  these descriptions I am describing what these
13  documents purport to be.
14         Peskoff Exhibit 6 is a February 15,
15  2000 letter to Mr. Peskoff from Mr. Farrell.
16         Peskoff Exhibit 7 is a copy of a
17  handwritten note that appears to be from Mr. Peskoff
18  to Mr. Farrell, bearing Bates stamp F178.
19         Peskoff Exhibit 8 is an April 7, 2005
20  letter to Mr. Farrell from Mr. Peskoff.
21         Peskoff Exhibit 9 has Bates stamp
22  P-131 from the production of Mr. Peskoff.  It is a
23  July 24, 2003 typewritten memo.
24         Peskoff Exhibit 10, Bates stamp No.
```

Page 167

```
1          Peskoff Exhibit 18, Bates stamp P-141,
2   is a March 7, 2005 memo from Mr. Peskoff's files.
3          Peskoff Exhibit 19, Bates stamp P-148,
4   is an April 19, 2005 memo from Mr. Peskoff's files.
5          Peskoff Exhibit 20, Bates stamp P-144,
6   is a June 1, 2005 memo from Mr. Peskoff's files.
7          And Peskoff Exhibit 21 is a copy of
8   the complaint in this action.  Okay?  That completes
9   my list of premarked exhibits.
10         Off the record.
11         (Discussion off the record.)
12         MR. NOVACK:  The counsel are the same
13  from yesterday, with the exception of Mr. Reed, who is
14  not here, and the witness remains under oath from
15  yesterday.
16  BY MR. NOVACK:
17  Q.     Do you understand that, Mr. Peskoff?
18  A.     Yes.
19  Q.     Thank you.  Mr. Peskoff, yesterday we had
20  some discussion about other finder's fee agreements if
21  they existed.  Your counsel was kind enough to
22  indicate to me this morning that you may have some
23  additional information for us.  Would you share that
24  with us?
```

2 (Pages 164 to 167)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                C.A. # 06-99 SLR                    October 11, 2006

Page 168

1  A.  Yes.  I discovered last night that there was
2  another document between a company called F-B-R-I-M,
3  FBRIM, which is Friedman Billings Investment
4  Management, and myself.  I had brought them one or two
5  customers several years back, and, you know, they paid
6  me for it.  And then they subsequently entered into an
7  agreement because they didn't have any documentation,
8  you know, prior to paying me for it.
9  Q.  When was the agreement signed?
10  A.  The agreement was signed approximately --
11  let's see.  This is 2'06.  I think it was signed early
12  in 2'06 or late 2'05.
13  Q.  When did you bring the transaction --
14  A.  The customers?
15  Q.  -- the customers to them?
16  A.  It was probably in 2'04 or 2'05.
17  Q.  When you say the agreement was with myself,
18  do you mean you individually or a company, your
19  company, I mean?
20  A.  Yes, yes, it was with my company.
21  Q.  What company?
22  A.  I have to look at the document, but, you
23  know, it was probably either Underhill or Renaissance.
24  Q.  Well, if it was signed in early 2006 and

Page 169

1  Underhill was dissolved effectively -- the certificate
2  of dissolution was November 2004, does that refresh
3  your recollection as to whether Underhill was the
4  signatory?
5  A.  It could have been myself or Renaissance.  I
6  mean, I didn't look at the document.
7  Q.  Do you have the document in your offices?
8  A.  The lawyers got it faxed to them this
9  morning.
10  Q.  Would I be permitted to see a copy of the
11  document?
12  A.  Sure, sure.
13  MR. BELL:  Yes.  I haven't actually
14  looked at it.  It has been faxed to our office, and I
15  have not accessed it yet.
16  MR. NOVACK:  During a break would
17  you -- if we provide you a fax here, could you get a
18  look at it and let us see it if you think you are
19  willing to?
20  MR. BELL:  Well, certainly we are
21  willing to, and I would have to get someone -- I can
22  do that, yes.  We can get somebody to take -- shoot it
23  over here.
24  MR. NOVACK:  Okay, great.

Page 170

1  THE WITNESS:  Yes.
2  BY MR. NOVACK:
3  Q.  So we will come back to that later rather
4  than waste time.
5  A.  That's fine.  That's fine.
6  Q.  Now, also yesterday I asked for production
7  of the original agreement between Friedman, Billings,
8  Ramsey and Underhill or you, and I was informed this
9  morning by your counsel that that agreement has not
10  been located as yet.
11  A.  That is correct.
12  Q.  What efforts have you made to locate the
13  agreement?
14  A.  I had my secretary and assistant go through
15  every file that we have with FBR.  And since it was
16  signed in 1994, it could have been one of the files
17  that we left there when I left in the end of 2'02, I
18  guess.
19  Q.  You said you had your secretary and
20  assistant.  Is that one person?
21  A.  Yes.
22  Q.  Is that Josie?
23  A.  Yes.
24  Q.  Is she a consultant still?

Page 171

1  A.  Technically, yes.
2  Q.  Okay.  So when you call her your secretary
3  and assistant, you are speaking colloquially?
4  A.  Yes.
5  Q.  Legally speaking, she is a consultant?
6  A.  Legally speaking, she is a consultant.
7  Q.  Is she paid by one of your companies?
8  A.  Yes.
9  Q.  Does your company issue a 1099 to her?
10  A.  Is a 1099 for employees?
11  Q.  Is not for employees.
12  A.  Yes, we must issue a 1099.
13  Q.  You are speculating or you know?
14  A.  Well, she is a consultant.  I don't withhold
15  anything from her, so I assume my accountants issue a
16  1099.  Okay.
17  Q.  Okay.
18  A.  Okay?  Without having that in front of me.
19  Q.  That's okay.
20  A.  Yes.
21  Q.  Thank you.  You think that if you were to
22  ask the people at Friedman, Billings to give you a
23  copy of that agreement if they have it in their files,
24  they would do so?

3 (Pages 168 to 171)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2        C.A. # 06-99 SLR        October 11, 2006

Page 172

1   **A.    Possibly.**
2             MR. NOVACK: Would you undertake -- I
3   am asking counsel. Would you undertake to see if you
4   can get a copy of that agreement by asking them?
5             MR. BELL: Sure.
6             MR. NOVACK: Okay. Thanks.
7   BY MR. NOVACK:
8   Q.    Okay. Is there anything else that you told
9   us yesterday that you want to add to or change?
10  **A.    No.**
11  Q.    Okay. So we can move forward then. I am
12  going to try to move relatively quickly this morning.
13  But sometimes short questions beget long answers, and
14  sometimes long questions will get short answers, so we
15  don't know how we will go.
16             Let's quickly go through -- let's look at
17  Peskoff Exhibit 4, please.
18  **A.    Okay.**
19  Q.    Do you have that in front of you?
20  **A.    Yes.**
21  Q.    I am going to ask you some questions with
22  regard to specific items on it, and first, I would
23  like to ask you (Pause) -- let me go back here.
24             I think I may have asked this yesterday, but

Page 173

1   I just want to go over it quickly. Your signature
2   appears on the verification page; correct? It is the
3   next to the last page.
4   **A.    Yes.**
5   Q.    And you believe everything that is stated in
6   these objections and responses is correct, to the best
7   of your knowledge?
8   **A.    Yes, I do.**
9   Q.    Okay. Let's go on. Look at Peskoff
10  Exhibit 5, please, which is the September 9, 2005
11  letter from Mr. Ruben to Mr. Farrell. Do you have
12  that in front of you?
13  **A.    Yes.**
14  Q.    Okay. You saw this letter at the time it
15  went out?
16  **A.    Yes.**
17  Q.    Did you see a draft of the letter before it
18  went out?
19  **A.    Yes.**
20  Q.    Did you see more than one draft of the
21  letter?
22  **A.    Did I see more than one draft? If there was**
23  **more than one draft, I probably saw it.**
24  Q.    Did you make any suggestions to any drafts?

Page 174

1   Don't tell me what they were. Just tell me if you
2   made any suggestions.
3   **A.    I don't remember.**
4   Q.    Did you find anything incorrect in any of
5   the drafts?
6   **A.    If I did, I would have made sure that they**
7   **were corrected.**
8   Q.    Did you undertake any effort to check the
9   accuracy of any of the factual statements made in
10  Peskoff Exhibit 5 before it was sent?
11  **A.    Exhibit 5.**
12  Q.    That's the letter that was actually sent by
13  Mr. Ruben.
14  **A.    I am lost here.**
15  Q.    Okay. Let me start. Where do you think you
16  are? When you say you are lost, I mean, what --
17  **A.    You are talking about Exhibit 5, and I have**
18  **this -- oh, this is Exhibit 5. Okay. Okay.**
19  Q.    All right. Let's start again.
20  **A.    Yes.**
21  Q.    You have before you Peskoff Exhibit 5?
22  **A.    Right.**
23  Q.    Which is Mr. Ruben's September 9, 2005
24  letter.

Page 175

1   **A.    Correct.**
2   Q.    Okay. Did you see drafts of that letter
3   before it went out?
4   **A.    Yes.**
5   Q.    Do you remember how many drafts you saw?
6   **A.    I don't remember how many, no.**
7   Q.    Was it more than one?
8   **A.    Probably.**
9   Q.    Did you undertake any effort to ensure that
10  the factual statements made in Mr. Ruben's letter were
11  accurate?
12  **A.    I believe that when we sent the letter out,**
13  **that the information contained here was accurate.**
14  Q.    I asked you if you made any efforts to
15  determine whether or not the factual statements were
16  accurate. For example, did you check anything he said
17  against any documents?
18  **A.    No.**
19  Q.    You didn't?
20  **A.    No.**
21  Q.    You did it all from memory?
22  **A.    Basically.**
23  Q.    Do you recall how much money Mr. Ruben was
24  saying FIDAC owed Underhill in this letter --

4 (Pages 172 to 175)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 176

1  A.    No.
2  Q.    -- more or less?
3  A.    No, I don't.
4  Q.    Do you remember that it was more than a
5  thousand dollars?
6  A.    If you let me read the letter, I probably --
7  Q.    Well, please refresh yourself. Why don't
8  you read it quickly. I am not going to ask you
9  details about all of this --
10  A.    Yes. I mean, I haven't seen this in months.
11  Okay?
12  Q.    Mr. Peskoff, let me interrupt to make this a
13  little simpler. I am going to allow you to read the
14  letter for as much time as you want. If you want to
15  read it later. I am only going to ask you about some
16  very narrow, specific factual statements.
17  A.    Go ahead.
18  Q.    I will direct your attention to them.
19  A.    Go ahead.
20  Q.    And then you can read those.
21  A.    Sure.
22  Q.    And then if you want to read more of the
23  letter, you can. I am not going to stop you. But I
24  don't think you need to.

Page 177

1  A.    Okay.
2  Q.    Okay?
3  A.    Sure.
4  Q.    Let's go to page 2 of the letter. If you go
5  down to the second paragraph from the bottom that
6  begins, "We have no issue." Are you on page 2 of the
7  letter?
8  A.    Yes.
9  Q.    Do you see the paragraph that begins, "We
10  have no issue"? Does it say right there?
11  A.    Okay. It is paragraph 2.
12  Q.    From the bottom I was counting. Okay?
13  A.    Yes.
14  Q.    In that paragraph it states in part that
15  "FIDAC collected some 5.85 million in management fees
16  as a result of Underhill's introduction and paid
17  Underhill $585,000, or 10 percent of FIDAC's fees,
18  through a series of checks delivered as and when FIDAC
19  collected from the REIT."
20  Now, did you recall at the time the letter
21  was sent that only 10 percent of FIDAC's fees were
22  paid to Underhill?
23  A.    Would you repeat the question?
24  Q.    At the time the letter was sent was it your

Page 178

1  belief that Underhill had been paid by FIDAC
2  10 percent of FIDAC's fees?
3  A.    Yes.
4  Q.    Did you make any effort at all before the
5  letter went out to look at any piece of paper --
6  MR. BELL: Steve, excuse me. I am
7  sorry. You are covering your microphone. Why don't
8  you move it up higher on your tie. You can move it up
9  just below your knot.
10  THE WITNESS: Sure. There we go. How
11  is that? Okay.
12  MR. NOVACK: Can you tell me, was the
13  microphone able to pick up everything the witness
14  said? All right.
15  BY MR. NOVACK:
16  Q.    Did you make any effort at all before the
17  letter went out to determine whether or not that FIDAC
18  only paid 10 percent of its fees to Underhill?
19  A.    No.
20  Q.    Did you feel that you had any obligation to
21  be checking that before you wrote -- you had your
22  counsel send that letter out?

REDACTED

Page 179

REDACTED

6  Q.    Was the $585,000 paid to Underhill during
7  the period 2000, 2001 and part of 2002 a significant
8  proportion of Underhill's income?
9  MR. BELL: Objection to form.
10  THE WITNESS: I am not sure -- what do
11  you determine by --
12  BY MR. NOVACK:
13  Q.    What I am trying to figure out is this.
14  Maybe I am asking -- let me ask it in a better way so
15  I don't have a form objection.
16  A.    Yes.
17  Q.    When you first received the first check at
18  Underhill from FIDAC --
19  A.    Yes.
20  Q.    -- for the FBR REIT transaction, did you
21  look to see what percent you had gotten?
22  A.    No.
23  Q.    You didn't know until Mr. Farrell paid it
24  what it was going to be, you testified yesterday.

5 (Pages 176 to 179)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 180

1  A.    That's correct.
2  Q.    And you didn't have the slightest curiosity
3  to see what percent he paid you?
4  A.    No.
5  Q.    Was it a matter of indifference to you
6  whether he paid you 10 percent or 20 percent or
7  30 percent or any other percent?
8  A.    Was it a matter of indifference? I trusted
9  him implicitly. We had a very close relationship, and
10 when he told me when he -- if and when he signed a
11 deal with FBR, he would take care of me through a
12 consulting contract that would be fair and reasonable
13 by anybody's standards, end of story, I accepted that
14 at face amount, period.
15 Q.    At any time during the period 2000, 2001,
16 2002, 2003 or 2004, did you ever try to see what
17 percent FIDAC had paid you with respect to the FBR
18 REIT transaction?
19 A.    There may have been, you know, -- my mind is
20 not a hundred percent clear, but when --
21 Q.    Don't cover your mouth when you speak,
22 please.
23 A.    Sorry. When I introduced GenCorp and I
24 introduced Sentry, I may have gone back to the

Page 181

1  original -- A, the original contract, and I don't
2  quite recall whether I went back to the check stubs.
3  Q.    Is it correct to say that as you sit here
4  today, you have no recollection that at any time
5  during the years 2000, 2001, 2002, 2003, 2004, or,
6  indeed, up through 2005, you ever looked to see what
7  percent FIDAC paid Underhill with respect to the FBR
8  REIT transaction?
9  A.    I think that's true, yes.
10 Q.    Okay.
11 A.    Yes, that's true.
12 Q.    I would like you to look at Peskoff Exhibit
13 6, please.
14 A.    Thank you.
15 Q.    Peskoff Exhibit 6, when you received Peskoff
16 Exhibit 6, you recognized that this was the, quote,
17 contract that you testified to yesterday that
18 Mr. Farrell said he was going to send you; right?
19 A.    Yes.
20 Q.    The handwritten notation to the left of the
21 date, "file in contract file" -- is that what it says?
22 A.    Yes.
23 Q.    That's your handwriting?
24 A.    Yes.

Page 182

1  Q.    You put it on there at the time you got the
2  contract?
3  A.    Yes.
4  Q.    Let's go to Peskoff Exhibit 7, please.
5  A.    7.
6  Q.    Mr. Peskoff, is Exhibit 7 a note that you
7  wrote to Mike Farrell, a handwritten note that you
8  wrote to Mike Farrell?
9  A.    Yes.
10 Q.    And I am going to show you also -- keep
11 Exhibit 7 with you -- Peskoff Exhibit 8. Is Peskoff
12 Exhibit 8 a letter you wrote to Mr. Farrell on
13 April 7, 2005?
14 A.    Yes.
15 Q.    Can you tell me which one was sent first;
16 the handwritten note, which is Exhibit 7, or the typed
17 document, which is 8?
18 A.    The handwritten note.
19 Q.    In your handwritten note you say, "You have
20 always been a good and generous friend." Did you mean
21 that when you sent it?
22 A.    Absolutely.
23 Q.    Had Mr. Farrell done anything before the
24 time you sent this note to make you think really in

Page 183

1  your heart that he was not a good and generous friend?
2  A.    No.
3  Q    Peskoff Exhibit 8 let's just skip. I have
4  no questions about 8. Okay.
5      Let's go to Peskoff Exhibit 9, please.
6  A.    Okay.
7  Q.    You have Peskoff Exhibit 9 in front of you,
8  Mr. Peskoff?
9  A.    Yes.
10 Q.    You have Exhibit 9 in front of you?
11 A.    Mm-hmm.
12 Q.    Okay. Peskoff Exhibit 9 is a document that
13 was produced by your counsel to us, and we believe it
14 was produced as a result of the retrieval of
15 information from the electronic files in the
16 computers.
17 A.    Mm-hmm.
18 Q.    Can you tell me first during the year 2000
19 through 2005, did you have any practice with regard to
20 when you created memos or notes of conversations with
21 business people with whom you were dealing, such as
22 Mr. Farrell?
23 A.    Repeat that question again.
24 Q.    For the period 2000 through 2005 did you

6 (Pages 180 to 183)

Underhill Investment Corporation and Peskoff    v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2        C.A. # 06-99 SLR                October 11, 2006

Page 184

1 have any practice with regard to whether and when you
2 would create any kind of notes or memos of
3 communications or dealings you had with business
4 people, such as Mr. Farrell?
5     A.    Yes. I normally would have a -- If I had a
6 phone conversation or a business meeting, whether it
7 was on the phone or away on business, I would
8 communicate it to my assistant, and the form would be
9 in the form of a memo that she probably would type up.
10 Sometimes those memos were rushed. Sometimes I
11 cleaned them up after I got back to the office. But
12 that was and still is our business practice of doing
13 business.
14     Q.    All right. Did you try to record in these
15 memos anything that you thought was important?
16     A.    Certainly.
17     Q.    Now, I want to just look at Peskoff
18 Exhibit 9. It reads at the top left-hand corner, "SDP
19 thoughts on Mike Farrell." Underneath it states,
20 "July 24, 2003." Then it has some text.
21     A.    Mm-hmm.
22     Q.    It refers to you in the third person. It
23 says, "SDP will have meeting with Ernie Baptista to
24 discuss Mike Farrell's situation."

Page 185

1     A.    Mm-hmm.
2     Q.    Further down it says, "SDP needs to get a
3 complete understanding," et cetera. Did you write
4 about yourself in the third person or is this Josie
5 writing down what you have told her?
6     A.    This is Josie writing down what I told her.
7     Q.    Would you call Josie and tell her something
8 and then she would type up the notes?
9     A.    That is correct.
10     Q.    So you didn't write the notes up first and
11 then have her edit them or clean them up?
12     A.    Not necessarily. It depends. If I am in a
13 business meeting, I take a bunch of notes. The
14 meeting ends, and I might pick up the phone or
15 cellphone, call her, offer the notes that I have.
16     Q.    So --
17     A.    She then puts the notes together. I get
18 back in the office. We go through her rough copy of
19 the notes. If it is right, it goes into the file. If
20 it is not right, we make whatever changes and it goes
21 into the file.
22     Q.    Now I understand why you were referring to
23 yourself in the third person. I have to tell you I
24 was thinking that was --

Page 186

1     A.    You think I talk to myself, huh?
2     Q.    No, no. It was kind of like the imperial we
3 almost, and I was wondering --
4     A.    Okay. Okay.
5     Q.    Okay. Weren't you wondering about that?
6 Okay. Now, that will help us.
7     A.    Okay.
8     Q.    SDP thoughts on Mike Farrell, Peskoff
9 Exhibit 9, July 24, 2003. It states, "SDP will have
10 meeting with Ernie Baptista to discuss the Mike
11 Farrell situation. They will discuss the highs and
12 lows of GenCorp deal.
13        "Take the high or low end amount raised and
14 SDP will calculate his 20 percent of Mike's management
15 fee.
16        "SDP is willing to pick up half of what Mike
17 has spent on putting deal together (i.e. $500,000
18 total on Mike's end) - he'll take his fee and give it
19 back to Mike to cover costs.
20        "SDP needs to get a complete understanding
21 of what his fees will entail in contract with FIDAC."
22        Can you tell me what 20 percent fee you were
23 referring to?
24     A.    This was probably one -- what 20 percent fee

Page 187

1 I was referring to?
2     Q.    Well, you say, "SDP will calculate his
3 20 percent of Mike's management fee."
4     A.    This could have been one of the times after
5 I said - told you previously that with GenCorp
6 that --
7     Q.    Just stop talking for a second. Okay? Now,
8 can we start again? This would have been --
9     A.    This could have been one of the times --
10     Q.    Otherwise, it looks like I was trying to
11 choke you as you were testifying. Okay. We are going
12 to start again. Let me ask you the question again --
13     A.    Sure.
14     Q.    -- because I really don't want to play that
15 to a judge.
16        MR. NOVACK: Can I get on the record
17 that you recognize I was not trying to choke him; I
18 was only adjusting his microphone?
19        MR. BELL: We will make reasonable
20 stipulations. We won't stipulate to that.
21        MR. NOVACK: I am glad this is being
22 videotaped. Make sure you got that laughter.
23        MR. RUBEN: You better hug him, just
24 to make it --

7 (Pages 184 to 187)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 188

1      MR. SINGH:  That will make it worse.
2      MR. NOVACK:  I am embarrassed.  Okay.
3   But I will get over it.  Don't worry, Mr. Peskoff.
4   BY MR. NOVACK:
5   Q.      Going back to Peskoff Exhibit 9, it refers
6   to "SDP will calculate his 20 percent of Mike's
7   management fee."  Can you tell me what that was
8   referring to?
9   A.      This may have been one of the times when I
10  went back to look at an agreement, and I might have
11  asked Josie to pull out any compensation that we had,
12  you know, to see what and how we got paid in the past,
13  what it meant.
14  Q.      You are speculating now; right?
15  A.      Yes.
16  Q.      You don't know where you got the 20 percent
17  from when this memo was created; is that right?
18  A.      No.
19  Q.      Well --
20  A.      I am assuming --
21  Q.      No, no.  Do you know?  Do you remember?
22  A.      I remember taking out -- having -- taking
23  out the agreement and looking at the check stubs and
24  seeing that that's where I used that 20 percent.

Page 189

1   Q.      Didn't you just tell me a moment ago or a
2   few moments ago you had no recollection of any time
3   during the period 2000 through 2005 going back and
4   actually looking to see what the percent was that you
5   had been paid by the FBR REIT transaction?
6   A.      I said to you that I had exception -- with
7   the exception being that there was a couple of times
8   during Sentry and GenCorp when I was -- when the
9   question was raised as to my compensation, not -- in
10  this case Baptista was raising the issue.  This is
11  after a phone conversation with Ernie Baptista, to be
12  factual.  I said, you know, I didn't know, but I would
13  check my agreements to see what I have, and I must
14  have asked Josie to look at the check stubs.
15  Q.      You now recall going back to see in July
16  2003 whether you had gotten --
17  A.      I must have.
18  Q.      Let me finish my question.
19  A.      Yes.
20  Q.      You now recall independently -- you are not
21  speculating.  You now recall you asked Josie to check
22  to see what percent you got, and then you knew it was
23  20 percent in July 2003?
24  A.      That's probably the first time.

Page 190

1   Q.      Okay.  But now you are firm you knew in July
2   2003 that on the FBR REIT you received 20 percent?
3   A.      Based at that time, correct.
4   Q.      Did you forget after July 2003 that you had
5   received 20 percent?

# REDACTED

16  Q.      Okay.  So to get this clear --
17  A.      Yes.
18  Q.      -- in July 2003 you knew you had received 20
19  percent on the FBR REIT transaction, and you had
20  forgotten in December 2003, six months later, that it
21  was 20 percent, and you assumed when Farrell said, "I
22  am going to give you 10 percent," that's what you must
23  have gotten on the FBR REIT?
24  A.      That's correct.

Page 191

1   Q.      Okay.
2   A.      Yes.
3   Q.      Do you think you have a pretty good memory
4   for numbers?
5   A.      I think I have a pretty good memory for
6   numbers, except --
7   Q.      Numbers are your business; right?
8   A.      Yes and no.  There are so many numbers in
9   our business and so many dates in our business that
10  you would have to be a genius with a photographic
11  memory to keep track of all the business phone calls,
12  business meetings, numbers and stuff that are
13  concerned regarding clients.  It is beyond -- it is
14  beyond memory.
15  Q.      Going back to Peskoff Exhibit 9 --
16  A.      Yes.
17  Q.      -- you told me this series of thoughts you
18  had followed a conversation you had with Mr. Baptista;
19  correct?
20  A.      That's correct.
21  Q.      And in this memo you say, "SDP is willing to
22  pick up half of what Mike has spent on putting deal
23  together" --
24  A.      Right.

8 (Pages 188 to 191)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                C.A. # 06-99 SLR                October 11, 2006

Page 192

```
 1  Q.    -- "(i.e. $500,000 total on Mike's end.)"
 2  A.    Mm-hmm.
 3  Q.    "He'll take his fee and give it back to Mike
 4  to cover costs." Does this mean that you were
 5  considering paying $250,000 out of the first amount
 6  you got in terms of any fees?
 7  A.    No.
 8  Q.    Okay. What does it mean?
 9  A.    What this means was this was Ernie
10  Baptista's idea of a way to ameliorate Farrell's
11  hostility, having paid all this upfront money --
12  okay? -- in this transaction. So he said, "If you are
13  going to meet with him down the line, why don't you
14  offer him that you will pay, you know -- you will pay
15  a part of the fee either out of pocket or out of the
16  first commissions that come in, let him take all the
17  expenses first before he pays you anything," period.
18  Q.    The language of this memo states, "SDP is
19  willing to pick up half." Is that language
20  inaccurate? You weren't willing to pick up half?
21  A.    No. I was willing to pick up half.
22  Q.    So this is accurate?
23  A.    What is accurate is that I was willing to
24  pick up half. Okay? What is not accurate, that did
```

Page 193

```
 1  not come from me, was Baptista's idea of offsetting
 2  whatever fees that I would have earned to reimburse
 3  Mike Farrell 100 percent of his. That was his
 4  thought.
 5  Q.    Okay. We are not referring to his thought
 6  in the memo. Let's look at the memo together again.
 7  I think there is some confusion.
 8  A.    No, there isn't any confusion.
 9  Q.    Well, let's just see.
10  A.    Okay.
11  Q.    Okay?
12  A.    Yes.
13  Q.    Where it says here, "SDP is willing to pick
14  up half of what Mike has spent on putting the deal
15  together," is that accurate? You were willing to pick
16  up half of what Mike has spent?
17  A.    That's correct.
18  Q.    Okay. And did you also understand at the
19  time that $500,000 had been spent on Mike's end?
20  A.    At that time I did understand that, and --
21  Q.    Is half of 500,000 250,000?
22  A.    Yes, it is.
23  Q.    Were you willing at that time to pay to
24  FIDAC $250,000 out of whatever fees you were going to
```

Page 194

```
 1  get from FIDAC at a 20 percent rate?
 2  A.    I was willing to pay half of the fees that
 3  Mike Farrell had incurred not based upon a 20 percent
 4  rate at all. It was just pay a -- the statement
 5  wasn't tied into Mike 20 percent fee. The statement
 6  was tied into this -- Mike Farrell was bombarding me
 7  and Ernie and Messner with the fact that he was
 8  unhappy, he was running expenses, he was this, he was
 9  that and everything else. All right? And Ernie was
10  under as much pressure as I was.
11        Ernie's comment to me was, "Whatever you
12  figure your fee to be," he says, "why don't you check
13  to see what he paid you in the past." But I said, "I
14  am willing to avoid this bombardment to pay half of
15  his obligation to get something finalized, you know,
16  regarding this specific deal with you."
17        So he said, "Well, why don't you just offer
18  to pay half of it or all of it and let him take it out
19  of your commission dollars at whatever rate he was
20  paying you." Okay? Okay. That's Ernie Baptista
21  Part 2; okay?
22  Q.    This is what Ernie Baptista said to you.
23  Forget about what is in the memo. You are now telling
24  us what Ernie Baptista told you.
```

Page 195

```
 1  A.    That's correct.
 2  Q.    Okay.
 3  A.    This was a phone call.
 4  Q.    No. I understand that.
 5  A.    Yes.
 6  Q.    When you say "this" --
 7  A.    Right.
 8  Q.    -- the record doesn't pick it up.
 9  A.    This memo --
10  Q.    Let me do it sequentially.
11  A.    Yes.
12  Q.    You had a phone conversation with
13  Mr. Baptista before you dictated your thoughts to
14  Josie. You just now described the phone conversation
15  with Ernie Baptista.
16  A.    That's correct.
17  Q.    Now, looking at the memo, does the memo
18  reflect what you were dictating to Josie you were
19  willing to do?
20  A.    Yes.
21  Q.    Okay.
22  A.    Right.
23  Q.    Was your willingness to pay half of what
24  Mike Farrell had spent on the GenCorp deal independent
```

9 (Pages 192 to 195)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 196

1  of what rate you were going to be paid if you were
2  paid something by FIDAC? In other words, you were
3  just going to pay half.
4  **A.    I was going to pay half of the expenses --**
5  Q.    Okay.
6  **A.    -- to avoid the constant haranguing from**
7  **Farrell and disappointment because of our prior**
8  **relationship and on a going-forward kind of basis.**
9  **Right? But --**
10  Q.    Okay. Now, this is where I got confused.
11  **A.    Okay.**
12  Q.    At the time you dictated your thoughts, in
13  your own mind you had not come to a conclusion as to
14  what percent FIDAC would pay to Underhill in
15  connection with the GenCorp deal. Is that correct?
16  **A.    That's correct.**
17  Q.    And you explained to us yesterday what the
18  various factors are one would have to consider --
19  **A.    Yes.**
20  Q.    Let me finish my question, please. Am I
21  correct that you explained to us yesterday the various
22  factors that would have to be considered by you and
23  Mr. Farrell when you negotiated a percent? Is that
24  correct?

Page 197

1  **A.    Yes.**
2  Q.    All right. So as of July 24, 2003, in your
3  own mind, you did not know what percent of FIDAC's
4  fees would be paid to Underhill; correct?
5  **A.    Correct.**
6  Q.    Okay. And that's with regard to the GenCorp
7  transaction.
8  **A.    Correct.**
9  Q.    Now, during the period July 2003 through
10  December 2003, were you talking with anyone that was
11  going to be acting as an intermediary to talk to
12  Mr. Farrell about paying you something in connection
13  with GenCorp or Sentry Select?
14  **A.    That is too broad a question.**
15  Q.    Okay.
16  **A.    I mean --**
17  Q.    Did you have conversations with anyone
18  during the period June 2003 through the time you had
19  your conversation with Mr. Farrell in December 2003 --
20  **A.    I am sure I must have.**
21  Q.    No, no. I know you had conversations. I am
22  sure you say hello to people on the street and all.
23  **A.    Right.**
24  Q.    But let's start again. Okay?

Page 198

1  **A.    Yes.**
2  Q.    I know you want to get out sooner rather
3  than later, but you have to let me finish my question
4  if you want to get out sooner.
5  **A.    Sure.**
6  Q.    During the period -- let me restate it.
7  After you dictated the July 24, 2003 memo and prior to
8  the time you spoke to Mr. Farrell in December 2003,
9  were you speaking with anyone at FIDAC or anyone at
10  FBR and asking them to intercede on your behalf with
11  Mr. Farrell to get you paid something with regard to
12  either GenCorp or Sentry Select?
13  **A.    You know, I don't -- you are throwing dates**
14  **at me, and I am having a problem with the dates.**
15  **I remember writing a letter to Ron Kazel. I**
16  **don't remember whether it fit in that date --**
17  Q.    No. That was afterwards. That was
18  afterwards.
19  **A.    Okay. I remember writing a letter to Ron**
20  **Kazel at one time --**
21  Q.    No. It is not that. That is in 2004. We
22  will come to that.
23  Did you talk to Spencer Browne?
24  **A.    Did I talk to Spencer Browne? About this**

Page 199

1  situation?
2  Q.    Yes.
3  **A.    No.**
4  Q.    Did you talk to Ernie Baptista about the
5  situation?
6  **A.    Yes.**
7  Q.    Did you ask Ernie Baptista to talk to Mike
8  Farrell?
9  **A.    No.**
10  Q.    Okay. Do you remember ever asking anyone to
11  talk to Mike Farrell during the year 2003 about your
12  situation and you wanted to get paid something for
13  either Sentry Select or GenCorp?
14  **A.    I talked to Mike Farrell directly. We had**
15  **meetings from sometime after that in New York. I**
16  **don't remember what the dates were, but I talked to**
17  **him directly.**
18  Q.    Let's go back to Peskoff Exhibit 9 for one
19  moment. You say in the last line --
20  **A.    Yes.**
21  Q.    -- of Peskoff Exhibit 9, "SDP needs to get a
22  complete understanding of what his fees will entail in
23  contract with FIDAC." What is that a reference to?
24  Could you explain what you meant there?

10 (Pages 196 to 199)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 200

1    A.    What it is in reference to, since the
2    transaction -- and we are talking about GenCorp's
3    transaction there --
4    Q.    Okay.
5    A.    -- because I had been talking with Baptista,
6    since I was not privileged to know what was going on,
7    how the money was being raised, in what amounts, what
8    was being raised, how the transaction was going,
9    whether it was going smoothly or not, other than from
10   Farrell's or Kazel's comments that, you know, this is
11   bumpy. It is not performing. It is not this. It is
12   not that. Expenses are high. All right? And
13   Baptista and Messner are not doing the proper sales
14   job. You know, I heard that from Baptista directly,
15   period. He was having a hell of a time with Farrell
16   as well. All right? And he would communicate that
17   with me. All right? And he was my sole source of
18   information regarding this particular subject other
19   than Mike Farrell directly or anything that I wrote to
20   somebody or phone conversation that I had with
21   somebody on it.
22         It was a moving target that moved very
23   slowly and then all of a sudden exploded, period, by
24   the end of '04 or the beginning of '05. And part of

Page 201

1    the moving slowly, quite frankly, according to
2    Baptista, was the fact that things changed a little
3    bit. We had to remark -- restructure, legal costs
4    was longer, it was nine months to get the contract
5    signed, and all the things that taking an insurance
6    product to market is consistent with. It takes two or
7    three years to get an insurance product from start to
8    finish, where it takes an investment banking deal, you
9    know, up to six months or seven months, period. So --
10   Q.    Okay. Could I refer you to the last
11   sentence on Peskoff Exhibit 9, please? Can you tell
12   me what that is a reference to?
13   A.    That's a reference to understanding on a
14   continual basis all the stuff that is going on with
15   GenCorp so that at some point in time I can sit down
16   with the intelligent facts and discuss with Mike
17   Farrell, et al., how I am to be, you know, compensated
18   regarding this particular transaction, considering
19   that I was kept out of the loop.
20   Q.    All right.
21   A.    Okay?
22   Q.    So the language here referring to "get a
23   complete understanding of what his fees will entail in
24   contract with FIDAC" is a reference to getting an

Page 202

1    understanding with Mike Farrell of what Underhill's
2    fees would be from FIDAC in connection with the
3    GenCorp transaction?
4    A.    That's correct.
5    Q.    All right.
6    A.    Not -- but the completion is knowing damn
7    well that I brought FIDAC in and FIDAC was a --
8    Q.    No. You brought in GenCorp.
9    A.    I brought in GenCorp, but GenCorp became the
10   customer of FIDAC. Okay? So technically speaking,
11   under my -- and this is why I referred to the contract
12   up here. I went back to look at it. It said that any
13   customer that I bring in, any account that I bring in
14   that they continue -- that they are doing business or
15   continue to doing business with becomes an account of
16   mine. A contract couldn't be terminated, you know, et
17   cetera, et cetera.
18         So I knew that, you know, eventually that
19   based upon the original contract that we drew, that
20   there would be some compensation, you know, for me,
21   depending upon all those other variables that we
22   discussed. But there was no issue in my mind and
23   subsequently reaffirmed by Ron Kazel that the client
24   GenCorp came in through me, as did Sentry, period.

Page 203

1    Q.    Thank you.
2    A.    Okay?
3    Q.    Would you go to Peskoff Exhibit 10.
4    A.    Okay. Another beauty here, huh?
5    Q.    Peskoff Exhibit 10 came from the files of
6    FIDAC. It is an email. It purports to be an email
7    from Mr. Farrell to Mr. Kazel describing a
8    conversation with you. And I will read it into the
9    record.
10         "FYI I spoke to Steve this morning and I
11   made it clear that he would not be getting paid
12   anything on insurance and that I would probably make a
13   small, one-time payment to him on Canada in the first
14   quarter. No dollar amount was committed to, and I
15   estimate that it will be less than 50K," referring to
16   $50,000, I believe.
17         I am showing you this because I want to ask
18   you, does it refresh your recollection at all as to
19   the conversation you testified to yesterday that you
20   had with Mr. Farrell in December 2003 in which he said
21   he was paying the one-time fee? Does this refresh
22   your recollection in any way?
23   A.    Well, part of it does. Okay?
24   Q.    All right. Let me go through pieces of it

11 (Pages 200 to 203)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2     C.A. # 06-99 SLR     October 11, 2006

Page 204

1   then. I want to just see. The date is December 16,
2   2003. Is that consistent with your recollection that
3   the conversation took place around the middle of
4   December?
5   **A.    Yes, that's -- right.**
6   Q.    Do you recall that before you had the
7   conversation, that you had been talking to
8   Mr. Peskoff -- excuse me. Withdrawn.
9       Before you had the December 2003
10   conversation, do you now recall that you had been
11   speaking in the previous four and five months with
12   Mr. Farrell about getting paid something in connection
13   with GenCorp, which is the reference to insurance
14   here?
15   **A.    Yes.**
16   Q.    Okay. Do you recall that during this
17   conversation that's reflected by the email that
18   Mr. Farrell told you that you would not be paid
19   anything on the insurance or GenCorp?
20   **A.    No.**
21   Q.    You don't remember that?
22   **A.    No. I do remember that he did not say that**
23   **to me at the time when we discussed the one-time**
24   **payment. I remember that specifically. Okay?**

Page 205

1   Q.    You remember specifically that he did not
2   say that?
3   **A.    That he did not say that. He did say the**
4   **other part, you know, the one-time payment for the --**
5   **for Sentry.**
6   Q.    The email says that he didn't specify any
7   dollar amount in this conversation. Do you think
8   that's correct, that in that conversation he didn't
9   tell you --

REDACTED

14   Q.    Okay. We will come to that.
15   **A.    Okay.**
16   Q.    After you received the $30,000 check, didn't
17   you then have a conversation with Mr. Farrell in which
18   you called him and thanked him for the check?
19   **A.    I don't know if I thanked him for the check.**
20   **I was surprised that I got a check. Okay? All right?**
21   **Because as far as I was concerned, the negotiations**
22   **were still open.**
23   Q.    The negotiations for what were still open?
24   **A.    For my compensation on both Sentry and**

Page 206

1   **FIDAC; okay? Because the deals were ongoing deals.**
2   Q.    So you were surprised when you received the
3   $30,000 check?
4   **A.    That's correct.**
5   Q.    You were surprised you actually received any
6   check?
7   **A.    I was surprised — I wasn't happy. I was**
8   **surprised that I received any check. Correct.**
9   Q.    Right. Okay.
10   **A.    That's fair.**
11   Q.    So does that indicate to you that your
12   conversation with Mr. Farrell that you are remembering
13   took place after you received the check, the
14   conversation in which he said, "I am paying you" --
15   **A.    I said that. I said that yesterday it could**
16   **have been after.**
17   Q.    Okay. So now it is your recollection --
18   what is your best recollection now? Did you get the
19   check before Mr. Farrell told you he was going to pay
20   the one-time finder's fee?
21   **A.    You know what? There is two conversations**
22   **there. I really don't remember which time it**
23   **happened. I remember --**
24   Q.    But you remember being surprised you got a

Page 207

1   check.
2   **A.    That's correct.**
3   Q.    That would necessarily suggest that you had
4   not been told you were going to be paid something then
5   in the near future. I am only asking you whether that
6   refreshes your recollection.

REDACTED

14   Q.    Let's go to Peskoff Exhibit 11, please.
15   Now, Peskoff Exhibit 11 is a copy, what appears to be
16   the $30,000 check we are referring to.
17   **A.    Yes.**
18   Q.    Is that right? That is a copy of the check?
19       MR. NOVACK: And I have here, and I
20   would like to mark as -- if it is okay with counsel, I
21   would like to mark this as an original, because it has
22   this thing separately done. Can we do that?
23       MR. BELL: Sure.
24       MR. RUBEN: May I see it?

12 (Pages 204 to 207)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR                    October 11, 2006

Page 208

1          MR. NOVACK:  This blue tab was on it.
2   I believe this is done for your production purposes;
3   right.  It says original check stub.
4          MR. RUBEN:  Yes, yes.
5          MR. NOVACK:  I don't want to make that
6   part of it.  This is just a mechanical issue here.  I
7   don't have --
8          MR. BELL:  Well, no.  There might be a
9   privilege issue as well.
10          MR. NOVACK:  Do you want to go off the
11   record?
12          MR. BELL:  Yes.  May I just have a
13   word with the witness?
14          MR. NOVACK:  Yes, sure.
15          (Recess taken.)
16          (Peskoff Deposition Exhibit 11A was
17   marked for identification.)
18   BY MR. NOVACK:
19   Q.       While we were off the record we marked as
20   Peskoff Exhibit 11A a document that was produced as an
21   original from the files of Mr. Peskoff and Underhill.
22   It appears to be a copy of the $30,000 check plus as a
23   separate piece of paper which has been stapled to the
24   Xerox copy of the check we have what seems to be a

Page 209

1   check stub of sorts.  I use the word "stub"
2   colloquially.  On it it reads, "Consulting Expense."
3   That's typewritten.  And then it says in handwriting,
4   "For Canadian deal."
5          Can you read the other words there?
6   A.       "With" -- no, I can't.
7   Q.       "With Sentry Select"?
8   A.       Yes, "with Sentry Select."
9   Q.       "This is a one-time finder's fee."
10   A.       Correct.
11   Q.       Now, when you got the check, this stub that
12   is attached as part of 11A was with it; correct?
13   A.       I don't remember seeing the stub.  I
14   remember seeing a check that had something like this
15   on it (indicating).  Okay?
16   Q.       Pointing to the language that says this
17   is --
18   A.       Yes, right, right, right.
19   Q.       So you knew when you received the check that
20   Mr. Farrell was saying this was a one-time finder's
21   fee?
22   A.       I understood what he said.
23   Q.       All right.  And you can't recall now whether
24   or not this was the first time you heard about it

Page 210

1   being a one-time finder's fee or you had heard about
2   it in the prior conversation?  You can't recall the
3   sequence; is that right?
4   A.       I can't recall the sequence because in my
5   mind it was irrelevant and --
6   Q.       That may be why you can't recall it.
7   A.       No.
8   Q.       My question is:  Can you not recall the
9   sequence or can you recall the sequence, phone
10   conversation first or not?
11   A.       We may have had a phone con -- I don't
12   remember phone dates.  I remember substance of calls.
13   You have pieces of paper.  All right?
14          The point in his telling me all this --
15   okay -- and my listening to all this was in my mind --
16   and I will repeat it again -- the difference in the
17   way we looked at this is that if we would have sat
18   down and negotiated, he would have looked at this as an
19   investment banking deal as a one-time fee.  The
20   business that he was creating and the client that I
21   brought in the door, Sentry, was a management company,
22   and the business was to go on, in my understanding,
23   for a number of years, maybe as long as ten, just like
24   FBR Asset.  So the fact that he sent me a check for

Page 211

1   $30,000 -- okay? -- really didn't mean a thing to me.
2   All right?  That was his way of trying to push this
3   thing without talking about it.
4   Q.       You disagreed with Mr. Farrell's view?
5   A.       Absolutely.
6   Q.       You were disputing his view?
7   A.       That's why you have a lawsuit.  Okay?
8   Q.       You understood you had a disagreement with
9   Mr. Farrell when you got the check?
10   A.       That's correct.
11   Q.       You cashed the check?
12   A.       That's correct.
13   Q.       You didn't write "under protest," did you?
14   Did you?
15   A.       I didn't think I had to.
16   Q.       You didn't call Mr. Farrell up and say, "I
17   don't want to take this.  I disagree."  You chose to
18   take the money; right?
19   A.       The check was cashed.
20   Q.       You never wrote back to Mr. Farrell and
21   said, you know, "I took the money, but we have a
22   disagreement still"?
23   A.       Well, I think -- doesn't that letter to Ron
24   Kazel point that out?

13 (Pages 208 to 211)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 212

```
 1   Q.   No.
 2   A.   No?
 3   Q.   Not in my view.  But we will get to that.
 4   A.   Okay.
 5   Q.   Do you think it does?  Do you think you
 6   wrote back to him saying, "I disagree with what you
 7   paid me on Sentry Select"?  Is that your recollection?
 8   A.   No.
 9   Q.   Okay.
10   A.   No.
11   Q.   Okay then.  We have resolved that.
12   A.   Okay.
13   Q.   Peskoff Exhibit 12.  This is something that
14   came from the files of FIDAC.  When the check was
15   cashed and it was returned, we were able to make a
16   copy of the back of the check.  On the back of the
17   check it indicates "for deposit only."  Is that your
18   handwriting or Josie's handwriting?  Can you tell?
19   A.   It is Josie's handwriting.
20   Q.   Okay.  I am correct, you agree, that there
21   is nothing on the back of the check or on the front of
22   the check that was cashed that says, "under protest"
23   or indicates any disagreement whatsoever?
24   A.   That's correct.
```

Page 213

```
 1   Q.   When was the first time after you got the
 2   check that you began asking Mr. Farrell to pay you
 3   more on Sentry Select?
 4            MR. BELL:  Object to the form of the
 5   question.
 6            THE WITNESS:  Yes.
 7            MR. NOVACK:  What is wrong with the
 8   form?
 9            MR. BELL:  I think it implies that he
10   didn't talk to Mr. Farrell about wanting more fees
11   until after he received the check.
12            MR. NOVACK:  Oh, I will state it
13   differently.
14   BY MR. NOVACK:
15   Q.   I just want to orient you to a timeframe
16   now.  I want to ask you about the period after you
17   received the $30,000 check.  When is the first time
18   after you received the $30,000 check that you
19   communicated to Mr. Farrell that you wanted more fees
20   with respect to Sentry Select?
21   A.   I would have to check my files.
22   Q.   What do you remember?
23   A.   I remember that I wasn't happy, you know,
24   having received, you know, the 30,000.
```

Page 214

```
 1   Q.   If you could listen to my question.
 2   A.   Yes.
 3   Q.   I am not asking you whether you were happy.
 4   I am not asking about your motivations.  So please
 5   listen to the question.  I will ask it again.
 6   A.   Go ahead.
 7   Q.   When was the first time you communicated to
 8   Mr. Farrell after you received the $30,000 check that
 9   you wanted more by way of fees for Sentry Select?
10   A.   You know what?  I don't remember.  I only
11   remember in my own mind that --
12   Q.   No, no, no.  I only want to know -- if you
13   are going to tell me when you communicated, fine.  I
14   am only asking you when you communicated.
15   A.   And I am telling you I don't remember.
16   Q.   Isn't it true that you did not communicate
17   that thought to Mr. Farrell until Mr. Ruben wrote his
18   letter in September 2005?
19   A.   No, that's not true.
20   Q.   When did you do it before that?
21   A.   He and I had some very broad discussions
22   about FIDAC and GenCorp, you know, in general sometime
23   in early 2'05.  I had conversations with Kazel.  I
24   wrote Kazel a letter specifically, you know -- I don't
```

Page 215

```
 1   remember the content of the letter.  I haven't looked
 2   at it in a while, but saying that, you know,
 3   essentially that I felt that, you know, the situation
 4   hadn't been handled properly, that it was -- can I see
 5   that letter?
 6   Q.   I am asking you what you recall.  I promise
 7   you I will give you what I think the letters are --
 8   A.   Okay, yes.
 9   Q.   -- in time.  But what I am trying to
10   understand is what you actually can remember now.
11   When we get done with what you remember, we will show
12   you documents and we will see --
13   A.   Fine.
14   Q.   -- if the documents help your memory.
15   A.   Okay.
16   Q.   Now, I want to caution you not to confuse
17   things you said about GenCorp with Sentry Select.  So
18   I am going to ask my question again, because you just
19   answered referring to GenCorp.  And I don't want you
20   to be unclear.
21            I am asking you a question that deals only
22   with communications relating to Sentry Select.  Do you
23   understand that?  You agree with me?
24   A.   Fine.
```

14 (Pages 212 to 215)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2     C.A. # 06-99 SLR     October 11, 2006

Page 216

1  Q.     I am only asking about Sentry Select. After
2  you received the Sentry Select $30,000 payment in
3  December 2003, isn't it true you never again
4  communicated to Mr. Farrell that you wanted more money
5  on the Sentry Select deals until you had Mr. Ruben
6  send a letter in September 2005?
7  A.     I don't remember that.
8  Q.     Isn't it true you don't remember any time --
9  you can't tell me of any time that you recall that you
10  did it before September 2005?
11  A.     I would have to check my records. I don't
12  remember. Okay?
13  Q.     Do you have any reason to believe that what
14  I have said is incorrect? Do you think there is some
15  document that indicates you did so communicate?
16  A.     Whether -- some document? There may have
17  been some notes to my file of some thoughts that I had
18  or there may have been a telephone conversation or so.
19  Q.     You are speculating now; right?
20  A.     I don't remember specifically.
21  Q.     You don't have any recollection of any
22  communication, oral or written, between you and
23  Mr. Farrell from during the period after you received
24  the $30,000 check up until September 2005 in which you

Page 217

1  asked for more money with respect to Sentry Select;
2  isn't that right?
3  A.     I am not sure. I am not sure.
4         MR. NOVACK:  We have only two minutes
5  of tape remaining, so why don't we let him change the
6  tape now.
7         (Recess taken.)
8  BY MR. NOVACK:
9  Q.     Mr. Peskoff, during the break I gave you
10  Peskoff Exhibit 15. Is that a letter that you wrote
11  to Mr. Kazel on April 12, 2004?
12  A.     Yes.
13  Q.     In that letter you make some reference to
14  GenCorp; correct?
15  A.     Yes.
16  Q.     In that letter there is no reference to
17  Sentry Select, is there?
18  A.     Correct.
19  Q.     So when you earlier said you thought there
20  might have been a letter you wrote about Sentry
21  Select --
22  A.     Yes.
23  Q.     -- you were mistaken; correct?
24  A.     I thought that this letter --

Page 218

1  Q.     You said you wrote a letter to Mr. Kazel, I
2  think.
3  A.     I thought that I might have included both of
4  them. Okay?
5  Q.     But we now agree that the letter did not
6  include --
7  A.     I agree. That's correct.
8  Q.     -- Sentry Select?
9  A.     That's correct.
10  Q.     Okay. At the time you wrote this letter in
11  April 2004, it was over a year since you had received
12  the $30,000 payment; correct?
13  A.     Excuse me?
14  Q.     At the time you wrote the letter in April --
15  I am sorry. I was off by only eight months. Forget
16  it.
17  A.     Yes.
18  Q.     I skipped a year.
19  A.     That's all right.
20  Q.     You threw me off by staring at me.
21  A.     Good.
22  Q.     That was very good. It was very effective.
23  Keep that up. Well, we have to have some humor or
24  else we will all go crazy; right?

Page 219

1  A.     Yes. You ask your question again. Okay
2  Q.     Which question should I ask?
3  A.     The one that I was vague, because I --
4  Q.     Okay. Tell me. Okay. Let's go back. What
5  is the question that I should ask?
6  A.     You asked me there is very little on the
7  record about contacting Farrell after the Sentry --
8  after he paid me the $30,000 check, and there was no
9  attempt to talk to him, show him I --
10  Q.     I didn't say that. That was not my
11  question.
12  A.     Okay.
13  Q.     I will ask my question again so I make sure
14  you heard it correctly.
15  A.     Yes, please. Would you do that?
16  Q.     Isn't it true you didn't send any writing of
17  any sort, letter, memo, note, to Mr. Farrell after you
18  received the $30,000 check and before Mr. Ruben's
19  letter in which you said, "I want more money for
20  Sentry Select"?
21  A.     Yes.
22  Q.     That is true, what I told you, what I just
23  said; right?
24  A.     Yes.

15 (Pages 216 to 219)

Underhill Investment Corporation and Peskoff     v.
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR

Fixed Income Discount Advisory Company
October 11, 2006

Page 220

1    Q.    And isn't it true you have no recollection
2    of any conversation with Mr. Farrell after you
3    received the $30,000 check up through September 2005
4    in which you said to Mr. Farrell, "I want more money
5    on Sentry Select"; correct?  You have no recollection
6    as you sit here today of any such conversation?
7    A.    That's correct.
8    Q.    Okay.  Let's go to Peskoff Exhibit 13,
9    please.  Would you please look at Peskoff Exhibit 13?
10   This is another memorandum for your files.  Does this
11   reflect notes that you dictated to Josie?
12   A.    Yes, but transcribed inaccurately.
13   Q.    Yes, I know that.  I can see.  Let's go over
14   the inaccuracies in the notes.
15         First, this memo reflects the fact that you
16   had spoken to Ernie Baptista at around this date?
17   A.    Probably this date.
18   Q.    All right.  Mr. Baptista was telling you how
19   much money was in the pot?
20   A.    Right.
21   Q.    What pot was he referring to?
22   A.    GenCorp client pot.
23   Q.    Referring to the Premier --
24   A.    Yes.

Page 221

1    Q.    -- product?
2    A.    Yes.
3    Q.    Okay.  Did you have any understanding one
4    way or another whether Mr. Baptista was authorized to
5    disclose that information to you or whether it was
6    supposed to be confidential?
7    A.    Repeat the question.
8    Q.    Did you have any understanding one way or
9    another whether Mr. Baptista had authority to disclose
10   to you that information?  Did you have any
11   understanding whether it was supposed to be
12   confidential?
13   A.    No.
14   Q.    Neither, an understanding neither way?
15   A.    Neither way, because I introduced him to the
16   transaction, and he felt that since I was an intimate
17   part of the transaction, he could talk to me about it.
18   Q.    Did you ever make any effort to ask him or
19   anyone else whether this information was confidential?
20   A.    No.

REDACTED

Page 222

REDACTED

14   A.    Whatever the accuracies should have been,
15   this was not -- this is not accurate.
16   Q.    Okay.  Let's assume that.  Let's go to the
17   last line down.  "Theoretically, SDP should receive
18   one-half basis point at ongoing basis."
19   A.    Yes, that's not accurate either.
20   Q.    What is that one-half supposed to be?
21   A.    That was inaccurate as well.
22   Q.    What did you dictate to her?
23   A.    I don't remember exactly, but that was
24   inaccurate as well.

Page 223

1    Q.    Well, do you have any idea if anything on
2    this page with regard to the basis points is accurate
3    in any respect?
4    A.    All I did was try to repeat what Baptista
5    told me.  Since I really didn't know what was accurate
6    because I wasn't inside the transaction, as I should
7    have been, so he felt he had a responsibility to tell
8    me, and what he told me and what got transcribed here
9    was inaccurate.  Just Josie is not great with numbers.
10   Okay?
11   Q.    You said that you would review what Josie
12   typed up sometimes and you would correct it before it
13   went to the file.
14   A.    Mm-hmm.
15   Q.    Did you review this memo before it went to
16   the file?
17   A.    Probably something like this, not, a phone
18   conversation.  It was just -- there would have been --
19   something like this with, you know, a two-minute phone
20   conversation from somebody, probably wouldn't have
21   reviewed it, because probably in my mind at the time I
22   understood very clearly what it was.  Okay?
23
24

REDACTED

16 (Pages 220 to 223)

Underhill Investment Corporation and Peskoff   v.   Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2   C.A. # 06-99 SLR   October 11, 2006

Page 224

1   **REDACTED**
2
3
4
5
6   Q.   I understand that.
7   A.   Yes.
8   Q.   Let me ask you, in February 2004, about the
9   time of this conversation, were you trying to figure
10   out what number you were going to negotiate for as a
11   percent that you would get in connection with Premier?
12   A.   **At this time, no.**
13   Q.   You weren't thinking about that?
14   A.   **No, not at all.**
15   Q.   Would you explain why then she wrote down,
16   "Theoretically, SDP should receive one-half basis
17   point at ongoing basis"?  Disregarding the fact it is
18   the wrong number, doesn't that reflect you were
19   thinking about how much you should be getting, or am I
20   wrong?

**REDACTED**

Page 225

**REDACTED**

4   Q.   Okay.  My question is not whether the number
5   is accurate.  I am assuming the number is inaccurate
6   when it refers to one-half basis point.  My question
7   to you -- please focus on it -- is this.
8   A.   **Yes.**
9   Q.   Doesn't this memo reflect that you at the
10   time you dictated it were trying to figure out what
11   you should be getting as your fee on the Premier
12   transaction?
13   A.   **No.**
14   Q.   It does not?
15   A.   **No.**
16   Q.   Do you think that you did not indicate to
17   her something to the effect as to what you should
18   receive on a ongoing basis?  She typed that up on her
19   own?
20   A.   **There may have been -- it may have been 20**
21   **percent.**
22   Q.   I am not asking the number.  I am asking the
23   concept.  That's what I want you to focus on --
24   A.   **I understand.**

Page 226

1   Q.   -- please.
2   A.   **All I am saying is that the concept was too**
3   **early to even make a determination in terms of what I**
4   **should be getting or could be getting or might be**
5   **getting because the deal was not anywhere near closed.**
6   **It was ongoing.  This is just like, you know, just --**
7   Q.   Okay.
8   A.   **You know.**
9   Q.   I don't think you have to keep explaining --
10   A.   **Okay.**
11   Q.   -- unless you feel you need to.
12   A.   **I think I have explained.**
13   Q.   You have answered my question.  You were not
14   thinking about --
15   A.   **No.**
16   Q.   -- what the percent was at the time?
17   A.   **No.**
18   Q.   No.  And she wrote it down, and you have no
19   explanation for that?
20   A.   **That's correct.**
21   Q.   Okay.  Let's go to Peskoff Exhibit 14,
22   please.
23       MR. NOVACK:  Tom, I don't understand
24   how I can have this, Peskoff Exhibit 14, page P-326,

Page 227

1   and I don't seem to have an original of it in what you
2   gave me this morning, unless I gave it back.  I don't
3   see anything.  This is the one that starts "Monday" at
4   the top of the page.  And we don't seem to have it
5   here.  Since this is handwritten --
6       MR. SINGH:  Go through that again.
7       MR. NOVACK:  Yes.  You can.  I didn't
8   see it here.  I am keying off this word "Monday."
9       While we are questioning, Tom, if you
10   could maybe keep looking.  I want to keep it moving.
11   Okay?
12       MR. BELL:  Yes, go ahead.
13       MR. NOVACK:  If it is okay with you.
14       MR. BELL:  Yes.
15       MR. NOVACK:  By the way, looking at
16   Peskoff Exhibit 14, it had a little label that was
17   inadvertently photocopied, and we all agree that the
18   document itself in the files as maintained did not
19   have the notation at the bottom that said, "Mike
20   Farrell notes 3/1/04."  Right, counsel?
21       MR. BELL:  Yes.
22       MR. NOVACK:  Okay.
23       MR. BELL:  That's correct.
24       MR. NOVACK:  And he is looking for the

17 (Pages 224 to 227)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR                October 11, 2006

Page 228

1   original while we are doing this.
2   BY MR. NOVACK:
3       Q.      Mr. Peskoff, I am asking you whether or not
4   this is your handwriting —
5       A.      Yes.
6       Q.      — on Peskoff Exhibit 14?
7       A.      It is.
8       Q.      Okay. Are these contemporaneous notes you
9   made at the time you met with Mr. Farrell?
10      A.      I am sure.
11      Q.      Okay. If you go — withdrawn.
12          Can you tell me where you were when you met
13  with Mr. Farrell?
14      A.      I think, if I remember, this meeting was
15  held in his new offices where the Fox Building is.
16      Q.      Was the meeting held on March 1, 2004?
17      A.      It says so here, so I am assuming it is when
18  this meeting was.
19      Q.      How long did the meeting last?
20      A.      You know, quite frankly, I don't remember.
21  It was a pretty good, long — a pretty good meeting.
22      Q.      Is it correct that the meeting covered a
23  variety of topics, as indicated by your notes?
24      A.      Mm-hmm.

Page 229

1       Q.      It wasn't just confined to either — well, I
2   will just leave it at that for now.
3           Did you write anything on these notes, on
4   this page recently in connection with the litigation
5   in order to give information to your counsel as to
6   what was going on? I am not suggesting anything
7   improper, but I know in certain instances you have
8   written something on older notes or put tabs on them.
9   Do you see anything that wasn't on here —
10      A.      No.
11      Q.      — when you first created the notes?
12      A.      No.
13      Q.      Okay. If you would go — and tell me, who
14  else was at the meeting, if anyone?
15      A.      Just Mike and myself, and then I met with, I
16  think, possibly Ron Kazel for a couple minutes.
17      Q.      Okay. Was the meeting a cordial meeting?
18      A.      Reasonably.
19      Q.      How long did the meeting last?
20      A.      It was, you know, maybe a half an hour,
21  maybe 20 minutes, something like that.
22      Q.      If you could tell me without getting into
23  detail yet — there are, I think, six numbered items.
24  Do those reflect what the topics were that were

Page 230

1   discussed that you thought were worthy of taking notes
2   on?
3           MR. NOVACK:  Where was this?
4           MR. BELL:  Attached to the last packet
5   of the stack.
6           MR. NOVACK:  I didn't get the last
7   packet before you gave it to me. I think that's why I
8   missed it.
9           MR. BELL:  It was in there.
10          MR. NOVACK:  I got all the receipts
11  and travel things. I must have missed it. Oh, it was
12  attached to this, the travel stuff and the receipts
13  and bills.
14          MR. BELL:  Yes.
15          MR. NOVACK:  Okay. Oh, yes. Was it
16  right here at the bottom?  That's the only place I
17  didn't look. Do you want to see it?  The witness is
18  reading the document.
19          Bob, can I show that to the witness
20  just to make sure he can see his own handwriting?  It
21  might be easier for him to read.
22          Thanks.
23  BY MR. NOVACK:
24      Q.      Do you want to look at the original if it is

Page 231

1   easier for you to read?
2       A.      Either way it is fine. It is not —
3           MR. NOVACK:  I would like to mark the
4   original as Exhibit 14A, if I could. Is that okay?
5           MR. RUBEN:  Fine.
6           MR. BELL:  Sure. Maybe we should mark
7   that on the back.
8           MR. NOVACK:  There is room on the
9   bottom here.
10          (Peskoff Deposition Exhibit No. 14A
11  was marked for identification.)
12  BY MR. NOVACK:
13      Q.      Mr. Peskoff, you have had a chance to review
14  the notes you took?
15      A.      Yes.
16      Q.      All right. Can you tell me what the topic
17  was that is referred — without getting into any
18  detail at all, I just want to have a list of
19  topics. What is Topic 1?  Is that "update on
20  business"?
21      A.      His business, Annaly.
22      Q.      Okay. Topic 2 is "FIDAC deal." What was
23  that referring to, what deal?  If you don't recall
24  right now, we will —

18 (Pages 228 to 231)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                C.A. # 06-99 SLR                October 11, 2006

Page 232

1   A.      You know, I don't recall what it was.
2   Q.      Item 3, "SDP" -- it seems to say C-U-S-H or
3   C-U-S-T --
4   A.      Yes.
5   Q.      -- "to invest." What was that a reference
6   to?
7   A.      Just a personal investment.
8   Q.      By you in --
9   A.      Whatever.
10  Q.      Whatever. 4 was "Farrell and SDP own a
11  horse"?
12  A.      Correct.
13  Q.      That's about a horse? Okay. Item 5 -- 4A
14  is "maybe Woodbine deal," and B is another -- is that
15  another horse --
16  A.      No. It is just a money manager.
17  Q.      -- that is referenced? Okay. It is another
18  topic. Okay.
19  A.      Yes.
20  Q.      Item 5 is "insurance estate planning - Ernie
21  Baptista can help." Is that right?
22  A.      Yes.
23  Q.      And it says underneath it, "Helping me"
24  arrows "with private placement." What is that a

Page 233

1   reference to, if you recall?
2   A.      I don't.
3   Q.      Item 6, "relationship with Corsini,"
4   C-O-R-S-I-N-I --
5   A.      That's Sentry.
6   Q.      -- "in Canada."
7   A.      That's Sentry.

REDACTED

Page 234

REDACTED

7   Q.      Right.
8   A.      Yes.
9   Q.      Okay. So we have two mistakes in the letter
10  about the percentages so far.
11  A.      A 2 percent difference.
12  Q.      Going up to the --
13  A.      Excuse me. Will you ask your question,
14  because I wanted to go over these six items here.
15  Q.      I will. I am going to go over them now.
16  A.      Okay.
17  Q.      But I am allowed to choose the sequence.
18  A.      Okay.
19  Q.      Your lawyers can then ask you whatever
20  sequence they like or you might enjoy.
21  A.      Okay.
22  Q.      On the top right-hand side there is a
23  reference to getting a car. Let me just read across
24  the top of the page. You tell me if you think I am

Page 235

1   reading it right.
2           "Enjoy your friendship when I'm not getting
3   verbally abused. What" -- what does the rest of that
4   say? "What do you see in the marketplace?"
5   A.      Yes.
6   Q.      "Mr. Fixed Income." Is that something that
7   you wrote down that you had said to him or something
8   you were thinking, like doodling?
9   A.      No.
10  Q.      What? What was that?
11  A.      Mr. Fixed Income is the name of a racehorse
12  that I named after him.
13  Q.      Oh, okay.
14  A.      All right? That's the kind of relationship
15  we had.
16  Q.      Was he honored? Was he honored?
17  A.      He was a stakes winner.
18  Q.      Let me ask you, when did you name the horse
19  after him?
20  A.      This was in '04. Probably in '02 or '1.
21  Q.      Okay. So that was a reference --
22  A.      To a racehorse.
23  Q.      And you were asking what --
24  A.      I wasn't asking. These were notes for me to

19 (Pages 232 to 235)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                C.A. # 06-99 SLR                October 11, 2006

Page 236

```
1   discuss some of the things with him.  Okay?
2   Q.      Well --
3   A.      Because as I said to you, historically, the
4   conversations I had with him, he was really on the
5   muscle with me regarding GenCorp and all this other
6   stuff, and every time he would talk, you know, he
7   would be telling me how costly it was, how miserable
8   he was, how slow the deal was going, how frustrated.
9   I mean, you know, it was a continual thing, you know.
10  Just --
11  Q.      I guess it made an impact on him, huh?
12  A.      It made an impact on him?  I guess it did.
13  Q.      Okay.  So let's go --
14  A.      You have to look at the checks that he has
15  been receiving to see the impact that it made on him.
16  Q.      Okay.  Well, your counsel will take a good
17  look, I am sure, so let's just go forward here now
18  with what we have as the business of the day.
19  A.      Sure.  Go ahead.
20  Q.      Did you write, "Enjoy your friendship when
21  I'm not getting verbally abused" --
22  A.      Yes.
23  Q.      -- before the meeting?
24  A.      Correct.
```

Page 237

```
1   Q.      Something you wanted to make a point of?
2   A.      Which we discussed.
3   Q.      Okay.
4   A.      And that was the time I think I took out my
5   checkbook as well, I think.
6   Q.      Okay.  We will come to that.
7   A.      Yes.  Okay.
8   Q.      And going to Item 2 --
9   A.      Item 2.
10  Q.      Above Item 2, which says, "FIDAC deal," it
11  says, "Raising more money"; is that right?
12  A.      That's what it says.
13  Q.      And then it has an arrow connecting it to
14  what appears directly under the words "FIDAC deal,"
15  and those words are -- and tell me if I am correct --
16  can I bring in some new bus," referring to business?
17  A.      Correct.
18  Q.      And then can you read the words to the right
19  of the word "business"?
20          Do you want to look at the original?
21  A.      No.  It won't make a difference.
22  Q.      It looks a little clearer.
23  A.      I write like a doctor.  "Bring in new
24  business."
```

Page 238

```
1           MR. NOVACK:  Where is the
2   transcription?
3   BY MR. NOVACK:
4   Q.      We have a transcription.  You were kind
5   enough to give us a transcription of some of what
6   appears to be --
7   A.      Yes.  Yes.  I am looking at those three
8   words.
9   Q.      I will look and see if I can find it.
10  A.      "Can we settle export" -- you know, I don't
11  remember what that would be.
12  Q.      All right.  Let me just see.  Is it correct
13  that you were talking with Mr. Farrell about you
14  bringing in some new business to him when it says,
15  "Can I bring in some new business," and you were
16  referring to raising more money for FIDAC to manage?
17  A.      Essentially.
18  Q.      All right.  That's independent of what you
19  have already started in motion, which was Sentry
20  select and the Premier.
21  A.      Right.
22  Q.      This was a wholly new area?
23  A.      That's correct.  Right.
```

REDACTED

REDACTED

Page 239

```
7   A.      I don't know whether it was my note
8   beforehand or whether I discussed it with him at the
9   meeting.
10  Q.      Okay.  All right.
11  A.      Okay?
12  Q.      Okay.  Thank you.
13  A.      Yes.
14  Q.      Then to the right, the words appear
15  "Farrell."  Then it says, "said would" --
16  A.      "Take care of me."
17  Q.      "Take care of me."  And beneath that it
18  says, "2 pts," referring to points, dash "objective,"
19  and underneath that it says, "settle for 1-1/2."  Did
20  you make that note before the meeting --
21  A.      Probably.
22  Q.      -- something you wanted to bring up?  Okay.
23  Do you recall whether you, in fact, brought it up or
24  not at the meeting?
```

20 (Pages 236 to 239)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 240

REDACTED

20 Q.   Okay.
21 A.   Because 4 and 5 and 6 weren't even relevant
22 to him. Okay?
23 Q.   Okay.
24 A.   Yes.

Page 241

1 Q.    So is it correct that you are not sure
2 whether or not the reference to the 12 percent was put
3 on by you before the meeting?
4 A.    I am -- that's a fair statement, yes.
5 Q.    Okay. We have clarified that you are not
6 sure on that.
7 A.    Okay.
8 Q.    Let's go to Exhibit 15, Peskoff Exhibit 15.
9 A.    15. Okay.
10 Q.    Peskoff Exhibit 15 was a letter you received
11 from Mr. Kazel. Excuse me. A letter you wrote to
12 Mr. Kazel on April 12, 2004; right? We might have
13 gone over that already.
14 A.    Right.
15 Q.    In this letter you state in part, "It's
16 always been Mike's intention that I would be
17 compensated from the FIDAC/Annaly side of the equation
18 and at this time I believe it is appropriate to broach
19 the subject."
20    First question:  Had you broached the
21 subject with Mike Farrell before this letter of
22 April 12, 2004?
23 A.    May have. May have. I don't remember.
24 Q.    Either way you don't remember?

Page 242

1 A.    Don't remember, because the deal was in the
2 process of happening.
3 Q.    Okay. You don't remember Mike Farrell being
4 clear before April 12, 2004, that nothing was going to
5 be paid in connection with GenCorp?
6 A.    No.

REDACTED

13 Q.    Can you just tell us, so we have it for the
14 record, what your understanding is of what a basis
15 point is?
16 A.    A basis point is a percentage of -- it is 1
17 percent of 100 -- it is 1 percent of 100 percent of a
18 transaction.
19 Q.    One percent of 100 percent of a transaction
20 would be 1 percent, I think.
21 A.    Yes. So let's divide that by ten. A basis
22 point -- move it over one. Is that correct?
23 Q.    No, no. You have to answer me. You can't
24 look to counsel. I am not sure counsel could help

Page 243

1 with numbers anyway, but let's try again.
2    Can you figure out what a basis point is so
3 you can explain it to us clearly on the record?
4 A.    .01.
5 Q.    .01 what?
6 A.    Percent.
7 Q.    .01 percent?
8 A.    Correct.
9 Q.    Well, .01 percent, can you write down for me
10 on a piece of plain paper what you think a basis point
11 would look like as a decimal, as you described it?
12    The record should reflect the witness is
13 doing some kind of calculation on a piece of paper.
14 A.    (Witness writes on paper.) I am not. I am
15 so used to --
16    MR. NOVACK: Okay. Let me mark this
17 as Peskoff Exhibit 22.
18    I am going to -- why don't you make a
19 copy of this. Take a look. I need to get it marked
20 it first.
21    (Peskoff Deposition Exhibit No. 22 was
22 marked for identification.)
23 BY MR. NOVACK:
24 Q.    I am giving you back Peskoff Exhibit 22. I

21 (Pages 240 to 243)

Underhill Investment Corporation and Peskoff       v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                    C.A. # 06-99 SLR                    October 11, 2006

Page 244

1  want to ask you to explain to me what number on here,
2  what figure is a statement of a basis point. At the
3  top of the page you wrote 1 percent. You have to look
4  at the -- you are covering it over, Mr. Peskoff. I am
5  looking at Exhibit 22. I asked you to write down what
6  a basis point is. Would you tell me where on the page
7  you have done that?
8    A.      Here (indicating).
9    Q.      No, no. Point on yours. On Exhibit --
10   A.      Over here (indicating).
11   Q.      Take and draw an arrow to where you are
12  pointing so we have it for the record.
13   A.      (Witness writes on Peskoff Deposition
14  Exhibit No. 22.)
15   Q.      Okay. You put a checkmark alongside where
16  you think is --
17   A.      .0001, yes.
18   Q.      You just said .0001.
19   A.      No. .001.
20   Q.      That is a basis point?
21   A.      That's a basis point.
22   Q.      Okay. Let's go to Exhibit 15 again, Peskoff
23  Exhibit 15.
24   A.      Yes.

Page 245

REDACTED

8         Now, in that letter the points you are
9  referring to are basis points, not percentage points;
10  correct?
11   A.      Yes.
12   Q.      Okay. You were suggesting as an opening in
13  the negotiations that you would get two points going
14  forward?
15   A.      Yes.
16   Q.      You were not insisting that you had a right
17  to two points but rather this is what you were asking
18  for; correct?
19   A.      This was based on the assumption that this
20  was a deal --
21   Q.      No, no. Read back the question, please.
22  Then if you want to answer it this way, you can, but
23  please listen to the question.
24   A.      Okay.

Page 246

1         (The court reporter read back as
2  follows:
3         "Question: You were not insisting
4  that you had a right to two points but rather this is
5  what you were asking for; correct?")
6         THE WITNESS: No.
7  BY MR. NOVACK:
8    Q.      You were insisting that you had a right to
9  two points?
10   A.      I was -- I knew that I had a right --
11  okay? -- having brought the client in the door under
12  my contract, that this was a client that I brought in.
13   Q.      I am not asking about --
14   A.      Okay?
15   Q.      I am not -- I am asking you about a number.
16  I am going to ask you to focus on my question. Were
17  you insisting that you had a right to get two points
18  versus three points or one point or something else? I
19  am asking about the number.
20   A.      I wasn't insisting. I wasn't insisting.
21   Q.      Okay. Did you believe you had a right to
22  two points --
23   A.      Yes.
24   Q.      -- as opposed to some other number?

Page 247

1    A.      I had a right to two, yes, at least two
2  points; correct.
3    Q.      And is there a document that reflects some
4  agreement on that particular number of at least two
5  points? Is there some document you can point me to?
6    A.      No.

REDACTED

19   Q.      You have explained that. I understand.
20   A.      Okay. So that's --
21   Q.      So the two points is your calculation based
22  in your subjective judgment as to what you think would
23  be fair?
24   A.      If the deal reached the consummate part that

22 (Pages 244 to 247)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 248

1  they were -- that Ernie had been talking about to me.
2  Q.    All right.  To state it more fully then,
3  assuming the assumptions as to the size of the deal
4  were realized that are outlined in this letter, then
5  you believed it would be fair that you get at least
6  two basis points?
7  A.    Yes.
8  Q.    Is that right?

REDACTED

17  Q.    Okay.  But I would like to just if we could
18  for a moment confine ourselves --
19  A.    Yes.
20  Q.    -- to the time you wrote the letter.  At the
21  time you wrote the letter you laid out certain
22  assumptions as to how large Premier might grow, and
23  those are contained in the letter.
24  A.    Right.

Page 249

1  Q.    Is it correct that when you said you wanted
2  two basis points in this letter, it was based on your
3  subjective judgment as to what would be fair based on
4  the assumption contained in the letter?
5  A.    That's correct.  And I calculated
6  originally, now that I think about it -- okay? --

REDACTED

11  Q.    I am not asking you to go through all of
12  your thinking from the beginning of how you got
13  somewhere to where you ended up.  I just want to know
14  what you were thinking on April 12 --
15  A.    That's correct.
16  Q.    -- 2004, when you wrote the letter.  So I am
17  going to ask it again.
18  On April 12, 2004, when you wrote the
19  letter, you laid out certain assumptions as to how
20  large Premier would grow; correct?
21  A.    It was outlined for me.
22  Q.    But in the letter you laid out certain
23  assumptions you were making?
24  A.    That's correct.

Page 250

1  Q.    And you told Kazel that based on these
2  assumptions being realized, if they were realized, it
3  would be fair that you receive two basis points on a
4  going forward basis; is that right?
5  A.    Yes.
6  Q.    And am I correct that you subjectively
7  determined that two basis points was fair for you to
8  be paid based on the assumptions contained in the
9  letter?
10  A.    Yes.

REDACTED

14  Q.    Here is a calculator.  Let's do that.  This
15  is a gift, gentlemen, so you can do it if you want to
16  check the math.
17  What would you do?  Do you know how to
18  figure out what percentage it is?  I am sure you do.
19  I didn't mean it that way.  It is a rhetorical
20  question.
21  MR. BELL:  I mean, this is --
22  THE WITNESS:  This is getting to a
23  point --
24  MR. NOVACK:  No, no.  I am going to

Page 251

1  ask a question about the number.  It is relevant.
2  MR. BELL:  Well, why don't you tell us
3  what the number is.  I don't want him making --
4  MR. NOVACK:  I will tell you.  It is
5  11.7 percent.
6  MR. BELL:  Okay.
7  MR. NOVACK:  Do you want to check my
8  math --
9  THE WITNESS:  Okay.

REDACTED

13  MR. BELL:  We can.
14  BY MR. NOVACK:
15  Q.    Okay.  So you in your subjective judgment
16  were asking for 11.7 percent in this letter; correct?
17  A.    Yes.
18  Q.    You weren't asking for 10 percent.  You
19  weren't asking for 20 percent.  You were asking for
20  11.7 percent in your subjective judgment; correct?
21  A.    Correct.
22  Q.    Okay.  Now, let's go to Peskoff Exhibit 16.
23  You received this letter from Mr. Kazel on or about
24  April 20, 2004?

23 (Pages 248 to 251)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                    C.A. # 06-99 SLR          October 11, 2006

Page 252

1  A.    Yes.
2  Q.    You have read this letter before today, in
3  the recent past; right? I am not going to ask you --
4  A.    I haven't read it recently. Okay? I am
5  reading it now.
6  Q.    Why don't you take a quick look through the
7  letter. I am only going to ask about specific things.
8  So you can go back and look at it a second time if you
9  care to.
10  A.    Okay.
11         (Discussion off the record.)
12         (There was a pause.)
13         THE WITNESS: Okay.
14  BY MR. NOVACK:
15  Q.    When you got this letter -- well, withdrawn.
16         Before you received this letter response,
17  had you had any conversations with either Farrell or
18  Mr. Kazel about what you had written in your April 12
19  letter to them?
20  A.    I don't remember.
21  Q.    You don't remember any?
22  A.    Any response other than this.
23  Q.    Okay. All right. When you got this
24  response from Mr. Kazel, what was your reaction? What

Page 253

1  did you immediately think about the position he took?
2  A.    It was a very polarizing position.
3  Q.    Were you completely surprised?
4  A.    Yes.
5  Q.    Were you angry?
6  A.    Yes.
7  Q.    Were you upset?
8  A.    Upset? Yes and no.
9  Q.    What part is the yes; what part is the no?
10  A.    I wasn't upset because he recognized that,
11  A, that I brought, you know, the clients in the door.
12  Okay? Both clients. Okay?
13  Q.    And what is the part that made you upset?

**REDACTED**

23      And secondly, I found upsetting the fact
24  that he mentions Mike's $30,000 check was to cover

Page 254

1  this as well. Okay?
2  Q.    Let me read into the record so we have it
3  clear so if someone reads the transcript, they will
4  know what you are referring to. The last paragraph of
5  the letter to you from Mr. Kazel, which is Peskoff
6  Exhibit 16, says in part, "Mike discussed with you in
7  December 2003 that he would compensate you for your
8  limited involvement in these products and a check was
9  issued to you on December 22; and cashed by you, for
10  $30,000."
11      Now, the reference to these products was
12  both MBS Trusts, which was Sentry Select, and Premier,
13  which was GenCorp; correct?
14  A.    Correct.
15  Q.    "It was also explicitly explained that there
16  would be no further consideration paid to you and this
17  letter serves as a further reiteration of that
18  position."
19      Is it your testimony that this letter was
20  the first time you had been told by anyone at FIDAC
21  that the $30,000 was all you were getting and you
22  would get nothing more either with regard to Sentry or
23  with regard to Premier?
24  A.    No. Farrell did make it clear that the

Page 255

1  $30,000 in December was a payment for Sentry.
2  Q.    Okay.
3  A.    Okay? And I noted that with hostility. And
4  B, --
5  Q.    You noted what with hostility? When he
6  first said it or in this letter?
7  A.    When he said it. When he said it. When he
8  said it. It bothered me. I knew I was up -- I had a
9  fight on my hands. Okay? Because --
10  Q.    This was in the December conversation?
11  A.    December. That's correct.
12  Q.    December 2003?
13  A.    Right.
14  Q.    Okay. Go ahead. Keep going.
15  A.    And this was disproportionately upsetting
16  because of the fact that, A, we had a contract dating
17  back to April of -- April 15, 2003 in regards clients,
18  and that the only way that clients when they are in
19  process doing a transaction can be terminated is by
20  mutual writing, which was very clear. Here they were
21  making a statement that they were terminating the
22  relationships with both of them to 30,000, and I have
23  to at the same time if you go back to that contract
24  say, fine, I agree, this was acceptable to me. And it

24 (Pages 252 to 255)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                C.A. # 06-99 SLR                    October 11, 2006

Page 256

1    was not acceptable to me. And I knew, you know, from
2    seeing this, that I was going to have a bigger fight
3    on my hands.
4    Q.    Let me just clarify so there is no
5    confusion, because you spoke about several different
6    things.
7        Let's separate out the Sentry Select and
8    let's separate out the Premier. With regard to
9    Premier, is it your testimony this was the first time
10   that you had been told by anybody at FIDAC that there
11   would be nothing paid to you with respect to Premier?
12   A.    Absolutely.
13   Q.    Okay. Now, you referred with respect to
14   Sentry Select to an earlier conversation with
15   Mr. Farrell in which he told you he was paying $30,000
16   only on Sentry Select. Remember that?
17   A.    Yes.
18   Q.    Okay. Was that conversation the one you are
19   talking about in December 2003 that was about the time
20   the check was sent?
21   A.    Yes.
22   Q.    And in that conversation he told you that
23   all you were going to get on Sentry Select deals was
24   going to be the $30,000?

Page 257

1    A.    That's correct.
2    Q.    Okay. So you knew that as of the time of
3    this conversation the only further compensation --
4    withdrawn.
5        So it was your understanding after the
6    December conversation with Mr. Farrell about Sentry
7    Select being limited to 30,000 in fees to Underhill
8    that you could only look to Premier for further fees
9    to Underhill; is that right?
10   A.    No.
11   Q.    So you thought that -- well, what did you
12   think then?
13   A.    I thought that under my contract, going back
14   to April 15, 2000, the paragraph says that
15   anytime -- when an account is still in business --
16   okay? -- that I am entitled to receive compensation
17   with that account as long as -- it doesn't say it
18   exactly that way -- as long as that account remains an
19   account of FIDAC. And the only way that that can be
20   terminated or agreement can be terminated is mutually
21   in writing by both of us. This was the contract that
22   Mike Farrell prepared himself that I signed.
23   Q.    So when you had the conversation with
24   Mr. Farrell, he said, "I am only giving you $30,000

Page 258

1    with respect to the Sentry Select matters," in your
2    mind you thought that was inconsistent with what you
3    believed to be his contract obligation?
4    A.    I believed if -- I believed at that time
5    that there was no point getting into a pissing
6    contest, pardon my French, with him, you know, at that
7    time, because if there was a continuation of business
8    there, under the contract for April 15, 2000, that
9    there had to be a mutual consideration for terminating
10   a contract or our contract. Both of us had to sign in
11   order to terminate a relationship.
12   Q.    I understand that is your legal position.
13   A.    Okay?
14   Q.    Okay. Did you consider whether or not it
15   was fair to cash the check when you disagreed with
16   Mr. Farrell's statement that this is it; it is a
17   one-time payment for Sentry? Didn't you think that it
18   would have been fairer to call him up and say, "Look,
19   I am not going to cash the check because I disagree.
20   You are giving me this because it is a one-time
21   payment, but I don't regard it as a one-time payment."
22   Did you ever think about doing that?
23   A.    Yes, I thought about it.
24   Q.    And you didn't do it. You decided not to?

Page 259

1    You did think about it?
2    A.    I thought about it.
3    Q.    And you decided not to do it?
4    A.    No. I decided not to do it because I knew
5    at that point in time that there was some continued
6    hostility as to how we both looked at both FIDAC,
7    which he was trying to resolve now with this one-time
8    payment, and GenCorp, which was something that was a
9    happening in process. Okay? And he was embittered by
10   both because of the expenses that he had gone through
11   and all this other stuff, and this was his way of
12   washing his hands of it.
13       MR. BELL: Excuse me. I don't want to
14   interfere, but I think you misspoke a minute ago and
15   you said "FIDAC" when you meant "Sentry."
16       THE WITNESS: Excuse me?
17       MR. NOVACK: We will read back the
18   answer, please.
19       THE WITNESS: Okay.
20       MR. NOVACK: Thank you, Tom. If he
21   did say that. Thank you anyway for trying to help
22   out.
23       (The court reporter read back as
24   follows:

25 (Pages 256 to 259)

Underhill Investment Corporation and Peskoff            v.            Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2            C.A. # 06-99 SLR            October 11, 2006

Page 260

1            "Answer: No. I decided not to do it
2    because I knew at that point in time that there was
3    some continued hostility as to how we both looked at
4    both FIDAC, which he was trying to resolve now with
5    this one-time payment, and GenCorp" --)
6            THE WITNESS: That's correct.
7            MR. NOVACK: Can we by consent change
8    the word to GenCorp?
9            THE WITNESS: No; it is Sentry.
10            MR. BELL: Sentry is, I think, what he
11    meant to say.
12            THE WITNESS: Sentry. Right.
13            MR. NOVACK: Oh. Will you read back
14    the answer?
15            I will tell you what. Do you want to
16    physically change it? But I think we should just keep
17    it that way and then we will let him answer it again,
18    because I have a follow-up question, and I think it is
19    going to be confusing if we change it now. Off the
20    record.
21            (Recess taken.)
22    BY MR. NOVACK:
23    Q.        Mr. Peskoff, when we were off the record, we
24    had a discussion about a lack of clarity in some of

Page 261

1    the testimony. You earlier gave an answer where you
2    used the word "FIDAC" where you meant to use the words
3    "Sentry Select." I had previously suggested on the
4    record that we might physically change what had been
5    transcribed by the reporter, but in recognition of the
6    fact that the videotape is also present, all counsel
7    agreed it would be simpler and clearer if you would
8    simply explain that in your prior answer you meant to
9    refer to Sentry Select and kind of reorient us what
10    you were answering before, and we will proceed that
11    way.
12            Could you please go back to the answer you
13    gave when you explained what you thought after the
14    conversation with Mr. Farrell and tell us now on the
15    record? And we have had this transcript segment read
16    back when we were off the record to Mr. Peskoff to
17    help him refresh his recollection as to what he
18    testified.
19            I am not asking you to give me any different
20    testimony. I just want you to substitute the right
21    name.
22    A.        The right name is Sentry instead of FIDAC,
23    and the prior information is -- as testified is
24    correct.

Page 262

1    Q.        Okay. Now, after you received Peskoff
2    Exhibit 16, which told you for the first time, you
3    say, that there will be no more money paid with
4    respect to not only Sentry Select but also Premier,
5    did you write back to Mr. Kazel or Mr. Farrell and say
6    you disagree with their position?
7    A.        No.
8    Q.        Did you call them up, either one of them,
9    and say, "I disagree with this letter"?
10    A.        I don't think so. I don't think I did.
11    Q.        Insofar as they were aware, you accepted
12    that their statement was the view that both parties
13    now had?
14    A.        I am not certain of that.
15    Q.        Before Mr. Ruben wrote his September 2005
16    letter, did you at any time send any letter or any
17    writing to anyone at FIDAC telling him you disagreed
18    with what was said in the April 20, 2004 letter sent
19    to you by Mr. Kazel, which is Peskoff Exhibit 16?
20    A.        No, I did not.
21    Q.        Did you consider consulting counsel, legal
22    counsel, when you received this letter in April 2004,
23    which is Peskoff Exhibit 16?
24    A.        Yes.

Page 263

1    Q.        Did you consult counsel then?
2    A.        No.
3    Q.        Did you have counsel that you had dealt with
4    in the past that you could have called up easily if
5    you chose to do so? You didn't have to find a lawyer?
6    You knew lawyers?
7    A.        Certainly.
8    Q.        Okay. When is the first time you considered
9    consulting with counsel about the decision taken by
10    FIDAC that they would not pay anything more on Sentry
11    Select or Premier?
12    A.        In December of 2003.
13    Q.        December 2003?
14    A.        Correct.
15    Q.        Okay. So at about the time you had the
16    conversation with Mr. Farrell, when he told you that
17    it was a one-time finder's fee in December 2003, you
18    considered consulting with counsel?
19    A.        Yes.
20    Q.        Did you talk to anyone about consulting with
21    counsel?
22    A.        I might have.
23    Q.        "Might have" meaning that --
24    A.        It would have been some in-house or some

26 (Pages 260 to 263)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2     C.A. # 06-99 SLR     October 11, 2006

Page 264

1  friend of --
2  Q.     Well, who -- I am sorry. I didn't mean to
3  cut you off. It might have been in house or what?
4  A.     It might have been Josie or somebody like
5  that or my wife.
6  Q.     Did you consider it briefly or for some
7  period of time?
8  A.     I considered it for a very long period of
9  time.
10  Q.     Well, when did you start considering it;
11  before you cashed the check or after you cashed the
12  check?
13  A.     Before and after I cashed the check.
14  Q.     Did you consult with counsel at any time in
15  2003 with respect to FIDAC matters?
16  A.     No.
17  Q.     Did you consult with counsel at any time in
18  2004 with respect to FIDAC matters?
19  A.     I don't think I did, no.
20  Q.     Prior to June 2005 did you consult with
21  counsel with respect to any FIDAC matters?
22  A.     I may have talked to -- yes, I talked to
23  somebody at Hogan & Hartson who was a friend of mine.
24  Q.     I think that was in June of 2005. I was --

Page 265

1  A.     Okay. That's -- okay.
2  Q.     You say you considered it long?
3  A.     Right.
4  Q.     And hard?
5  A.     Right.
6  Q.     Well, for how long did you consider the
7  issue long and hard? Would you say about a week or
8  two, a month, two months, three months?
9  A.     Obviously, you can see the duration of the
10  period. From December '03 up until the time I finally
11  made the decision that, you know, that somehow
12  whatever Mike's and FIDAC's view were, that there was
13  no way of coming together amicably. You know, even
14  the transactions with all his hostility and the fact
15  that now GenCorp became I won't say a home run but a
16  very substantial success, and the MBS Trust
17  transaction, the introduction became more than one
18  transaction. It became multiple transactions. All
19  right? You know, that I thought that would have,
20  you know, some significance, you know, on our
21  relationship. In other words, the point being that I
22  thought history of a very close relationship and the
23  fact that these two ugly ducklings turned into a very
24  substantial part of FIDAC's income would make a

Page 266

1  change, you know, down the line in his attitude and my
2  attitude, you know, towards him, period.
3  Q.     Starting in December 2003 did your view
4  change as to whether or not you felt Mike was a good
5  and generous friend? Well, put it another way. You
6  still regarded him as good and generous in April of
7  2005; correct?
8  A.     History up until that point, there is no
9  question about it. He always treated me fairly and
10  more than reasonably. We had a disagreeing viewpoint
11  on two transactions, especially as to time, because
12  when they were considered ugly duckling deals and then
13  a year later they became something of successes, you
14  know, all the harsh words and the conversations and
15  the attitude build-up and everything else, you know,
16  it was almost as if I had no part in it.
17       You know, you mentioned Sentry as an
18  example. FIDAC still wouldn't be in Canada,
19  forgetting about a transaction for $30,000, if it
20  wasn't my idea to open up the country to FIDAC. Okay?
21  Q.     Well, you are not passport control here.
22  Let's not -- I mean, I don't want to be unfair to you,
23  but if you keep saying, "I opened up Canada to FIDAC,"
24  I am going to eventually start asking you questions

Page 267

1  about that. I am trying to get out of here within a
2  reasonable period of time. I am not going to cut you
3  off --
4  A.     Okay.
5  Q.     -- but it is only fair if you start talking
6  about something, you should expect that I may start
7  following up.
8  A.     That's fine.
9  Q.     I let that go seven or eight times already
10  in this deposition, that you opened up Canada like it
11  was the wilderness. You are the Lewis and Clark for
12  FIDAC. Come on. Let's -- please.
13  A.     Okay.
14  Q.     I am trying to get you out of here, really.
15  A.     Okay.
16  Q.     See, you even got to me. You got to me
17  successfully.
18  A.     Good.
19  Q.     But I am back now, so don't worry.
20       So do you think he was treating you
21  generously and fairly during 2004, "he" meaning
22  Mr. Farrell?
23  A.     No.
24  Q.     You didn't?

27 (Pages 264 to 267)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 268

1   **A.**   No.

2   **Q.**   So when you wrote the note in April 2005

3   that he was a good and generous friend, you didn't

4   mean it, because he had not been good and generous to

5   you in 2004. Is that what you are telling us?

6   **A.**   On a historical basis, historical basis, up

7   until the time that we had the problems with Sentry

8   and GenCorp, our relationship was fabulous. He had

9   his perspective; I had mine, period.

10   **Q.**   And in 2004 you told me he was no longer

11   being good and generous to you; right?

12   **A.**   There is a difference between business

13   perspective and personal perspective. When I wrote

14   him a letter, I wrote him a letter he was very kind to

15   my mother. They made a sizable contribution. You

16   know, we had a representative from Annaly at the

17   funeral. That's being kind and generous. Okay?

18   That's personal. Okay? This was business. Okay?

19   So, you know, the attitude that changed was a business

20   attitude.

21   **Q.**   Why did you decide not to go to a lawyer

22   when you were told in the end of 2003 by Mr. Farrell

23   that there is going to be a one-time finder's fee?

24   **A.**   Because optimistically, and based upon our

Page 269

1   past history, I had hoped things could work out where

2   we would eventually be able to sit down and talk and

3   that all the transactions that he had knocked as being

4   unsuccessful could turn around and that would make a

5   difference.

6   **Q.**   If you hoped that things could work out, why

7   didn't you call him up and say, "Look, I don't want to

8   take the $30,000 under false pretenses, I don't

9   accept what you have said, it is a one-time finder's

10   fee"? Why didn't you do that instead of cashing the

11   check?

12   **A.**   Because I felt that I had been covered under

13   my contract as well.

14   **Q.**   But you didn't check with any lawyer to see

15   if you were?

16   **A.**   I didn't need to check with any lawyers.

17   **Q.**   You checked the contract first to see what

18   your rights were?

19   **A.**   I looked at the contract and -- yes, I

20   looked at the contract to see what, when I brought in

21   a client or what was new -- or what was termination,

22   what had to be under the termination clause between a

23   client or between Farrell and myself.

24   **Q.**   So you knew you had a legal dispute with

Page 270

1   FIDAC, and you said, "Look, I can advise myself. I

2   don't need an outside lawyer"?

3   **A.**   No, I didn't say that. I was hoping to

4   avoid a legal dispute, knowing that I had some legal

5   substance -- okay? -- going forward and that he and I

6   could resolve it somehow, that, you know, he would

7   pick up the phone or say something, you know, that

8   these transactions turned out better than -- let's sit

9   down and talk. Wonderful.

10   MR. NOVACK:   When the witness said

11   "wonderful," he was just referring to the fact that I

12   had shown him a note that says there was very little

13   tape time remaining. He wasn't commenting on his

14   answer.

15   THE WITNESS:   Okay.

16   MR. NOVACK:   It wasn't a

17   self-critique.

18   THE WITNESS:   No. Okay.

19   MR. NOVACK:   We will change the tape.

20   (Recess taken.)

21   BY MR. NOVACK:

22   **Q.**   All right. Going back on the record, I

23   would like you to look at Peskoff Exhibit 17, please.

24   That's the December 22, 2004 memo from your files. Is

Page 271

1   the handwritten material on it your handwriting?

2   **A.**   Yes.

3   **Q.**   At the top it says, "Ernie Baptista update."

4   Did you dictate this memo to Josie after you had a

5   conversation of some sort with Ernie Baptista?

6   **A.**   Yes.

7

8   **REDACTED**

9

10

11   **REDACTED**

18   **Q.**   Okay.

19   **A.**   That's -- yes.

20   **Q.**   Okay. Now, you understood that the hundred

21   thousand was the monthly fee to FIDAC in connection

22   with Premier?

23   **A.**   That is what he said.

24   **Q.**   Based on what Mr. Baptista is telling you?

28 (Pages 268 to 271)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                C.A. # 06-99 SLR                                October 11, 2006

Page 272

1  A.      That's correct.
2  Q.      You see there is a line drawn above the word
3  "for" and which says, "Pay SDP 10,000 a month." Do
4  you see that?
5  A.      Mm-hmm.
6  Q.      Did you write that?
7  A.      Yes.
8  Q.      Did you write that when you reviewed the
9  memo at about the time you reviewed the memo, which I
10 presume you reviewed? This is your handwriting, isn't
11 it?
12 A.      Yes.
13 Q.      Okay. So you wrote that at the time. Was
14 that a note to yourself?
15 A.      Yes.
16 Q.      Was it a note to remind you to ask or to
17 consider whether or not you should get 10,000 a month?
18 A.      It was a thought.
19 Q.      And what was that 10,000 a month supposed to
20 be? The amount that Underhill would receive for its
21 fee from FIDAC for the introduction of GenCorp?
22 A.      Probably.
23 Q.      Well, you don't know what it was for?
24 A.      Yes. I mean, based on that conversation,

Page 273

1  yes.
2  Q.      It only could be that; right?
3  A.      Yes. That's what we talked about.
4  Q.      We know without the calculator that is
5  10 percent; correct?
6  A.      Yes.
7  Q.      So there you were thinking that you should
8  perhaps ask for 10 percent of the Premier fees that
9  FIDAC was earning?
10 A.      Correct.
11 Q.      Okay. Go down halfway on the memo under
12 "Problems." "Ernie is dealing with Kazel and Diamond
13 who are inflexible." Who is Diamond?
14 A.      He is one of the -- he is, I guess, an
15 executive vice president of FIDAC/Annaly.
16 Q.      Okay. To the right someone has written
17 in -- and I presume it is you -- "20 percent of F."
18 Is that what it says?
19 A.      20 percent of -- I don't remember what that
20 is. If --
21 Q.      Is that your handwriting?
22         MR. BELL: The question is just is
23 that what it says, first of all, Steve.
24         THE WITNESS: It is 4-1/2 million, not

Page 274

1  F. 4-1/2 million.
2  BY MR. NOVACK:
3  Q.      I am going to point here. Does that say 20
4  percent?
5  A.      Yes.
6  Q.      Does that say "of"?
7  A.      Yes.
8  Q.      And what is the character immediately to the
9  right of the word "of"?
10 A.      That looks like an F.
11 Q.      That is an F?
12 A.      Mm-hmm.
13 Q.      Okay. And so it is 20 percent of F is what
14 you have written down?
15 A.      Yes.
16 Q.      And I am asking you what that is a reference
17 to.
18 A.      I have no idea.
19 Q.      You wrote it, but you don't know what you
20 were --
21 A.      I wrote it. That's absolutely correct.
22 Q.      Could it be a reference to 20 percent of
23 FIDAC's fees?
24 A.      It could be.

Page 275

1  Q.      Do you see to the left it says, "Kazel and
2  Diamond are inflexible"?
3  A.      Yes.
4  Q.      What was that a reference to what they were
5  being inflexible about?
6  A.      The relationship with Ernie Baptista.
7  Q.      I see.
8  A.      You see his comments. These are all his
9  comments. These are all his numbers, and Josie took
10 some of it down --
11 Q.      Well, slow down, slow down. Don't
12 overstate. In fairness to you, you wrote down, "Pay
13 SDP 10,000 a month." That was your numbers, not Ernie
14 Baptista's numbers.
15 A.      That's correct.
16 Q.      You said this was all his comments. Okay.
17 So you wrote down maybe consider pay 10,000 a month to
18 you. And then we see 20 percent of F. Can you think
19 of anything else you are referring to other than
20 perhaps Underhill getting 20 percent of FIDAC's fees?
21 A.      I don't -- I don't know what it refers to.
22 Q.      Okay?
23 Q.      Can you think of anything else that it might
24 refer to?

29 (Pages 272 to 275)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                     C.A. # 06-99 SLR                October 11, 2006

Page 276

1  A.    Off the hand, no.
2  Q.    No.
3  A.    This was several years ago.
4  Q.    So in the same -- well, this is December
5  2004.
6  A.    Right.
7  Q.    Okay. So in the same document you are
8  considering perhaps 20 percent of FIDAC's fees,
9  perhaps, and you are considering perhaps 10 percent of
10  FIDAC's fees; correct?
11         MR. BELL: Objection.
12  BY MR. NOVACK:
13  Q.    Is that right? You can answer.
14         MR. BELL: You can answer it.
15         THE WITNESS: The 10,000 I wrote that
16  as scribbling as a thought because that would be
17  roughly 10 percent of the -- correct. 10 percent of
18  one. But I don't recall what the 20 percent would
19  have been.
20  BY MR. NOVACK:
21  Q.    The 10 percent that you were considering,
22  that's a number that is the result of your subjective
23  consideration of what you think would be fair;
24  correct?

Page 277

1  A.    No. It was a direct result of what Baptista
2  told me FIDAC was making at that point, which he
3  said would have been a hundred thousand a month,
4  because I didn't have access to the numbers, so that I
5  just scribbled, you know, at 10 percent my end would
6  be $10,000, a thought.
7  Q.    You were considering asking for 10 percent?
8  A.    This was a thought on a memo. This wasn't
9  considering -- I wasn't in a negotiation mode yet.
10  Q.    I understand that. I understand that. But
11  you were considering, you were thinking about whether
12  you would ask for 10 percent, whether it would be
13  reasonable to you?
14  A.    I thought what I would be entitled to --
15  okay? -- under that basis.
16  Q.    If it were 10 percent, you would get 10,000
17  a month?
18  A.    And the numbers -- and if it were a hundred
19  thousand dollars.
20  Q.    I understand that.
21  A.    Okay.
22  Q.    I understand that.
23  A.    Okay.
24  Q.    And you have no idea what the 20 percent

Page 278

1  is --
2  A.    No.
3  Q.    -- that is referred to?
4  A.    No.
5  Q.    No. Now, throughout 2004 did you have any
6  view whether or not the contract that Underhill had
7  was still in effect? I think you told us you thought
8  it did because it couldn't be terminated; right?
9  A.    Correct.
10  Q.    Did you believe that you had, "you" meaning
11  Underhill had any obligations under that contract?
12  A.    Obligations in terms of what?
13  Q.    To be entitled to be paid --
14  A.    Compensation?
15  Q.    -- for the -- yes.
16  A.    Yes.
17  Q.    What was your understanding in 2004 as to
18  what obligations Underhill had that it had to perform
19  in order to keep getting the compensation that you
20  thought it was entitled to?
21  A.    What I thought Underhill had to --
22  Q.    Yes. Did Underhill have to be prepared to
23  do anything or to do anything in 2004 if requested in
24  order to keep --

Page 279

1  A.    Underhill --
2  Q.    -- getting compensation?
3  A.    The answer is no.
4  Q.    So Underhill had no obligations under the
5  contract any further? Nothing more to do?
6  A.    Underhill offered to do certain things with
7  both companies, and they said they didn't need our
8  help.
9  Q.    And it is your view if Mr. Farrell were to
10  then say, "I would like some help" in 2004, Underhill
11  could say, "No, we don't have to do anything"?
12  A.    No. I would have been happy to do it.
13  Q.    No, no. Would Underhill be entitled to say,
14  under your view of its contract, "No, we don't have to
15  do anything"? If he asked for consulting services to
16  Underhill in 2004, could Underhill say, "We don't have
17  to provide any consulting services"?
18         MR. BELL: You are asking him for his
19  understanding, not his legal conclusion on this.
20         MR. NOVACK: I am not accusing him of
21  being a lawyer. That's right. I am only asking for
22  what you understood. And I will ask it again now.
23  BY MR. NOVACK:
24  Q.    In 2004, throughout 2004, was it your

30 (Pages 276 to 279)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 280

1 understanding that if Mike Farrell had asked Underhill
2 to provide some consulting services with respect to
3 either Sentry Select or Premier, that Underhill had no
4 obligation to provide those consulting services?
5 A.    The answer is no. I would have thought
6 Underhill would have some responsibility if he asked
7 to --
8 Q.    Under the terms of what you say is the
9 contract?
10 A.    Yes, if he asked.
11 Q.    Okay. Let me ask you, when did you first
12 meet Ernie Baptista? Just give me a year or a date.
13 A.    At the end of 2'01.
14 Q.    And how did it come about that you decided
15 to introduce Mr. Baptista to Mr. Farrell?
16 A.    It came about, you know, in a meeting. He
17 was --
18 Q.    Who meaning he, he --
19 A.    Mr. Baptista was in the insurance business.
20 Q.    Right.
21 A.    And he had some interesting, you know,
22 concepts that he was in the process of deploying in
23 his business. He had interesting relationships with
24 large institutions, banks, savings and loans which he

Page 281

1 utilized. And when we discussed in a broad
2 generalization, you know, clients that I represented
3 and so on and so forth, he thought that he could
4 create several products for a FIDAC/Annaly kind of
5 that would be unique in the industry.
6 Q.    Did he know Mr. Farrell?
7 A.    No, never met him.
8 Q.    Did you raise with Mr. Baptista the idea
9 that "Why don't I introduce you to Mr. Farrell"?
10 A.    Yes.
11 Q.    And how did you go about arranging -- well,
12 when was the first time you talked to Mr. Farrell
13 about Mr. Baptista, more or less?
14 A.    I think it was in January of '02.
15 Q.    And in that conversation you introduced to
16 Mr. Farrell the idea of meeting with Mr. Baptista --
17 A.    Yes.
18 Q.    -- and talking with him?
19 A.    And I may have sent him a package of what
20 Mr. Baptista did for a living, you know, the different
21 products that he created and worked on, and at the
22 same time he sent us an agenda for a meeting with
23 Mr. Farrell that he would like to have.
24 Q.    And insofar as you were aware, Mr. Farrell

Page 282

1 didn't know who Mr. Baptista was at all until you
2 introduced him?
3 A.    That's correct.
4 Q.    When you first introduced Mr. Baptista to
5 Mr. Farrell, there was some discussion about various
6 products and ideas that Mr. Baptista had?
7 A.    I am sure.
8 Q.    And isn't it correct that those initial
9 ideas didn't come to pass? They didn't work out, for
10 whatever reason, without attributing any fault, but
11 they just didn't work out?
12 A.    I think that's very possible. I know that
13 he talked to him about three or four different things,
14 and a couple didn't work out.
15 Q.    Okay. Now, with regard to Mr. Corsini,
16 Raniero -- R-A-N-I-E-R-O -- Corsini, he is the
17 individual from Sentry Select that you first spoke to
18 about possibly getting in touch with FIDAC and
19 Mr. Farrell; is that right?
20 A.    Correct.
21 Q.    How did you meet Mr. Corsini?
22 A.    I met him in Canada in his offices.
23 Q.    Did you ever meet him before that?
24 A.    No.

Page 283

1 Q.    Did you ever meet anybody from Sentry Select
2 while traveling on an airplane?
3 A.    No.
4 Q.    Did you ever tell anybody at FIDAC that you
5 had met someone on a plane flight from Sentry Select?
6 A.    No.
7 Q.    Okay. How did you meet Mr. Corsini?
8 A.    I met him in his office.
9 Q.    How? How? How did it come about, I mean?
10 A.    A friend of mine arranged a meeting with
11 them because they were specialized in monthly income
12 products for the Canadian market.
13 Q.    And who else was present when you met
14 Mr. Corsini?
15 A.    Well, I met with him directly.
16 Q.    All right.
17 A.    Then he brought in for a while Mr. Schwartz,
18 who was executive vice president of Sentry.
19 Q.    Was it your idea to put together Sentry and
20 FIDAC?
21 A.    Yes.
22 Q.    Did you form that idea before you went up to
23 see Sentry or was it as a result of the discussions
24 with Sentry?

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 284

1  **A.**    Both. Both. I thought there was a fit
2  there.
3  Q.    Did Mr. Farrell know of Mr. Corsini or
4  Sentry, as far as you were aware --
5  **A.**    No.
6  Q.    -- before you introduced Mr. Farrell?
7  **A.**    No.
8  Q.    Did you tell Mr. Farrell before you went up
9  to Sentry that you thought that Sentry was something
10 that he would be interested in or is that --
11 **A.**    No.
12 Q.    Okay. So basically, after you met with
13 Sentry, you took it upon yourself to take the
14 initiative to approach Mr. Farrell and say, "Look, I
15 want to introduce you to these people"?
16 **A.**    That's correct. He and Mr. Kazel.
17 Q.    So neither Mr. Kazel nor Mr. Farrell or
18 anybody at FIDAC had asked you to introduce them to
19 either Mr. Baptista --
20 **A.**    That's correct.
21 Q.    -- or Mr. Corsini or anyone at Sentry
22 Select; is that right?
23 **A.**    That's correct.
24 Q.    Okay.

Page 285

1       MR. RUBEN: Hold on for one second.
2  Let him finish the question before you give the
3  answer. It will just be --
4       MR. NOVACK: Yes, I will say it again,
5  because we interjected, and I think the reporter
6  probably got it all.
7       THE WITNESS: Okay.
8  BY MR. NOVACK:
9  Q.    Is it correct that no one at FIDAC had asked
10 to arrange any introductions for FIDAC with anyone
11 from GenCorp, including Mr. Baptista, or anyone from
12 Sentry Select, including Mr. Corsini or Mr. Schwartz?
13 Is that right?
14 **A.**    That's correct.
15 Q.    There was no prior discussion of that
16 subject with anyone at all at FIDAC? It was totally
17 on your initiative; correct?
18 **A.**    That's correct.
19 Q.    Let's go back to Peskoff Exhibit 18, which
20 is the March 7, '05 memo from your files. You can
21 take a moment to read it quickly.
22      MR. NOVACK: There are other originals
23 that seem to be missing, but let's not take time now.
24

Page 286

1  BY MR. NOVACK:
2  Q.    Do you have Peskoff Exhibit 18 in front of
3  you?
4  **A.**    Yes.
5  Q.    Okay. Oh, I am sorry. I will stick with
6  this; then I will come back. I just had a thought, a
7  random thought.
8       Is this memorandum from your files something
9  that you dictated to Josie, do you believe?
10 **A.**    Yes.

**REDACTED**

18 **A.**    That was meant to convey, yes.
19 Q.    Okay. Then there is a reference to possibly
20 increasing the size of the pot. It says in the last
21 lines, "After the Easter break, SDP will arrange to
22 meet with Mike Farrell to negotiate fee -- maybe 2
23 percent." Do you remember what you actually dictated?
24 I assume 2 percent is not correct.

Page 287

1  **A.**    I don't remember. What I do remember was
2  that --
3  Q.    Might that be two basis points?
4  **A.**    You know, the answer is yes, it would have
5  been two basis points.
6  Q.    So it was two basis points?
7  **A.**    It would have been, yes, it would have
8  been --
9  Q.    Okay.
10 **A.**    Yes, right.

**REDACTED**

16 **A.**    It was just a thought.
17 Q.    It was a thought. You were considering it?
18 **A.**    It was a thought.
19 Q.    Okay. So we now have 11.7 percent
20 possibility and a 13.3 percent possibility. Just a
21 thought. Okay.
22      MR. RUBEN: Was that a question?
23      MR. NOVACK: I am trying to think if
24 it was.

32 (Pages 284 to 287)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 288

1          MR. RUBEN: Or are you testifying?
2          MR. NOVACK: Testifying further, you
3    mean?
4          THE WITNESS: This is --
5          MR. NOVACK: That's yours.
6          THE WITNESS: That's mine.
7          MR. NOVACK: We can share here.
8          THE WITNESS: Okay.
9    BY MR. NOVACK:
10   Q.     Let's go to Peskoff Exhibit 19, please.
11   A.     19. 19. Okay.
12   Q.     You have 19 in front of you?
13   A.     Yes.
14   Q.     This appears to be a memo from your files
15   dated April 19, 2005. Are these notes which you
16   believe you dictated on or around April 19, 2005 to
17   Josie?
18   A.     Yes.
19   Q.     I presume that these notes reflect a
20   conversation you had with Ernie Baptista.
21   A.     Mm-hmm.
22   Q.     During the course of 2005 and 2 -- well,
23   withdrawn.
24          Prior to this conversation had Mr. Baptista

Page 290

1    recounting to Josie for the memo, did he make any
2    suggestions, Mr. Baptista, how to deal with
3    Mr. Farrell?
4    A.     Yes. I mean, his suggestion was, you know,
5    he can't understand why he, Mike, doesn't just sit
6    down with me, go through all this thing, look at what
7    is going on now.    REDACTED
8    REDACTED             All the complaining
9    that he did about he and Messner, look at it. Look at
10   the amount of money they are taking in on a monthly
11   basis. He said, "I am not sure that the board of
12   directors even knows, you know, that, you know, you
13   brought this transaction in and if it wasn't for you
14   bringing me in, and, you know, Mike also saying that
15   he would compensate you directly to me" -- you know,
16   he said, you know, try to sit down with him and see
17   if, you know, something can be worked out now.
18          This is the kind of thing that delayed, you
19   know, just -- well, this was good that it happened,
20   that the pot increased, because I hoped it would be
21   the catalyst of a Mike Farrell/Steve Peskoff sitdown
22   and --
23   Q.     Are you looking to counsel for some kind of
24   divine guidance?

Page 289

1    been counseling you on how you might approach Mike
2    Farrell about negotiating a fee for Underhill in
3    connection with Premier?
4    A.     Counseling me --
5    Q.     Giving you advice.
6    A.     -- on a fee?
7    Q.     The notes seem to indicate he has been
8    giving you --
9    A.     No, he wasn't counseling me.
10   Q.     Was he giving you any advice?
11   A.     He was sort of frustrated from my
12   perspective that we hadn't clarified my compensation.
13   Q.     I didn't ask if he was frustrated. I asked
14   you was he giving you any advice.
15   A.     No.
16   Q.     Okay. He didn't make any suggestions to you
17   how you should deal with Mr. Farrell?
18   A.     He may have.
19   Q.     Well, either -- you don't remember?
20   A.     He may have.
21   Q.     You don't remember?
22   A.     He had lots of suggestions regarding the
23   transaction and --
24   Q.     Well, in this conversation that you are

Page 291

1    A.     Yes, I am looking to --
2    Q.     I mean, what are you --
3    A.     He is giving you his right eye, which tells
4    me to go ahead, or the left -- no, not at all.
5          MR. BELL: Let the --
6          MR. NOVACK: The witness was joking.
7    I will stipulate --
8          MR. BELL: Okay. Thank you.
9          MR. NOVACK: I will stipulate that the
10   witness felt he was joking. I won't stipulate that it
11   was funny, but I will stipulate that he was joking.
12          THE WITNESS: Okay.
13   BY MR. NOVACK:
14   Q.     Okay. Let's go to the memo.
15   A.     Yes.
16   Q.     First point, bullet point, "Ernie Baptista
17   feels that Mike Farrell forgot that he had a contract
18   with SDP that has not yet been terminated." Did
19   Baptista tell you that that was his feeling, that Mike
20   Farrell had forgotten that he had a contract?
21   A.     That was his feeling.
22   Q.     Did he tell you the basis for concluding
23   that there was a contract, in fact? Did Mr. Baptista
24   say how he knew that you had a contract?

33 (Pages 288 to 291)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 292

1    A.    He knew that he had a contract --
2    Q.    No. How Mr. Baptista knew you had a
3    contract.
4    A.    Because I think I had told him that I had
5    one.
6    Q.    I see.
7    A.    And I may even have shown him that I had a
8    contract which was --
9    Q.    Well, did you or didn't you?
10    A.    I don't remember. Okay? Okay? But he knew
11    that there was a contract.
12    Q.    Mr. Baptista is not a lawyer, right?
13    A.    No, he is not a lawyer.
14    Q.    Okay. I want to make sure.
15        Did Mr. Baptista tell you that -- excuse me.
16    Did Mr. Baptista tell you that he believed that the
17    board of directors of Annaly was unaware of this
18    contract?
19    A.    Yes. That's why it is there.
20        MR. RUBEN: Excuse me. Annaly or
21    FIDAC?
22        MR. NOVACK: No. Annaly. At the
23    time --
24        THE WITNESS: No, no. This would have

Page 293

1    been the board of Annaly, because FIDAC would have
2    been merged into Annaly.
3        MR. NOVACK: Actually, FIDAC is a
4    subsidiary of Annaly, is it not?
5        Mr. SINGH: Yes, and --
6        MR. NOVACK: Okay.
7    BY MR. NOVACK:
8    Q.    So the board of directors referred to here
9    was the Annaly board of directors?
10    A.    Sure.
11    Q.    Do you believe, by the way, that Mike
12    Farrell thought he had to conceal from the people at
13    Annaly the existence of your February 2000 letter
14    agreement --
15    A.    No.
16    Q.    -- in order to have Annaly go forward with
17    the acquisition of FIDAC at the end of 2003?
18    A.    No.
19    Q.    That is a farfetched notion, isn't it?
20    A.    Of course.
21    Q.    Okay.
22    A.    Of course.
23    Q.    Now, next bullet point. You record that
24    Mr. Baptista suggested that you, Mr. Peskoff, "wait a

Page 294

1    few weeks and then sit down with him face to face
2    outside the office." And the word "outside" is
3    italicized to indicate emphasis.
4    A.    That was his suggestion.
5    Q.    Yes. Why outside the office? Why the
6    emphasis on outside the office?
7    A.    I have no idea.
8    Q.    No idea at all? Okay.
9    A.    No idea.
10    Q.    Then Mr. Baptista suggests, according to the
11    memo, that you inform Mr. Farrell of your prior offer
12    to pay 600,000 in expenses. Now, was that actually
13    600 or was it 500?
14    A.    No. It had gone up, obviously, from that,
15    in this period.
16    Q.    And it was the full 600,000 you would pay?
17    That was the offer he was referring to?
18    A.    That was his suggestion.
19    Q.    Right.
20    A.    Yes.
21    Q.    Not to split it but rather you offer to pay
22    it.
23    A.    His suggestion, going back to a prior memo,
24    was --

Page 295

1    Q.    Right.
2    A.    -- me to pay it and have it come out of my
3    fees.
4    Q.    But not to pay half but rather to pay the
5    whole thing?
6    A.    That was his suggestion then.
7    Q.    Right. And it says here in the memo, "Have
8    Farrell take that off the top (of whatever is owed to
9    SDP) and then SDP to get paid after that." Is that a
10    suggestion that you seriously considered?
11    A.    No.
12    Q.    Why did you dictate it, then, into a memo?
13    A.    Why? Because I normally -- most things when
14    I have a conversation, as you see -- you have been
15    privy to all these many conversations -- that I put it
16    into a memo form, especially given the fact that the
17    GenCorp thing was an ongoing situation, that things
18    were changing weekly. Moneys were coming in.
19    Business was changing, et cetera.
20    Q.    So you were not considering it at all what
21    he was proposing with regard to paying the 600,000?
22    A.    At this point, no.
23    Q.    No. Okay. Go to Peskoff Exhibit 20,
24    please. That is a June 1, 2005 memo from your files.

34 (Pages 292 to 295)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                    C.A. # 06-99 SLR                    October 11, 2006

Page 296

1  A.    Okay. Okay.
2  Q.    Is this a memo that you dictated on or
3  around June 1, 2005?
4  A.    Yes.
5  Q.    Now, the information in here you have about
6  how much FIDAC was making and how much was in the pot,
7  did that come from Mr. Baptista?
8  A.    Yes.
9  Q.    Do you know whether or not Mr. Baptista was
10  authorized to disclose this information to you about
11  Premier?
12  A.    I don't know whether he was authorized or
13  not. I mean --
14  Q.    Did you have any understanding whether the
15  Premier deals were private deals versus public?
16  A.    Mr. Baptista considered me an insider.
17  Q.    I didn't ask that question, I don't believe.
18  But we can get into that in a minute if you want. But
19  I think if you would just please answer my question.
20        Did you have any understanding, based on
21  your years of experience dealing with confidential
22  information in investment banking, as to whether or
23  not the Premier transaction details and the amounts
24  that were being managed were confidential information?

Page 298

1  be disclosed by Mr. Baptista to a member of the
2  public, you were entitled to know it because you
3  wanted to get a fee?
4        MR. BELL: Objection.
5        MR. NOVACK: Because you brought --
6  you say you brought it in. Never mind. I will strike
7  that. Never mind.
8        THE WITNESS: Yes.
9  BY MR. NOVACK:
10  Q.    Let's go down further into the memo. Do you
11  know if you reviewed this memo before it was
12  finalized?
13  A.    I don't -- probably didn't review it because
14  it was a simple phone conversation. There is
15  obviously, once again --
16  Q.    Well, we see here that Mr. Baptista is
17  telling you how much is being earned by FIDAC in terms
18  of basis points and how much he is; right?
19  A.    Yes.

REDACTED

24  Q.    Okay. That was SDP should receive 10

Page 297

1  A.    They were private information, yes.
2  Q.    And if you were not an insider, as you put
3  it, you would understand that he should not be
4  disclosing that to you; is that correct?
5  A.    That's correct. Right.
6  Q.    So -- and what do you base your statement on
7  that you were, quote, an insider and entitled to know
8  this information?
9  A.    I didn't say that. I said he thought that I
10  was an insider.
11  Q.    Did you think you were?
12  A.    Did I think? I thought that since I brought
13  the transaction in the door, that I was entitled to
14  compensation and should be part of the team, yes.
15  Q.    Do you feel that gave you the right to get
16  confidential information?
17  A.    Yes. I mean, this is a client that I
18  brought in the door.
19  Q.    I didn't ask for the reason.
20  A.    Yes.
21  Q.    I just --
22  A.    Yes, the answer is yes.
23  Q.    So you accept that if this were confidential
24  information and was not something that could properly

Page 299

1  percent?
2  A.    It should. It was a thought.
3  Q.    So this was just a thought you were toying
4  with --
5  A.    Right.
6  Q.    -- or this is your view of --
7  A.    It is my view of the deal at that point in
8  time.
9  Q.    Am I correct that you did not believe you
10  were entitled specifically to 10 percent?
11  A.    That's correct.
12  Q.    Okay. What did you base the thought of 10
13  percent? And if it is based on the same factors you
14  previously testified to, you can say that. But here
15  you are choosing 10 percent.
16  A.    Based upon the same factors that I thought
17  historically.
18  Q.    Which had led you to conclude that you might
19  want to have 11-something percent, 13 percent, perhaps
20  20 percent. All those different factors came out to
21  different percents at different times in your mind; is
22  that right? Yes or no. Is that right?
23  A.    No, it is not right.
24  Q.    Okay.

35 (Pages 296 to 299)