

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT
CORPORATION, *by and through*
*Stephen D. Peskoff as successor in*
*interest*, and STEPHEN D. PESKOFF,
*individually*,

            Plaintiffs

    v.

FIXED INCOME DISCOUNT
ADVISORY COMPANY,

            Defendant.

Civil Action No. 06-0099-SLR

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

**This document is not to be opened or its**
**contents displayed, copied, or revealed except**
**by Court Order or by agreement of the parties**
**to this action.**

## CERTIFICATE OF COUNSEL REGARDING EXHIBITS TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Todd J. Cook hereby certify as follows:

1.    I am an associate with the law firm Stevens & Lee, P.C., counsel for the Plaintiffs in this action. I have been admitted to practice in the United States District Court for the District of Delaware *pro hac vice* in this action. I offer this Certificate in support of the Plaintiffs' Motion for Partial Summary Judgment, which is being filed contemporaneously herewith.

2.    Attached to this Certificate are true and correct copies of the following documents:

*[Table begins on following page.]*

SL1 726181v1/100409.00001

| Item | Exhibit |
|------|---------|
| Excerpts of Deposition of Michael A.J. Farrell, December 15, 2006 | 1 |
| Excerpts of Depositions of Stephen D. Peskoff, October 10, 2006, and December 12, 2006 | 2 |
| Letter between Michael A.J. Farrell to Stephen D. Peskoff dated February 15, 2000 (the "Consulting Agreement") | 3 |
| FIDAC payment statements and checks to Peskoff for FBR transaction | 4 |
| Letter from Ronald D. Kazel to Stephen D. Peskoff dated April 20, 2004 | 5 |
| Excerpts of Deposition of Ernest P. Baptista, December 12, 2006 | 6 |
| Excerpts of Deposition of Ronal D. Kazel, December 14, 2006 | 7 |
| Agreement between Gen Advisors and FIDAC dated October 10, 2002 | 8 |
| FIDAC Tables showing fees from Premier fund and MBS Trusts | 9 |
| Agreement between Sentry Select and FIDAC dated September 13, 2002 | 10 |
| **REDACTED** | 11 |

Todd J. Cook

SL1 726181v1/100409.00001

STEVENS & LEE, P.C.

By: _____
Joseph Grey (DE Bar No. 2358)
G. Thompson Bell, III, *pro hac vice*
Pa. Attorney I.D. No. 32649
Todd J. Cook, *pro hac vice*
Pa. Attorney I.D. No. 89041
1105 North Market Street
Seventh Floor
Wilmington, DE 19801
TEL: (302) 654-5180
FAX: (302) 654-5181
EMAIL: jg@stevenslee.com
          gtb@stevenslee.com
          tjc@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP

Robert L. Ruben, *pro hac vice*
D.C. Attorney I.D. No. 414580
Marshall F. Berman, *pro hac vice*
D.C. Attorney I.D. No. 020743
4800 Montgomery Lane, Suite 150
Bethesda, MD 20814
TEL: (301) 951-9696
FAX: (301) 951-9636
EMAIL: rruben@randalaw.com
          mberman@randalaw.com

*Attorneys for Plaintiffs Underhill Investment Corp.
and Stephen D. Peskoff*

3

## CERTIFICATE OF SERVICE

I, Joseph Grey, hereby certify that on this 29th day of May, 2007, I caused true and

correct copies of the foregoing Certificate of Counsel to be served by the means indicated below

addressed to Defendant's counsel as follows:

John L. Reed, Esquire
Denise Seastone Kraft, Esquire
EDWARD'S ANGELL PALMER & DODGE LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
BY HAND DELIVERY

Gerald A. Novack, Esquire
KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
BY FEDERAL EXPRESS

Joseph Grey

SLI 726181v1/100409.00001

COPY

# EXHIBIT
# 1

09:32a

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT            :   Civil Action
CORPORATION, by and through     :   NO. 06-0099-SLR
Stephen D. Peskoff as           :
successor in interest, and      :
STEPHEN D. PESKOFF,             :
individually,                   :
                    Plaintiffs  :
                                :
            vs.                 :
                                :
FIXED INCOME DISCOUNT           :
ADVISORY COMPANY,               :
                    Defendant   :

                    ——————————

                Oral Deposition of
                MICHAEL A.J. FARRELL

                    ——————————

        Date:    Friday, December 15, 2006

        Time:    9:33 a.m.

        Place:   Stevens & Lee, P.C.
                 1818 Market Street
                 29th Floor
                 Philadelphia, PA  19103

                    ——————————

        COMPUTERIZED REPORTING SERVICES, INC.
          By:  Roxanne Weaver, RPR, CRR
                3449 Penn Avenue
            Sinking Spring, PA  19608

            Phone:  (610) 678-6652   ORIGINAL

09:33a

# REDACTED

Q     Well, as you may remember then, essentially what this is is a question-and-answer session.  And my job is to ask questions, hopefully fairly clearly.  But if I don't make any of my questions clear, please let me know, and we'll do our best to clarify them.

Your job is to answer the questions to the best of your ability and recollection.  Please try to answer the questions verbally as opposed to nodding your head or shrugging your shoulder, because the court reporter has to take down your answer.

Please try to wait until I finish my question before giving your answer, and I'll try to do the same with respect to your answers, so we're not both talking at the same time; okay?

A     Okay.  Thank you.

Q     What is your current position with FIDAC?

A     I'm the chairman, CEO, and president.

Q     How long have you held those three titles?

A     I'm the founder of the company, and I would guess that that goes back to the beginning, 1994.

09:38a

1    employee of FBR.  His offices were located in FBR.  The

2    staff that worked with him, mostly junior staff, I think,

3    had FBR business cards actually who were assigned to work

4    with him, and we just assumed that he was part of FBR.

5         Q    My question really was more toward the

6    relationship.

7         A    Sorry.

8         Q    Although I understand you may have had a

9    relationship with FBR, you also developed -- you

10   personally developed a relationship with Mr. Peskoff,

11   didn't you?

12        A    Yes, I did.

13        Q    And the relationship was, as I understand it,

14   really both a business and a personal relationship over

15   the next few years.

16

17                        **REDACTED**

18

19

20

21                        **REDACTED**

22

23        Q    What were your dealings with Mr. Peskoff in

24   connection with those transactions with FBR?

25        A    Essentially, the first meeting was --

8

09:42a

1    number of the FBR principals that led to that.

2              So I would say for '97, '98, there was really

3    very little talking to Steve outside of family, how are

4    you, what's going on, those kinds of things.  And, you

5    know, at the offshoot, at first I was upset because I

6    felt like he did not -- was not clear about who he

7    represented.  And then eventually I just figured that he

8    was just kind of a quirky character, and I let it go.

9    And he was -- he's a genuinely nice guy, so, you know,

10   not badly intentioned at the time, I didn't feel.  So

11   from my perspective, I just continued to have some sort

12   of personal relationship with him.

13        Q     What was the nature of your personal

14   relationship?

15        A     More by phone, an occasional visit down to

16   the FBR offices where he was still located, you know.

17   But that would be in the context of general business

18   activity about our capital-raising efforts or our

19   business activities.  Occasionally he would try to come

20   to me with deals along the way that just did not fit our

21   structure, and I would politely accept meetings, but

22   generally, those meetings would not lead anywhere.

23        Q     Did you see him socially during that

24   '96-to-'99 period?

25        A     Socially to include a dinner or a lunch, you

11

09:44a

1  know, one on one, maybe, mostly in New York.  He was

2  invited to my 50th birthday party by people who organized

3  the party.  I didn't invite him.  But, I mean, that's

4  kind of how it was limited to.

5        Q     Now, Mr. Peskoff was instrumental in having

6  FIDAC hired as manager of the FBR REIT; is that right?

7        A     That's what I believed at the time, although

8  I've learned differently since then.

9        Q     What did you believe at the time?  Or let me

10 rephrase that question.  What did you believe at the time

11 Mr. Peskoff had done to promote FIDAC and assist in

12 having FIDAC hired as the manager of the FBR REIT?

13

14                    **REDACTED**

15

16

17                    **REDACTED**

18

19

20

21

22

23                    **REDACTED**

24

25

12

09:51a

1    The check writers --  They're on a monthly basis.

2    Probably wasn't a very big number of bills going out, so

3    it was just easier to hand-write them.

4         Q    So the practice was to hand-write checks in

5    May of 2000?

6         A    I would guess, yeah.

7         Q    Do you know?  Your lawyer is going to tell

8    you not to guess.  He probably already did.

9         A    I don't know.

10        MR. NOVACK:  He doesn't listen to me, so

11   there was no point in me telling him.

12        THE WITNESS:  Yeah, I don't know.

13   BY MR. BELL:

14        Q    Were you aware in May of 2000 that FIDAC was

15   making payments to Mr. Peskoff in connection with the FBR

16   REIT?

17        A    Yes.

18        Q    And did you authorize the payments to

19   Mr. Peskoff?

20        A    Not specifically.  I -- I gave him something

21   in writing to cover payments that might be made from time

22   to time, but -- as a consultant, but in this case I don't

23   remember, you know, exactly what I said and when I said

24   it.

25        Q    Do you recall any discussion that you had

16



09:53a

1

2

3

4

5                    REDACTED

6

7

8

9

10

11

12

13

14                   REDACTED

15

16

17

18

19

20

21

22                   REDACTED

23

24

25        Q        He was going to help manage it in the sense

10:02a

1    first, he called you and discussed you becoming the

2    manager of the FBR REIT?

3        A    Um-hum.

4        Q    You then put --   You then had some

5    discussions with FBR about you becoming the manager of

6    the FBR REIT?

7

8                    **REDACTED**

9

10       Q    Do I understand you correctly that your

11   communication with FBR - when I say your, I mean FIDAC's

12   communication with FBR - that resulted in FIDAC being

13   hired as manager of the FBR REIT was entirely through

14   Mr. Peskoff?

15

16                   **REDACTED**

17

18       Q    In any event, back to our sequence of events,

19   so he was dealing with you and FBR in connection with

20   having you -- FIDAC hired as the manager of the FBR REIT?

21       A    Um-hum.

22       Q    And then you put this letter in place, and

23   then you started paying him fees.  Is that the sequence?

24       A    I believe so, yes.

25       Q    Now, when you sent this letter to him --  Let

22

10:19a

1    Underhill or FIDAC may terminate the agreement by

2    delivering written notice to the other party?

3            A      Yes.

4            Q      Has FIDAC ever delivered written notice to

5    Mr. Peskoff that it was terminating this agreement?

6            A      I don't know.

7            Q      As far as you know, that has not been done;

8    is that right?

9            A      I don't know.

10           Q      You're not aware of it being done?

11           A      Yes, that's correct.  I'm not aware.

12           Q      Mr. Farrell, was it FIDAC's practice in

13   February of 2000 to enter into written agreements without

14   consultation with legal counsel?

15           A      No.

16           Q      But to the best of your recollection, that's

17   what was done with Mr. Peskoff; is that right?

18           A      That's true.

19           Q      Why was it that you didn't consult with legal

20   counsel with respect to Mr. Peskoff's agreement?

21           A      This agreement was a very specific agreement

22   to the FBR account.  I felt that as long as the account

23   was alive, that this letter would cover it, and that I

24   had a personal relationship with Steve specific to

25   consulting services.  So I felt that if we terminated the

10:43a

1    them approximately a year beforehand.

2        Q    So you think sometime in maybe late 2001?

3        A    I would be speculating, but I would assume it

4    was at least a year beforehand.

5        Q    When you first met Mr. Baptista or

6    Mr. Messner, where did that meeting take place?

7        A    I met Mr. Baptista first in my office at 12

8    East 41st Street.

9        Q    Who else was present at that meeting?

10       A    No one except for myself and Mr. Baptista.

11       Q    Was that meeting arranged by Mr. Peskoff?

12       A    Yes, it was.  At the time I was doing estate

13   planning.  And Steve was aware that I was doing that, and

14   he suggested that I meet an insurance salesman who dealt

15   with specifically estate planning and general insurance

16   needs.  And he asked me to meet with Ernie Baptista to

17   talk about that.  In effect, I was a reference for Steve

18   for Baptista to do insurance payments, just general

19   personal insurance planning.

20       Q    What do you recall about the substance of

21   that first meeting with Mr. Baptista?

22       A    I felt that it was not a productive meeting

23   for me, because many of the concepts of the insurance

24   plans that he was presenting to me were not things that I

25   hadn't already covered in my own personal life or felt

40

11:07a

1    take the word how out of that question, because I think

2    maybe that's what is causing the confusion.  Did you have

3    any discussion with Mr. Baptista that you can recall

4    prior to October 10th, 2002, about compensating

5    Mr. Peskoff?

6        A    Yes.

7        Q    Approximately when did that conversation

8    occur?

9

10                    REDACTED

11

12                    REDACTED

13

14

15

16

17                    REDACTED

18

19

20        Q    Do you recall making a statement to the

21    effect that FIDAC would take care of Steve?

22        A    In the context of what I just testified, yes.

23        Q    I understand your context.

24        A    Um-hum.

25        Q    Did you also make a statement that you can

11:09a

1    recall to the effect that you wanted to make sure that

2    Steve didn't double-dip?

3        A    Absolutely.

4        Q    You don't recall when that meeting occurred;

5    is that right?

6        A    It was early on in the process.  As I said

7    earlier, I think it was the first time I met Messner.

8        Q    Did you have any discussion with Mr. Baptista

9    at any time after October 10th, 2002, about compensating

10    Mr. Peskoff, that you can recall?

11        A    Not that I recall.

12        Q    Now, FIDAC has not paid Mr. Peskoff anything

13    as a result of the Premier Fund; is that right?

14        A    That's correct.  Can I qualify that answer?

15            MR. NOVACK:  Sure.

16            MR. BELL:  Sure.

17            THE WITNESS:  FIDAC has not directly paid

18    Steve Peskoff anything from the proceeds that have been

19    received on the Premier Fund.  But we are not aware that

20    he did not receive or did receive compensation from Gen

21    Advisors.

22    BY MR. BELL:

23        Q    Are you --

24        A    Or any other source.

25        Q    Are you saying that it is possible that

11:11a

1    Mr. Peskoff has received fees from Gen Advisors or

2    another source in connection with the Premier Fund?

3         A    I don't know all of the agreements that Steve

4    has in his universe.  But it wouldn't surprise me.

5         Q    You don't have any evidence, I take it, that

6    he has received payments from anyone else in connection

7    with the Premier Fund; is that right?

8         A    No, I do not.

9         Q    Now, Mr. Peskoff also introduced FIDAC to a

10   company known as Sentry Select; correct?

11        A    We received a phone call from Sentry Select

12   that they had heard from Steve Peskoff, yes.

13        Q    Who was that phone call from; Mr. Corsini?

14        A    Raniero Corsini, right.

15        Q    Was that phone call to you or to someone else

16   at FIDAC?

17        A    I believe it was to me.

18        Q    Do you recall approximately when that phone

19   call occurred?

20        A    No, I don't.

21        Q    What do you recall Mr. Corsini saying to you

22   during that call?

23        A    Essentially, that he had met Mr. Peskoff on a

24   plane and that Mr. Peskoff had told him that he should

25   look at what we do in Annaly and FIDAC.  Apparently they

11:14a

1    had anyone at FIDAC, to your knowledge, had any

2    communication with anyone at Sentry?

3        A    Not that I'm aware.

4        Q    Now, as I understand it, the FIDAC-Sentry

5    Select relationship has resulted in four different

6    investment vehicles; is that right?

7        A    Correct.

8        Q    All four of those investment vehicles are

9    marketed in Canada; correct?

10       A    They're directly marketed by Sentry, yes.

11       Q    But for the Canadian market?

12       A    That's correct.  I would like to also point

13   out that all four of the structures are not the same

14   legal structure.

15       Q    Okay.  Would you prefer that I use the word

16   structure as opposed to vehicle?

17       A    I'll take either one.

18       Q    That's why I was trying to use a general

19   word, to capture all four of them.

20       A    Yeah, I just don't want to lump them all

21   together, because they are very different instruments

22   with very different risk characteristics and very

23   different legal structures to them.

24            MR. NOVACK:  Can I just suggest that for

25   purposes of these questions, we make clear some early

11:20a

# REDACTED

3      Q      Before you - when I say you, I'm talking

4 about FIDAC - started talking to Mr. Corsini, FIDAC had

5 not been involved with any products marketed in Canada;

6 is that right?

7      A      No.

8      Q      Yes, that is right?

9      A      That's correct, yes.  No, we were not

10 involved.  Sorry.

11      Q      That's all right.  The double negatives get

12 tough sometimes.

13      Did you ever have any discussion with

14 Mr. Corsini or anyone else representing Sentry Select

15 about payment of compensation to Mr. Farrell -- excuse

16 me, to Mr. Peskoff?

17      A      No.

18      Q      Now, we're going to get a little bit into the

19 $30,000 check you issued to Mr. Peskoff and events

20 subsequent to that.  But prior to the issuance of that

21 $30,000 check and a conversation which I understand may

22 have taken place shortly before that with Mr. Peskoff,

23 did you have any conversation with Mr. Peskoff about

24 compensating him for Sentry Select?

25      A      I would say that Steve and his proxy, Spencer

11:51a

1    conversations that he was not making the -- at least in

2    his mind, he was not making the introductions to Sentry

3    Select, Gen Advisor, and others gratuitously?

4        A    You know, in our business, we meet people all

5    the time and refer people with specific expertise across

6    the board when we don't have it internally.  Very rarely,

7    if ever, do those lead to payments of fees.  And, in

8    fact, I had no basis by which I owed Steve anything.  I

9    had no contract with him.  As far as I was concerned, our

10   consulting services ended when I got rid of the FBR REIT.

11       Q    But that's what was in your mind; correct?

12       A    I can't speak to what was in his mind.

13       Q    I'm not asking you to read his mind.  I'm

14   asking you whether, based on the conversations that you

15   had with him, whether it was apparent to you that in his

16   mind, he was entitled to be paid for those introductions.

17       A    Not totally, because he was unaware of any

18   process that was going on.  Some things were in

19   development, so there was no basis for understanding what

20   the income or expenses would be against it.  I did have

21   discussions with him one time explaining to him that he

22   had no idea about the capital market structures that were

23   being created, nor did he have any meaningful

24   contribution that he was adding to that, because he kept

25   on trying to add value in some way, shape, or form, but I

72

11:53a

1    told him that I didn't consider his expertise to be in

2    that arena.

3         Q    Did you understand that he was attempting to

4    add value in order to convince you that he should be

5    paid?

6         A    Apparently.

7         MR. NOVACK:  You're asking him what was in

8    Peskoff's mind.  Before you were saying you don't want

9    him to read his mind, and he's speculating that's what he

10   may be thinking.

11        MR. BELL:  No.  I'm asking him.

12        MR. NOVACK:  Do you want to read the question

13   back then, because I think --

14        MR. BELL:  He's answered the question.

15        MR. NOVACK:  I'd like the question back or

16   marked, in any event.  You can keep going.  Would you

17   mark the question so I can come back to it later.

18   BY MR. BELL:

19        Q    Are you aware of any role that Mr. Peskoff

20   played in having Spencer Brown appointed to the Annaly

21   board?

22        A    No.

23        Q    How did Mr. Brown come to be appointed to the

24   Annaly board, if you know?

25        A    Manny Friedman, who was at the time the

# EXHIBIT
# 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT CORPORATION:
and STEPHEN D. PESKOFF,

                        :

         Plaintiffs,

                        :

        vs.                 Civil Action No.

                        :    06-99 SLR

FIXED INCOME DISCOUNT ADVISORY
COMPANY,                :

         Defendant.    :

                    - - -

         Deposition of STEPHEN D. PESKOFF,
taken pursuant to notice in the law offices of Edwards
Angell Palmer & Dodge LLC, Suite 1500, 919 North
Market Street, Wilmington, Delaware, on Tuesday,
October 10, 2006, at 1:12 p.m., before Lorraine B.
Marino, Registered Diplomate Reporter and Notary
Public.

                    - - -

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters


COPY

S. D. Peskoff

73

```
1    A.       I wouldn't call it the F -- you know, I
2    wouldn't call it -- there may have been an FBR entity
3    that was responsible for the management of the REIT.
4    Stop.
5    Q.       Okay.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

REDACTED

REDACTED



S. D. Peskoff

74

1

2

3

4

5     REDACTED

6

7

8

9

10

11

12     REDACTED

13

14

15

16

17

18

19

20

21     REDACTED

22

23

24

75

REDACTED

1

2

3

4

5

6

7

8

9    Q.        Did that meeting take place?

10   A.        Yes.

11   Q.        When was that in relation to when you called

12   Mike?

13   A.        Certainly within a week after that.

14   Q.        Where did the meeting take place?

15   A.        My understanding, my understanding --

16   okay? -- was that -- I wasn't there -- it was at

17   Friedman, Billings & Ramsey.

18   Q.        How did you learn about the meeting having

19   occurred, not that it was going to happen but that it

20   did occur?

21   A.        Because Mike and I talked, you know, after,

22   and he said -- he told me that he has got the

23   management responsibility and that he appreciated

24   everything that I, you know, that I did, putting a



S. D. Peskoff

95

1    Q.      You just reread the whole contract?

2    A.      Yes.

3    Q.      And after you read the whole contract, did

4    you do anything with respect to the contract?

5    A.      Did I do anything --

6    Q.      Yes.

7    A.      -- with respect to the contract?  No.  I

8    thought that part of the general consulting contract

9    that I had signed with Mike Farrell covered bringing

10   in customers, just like I brought in FBR REIT, and

11   that I was covered under that agreement because the

12   agreement says specifically that in order for the

13   agreement not to be in effect, we both have to sign

14   and terminate, and any clients or relationships that I

15   bring in -- okay? -- you cannot terminate the contract

16   with them unless we mutually sign.

17          So both clients were brought in.  Business

18   was ongoing.  And I felt within that paragraph that I

19   was totally covered in terms of a fee arrangement that

20   he and I would, you know, would --

21   Q.      Would work out?

22   A.      Would work out.  Correct.

23   Q.      Now, did you think about anything more at

24   the time you read the February 15 letter?

S. D. Peskoff

145

1   BY MR. NOVACK:

2   Q.        Of?

3   A.        Of FIDAC/Annaly, not the new Fox stuff that

4   they have.  Okay?

5   Q.        Right.

6   A.        All right?  After the meeting was over --

7   and we had several people from Annaly.  We had

8   Mr. Diamond there.  Mike Farrell came in late to the

9   meeting.  Kazel was there.  I was there, and Messner,

10  you know, his partner.  Baptista said to Mike Farrell,

11  he said "Mike, look, let's get this out of the way.  I

12  want to know how Steve is being compensated."  Mike's

13  quote:  "That's not any of your responsibility.  I'm

14  taking care of that.  We have a prior relationship and

15  understanding."  End of story.

16          If that response was not done, I probably

17  would have pursued some kind of relationship with

18  Baptista from a compensation point of view because it

19  was only logical.

20  Q.        What was the month in which this meeting

21  took place and the year?

22  A.        I think it was February 2'02.  It may have

23  been --

24  Q.        You remember it was before FIDAC ceased

S. D. Peskoff

196

1    of what rate you were going to be paid if you were

2    paid something by FIDAC?  In other words, you were

3    just going to pay half.

4    A.       I was going to pay half of the expenses --

5    Q.       Okay.

6    A.       -- to avoid the constant haranguing from

7    Farrell and disappointment because of our prior

8    relationship and on a going-forward kind of basis.

9    Right?  But --

10   Q.       Okay.  Now, this is where I got confused.

11   A.       Okay.

12   Q.       At the time you dictated your thoughts, in

13   your own mind you had not come to a conclusion as to

14   what percent FIDAC would pay to Underhill in

15   connection with the GenCorp deal.  Is that correct?

16   A.       That's correct.

17   Q.       And you explained to us yesterday what the

18   various factors are one would have to consider --

19   A.       Yes.

20   Q.       Let me finish my question, please.  Am I

21   correct that you explained to us yesterday the various

22   factors that would have to be considered by you and

23   Mr. Farrell when you negotiated a percent?  Is that

24   correct?



# EXHIBIT
# 3

# FIDAC

*Fixed Income Discount Advisory Company*



February 15, 2000

Mr. Steve Peskoff
Underhill Investment Corp.
7414 Old Maple Square
McLean , VA  22102

Re:  Consulting Engagement

Dear  Mr. Peskoff :

This letter will confirm our engagement regarding the provision of consulting services by  Underhill Investment Corp.  ("Underhill") to Fixed Income Discount Advisory Company ("FIDAC").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Underhill and FIDAC agree as follows:

1.  **Consulting Services**.  Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the "Accounts").

2.  **Compensation**.  FIDAC shall pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC to Underhill monthly and calculated in accordance with the formula described in the (the "Accounts Agreements").

3.  **Term; Termination**.  Unless earlier terminated in ordinance with this paragraph, this Agreement shall be for an initial term of one year, commencing on February 15, 2000, and ending on  February 15, 2001.  Upon expiration of the initial term, and provided that neither party shall be in default hereunder, this Agreement shall be automatically renewed under the same terms and conditions for successive one-year terms, each expires and ending on the same date one year later.  Either Underhill or FIDAC may terminate this Agreement by delivering written notice to the other party; provided, however, that neither party shall terminate this Agreement without written consent  of the other party so long as any of the Account Agreements remain in effect.

**F 00180**

12 E. 41st Street • Suite 700 • New York, NY 10017 • 1-800-487-9947 • Tel: 212-696-0100 • Fax: 212-696-9809

4. **Notices** . Unless otherwise directed, all communications or notices required or permitted hereunder will be directed to Underhill at the address set forth above. Likewise, if you wish to communicate with us or serve any notice required or permitted under this Agreement, please contact us at:

> Fixed Income Discount Advisory Company
> 12 E. 41st Street
> Suite 700
> New York, NY 11021

5. **Assignability**. Our relationship is a personal one and cannot be assigned, sold or in any manner hypothecated or pledged by either of us without the written consent of the other party. No merger, sale, or consolidation will effect the transfer of this Agreement.

6. **Amendment**. This Agreement may be amended only by a writing executed by both parties.

7. **Binding Affect**. This Agreement shall be binding upon, and shall insure the benefit of, the parties hereto and their respective heirs, successors, and assigns.

8. **Governing Law**. This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware.

9. **Independent Contractor**. Underhill is and shall hereafter be an independent contractor vis-à-vis FIDAC, and nothing herein may be interpreted or construed so as to create any employment, partnership, joint venture, or other relationship, between Underhill and FIDAC or their respective employees, representatives and agents.

10. **Best Efforts; Liability** . Underhill shall exercise its best efforts and judgement in the performance of its duties hereunder. Neither Underhill nor its owners, officers, directors, or employees, shall incur, any liability in connection with the performance of such duties, and obligations, except, in the case of bad faith, willful misfeasance and gross negligence.

F 00181

If the foregoing accurately states our agreement, please signify your acceptance by signing and dating below where indicated.

Very truly yours,

FIXED INCOME DISCOUNT
ADVISORY COMPANY

By _____

Michael A. J. Farrell, Chairman

ACCEPTED AND AGREED
To as of the February 15, 2000

Underhill Investment Corp.

Steve Peskoff

F 00182

# EXHIBIT
4

CONFIDENTIAL

F 00005

FIXED INCOME DISCOUNT
12 E 41ST ST
NEW YORK, NY 10017

297

WCMA® Working Capital
Management™ Account

25-30/440

DATE 5/15/02

PAY TO THE
ORDER OF __Underhill Investments__     $

REDACTED

**Merrill Lynch**

BANCONE, BANK ONE COLUMBUS, NA
COLUMBUS, OHIO 43271

MEMO _____

REDACTED

Kathleen Bagan

REDACTED

Steve Peshoff
7414 Old Maple St.
McLean, VA    22105

Check:

Underhill Invest.

REDACTED

FIXED INCOME DISCOUNT ADVISORY COMPANY

FBR Investment Management, Inc.
INVOICE # 06

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

# REDACTED

**CONFIDENTIAL**

F 00006

FIDAC

File: Steve Peskoff

FIXED INCOME DISCOUNT ADVISORY COMPANY

FBR Investment Management, Inc.
INVOICE # 08

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days In Year | Total FIDAC Fees | | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**REDACTED**

Steve Peskoff
7414 Old Maple Sq.
McClean, VA

Check:      22102

Underhill Invest.

**REDACTED**

**CONFIDENTIAL**

F 00007

FIXED INCOME DISCOUNT ADVISORY COMPANY

FBR Investment Management, Inc.
INVOICE # 08

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|

REDACTED

**CONFIDENTIAL**

**F 00008**

file : Steve Peskoff

*FIXED INCOME DISCOUNT ADVISORY COMPANY*

Christine set up
FIDAC Adviry Fees

FBR Investment Management, Inc.
INVOICE # 02

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|

**REDACTED**

Statement

P - 25

FIXED INCOME DISCOUNT ADVISORY CO.
1500 HARBOR BLVD.
WEEHAWKEN, NJ 07087

1489

55-271
212 293

PAY
TO THE
ORDER OF Steve Peskoff — Underhill Investment    5/5/2000    19____

REDACTED

THE BANK OF NEW YORK
NATIONAL COMMUNITY DIVISION
1200 HARBOR BOULEVARD, WEEHAWKEN, NJ 07087

FOR 2·14·00 - 4·1·2000  FBR Acct

REDACTED

P - 26

*FIXED INCOME DISCOUNT ADVISORY COMPANY*

FBR Investment Management, Inc.
INVOICE # 04

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | | Total FIDAC Fees Paid | Date | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

# REDACTED

P - 30

FIXED INCOME DISCOUNT ADVISORY COMPANY

FBR Investment Management, Inc.
INVOICE # 05

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | | Total FIDAC Fees Paid | Date | Fees Paid to Steve Pevkoff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**REDACTED**

Payable to Underhill Investment Corp.

P - 32

FIDAC
4-18-01
Ok #154

# EXHIBIT
# 5

# FIDAC

*Fixed Income Discount Advisory Company*



April 20, 2004

Mr. Steve Peskoff
Underhill Investment Corporation
1660 International Drive
Suite 400
McLean, VA 22102

Dear Steve:

I received your letter dated as of the 12th of this month and wanted to respond to you in a timely manner.

During the last two years FIDAC has successfully grown its business through the launch of five different investment vehicles which are marketed in China, Japan, Latin America, Canada (MBS Trust) and the US life insurance market (Premier). The latter two of which you provided the initial introduction to the principals involved in their formation. Although I understand that you have a personal relationship with Mr. Baptista, you should realize that not only is the information he provided you incorrect, but it is in direct violation of the terms of the Confidentiality Agreement entered into between us and his organization. Based upon the extensive development time and costs involved for launching Premier, and the nominal level of assets currently in the fund, we have yet to see a positive return on our investment. While we have a dedicated team of investment professionals involved in the daily management of the fund who are responsible for its above market returns, we are dedicating limited resources to the further marketing of this product.

On numerous prior occasions Mike has mentioned to you that the least successful of products we launched in the past two years have been MBS Trust and Premier. Nonetheless, Mike discussed with you in December 2003 that he would compensate you for your limited involvement in these products and a check was issued to you on December 22, and cashed by you, for $30,000. It was also explicitly explained that there would be no further consideration paid to you and this letter serves as a further reiteration of that position.

Regards,

Ronald D. Kazel

P - 6

# EXHIBIT
# 6

Page 1

```
 1

 2      IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE
 3      ---------------------------------x

 4      UNDERHILL INVESTMENT
        CORPORATION, by and through
 5      Stephen D. Peskoff as successor in
        interest, and STEPHEN D. PESKOFF,
 6      individually,
                      Plaintiffs,    Civil Action No.
 7             -against-                06-99-SLR

 8      FIXED INCOME DISCOUNT
        ADVISORY COMPANY,
 9                     Defendant.

10      ---------------------------------x

11                    December 12, 2006
                      10:02 a.m.
12

13

14           DEPOSITION of ERNEST P. BAPTISTA, JR.,

15      taken by Defendant, pursuant to Subpoena, at the

16      law offices of Kirkpatrick & Lockhart Nicholson

17      Graham LLP, 599 Lexington Avenue, New York, New

18      York, 10022-6030, before Eleanor Greenhouse, a

19      Shorthand Reporter and Notary Public within and

20      for the State of New York.

21

22

23               GREENHOUSE REPORTING, INC.
                 363 Seventh Avenue - 20th Floor
24               New York, New York  10001
                      (212) 279-5108
25
```

1              E. Baptista, Jr.
2      Q.    So you said to Mike that, "We have
3  to find a way to create a fund or a vehicle where
4  you will be the investment advisor which will
5  qualify for investment by the insurance companies
6  as part of their COLI and BOLI programs"; is that
7  right?
8      A.    Correct.  And we talked a little bit
9  about M being the largest producer group in the
10  country, largest premium -- in other words,
11  there's only two carriers in the United States
12  that produce more premium, Northwestern Mutual
13  and Metropolitan.
14      Q.    Slowly.  You're speaking too fast
15  for the reporter.
16      A.    There are only two insurance
17  carriers that produce more new premium a year,
18  Northwestern Mutual and Metropolitan and our
19  group.  Therefore, that's what we talked about.
20  We didn't talk specifically about Mullen.  We
21  said also we've got to bring in some people who
22  actually sell the product.
23      Q.    The product being the COLI and BOLI?
24      A.    Correct.  So that you know you have
25  distribution if you spend some time, effort, and

1              E. Baptista, Jr.
2  money, that you just don't have a product sitting
3  on a platform that no one sells.
4      Q.    Okay.  So you have, first, FIDAC
5  would have to design and create a fund which had
6  the characteristics necessary to attract COLI and
7  BOLI and the insurance companies' investment?
8      A.    Um-hum.
9      Q.    Second, FIDAC had to be sure that
10  the insurance product that was going to be the
11  vehicle for making the investment in this new
12  vehicle that was going to be created was going to

# REDACTED

21      Q.    And what happens is the brokers go
22  to the people at the corporations and the banks
23  and they talk to the executives there that make
24  the decisions?
25      A.    Correct.

1              E. Baptista, Jr.
2      Q.    And they say, "If you buy this
3  insurance product, one of the available
4  investment options is going to be this FIDAC
5  fund"?
6      A.    Correct.  Our job, when you look at
7  our contract that was signed on October 10, 2002,
8  was to advise FIDAC how to do all these thing and
9  to be the liaison with the insurance carriers and
10  the liaison with the brokerage community.
11  Between Jeff Messner and John Boma, and myself,
12  we knew all the carriers and we knew all the top
13  brokers.
14      Q.    The ultimate source of the money in
15  these situations was going to either be the banks
16  or the corporations.
17      A.    Correct.
18      Q.    Did you, at the first meeting with
19  Mr. Farrell in November 2001, get any more
20  specific than this general concept?
21      A.    No.
22      Q.    How was it left at the conclusion of
23  the meeting?
24      A.    I told him I would get back to him
25  and try to set up a meeting.  I would get back to

1              E. Baptista, Jr.
2  him and try to set up a meeting after the first
3  of the year, with all the different parties that
4  I think could bring something to the table so we
5  could discuss it and drill it down a little bit
6  and be more specific and it's something that we
7  should pursue or not pursue.
8      Q.    At the first meeting, was there any
9  discussion of Mr. Peskoff or Underhill, his
10  company?
11      A.    Yes.
12      Q.    What was the discussion?
13      A.    The discussion was very simple.
14  "Steve set up the meeting.  How do you know
15  Steve?"
16      Q.    And what was said?
17      A.    I said, "I met him in August at an
18  investment banking conference and I was telling
19  him what I was doing, and he said you should talk
20  to Mike Farrell.  I think the two of you can do
21  some things together."
22      Q.    Am I correct nothing else was said
23  about Steve or his company, Underhill, at this
24  first November meeting?
25      A.    Outside of he explained that they

Greenhouse Reporting, Inc.

(212)279-5108

Page 50

E. Baptista, Jr.

1
2 summary form the various steps that have to be
3 taken by Gen Advisors in order to result in this
4 new source of funds coming into FIDAC's
5 management sphere. Did you lay all of this out
6 in words or substance at the January meeting?
7       A.    No.
8       Q.    What part of it didn't you explain
9 at the January meeting?
10      A.    We didn't go into all the
11 particulars, because quite frankly, you cannot be
12 in a meeting with people who are going to develop
13 a fund and just do the shortened version. There
14 were subsequent meetings in the end of February,
15 March, April, May, and June when they decided to
16 go ahead with it. Okay? And each one got into
17 more particular details.
18      Q.    Can you tell me more or less --
19      A.    And at one of the meetings, we
20 brought in the number one BOLI broker in the
21 country.
22      Q.    We will come to that. Can you tell
23 me more or less what was disclosed by you or
24 discussed by you at the meeting with respect to
25 what Gen Advisors was proposing to FIDAC?

Page 51

E. Baptista, Jr.

1
2       A.    We didn't propose anything at the
3 January meeting. We just told them what had to
4 be done. Because remember, I want you to
5 understand, the contract with FIDAC/Gen Advisors
6 wasn't signed for another ten months.
7       Q.    I understand that.
8       A.    So the roles, the compensation and
9 so on and so forth, were being meshed out between
10 February and October.
11      Q.    But in the January meeting, what was
12 the sum and substance of what you told the people
13 at FIDAC as to what would --
14      A.    Our role would be consultive and we
15 would help them with the insurance carriers. We
16 would help them in design and we would help them
17 with the brokerage end or the distribution end.
18      Q.    And this was a very, very general
19 and conceptual meeting?
20      A.    Very, very general.
21      Q.    Was there any discussion of
22 compensation at that meeting?
23      A.    Specific compensation, no.
24      Q.    What about any discussion at all
25 about compensation at that meeting?

Page 52

E. Baptista, Jr.

1
2       A.    Yeah. We told them we had to get
3 paid.
4       Q.    Can you tell me as best you recall
5 how that came up? Did someone ask you, "Are you
6 doing this for free," and you said, "No. We have
7 to get paid"? How did it come up if you recall
8 anything about that?
9       A.    You know, Steve was at the meeting,
10 and the only thing I remember with any certainty,
11 okay, is -- and I believe it was Steve, I'm
12 pretty certain, and said, "You've got to work out
13 contracts and how everyone gets paid here." And
14 everyone went, "Yeah, yeah, yeah, yeah." We were
15 working with other money managers at the time.
16 We hadn't settled on FIDAC yet.
17      Q.    Other than what you've just
18 testified to, do you recall anything else being
19 said at this meeting about anybody's
20 compensation, if you went forward?
21      A.    Not at that time. At subsequent
22 meetings, yes.
23      Q.    When is the next time that you met
24 or spoke with Mike Farrell or anyone at FIDAC
25 about this?

Page 53

E. Baptista, Jr.

1
2       A.    I believe it was March of 2002. I
3 could be off on this, but it was sometime in late
4 winter-early spring.
5       Q.    And where was that meeting? Was it
6 a meeting?
7       A.    Yeah, at FIDAC.
8       Q.    Who attended the meeting?
9       A.    We had -- was that the meeting with
10 Bobby Long or was it the next one? At that
11 meeting was Jeff, John. I did not attend. I had
12 my partner, Bob Padula, with me and we just came,
13 said hi, and left, because Jeff thought we would
14 have too many people. So that's the extent of
15 what I know about that meeting, except I got a
16 report later.
17      Q.    Before you get to that, just tell me
18 you were at the meeting in March very briefly?
19      A.    Yes.
20      Q.    Just to make introductions?
21      A.    Yes.
22      Q.    And then you left?
23      A.    Um-hum.
24      Q.    What was discussed when you were
25 there, if you recall?

14 (Pages 50 to 53)

Page 78

E. Baptista, Jr.

1   people at FIDAC or their lawyers?
2   A.   Totally FIDAC. As a matter of fact,
3   I believe it was all Nick Singh, who is now
4   general counsel.
5   Q.   The meeting that you had in October
6   2002, did we go over how long it lasted? I'm not
7   quite sure I remember.
8   A.   No, but it was a short meeting, less
9   than an hour. Because everything was agreed to
10  beforehand.
11  Q.   Was it your understanding that the
12  structure of the vehicle that was going to be
13  newly created by FIDAC was set and agreed upon by
14  that time?
15  A.   No.
16  Q.   That still had to be developed?
17  A.   That was in process, both with
18  Deloitte and Nick Singh, who was working on the
19  structuring and the legal limited partnership or
20  the private placement memorandum. It was a work
21  in progress.
22  Q.   At the meeting, can you tell me what
23  was discussed?
24  A.   We just went over the contract.
25

Page 79

E. Baptista, Jr.

1   Q.   Take your hand away from your mouth,
2   please. What happened at the meeting in October
3   2002?
4   A.   We went over the contract: "Is
5   there are any issues?" "No." The question of
6   Steve Peskoff.
7   Q.   With regard to this, please tell me
8   who said what, as opposed to a summary of the
9   substance. Try to recall. What was said at this
10  meeting about Mr. Peskoff?
11  A.   I can't tell you for sure who said
12  this part, what I'm going to say. "Okay, what do
13  we do about Steve Peskoff?" I don't know if I
14  said it, I don't know if Mike Farrell, Ron Kazel
15  said it. I really don't remember. Okay. All I
16  know is the answer to it is, "We don't want you
17  paying him. We will discuss it with him."
18  Q.   Okay.
19  A.   Okay?
20  Q.   What else was said, if anything?
21  A.   And the word "double dip," was
22  mentioned. I can't tell you if it was Ron Kazel
23  or Mike Farrell.
24  Q.   What else was said about that?
25

Page 80

E. Baptista, Jr.

1   A.   That's it.
2   Q.   Those few words are the only words
3   that were uttered with regard to Steve Peskoff
4   and compensation; is that right?
5   A.   Um-hum.
6   Q.   After that time, did you ever again
7   have a conversation with anyone at FIDAC about
8   compensation for Steve Peskoff?
9   A.   No.
10  Q.   To your knowledge, did anyone else
11  at Gen Advisors after that have any discussion?
12  A.   I don't think so. I don't have any
13  knowledge.
14       MR. NOVACK: Can we take maybe a
15  15-minute break?
16       (Recess taken.)
17  Q.   Am I correct that other than the one
18  comment that was made at the meeting in October
19  2002, you're not aware of any other comment or
20  statement made by anyone at FIDAC with respect to
21  compensating Steve Peskoff or Underhill for
22  services rendered in connection with Gen
23  Advisors?
24  A.   Could you rephrase that question?
25

Page 81

E. Baptista, Jr.

1   Q.   Sure. What part of it is unclear?
2   A.   When you say the Gen Advisors, do
3   you mean -- be more specific. A finder's fee for
4   Premier or whatever you want to call it.
5   Q.   Let me ask it a different way, then.
6   That's a fair thing. You went to law school for
7   a little while, you said; right?
8   A.   I got a lot of lawyers floating
9   around.
10  Q.   Mr. Peskoff gave you the
11  introduction to Mike Farrell; right?
12  A.   Um-hum. Yes.
13  Q.   Other than the comment that was made
14  in the October 2002 meeting, are you aware of any
15  other comment or statement made by anyone at
16  FIDAC with respect to possibly compensating
17  Mr. Peskoff or Underhill for this introduction?
18  A.   I do not recall any other meetings,
19  although people have told me that there was a
20  meeting where he said, "We will take care of
21  Steve." I don't recall that. But I do recall in
22  the October meeting, that's --
23  Q.   Am I correct that you've given us
24  the full and best recollection you have of what
25

Page 94

E. Baptista, Jr.

1  E. Baptista, Jr.
2  compensation of Mr. Peskoff --
3      A.    No.
4      Q.    -- or Underhill?
5      A.    No.
6      Q.    What is your understanding of what
7  Mr. Peskoff did with regard to the eventual
8  creation of Premier beyond introducing you to
9  Mike Farrell?
10     A.    He introduced us to -- let me answer
11 it this way:  He made an introduction to Mike
12 Farrell, ran the first full meeting with
13 everyone, getting everyone on board.  As far as
14 the technical aspects of the fund or raising
15 money for the fund, nothing.
16     Q.    I'm correct that Mr. Peskoff didn't
17 go out and meet with the insurance brokerage
18 community?
19     A.    No.
20     Q.    He didn't go out and meet with the
21 insurance companies?
22     A.    No.
23     Q.    He didn't go out and meet with the
24 corporations and banks that were going to make
25 the determination of what investment vehicle to

Page 95

1  E. Baptista, Jr.
2  use if they went into the life insurance
3  products?
4      A.    No.
5      Q.    He didn't meet with the banks that
6  were doing the wrapping?
7      A.    No.
8      Q.    Is it fair to say all he did was
9  introduce you to Mr. Farrell and help arrange for
10 that first meeting in January?
11     A.    Well, just one other thing, and it's
12 not on the technical side.  Every time there was
13 a problem, Mike Farrell would call him saying,
14 "It's costing me a fortune.  Tell Ernie he's got
15 to get his act together, this, that, problems."
16 He acted as I'll call it Mike Farrell's
17 representative when there was a problem that Mike
18 Farrell didn't want to call.  For about a year,
19 when Mike got pissed off, pardon the language,
20 about the cost or the time and this wasn't
21 happening first enough, so on and so forth, I got
22 a call from Steve, and that's usually every two
23 weeks or at least once a month for a year.
24     Q.    Do you think that Mr. Farrell was
25 acting unreasonably in being upset that it had

Page 96

1  E. Baptista, Jr.
2  cost so much money to try to develop this
3  product?
4      A.    I'm not going to -- I have no idea
5  what was in his head.
6      Q.    Did you, during the course of the
7  period 2003 -- let me withdraw that.  When was,
8  to your recollection, Premier established, the
9  vehicle established?
10     A.    It was opened with the first dollars
11 put in, which was established December 29th,
12 2003.
13     Q.    Before that, we know that Premier,
14 the investment vehicle, had to be created?
15     A.    Right.
16     Q.    Then it had to be marketed to --
17     A.    Right.
18     Q.    To whom?
19     A.    Marketed to whoever.  It had to be
20 marked to the insurance carriers, had to be
21 marketed to the brokerage community.  It had to
22 be marketed to the wrap providers and then to the
23 ultimate user, the person or the organization
24 that wrote the check, and that became effective
25 12/29/03.

Page 97

1  E. Baptista, Jr.

**REDACTED**

25 (Pages 94 to 97)

Page 174

E. Baptista, Jr.

1
2     A.    I don't know.
3     Q.    You don't know if that would be
4  confidential information?
5     A.    No, I don't know.
6     Q.    Why don't you know?
7     A.    Because I don't know.
8     Q.    I don't understand.  You think it's
9  public knowledge as to what was pending?
10     A.    I don't know.  There were
11  insurance -- there are other people involved.  I
12  said I don't know.  Okay?  You're getting me at a
13  point where you're questioning my numbers.  I
14  could be wrong.  I make a lot of mistakes.
15     Q.    That's why I'm telling you this.
16  I'm not trying to sneak up on you.  I'm telling
17  you I checked with the client, which would
18  presumably know what the numbers are that they
19  have under management.  That's why I'm giving
20  you, out of a sense of an abundance of fairness,
21  I'm giving you -- I'm not hiding anything, I'm
22  telling you exactly why I'm asking the questions.
23  You may be wrong.  Is there something available
24  in your office if you made a phone call you could
25  check?

Page 175

E. Baptista, Jr.

1
2     A.    I have all those --
3     Q.    I don't want detailed --
4     A.    I can get it tomorrow.  All those
5  records are locked up with me because of the
6  confidentiality issue.
7     Q.    Okay.  How much did Gen Advisors
8  invest, in terms of out-of-pocket expenses, in
9  the development of Premier?
10     A.    Out-of-pocket or time?
11     Q.    Out-of-pocket.
12     A.    About $75,000.
13     Q.    How much did Mr. Peskoff invest, do
14  you know?
15     A.    Zero.  He also worked for two years,
16  so if you want to count that, we put that on our
17  books, our time, just like FIDAC did, when they
18  said they had $500,000.  It wasn't all
19  out-of-pocket, it was their time too.
20     Q.    Do you know what proportion of the
21  500 was outside lawyers and auditors?
22     A.    I don't know for sure, but it was at
23  least 300,000 is my guess.
24     Q.    Right.  So we will get to that.
25  Now, do you recall having a discussion with

Page 176

E. Baptista, Jr.

1
2  Mr. Peskoff in which you told him that he ought
3  to offer to pay the out-of-pocket expenses of
4  FIDAC?
5     A.    No.
6     Q.    No?
7     A.    He had a conversation that he told
8  me he had with Mike Farrell and he offered to pay
9  half of them, and Mike said no.
10     Q.    Did you have a conversation on April
11  19, 2005 -- and I'm asking you this because I
12  have a memo from Mr. Peskoff's file, just so you
13  know.  I'm just asking what you remember -- in
14  which you said that you felt that Mike Farrell
15  forgot he had a contract with Steve Peskoff that
16  hasn't been terminated?
17     A.    No.
18     Q.    Did you tell Mr. Peskoff in April
19  2005 --
20     A.    Just let me --
21     Q.    I'm sorry.
22     A.    If he had a contract, I've never
23  seen it.
24     Q.    Right.
25     A.    So since no one showed me a

Page 177

E. Baptista, Jr.

1
2  contract --
3     Q.    Is it correct to say that you did
4  not tell Mr. Peskoff in April 2005 that you felt
5  that Mike Farrell forgot he had a contract with
6  Mr. Peskoff that hasn't been terminated?
7     A.    No.
8     Q.    It is not correct to say that?
9     A.    It is not correct.

# REDACTED

15     A.    Absolutely not.  It never, never was
16  anywhere near that.
17     Q.    And you did not ever tell him that?
18     A.    No.
19     Q.    Did you tell Mr. Peskoff in April
20  2005 -- did you suggest to him that he inform
21  Mr. Farrell of the offer that Mr. Peskoff made to
22  pay the $600,000 in expenses, have Farrell take
23  that off the top of whatever is owed to Peskoff,
24  and then Peskoff will get paid after that?
25     A.    I have a little recollection of

45 (Pages 174 to 177)

# EXHIBIT
# 7

09:24a

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
2

3   UNDERHILL INVESTMENT            :   Civil Action
    CORPORATION, by and through     :   NO. 06-0099-SLR
4   Stephen D. Peskoff as           :
    successor in interest, and      :
5   STEPHEN D. PESKOFF,             :
    individually,                   :
6                       Plaintiffs  :
                                    :
7              vs.                  :
                                    :
8   FIXED INCOME DISCOUNT           :
    ADVISORY COMPANY,               :
9                       Defendant   :

10

11                    _____

12                Oral Deposition of
                   RONALD D. KAZEL
13

14                    _____

15

        Date:   Thursday, December 14, 2006
16

        Time:   9:55 a.m.
17

        Place:  Stevens & Lee, P.C.
18              1818 Market Street
                29th Floor
19              Philadelphia, PA  19103

20

21                    _____

22

23       COMPUTERIZED REPORTING SERVICES, INC.
           By:  Roxanne Weaver, RPR, CRR
24              3449 Penn Avenue
           Sinking Spring, PA  19608
25
             Phone:  (610) 678-6652    ORIGINAL

10:43a

1     A   My understanding is that Mr. Peskoff

2 introduced Mr. Baptista to Michael Farrell with the

3 general idea that there was a potential business

4 opportunity to work together.

5     Q   Who was present at that first meeting between

6 FIDAC and Gen Advisors?

7     A   The meeting I attended had Michael Farrell,

8 Ernie Baptista, Steve Peskoff, Jeff Messner, and I

9 believe there was one other individual that came along

10 with Mr. Messner, but I don't recall his name.

11     Q   And you?

12     A   And myself, yes.

13     Q   Where was the meeting?

14     A   It was held at FIDAC's offices.

15     Q   Did you take notes of what occurred at that

16 meeting?

17     A   I don't recall.

18     Q   If you did, they would be in one of your

19 notebooks?

20     A   Yes, they would be.

21     Q   What do you recall happening at that meeting?

22     A   That meeting was a general meeting to discuss

23 with Mike and I the insurance industry and how investment

24 vehicles fit within the insurance industry and to

25 determine whether it was an opportunity for FIDAC to

10:44a

1    manage a product that fit inside the insurance industry.

2        Q    Did you discuss any specific products or

3    potential products?

4        A    We didn't discuss any specific products,

5    other than it would just be a knock-off of one of our

6    existing funds or a strategy that was very similar to

7    what we were already doing.

8        Q    What was Mr. Peskoff's role at that meeting?

9        A    Mr. Peskoff was primarily just a listener

10   like Mike and I was, to learn more about the industry at

11   that point in time.

12       Q    Prior to attending --  Let me strike that.

13            Approximately when was that meeting?

14       A    February of '02, or maybe January of '02.

15       Q    You've got a good memory, or it's been

16   refreshed well.

17       A    It was the first transaction I worked on when

18   I came to the firm.  That's how I can remember.

19       Q    Prior to that meeting, had you had any

20   conversation with either Mr. Peskoff or Mr. Farrell about

21   a possible opportunity with Gen Advisors?

22       A    No, I had not.

23       Q    So you went into that meeting cold?

24       A    Right.

25            MR. BELL:  Let's just take a five-minute

33

```
10:46a
```

1  break.

2              (Whereupon, at this time a recess was

3              held.)

4  BY MR. BELL:

5      Q    Mr. Kazel, let me go back and try to tie up a

6  few loose ends before we continue.

7

8

9

10

11              **REDACTED**

12

13

14

15

16

17              **REDACTED**

18

19

20

21

22

23

24              **REDACTED**

25

34

11:03a

1

2

3        **REDACTED**

4

5

6        Q      Let me try to back into the question I just

7   asked then.  When did you --  When was the agreement

8   reached with the insurance carriers with respect to the

9   Premier Fund?

10        A      The various carriers came in at different

11  points in time.  It would have been throughout, I guess,

12  2003, because the first funding occurred of Premier at

13  the end of '03, I believe.

14

15        **REDACTED**

16

17              MS. KENNEY:  Do you mean in relation to

18  Premier?

19              MR. BELL:  With respect to Premier, yes.

20

21        **REDACTED**

22

23

24        **REDACTED**

25

11:06a

1

2                              REDACTED

3

4        A       It would have been sometime in '03.

5        Q       But you don't know when?

6        A       I don't know exactly when.

7        Q       Do you know whether that agreement had been

8   reached at the time FIDAC entered into Kazel Exhibit 2?

9        A       No, it would not have been.

10       Q       So it would have been sometime between

11  October 10th of 2002 and the end of '03?

12       A       That is correct.

13

14

15                             REDACTED

16

17

18       Q    Now, you said the first funding came in at

19  the end of 2003, correct, for the Premier Fund?

20       A       Yes, I believe that to be correct.

21

22

23                             REDACTED

24

25

                               39

11:37a

1    '03, so we would have had those development costs from

2    sometime in '02 till the formation of the fund in '03.

3        Q    Now, my understanding is that this fund is a

4    unique fund in your industry; is that --

5        A    Yes, that is correct.

6        Q    What is it that makes it unique?

7        A    There are --  To our knowledge, there are no

8    leveraged fixed-income funds inside variable life

9    insurance contract policies outside of the Premier Fund.

10       Q    Even today there are none other than the

11   Premier Fund?

12       A    That's correct.

13       Q    Were the costs of developing this fund

14   greater than the costs of developing other funds that

15   you've been involved in?

16       A    Yes, they were.

17       Q    Is that because this was a unique product?

18       A    Yes, it was.

19       Q    Did this product also take longer to develop

20   than other products that you've been involved in?

21       A    Yes, it did.

22       Q    Is that also because it was a unique product?

23       A    Yes, it is.

24       Q    What was Mr. Peskoff's role in the

25   development of the Premier Fund?

11:48a

1          A       My involvement was as advisor to the limited

2     partnership, setting up the agreement between FIDAC to

3     manage the assets in the partnership in conjunction with

4     the terms set out by Sentry Select, the general partner

5     to the partnership.

6          Q       So if I'm understanding this correctly,

7     FIDAC's client, or the party with whom FIDAC has the

8     contractual relationship, is the limited partnership?

9          A       FIDAC's contractual relationship is with the

10    limited partnership, yes.

11         Q       And prior to the formation of the MBS income

12    trust, did you have any discussions with Mr. Peskoff

13    about the possibility of FIDAC and Sentry Select working

14    together on any investment vehicle?

15         A       My discussions were held with Raniero Corsini

16    of Sentry Select.

17         Q       Before you first met with Raniero Corsini,

18    did you have any discussions with Mr. Peskoff about FIDAC

19    working with Sentry Select?

20         A       Yes, I did.

21         Q       Is it your understanding that Mr. Peskoff was

22    responsible for introducing Sentry Select to FIDAC?

23         A       Yes, it is.

24         Q       And that prior to Mr. Peskoff's introduction

25    of Sentry Select to FIDAC, FIDAC did not have any

# EXHIBIT
# 8

# FIDAC

*Fixed Income Discount Advisory Company*



October 10, 2002

Mr. Ernest P. Baptista
Gen Advisors LLC
16 Main Street
East Greenwich, RI 02818

Dear Mr. Baptista:

# REDACTED

# REDACTED

P - 114

October 10, 2002
Page 2

REDACTED

REDACTED

October 10, 2002
Page 3

REDACTED

REDACTED

October 10, 2002
Page 8

REDACTED

October 10, 2002
Page 9

REDACTED

REDACTED

October 10, 2002
Page 4

REDACTED

REDACTED

P – 119

Mr. Ernest F. Baptista
October 10, 2002
Page 5

REDACTED

REDACTED

P - 120

C70

Mr. Ernest P. Baptista
October 10, 2002
Page 6

REDACTED

REDACTED

P - 121

ΣΡB

Mr. Ernest P. Baptista
October 10, 2002
Page 7

REDACTED

REDACTED

P - 122

CP4

Mr. Ernest P. Baptista
October 10, 2002
Page 10

REDACTED

REDACTED



P - 123

C10

Mr. Ernest P. Baptista
October 10, 2002
Page 11

REDACTED

[Remainder of Page Intentionally Left Blank]

P - 124

SJ6

Mr. Ernest F. Baptista
October 10, 2002
Page 12

REDACTED

REDACTED

P - 125

EXHIBIT A

# REDACTED

A-1

<u>EXHIBIT B</u>

# REDACTED

P - 127

# EXHIBIT
# 9

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

REDACTED

CONFIDENTIAL

F 00270

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

REDACTED

CONFIDENTIAL

F 00271

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

REDACTED

REDACTED

CONFIDENTIAL

F 00272

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

REDACTED

REDACTED

CONFIDENTIAL

F 00273

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

REDACTED

REDACTED

**CONFIDENTIAL**

F 00274

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES





CONFIDENTIAL

F 00275

# EXHIBIT
# 10



# FIXED INCOME DISCOUNT ADVISORY COMPANY

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Steve Peskoff | Ron Kazel |
| **COMPANY:** Underhill | **DATE:** 9-25-02 |
| **FAX NUMBER:** 703-287-4235 | **TOTAL NO. OF PAGES INCLUDING COVER:** 4 |
| **PHONE NUMBER:** 703-287-4234 | **SENDER'S PHONE NUMBER:** 212-696-0100 |
| **RE:** | **SENDER'S FAX NUMBER:** 212-696-9809 |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY

# REDACTED

1211 AVENUE OF THE AMERICAS
SUITE 2902
NEW YORK, NY 10036

P - 1

REDACTED

REDACTED

REDACTED

P-2

REDACTED

REDACTED

REDACTED

P-3

REDACTED

REDACTED

REDACTED

P - 4

# EXHIBIT
# 11

PAGE  01

REDACTED

CONFIDENTIAL     F 00276

CONFIDENTIAL     F 00276

**REDACTED**

CONFIDENTIAL     F 00277

07/07/2003  11:37    8589078245

REDACTED

3

07/07/2003  11:37    8589078245

PAGE  05

# REDACTED

CONFIDENTIAL          F 00279

07/07/2003  11:37    8509078245

REDACTED

F 00280

CONFIDENTIAL

07/07/2003  11:37    8509878245

# REDACTED

shared\Beecher\PTDA\Cingros

CONFIDENTIAL       F 00281

07/07/2003  11:37    8509878245

# REDACTED

CONFIDENTIAL

F 00282

07/07/2003  11:37    0509070245

REDACTED

CONFIDENTIAL

F 00283

07/07/2003  11:37   0509070245

REDACTED

CONFIDENTIAL

F 00284

**AMENDMENT NUMBER 2**
**TO**
**MARKETING AGREEMENT**

**REDACTED**

F 00285

CONFIDENTIAL

**REDACTED**

2

F 00286

CONFIDENTIAL

REDACTED

3

F 00287

CONFIDENTIAL

REDACTED

4

F 00288

CONFIDENTIAL

REDACTED

5

F 00289

CONFIDENTIAL

REDACTED

5

F 00290

CONFIDENTIAL

<u>**CERTIFICATE OF SERVICE**</u>

I, Joseph Grey, hereby certify that on this 5th day of June, 2007, I caused a true and

correct copy of the foregoing REDACTED CERTIFICATE OF COUNSEL to be served by the

means indicated below addressed to Defendant's counsel as follows:

John L. Reed, Esquire
Denise Seastone Kraft, Esquire
EDWARD'S ANGELL PALMER & DODGE LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
BY HAND DELIVERY

*/s/ Joseph Grey*
Joseph Grey