Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2                    C.A. # 06-99 SLR                    October 11, 2006

Page 300

1  A.    It is not right.
2  Q.    Tell me why it is wrong.
3  A.    It is wrong because those were thoughts
4  based upon numbers in a pot and they weren't
5  conclusions. They were thoughts.
6  Q.    Well, this wasn't a conclusion either, was
7  it?
8  A.    Absolutely not.
9  Q.    It is just another thought.
10  A.    It was just a thought.
11  Q.    So your thoughts were in a different set of
12  numbers?
13  A.    Considering that the hostility on the other
14  side, all I could have was thoughts, based upon the
15  fact --
16  Q.    Well --
17  A.    What I am saying is, you know, nobody has
18  offered to settle, you know, to settle, you know,
19  GenCorp, and I am relying on my original contract, and
20  now I am at a point where as this thing grows, you
21  know, I am going to probably have to dispute it
22  legally, period. There is no phone calls from
23  Farrell. He is not -- he is still unhappy making all
24  this money, blah, blah, blah, blah, and, you know, and

Page 301

1  hoping that the fact that it worked out for him -- all
2  right? -- and that he recouped his $600,000 and he has
3  got a big winner because he has got -- you know, he is
4  going to manage this for the next ten years or so, you
5  know, that doesn't make a difference. Okay?
6  Q.    You keep saying he is going to manage it for
7  ten years. Is it your understanding that anyone who
8  invests in the Sentry Select -- the MBS Trust. Let me
9  strike that. Is it your understanding that if someone
10  invests in an MBS trust, they are locked in for ten
11  years?
12  A.    No, I am not suggesting that at all.
13  Q.    Well, you said it will go for ten years.
14  A.    What I am saying is that I believe that the
15  management contracts with the advisor and with Sentry
16  are for a long period of time, some of them as much as
17  ten years.
18  Q.    But isn't it meaningless if there is a
19  ten-year contract if all the investors withdraw their
20  money --
21  A.    Certainly.
22  Q.    -- after four years?
23  A.    If that happens, obviously.
24  Q.    All right. So that it would be misleading

Page 302

1  to suggest that there is a ten-year stream of fees
2  that is virtually certain or probable or even likely
3  simply because the management contract may go for ten
4  years. You have to know whether or not investors can
5  and customarily do withdraw after a number of years;
6  isn't that right?
7  A.    Possible, yes.
8  Q.    It is right. It is not just possible. It
9  is right.
10  A.    Yes. I mean, but --
11  Q.    Okay. Let's go to Peskoff -- I am sorry --
12        MR. BELL: Well, let him finish his
13  answer.
14        MR. NOVACK: Yes. No. I apologize
15  for inadvertently cutting you off. Why don't you add
16  whatever you want to add, if anything.
17        THE WITNESS: However, given this
18  particular type of product, which is not an equity
19  product like stocks and bonds and stuff, it is
20  specifically providing a monthly income. It tends to
21  be -- what is the word? -- less risky. Okay? People
22  tend to stay in where they receive a monthly income
23  much longer than people do with mutual funds and other
24  kinds of things that they have. So it doesn't mean

Page 303

1  that they can't sell it, but when you receive monthly
2  income, the history is the amount of money usually
3  stays for a longer period of time.
4  BY MR. NOVACK:
5  Q.    Have you ever done any kind of analysis of
6  how long investors stay in trusts such as the MBS
7  Trusts?
8  A.    No.
9  Q.    All right. Have you done any analysis of
10  how long shareholders or investors, for want of a
11  better term -- have you done any analysis of how long
12  investors keep their money in in Premier products?
13  A.    No.
14  Q.    And you don't know the detailed terms and
15  conditions of either of those products, do you?
16  A.    Only what is public.
17  Q.    And whatever you were told by Mr. Baptista
18  that was confidential that you felt that you wanted to
19  know?
20        MR. BELL: Objection.
21  BY MR. NOVACK:
22
23
24

**REDACTED**

36 (Pages 300 to 303)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2            C.A. # 06-99 SLR            October 11, 2006

Page 304

```
 1
 2
 3
 4          REDACTED
 5
 6
 7
 8
 9
10
11   Q.    All right. Let's go to Peskoff Exhibit 6,
12   your favorite, which is the February 15, 2000 letter.
13         MR. NOVACK:  How much time do we have
14   on the tape?
15         THE VIDEOGRAPHER:  26 minutes.
16         MR. NOVACK:  Okay.
17         THE WITNESS:  Which one are we on
18   right now?
19         MR. NOVACK:  I had given him the
20   document to look at before.
21         MS. KENNEY:  It is right here,
22   actually.
23   BY MR. NOVACK:
24   Q.    Mr. Peskoff, would you look at the
```

Page 306

```
 1   Q.    And you understood that at the time.  That's
 2   why you thought of going to a lawyer; correct?
 3   A.    That's correct.
 4   Q.    Okay.  Go to paragraph 5, "Assignability.
 5   Our relationship is a personal one and cannot be
 6   assigned, sold or in any manner hypothecated or
 7   pledged by either of us without the written sent of
 8   the other party.  No merger, sale, or consolidation
 9   will effect the transfer of this Agreement."
10         You understood that, based on this
11   provision, Underhill could not assign the contract to
12   anyone else?
13   A.    The answer is the assignment of the
14   contract -- well, I looked at that meaning it was
15   Underhill and Steve Peskoff.
16   Q.    I am sorry.  Who were the parties to this
17   agreement, as you understood it?
18   A.    The parties to this agreement were
19   Underhill.
20   Q.    And FIDAC; right?
21   A.    Yes.
22   Q.    So are you now saying that it could be
23   assigned to you and that's an exception that is not
24   mentioned in writing here?
```

Page 305

```
 1   February 15, 2000 letter, which we have been referring
 2   to for convenience sake as the contract in your
 3   testimony.  Let's go to paragraph 6, which reads,
 4   "Amendment.  This Agreement may be amended only by a
 5   writing executed by both parties."  Do you see that?
 6   A.    Yes.
 7   Q.    There was never any writing which amended
 8   this agreement; is that correct?
 9   A.    By both parties, no.
10   Q.    Was there ever a writing which purported to
11   amend it that was signed by anybody from FIDAC?
12   A.    Farrell, Farrell's check would, you know --
13   his writing to me about that this was your sole
14   payment.  Okay?
15   Q.    You consider that to be an amendment to this
16   agreement?
17   A.    You know, I don't know what you would call
18   it.
19   Q.    Well, I am asking you what you would call
20   it.
21   A.    I would call it a check as part
22   consideration for moneys owed me; okay?  But he
23   considered it, obviously, a termination of the
24   transaction.
```

Page 307

```
 1   A.    Well, since I was Underhill, I owned a
 2   hundred percent of the stock and I owned all of the
 3   debt, Underhill was synonymous.
 4   Q.    So your view is that this was a personal
 5   contract that --
 6   A.    I didn't say that.
 7   Q.    Okay.  So this is a contract you felt could
 8   be assigned, notwithstanding what the words were in
 9   the contract?
10   A.    I felt the reason why it was done in terms
11   of Underhill was for tax purposes, because Underhill
12   had a tax loss carryforward, just like my Friedman,
13   Billings contract.  It was done in Underhill's name.
14   All the services were performed by the individual,
15   Steve Peskoff -- okay? -- acting as Underhill.  So
16   this was a way, you know, that I could receive, you
17   know, income.
18   Q.    Based on your relationship with Mr. Farrell,
19   isn't it true that you regarded this contract, as you
20   call it, as really a written document that would be
21   used by FIDAC and you to reflect why you would be paid
22   money when you were paid money so you would have some
23   written record for it, as was the case with Friedman,
24   Billings, which you told me about earlier?  Let me
```

37 (Pages 304 to 307)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2        C.A. # 06-99 SLR        October 11, 2006

**Page 308**

1 back up.
2     MR. BELL: Yes, object to the form.
3     MR. NOVACK: Do you remember you told
4 me earlier -- it is a fair objection.
5 BY MR. NOVACK:
6   Q.   Do you remember you told us earlier that
7 Friedman, Billings wanted to get a written document, a
8 contract that reflected what had happened with you so
9 that you would have a record for accounting, tax
10 purposes? Do you remember that testimony?
11   A.   **I don't understand the context you are**
12 **outlining.**
13   Q.   Well, forget the context. You have a
14 written agreement with Friedman, Billings.
15   A.   **Are you talking about originally or after?**
16   Q.   The one that was created two years after you
17 did the work. Remember you said you brought some
18 customers to them. Then they created a contract
19 afterwards so they would have a record that they paid
20 you for your consulting services in connection with --
21   A.   **Yes.**
22   Q.   -- those customers?
23   A.   **Yes.**
24   Q.   You didn't need the contract. They were

**Page 309**

1 going to pay you anyway. They wanted to have a
2 contract for recordkeeping purposes; right?
3   A.   **Specifically, they needed it for NASD audit**
4 **purposes.**
5   Q.   Okay.
6   A.   **Okay? Because they were being audited. All**
7 **right? And they didn't have the appropriate backup,**
8 **having paid me the check.**
9   Q.   Okay.
10   A.   **Okay?**
11   Q.   All right. Now, based on your relationship
12 with Mr. Farrell as it existed in February 2000, as
13 far as you were concerned, you didn't even need this
14 written contract, because you could rely upon him to
15 do the right thing by you?
16   A.   **I felt that way.**
17   Q.   Yes. That, for example, I guess would
18 explain why when you looked at the compensation
19 agreement in paragraph 2 of the agreement and there is
20 no percent given, you weren't worried about it. You
21 just followed the contract.
22   A.   **I think that's a fair statement.**
23   Q.   You understood that in the future you and
24 Mr. Farrell would sit down and talk and try to agree

**Page 310**

1 upon what you both considered to be fair compensation
2 to you; is that right?
3   A.   **I think that's a fair statement.**
4   Q.   Now, did you have a view during the
5 year-long period in 2004 when you were considering the
6 dissolution of Underhill -- you started thinking about
7 it in January of 2004, as I understand it, and it
8 wasn't concluded in terms of the certificate being
9 filed until November of 2004. So with that time line
10 as a backdrop -- does that sound right to you?
11   A.   **No.**
12   Q.   Okay. You had conversations with Mr. Devlin
13 and Mr. Cocke, your accountants, in the early part --
14   A.   **There was a date specific. Whatever that**
15 **date specific with that memo was, that's when it**
16 **started, the thought process.**
17   Q.   All right. So let's say then the spring of
18 2004.
19   A.   **Could be.**
20   Q.   Actually --
21   A.   **The summer.**
22   Q.   All right --
23   A.   **But whenever it was --**
24   Q.   We are talking at the same time.

**Page 311**

1     MR. BELL: Yes. Let him finish his
2 question.
3     MR. NOVACK: I know it is my fault
4 perhaps. My voice sometimes drops.
5 BY MR. NOVACK:
6   Q.   Isn't it correct that early in the year of
7 2004 you thought about analyzing the possible
8 dissolution, but Mr. Cocke was very busy because tax
9 season was coming up. He said, "Let's look at this in
10 April." There was no rush. Does that refresh your
11 recollection?
12   A.   **No.**
13   Q.   Okay. Remember in April or May of 2004 you
14 had a conference with Mr. Devlin, phone conference --
15 excuse me. Yes, with Mr. Devlin and Mr. Cocke, the
16 two accountants, to discuss the possible dissolution
17 of Underhill?
18   A.   **No. We had a discussion that bordered on**
19 **discussing tax ways for me to take advantage of my**
20 **particular situation. And at that conference that was**
21 **when the idea of the dissolution of Underhill came up,**
22 **period. Charles Cocke. My accountant, never, never**
23 **saw through it or even came up with an idea of how to**
24 **handle that. It was Charles Cocke, the specialist,**

38 (Pages 308 to 311)

Underhill Investment Corporation and Peskoff     v.     Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2     C.A. # 06-99 SLR     October 11, 2006

Page 312

1 who made the recommendation during that conference
2 call.
3 Q. I didn't mean to suggest it was your
4 accountant versus Mr. Cocke.
5 A. No, no.
6 Q. They are both accountants, as I understand
7 it.
8 A. Correct.
9 Q. Mr. Cocke gives tax advice.
10 A. Correct.
11 Q. He is a tax strategist. Okay. So by April
12 2004 you were contemplating the dissolution of
13 Underhill.
14 A. Fair, yes.
15 Q. And the dissolution papers were finally
16 effective in November of 2004. That is not in dispute
17 here. We have seen documents on that. Does that
18 sound correct to you timewise? I am just trying to
19 give you a time background for the questions.
20 A. It seems correct.
21 Q. Yes. I think we can stipulate that in front
22 of the witness --
23         MR. BELL: We can.
24         MR. NOVACK: -- that's when it was

Page 313

1 effective.
2         THE WITNESS: Okay.
3 BY MR. NOVACK:
4 Q. Now, did you understand that the contract
5 was still in force and effect with FIDAC as of
6 November 2004, when Underhill dissolved?
7 A. Repeat the question, please.
8 Q. Did you understand in November 2004, when
9 Underhill dissolved, that the February 15 letter was
10 still in full force and effect?
11 A. Yes.
12 Q. Did you seek legal advice from anyone as to
13 what the proper way was to handle the issue of the
14 contract? Since Underhill was being dissolved and it
15 was the party to the contract, did you seek legal
16 advice from anyone?
17 A. No. Didn't consider it. It wasn't part of
18 my thinking at all.
19 Q. Did you not think at all about the contract
20 with FIDAC during the period --
21 A. Not --
22 Q. During the period that you were considering
23 the dissolution?
24 A. Not once.

Page 314

1 Q. Did you believe at the time of the
2 dissolution that Underhill had any kind of damage
3 claim against FIDAC for any breach of contract at that
4 point?
5 A. I hadn't thought about it. I hadn't
6 consulted an attorney. So the answer is that did not
7 cross my mind.
8 Q. Did you regard the contract with FIDAC as a
9 potentially important source of money for you
10 personally? I am referring to at the time of the
11 dissolution.
12 A. Given the circumstances that were present,
13 no.
14 Q. Why was that?
15 A. Well, because I hadn't resolved the issues
16 with Mike Farrell --
17 Q. Okay.
18 A. -- and the transactions that were involved
19 hadn't matured.
20 Q. Based on the level of maturity of the
21 transactions as of November 2004, what was your
22 understanding as to what the fees might be on, say, a
23 10 percent basis for you?
24 A. Never thought about it.

Page 315

1 Q. Never thought about it?
2 A. Never thought about it. Never thought about
3 it.
4 Q. When is the first time you began to think
5 about how much money Underhill or you might make if
6 you made a claim under the February letter, Peskoff
7 Exhibit 6? When is the first time you ever thought
8 about how much money you might make?
9 A. When we start -- after I discussed it, sat
10 down with my lawyers, I did some research into trying
11 to understand the business that was done with Sentry,
12 you know, understand what was completed with GenCorp,
13 you know, looking at some public documents which you
14 could read, you know, which gave you an indication of
15 the amount of fees that FIDAC was generating from the
16 two transactions that I had introduced, and that they
17 were a very substantial percentage of FIDAC's revenue,
18 you know, at the time in 2'05. And at that time, you
19 know, I discussed it with counsel, and, you know, we
20 just --
21 Q. Don't tell me what counsel said. I don't
22 want --
23 A. No, I am not telling you what counsel said.
24 I discussed it with counsel. And public documents

Underhill Investment Corporation and Peskoff   v.   Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 316

1  were somewhat revealing as to the proportion of
2  income. We made some guesses, period, and that was
3  the end of it.
4      Q.   Well, it isn't entirely accurate for you to
5  say that until you looked at these public documents
6  you didn't know how much was in the pot at FIDAC, is
7  it? Because you were getting information from
8  Mr. Baptista.
9      A.   Yes, but that changed on a weekly basis.
10     Q.   Yes. It got bigger and bigger.
11     A.   Well, but it also stopped. Okay? It also
12  stopped. By the end of 2'05, you know, the original
13  thought --
14     Q.   The letter was written in September 2005.
15  So when you say the information from -- when did
16  Mr. Baptista dry up as a source of your information as
17  to the finances, or did he?
18     A.   We stopped talking about it prior to the
19  filing of the complaint, because I didn't --
20     Q.   Did you stop -- I am sorry. Go ahead.
21     A.   Prior to the complaint.
22     Q.   Did you stop talking about it before you met
23  with Mr. Ruben or after you met with Mr. Ruben?
24     A.   After I met with Mr. Ruben.

Page 317

1      Q.   Did Mr. Ruben speak with Mr. Baptista, to
2  your knowledge?
3      A.   He may have.
4      Q.   Were you ever on the phone when they spoke?
5      A.   No.
6      Q.   Did anybody ever report to you that the two
7  of them had spoken?
8          MR. BELL: Objection.
9          MR. NOVACK: On what ground?
10         MR. BELL: Well, attorney-client
11  privilege and --
12         MR. NOVACK: Is Mr. Baptista his -- is
13  Mr. Baptista Mr. Ruben's client?
14         MR. RUBEN: No.
15         MR. BELL: If you got -- let me, if I
16  may instruct the witness.
17         MR. NOVACK: Sure, yes.
18         MR. BELL: If you got information
19  responsive to his question from Mr. Baptista, you can
20  go ahead and testify. If you got information
21  responsive to his question as a result of a
22  conversation with Mr. Ruben, do not testify to that.
23         MR. NOVACK: Why don't you answer the
24  first part of it.

Page 318

1          THE WITNESS: Can you repeat the
2  question?
3  BY MR. NOVACK:
4      Q.   Did Mr. Baptista ever tell you he had spoken
5  with Mr. Ruben?
6      A.   Yes.
7      Q.   When did Mr. Baptista tell you this?
8      A.   I think sometime prior to filing the
9  complaint.
10     Q.   Did Mr. Baptista tell you anything at all
11  about the subject of their discussion, his and
12  Mr. Ruben's discussion?
13     A.   Yes.
14     Q.   What did he tell you? You are permitted to
15  answer that. That's --
16     A.   He told me that he had a discussion with
17  Ruben as to his understanding of the meeting with --
18  the second meeting with GenCorp and Mike Farrell's
19  response in terms of "I will take care of Mr. Peskoff
20  financially. It's not your responsibility."
21     Q.   Okay. Anything else did he tell you?
22     A.   No.
23     Q.   Did he tell you that Mr. Ruben asked him
24  questions about some of the facts besides that

Page 319

1  meeting?
2      A.   No, he never said anything.
3          MR. NOVACK: While I disagree with
4  your legal conclusion as to the privilege, I am not
5  going to pursue it, just so you will know that I was
6  operating in good faith. I don't believe that --
7          MR. BELL: I don't question you were
8  operating in bad faith.
9          MR. NOVACK: No, no, no. But I don't
10  think that the attorney-client privilege covers a
11  communication from a lawyer to a client simply because
12  the two were speaking. I think the only time the
13  privilege is implicated is if the lawyer's
14  communication to the client would tend to disclose a
15  confidential information furnished to the lawyer. So
16  if he called him up and said that I did my own
17  independent research on the Mets and I reported back,
18  you know, there is no disclosure of what he has given
19  to him. So that's why when I asked the question,
20  that's entirely appropriate.
21         MR. BELL: I understand your position.
22         MR. NOVACK: But given this -- you
23  know, I have to ask these questions. It is a
24  compulsion.

40 (Pages 316 to 319)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 320

1    THE WITNESS: Okay.
2  BY MR. NOVACK:
3    Q.    So when is the first time you actually did a
4  calculation in your own mind as to how much money you
5  would get from FIDAC if you made a claim under this
6  contract in February 2000?
7    A.    Quite frankly, I never made a calculation.
8    Q.    Never did?
9    A.    I never made a calculation.
10    Q.    And when is the first time you had any idea
11  in your mind at all as to how much you might make if
12  you made a claim against FIDAC, whether you did the
13  calculation or saw someone else's numbers?
14    A.    I just looked at it -- after I knew that I
15  would have to pursue it legally, I stayed on top of
16  all the information that was public --
17    Q.    Right.
18    A.    -- did some analysis of the public
19  information and said, you know, quite frankly, you
20  know, for the two deals that turned out so badly,
21  somebody is making a hell of a lot of money. Okay?
22  And in the process for two years I was knocked about
23  being expensive to them, that, you know, their
24  expenses, you know, were, et cetera, et cetera.

Page 321

1    Q.    Well, there were, in fact, expenses.
2    A.    There were.
3    Q.    You don't deny that?
4    A.    I am not debating anything. Okay?
5    Q.    So was your thought back in December 2003
6  you would say nothing then and you would wait to see
7  how things turned out, and if it was successful, then
8  you would go to Farrell and say, "I would like a piece
9  of it"?
10    A.    Well, let's put it this way. I didn't
11  pursue the legal thing, hoping that the transactions,
12  A, would work out and that he and I would come to some
13  consensus and say, you know, look, you know, these
14  things have turned out -- they have turned around.
15  GenCorp is a moneymaker. It is not a loser. You
16  know, regardless of what you think you may be entitled
17  to, let's sit down and discuss something that makes
18  sense for both of us.
19    Q.    You didn't want to make a $30,000 bet? You
20  didn't want to just say, "Look, hold the 30,000.
21  Let's resolve this later"?
22    A.    That never crossed -- $30,000 doesn't mean a
23  thing.
24    Q.    It doesn't mean a thing to you?

Page 322

1    A.    No.
2    Q.    How much would it have to be to mean
3  something to you?
4    A.    That's not the point.
5    Q.    No. I asked you a question. How much would
6  it have to be?  You said it means nothing to me.
7    A.    The $30,000 --
8    Q.    Does 30,000 mean nothing to you?
9    A.    In the way that it was given, you know, with
10  the attitude that it was given -- okay? -- I knew that
11  I had a battle on my hands right then and there.
12  Okay?
13    Q.    If 30,000 meant nothing to you, why didn't
14  you just give it back and say, "This means nothing to
15  me. You owe me so much more" or "you will"?
16    A.    Because at that point in time I was
17  contemplating a strategy based upon hoping that his
18  problems that he kept on hitting me over the head with
19  would turn around, that the deals that were dogs that
20  were costing him money would end up being successful,
21  his attitude would change, and we could go back to
22  being cordial and working something out that was
23  intelligent for two prudent businessmen.
24    Q.    Suppose it had gone south and things didn't

Page 323

1  work out.  Would you have given back any of the
2  $30,000?  Was that your plan?
3    A.    No.
4    Q.    So heads I win, tails you lose?
5    A.    No.
6    Q.    Okay.
7    A.    No.
8    Q.    Okay. Let's go to your consulting agreement
9  again. Let's go to to the first paragraph.
10  "Underhill shall provide FIDAC with such consulting
11  services as they shall agree from time to time, and
12  the assets managed by FIDAC for those clients," and
13  then it has in parentheses "the Accounts'."
14        Is there a definition of "accounts" in this
15  agreement that you can find?
16        MR. BELL:  Again, you are asking for
17  his understanding.
18        MR. NOVACK:  Yes, his understanding
19  when he read it as the party to the agreement, I mean,
20  Underhill's sole shareholder.
21  BY MR. NOVACK:
22    Q.    What did you think "the accounts" is
23  referring to in here?  Is there something in the
24  letter that you see that describes what those are?

41 (Pages 320 to 323)

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 324

1    A.    Yes. The accounts, as far as I was
2    concerned, is those customers that were brought in by
3    myself, such as the FBR REIT or the other two that we
4    have been discussing, where FIDAC-Annaly is managing
5    money, you know, for them on an ongoing basis.
6    Q.    Where does it say "customer"?
7    A.    You asked me about accounts.
8    Q.    Well, actually --
9    A.    That's what I mean by accounts.
10    Q.    I asked you to point to me the language in
11    the letter that you see as defining the word
12    "accounts." Is there any?
13    A.    I don't see any definition.
14    Q.    What do you think -- do you think "the
15    accounts" refers to individuals or firms, to people or
16    to companies, or does it refer to a pot of money that
17    is in an account that is being managed by FIDAC?
18    Which was your understanding at the time you read the
19    letter, assuming you had any understanding, that you
20    thought about it?
21    A.    Well, let's keep it in simplistic form.
22    Q.    No, no. Keep it to what is in the
23    agreement.
24    A.    No, no. My interpretation was this was

Page 325

1    drawn when I brought in the FBR REIT. I was paid
2    under this agreement so much money per month for the
3    FBR REIT and the money that he was managing for the
4    FBR REIT, period.
5    Q.    Got it. Got it.
6    A.    Okay?
7    Q.    All right. So basically you are saying that
8    this agreement had to be interpreted in light of what
9    had been done already with the FBR REIT?
10    A.    That's the only way I could interpret it.
11    Okay?
12    Q.    Okay. All right.
13    A.    Okay?
14    Q.    I got it.
15    A.    Okay?
16    Q.    So in the case of the FBR REIT, "the
17    account" would be the account that contains the money
18    that the FBR REIT was having managed by FIDAC; right?
19    A.    I would agree.
20    Q.    So it is the pool of money that has got the
21    name on it FBR REIT account? That is what we are
22    talking about when we say "the account"?
23    A.    I would think so.
24    Q.    That's the only understanding in light of

Page 326

1    the history of the transaction that led to this
2    document?
3    A.    Correct.
4    Q.    And the purpose of this document was to
5    allow him to have a record to show what he was paying
6    you for; is that right? You have to say yes.
7    A.    Yes.
8    Q.    Okay. Now, if we go to the termination
9    provision, paragraph 3; right?
10    A.    Yes.
11    Q.    Is it your view that this agreement was not
12    terminated automatically by the dissolution of
13    Underhill, that that had no effect on the agreement
14    and it still continues in existence?
15    A.    Yes.
16    Q.    Is there anything more you want to show me
17    in this agreement? I said I would give you a chance
18    to talk about it further. I don't have any more
19    questions on it, but I don't want to deprive you of
20    this, since I promised you the chance. I am not
21    suggesting you do it. I am just giving you a chance.
22    A.    I think it is self-explanatory.
23         MR. NOVACK: Well, with your help, I
24    think it is explained.

Page 327

1         Can we take a break, please? There is
2    two minutes of tape. I want to see how quick I can
3    conclude.
4         MR. BELL: Sure.
5         (Recess taken.)
6         (Peskoff Deposition Exhibit No. 23 was
7    marked for identification.)
8    BY MR. NOVACK:
9    Q.    Mr. Peskoff, we have marked while we were
10    off the record as Peskoff Exhibit 23 a document called
11    "Referral Agreement" that is between FBR Investment
12    Management, Inc. and Steve Peskoff. And is that an
13    agreement that you signed?
14    A.    Yes.
15    Q.    Did you sign it in October 2004 or -- I
16    notice the agreement states it is made as of October
17    2004. Was it signed in 2004?
18    A.    Yes.
19    Q.    Now, did you make mention of this agreement
20    in your testimony yesterday and you want to just tell
21    us what this agreement refers to now?
22    A.    Well, you asked me a question about prior
23    finder fees agreement, and I said that there weren't
24    any. Upon going through the files yesterday, my

42 (Pages 324 to 327)

Underhill Investment Corporation and Peskoff    v.    Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2    C.A. # 06-99 SLR    October 11, 2006

Page 328

1    assistant found it is called the referral fee
2    agreement that could be defined as a finder's fee
3    agreement, so I wanted to restate that there was a
4    mistake made, that this -- there is a finder's fee
5    agreement that exists between myself and FBRIM.
6    Q.    FBRIM. Okay.
7    A.    Okay.
8    Q.    FBRIM is an investment -- what is the
9    business of FBRIM?
10    A.    They manage money within FBR.
11    Q.    Is that similar to the business of FIDAC in
12    the sense that it manages other people's money?
13    A.    I think so, yes.
14    Q.    Next is -- let's look at the complaint for
15    one moment. That is Exhibit 21, I believe, Peskoff
16    Exhibit 21. Is that right?
17        MS. KENNEY:  Yes.
18    BY MR. NOVACK:
19    Q.    I would like to ask you to turn to page 6 of
20    the complaint, please, paragraph 37 of the complaint.
21    Would you read it to yourself for a minute. (Pause)
22        I think you testified yesterday that you
23    read the complaint before it was filed?
24    A.    Yes.

Page 329

1    Q.    Paragraph 37 refers -- well, paragraph 37
2    reads in part as follows:  "Underhill and Peskoff
3    provided services to FIDAC with the expectation that
4    they would be paid for the services in accordance with
5    the Agreement," capital A agreement, "discussions
6    between the parties, and industry custom." What is
7    the industry custom to what you are referring, to
8    which you are referring? Let me ask that again.
9        Paragraph 37 refers to industry custom.
10    What industry custom are you referring to?
11    A.    I am referring to the type of business that
12    FIDAC manages for clients, institutions and others and
13    what is the customary fee that is paid, you know, for
14    somebody who brings business in to be managed by that
15    account.
16    Q.    Can you give me one example of industry
17    custom where the person who is paid the fee has merely
18    made an introduction to someone who turns out to be a
19    business partner to the investment advisor and is not
20    providing their own money, their own pool of capital?
21    A.    I -- in this specific example, I mean, since
22    my experience in this area was limited to FBR REIT and
23    the circumstances with that and GenCorp and Sentry,
24    those -- you know, I -- and that's not my area of

Page 330

1    expertese, that's the limit of my experience.
2    Q.    Now, next question. In your complaint in
3    this action you allege in paragraph 10 the following.
4    That is on page 2.
5    A.    Yes.
6    Q.    You allege, "The language of the Agreement,"
7    capital A -- that is referring to the February letter
8    we have talked about. Okay. I will read it again.
9    You allege in paragraph 10 as follows:  "The language
10    of the Agreement," capital A agreement, "and the
11    parties' course of dealing demonstrate the parties'
12    joint intent that Underhill was to receive 10 percent
13    of the revenues received by FIDAC which resulted from
14    Underhill's efforts to find or facilitate business for
15    FIDAC."
16        As you sit here today, are you still
17    contending that you want to recover 10 percent of the
18    fees received by FIDAC with respect to Premier or MBS
19    Trusts or is that percentage number now changed or you
20    don't know what percent you are claiming?

REDACTED

Page 331

REDACTED

7    Q.    Well, no. I am asking you.
8    A.    Yes.
9    Q.    You are the man who says, "I am entitled to
10    money here." Are you claiming now that you are
11    entitled to 10 percent? Is that what you are asking
12    for in this lawsuit still?
13    A.    I discussed this with my lawyers and we --
14    Q.    Don't --
15        MR. BELL:  No, no.
16        MR. NOVACK:  Don't tell me what the
17    lawyers said. I want to know --
18        THE WITNESS:  No, I am not going to
19    tell you what the lawyers said. We discussed this
20    because of the way that this thing was drafted. Okay?
21    It was focused on that December '03 discussion, and it
22    was not right -- okay? -- because, in fact, if I was
23    drafting it based upon something, I probably should
24    have drafted it based upon the 20 percent of his fee

Underhill Investment Corporation and Peskoff          v.          Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2          C.A. # 06-99 SLR          October 11, 2006

Page 332

1  that he paid me under the FBR REIT.
2          So if I was amending this, you know,
3  per se without taking in account some of the other
4  things that we talked about, being reasonable, you
5  know, what is reasonable fees, discussion, size, all
6  that stuff, you know, this should have said 20
7  percent.
8  BY MR. NOVACK:
9  Q.    My question to you --
10 A.    I understand what your question is.
11 Q.    My question to you now is the following:
12 Based on the facts as you now understand them, is it
13 necessary for you to go back to your office and think
14 about all the different factors that you say you have to
15 be taken into account in coming up with a percent, and
16 then after you have thought about all those factors,
17 talk with your counsel, and then as a result of
18 whatever legal advice they give you, you will then
19 figure out what percent you are going to claim in your
20 amended complaint?
21 A.    Or the method of claiming, yes.
22 Q.    Yes. That is something you have to figure
23 out? You can't tell us right now?
24 A.    No, no, no. That's correct.

Page 333

1  Q.    That is something you can't just turn to
2  some document and say this is the percent?
3  A.    That's correct. That's correct.
4          MR. NOVACK: I have no more questions.
5          MR. BELL: We have no questions.
6          MR. NOVACK: Thank you. Thank you
7  very much for your patience. Thank you guys for your
8  courtesy.
9          - - -
10         (Deposition concluded at 1:40 p.m.)
11         - - -

Page 334

1                INDEX
2  PESKOFF DEPOSITION EXHIBITS          Marked
3  4 Plaintiffs' objections and responses to
      defendant's first request for production
4    of documents----------------------------------- 165
5  5 Letter dated 9/9/05, from Mr. Ruben to
      Mr. Farrell------------------------------------------ 165
6
7  6 Consulting agreement dated 2/15/00,
      signed by Messrs. Farrell and Peskoff----- 165
8  7 Original handwritten note from
      Mr. Peskoff to Mr. Farrell------------------- 165
9
10 8 Letter dated 4/7/05, from Mr. Peskoff to
      Mr. Farrell
11 9 Mr. Peskoff's memo dated 7/24/03----------- 165
12 10 Email dated 12/16/03, from Mr. Farrell
      to Mr. Kazel----------------------------------- 165
13
14 11 Photocopy of Check No. 245, dated
      12/22/03, in the amount of $30,000, with
15   photocopied check stub--------------------- 165
16 11A Photocopy of Check No. 245, dated
      12/22/03, in the amount of $30,000, with
      original check stub------------------------- 208
17
18 12 Photocopy of front and back of endorsed
      and deposited Check No. 245------------- 165
19 13 Mr. Peskoff's memo dated 2/27/04------- 165
20 14 Photocopy of Mr. Peskoff's handwritten
      meeting notes------------------------------ 165
21
22 14A Original of Mr. Peskoff's handwritten
      meeting notes------------------------------ 231
23 15 Letter dated 4/12/04, from Mr. Peskoff
      to Mr. Kazel-------------------------------- 165
24

Page 335

1  PESKOFF DEPOSITION EXHIBITS, Cont'd.          Marked
2  16 Letter dated 4/20/04, from Mr. Kazel to
      Mr. Peskoff----------------------------------- 165
3
   17 Mr. Peskoff's memo dated 12/22/04, with
4     handwritten notations----------------------- 165
5  18 Mr. Peskoff's memo dated 3/7/05---------- 165
6  19 Mr. Peskoff's memo dated 4/19/05--------- 165
7  20 Mr. Peskoff's memo dated 6/1/05----------- 165
8  21 Complaint------------------------------------- 165
9  22 Mr. Peskoff's written rendering of one
      basis point----------------------------------- 243
10
   23 Referral agreement dated 10/22/04, between
11    FBRIM and Mr. Peskoff--------------------- 327
12         - - -
13 (Exhibits not attached; returned to Edwards Angell
   for copying.)

Underhill Investment Corporation and Peskoff        v.        Fixed Income Discount Advisory Company
Stephen D. Peskoff, Volume 2            C.A. # 06-99 SLR            October 11, 2006

Page 336

```
1                    CERTIFICATE
2            I, LORRAINE B. MARINO, Registered
3    Diplomate Reporter and Notary Public, do hereby
4    certify that the witness, STEPHEN D. PESKOFF, after
5    being duly sworn by me, was examined by counsel for
6    the respective parties and the questions of said
7    witness and his answers were taken down by me in
8    stenotype notes and thereafter transcribed into
9    typewriting at my direction.
10           I certify that the foregoing is a true
11   and correct transcript of the testimony given at said
12   examination of said witness.
13           I further certify that the deposition
14   was made available to the witness for reading and
15   signing.
16           I further certify that I am not
17   counsel, attorney, or relative of either party, or
18   otherwise interested in the event of this suit.
19
20
21
           Registered Diplomate Reporter and Notary Public
22           Certificate No. 181PS/Exp.: Permanent
23
     Date:  10/20/06
24
```

Wilcox & Fetzer, Ltd.        Professional Court Reporters        A-162        45 (Page 336)
(302)655-0477

VOL. 2

ATTACH TO DEPOSITION OF: _Stephen D. Peskoff_

DATE TAKEN: _10-11-06_

IN THE MATTER OF: _Underhill Investment v Fixed Income_

## ERRATA SHEET

**INSTRUCTIONS:** After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. <u>Do not make any marks or notations on the transcript itself.</u> Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 255 | 17 | Change "April" (both) to "February" |
|  |  | deponent misspoke in referring to February 15, 2000 |
|  |  | Agreement (Peskoff Ex. 6) |
| 311 | 22 | Change "Charles Cocke" to "John Devlin" |
|  |  | Deponent misspoke in identifying accountant. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _11/9/06_       _Stephen D. Peskoff_
                    (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
            1330 King Street
            Wilmington, DE  19801

**A-163**

# In The Matter Of:

*Underhill Investment Corp., and S. Peskoff v.*
*Fixed Income Discount Advisory Company*

---

*Stephen D. Peskoff*
*Vol. 1, December 12, 2006*

---

*Greenhouse Reporting, Inc.*
*Computerized Litigation Support*
*363 Seventh Avenue*
*20th Floor*
*New York, NY  10001*
*(212) 279-5108     FAX: (212) 279-5431*

*Original File SP121206.V1, 75 Pages*
*Min-U-Script® File ID: 3887849074*

**Word Index included with this Min-U-Script®**

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

---

Page 359

[1]
[2] IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF DELAWARE
[3]
[4] UNDERHILL INVESTMENT
    CORPORATION, by and through
    Stephen D. Peskoff as successor in
    interest, and STEPHEN D. PESKOFF,
[6] individually,
            Plaintiffs,   Civil Action No.
[7]     -against-         06-99-SLR
[8] FIXED INCOME DISCOUNT
    ADVISORY COMPANY,
[9]         Defendant.
[10]
[11]        December 12, 2006
            3:39 p.m.
[12]
[13]
[14]        CONTINUED DEPOSITION of
[15] STEPHEN D. PESKOFF, taken by Defendant, pursuant
[16] to Subpoena, at the law offices of Kirkpatrick &
[17] Lockhart Nicholson Graham LLP, 599 Lexington
[18] Avenue, New York, New York, 10022-6030, before
[19] Eleanor Greenhouse, a Shorthand Reporter and
[20] Notary Public within and for the State of New
[21] York.
[22]
[23]
[24]        GREENHOUSE REPORTING, INC.
[25]        363 Seventh Avenue - 20th Floor
            New York, New York  10001

---

Page 360

[1]
[2] APPEARANCES:
[3] RUBEN & ARONSON, LLP
       Attorneys for Plaintiffs
[4]    4800 Montgomery Lane, Suite 150
       Bethesda, Maryland  20814
[5] BY:  ROBERT L. RUBEN, Esq.
[6]
[7]
[8] KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
       Attorneys for Defendant
[9]    599 Lexington Avenue
       New York, New York  10022-6030
[10] BY:  GERALD NOVACK, ESQ.
        - and -
[11]      SARAH P. KENNEY, ESQ.
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 361

[1]                    S. Peskoff
[2] STEPHEN D. P ESKOFF, resumed as a
[3] witness, having been previously sworn by
[4] the Notary Public, was examined and
[5] testified further as follows:
[6]                 EXAMINATION BY
[7]     MR. NOVACK:
[8]     Q: Mr. Peskoff, you are here today by
[9] an agreement to resume testimony in your
[10] deposition. I remind you that you are still
[11] under oath. Do you understand that?
[12]    A: Yes.
[13]    MR. NOVACK: After the last session
[14] of your deposition, you filed an amended
[15] complaint. I'm going to mark that as
[16] Peskoff Exhibit 30.
[17]    (Peskoff Exhibit 30, amended
[18] complaint, was marked for identification.)
[19]    MR. RUBEN: Why don't we put on the
[20] record our agreement that today's
[21] continuation of the deposition will be
[22] limited to the new material in the
[23] complaint and the new documents that we've
[24] provided you.
[25]    MR. NOVACK: That's fine with me.

---

Page 362

[1]                    S. Peskoff
[2] That's fine with me, except that some of
[3] the new material in the complaint relates
[4] back to some of the things we discussed
[5] before. So I think we're going to have
[6] to —
[7]     MR. RUBEN: If it's rationally
[8] related, we will work with you. If it's
[9] far afield, we will object and direct him
[10] not to answer.
[11]    MR. NOVACK: It's all right for you
[12] to take whatever position you want, but
[13] hopefully we won't get into a dispute.
[14]             EXAMINATION
[15]          BY MR. NOVACK:
[16]    Q: Mr. Peskoff, did you read the
[17] amended complaint which is Peskoff Exhibit 30?
[18]    A: I did, a while ago.
[19]    Q: Did you read it before it was filed?
[20]    A: Yes.
[21]    Q: With whom did you discuss the
[22] substance of the amended complaint? I don't want
[23] to know the conversations. I just want to know
[24] with whom you discussed it.
[25]    A: Only with my lawyers.

---

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Page 363

**S. Peskoff**

[1]
[2] Q: That's Mr. Ruben and Mr. Bell?
[3] A: Correct, and there's another lawyer.
[4] Q: With Mr. Bell's firm?
[5] A: Yes.
[6] Q: Todd?
[7] A: Todd, yes.
[8] Q: I'd like you to go to paragraph 9.
[9] A: Paragraph 9.
[10] Q: It states, "Following dissolution,
[11] Underhill distributed and assigned to Peskoff,
[12] among other things, all of its rights, interests,
[13] and claims against FIDAC." Do you see that?
[14] A: Yes.
[15] Q: Are you referring to some documents
[16] as reflecting this distribution and assignment to
[17] you?
[18] A: Yes.
[19] MR. NOVACK: Do we have the other
[20] documents that were recently produced? Why
[21] don't we go off the record a minute. We
[22] can stay on the record. The reporter can
[23] mark physically these documents in order
[24] and then I'll describe them at one time.
[25] Q: Looking at paragraph 9 of the

Page 364

**S. Peskoff**

[1]
[2] complaint still, before we go to the newly marked
[3] documents, what did you understand this to be
[4] referring to in paragraph 9, the assignment to
[5] you of all of the rights and claims that
[6] Underhill had against FIDAC? Did you understand
[7] that those claims had been transferred to you
[8] outright?
[9] A: Yes.
[10] Q: And that they no longer were the
[11] property of Underhill?
[12] A: Yes.
[13] Q: What did you base that conclusion
[14] on, documents you've looked at or things you've
[15] said?
[16] A: Lawyers' advice when we originally
[17] decided —
[18] Q: I don't want to inadvertently get
[19] into your lawyers' advice, unless it's something
[20] which is intended to be public anyway, which it
[21] may be, frankly, what you're trying to accomplish
[22] here. Mr. Ruben will guide you.
[23]     Let me ask it a different way. Let
[24] me ask another question: Is it your belief that
[25] Underhill no longer has the cause of action

Page 365

**S. Peskoff**

[1]
[2] against FIDAC, and that you, personally and
[3] individually, are the owner of that cause of
[4] action?
[5] A: Yes.
[6] Q: Is it your belief that that was the
[7] state of affairs that existed at the time of your
[8] first deposition?
[9] A: No, it did not.
[10] Q: It's your belief that after your
[11] deposition, something took place which resulted
[12] in you now being the holder of the claim that
[13] Underhill had against FIDAC?
[14] A: That is correct.
[15] Q: What are the events that occurred
[16] thereafter that lead you to this conclusion?
[17] A: Well, when we decided with the
[18] accountants to take the company — not take the
[19] company down, but to dissolve the company, you
[20] know, I asked them to assign everything that we
[21] had in the company to me as being the sole
[22] shareholder and sole debtor. And in reviewing, I
[23] asked Rob and some other lawyer to review to make
[24] sure that all the things that were possible to
[25] assign from the company were done appropriately,

Page 366

**S. Peskoff**

[1]
[2] and my accountants did not do everything that
[3] they should have done to protect my interests and
[4] make the assignment accordingly.
[5] Q: And?
[6] A: And so subsequently, we made these
[7] changes.
[8] Q: Which accountants did not do what
[9] you wanted?
[10] A: Basically, my regular accountant and
[11] the tax guy that were supposed to work together.
[12] Q: That's Mr. Devlin and Mr. Cocke?
[13] A: Right.
[14] Q: So they messed up?
[15] A: I wouldn't say they messed up. I
[16] mean, the point is at the time the company was
[17] being dissolved, we didn't foresee any claims of
[18] action or anything against anybody else, but I
[19] asked them to protect my rights and give me
[20] everything the company has, and you know, but
[21] upon checking it, this obviously was something
[22] that should have been done and we did it after.
[23] Q: You said, I believe, "At the time
[24] the company was dissolved, we didn't foresee any
[25] claims of action against anybody else."

**Underhill Investment Corp., and S. Peskoff v.**
**Fixed Income Discount Advisory Company**

Stephen D. Peskoff
Vol. 1, December 12, 2006

Page 367

**S. Peskoff**

[1]
[2]  **A:** No. What I said was at the time the
[3] decision was made to dissolve the company, there
[4] were no claims of action against anybody, and
[5] what I asked my accountants to do is protect my
[6] total interests, and anything and any possible
[7] thing that could be assigned from the corporation
[8] to me, whether we — it was $2.00 of cash or real
[9] estate assets or whatever, be assigned
[10] accordingly. Upon checking it, you asked me,
[11] between the first and second — and the first
[12] deposition after, we found that they hadn't done
[13] their work to the satisfaction, and they — we
[14] amended — we amended it to include, you know,
[15] the lawsuit as well as whatever other assets were
[16] included in the amendment.
[17]  **Q:** You said at the time the decision
[18] was made to dissolve, there was no claim against
[19] anybody. Is that right?
[20]  **A:** That is correct.
[21]  **Q:** When did you first come to believe
[22] there was a claim that Underhill had against
[23] FIDAC?
[24]  **A:** Well, when we actually filed the
[25] lawsuit.

Page 368

**S. Peskoff**

[1]
[2]  **Q:** When was that, February 2006?
[3]  **A:** Is that when we — whenever we filed
[4] the — I don't have the dates in front of me.
[5] Whenever we filed — if it was February 2006,
[6] that's when it was.
[7]  **Q:** When did you believe for the first
[8] time that Underhill had a right to bring a claim
[9] against FIDAC?
[10]  **A:** Because I mean, originally, when we
[11] discussed the lawsuit, we discussed it in terms
[12] of both Underhill and myself together, because a
[13] lot of the work was being — even though I was
[14] the one that was doing the work, Underhill was
[15] the recipient of a lot of business income. I was
[16] getting paid through Underhill. So the decision,
[17] you know, was made, you know — and I don't
[18] remember whether the original lawsuit was
[19] Underhill and Steve Peskoff, or it was strictly
[20] Steve Peskoff.
[21]  **Q:** My question is, when did you, in
[22] your mind, first come to the belief that
[23] Underhill, if it chose to, could bring a lawsuit
[24] against FIDAC for not paying you anything with
[25] respect to Premier or Century Select? When?

Page 369

**S. Peskoff**

[1]
[2]  **MR. RUBEN:** I object as to form.
[3]  **A:** Probably, you know, a couple of
[4] months ago. Because that was a — because I
[5] realized that the lawsuit was an asset, you know,
[6] of Underhill, potentially, if Underhill recovered
[7] in a lawsuit, and A, Underhill owed me money, so
[8] this was a way, if Underhill won, money would go
[9] into Underhill and Underhill would reduce the
[10] debt to me or pay me off the $5 million plus that
[11] Underhill owed me.
[12]  **MR. RUBEN:** Can I try to help here?
[13]  **MR. NOVACK:** No. But thank you.
[14]  **Q:** Putting aside whether Underhill was
[15] going to sue or you were going to sue, I want to
[16] know when was the first time you believed that
[17] FIDAC had breached some alleged agreement with
[18] you and you or Underhill had the right to sue
[19] FIDAC, there was a claim that could be made by
[20] either you or Underhill?
[21]  **A:** Why don't you repeat the question
[22] slowly. The first time I alleged —
[23]  **Q:** I'll ask it again. In your mind,
[24] when did you first come to the view that FIDAC
[25] had breached a contract with you and you or

Page 370

**S. Peskoff**

[1]
[2] Underhill had a right to sue?
[3]  **A:** Probably in my original discussions
[4] with Rob Ruben.
[5]  **Q:** That would be in September 2005 or
[6] August 2005?
[7]  **A:** Whenever I had my original meeting
[8] with Rob Ruben.
[9]  **Q:** Is it correct then, in your mind,
[10] you did not think that Underhill had a claim
[11] against FIDAC for breach of contract before you
[12] met Mr. Ruben?
[13]  **A:** Before I — I hadn't been planning
[14] on filing a lawsuit before I met Mr. — the
[15] answer is before I sat down with Mr. Ruben to
[16] discuss the possibility of a lawsuit, because I
[17] felt that I hadn't gotten paid appropriately,
[18] whether it was myself or Underhill, I wanted to
[19] know whether — you know, what his legal opinion
[20] was whether there was a — and I had him look at
[21] some —
[22]  **MR. RUBEN:** Let's not get into any
[23] communications between us.
[24]  **THE WITNESS:** Okay.
[25]  **Q:** Are you saying that — I'm keeping

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

---

Page 371

**S. Peskoff**

[1]
[2] it simple. I want you to just listen to my
[3] question.
[4]    A: I'm trying to understand your
[5] question.
[6]    Q: I don't think it's that difficult.
[7] There came a time when you came to a conclusion
[8] that you thought FIDAC had not honored a
[9] contractual obligation to Underhill or to you,
[10] personally. One or the other. When was the
[11] first time that you thought, "Hey, FIDAC has
[12] breached its commitment to me by not paying"?
[13] Was it when you went to see Mr. Ruben?
[14]    A: Before that.
[15]    Q: When?
[16]    A: Before that. It's — it was over a
[17] period of time before that when Mike Farrell and
[18] I could not have a meeting of the minds.
[19]    Q: Give me —
[20]    A: I don't know the exact date. It was
[21] over a period of time when I saw that other
[22] people were getting paid. Money was being
[23] transferred, and, you know, I was trying to sit
[24] down with him and to finalize something that I
[25] thought that could be a negotiation between the

---

Page 372

**S. Peskoff**

[1]
[2] two of us.
[3]    Q: So you can't tell us if it was in
[4] 2005 or 2004 or 2003?
[5]    A: It was probably in 2004, and started
[6] in 2003.
[7]    Q: Okay.
[8]    A: It was probably — now I understand
[9] where you're going.
[10]    Q: You don't understand where I'm going
[11] necessarily, but you understand what I'm asking.
[12]    A: Yes.
[13]    Q: So now you're telling us that you
[14] believed in 2003 or 2004 —
[15]    A: You know, that I brought some
[16] business in the door.
[17]    Q: We don't need the full explanation.
[18] I'm just trying — I'll let you give it. I'm not
[19] going to cut you off, but you will be here
[20] longer, trust me.
[21]    A: I want to answer your questions.
[22]    Q: Then listen to my question. So
[23] let's try again. The decision to dissolve
[24] Underhill was made by you early in 2004, is that
[25] right, the decision in principle? That's when

---

Page 373

**S. Peskoff**

[1]
[2] you spoke to Mr. Devlin and Mr. Cocke?
[3]    A: I think it was the summer of 2004.
[4]    Q: Actually, we have the memo that says
[5] in May of 2004 you spoke with the accountants.
[6]    A: Then that's exactly when it was.
[7]    Q: And we recall from the prior
[8] testimony that it was in January or so that
[9] Mr. Cocke suggested the notion of liquidating
[10] Underhill. So in January, he suggests the
[11] notion. Everybody is busy for taxes. In May of
[12] 2004, there's a conference call with Mr. Devlin,
[13] Mr. Cocke and you about dissolving Underhill.
[14]    A: Okay.
[15]    Q: Okay?
[16]    A: Okay.
[17]    Q: We're at May 2004. Here's my
[18] question: When you had that conversation, did
[19] you believe that Underhill might have a breach of
[20] contract claim against FIDAC because Underhill
[21] wasn't being paid?
[22]    A: One of us, whether it was myself or
[23] Underhill, there was a possibility of — there
[24] was a problem between Mike Farrell and myself
[25] that one of us could eventually have a lawsuit

---

Page 374

**S. Peskoff**

[1]
[2] against Mike Farrell.
[3]    Q: Recognizing that Underhill was going
[4] to be dissolved, am I correct you still did not
[5] say anything to the accountants that Underhill
[6] might have a claim against Mr. Farrell or, FIDAC
[7] actually; right? You didn't tell the accountants
[8] that you thought that Underhill might have a
[9] claim against FIDAC and they ought to make sure
[10] that that's transferred?
[11]    A: That is correct. I did not.
[12]    Q: Even though you say you believed
[13] around April of 2004 that Underhill might have a
[14] claim against FIDAC, you didn't mention it to the
[15] accountants?
[16]    A: Did no.
[17]    Q: But you wanted them to protect
[18] Underhill's right to sue FIDAC, but you didn't
[19] tell them about what they had to protect; is that
[20] right?
[21]    A: No, that's not right.
[22]    Q: Tell me what you told them.
[23]    A: What I said to them was, "Make sure
[24] when we liquidate the company that all the
[25] potential assets, whatever is there, is assigned

---

Min-U-Script®   Greenhouse Reporting, Inc. (212)279-5108

A-168

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

Page 375

*S. Peskoff*

[1]
[2] to me to protect me in the best way possible."
[3] At that point in time, when we're talking about
[4] '04, April-May of '04, right, I had not made the
[5] decision to sue anybody, although in my mind I
[6] knew there was a problem that could lead to a
[7] lawsuit.
[8]    **Q:** By August of 2004, you didn't forget
[9] that you believed that Underhill had a claim
[10] against FIDAC, whether or not it chose to bring
[11] it. You still remembered you had that claim,
[12] you're testifying; right?
[13]    **MR. RUBEN:** Objection to form.
[14]    **Q:** Did you believe in August 2004?
[15]    **A:** I believed that there was a claim
[16] against FIDAC, whether it was Underhill or
[17] myself, either one of us.
[18]    **Q:** Am I correct as late as August 2004,
[19] you still didn't say to the accountants, "Make
[20] sure" —
[21]    **A:** That is correct.
[22]    **Q:** "Make sure that you protect the
[23] right to sue FIDAC," you never said that to the
[24] accountants?
[25]    **A:** I never said that to the

Page 376

*S. Peskoff*

[1]
[2] accountants.
[3]    **Q:** Nor to any lawyers?
[4]    **A:** Nor to any lawyers at that time.
[5]    **Q:** In November 2004, the dissolution of
[6] Underhill was effective?
[7]    **A:** That is correct.
[8]    **Q:** At no time before then did you say
[9] to anybody involved in the dissolution process on
[10] your behalf, "Make sure that you're preserving
[11] the right of Underhill or me to sue FIDAC"?
[12]    **A:** That is correct.
[13]    **Q:** Did you think it was an important
[14] claim worth a lot of money that you potentially
[15] were trying to protect?
[16]    **A:** What I was hoping —
[17]    **Q:** No, no. Did you think it was
[18] important?
[19]    **A:** The answer is no, I didn't think it
[20] was important at that time, because I was hoping
[21] that I wouldn't have to file a lawsuit, that Mike
[22] and I would negotiate something that was
[23] settleable between the two of us.
[24]    **Q:** So is that the reason that you
[25] didn't tell any of the accountants or the lawyers

Page 377

*S. Peskoff*

[1]
[2] that were doing the dissolution?
[3]    **A:** About that particularly?
[4]    **Q:** Yes.
[5]    **A:** Yes, because the decision hadn't
[6] been made to file a lawsuit.
[7]    **Q:** In your mind, if you hadn't yet
[8] decided whether to file a lawsuit, it wasn't
[9] important to tell the accountants that they ought
[10] to protect your right to do it at a later date?
[11]    **A:** All I instructed the accountants was
[12] to assign everything possible that could result
[13] in an asset play to me to me and they didn't do
[14] it appropriately upon investigation after the
[15] fact.
[16]    **Q:** And the only way you learned about
[17] that was as a result of your deposition?
[18]    **A:** No. Well, it wasn't my deposition.
[19] It was having some lawyers review the dissolution
[20] of Underhill to see that everything there was
[21] protected.
[22]    **Q:** What lawyers reviewed that?
[23]    **A:** A lawyer from — well, Rob Ruben's
[24] office in conjunction with a lawyer from Ohio.
[25]    **Q:** Who is that lawyer? What is his

Page 378

*S. Peskoff*

[1]
[2] name?
[3]    **A:** Ritzell?
[4]    **REQ MR. NOVACK:** Can you give me his
[5] name in a blank in the transcript, can you
[6] give me the name and address of the lawyer
[7] in Ohio that did this recent dissolution
[8] review?
[9]    **MR. RUBEN:** Sure.
[10] INSERT: _____
[11]
[12]    **Q:** When did you first think that you
[13] had to consult with the Ohio lawyer to see if the
[14] dissolution was properly done?
[15]    **MR. RUBEN:** Objection.
[16]    **MR. NOVACK:** When is objectionable?
[17]    **Q:** When did you first decide to go back
[18] to this Ohio lawyer who —
[19]    **A:** Upon sitting down with both Tom Bell
[20] and Rob Ruben, they made a suggestion —
[21]    **Q:** Just the when. Was it after your
[22] deposition?
[23]    **A:** I think — no, it wasn't after. The
[24] issue — we discussed it before the deposition.
[25]    **Q:** Okay.

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

---

Page 379

**S. Peskoff**

[1]
[2]  **A:** We discussed it before the
[3] deposition, yes. Yes.
[4]  **Q:** Look at the first page of your
[5] amended complaint. Look at the caption. It
[6] reads, "Underhill Investment Corporation, by and
[7] through Steven D. Peskoff, as successor in
[8] interest. And Stephen D. Peskoff individually."
[9] Is it your understanding that this lawsuit is
[10] being brought by Underhill, or is it being
[11] brought by you? Who has the cause of action in
[12] your mind?
[13]  **A:** Obviously both of us.
[14]  **Q:** You think it can be in both places
[15] at the same time, the cause of action?
[16]  **A:** Well, the cause of action —
[17]  **Q:** Let me tell you this. I'm willing
[18] to let Mr. Ruben tell me what the position is if
[19] he can articulate it, but it seems to me,
[20] Mr. Ruben, you're taking the position that it's
[21] still with the Underhill, and then you're saying
[22] it's with him, individually, and I don't see how
[23] both can co-exist in the same physical universe
[24] that I'm engaged in here. How can it be in both
[25] places? It can only be in one place at a time.

---

Page 380

**S. Peskoff**

[1]
[2] This is not for you, it's for your lawyer, if he
[3] wants to.
[4]  **MR. RUBEN:** I'm not going to
[5] testify.
[6]  **MR. NOVACK:** Or explain the
[7] inexplicable.
[8]  (Peskoff Exhibit 31, Collateral
[9] Assignment, Pledge Agreement and Security
[10] Agreement, Bates stamp number P 339 through
[11] 41, marked for identification.)
[12]  **Q:** Let's go to Peskoff Exhibit 31.
[13] It's a document which is described as Collateral
[14] Assignment, Pledge Agreement and Security
[15] Agreement. This has Bates stamp number P 339
[16] through 41. This was furnished to us after your
[17] deposition. Have you seen this document before
[18] today?
[19]  **A:** Yes.
[20]  **Q:** That's your signature on the last
[21] page?
[22]  **A:** That is correct.
[23]  **Q:** You signed as the president and sole
[24] shareholder of Underhill Investment Corporation?
[25]  **A:** That is correct.

---

Page 381

**S. Peskoff**

[1]
[2]  **Q:** And you signed as the pledgor.
[3] Underhill is the pledgor, right?
[4]  **A:** Yes.
[5]  **Q:** And Stephen D. Peskoff is the
[6] pledgee, as an individual.
[7]  **A:** Right.
[8]  **Q:** Do you know what a pledge is?
[9]  **A:** What a pledge is?
[10]  **Q:** Or do you know what a security
[11] agreement does?
[12]  **A:** Yes.
[13]  **Q:** It gives another person an interest
[14] in an asset that's held by the pledgor or the
[15] giver of the security; right?
[16]  **A:** Right.
[17]  **Q:** Let's look at this document. This
[18] document, by the way, was executed by you on
[19] December 6, 2006. Right?
[20]  **A:** Um-hum.
[21]  **Q:** It's between Underhill as pledgor
[22] and Stephen Peskoff as pledgee. It says, "This
[23] agreement is made as security for the following,"
[24] and it refers to certain loans and advances that
[25] you had made to Underhill. Okay?

---

Page 382

**S. Peskoff**

[1]
[2]  **A:** Yes.
[3]  **Q:** In paragraph 1 it says, "The
[4] pledgor," that's Underhill, "assigns and
[5] transfers a security interest to the pledgee in
[6] those claims of the pledgor," that would be
[7] Underhill, "against FIDAC." Do you see that?
[8]  **A:** Yes.
[9]  **Q:** And it refers to that claim that
[10] belongs to Underhill as the collateral that is
[11] being assigned as a security interest. Right?
[12]  **A:** Yes.
[13]  **Q:** And it says here, "The pledgor
[14] appoints the pledgee as attorney-in-fact for the
[15] transfer and perfection of the pledge, and the
[16] pledgee shall hold its security interest in the
[17] collateral as security for the repayment of the
[18] debt." Do you see that there? Now, as I read
[19] that, that indicates to me that Underhill has an
[20] asset, which is its claim against FIDAC, and it
[21] has assigned that asset as security for the
[22] repayment of the debt. Is that how you
[23] understand it?
[24]  **A:** I understand it if there is — since
[25] A, Underhill owes me money, and if there is an

---

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

Page 383

**S. Peskoff**

[1]
[2] award or a settlement with FIDAC, that whatever
[3] monies that would go to Underhill as one of the
[4] plaintiffs would be paid to me as part of the
[5] assets that I own as a debtholder in the — to
[6] reduce the debt that Underhill owes me.
[7]     **Q:** The claim that has been assigned is
[8] given as collateral?
[9]     **A:** That is correct.
[10]     **Q:** The claim still belongs to
[11] Underhill; correct?
[12]     **A:** That is correct.
[13]     **Q:** It does not belong to you as the
[14] owner of the claim. You're just a co-holder of
[15] the collateral; right?
[16]     **A:** That's what it says, yes.
[17]     **Q:** So we both agree that the claim, if
[18] there is a claim, still resides with Underhill;
[19] is that right?
[20]     **A:** That's what it says, yes.
[21]     (Peskoff Exhibit 32, document
[22] entitled, "Certified Minutes of Meeting of
[23] the Board of Directors of Underhill
[24] Investment Corporation," Bates stamped
[25] P 342 through 43, was marked for

Page 384

**S. Peskoff**

[1]
[2] identification.)
[3]     **Q:** Let's go to Peskoff Exhibit 32.
[4] This document is entitled, "Certified Minutes of
[5] Meeting of the Board of Directors of Underhill
[6] Investment Corporation." It's Bates stamped P
[7] 342 through 43. Do you have that in front of
[8] you?
[9]     **A:** Yes.
[10]     **Q:** That's your signature on the second
[11] page?
[12]     **A:** Yes.
[13]     **Q:** This was executed December 6, 2006?
[14]     **A:** That is correct.
[15]     **Q:** And you want it to be effective
[16] August 23, 2004? Right?
[17]     **A:** Yes.
[18]     **Q:** The first paragraph says that you're
[19] the president and you certify that the following
[20] action was taken at a meeting of the directors of
[21] the corporation held on the 23rd day of August
[22] 2004. And there's a resolution that appears here
[23] which supposedly was adopted on August 23, 2004.
[24]     Was there, in fact, a meeting of the
[25] directors of the corporation that you attended on

Page 385

**S. Peskoff**

[1]
[2] August 23, 2004?
[3]     **A:** No.
[4]     **Q:** So this is untrue, what it says in
[5] the first paragraph; correct?
[6]     **A:** That there was a — a physical
[7] meeting? I was the only director of the company,
[8] so that there weren't other directors of
[9] Underhill. But so that there was — you know —
[10]     **Q:** On that day, August 23, 2004, you
[11] didn't stop at any time and say, "I'm now holding
[12] a directors' meeting," or pass on any resolution
[13] or vote on any resolution or even consider a
[14] resolution?
[15]     **A:** On August 23, that is correct.
[16]     **Q:** So what I said before is true, isn't
[17] it, that the first paragraph of Peskoff Exhibit
[18] 32, which says that there was action taken at a
[19] meeting of the directors on the 23rd day of
[20] August 2004, is not true?
[21]     **A:** That is correct.
[22]     **Q:** And you created this document solely
[23] to help you continue to press this lawsuit when
[24] it was pointed out to you earlier that there was
[25] a question as to the standing of the plaintiffs

Page 386

**S. Peskoff**

[1]
[2] to sue; isn't that correct?
[3]     **A:** It was the document —
[4]     **Q:** Yes, is it correct, or am I
[5] incorrect?
[6]     **A:** Please repeat the question.
[7]     (The record was read.)
[8]     **A:** No, that's not correct.
[9]     **Q:** Was the precipitating cause for the
[10] creation of this document Peskoff Exhibit 32, the
[11] fact that you had learned that there was an issue
[12] raised as to the standing to pursue the lawsuit?
[13]     **A:** I'm not sure I understand what you
[14] mean by the standing to pursue the lawsuit.
[15]     **Q:** Let me ask it a different way, then.
[16] Was this document, Peskoff Exhibit 32, created as
[17] a result of something that occurred and you
[18] learned during the lawsuit?
[19]     **A:** This was a document that was asked
[20] to be created — the document wasn't asked to be
[21] created, but the protection of my interests,
[22] okay, as communicated to both accountants and
[23] others, wasn't properly attended to, so I had it
[24] reviewed by this Ohio counsel, you know, to
[25] protect, you know, my interests.

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff  v.
Fixed Income Discount Advisory Company

Page 387

[1]                                S. Peskoff
[2]        Q: And this was something you
[3] discovered, that it was not properly attended to
[4] during the course of the lawsuit; correct?
[5]        A: Correct.
[6]        Q: Did you read these certified minutes
[7] which are Peskoff Exhibit 32?
[8]        A: Yes.
[9]        Q: Did you ask anybody, "Why am I
[10] signing something that has a false first
[11] paragraph"?
[12]        A: No, I did not.
[13]        Q: You had no problem signing something
[14] that had a false first paragraph?
[15]        A: No, because —
[16]        Q: You didn't have a problem? I didn't
[17] ask why. You had no problem?
[18]        A: I didn't have a problem —
[19]        Q: I didn't ask you why. Your counsel
[20] can ask you why if he wants to.
[21]        MR. RUBEN: You cut him off.
[22]        MR. NOVACK: Okay, let him answer it
[23] and I'll strike it as non-responsive for
[24] the balance, but he can go through the
[25] exercise if he wants.

Page 388

[1]                                S. Peskoff
[2]        Q: Why didn't you have a problem
[3] signing a document that was false?
[4]        A: I relied on the opinions of my
[5] lawyers dealing with this Ohio — not that they
[6] said to sign a false document, but supposedly
[7] they were all hired to protect my interests going
[8] back to the time of the dissolution of the
[9] company. And there was a lot of things that
[10] weren't done properly. I.e., you already saw one
[11] of them, which they didn't assign an asset to me
[12] which they should have assigned. But the point
[13] was they didn't know about it at that time. So
[14] at this point in time, you know, knowing what we
[15] knew, the lawyers suggested that we — and I'm
[16] not saying Mr. Ruben and Mr. — that we clean up
[17] the books of Underhill to reflect — "to protect
[18] you the way you should have been protected
[19] originally, as the sole shareholder and sole
[20] debtor, because you're entitled to everything
[21] that the company had, you know, both now and in
[22] the future."
[23]        Q: Did you bring it to the attention of
[24] your Ohio lawyer that there was no meeting of the
[25] directors on August 23, 2004?

Page 389

[1]                                S. Peskoff
[2]        A: Did I bring it to the —
[3]        Q: — attention of your Ohio lawyer
[4] that there was no meeting of the directors on
[5] August 23, 2004?
[6]        A: I did not.
[7]        Q: Where do you think the lawyer got
[8] the date from? Do you have any idea at all?
[9]        A: He must have gone through some — he
[10] must have gone through some of the records that
[11] we had.
[12]        Q: You don't have any idea at all,
[13] you're telling me?
[14]        A: I didn't tell him August 2004, but
[15] probably based on the discussions.
[16]        Q: You don't have any idea at all? You
[17] don't know, you're guessing?
[18]        A: I'm assuming it's based on the
[19] decision to liquidate in August, the discussion
[20] with the two accountants, you know, that we
[21] decided to go ahead and liquidate the company.
[22]        Q: Your lawyer in Ohio didn't ask you
[23] whether or not there was a meeting on August 23,
[24] 2004?
[25]        A: He did not.

Page 390

[1]                                S. Peskoff
[2]        MR. RUBEN: Objection. Don't answer
[3] it. Privileged.
[4]        MR. NOVACK: I don't see how it
[5] could be privileged. Not that we have to
[6] fight over it, but it's clearly not
[7] privileged when you're creating a publicly
[8] available document that is stating there
[9] was a meeting on that date, but in any
[10] event, we know he didn't ask.
[11]        (Peskoff Exhibit 33, Certified
[12] Minutes of the Meeting of the Shareholders
[13] of Underhill Investment Corporation, was
[14] marked for identification.)
[15]        Q: If we could go to Peskoff Exhibit 33
[16] this document is titled "Certified Minutes of the
[17] Meeting of the Shareholders of Underhill
[18] Investment Corporation," and in the first
[19] paragraph it refers to a meeting of the
[20] shareholders held on August 23, 2004. Am I
[21] correct there was no meeting of the shareholders
[22] held on August 23, 2004?
[23]        A: That is correct.
[24]        Q: And there were no resolutions passed
[25] that date?

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

Page 391

**S. Peskoff**

[2] A: Well, there was a resolution
[3] between, you know, the accountants which was the
[4] time to liquidate. It's just that they didn't do
[5] the proper paperwork or suggest to me what the
[6] proper paperwork was.
[7] Q: Am I correct that the shareholders
[8] did not meet and pass a resolution on August 23,
[9] 2004?
[10] A: Correct.
[11] Q: Am I correct that the statement that
[12] opens this document, Peskoff Exhibit 33, the
[13] first paragraph, is false?
[14] A: Well, let's put it — I'm the sole
[15] shareholder, and you know, in my mind and in
[16] discussion with my accountants, you know, we
[17] decided to go ahead and liquidate, and I guess
[18] that based upon that, that's why the attorney
[19] used that date.
[20] Q: Paragraph 8 of Peskoff Exhibit 33,
[21] on the second page says, "The officers and
[22] directors of the corporation are empowered,
[23] authorized, and directed to carry out the
[24] provisions of this resolution and to adopt any
[25] further resolutions that may be necessary in

Page 392

**S. Peskoff**

[2] liquidating and dissolving the corporation."
[3] Did you understand that to be a
[4] direction to have Underhill bring a lawsuit on
[5] the claim that you believed existed against
[6] FIDAC?
[7] A: That paragraph 8 —
[8] Q: Let me ask it a different way. I
[9] don't want to make it complicated. If you look
[10] at the certified minutes of the shareholders'
[11] meeting, did you believe that that was a
[12] direction to the directors and officers of
[13] Underhill to promptly bring suit on any claims
[14] that Underhill might have so that the assets
[15] could be collected and then distributed?
[16] A: I'm not sure it relates to the
[17] lawsuit specifically.
[18] Q: What about generally?
[19] A: Well, any assets that could be
[20] collected, you know, as part of their debt to me,
[21] that could be liquidated, obviously, I'd like to
[22] have received and reduced my debt.
[23] Q: As a director of Underhill, did you
[24] believe that you had any obligation to act
[25] promptly to wind up the affairs of Underhill?

Page 393

**S. Peskoff**

[2] A: I thought I was acting promptly in
[3] the way that I dealt with my accountants.
[4] Q: Are you done?
[5] A: Yes.
[6] Q: After the plan — after the
[7] dissolution was effected, which is November
[8] 2004 — let me go back. Do you remember the
[9] dissolution was finally effective in November
[10] 2004?
[11] A: Yes.
[12] Q: You didn't bring suit against FIDAC
[13] on behalf of Underhill until February 2006; do
[14] you recall that?
[15] A: Yes.
[16] Q: Do you believe that you were acting
[17] promptly after the dissolution in waiting over a
[18] year to bring suit against FIDAC?
[19] A: The answer is I had hoped before the
[20] dissolution of the company and after the
[21] dissolution of the company that there wasn't
[22] going to be a lawsuit at all; that there would be
[23] some kind ever workout between Farrell and myself
[24] that would not necessitate any kind of legal
[25] action. So, you know.

Page 394

**S. Peskoff**

[2] Q: So I ask you again, do you believe
[3] you were acting promptly —
[4] A: Yes, I acted promptly —
[5] Q: You do believe that waiting over a
[6] year to bring a claim was acting promptly?
[7] A: Yes, I do.
[8] Q: Do you think that if you waited two
[9] years, that would still be promptly too?
[10] A: Not necessarily. You know, it
[11] depends upon the facts of the difference in time,
[12] what happened or didn't happen between
[13] Mr. Farrell and myself and FIDAC and myself.
[14] Q: Did you have any understanding at
[15] the time that Underhill was dissolved that Ohio
[16] law required the directors to speedily wind up
[17] the affairs of the corporation?
[18] A: That Ohio law required the directors
[19] to speedily? I put the discharge with my two
[20] accountants who I guess — especially the one
[21] that does the books on a normal basis, not the
[22] tax one who doesn't do anything speedily, so he
[23] either didn't understand the assignment that
[24] Charles Cocke gave him, or he didn't do it on a
[25] timely basis.

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff  v.
Fixed Income Discount Advisory Company

---

Page 395

**S. Peskoff**

[1]
[2]    **Q:** I asked you whether you thought that
[3] you had an obligation, as a director of Underhill
[4] in dissolution, to act speedily.
[5]    **A:** I thought I was acting
[6] appropriately, and the word "speedily," I don't
[7] know what you mean by that. I mean, I didn't
[8] think at that time there was any pressures
[9] necessarily, because I didn't contemplate any
[10] lawsuits or anything else on Underhill or my name
[11] at that point in time.
[12]    (Peskoff Exhibit 34, certified
[13] resolutions of the board of directors of
[14] Underhill in accordance with the plan of
[15] liquidation, was marked for
[16] identification.)
[17]    **Q:** If we go to Peskoff Exhibit 34 this
[18] is certified resolutions of the board of
[19] directors of Underhill in accordance with the
[20] plan of liquidation, and I want to ask you first
[21] whether or not that's your signature on the
[22] second page.
[23]    **A:** It is.
[24]    **Q:** And you signed it on December 6th?
[25]    **A:** That is correct.

Page 396

**S. Peskoff**

[1]
[2]    **Q:** And you refer in the first paragraph
[3] here again to a board meeting held on the 23rd
[4] day of August, 2004. Am I correct that that also
[5] is a false statement, like in the other
[6] documents?
[7]    **A:** Well, there wasn't a physical board
[8] meeting. Yes, there wasn't a physical board
[9] meeting.
[10]    **Q:** And you didn't stop and say, "I'm
[11] thinking of having a board meeting in my own mind
[12] and I'm having it now" either? You didn't think
[13] about this on that day?
[14]    **A:** I didn't think about this on that
[15] day. I just left everything in the hands of the
[16]
[17]    **Q:** Mr. Peskoff, please, I didn't ask if
[18] you left it in the hands. It's a simple
[19] question, a simple answer, please.
[20]    **A:** No, I didn't think about it.
[21]    **Q:** You read this document, which is
[22] Peskoff Exhibit 34, before you signed it; right?
[23]    **A:** Yes.
[24]    **Q:** And you knew you were signing a
[25] document that had a false opening paragraph;

Page 397

**S. Peskoff**

[1]
[2] correct?
[3]    **MR. RUBEN:** Objection to form. He
[4] already testified.
[5]    **MR. NOVACK:** No. He knew that this
[6] is false. I asked him when he signed it,
[7] before he signed it, did he realize he was
[8] signing something that had a false first
[9] paragraph?
[10]    **MR. RUBEN:** I believe he said no.
[11]    **MR. NOVACK:** No, he didn't say that.
[12]    **MR. RUBEN:** I believe he did, at the
[13] time that he signed.
[14]    **MR. NOVACK:** I didn't hear it, then,
[15] maybe because someone coughed or there was
[16] an objection. Why don't we go three or
[17] four questions back.
[18]    **MR. RUBEN:** It's back way beyond
[19] that. It was on the first one of these
[20] that you asked him about.
[21]    **MR. NOVACK:** Yes, but I didn't ask
[22] him about this one. This is a new one.
[23] I'm asking about each one of them.
[24]    **MR. RUBEN:** You're asking about the
[25] same meeting.

Page 398

**S. Peskoff**

[1]
[2]    **MR. NOVACK:** I'm asking him, when he
[3] signed this document, which is Peskoff
[4] Exhibit 34, when he signed this one and he
[5] read this, he knew this also was false.
[6] I'm allowed to ask that. Just like he knew
[7] the first one was false, the second one was
[8] false. It all relates to the same fact,
[9] right?
[10]    **MR. RUBEN:** But what I'm saying is
[11] you put those words in his mouth, he never
[12] testified to that, that you characterized
[13] it as being his previous testimony.
[14]    **MR. NOVACK:** Okay, if that's the
[15] objection. I thought you were objecting to
[16] something else. I'll start again.
[17]    **Q:** You agree with me that the statement
[18] made in the first paragraph of Peskoff Exhibit 34
[19] is untrue, there was no meeting of the board of
[20] directors held on August 23, 2004?
[21]    **A:** Yes.
[22]    **Q:** It is false, it is not true; we
[23] agree on that?
[24]    **A:** That is correct.
[25]    **Q:** And when you signed Peskoff Exhibit

---

Page 395 - Page 398  (12)

**Min-U-Script®  Greenhouse Reporting, Inc. (212)279-5108**

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

Page 399

**S. Peskoff**

[1]
[2] 34, you read it; correct?
[3]    **A:** That is correct.
[4]    **Q:** And when you signed it, you knew you
[5] were signing a document that opened with a first
[6] paragraph that was false; correct?
[7]    **A:** I agree that the first paragraph —
[8] that there was no physical meeting, but the guts
[9] of the document were true, although there was no
[10] physical meeting of the board of directors.
[11]    **Q:** I didn't ask you if the guts of the
[12] document were true. I just —
[13]    **A:** I'm agreeing with you, yes.
[14]    **Q:** You knew that you were signing a
[15] document which had a recital in the first
[16] paragraph that was false?
[17]    **A:** That is correct.
[18]    **Q:** On the second page of Peskoff
[19] Exhibit 34, the third resolution, it states,
[20] "Resolved that as part of the complete
[21] liquidation of the corporation, the officers are
[22] directed to proceed to take all action necessary
[23] to liquidate, prosecute, settle, or compromise
[24] any claim of the corporation in due course." Do
[25] you see that? I'm just asking if you see that

Page 400

**S. Peskoff**

[1]
[2] paragraph.
[3]    **A:** Yes, I do.
[4]    **Q:** Did you understand in August of
[5] 2004, that as an officer of the corporation, you
[6] were obligated to take whatever action was
[7] necessary to prosecute any claim of the
[8] corporation?
[9]    **A:** No.
[10]    (Peskoff Exhibit 35, document
[11] executed by Stephen Peskoff on December 6,
[12] 2006, was marked for identification.)
[13]    **Q:** Let's look at Peskoff Exhibit 35.
[14] Do you have Peskoff Exhibit 35?
[15]    **A:** Right.
[16]    **Q:** That was executed by you on December
[17] 6, 2006? Correct?
[18]    **A:** Yes.
[19]    **Q:** And that's your signature? That's
[20] your signature?
[21]    **A:** Yes.
[22]    **Q:** You read this document before you
[23] signed it?
[24]    **A:** Yes.
[25]    **Q:** The first paragraph says, "The

Page 401

**S. Peskoff**

[1]
[2] undersigned, being the president of Underhill
[3] Investment Corporation, hereby certifies that the
[4] following action was taken at a meeting of the
[5] board of directors of the corporation held on the
[6] 13th day of June 2005." Do you see that?
[7]    **A:** Yes.
[8]    **Q:** That statement is untrue, right,
[9] there was no meeting?
[10]    **A:** There was no meeting.
[11]    **Q:** This was a document that was created
[12] in order to assist you in the lawsuit here;
[13] correct?
[14]    **A:** It was a document that was created
[15] to preserve whatever rights Underhill and I had.
[16]    **Q:** Are you denying it was created to
[17] help you in this lawsuit?
[18]    **A:** I'm not denying it was — obviously,
[19] it was — it's helpful in the lawsuit, but —
[20] yes.
[21]    **Q:** If there were no lawsuit, you
[22] wouldn't have bothered to go back to create this
[23] document; right?
[24]    **A:** Possibly.
[25]    **Q:** Do you think you might have gone

Page 402

**S. Peskoff**

[1]
[2] back to create the document?
[3]    **A:** Yes.
[4]    **Q:** Why?
[5]    **A:** Because what I found was that the
[6] accountants, once again, that I asked to really
[7] fully protect my interests in any possible
[8] recapture of income or other assets, you know,
[9] really didn't do what I asked them to do. They
[10] just liquidated the company without any
[11] appropriate documents. So when I discussed this
[12] with legal counsel, they said, "You know what?
[13] You didn't get the best advice that you could
[14] have gotten, and you weren't fully protected in
[15] all situations." So that's why we went back and
[16] did what we did, just to —
[17]    **Q:** Aside from the claim against FIDAC,
[18] what other assets or issues were you concerned
[19] about?
[20]    **A:** Well — do you mean at the present
[21] time?
[22]    **Q:** When you went back to create these
[23] documents that we've been talking about, Peskoff
[24] Exhibit 31 through 35, what issues were you
[25] concerned about beside the claim against FIDAC?

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff  v.
Fixed Income Discount Advisory Company

Page 403

*S. Peskoff*

[1]
[2] **A:** You know, I don't know the answer to
[3] that question. I was concerned about the claim
[4] against FIDAC, but there are other things that
[5] could have happened, might have happened, that I
[6] wasn't prepared on, that could have been similar
[7] or a similar lawsuit or some other kind of
[8] protection that my accountants didn't take. I
[9] had inappropriate documentation for supposedly
[10] how an Ohio corporation should be liquidated and
[11] the sole shareholder and debtor should be
[12] protected, and that's what I was told. So I
[13] said, "Okay, do the right thing and then protect
[14] me accordingly."
[15] **Q:** Is it correct there is no other
[16] claim that you're aware of or any other factual
[17] problem that you're aware of other than FIDAC
[18] which led you to create these documents we've now
[19] been talking about?
[20] **A:** That was — that was a part of it,
[21] but — please repeat the question again. Because
[22] the first part —
[23] **Q:** You know what, you've worn me down.
[24] I'm going to let you off the hook on that,
[25] because I think I'm beating a dead horse here and

Page 404

*S. Peskoff*

[1]
[2] I don't want to do that anymore. I just think
[3] it's not worth it and your answer will stand as
[4] it stands.
[5]     It says here in Peskoff Exhibit 35,
[6] the last paragraph, "Resolved that the
[7] corporation shall pledge or assign any right of
[8] recovery in that claim to Stephen Peskoff as
[9] security for loans and advances made to the
[10] corporation." So this authorizes the corporation
[11] to give you a security interest in its asset;
[12] correct?
[13] **A:** Correct.
[14] **Q:** And it's the corporation that owns
[15] the claim against FIDAC; correct?
[16] **A:** That's the way it looks, yes.
[17] **Q:** So the corporation is the only
[18] plaintiff insofar as you know that is proper to
[19] bring the claim insofar as you understand?
[20] **A:** That's a legal question and I can't
[21] answer that because at one time, we had discussed
[22] that it was going to be — I'd have — to answer
[23] your question honestly, I'd have to discuss that
[24] with my legal counsel.
[25] **Q:** Do you think — you, the president,

Page 405

*S. Peskoff*

[1]
[2] sole shareholder, director, of Underhill, do you
[3] believe that Underhill still owns the claim
[4] against FIDAC?
[5] **A:** Well, we wouldn't have gone
[6] through —
[7] **Q:** As opposed to you individually,
[8] that's what I'm asking.
[9] **A:** Well, I think —
[10] **Q:** I just want to know —
[11] **A:** I think the answer is that Underhill
[12] does, according to my counsel that restructured,
[13] Underhill does own the claim and he's assigning
[14] it to me.
[15] **Q:** As security?
[16] **A:** Well, as security, that's part of
[17] it, in case there is a recovery, because —
[18] **Q:** I understand that, but do you know
[19] the difference between an outright assignment of
[20] an asset or an assignment as security? Do you
[21] have any idea of the difference or you don't know
[22] the difference?
[23] **A:** The difference between —
[24] **Q:** If I were to assign to you a right
[25] to recover $10 that I have under a promissory

Page 406

*S. Peskoff*

[1]
[2] note outright, contrasted with I assign to you as
[3] collateral for a debt I owe you the right to
[4] recover $10, if you have to realize on the
[5] collateral, right, you foreclose on the
[6] collateral, are you familiar with that concept?
[7] **A:** Yes.
[8] **Q:** Do you know the difference between
[9] the two scenarios I just described?
[10] **A:** I see what you're saying.
[11] **Q:** Do you understand there is a
[12] difference? How many years have you been in
[13] business now?
[14] **A:** A considerable amount.
[15] **Q:** Do you think you understand that
[16] difference between an outright assignment and an
[17] assignment as security, or you don't understand
[18] how that operates here?
[19] **A:** Well, you know — I understand the
[20] difference.
[21] **Q:** So you know that Underhill has kept
[22] the claim, ownership of the claim against FIDAC?
[23] **A:** That's what it says here and that's
[24] why the lawyer assigned it to me because
[25] Underhill — if Underhill recovers, the company

Min-U-Script®  Greenhouse Reporting, Inc. (212)279-5108
A-176

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

---

Page 407

**S. Peskoff**

[2] owed me a great deal of money and could pay off
[3] whatever part of it —
[4]  **Q:** I understand the motive. If you
[5] could distinguish in my questions between asking
[6] you for an answer yes or no and giving me
[7] motives.
[8]  **A:** I understand.
[9]  **Q:** I'm being patient, but you're
[10] unnecessarily prolonging this. I asked you a
[11] simple — not the reason why. You keep giving me
[12] the reason why, you feel impelled to do it.
[13] Please don't, please. I want to get out of here
[14] too, and you will wear me down only to a certain
[15] degree and then I'll have to stay, whether I want
[16] to or not.
[17]  **A:** I'm not trying to wear you down.
[18]  **Q:** But you're succeeding. You're
[19] succeeding where other people have failed, but
[20] I've reached the point of the irreducible minimum
[21] where I must continue, so I'm asking you in your
[22] own interests, believe me, you will not wear me
[23] down any further than that one question where you
[24] succeeded, to your credit. Let's just be clear
[25] so I can go on to something else.

Page 408

**S. Peskoff**

[2]  **A:** Okay.
[3]  **Q:** The claim that is being asserted in
[4] this case, in your personal opinion, based on
[5] everything you know as a businessman and all
[6] these documents you read, that claim belongs to
[7] Underhill, not to you individually; correct?
[8]  **A:** That's what it says, yes.
[9]  **Q:** If Underhill is successful, those
[10] proceeds will stand as security for the money
[11] that Underhill owes you because you are a
[12] creditor of the company; is that right?
[13]  **A:** That's what it says, right.
[14]  **Q:** And you understand that?
[15]  **A:** I understand that.
[16]  **Q:** Good job. We're on to something
[17] new.
[18]  Let's go to the amended complaint.
[19] Paragraph 10 in the complaint says, "Peskoff is
[20] the successor in interest to all of Underhill's
[21] claims against FIDAC, including the claim set
[22] forth in this amended complaint." Do you see
[23] that?
[24]  **A:** Yes.
[25]  **Q:** You agree, do you not, that at the

Page 409

**S. Peskoff**

[2] present time, Peskoff is not the successor in
[3] interest to the claims against FIDAC, it is only
[4] the holder of security interest?
[5]  **A:** Are you saying that this statement
[6] in the amended complaint is wrong? I'm trying to
[7] understand — Peskoff is a successor in interest.
[8] In the interest that I have, the claim as
[9] security against my debt? Is that what that says
[10] there?
[11]  **Q:** Do you think that's accurate or not,
[12] as best you understand it? You can just say,
[13] "Yes, it's accurate," "No, I don't know if it's
[14] accurate," "No, it's not accurate," any choice.
[15] You can't answer my question?
[16]  **A:** Well, I'm trying to, but as a
[17] successor in interest, okay, if that means that I
[18] own the security, you know, through Underhill,
[19] you know, as pledging the security, then that's
[20] what it means.
[21]  **Q:** Okay, I'll let you go on that.
[22] That's okay. Paragraph 32 of the complaint, do
[23] you see that? Do you have that in front of you?
[24]  **A:** Yes. I'm reading it.
[25]  **Q:** I'll read it out loud too, so we

Page 410

**S. Peskoff**

[2] have it for the record. "During the discussions
[3] that led directly to the launching of Premier,
[4] Gen Advisors, through Baptista, questioned how
[5] plaintiffs will be compensated for their services
[6] in putting the parties together and facilitating
[7] the development of their new business
[8] relationship.
[9]  "FIDAC, acting through Farrell,
[10] represented to Gen Advisors and plaintiffs that
[11] FIDAC would compensate plaintiffs pursuant to an
[12] agreement already in place between Underhill and
[13] FIDAC."
[14]  I'm asking you first, with regard to
[15] paragraph 32, were you present when Baptista
[16] questioned how plaintiffs would be compensated
[17] for their services as referred to in paragraph
[18] 32?
[19]  **A:** Yes.
[20]  **Q:** Where were you?
[21]  **A:** It was a meeting in New York, the
[22] first time, it was either January or February
[23] of — I'd have to check my notes.
[24]  **Q:** 2002?
[25]  **A:** 2002, and we walked out of a room.

---

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Page 411

[1]                    **S. Peskoff**
[2] There were five or six people in that room, and
[3] Baptista asked Mike Farrell, "You know, how is
[4] Steve going to be taken care of here?" And
[5] Farrell said, "You know, that's not — that's not
[6] any of your concern. It's my responsibility."
[7]    **Q:** Were you present when he said that?
[8]    **A:** Yes.
[9]    **Q:** Did you then ask Mike Farrell what
[10] he meant?
[11]    **A:** No.
[12]    **Q:** Did you ever ask him what he meant?
[13]    **A:** The answer is — did I ever ask him?
[14] Eventually, once the deal got signed between he
[15] and Baptista, and — because this thing dragged
[16] on. This was —
[17]    **MR. NOVACK:** Please don't give me
[18] all the reasons it dragged on. Just tell
[19] me, if you ever asked him, tell me when.
[20] We can stay until 10:00 at night, and I
[21] will. I'm just telling you this is endless
[22] digression, and if you want to do it, fine,
[23] but we will stay here. But — I'm being
[24] very fair, Rob. He's digressing.
[25]    **MR. RUBEN:** How is this related to

Page 412

[1]                    **S. Peskoff**
[2] the new matter in the amended complaint or
[3] the new corporate documents, and not
[4] something that has been covered or should
[5] have been covered —
[6]    **MR. NOVACK:** I'll tell you why.
[7] Before you brought this case, you brought
[8] this case based upon a written agreement,
[9] and my questioning was based upon the
[10] belief you were alleging a written
[11] agreement. Now you've abandoned that claim
[12] and you're claiming something else. Now
[13] that the shift in the entire case is off
[14] the written agreement, I want to know —
[15] questions I would not ask because I knew
[16] what agreement you're talking about, I'm
[17] entitled to know now if he is talking about
[18] some other agreement than the written
[19] agreement. It will be short. He's the one
[20] that is making it long.
[21]    **MR. RUBEN:** The original complaint
[22] contained the same quantum meruit claim we
[23] have now.
[24]    **MR. NOVACK:** But it was in the
[25] context of suing under a written agreement

Page 413

[1]                    **S. Peskoff**
[2] and my questions were focused on the
[3] written agreement. I just want to
[4] eliminate any claim that there's any other
[5] agreement now, so that's why I'm dealing
[6] with these two. It will be very quick if
[7] we ever get to it, but I'm insisting on
[8] asking these questions. If you want to
[9] direct him, you can. I will go to the
[10] judge. I want to pin this down once and
[11] for all.
[12]    **THE WITNESS:** Ask your question
[13] again.
[14]    **Q:** I asked you whether or not you
[15] referred to Mike Farrell — withdrawn. I asked
[16] you whether afterwards you brought up this
[17] conversation that you referred to in paragraph 32
[18] with Mike Farrell.
[19]    **A:** I brought it up — I brought it up
[20] from time to time.
[21]    **Q:** That particular conversation? Not
[22] the concept of payment.
[23]    **A:** Not the particular conversation.
[24]    **Q:** My question was about the
[25] conversation.

Page 414

[1]                    **S. Peskoff**
[2]    **A:** The conversation was a question that
[3] Baptista asked Farrell, and Farrell responded in
[4] front of six people standing there, that that was
[5] his responsibility and he didn't have to be
[6] concerned. Period, end of statement.
[7]    **Q:** Paragraph 33, you say that Farrell
[8] represented to Gen Advisors and to you that FIDAC
[9] would compensate you pursuant to an agreement
[10] already in place between Underhill and FIDAC.
[11] When was that said, in the same conversation?
[12]    **A:** That is correct.
[13]    **Q:** Did Mr. Farrell refer to an
[14] agreement that was already in place, a specific
[15] agreement?
[16]    **A:** He referred to that we had a
[17] relationship and there was an agreement — okay,
[18] not necessarily about this particular
[19] transaction — that was in place between us. I
[20] think he was referring to the original consulting
[21] agreement that had been done with FBR Assets that
[22] he put in.
[23]    **Q:** Did he make a reference to a
[24] specific agreement?
[25]    **A:** No, no.

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

---

Page 415

**S. Peskoff**

[1]
[2]   **Q:** He just said, "We have a
[3]  relationship"?
[4]   **A:** "We have a relationship. It's my
[5]  responsibility to take care of your
[6]  compensation."
[7]   **Q:** And that's all he said?
[8]   **A:** That is correct.
[9]   **Q:** And that's the sum total of the
[10]  facts that you are relying on in paragraphs 32
[11]  and 33; is that right?
[12]   **A:** That is correct.
[13]   **Q:** In paragraph 34 you say, "FIDAC
[14]  subsequently raised the issue of plaintiff's
[15]  compensation to Gen Advisors on a second occasion
[16]  and specifically directed Gen Advisors not to
[17]  compensate plaintiffs for their services." And
[18]  it goes on to say, "FIDAC did not want plaintiffs
[19]  double dipping." When was that conversation?
[20]   **A:** I didn't have that conversation. It
[21]  was —
[22]   **Q:** You were not present for that
[23]  conversation?
[24]   **A:** No. It was between Farrell and
[25]  Baptista.

---

Page 416

**S. Peskoff**

[1]
[2]   **Q:** When was the first time you learned
[3]  of that conversation?
[4]   **A:** I learned about it after Baptista
[5]  met with Rob Ruben a month or two ago, was the
[6]  first time.
[7]   **Q:** Am I correct that you did not take
[8]  any action prior to the time Mr. Ruben met at the
[9]  train station with Baptista in reliance upon this
[10]  statement that was made that's referred to in
[11]  paragraph 34?
[12]   **MR. RUBEN:** Objection, form.
[13]   **Q:** I'll restate it. You didn't know
[14]  about what you allege in paragraph 34 until
[15]  several months ago when Mr. Ruben met with
[16]  Mr. Baptista at the train station; right?
[17]   **A:** About the double dipping, that is
[18]  correct.
[19]   **Q:** And you didn't know about this
[20]  meeting this second occasion until the train
[21]  station meeting?
[22]   **A:** No, I knew that Baptista had
[23]  discussed the issue with Farrell. I didn't know
[24]  the details, because I wasn't there, it was
[25]  between the two of them, and you know, the

---

Page 417

**S. Peskoff**

[1]
[2]  information that I got from Baptista is, "This is
[3]  Mike's responsibility. He admitted to me that
[4]  he's responsible to take care of you, period, end
[5]  of story."
[6]   **Q:** When did Baptista tell you this,
[7]  that Mike had raised this a second time?
[8]   **A:** If this meeting was in — I'm trying
[9]  to remember the dates. If he met with him in
[10]  October of — what was it —
[11]   **Q:** 2003. 2002, 2002.
[12]   **A:** — 2002, it was probably a month or
[13]  two after that.
[14]   **Q:** That's when you were told about this
[15]  second meeting?
[16]   **A:** That is correct. I wasn't told
[17]  about the details. That is correct, yes.
[18]   **Q:** You were told just generally that
[19]  Mike said it was his responsibility?
[20]   **A:** That is correct, yes.
[21]   **Q:** Were you told specifically that Mike
[22]  said that Gen Advisors should not pay you?
[23]   **A:** No, I wasn't aware of that at all
[24]  until it was told to Rob.
[25]   **Q:** We're almost done. Go to paragraph

---

Page 418

**S. Peskoff**

[1]
[2]  50 of the complaint.
[3]   **A:** 50?
[4]   **Q:** 50.
[5]   **A:** 50.
[6]   **Q:** It says, "FIDAC has been unjustly
[7]  enriched through its failure to pay plaintiffs
[8]  the fair market value of their services." Do you
[9]  have an opinion of the fair market value of your
[10]  services in introducing Mr. Baptista?
[11]   **A:** I'm not sure I understand your
[12]  question.
[13]   **Q:** It's your complaint. And you say
[14]  that you — it's your complaint. You don't know
[15]  what the words, "Fair market value," refer to in
[16]  paragraph 50 of your complaint?
[17]   **A:** All I know is that the fair market
[18]  value of my services over a two-year period,
[19]  without going into the details, making this thing
[20]  happen, and seeing what the compensation that
[21]  Mr. Baptista received, and I introduced him, and
[22]  what FIDAC received, was this.
[23]   **MR. NOVACK:** He's gesturing a zero
[24]  with his hand.
[25]   **A:** Was zero. So in terms of fair

---

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Page 419

S. Peskoff

[1]
[2] market value, I think putting in two years of
[3] keeping the pieces together, introducing the
[4] parties and so on and so forth, that given my
[5] relationship, and I don't mean to be wordy, with
[6] Mike Farrell, on a historical basis, getting
[7] this —
[8]    MR. RUBEN: Again, zero —
[9]    A: — is I don't think fair market
[10] value for what I've done.
[11]    Q: I'm asking you if you have an
[12] opinion of the fair market value of your services
[13] that you referred to in your complaint in
[14] paragraph 50, paragraph 54 and paragraph 55. Do
[15] you have an opinion as to what that is?
[16]    A: Okay. My opinion, my opinion is
[17] that it's substantially greater than what I've
[18] been paid, but dramatically less than the 20
[19] percent he paid me for FBR Asset, which quite
[20] frankly, involved two phone calls, not two years
[21] of meetings, and that was his decision.
[22]    Q: Other than that, you have no opinion
[23] whatsoever; is that what you're telling me?
[24]    A: No. The point is that I think the
[25] services that I provided, which provided FIDAC

Page 420

S. Peskoff

[1]
[2] with millions of dollars of income, is probably
[3] worth 5 or 6 basis points. It's probably
[4] worth — look, Baptista quite frankly, is a
[5] finder. He said that. I found him, put him in
[6] place, and if you — you know, I mean, so it
[7] should be worth, you know, almost as much as what
[8] he's provided.
[9]    Q: Please tell me the facts on which
[10] you base your conclusion that this is the fair
[11] market value of your services.
[12]    A: The facts. Okay, do I have a
[13] minute —
[14]    Q: Not the work you did. The market
[15] proof. What is the evidence of the market proof?
[16]    A: I can't tell you that, because this
[17] was a unique transaction, the first of its kind,
[18] and Baptista has, you know, said the same thing.
[19]    Q: So is it fair to say that there is
[20] no market value that one could look to because
[21] it's unique?
[22]    A: I would say that you would need some
[23] experts looking at this thing, the duration, and
[24] some of the information that I don't have, the
[25] length of the contract. I don't know the total

Page 421

S. Peskoff

[1]
[2] amount of the premium, the leverage used, all
[3] those things which determined Baptista's
[4] compensation as a separate item, and Mike's
[5] compensation. That somewhere I'm entitled to
[6] some piece that's either equal to or a little
[7] less than what Baptista has received. But
[8] certainly given Mike's treatment of me in the
[9] past unilaterally, where he's paid me as much as
[10] 20 percent, I'm certainly worth a few percent,
[11] without resorting to expert. Not this.
[12]    MR. NOVACK: Could you read back the
[13] question, please, not the answer, just the
[14] question.
[15]    (The record was read.)
[16]    A: The answer is yes.
[17]    Q: Yes, it is fair to say there is no
[18] market value or fair market value for these
[19] services that you can point us to?
[20]    A: That is correct. Because it was
[21] a —
[22]    Q: Unique?
[23]    A: Yes.
[24]    Q: Is it correct to say that basically
[25] your view as to what you should be paid is not

Page 422

S. Peskoff

[1]
[2] based on a fair market value, but rather, your
[3] subjective belief based on what you think is
[4] fair?
[5]    A: No.
[6]    Q: Okay.
[7]    A: That's not —
[8]    Q: Okay.
[9]    A: No.
[10]    Q: Have you ever asked Gen Advisors to
[11] pay you —
[12]    A: No.
[13]    Q: — for the services rendered?
[14]    A: No.
[15]    Q: You said you thought a fair fee was
[16] five or six basis points?
[17]    A: I'm just saying that's what Ernie
[18] ended up with, when originally it was 10 or 12
[19] that he said.
[20]    Q: I just want to understand. You
[21] think you should get 5 or 6 basis points too for
[22] your involvement, and you consider your
[23] involvement the same as Gen Advisors'?
[24]    A: I don't.
[25]    Q: Okay.

Underhill Investment Corp., and S. Peskoff v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

Page 423

*S. Peskoff*

[1]
[2] **A:** I don't.
[3] **Q:** But you want the same? You would
[4] say 5 or 6 basis points?
[5] **A:** I'm willing to sit down, and that's
[6] what I thought, you know, all along, that Mike
[7] Farrell and I could sit down and discuss
[8] something that would be reasonable and fair,
[9] given our relationship in the past period, since
[10] we were cutting new territory, and it would have
[11] been very easy to do, you know, because every
[12] time that we did a deal, whether it was,
[13] whatever, we worked —
[14] **Q:** Do you know what my question is?
[15] What question are you answering?
[16] **A:** I'm answering the one —
[17] **Q:** What question are you answering?
[18] **MR. RUBEN:** Why don't you just read
[19] back the question.
[20] **MR. NOVACK:** I think you might have
[21] gone off on a — I understand this is
[22] emotional for you and you think you have
[23] been treated unfairly. Take it from me
[24] that people on the other side think they
[25] have been treated unfairly after the

Page 424

*S. Peskoff*

[1]
[2] $30,000 payment and no complaint at the
[3] time, and you have put people through a lot
[4] of expense and aggravation, and it's your
[5] right to do it as a citizen, but I'm asking
[6] to try to reign in your emotional impulses
[7] and just listen to the questions and
[8] answers so we can get done here, please.
[9] All right. It's not going help you to try
[10] to persuade me. You've got to do that to
[11] the judge. I've heard this story before.
[12] I know why you feel about it. Believe me,
[13] it's not my call. Please.
[14] **Q:** You think 5 or 6 basis points would
[15] be fair for you; yes or no?
[16] **A:** I really don't have an opinion
[17] because of the fact that we're cutting new
[18] ground.
[19] **Q:** Because you just said before five or
[20] six basis points.
[21] **A:** That's essentially what somebody
[22] like Baptista said, who —
[23] **Q:** I know that's what Baptista —
[24] **A:** Look, he's an expert in that field.
[25] I'm — whatever.

Page 425

*S. Peskoff*

[1]
[2] **Q:** Please listen. Baptista gets —
[3] Baptista is getting 5, you think. Right?
[4] **A:** Whatever he gets.

# REDACTED

[12] **A:** I'm not suggesting that. I'm
[13] suggesting that we need somebody who understands
[14] the situation and really — I haven't evaluated
[15] the — you know, the value of the services.
[16] **Q:** That you provided?
[17] **A:** What I'm saying is in terms of raw
[18] dollars. I know the time that I spent and the
[19] meetings that I went to, and the fact that, you
[20] know, I mean —
[21] **Q:** We know you know what you did. You
[22] just said you haven't evaluated what the fair
[23] value is of that yet; is that right?
[24] **A:** That' correct, yes.
[25] **Q:** The last question about this amended

Page 426

*S. Peskoff*

[1]
[2] complaint. In the amended complaint, you dropped
[3] the claim for breach of contract under the
[4] February 15, 2000 letter that's Peskoff
[5] Deposition Exhibit 6. This letter, right?
[6] **A:** I remember.
[7] **Q:** At the last session, you explained
[8] to us that this letter had been sent to you by
[9] Mike Farrell after a conversation in which he
[10] said, "I'm going to send you a letter, and I'm
[11] going to give you something for bringing this
[12] business," and he sent the letter?
[13] **A:** That's the FBR letter?
[14] **Q:** Yes.
[15] **A:** Yes.
[16] **Q:** And am I correct that you agree that
[17] there's no price term in there, there's no
[18] specification as to how much you were going to be
[19] paid? Right?
[20] **A:** Are you talking about for future
[21] business?
[22] **Q:** For the past business with FBR as
[23] well.
[24] **A:** Well, he — there's no specificity
[25] in it.

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff  v.
Fixed Income Discount Advisory Company

Page 427

**S. Peskoff**

[1]
[2]  **Q:** That's all I'm saying.
[3]  **A:** Yes, I agree.
[4]  **Q:** And you understood at the time you
[5]  got it that the letter was intended to provide a
[6]  written record as to what was the reason you were
[7]  being paid money by FIDAC in connection with the
[8]  investment management fees it was earning from
[9]  FBR REIT; right?
[10]  **A:** That is correct.
[11]  **Q:** And there was no discussion at all
[12]  at about the time this letter was sent to you by
[13]  Mr. Farrell other than what you previously
[14]  testified to; correct?
[15]  **A:** That is correct.
[16]  **Q:** And there was no later oral
[17]  agreement that you reached with Mr. Farrell at
[18]  any time in which he said, "I will pay you X or Y
[19]  or anything else for bringing me new business
[20]  from somebody"; isn't that correct?
[21]  **A:** That is correct.
[22]  **MR. NOVACK:** That's it. We're done.
[23]  **MR. RUBEN:** Give me a moment.
[24]  (Recess taken.)
[25]

Page 428

**S. Peskoff**

[1]
[2]  **EXAMINATION**
[3]  **BY MR. RUBEN:**
[4]  **Q:** I just have one question that I want
[5]  to clean up. Steve, if you could pull out the
[6]  amended complaint and go to paragraph 33. I just
[7]  want the record to be clear, because I think
[8]  there were two different things said about 33.
[9]  One, there was testimony or a question by
[10]  Mr. Novack, and I can't remember which, referring
[11]  to a relationship with Mr. Farrell pursuant to
[12]  which you were going to be paid, and we were
[13]  using the terms interchangeably, relationship and
[14]  agreement. Do you have a recollection of which
[15]  one he used or whether it was both?
[16]  **A:** At the meeting in '02 are you
[17]  talking about?
[18]  **Q:** Yes.
[19]  **A:** Ernie — Let me read this. What he
[20]  said was it was of no concern at this point — no
[21]  concern to Baptista at all, because we had a
[22]  relationship, and it was his responsibility to
[23]  take care of my compensation.
[24]  **MR. RUBEN:** That's all I have.
[25]  **EXAMINATION**

Page 429

**S. Peskoff**

[1]
[2]  **BY MR. NOVACK:**
[3]  **Q:** Am I correct that at that time
[4]  Mr. Farrell made no promise to you to pay
[5]  anything?
[6]  **A:** That is correct.
[7]  **MR. NOVACK:** That's all.
[8]  (Discussion off the record.)
[9]  (Peskoff Exhibit 36, certified
[10]  resolution of shareholders of Underhill
[11]  Investment Corporation in accordance with a
[12]  plan of Complete Liquidation under Ohio
[13]  Revised Code 1701.88, was marked for
[14]  identification.)
[15]  **Q:** Mr. Peskoff, look at Exhibit 36.
[16]  That's your signature and you signed it on
[17]  December 6, 2006?
[18]  **A:** Yes, sir.
[19]  **MR. NOVACK:** That's all.
[20]  (Time noted: 4:56 p.m.)
[21]
[22]
[23]
[24]
[25]

Page 430

**S. Peskoff**

[1]
[2]  I, the witness herein, having read
[3]  the foregoing testimony, do hereby certify
[4]  it to be a true and correct transcript,
[5]  subject to the corrections, if any, shown
[6]  on the attached page.
[7]
[8]
[9]
[10]
[11]
[12]  **STEPHEN D. PESKOFF**
[13]
[14]
[15]  Subscribed and sworn to
[16]  before me this _____ day
[17]  of _____ 2006.
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Underhill Investment Corp., and S. Peskoff  v.
Fixed Income Discount Advisory Company

Stephen D. Peskoff
Vol. 1, December 12, 2006

Page 431

[1]          S. Peskoff
[2]              CERTIFICATE
[3] STATE OF NEW YORK )
[4]
[5] COUNTY OF NEW YORK)
[6]      I, ELEANOR GREENHOUSE, a Shorthand
[7] Reporter and Notary Public within and for the
[8] State of New York, do hereby certify:
[9]      That STEPHEN D. PESKOFF, the witness whose
[10] deposition is hereinbefore set forth, was duly
[11] sworn by me and that such deposition is a true
[12] record of the testimony given by such witness.
[13]      I further certify that I am not related to
[14] any of the parties to this action by blood or
[15] marriage, and that I am in no way interested in
[16] the outcome of this matter.
[17]      IN WITNESS WHEREOF, I have hereunto set my
[18] hand this 20th day of December, 2006.
[19]
[20]
[21]
[22]
[23]
[24]          ELEANOR GREENHOUSE
[25]

Page 432

[1]          S. Peskoff
[2]              INDEX
[3] WITNESS          EXAMINATION BY   PAGE
[4] STEPHEN D. PESKOFF   MR. NOVACK     361
[5]                  429
[5]
[6]              MR. RUBEN      428
[6]
[7]
[8]              EXHIBITS
[9] PESKOFF EXHIBIT          PAGE  LINE
[10] 30, Amended complaint     361    17
[11] 31, Collateral Assignment,  380    8
         Pledge Agreement and
[12]     Security Agreement, Bates
         stamp number P 339
[13] through 41
[14] 32, Document entitled,    383   21
         "Certified Minutes of
[15]     Meeting of the Board of
         Directors of Underhill
[16]     Investment Corporation,"
         Bates stamped P 342
[17] through 43
[18] 33, Certified Minutes of the   390    11
         Meeting of the
[19]     Shareholders of Underhill
         Investment Corporation
[20]
     34, Certified resolutions of   395    12
[21]     the board of directors of
         Underhill in accordance
[22]     with the plan of
         liquidation
[23]
     35, Document executed by   400    10
[24]     Stephen Peskoff on
         December 6, 2006
[25]

A-183

Stephen D. Peskoff
Vol. 1, December 12, 2006

Underhill Investment Corp., and S. Peskoff  v.
Fixed Income Discount Advisory Company

Page 433

[1]          S. Peskoff
[2]              INDEX (Continued.)
[3]          EXHIBITS
[4]          EXHIBITS
[5] PESKOFF EXHIBIT          PAGE  LINE
[6]  36, Certified resolution of    429    9
     shareholders of Underhill
[7]    Investment Corporation in
     accordance with a plan of
[8]    Complete Liquidation
     under Ohio Revised Code
[9]    1701.88
[10]
[11]
[12]      DOCUMENTS AND/OR INFORMATION REQUESTED
[13]         PAGE   /  LINE
[14]         378      4
[15]
[16]         TO BE INSERTED
[17]      PAGE   /  LINE
[18]         378     10
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Min-U-Script®   Greenhouse Reporting, Inc. (212)279-5108
A-184



ERRATA SHEET FOR THE TESTIMONY OF:   Stephen D. Peskoff

IN THE MATTER OF:    Underhill, et al. v. Fixed Income Discount Advisory Co.

DATE TAKEN:    December 12, 2006

| PAGE/LINE | CORRECTION | REASON |
|---|---|---|
| 368:25 | "Century" should be "Sentry" | Error in transcription |
| 278:10-11 | Add in blank:<br>Richard D. Wetzel, Jr., Esquire<br>Crabbe, Brown & James<br>500 South Front Street, Suite 2300<br>Columbus, OH 43215 | Requested information |
| 393:23 | Change "some kind ever workout" to<br>"some kind of workout" | Error in transcription |

_____
(SIGNATURE OF WITNESS)

Commonwealth of Virginia
County of Fairfax
SUBSCRIBED AND SWORN TO
BEFORE ME THIS 18th DAY
OF January , 2007.
Samuel Franco , Notary Public

*ADDITIONAL SPACE FOR CORRECTIONS ON THE OTHER SIDE OF THIS SHEET*

My commission Expires: 03/31/2009

**A-185**

1

1

2   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF DELAWARE

3   ------------------------------------x

4   UNDERHILL INVESTMENT
    CORPORATION, by and through

5   Stephen D. Peskoff as successor in
    interest, and STEPHEN D. PESKOFF,

6   individually,
                    Plaintiffs,      Civil Action No.

7        -against-                      06-99-SLR

8   FIXED INCOME DISCOUNT
    ADVISORY COMPANY,

9                   Defendant.

10  ------------------------------------x

11                  December 12, 2006
                    10:02 a.m.

12

13

14        DEPOSITION of ERNEST P. BAPTISTA, JR.,

15  taken by Defendant, pursuant to Subpoena, at the

16  law offices of Kirkpatrick & Lockhart Nicholson

17  Graham LLP, 599 Lexington Avenue, New York, New

18  York, 10022-6030, before Eleanor Greenhouse, a

19  Shorthand Reporter and Notary Public within and

20  for the State of New York.

21

22

23

24                  GREENHOUSE REPORTING, INC.
                    363 Seventh Avenue - 20th Floor
                    New York, New York  10001

25                     (212) 279-5108

Page 2

```
1
2  A P P E A R A N C E S :
3  RUBEN & ARONSON, LLP
     Attorneys for Plaintiffs
4       4800 Montgomery Lane, Suite 150
        Bethesda, Maryland  20814
5  BY:   ROBERT L. RUBEN, Esq.
6
7
8  KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
     Attorneys for Defendant
9       599 Lexington Avenue
        New York, New York  10022-6030
10 BY:  GERALD NOVACK, ESQ.
        - and -
11      SARAH P. KENNEY, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            E. Baptista, Jr.
2  ERNEST P. BAPTISTA, JR., residing at 14 Stevens
3       Road, Cranston, Rhode Island 02910,
4       called as a witness, having been duly
5       sworn by a Notary Public, was examined and
6       testified as follows:
7            MR. NOVACK:  Mr. Baptista, you
8       appeared here today pursuant to a subpoena
9       which we sent you which requested the
10      production of some documents.  I'm going to
11      mark that subpoena as Baptista Exhibit 1.
12      I'm going to give you a copy in a minute.
13           (Baptista Exhibit 1, subpoena, was
14      marked for identification.)
15 EXAMINATION
16 BY MR. NOVACK:
17      Q.   Would you just take a look at it for
18 one moment.  This is the subpoena that you
19 accepted from us; correct?
20      A.   Yes.
21      Q.   Attached to the subpoena is a
22 request for documents.  Do you see that?  It's
23 Schedule A.
24      A.   Yes.
25      Q.   Have you made any search to see if
```

Page 4

```
1            E. Baptista, Jr.
2  there are any documents that are called for by
3  Schedule A that are in the possession of your
4  company or in your possession?
5       A.   Yes.
6       Q.   And did you find any documents?
7       A.   There are no documents that relate
8  to the document request for these four.
9       Q.   Are you the person who did the
10 search, or did you ask someone to do it for you?
11      A.   I did it, and in-house counsel.  We
12 went through the files.  It would be in the files
13 with the contract with FIDAC and all that stuff
14 and there's nothing that relates to Peskoff,
15 Underhill, so on and so forth.
16      Q.   Can you tell me where the files were
17 kept that were looked at in terms of the New York
18 office --
19      A.   16 Main Street, East Greenwich,
20 Rhode Island 02818, at my office, Gen Corp.
21 Insurance and Financial Services.
22      Q.   Can you please tell me the identity
23 of the different Gen Corp. companies, and then I
24 think we will agree on a shorthand term to use,
25 and if you would do it as the company stood in
```

Page 5

```
1            E. Baptista, Jr.
2  the year 2001 and how they have changed, if they
3  have changed.
4       A.   There's an umbrella company called
5  Gen Corp. Insurance Group.  We're the second
6  largest insurance operation in the State of Rhode
7  Island brokerage.  We have 72 employees who are
8  broken down in different divisions.  The division
9  I'm involved in and a partner in is called Gen
10 Corp. Insurance and Financial Services, which
11 provides the financial services for Gen Corp.
12 quote-unquote sister companies, affiliates, so on
13 and so forth.  If you want, I can get into all
14 the other --
15      Q.   No.  Only the ones that you're
16 involved in.
17      A.   Okay.  And then we're also part of a
18 national group called M Financial, which is the
19 largest insurance producer group in the country.
20      Q.   M Financial?
21      A.   Financial.
22      Q.   Just the letter M?
23      A.   M, just M.
24      Q.   And it's an insurance producer
25 group, you said?
```

1          E. Baptista, Jr.
2     A.    Correct.
3     Q.    What does that mean?
4     A.    It's headquartered in Portland,
5  Oregon. There are 473 licensed insurance agents
6  who are stockholders of M Financial in 95 offices
7  throughout the United States. We do a little bit
8  over a billion dollars in life insurance premiums
9  a year. We own our own reinsurance operation,
10  and so on and so forth. I'm just giving you this
11  for background information. Our core carriers
12  are John Hancock, New York life, Prudential,
13  Nationwide, Sun Life, Lincoln National,
14  Nationwide and ING and Pacific Life.
15          The reason I give you this, because
16  we have developed private placement products,
17  proprietary private placement products, which was
18  the engine that drove the thinking on what we
19  were doing at FIDAC at the time. And we're
20  closely held, but it's a relatively -- to give
21  you the magnitude, we have -- we have a book
22  value of our stock of $250 million which means we
23  have $250 million in cash sitting in there.
24     Q.    When you say "we," are you referring
25  to Gen Corp. Insurance Group?

1          E. Baptista, Jr.
2     A.    No. I'm referring to the
3  individuals who are shareholders. Gen Corp.
4  Insurance and Financial Services is an affiliate
5  member, but I own all the stock in M personally.
6     Q.    What is the corporate relationship
7  between M Financial, Gen Corp. Insurance Group,
8  and Gen Corp. Insurance and Financial Services?
9     A.    Gen Corp. Insurance and Financial
10  Services is an affiliated firm of M. Gen Corp.
11  Group has no relationship with them outside of
12  the relationship that exists with M, and I'll
13  call it an acronym, GIFS, that's what we call Gen
14  Corp. Insurance and Financial Services, GIFS.
15     Q.    You said that GIFS provides services
16  for its sister companies?
17     A.    Correct, financial services.
18     Q.    And one of the sister companies is
19  Gen Corp. Insurance Group?
20     A.    Correct.
21     Q.    Is Gen Corp. Insurance Group a legal
22  entity of some sort?
23     A.    Yes.
24     Q.    What is it?
25     A.    It's a C corporation. It's the

1          E. Baptista, Jr.
2  holding corporation for all the other
3  subsidiaries --
4     Q.    And --
5     A.    -- except for GIFS.
6     Q.    And who owns GIFS, you alone?
7     A.    No, myself and my partner, Robert
8  Padula.
9     Q.    Could you spell that last name.
10     A.    P-A-D-U-L-A.
11     Q.    And you own it equally?
12     A.    Um-hum. Now, to complicate the
13  matter --
14     A.    No, don't complicate it yet, because
15  you've already gotten me in a tizzy here. I'm
16  going to see if I can swim my way out of this.
17  Am I mixing my metaphors?
18     A.    No.
19          MR. RUBEN:  You painted yourself
20     into a corner and threw away the key.
21          MR. NOVACK:  And I think I swallowed
22     some paint too.
23     Q.    Gen Corp. Insurance and Financial
24  Services, did it have anything to do with FIDAC
25  over the course of the period 2001 through the

1          E. Baptista, Jr.
2  present?
3     A.    No.
4     Q.    Gen Corp. Insurance Group, that
5  closely held corporation, did it have anything to
6  do with FIDAC?
7     A.    No.
8     Q.    Which is the Gen Corp. entity that
9  first dealt with FIDAC?
10     A.    It's not a Gen Corp. entity. Let me
11  just give you two other entities. So you
12  understand, there's EB Inc., which is 100 owned
13  by me, which holds the rights to the M stock in
14  the M franchise, just so you have it. It has no
15  bearing on this, but so you have it.
16          The organization that was dealing
17  with FIDAC during the germination period of this
18  whole thing was Gen Advisors. Gen Advisors is a
19  Rhode Island LLC.
20     Q.    Go ahead.
21     A.    The ownership of Gen Advisors is
22  16-2/3 percent Ernie Baptista, 16-2/3 percent
23  Robert Padula, 33-1/3 percent Jeff Messner, and
24  33-1/3 percent John Boma.
25     Q.    Spell that last name.

1          E. Baptista, Jr.
2     A.     B-O-M-A.
3     Q.     Gen Advisors is the Rhode Island
4 LLC?
5     A.     Correct.
6     Q.     And that was the entity that dealt
7 with FIDAC at the outset?
8     A.     Correct, and also has the contract
9 with FIDAC.
10     Q.     How long has Gen Advisors been in
11 existence?
12     A.     Since 2001 or January of 2002.  One
13 of those.  I can get that information for you.  I
14 should have it.
15     Q.     So was it -- what were the
16 circumstances that led to the formation of Gen
17 Advisors LLC?
18     A.     After a couple of meetings with
19 FIDAC, I said we should have a separate company
20 to do this.
21     Q.     And you said that to Jeff Messner?
22     A.     Jeff, John Boma and Bob Padula.
23     Q.     What involvement, if any, did
24 Mr. Boma have in Gen Advisors?  Other than being
25 a member, what services does he provide?

1          E. Baptista, Jr.
2     A.     At the time we started this, it was
3 just his thinking process, and let me tell you
4 what I mean by that.  He was working in a company
5 called Mullen Consulting, which is the largest
6 privately held executive benefit firm in the
7 country.  He was also head of the AICPA executive
8 benefits section, negotiating with the IRS for a
9 split dollar and some other things.  His
10 expertise area in the area of COLI/BOLI --
11     Q.     Let me just pause.  COLI is C-O-L-I?
12     A.     Corporate-owned life insurance, and
13 BOLI is bank-owned life insurance.
14     Q.     Okay.
15     A.     That was his role.  When he left
16 Mullen in September of '04, he came to work with
17 us full time.
18     Q.     So prior to September of '04,
19 Mr. Boma was not a member of Gen Advisors?
20     A.     No, he was a member from the
21 beginning.  He was not day-to-day active.
22     Q.     Did Mr. Boma have any involvement in
23 the initial dealings in 2002 with FIDAC?
24     A.     He attended some of the meetings
25 originally.

1          E. Baptista, Jr.
2     Q.     And Mr. Padula's role in connection
3 with Gen Advisors?
4     A.     He has 16-2/3 percent, because he
5 and I are partners in many deals and whenever we
6 do deals, I get half of what he does and he gets
7 half of what I do.
8     Q.     Did he have any day-to-day
9 involvement --
10     A.     None.
11     Q.     You have to let me finish my
12 questions even though you may know what I'm going
13 to ask.  I probably should just say why don't you
14 ask yourself some questions and answer them for
15 me and see if I leave anything out.
16     A.     That's okay.
17     Q.     Did he have any day-to-day
18 involvement in the dealings with FIDAC in 2002?
19     A.     No.
20     Q.     Mr. Messner, what was your
21 relationship with him and when did he first join
22 Gen Advisors?
23     A.     He joined -- he was originally a
24 partner, and then he became active and
25 spearheaded the whole thing effective May 2002.

1          E. Baptista, Jr.
2     Q.     When you say --
3     A.     And he worked full time.  He was the
4 only full-time person working there.
5     Q.     Gen Advisors, when it was originally
6 formed, who were the -- were the shareholdings as
7 you've described them today since inception and
8 to the present?
9     A.     Yes.
10     Q.     What was Mr. Messner's position with
11 any other company at the time he became a member
12 of Gen Advisors?  Did he work for anybody else?
13     A.     Yes.  He was working for Mullen
14 Consulting.
15     Q.     Did he ever work with ING?
16     A.     Yes.
17     Q.     When did he work with them or for
18 them?
19     A.     He was the chief marketing officer
20 for ING.
21     Q.     Do you know when he began and when
22 he ended?
23     A.     I'm trying to get the dates.  I
24 believe he started in -- we were in Australia.
25 Hold on.  Just let me recollect for a second.

Page 14

1          E. Baptista, Jr.
2     Q.    You can think to yourself if you
3  want and then give me the answer.
4     A.    It was 19 -- he went to work for
5  them in 1998 and left in 2000, by my
6  recollection.
7     Q.    At the time Gen Advisors was formed,
8  Mr. Messner was no longer with ING?
9     A.    No.
10    Q.    And when he left ING, where did he
11 go to?
12    A.    He retired for a year.  And then he
13 went to work as a marketing officer for Mullen
14 Consulting.
15    Q.    Was he a marketing officer for
16 Mullen Consulting at the time that Gen Advisors
17 was formed?
18    A.    I don't believe so.
19    Q.    He had retired from that as well?
20    A.    Yes.
21    Q.    Then when Gen Advisors or you began
22 your first dealings with FIDAC, Mr. Mullen was
23 not employed by anybody?
24    A.    Mr. Who?
25    Q.    I'm sorry, Mr. Messner was not

Page 15

1          E. Baptista, Jr.
2  employed by anyone as far as --
3     A.    No, that's not true.
4     Q.    Who was he employed by?
5     A.    He was still at Mullen when I first
6  met with -- when I first started dealing with
7  Mike Farrell and Ron Kazel, both Jeff and John
8  were working at Mullen.
9     Q.    Shortly thereafter --
10    A.    Eight months later, when it really
11 got going in June of 2002, Messner wasn't there
12 anymore.
13    Q.    Do you know when he left in relation
14 to where you were in your dealings with FIDAC, at
15 what point in the dealings with FIDAC did he
16 leave Mullen?
17    A.    He left Mullen in April of 2002,
18 either March 31st or April 1st, one of those.  We
19 were still talking.  We did not have a contract
20 with FIDAC, and the contract was signed on
21 10/10/02.
22    Q.    We have a copy of the contract.  We
23 will show it to you later.
24    A.    Okay.  Does that answer your
25 question?

Page 16

1          E. Baptista, Jr.
2     Q.    I think so.  When Mr. Messner was at
3  ING, he was, you said, their chief marketing
4  officer?
5     A.    Um-hum.
6     Q.    Do you know if he maintained any
7  ties with ING after he left being chief marketing
8  officer?
9     A.    Could you define what you mean by --
10 do you mean relationships with people?
11    Q.    Yes.  What relationships did he
12 maintain with ING?
13    A.    Oh, he still had good relationships
14 with Steve Christopher, who was the president.
15 Fred Deering, the former president, was still on
16 the board of directors.
17    Q.    Steve Deering is --
18    A.    No.  Steve Christopher and Fred
19 Deering.
20    Q.    And Deering's last name is
21 D-E-E-R-I-N-G?
22    A.    Correct.
23    Q.    How did you first meet Mr. Messner?
24    A.    We all belonged to M together.
25 We've known each other since 1990.

Page 17

1          E. Baptista, Jr.
2     Q.    When did you first talk to
3  Mr. Messner about doing anything with FIDAC?
4     A.    I believe the first meeting, the
5  first time we talked, was January of 2002.
6     Q.    Did you approach Mr. Messner about
7  it?
8     A.    Yes.
9     Q.    Why did you go to Mr. Messner?
10    A.    Because both John Boma and Messner
11 were at Mullen Consulting.  And as I said, Mullen
12 Consulting was one of the founding members of M,
13 and we had a private placement product and they
14 were looking for funds.  That's why I approached
15 him.
16    Q.    Who had the private placement
17 product?
18    A.    M.
19    Q.    What was the private placement
20 product?
21    A.    Private placement variable UL.
22    Q.    Private placement variable UL, would
23 you explain what that is?
24    A.    Private placement variable insurance
25 is insurance that has unregistered funds sitting

Page 18

1          E. Baptista, Jr.
2  on the insurance company platform, and this is
3  for high net worth COLI/BOLI transactions of a
4  large size, $1 million to $100 million or $200
5  million of premium deposit.
6      Q.    Now, I apologize for taxing your
7  patience, but I think you're going to have to
8  explain some of these terms so that we have an
9  understanding.  Let me try to break it down.  You
10  say M has a product.
11     A.    Right.
12     Q.    Does that mean M is trying to
13  persuade someone to put some money into this
14  product?
15     A.    Correct.  We, as brokers, are trying
16  to sell the private placement product, and it's
17  on the chassis of a number of insurance
18  companies, and one of the things that I started
19  looking at when these products first came out is
20  talking to money managers so that they could get
21  new money that they don't have today and if it's
22  placed in this tax deferred or tax free
23  receptacle, then it would be stickier money than
24  regular managed money and would have more value
25  to the money manager, both in terms of long-term

Page 19

1          E. Baptista, Jr.
2  cash flow and if he or she wanted to sell, they
3  have -- there's a higher multiple for that type
4  of money.
5      Q.    Let's try to deal with this a
6  different way so it will be easier for the lay
7  people.  Let's assume that we're dealing with
8  $100.  Okay?  And you tell me, give me an example
9  of a transaction which involves this, who the
10  players would be in the transaction that
11  somewhere, somehow, there's $100 that's going to
12  be invested by somebody.  Let's go through it
13  step by step.
14     A.    I'm going to do a little diagram
15  too.
16     Q.    That's fine.  That's fine.  And what
17  I'd like you to do is to try to diagram for me
18  the steps in the transaction that you would
19  contemplate whereby FIDAC or any money manager
20  would now start managing this pile of money that
21  is going to be the $100 in my example.
22     A.    I'm doing this really simple.  This
23  is a real oversimplification --
24          MR. NOVACK:  I like simple.  To make
25  this easier, we're going to take 30

Page 20

1          E. Baptista, Jr.
2  seconds.  We're going to make a copy of
3  this so Mr. Ruben has it and everyone else
4  does.  Do you want to tear that page out,
5  please?  Why don't we mark that Exhibit 2.
6          (Baptista Exhibit 2, diagram drawn
7  by Mr. Baptista, marked for
8  identification.)
9          (Recess taken.)
10     Q.    Mr. Baptista, I'm showing you
11  Exhibit 2.  Can you read for us, going from left
12  to right, what you've written there, please.
13     A.    Sure.  On the top left-hand side,
14  the word, "Broker."  And what the broker does
15  is --
16     Q.    Just read the words as they appear.
17     A.    "Broker sells insurance to insured.
18  Insured writes check to insurance company."  In
19  the box in the middle, the small box, "Insurance
20  company expenses are taken out," and then the
21  balance goes to the money manager designated by
22  the insureds or the owner of the policy, I should
23  say.
24     Q.    In the case of COLI or BOLI, is the
25  insured the corporation or the bank?

Page 21

1          E. Baptista, Jr.
2      A.    Well, the insured has to be a
3  person.
4      Q.    So when you said the insured writes
5  a check --
6      A.    It's really the owner.  You're
7  right.
8      Q.    The owner.  And the owner would be
9  the corporation or the bank; correct?
10     A.    Correct.  Correct.
11     Q.    Let's discuss generally some basic
12  terms in insurance.  When we were off the record,
13  you gave me and Mr. Ruben, and Mr. Peskoff
14  probably knows all of this, a tutorial on
15  insurance and I'm going to try to restate in
16  simple terms what I've learned.
17          There are two terms we've been using
18  regularly called COLI and BOLI.  COLI is
19  corporation-owned life insurance.
20     A.    Um-hum.
21     Q.    BOLI is bank-owned life insurance.
22  Am I correct?
23     A.    Correct.
24     Q.    Am I correct that the basic concept
25  is as follows:  Either a corporation or a bank

Page 22

E. Baptista, Jr.

1           E. Baptista, Jr.
2  will cause a sum of money, let's say $100, to be
3  put with an insurance company.  The insurance
4  company, in turn, will invest that $100 in an
5  investment product that's directed by either the
6  corporation or the bank under the COLI and BOLI
7  arrangements.  If it's a private placement
8  unregistered VUL, referring to a type of product
9  that does not have to be registered with the SEC
10 and only involves accredited investors --
11      A.    And also qualified investors.  You
12 have to have both.
13      Q.    And qualified investors.
14           -- then the insurance companies can
15 invest the money in hedge funds or equities.  Is
16 that correct?
17      A.    Correct.
18      Q.    The advantage to the corporation and
19 the bank is that the earnings on the funds
20 invested can be tax deferred.  Another advantage
21 is that the investment can be made in something
22 that is leveraged.
23      A.    Correct.
24      Q.    And it's only if there's leverage
25 that FIDAC, which operates on a leverage basis,

Page 23

1           E. Baptista, Jr.
2  would be a suitable investment manager?
3      A.    Correct.
4      Q.    Could you tell us what the
5  expression VUL stands for in the insurance
6  industry, please.
7      A.    Variable universal life.
8      Q.    And variable refers to --
9      A.    Variable refers to a product that
10 allows you to invest outside of the general
11 account of the insurance company.  A universal
12 means a flexible premium product, and life is
13 life.
14      Q.    And flexible premium also means that
15 there are different charges or loads that the
16 insurance company can negotiate and it's not
17 fixed by statute or regulation?
18      A.    Some are fixed and some aren't, but
19 what they do on private placement is they will
20 amortize the load charges over ten years in a
21 contract, like state premium tax.
22      Q.    For purposes of relating all of this
23 to our matter here, these products that we've
24 just been describing, COLI and BOLI products that
25 are unregistered VUL, would be products where

Page 24

1           E. Baptista, Jr.
2  funds would be raised from banks or corporations
3  and the insurance company would invest those
4  funds into an investment vehicle that could be
5  managed by FIDAC; is that correct?
6      A.    Correct.
7      Q.    Go ahead, please.
8      A.    At the direction of the owners of
9  the policy, bank or corporation.  The insurance
10 company doesn't decide where the money goes.  It
11 hires the managers to put on the platform and
12 then here's our list of managers, okay, and I
13 directed 50 percent to FIDAC and 50 percent over
14 here.
15      Q.    In the case of -- let's take a
16 hypothetical case.  Let's say a bank is going to
17 spend $100 on -- what is it, a premium?
18      A.    Um-hum, premium.
19      Q.    The bank would then direct the
20 insurance company as to where to invest that
21 $100?
22      A.    Correct, after any load charges.
23      Q.    The person, the individual, who is
24 the insured does not make that decision?
25      A.    No, unless he or she, and this is

Page 25

1           E. Baptista, Jr.
2  where you go to the high net worth, is the owner
3  of the policy, and that's not the case here.
4      Q.    Right.  So in terms of who
5  determines where the money goes that's going to
6  be invested, whether it goes to FIDAC or some
7  other alternative money manager, that's up to the
8  corporation or the bank?
9      A.    Correct.
10           MR. NOVACK:  Rob, if you have any
11 questions on this, if you're not clear on
12 it, I'm happy to let you do it now.
13           MR. RUBEN:  I don't have any
14 questions about it, but since you did ask
15 for my help, I think you might have made
16 one misstatement and one omission.
17           MR. NOVACK:  Sure, please correct
18 me.
19           MR. RUBEN:  I believe from the
20 off-the-record discussion the ability to
21 negotiate commissions and loads was not a
22 function of the variable feature, but of
23 the private placement feature and you
24 characterized it, Jerry, as being part of
25 the variable product.

Page 26

1        E. Baptista, Jr.
2        THE WITNESS:  That is correct.
3        MR. NOVACK:  Mr. Baptista agrees
4    that I'm being corrected correctly.
5        MR. RUBEN:  The second one, I think
6    you left out one of the advantages of the
7    private placement of the insurance that
8    Mr. Baptista talked about during the
9    off-the-record discussion, which was that
10    the funds could not only -- well, that the
11    funds could be invested not just in
12    equities but in unregistered equities, not
13    having to be registered with the SEC.
14        MR. NOVACK:  I think that's correct.
15    Thank you for the correction.
16    Q.    Mr. Baptista, do you agree?
17    A.    Yes.
18    Q.    Can I just summarize, then, my
19    understanding of the situation at the end of
20    2001, beginning of 2002.  It was around that time
21    that you were first introduced to Mike Farrell?
22        A.    Do you want me to go into when I was
23    introduced?
24    Q.    Yes, please.
25    A.    And I'm going to give you a little

Page 27

1        E. Baptista, Jr.
2    history.  I did not know Steve Peskoff.  I heard
3    his name, and I used to go to the investment
4    banking conferences, NIBA, to --
5    Q.    What are the initials?
6    A.    National Investment Banking
7    Association, NIBA.  And they were small
8    investment bankers; it wasn't Lehman Brothers.  I
9    met him in August of 2001, and I explained what I
10    was trying to do.  Okay?  And he said, "I've got
11    a guy you should meet," and then 9/11 and all
12    that other stuff.  I did not meet Mike Farrell
13    until Steve set up an appointment at Mike
14    Farrell's office and Mike and I met at his old
15    office on 48th or 49th.  48th, and in his
16    conference room.

REDACTED

Page 28

1        E. Baptista, Jr.

REDACTED

6    Q.    Slow down, so the reporter can get
7    it.  He said, "If you want to do it with life
8    insurance and your group, M, and all this other
9    stuff" --
10    A.    -- "you should meet with Mike
11    Farrell and I will set that up."  That's what
12    happened.  In between, there was 9/11.  Now, I
13    was working with other investment banking firms
14    talking to them about this, and on the BOLI
15    marketplace, and I'll just tell you a quick
16    story.  One of the firms was Sandler, O'Neill.
17    Tom O'Neill is a friend.  As a matter of fact, on
18    September 11, 2001, at 10:00, I had an
19    appointment on the 104th floor at Sandler,
20    O'Neill that Tom cancelled the Friday before
21    because he wanted to play golf at Banyon Dunes,
22    in Oregon, and we're both alive because of that.
23        So I was working with other
24    investment banking firms, it wasn't just Mike,
25    okay.  And they did banks and they had a money

Page 29

1        E. Baptista, Jr.
2    management division.  I met with Mike.  Now, I'm
3    terrible at records.
4    Q.    Okay.
5    A.    My recollection -- and I don't know
6    where the hell my appointment book is, I throw
7    things away -- is that I met Mike at November
8    11th, and Steve warned me before I met him that,
9    "Please don't try to sell him insurance."  We had
10    a nice conversation.
11    Q.    You recall meeting him before
12    year-end?
13    A.    Yes.
14    Q.    Okay.
15    A.    I met him alone, just me.  There was
16    no John Boma, Jeff Messner, no one else.
17    Q.    Nor Steve Peskoff?
18    A.    No, Steve Peskoff was not there.
19    Q.    Right.
20    A.    Okay.  We talked and at the end, my
21    nature, I said, "And by the way, if you ever do
22    need any insurance, I would be happy to do
23    something with you."  And he calls Peskoff up and
24    he said, "The guy tried to sell me insurance."
25    And I'm sure Mike will remember that.

Page 30

E. Baptista, Jr.

1

2    Q.    Okay.  What did you say and what did
3  he say at this first meeting?  What did you
4  discuss?
5    A.    I explained who M was, what we were
6  doing in private placement, why I think this
7  works in private placement.  Private placement
8  has been around for a while, but really coming
9  into its own actually in the last couple of
10  years.  I said, "We're ahead of the curve.  If
11  you want to be ahead of the curve, it's going to
12  require some time on your part or your staff's
13  part."  So I said, "Let's set up a meeting with
14  the people from Mullen and myself and maybe
15  someone from M and Steve Peskoff in January."
16  And we had a meeting in January.
17    Q.    Before you get to that meeting, tell
18  me what else was said at the first meeting.
19    A.    I said, "This is an opportunity for
20  you to pick up assets you normally would not have
21  any access to.  They are going to be sticky, but
22  it's not going to be easy, because we're blazing
23  a new trail."
24    Q.    When you say sticky, do you mean
25  they are likely to be kept under this management

Page 31

E. Baptista, Jr.

1

2  once they are invested with them?
3    A.    Right.  In BOLI, if you do the job
4  and everyone understands what they've bought and
5  its asset allocation, because you never get 100
6  percent of the money, because they are modified
7  endowment contracts, the money stays in those
8  accounts anywhere from 10 to 20 years.  That's
9  what I mean by sticky money.
10    Q.    Now, would you explain to me, when
11  you met with Mike the first time, what you were
12  proposing that the structure be of whatever
13  transaction you were contemplating?  Can you
14  simplify for us what you were proposing?
15    A.    We were talking conceptually, "If
16  you're willing to work with us, we might be able
17  to help you structure an insurance dedicated
18  fund, IDF" -- that's what you have to have to be
19  on these platforms -- "for mortgage-backed
20  securities that can pick the low-hanging fruit,"
21  because the interest rates were dropping and
22  interest rates were low and the interest rates
23  insurance companies' general accounts were paying
24  were starting their precipitous drop and everyone
25  saw that coming and knew it was going to get

Page 32

E. Baptista, Jr.

1

2  worse no matter what.  So there was a product
3  needed that banks understood -- mortgage-backed
4  securities, they understand that -- AAA paper,
5  bank eligible investments, using leverage that
6  would get a return of anywhere from 3 to 400
7  basis points over ten-year Treasury.  That's the
8  goal.  That's all we talked about, not in that
9  much detail, was the conceptual how to do
10  something in an insurance contract, that "I
11  should bring in some people who can also bring
12  the distribution of the product and let you talk
13  to them because if they are going to sell it, you
14  want to hear what they have to say."
15    Q.    So let me summarize and expand in
16  some respects.  At the first meeting, you
17  discussed with Mike Farrell the possibility of
18  finding new sources of money for him to manage?
19    A.    Correct.
20    Q.    The potential new sources of money
21  would come from either the corporate-owned life
22  insurance or the bank-owned life insurance?
23    A.    Um-hum.
24    Q.    And the means by which Mike would be
25  able to compete to get this would require that he

Page 33

E. Baptista, Jr.

1

2  establish a fund which would meet the
3  requirements for investment that the banks and
4  the corporations had to comply with.
5    A.    As well as the insurance carriers.
6    Q.    As well -- okay, because it's the
7  banks and the corporations that will want a
8  certain structure or characteristics in this fund
9  and the insurance carriers will want that as
10  well.
11    A.    Correct.
12    Q.    And what didn't exist at the time
13  was a fund that necessarily met the requirements
14  of both the banks, the corporations, and the
15  insurance carriers.  Mullen Consulting would come
16  in to help structure that fund?
17    A.    Yes.
18    Q.    And --
19    A.    Well, I brought them to the meeting.
20    Q.    No.  This is the first meeting.
21  This is what you were proposing at the first
22  meeting.  What role --
23    A.    I didn't bring up the name Mullen at
24  the first meeting.  I just had it in the back of
25  my mind.

Page 34

1          E. Baptista, Jr.
2     Q.   So you said to Mike that, "We have
3 to find a way to create a fund or a vehicle where
4 you will be the investment advisor which will
5 qualify for investment by the insurance companies
6 as part of their COLI and BOLI programs"; is that
7 right?
8     A.   Correct.  And we talked a little bit
9 about M being the largest producer group in the
10 country, largest premium -- in other words,
11 there's only two carriers in the United States
12 that produce more premium, Northwestern Mutual
13 and Metropolitan.
14     Q.   Slowly.  You're speaking too fast
15 for the reporter.
16     A.   There are only two insurance
17 carriers that produce more new premium a year,
18 Northwestern Mutual and Metropolitan and our
19 group.  Therefore, that's what we talked about.
20 We didn't talk specifically about Mullen.  We
21 said also we've got to bring in some people who
22 actually sell the product.
23     Q.   The product being the COLI and BOLI?
24     A.   Correct.  So that you know you have
25 distribution if you spend some time, effort, and

Page 35

1          E. Baptista, Jr.
2 money, that you just don't have a product sitting
3 on a platform that no one sells.
4     Q.   Okay.  So you have, first, FIDAC
5 would have to design and create a fund which had
6 the characteristics necessary to attract COLI and
7 BOLI and the insurance companies' investment?
8     A.   Um-hum.
9     Q.   Second, FIDAC had to be sure that
10 the insurance product that was going to be the
11 vehicle for making the investment in this new
12 vehicle that was going to be created was going to
13 be marketed by someone?
14     A.   Um-hum.

## REDACTED

21     Q.   And what happens is the brokers go
22 to the people at the corporations and the banks
23 and they talk to the executives there that make
24 the decisions?
25     A.   Correct.

Page 36

1          E. Baptista, Jr.
2     Q.   And they say, "If you buy this
3 insurance product, one of the available
4 investment options is going to be this FIDAC
5 fund"?
6     A.   Correct.  Our job, when you look at
7 our contract that was signed on October 10, 2002,
8 was to advise FIDAC how to do all these thing and
9 to be the liaison with the insurance carriers and
10 the liaison with the brokerage community.
11 Between Jeff Messner and John Boma, and myself,
12 we knew all the carriers and we knew all the top
13 brokers.
14     Q.   The ultimate source of the money in
15 these situations was going to either be the banks
16 or the corporations.
17     A.   Correct.
18     Q.   Did you, at the first meeting with
19 Mr. Farrell in November 2001, get any more
20 specific than this general concept?
21     A.   No.
22     Q.   How was it left at the conclusion of
23 the meeting?
24     A.   I told him I would get back to him
25 and try to set up a meeting.  I would get back to

Page 37

1          E. Baptista, Jr.
2 him and try to set up a meeting after the first
3 of the year, with all the different parties that
4 I think could bring something to the table so we
5 could discuss it and drill it down a little bit
6 and be more specific and it's something that we
7 should pursue or not pursue.
8     Q.   At the first meeting, was there any
9 discussion of Mr. Peskoff or Underhill, his
10 company?
11     A.   Yes.
12     Q.   What was the discussion?
13     A.   The discussion was very simple.
14 "Steve set up the meeting.  How do you know
15 Steve?"
16     Q.   And what was said?
17     A.   I said, "I met him in August at an
18 investment banking conference and I was telling
19 him what I was doing, and he said you should talk
20 to Mike Farrell.  I think the two of you can do
21 some things together."
22     Q.   Am I correct nothing else was said
23 about Steve or his company, Underhill, at this
24 first November meeting?
25     A.   Outside of he explained that they

Page 38

1          E. Baptista, Jr.
2 were good friends and he helped him raise money.
3 Nothing about the project, if that's what you're
4 getting at.
5     Q.    That's what I am getting at.
6     A.    Yeah.
7     Q.    Did you or Mr. Farrell discuss how
8 either you or the entity that you were going to
9 use would be compensated if this went forward at
10 the time?
11    A.    No.
12    Q.    At the time of this November
13 meeting, am I correct that Gen Advisors had not
14 yet been formed?
15    A.    Correct.
16    Q.    The next time you met with
17 Mr. Farrell was in January 2002, do you think?
18    A.    Correct.
19    Q.    Between November, the first meeting,
20 and that meeting in January, did you have any
21 communications, either oral or written, with
22 Mr. Farrell?
23    A.    No.
24    Q.    Other than setting up a meeting?
25    A.    No.

Page 39

1          E. Baptista, Jr.
2     Q.    Did you discuss with Mr. Peskoff
3 anything about this possibility of doing business
4 with FIDAC?
5     A.    I can't tell you exactly when, but
6 between that and January, because I told Steve he
7 had the meeting set up in January and he came to
8 the meeting, and "I think there's great
9 opportunity here." And I explained to him in a
10 little more detail about our business and why I
11 think there's great opportunity.
12    Q.    You explained it to Steve?
13    A.    Correct.
14    Q.    At the meeting in January, who
15 attended?
16    A.    Myself, John Boma, Jeff Messner,
17 Steve Peskoff, Ron Kazel.
18    Q.    K-A-Z-E-L?
19    A.    Yes. Mike Farrell, and I'm not sure
20 now if Wellington was there. I'm not sure if she
21 was. Wellington Denahan.
22          MR. NOVACK: Do we know how to spell
23 her last name?
24          MS. KENNEY: D-E-N-A-H-A-N.
25    A.    I'm not sure if she was there.

Page 40

1          E. Baptista, Jr.
2     Q.    Where did the meeting take place?
3     A.    In the conference room at FIDAC.
4     Q.    About how long did it last?
5     A.    About an hour and a half.
6     Q.    Can you tell me, as best you can
7 recall, the subjects that were discussed without
8 getting into the detail just yet?
9     A.    The subject that was discussed is
10 the concept briefly, a little bit more detail how
11 it works, and do we think we can -- and that's
12 when Mullen first came up and Steve was there --
13 do we think we can truly go out and make this
14 work and sell it? And the answer was yes.
15    Q.    I have a basic question: Why
16 couldn't the insurance companies just be
17 approached and the insurance companies told,
18 "We'd like you to offer this," versus going out
19 to the -- "this," referring to the new fund that
20 would be created, the new vehicle created by
21 FIDAC, as opposed to having to go out to the
22 corporations and banks, themselves? If the
23 insurance companies provide the various options,
24 why couldn't the insurance companies market to
25 the banks and just say --

Page 41

1          E. Baptista, Jr.

**REDACTED**

5     Q.    I see.
6     A.    Under large, large transactions, but
7 they still -- you see, there's a culture, if I
8 can back-step for a second. There's a culture.
9 Money managers have a certain culture and they
10 think in nanoseconds. Insurance company
11 executives don't care if they do the deal or not.
12 They still get their paycheck. They are
13 notoriously parochial. Then you have the broker
14 who wants to do it, just like the money manager,
15 in a nanosecond, because they want to get paid
16 because the broker doesn't get paid.
17          Then you have the end user, the
18 client. He wants to make sure all the cultures
19 are in sync so that he or she, the corporation,
20 is getting the best deal for their buck. We
21 transcend all of them.
22    Q.    "We" meaning?
23    A.    Gen Advisors. We're brokers. We
24 were senior executives at insurance carriers, and
25 at the beginning we didn't, now we do, understand

Page 42

1         E. Baptista, Jr.
2  money managers and their culture.  They are
3  different cultures.  And there are a number of
4  people that have done exactly what you've just
5  said, and put stuff on platforms.
6       Q.    Right.

REDACTED

13      Q.    That is because, in your view --
14      A.    They don't understand all the
15  cultures, and they think because our performance
16  is such that everyone is just going to flock and
17  send us money.
18      Q.    You mean that the executives at the
19  corporations and the banks will select their
20  vehicles?
21      A.    Um-hum.  They never see their
22  vehicles most of the time, unless someone is
23  arguing or presenting their case as a broker.
24      Q.    So then --
25      A.    The insurance companies won't do

Page 43

1         E. Baptista, Jr.
2  that.
3       Q.    Okay.  So you need to go to the
4  person at the corporation or the bank who makes
5  the choice what fund to have the monies invested
6  in?
7       A.    It's usually their investment
8  department.
9       Q.    Right.  Okay.  That's the key --
10      A.    Their chief investment officer.
11      Q.    So you have to persuade the
12  insurance companies to list you as a vehicle that
13  can be chosen from, and then you have to go out
14  to the person who is making the decision at the
15  bank or corporation?
16      A.    Correct.
17      Q.    And what Gen Advisors does, it goes
18  to the insurance companies and it goes to the
19  corporations?
20      A.    No, no.  We don't go to the
21  corporations.  There are about 250 brokers in the
22  United States that really do 80, 85 percent of
23  this work.  One of us knows each one personally
24  and they trust us.  We do not sell.  We do not
25  compete with them.

Page 44

1         E. Baptista, Jr.
2       Q.    Okay.  So what Gen Advisors provides
3  is the following, and this is what you were
4  offering to provide to Mike Farrell.  Let me ask
5  it a different way.  At the first meeting with
6  Mike Farrell in 2002, the January meeting, you
7  explained the concept, and among the things you
8  explained to him were that you and your
9  colleagues would reach out to the brokers in the
10  nation to promote whatever vehicle was
11  established by FIDAC.  You would also, you at Gen
12  Advisors, if it had been formed by this time --
13  I'm not sure -- would go to the insurance
14  companies to persuade them that this is a vehicle
15  that would comply with the regulations that they
16  needed, and the regulations that the banks and
17  the corporations had to comply with, and as I
18  said, you would advise FIDAC on what it had to do
19  to structure this fund correctly.
20      A.    And we'd take it to the carriers
21  with them.
22      Q.    Right.
23      A.    Because we knew all the people at
24  the carriers, personal relationships.  And then
25  there's one last piece.  I hate to confuse you.

Page 45

1         E. Baptista, Jr.
2       Q.    I'm not confused, I don't think.
3       A.    Because it's bank-owned insurance,
4  they have a real hard time.  They have to mark to
5  market every quarter these products.  So there's
6  ups and downs regardless of what the money
7  managers say.
8       Q.    Right.
9       A.    And there's a thing called wrapping.
10  There are three banks that wrap.
11      Q.    W-R-A-P-P-I-N-G?
12      A.    Yes.
13      Q.    Go ahead.
14      A.    There are three banks that do this
15  in the world mostly.  There's J.P. Morgan, Bank
16  of America and Royal Bank of Canada, and they
17  charge basis points to wrap so that the
18  principle/plus interest can be for accounting
19  purposes used, because the bank gives a
20  guarantee.  So you don't have to mark to market.
21  So you never have a down quarter.  We also
22  arranged that for FIDAC's fund.  Without that, it
23  could never be sold.
24      Q.    How does Gen Advisors provide that?
25      A.    We don't.  We went to the banks that

Page 46

1          E. Baptista, Jr.
2  got them comfortable with the insurance carriers,
3  the brokers who were going to sell it, who they
4  were going to sell it to, and with FIDAC in due
5  diligence meetings so that they felt comfortable
6  doing that.
7          Q.    Let's see if I have the
8  constellation, then, of players now.  In order to
9  create this new fund and this new repository for
10 additional capital to be managed by FIDAC, Gen
11 Advisors would go to the following:  First, it's
12 with FIDAC and it advises it on how to structure
13 the fund to be able to satisfy the requirements
14 of the insurance companies and the corporations
15 and the banks?
16         A.    Correct.  And the OCC.
17         Q.    The OCC referring to?
18         A.    Office of the Controller of the
19 Currency for banks buying life insurance.  There
20 are certain rules and regulations and there's
21 bank eligible investments and non-bank eligible
22 investments.
23         Q.    And the same thing for I guess
24 insurance eligible investments?
25         A.    Correct.

Page 47

1          E. Baptista, Jr.
2          Q.    So FIDAC is advised by Gen Advisors
3  with regard to that.  Gen Advisors would then go
4  out to the people who comprise the brokerage
5  community in the country?  I think you said they
6  had 85 percent of the licensed brokers --
7          A.    We couldn't go to the brokerage
8  community until we had the insurance companies
9  and the wrap provider lined up.
10         Q.    I wasn't going in sequence.  I was
11 going into categories.  But let's try it again.
12 First Gen Advisors has to advise FIDAC on how to
13 structure the fund to comply with the
14 requirements of the banks, the corporations, the
15 Office of the Controller of the Currency and any
16 insurance departments.
17         A.    Um-hum.
18         Q.    Second, Gen Advisors has to deal
19 with the three major banks you told us about,
20 which provide this wrapping?
21         A.    No, the carriers.  The wrappers
22 won't -- until it's on a carrier platform, they
23 won't discuss the wrapping.
24         Q.    So here we go again.  First, here's
25 what Gen Advisors does.  It advises FIDAC on the

Page 48

1          E. Baptista, Jr.
2  basic structure that's required to satisfy the
3  corporations, the banks, the Controller, and the
4  insurance departments.
5          A.    Um-hum.
6          Q.    Next, Gen Advisors goes to the
7  insurance companies to persuade them that this is
8  a viable vehicle for them to make the
9  investments?
10         A.    Um-hum.
11         Q.    Then Gen Advisors goes to the three
12 banks that provide the wrapping service, which is
13 essential to having a track record or not having
14 to mark to market to make this an attractive
15 vehicle for the insurance companies and the
16 corporations and bankers?
17         A.    It's an accounting wrapper.  It
18 allows them to account in a certain way that's
19 favorable to them.
20         Q.    And then Gen Advisors reaches out to
21 the nationwide network of brokers it has.  Those
22 brokers then go to, in turn, the executives who
23 make the decisions at the corporations and the
24 banks as to what investment vehicle to employ,
25 assuming they buy the insurance product?

Page 49

1          E. Baptista, Jr.
2          A.    Um-hum.
3          Q.    And the goal is to persuade the
4  executives at the corporations and the banks to
5  buy the insurance product which has as an option
6  investing in this new FIDAC vehicle?
7          A.    Correct.
8          Q.    Have I got all the steps in the
9  transaction?
10         A.    You've got it all now.
11         Q.    Can I come work for you next year,
12 do you think --
13         A.    Sure.
14         Q.    -- as a tedious advisor?
15         A.    No.  You're more graceful with the
16 executives than I would be maybe.
17         MR. NOVACK:  I'm not always so
18 graceful, as I'm sure some of the people in
19 this room can tell you.
20         MR. RUBEN:  Before we move on, as I
21 assume you're about to, can I just ask the
22 court reporter to mark that section because
23 I may want to refer to it later.
24         Q.    Let's go back now if we can, please,
25 to the meeting in January.  I laid out for you in

Page 50

1          E. Baptista, Jr.
2  summary form the various steps that have to be
3  taken by Gen Advisors in order to result in this
4  new source of funds coming into FIDAC's
5  management sphere. Did you lay all of this out
6  in words or substance at the January meeting?
7      A.    No.
8      Q.    What part of it didn't you explain
9  at the January meeting?
10     A.    We didn't go into all the
11  particulars, because quite frankly, you cannot be
12  in a meeting with people who are going to develop
13  a fund and just do the shortened version. There
14  were subsequent meetings in the end of February,
15  March, April, May, and June when they decided to
16  go ahead with it. Okay? And each one got into
17  more particular details.
18     Q.    Can you tell me more or less --
19     A.    And at one of the meetings, we
20  brought in the number one BOLI broker in the
21  country.
22     Q.    We will come to that. Can you tell
23  me more or less what was disclosed by you or
24  discussed by you at the meeting with respect to
25  what Gen Advisors was proposing to FIDAC?

Page 51

1          E. Baptista, Jr.
2      A.    We didn't propose anything at the
3  January meeting. We just told them what had to
4  be done. Because remember, I want you to
5  understand, the contract with FIDAC/Gen Advisors
6  wasn't signed for another ten months.
7      Q.    I understand that.
8      A.    So the roles, the compensation and
9  so on and so forth, were being meshed out between
10  February and October.
11     Q.    But in the January meeting, what was
12  the sum and substance of what you told the people
13  at FIDAC as to what would --
14     A.    Our role would be consultive and we
15  would help them with the insurance carriers. We
16  would help them in design and we would help them
17  with the brokerage end or the distribution end.
18     Q.    And this was a very, very general
19  and conceptual meeting?
20     A.    Very, very general.
21     Q.    Was there any discussion of
22  compensation at that meeting?
23     A.    Specific compensation, no.
24     Q.    What about any discussion at all
25  about compensation at that meeting?

Page 52

1          E. Baptista, Jr.
2      A.    Yeah. We told them we had to get
3  paid.
4      Q.    Can you tell me as best you recall
5  how that came up? Did someone ask you, "Are you
6  doing this for free," and you said, "No. We have
7  to get paid"? How did it come up if you recall
8  anything about that?
9      A.    You know, Steve was at the meeting,
10  and the only thing I remember with any certainty,
11  okay, is -- and I believe it was Steve, I'm
12  pretty certain, and said, "You've got to work out
13  contracts and how everyone gets paid here." And
14  everyone went, "Yeah, yeah, yeah, yeah." We were
15  working with other money managers at the time.
16  We hadn't settled on FIDAC yet.
17     Q.    Other than what you've just
18  testified to, do you recall anything else being
19  said at this meeting about anybody's
20  compensation, if you went forward?
21     A.    Not at that time. At subsequent
22  meetings, yes.
23     Q.    When is the next time that you met
24  or spoke with Mike Farrell or anyone at FIDAC
25  about this?

Page 53

1          E. Baptista, Jr.
2      A.    I believe it was March of 2002. I
3  could be off on this, but it was sometime in late
4  winter-early spring.
5      Q.    And where was that meeting? Was it
6  a meeting?
7      A.    Yeah, at FIDAC.
8      Q.    Who attended the meeting?
9      A.    We had -- was that the meeting with
10  Bobby Long or was it the next one? At that
11  meeting was Jeff, John. I did not attend. I had
12  my partner, Bob Padula, with me and we just came,
13  said hi, and left, because Jeff thought we would
14  have too many people. So that's the extent of
15  what I know about that meeting, except I got a
16  report later.
17     Q.    Before you get to that, just tell me
18  you were at the meeting in March very briefly?
19     A.    Yes.
20     Q.    Just to make introductions?
21     A.    Yes.
22     Q.    And then you left?
23     A.    Um-hum.
24     Q.    What was discussed when you were
25  there, if you recall?

Page 54

1              E. Baptista, Jr.
2       A.   "Hi.  How are you?"
3       Q.   Just pleasantries?
4       A.   Yes.  Let me explain what my role
5  is.  I find things.
6       Q.   Right.
7       A.   And then I hire people to do the T's
8  and the I's and the nitty-gritty.  I really
9  don't --
10      Q.   To cross the T's and dot the I's?
11      A.   That's not me.
12      Q.   Not to tease anybody?
13      A.   Yeah.
14      Q.   At the January meeting, Messner was
15  there?
16      A.   Yes.
17      Q.   And Messner was at the March
18  meeting?
19      A.   Um-hum.
20      Q.   Messner is still with Gen Corp.;
21  right?
22      A.   Yes.
23      Q.   Gen Advisors?
24      A.   Gen Advisors, yes.
25      Q.   Today?

Page 55

1              E. Baptista, Jr.
2       A.   Yes.  In fact, they were at FIDAC
3  about two hours ago, Jeff and John.
4       Q.   Put aside the report for a minute.
5  Did you speak with anybody at FIDAC between the
6  January meeting and the March meeting, if that's
7  when it occurred, other than to set up the second
8  meeting?
9       A.   Just to set it up.  And you know,
10  and I could have talked to Mike.  I said, "Look,
11  I think this could be really good."  Okay?
12  Because we were getting more and more comfortable
13  with FIDAC and their strategy.
14      Q.   At the March meeting -- withdrawn.
15  What, as you understood it, was the purpose of
16  the March meeting?
17      A.   Just to keep on pushing it forward
18  and see if there was common interest, common
19  goals.
20      Q.   During the period January through
21  March, had there been any change or developments
22  either in the regulatory landscape or in your
23  thinking, or was it just basically keeping on
24  pushing with the concept that had been broadly
25  outlined in January?

Page 56

1              E. Baptista, Jr.
2       A.   Just with the concept.
3       Q.   Had anybody, to your knowledge, ever
4  created a fund like the fund or vehicle that you
5  were proposing FIDAC create in order to
6  participate --
7       A.   Not up to that time.  That's why I
8  said we were breaking new ground.
9       Q.   In what way was this new ground?
10  Why was it new ground?  Was it the leverage
11  aspect of FIDAC's?
12      A.   No one has done a mortgage-backed
13  security in an insurance contract with leverage.
14      Q.   I see.
15      A.   And had a track record going back to
16  the quote-unquote dollar fund that we were
17  looking at back to 1994 where there were only
18  three or four down months in a six or seven-year
19  period of time.
20      Q.   So that's what was so far
21  unprecedented?
22      A.   Yeah.  In an insurance contract.
23      Q.   Yes.  That's what we're talking
24  about here.  The whole premise here was this was
25  going to be FIDAC's investment vehicle, that it

Page 57

1              E. Baptista, Jr.
2  managed anyway, in the insurance contract?
3       A.   Correct.  Excuse me.  Can I do one
4  thing?  Can I just call someone I'm supposed to
5  meet?
6           MR. NOVACK:  Off the record.
7           (Recess taken.)
8       Q.   You say you got a report after the
9  March meeting?
10      A.   Um-hum.
11      Q.   Who gave you the report?
12      A.   Jeff Messner.
13      Q.   Was it oral?
14      A.   Yes.
15      Q.   Can you tell me what you remember of
16  the report?
17      A.   He told me -- he said, "Done
18  properly, this could be a home run, because this
19  is what the distribution systems are looking
20  for," and he talked to some of the distribution
21  systems.
22      Q.   When you say the distribution
23  systems --
24      A.   The people, brokers who actually
25  sell the product on the firing line.

Page 58

```
1          E. Baptista, Jr.
2      Q.   And what else did he tell you, or
3  was it just a summary like that?
4      A.   A summary like that.  And then he
5  said, "The next meeting, we're going to bring in
6  Bobby Long for them to meet," and subsequently he
7  left Mullen and then worked on this.  This was in
8  about June -- May or June, the end of May.  We
9  brought in Bobby Long from Long Miller.
10     Q.   Which is?
11     A.   The number -- he is the person who
12 invented BOLI.  He was the largest BOLI broker in
13 the country.  There was he and Mr. Miller, and a
14 staff of 20 people, in Greensboro, North
15 Carolina.  So we brought him in to meet Mike and
16 Ron and bring his 2 cents as to what he thought
17 the marketplace was.
18     Q.   When did that take place?
19     A.   I believe it was the end of May or
20 June 2002.
21     Q.   Is that at a meeting in New York
22 again?
23     A.   Yes.
24     Q.   At FIDAC?
25     A.   At FIDAC.
```

Page 59

```
1          E. Baptista, Jr.
2      Q.   Who was present at that meeting?
3  Were you there?
4      A.   Yes.
5      Q.   Were you there for the whole
6  meeting?
7      A.   No.  I had another meeting to
8  attend.
9      Q.   Did you just do the intros and
10 pleasantries and leave?
11     A.   That's what I do.
12     Q.   Did you then get a report after that
13 meeting?
14     A.   Yes.  I met them all afterwards for
15 lunch.
16     Q.   Who did you meet for lunch?
17     A.   Bobby Long, Jeff Messner and John
18 Boma.
19     Q.   Can you tell me what you learned
20 about the meeting at the lunch?
21     A.   Um-hum.
22     Q.   Please.
```

REDACTED

Page 60

```
1          E. Baptista, Jr.
```

REDACTED

Page 61

```
1          E. Baptista, Jr.
           REDACTED
3      Q.   Was Long operating pursuant to some
4  understanding with Gen Advisors --
5      A.   No.
6      Q.   -- in terms of compensation or
7  participation?
8      A.   No.
9      Q.   He just did this as a favor?
10     A.   Yes.  That's the brokerage --
11     Q.   Culture, I know.
12     A.   -- culture and community with
13 relationships that go back 20 years.
14     Q.   At this lunch, the post meeting
15 lunch, referring to the late May-early June
16 meeting, was anyone else present besides Long --
17     A.   No.
18     Q.   -- Boma --
19     A.   No.
20     Q.   -- Messner --
21     A.   Messner and myself, no.
22     Q.   And Steve Peskoff was not there?
23     A.   No.
24     Q.   Was Steve Peskoff present for the
25 meeting in May or June?
```

Page 62

1          E. Baptista, Jr.
2     A.    No.
3     Q.    Between the March meeting and the
4 meeting in the end of May or June, had you had
5 discussions with Steve about this?
6     A.    Yeah.  I just kept him apprised of
7 what was going on, and that I think we're moving
8 to a point where we have more and more to talk
9 about because it looks like it's a viable
10 project.  And at about that time, as I said, we
11 were looking at other money managers.  We sort of
12 focused -- we thought FIDAC had the best
13 mousetrap.
14    Q.    The next meeting or communication
15 with FIDAC was what?
16    A.    In the summer.  And Jeff was taking
17 over full time.  I was off finding other funds
18 and other things at that time.  I mean, I still
19 kept -- I still went to some meetings.  I still
20 went to the new offices for the Christmas party,
21 and all that other stuff, but I was out of the
22 loop as it relates to finalizing things except
23 for the October, when we finalized the contract,
24 because my signature -- all the money comes to me
25 and then it's distributed, which I can tell you

Page 63

1          E. Baptista, Jr.
2 how it's distributed later on, and the contract
3 is signed by me.  So as the managing director
4 of --
5     Q.    Of the LLC, the managing member of
6 the LLC?
7     A.    Correct.
8     Q.    So the next meeting was when did you
9 say?
10    A.    There was meetings all summer.
11    Q.    But you did not attend those
12 meetings?
13    A.    No.
14    Q.    You were getting reports?
15    A.    Correct.
16    Q.    When is the next meeting you
17 attended?
18    A.    The next meeting I attended was in
19 early fall -- yes, September 22nd, early fall,
20 that coincides with the contract.
21    Q.    I think the contract was dated in
22 October.
23    A.    10/10/02.
24    Q.    And when was this meeting you're
25 referring to in relation to October 10?

Page 64

1          E. Baptista, Jr.
2     A.    I think it was a week or ten days
3 before, just finalizing.
4     Q.    What was the state of discussions at
5 that time in terms of whether there was a
6 consensus that it would move forward, on what
7 terms, as far as you understood?
8     A.    There was a consensus exactly what
9 was in the contract, our roles, our
10 responsibilities, how we were going to get paid.
11 And also at the same time they wanted to make
12 sure that we were being paid and we weren't
13 paying anyone else.  They didn't want people
14 double dipping, specifically him.
15    Q.    We will come to that in a moment,
16 but between the March meeting and this meeting a
17 week or so before the contract with Gen Advisors
18 was signed, you had not participated in any
19 substantive discussions in any of these meetings
20 between FIDAC on the one hand or Gen Advisors on
21 the other; isn't that right?
22    A.    That is correct.
23    Q.    And you have no personal knowledge
24 as to what was being said at those meetings; is
25 that right?

Page 65

1          E. Baptista, Jr.
2     A.    No.  Whatever they told me.
3     Q.    You were just getting reports?
4     A.    Correct.
5     Q.    Now, you just made a reference now
6 to double dipping.
7     A.    Um-hum.
8     Q.    Was that an expression that was used
9 at a meeting you were personally present at?
10    A.    Yes.
11    Q.    When was that meeting?
12    A.    That was that meeting before the
13 contract was signed.
14    Q.    About a week or so before the
15 contract was signed?
16    A.    Saying, you know --
17    Q.    We will get to that, we will get to
18 that.
19    A.    I'm sorry.
20    Q.    I just want to keep it orderly so
21 that we can keep track of it.  What were the
22 circumstances that led to this meeting taking
23 place?  Who called for it?
24    A.    I think Jeff set it up.  It was to
25 finalize the contract.

Page 66

1          E. Baptista, Jr.
2     Q.    What did you understand from Jeff
3  was the status of things on the day you were
4  going to this meeting before the meeting took
5  place?
6     A.    Our lawyers had already looked at
7  the contract, FIDAC's attorneys had prepared it,
8  and there were no issues.
9     Q.    So you had the contract in hand
10 about a week or so before it was signed?
11    A.    At least a couple of weeks.
12    Q.    And you had your lawyers look at it?
13    A.    The outline.  We didn't have
14 everything.
15    Q.    You had a draft of the contract, do
16 you mean?
17    A.    Yes.
18    Q.    Or an outline of terms?
19    A.    A draft.
20    Q.    You didn't produce a draft.  I
21 presume you don't have it in the files.
22    A.    No.
23    Q.    What was your understanding of the
24 status of the development of the vehicle,
25 approaches to insurance companies, approaches to

Page 67

1          E. Baptista, Jr.
2  the banks and corporations, approaches to the
3  banks that were going to do the wrapping,
4  approaches to the brokers?
5     A.    Okay.  There were no -- with the
6  exception of Bobby Long, there were no approaches
7  to the brokers.  There were no approaches to the
8  wrappers.  There was some conversation with
9  insurance carriers where a relationship existed.
10 It was putting this together.  There were starts
11 and stops because FIDAC had hired Deloitte, and
12 they started, and they stopped for a while.  Then
13 they got going again, and so on and so forth.
14          Once the contract was signed, I
15 think there was one more stop in the spring of
16 '03, but it was moving ahead, because they had
17 other things to work on.  There was a human
18 resource issue at FIDAC.  They had a number of
19 different things they were doing.  They only had
20 so many people.  So that, you know, might have
21 slowed it down, might not have.  I don't know, I
22 wasn't there, but I'm just saying it took what I
23 thought was a longer time than it should.  But be
24 that as it may, through that whole process, it
25 moved forward inches, sometimes feet, sometimes

Page 68

1          E. Baptista, Jr.
2  yards, until the culmination where brokers, wrap
3  people, in 2003, looked at it.
4     Q.    I don't want to get to 2003.  I will
5  eventually, I hope, and we're not operating in
6  real time that it will take us a year to get
7  there.  My question was, what was your
8  understanding of the status of things as to who
9  had been approached by the time you met in the
10 week or so before the contract was signed with
11 Gen Advisors?  And the answer is some people had
12 talked to some of the insurance companies, but
13 that's it?
14    A.    That's it.
15    Q.    Between --
16    A.    And the broker.  One broker.
17    Q.    Long?
18    A.    Long.
19    Q.    Between January and this meeting
20 which took place in around early October, I
21 guess, 2002 --
22    A.    The last week of December, early
23 October.
24    Q.    The last week of September-early
25 October?

Page 69

1          E. Baptista, Jr.
2     A.    Um-hum.
3     Q.    So let's call it the early October
4  meeting for now.
5     A.    Um-hum.
6     Q.    Between January and the early
7  October meeting had you had any discussions at
8  all with anyone as to compensation for Steve
9  Peskoff in connection with this matter?
10    A.    No.
11    Q.    Did you have in place at Gen
12 Advisors at this time any policies or practices
13 with regard to compensating someone in the
14 position of Steve Peskoff for the role he played
15 in introducing you to Mike Farrell?
16    A.    No.
17    Q.    Did you have any experience paying
18 people who had provided similar services?  Had
19 you in the past paid anyone for --
20    A.    No.
21    Q.    -- providing similar services?  No?
22    A.    No.
23    Q.    Did you have any thoughts, before
24 the October meeting, in 2003 -- 2002, I'm sorry.
25          Before the October 2002 meeting with

Page 70

1           E. Baptista, Jr.
2 FIDAC, had you considered at all making any
3 agreement with Steve Peskoff to pay him anything
4 for introducing you to Mike Farrell?
5      A.   We were going to have a
6 conversation, and that's what we had in October,
7 about, "Okay, Steve introduced us.  What takes
8 place"?  And they said, "We will take care of
9 Steve."
10     Q.   No.  Don't jumble the two.  I'm
11 asking you before the meeting, so let's just
12 confine it before the meeting.  Then we're going
13 to be --
14     A.   No.
15     Q.   So let me try to clarify what you
16 said.  Is it correct that before the October 2002
17 meeting with FIDAC, you had not considered what,
18 if anything, you would pay Steve Peskoff or
19 Underhill for introducing you or Gen Advisors to
20 FIDAC?
21     A.   Correct.
22     Q.   You had not discussed this with Jeff
23 Messner or anyone at all?
24     A.   I believe what I told Jeff was in
25 negotiating the contract, we have to address this

Page 71

1           E. Baptista, Jr.
2 issue.
3      Q.   Other than that?
4      A.   Right.
5      Q.   Did you have any prior experience
6 with someone in Steve Peskoff's position who had
7 provided similar services, i.e., an introduction?
8      A.   No.
9      Q.   Did you have any thought in your own
10 mind before the October meeting as to what would
11 be a fair way to compensate Steve Peskoff or his
12 company, Underhill, for introducing you to Mike
13 Farrell?
14     A.   I had not thought about it in detail
15 because quite frankly, I didn't have experience
16 with this.  I had known before, because Steve had
17 told me, and Mike had intimated but he didn't
18 tell me in exact detail, that Steve was paid by
19 FIDAC for past stuff that he referred in, so I
20 had no idea and I knew it was something we had to
21 address.
22     Q.   When were you told by either Steve
23 or Mike that Steve had been paid before by FIDAC?
24     A.   I believe he told me in August, when
25 I first met him, August of 2001.  Steve Peskoff

Page 72

1           E. Baptista, Jr.
2 had told me.
3      Q.   Steve Peskoff told you?
4      A.   Right.
5      Q.   And other than that, you don't have
6 any recollection of Mike Farrell or anyone else
7 at FIDAC telling you this before the October 2002
8 meeting?  Right?
9      A.   No.  Mike had intimated.  He didn't
10 come out and say, "I paid Steve Peskoff."  He
11 intimated Steve is taken care of.
12     Q.   When did he intimate that?
13     A.   Oh, God.  That's an off-the-cuff
14 comment.  It wasn't -- it might have been a
15 private conversation.  I don't remember.
16     Q.   Was it in a meeting or in a phone
17 conversation?
18     A.   It wasn't on a phone conversation.
19 It could have been our first meeting in November.
20 You know, he's done X -- you know, I don't know
21 what he was referring to, but remember, he was --
22 and I remember this, he was the investment banker
23 that first raised the money, so I don't know what
24 he meant.  I can't tell you, until the question
25 was posed to him by us saying, "What do we do?"

Page 73

1           E. Baptista, Jr.
2      Q.   So basically all you recall before
3 the October 2002 meeting is that Mike Farrell
4 intimated that Steve or Underhill had been paid
5 something in the past by FIDAC?
6      A.   Um-hum.
7      Q.   We come to the October 2002 meeting
8 about a week or so before the contract with Gen
9 Advisors was signed.  Who was present and where
10 was it?
11     A.   It was at FIDAC in their new offices
12 on Avenue of the Americas.
13     Q.   Who was present?
14     A.   Ron Kazel, Ron Farrell, myself, Jeff
15 Messner.
16     Q.   Was Steve Peskoff present?
17     A.   No.
18     Q.   What was the discussion with respect
19 to the product and going forward, putting aside
20 any discussion as to Mr. Peskoff?  We will come
21 to that separately.
22     A.   Well, there was no discussion per se
23 about the product except timelines to get things
24 be done, because everyone agreed, and that's why
25 we had a contract, that we were moving ahead and

Page 74

1          E. Baptista, Jr.
2 this is what we were going to do. Jeff presented
3 some timelines of different things and they
4 talked a little bit about Deloitte and what their
5 role would be.
6     Q.    What was Deloitte's role?
7     A.    Deloitte was doing research.
8 Deloitte charged a lot of money. And I would
9 understand that coming back because Steve Peskoff
10 would call me all the time, when Mike called him
11 and says, "How come this thing is costing me
12 $500,000 and I don't have anything yet?" So
13 that's the feedback I got.
14    Q.    This was before your contract was
15 signed?
16    A.    Correct, and after.
17    Q.    Okay. And what was --
18    A.    Because our contract is performance
19 based. If we brought no money in, we didn't get
20 paid.
21    Q.    What do you mean "if we brought no
22 money in"?
23    A.    If no money went in the fund, we got
24 nothing. So we were pure performance driven. If
25 we didn't bring any money to the fund, we worked

Page 75

1          E. Baptista, Jr.
2 for two-and-a-half years for nothing.
3     Q.    As you understood it, if a
4 corporation purchased an insurance product and
5 opted for the FIDAC investment vehicle, but
6 someone from Gen Advisors had not directly or
7 indirectly gone to that corporation, would you
8 get any payment?
9     A.    Let me back step. Gen Advisors
10 doesn't go to that corporation. Our contract
11 states that if money goes into the fund, and the
12 people are on Schedule A or Schedule B,
13 distribution systems and insurance carriers, we
14 get paid.
15    Q.    I see. So Gen Advisors would
16 identify those individuals who would be going out
17 to solicit --
18    A.    Or organizations.
19    Q.    -- or organizations who would be
20 going out to solicit the corporate or bank
21 executives to choose this product for this
22 investment option?
23    A.    Um-hum.
24    Q.    And then you would get paid if it's
25 on the list?

Page 76

1          E. Baptista, Jr.
2     A.    Even if it's not on the list we get
3 paid. That list was for if the contract ever
4 terminated. Future money coming in from those
5 distribution systems, we could still get paid on.
6     Q.    Okay. And if you were not on that
7 list, then was it different, to your
8 understanding?
9     A.    If they terminated us --
10    Q.    If who terminated us?
11    A.    FIDAC. And then they went out and
12 got an XYZ distribution system we never talked
13 to, we wouldn't get paid on that money.
14    Q.    So it was basically like a broker
15 says, "Look, I brought you these people and if
16 you later do deals with them, then I'm going to
17 get a share also"?
18    A.    Correct.
19    Q.    What was your understanding was the
20 cause of the delay between January and October in
21 signing a contract with Gen Advisors?
22    A.    I don't think there was a delay. It
23 was just new ground and everyone had to get
24 comfortable with one another and decide that they
25 are going to go ahead and do it. Because you

Page 77

1          E. Baptista, Jr.
2 know, I think when they talked to Deloitte and
3 had them first take -- when they first talked to
4 Deloitte and Deloitte took the first look at it,
5 they were going to -- they understood they were
6 going to start spending some money. So I don't
7 want to say that delayed anything, but it's
8 just -- and then the human resource side. You
9 had Ron Kazel there. It's a different company
10 today with more people. Ron Kazel was it.
11    Q.    It was a lot of Ron Kazel's time
12 dealing with this?
13    A.    It was all Ron Kazel's time just
14 about, in the beginning.
15    Q.    When was the first time that you or
16 anyone at Gen Advisors tried to negotiate what
17 would be the compensation paid to Gen Advisors by
18 FIDAC?
19    A.    Jeff started that in the summer of
20 2002, so when I look at the summer as June or
21 July -- let's call it June -- for a contract and
22 a relationship like this, to have a contract by
23 October 10th, that's pretty good.
24    Q.    The contract that was eventually
25 signed, was that drafted principally by the

**A-205**

Page 78

1         E. Baptista, Jr.
2  people at FIDAC or their lawyers?
3      A.   Totally FIDAC. As a matter of fact,
4  I believe it was all Nick Singh, who is now
5  general counsel.
6      Q.   The meeting that you had in October
7  2002, did we go over how long it lasted? I'm not
8  quite sure I remember.
9      A.   No, but it was a short meeting, less
10 than an hour. Because everything was agreed to
11 beforehand.
12     Q.   Was it your understanding that the
13 structure of the vehicle that was going to be
14 newly created by FIDAC was set and agreed upon by
15 that time?
16     A.   No.
17     Q.   That still had to be developed?
18     A.   That was in process, both with
19 Deloitte and Nick Singh, who was working on the
20 structuring and the legal limited partnership or
21 the private placement memorandum. It was a work
22 in progress.
23     Q.   At the meeting, can you tell me what
24 was discussed?
25     A.   We just went over the contract.

Page 79

1         E. Baptista, Jr.
2      Q.   Take your hand away from your mouth,
3  please. What happened at the meeting in October
4  2002?
5      A.   We went over the contract: "Is
6  there any issues?" "No." The question of
7  Steve Peskoff.
8      Q.   With regard to this, please tell me
9  who said what, as opposed to a summary of the
10 substance. Try to recall. What was said at this
11 meeting about Mr. Peskoff?
12     A.   I can't tell you for sure who said
13 this part, what I'm going to say. "Okay, what do
14 we do about Steve Peskoff?" I don't know if I
15 said it, I don't know if Mike Farrell, Ron Kazel
16 said it. I really don't remember. Okay. All I
17 know is the answer to it is, "We don't want you
18 paying him. We will discuss it with him."
19     Q.   Okay.
20     A.   Okay?
21     Q.   What else was said, if anything?
22     A.   And the word "double dip," was
23 mentioned. I can't tell you if it was Ron Kazel
24 or Mike Farrell.
25     Q.   What else was said about that?

Page 80

1         E. Baptista, Jr.
2      A.   That's it.
3      Q.   Those few words are the only words
4  that were uttered with regard to Steve Peskoff
5  and compensation; is that right?
6      A.   Um-hum.
7      Q.   After that time, did you ever again
8  have a conversation with anyone at FIDAC about
9  compensation for Steve Peskoff?
10     A.   No.
11     Q.   To your knowledge, did anyone else
12 at Gen Advisors after that have any discussion?
13     A.   I don't think so. I don't have any
14 knowledge.
15         MR. NOVACK: Can we take maybe a
16     15-minute break?
17         (Recess taken.)
18     Q.   Am I correct that other than the one
19 comment that was made at the meeting in October
20 2002, you're not aware of any other comment or
21 statement made by anyone at FIDAC with respect to
22 compensating Steve Peskoff or Underhill for
23 services rendered in connection with Gen
24 Advisors?
25     A.   Could you rephrase that question?

Page 81

1         E. Baptista, Jr.
2      Q.   Sure. What part of it is unclear?
3      A.   When you say the Gen Advisors, do
4  you mean -- be more specific. A finder's fee for
5  Premier or whatever you want to call it.
6      Q.   Let me ask it a different way, then.
7  That's a fair thing. You went to law school for
8  a little while, you said; right?
9      A.   I got a lot of lawyers floating
10 around.
11     Q.   Mr. Peskoff gave you the
12 introduction to Mike Farrell; right?
13     A.   Um-hum. Yes.
14     Q.   Other than the comment that was made
15 in the October 2002 meeting, are you aware of any
16 other comment or statement made by anyone at
17 FIDAC with respect to possibly compensating
18 Mr. Peskoff or Underhill for this introduction?
19     A.   I do not recall any other meetings,
20 although people have told me that there was a
21 meeting where he said, "We will take care of
22 Steve." I don't recall that. But I do recall in
23 the October meeting, that's --
24     Q.   Am I correct that you've given us
25 the full and best recollection you have of what

Page 82

1          E. Baptista, Jr.
2 was said with respect to compensating Mr. Peskoff
3 or Underhill?
4     A.    Yes.
5     Q.    You just said a moment ago people
6 told you that something was said.  Who were these
7 people?
8     A.    Steve had mentioned to me, and I
9 believe Jeff Messner also mentioned to me that he
10 thought that at another meeting that was said.
11     Q.    And what about Mr. Ruben?
12     A.    No.
13     Q.    You've talked to Mr. Ruben before
14 today --
15     A.    Yes.
16     Q.    -- other than to exchange
17 pleasantries?
18     A.    Yes.
19     Q.    Mr. Ruben has asked you questions as
20 to --
21     A.    Yes.
22     Q.    You have to let me finish my
23 question.
24     A.    I'm sorry.
25     Q.    You don't have to let me finish, but

Page 83

1          E. Baptista, Jr.
2 I would appreciate it.  Mr. Ruben asked you
3 questions as to what occurred during the course
4 of 2002, 2003, 2004, and 2005, up until the time
5 this dispute arose; correct?
6     A.    Correct.
7     Q.    What did Mr. – well, I'll withdraw
8 that.  When was the first time you spoke with
9 Mr. Peskoff about the subject of what anyone from
10 FIDAC had supposedly said about compensating him?
11     A.    I'd say 2003.
12     Q.    What were the circumstances that led
13 to that?
14     A.    Well, Mr. Peskoff and I had numerous
15 telephone calls, because every time there was a
16 problem with the project, Mike Farrell would call
17 him.  Then he would call me and say, "What's
18 going on?  Mike Farrell says 'This thing is
19 dragging, blah blah blah,'" all these other
20 things.  So we had numerous telephone calls back
21 and forth about those issues.  And there was one
22 in particular that required me to take action
23 with Mike Farrell as it relates to one of the
24 guys on the Gen Advisors team and has no bearing
25 on compensation.  It was a completely different

Page 84

1          E. Baptista, Jr.
2 issue so I'm not going to go into it.  So I
3 directly addressed that with Mike Farrell after
4 Steve called me to whatever.

REDACTED

Page 85

1          E. Baptista, Jr.

REDACTED

4     Q.    But you said you think it may have
5 been in 2003 that had you a conversation or
6 conversations with Steve Peskoff about his
7 compensation.
8     A.    Um-hum.
9     Q.    Can you tell me how many times you
10 think you discussed it with him?  Let me back up.
11 I'm sorry, I apologize.  You said in 2003, you
12 had a conversation or conversations with Steve
13 Peskoff in which he indicated to you that FIDAC
14 said that they would take care of his
15 compensation.  Is that what you're saying?
16     A.    No.
17     Q.    Please clarify it for me.  I'm a
18 little bit lost here.
19     A.    What I told him -- maybe I'm saying
20 the same thing.

REDACTED

24 "Remember, don't look to me.  Look to them.  They
25 said they would take care of you."  That's the

Page 86

1          E. Baptista, Jr.
2 extent of what I said about compensation.
3      Q.    And what did Mr. Peskoff say in
4 these conversations about his compensation?
5      A.    I believe he said, "Yeah, I have a
6 deal with them."  I couldn't swear on a stack of
7 bibles that's what he said.
8      Q.    What can you swear that he said,
9 bibles or not, which you are under oath anyway,
10 so we don't need the bible?
11      A.    You know, I guess I'll just let it
12 fly at that, "Yeah, I have a deal with them,"
13 because I knew he had a prior deal on some other
14 projects that he was working on or worked on with
15 them.  So I assumed that that's what he was
16 referring to.
17      Q.    If you had, in October 2002, not
18 heard anything from FIDAC about whether or not
19 they would discuss compensation with Mr. Peskoff,
20 would you have volunteered to pay Mr. Peskoff or
21 Underhill anything for his services in
22 introducing you to Mike Farrell?
23      A.    No, unless asked.  I'm cheap.
24      Q.    If you were asked by Mr. Peskoff at
25 that time, what would you have agreed to pay for

Page 87

1          E. Baptista, Jr.
2 that introduction?
3      A.    Nothing, and I'll tell you why I say
4 it that way.  I knew Steve had been paid fees by
5 FIDAC for introducing other people, and I would
6 have first told him to go back to FIDAC and get
7 money.
8      Q.    And if Mr. Peskoff then came back to
9 you and said, "FIDAC is not at this point
10 prepared to agree to pay me anything," would you
11 have then agreed to pay him something?
12      A.    I don't know.  We didn't cross that
13 bridge so I can't tell you.  I didn't think about
14 it because it wasn't an issue.
15      Q.    Thinking about it now, do you know
16 what you would have done, or you can't tell us
17 what you would have done?
18      A.    That's a hypothetical.
19      Q.    I know very well what it is.  I
20 finished law school, so just tell me.  Can you
21 tell us now what you would have done?
22      A.    No, I don't know.
23      Q.    You can't possibly say?
24      A.    No.  Because it -- you're asking me
25 and I have partners.  It would have to be

Page 88

1          E. Baptista, Jr.
2 discussed.

REDACTED

5      Q.    I understand that, but I'm asking
6 you as of October 2002, at that meeting.
7      A.    At that meeting we were told --
8      Q.    I'm telling you as of October 2002,
9 at the time of that meeting, here's my question:
10 If you understood that Mr. Peskoff was not going
11 to be paid anything by FIDAC, would you or Gen
12 Advisors have agreed to pay Mr. Peskoff a fee for
13 introducing you to Mike Farrell?
14      A.    I don't know.
15      Q.    If you were inclined to consider a
16 fee, what would be the range of the fee, or you
17 can't possibly tell us?
18      A.    I don't know.
19      Q.    Is it correct you have no experience
20 whatsoever, in all your years, of paying a fee to
21 someone who just introduced you to someone in
22 Mike Farrell's position?
23      A.    I have never had any experience or
24 paid any fees in my business career like that.
25 Remember, I come out of the -- let me explain.  I

Page 89

1          E. Baptista, Jr.
2 come out of the insurance business.  In the
3 insurance business, that's called rebating and
4 it's illegal.
5      Q.    So we know that based on your
6 experience, there is no basis for you having
7 concluded to pay Mr. Peskoff a fee if he asked;
8 correct?
9      A.    Um-hum.
10      Q.    And we know that you are not telling
11 us today that you would, in fact, have paid
12 Mr. Peskoff a fee if you knew that FIDAC wasn't;
13 correct?
14      A.    Correct.
15      Q.    If you chose to now, knowing that
16 FIDAC is not paying Mr. Peskoff a fee, would you
17 be free to pay Mr. Peskoff a fee for this
18 introduction?
19      A.    I believe not, because FIDAC told us
20 not to.
21      Q.    Do you think there's a contractual
22 obligation that Gen Advisors has that prohibits
23 it from paying anything to Mr. Peskoff for
24 introducing you to Mike Farrell and FIDAC?
25      A.    They told us.

Page 90

```
1            E. Baptista, Jr.
2      Q.   I'm asking you if you believe
3  there's a contractual obligation.
4      A.   I believe it's not in writing.  It
5  was an oral contract.
6      Q.   When was the contract reached?
7      A.   In October when they told us not to
8  pay him: "We will take care of him."
9      Q.   You think that statement is part and
10 parcel of the contract obligations that's set
11 out --
12     A.   Sure.  Can I tell you why?
13     Q.   No, not yet.  So you believe that
14 you're prohibited by an oral contract from
15 voluntarily paying anything to Mr. Peskoff?
16     A.   Look, you're --
17     Q.   Do you believe it?
18     A.   I believe we shouldn't pay him
19 because they told us not to.
20     Q.   I'm not asking you whether you
21 should.
22     A.   That's what I believe.
23     Q.   I'm asking you whether you believe
24 you could, if you chose to do so, now pay
25 Mr. Peskoff a fee for introducing you to
```

Page 91

```
1            E. Baptista, Jr.
2  Mr. Farrell.
3      A.   I have absolutely no idea.  I would
4  have to consult with my attorney, but they told
5  us specifically not to, so I -- we complied.
6      Q.   If I were to get Mr. Farrell on the
7  phone to call you, and then put it in writing
8  saying, "It's okay if you, Ernie, want to pay
9  Steve Peskoff something for the introduction
10 here, and we release you from whatever obligation
11 you felt you had not to pay him," would you pay
12 Mr. Peskoff anything?
13     A.   Not now.
14     Q.   Why wouldn't you pay him anything
15 now?
16     A.   I just wouldn't.
17     Q.   Why?
18     A.   We just wouldn't.
19     Q.   Why?
20     A.   Because we've been through all --
21 we've been through all this back and forth and
22 quite frankly, everyone's -- this is not meant at
23 you, okay, because you're doing your job.
24     Q.   My skin is very thick, don't worry,
25 at least in this.
```

Page 92

```
1            E. Baptista, Jr.
2      A.   This has all gotten to be a little
3  bit ridiculous.  We just want this to go away and
4  do our job.
5      Q.   I understand that.
6      A.   So that's my answer.
7      Q.   Are you -- I'm sorry.  I didn't mean
8  to interrupt you.  Please feel free to continue.
9      A.   If Farrell called and said, "Okay,
10 it's up to you guys.  You can pay him now," I
11 find that really ridiculous after all these
12 years.  Okay?  But he can do that.
13     Q.   I know he could call you to say
14 that.  My question is whether or not, if you were
15 released from whatever obligation you felt you
16 had not to pay Mr. Peskoff, you would feel a
17 sense that he had earned a fee and you should pay
18 him.
19     A.   You're asking me a hypothetical,
20 whether he earned a fee, and I'm not going to go
21 down that road.  Today, I wouldn't pay him, if
22 Mike Farrell released an oral contract, because
23 we're so far down the road.  Okay?  Let me leave
24 it at that.
25     Q.   Do you have any way you could
```

Page 93

```
1            E. Baptista, Jr.
2  evaluate what would be the value of the services
3  that Mr. Peskoff provided by introducing you to
4  Mike Farrell?
5      A.   I have no idea.
6          MR. RUBEN:  Objection as to form.
7  Value to whom?  What are you talking about,
8  to FIDAC or to Gen Advisors?
9          MR. NOVACK:  Let me ask it a
10 different way.
11     Q.   What do you think is the fair market
12 value of the services provided by Mr. Peskoff or
13 Underhill to FIDAC in introducing you to FIDAC?
14     A.   I have absolutely no idea, because I
15 have never evaluated or done that before, and I
16 know FIDAC and Mr. Peskoff have, so let them
17 worry about it.  I can't value it because I've
18 never done one before.
19     Q.   During the course of -- withdrawn.
20 Other than what you've testified to, do you know
21 of any other conversations -- withdrawn.  I'm
22 sorry, that's a little sloppy.
23          Other than what you've testified to,
24 do you recall any other conversations you had
25 with anyone at FIDAC with respect to the
```

Page 94

```
1          E. Baptista, Jr.
2  compensation of Mr. Peskoff --
3      A.   No.
4      Q.   -- or Underhill?
5      A.   No.
6      Q.   What is your understanding of what
7  Mr. Peskoff did with regard to the eventual
8  creation of Premier beyond introducing you to
9  Mike Farrell?
10     A.   He introduced us to -- let me answer
11 it this way:  He made an introduction to Mike
12 Farrell, ran the first full meeting with
13 everyone, getting everyone on board.  As far as
14 the technical aspects of the fund or raising
15 money for the fund, nothing.
16     Q.   I'm correct that Mr. Peskoff didn't
17 go out and meet with the insurance brokerage
18 community?
19     A.   No.
20     Q.   He didn't go out and meet with the
21 insurance companies?
22     A.   No.
23     Q.   He didn't go out and meet with the
24 corporations and banks that were going to make
25 the determination of what investment vehicle to
```

Page 95

```
1          E. Baptista, Jr.
2  use if they went into the life insurance
3  products?
4      A.   No.
5      Q.   He didn't meet with the banks that
6  were doing the wrapping?
7      A.   No.
8      Q.   Is it fair to say all he did was
9  introduce you to Mr. Farrell and help arrange for
10 that first meeting in January?
11     A.   Well, just one other thing, and it's
12 not on the technical side.  Every time there was
13 a problem, Mike Farrell would call him saying,
14 "It's costing me a fortune.  Tell Ernie he's got
15 to get his act together, this, that, problems."
16 He acted as I'll call it Mike Farrell's
17 representative when there was a problem that Mike
18 Farrell didn't want to call.  For about a year,
19 when Mike got pissed off, pardon the language,
20 about the cost or the time and this wasn't
21 happening first enough, so on and so forth, I got
22 a call from Steve, and that's usually every two
23 weeks or at least once a month for a year.
24     Q.   Do you think that Mr. Farrell was
25 acting unreasonably in being upset that it had
```

Page 96

```
1          E. Baptista, Jr.
2  cost so much money to try to develop this
3  product?
4      A.   I'm not going to -- I have no idea
5  what was in his head.
6      Q.   Did you, during the course of the
7  period 2003 -- let me withdraw that.  When was,
8  to your recollection, Premier established, the
9  vehicle established?
10     A.   It was opened with the first dollars
11 put in, which was established December 29th,
12 2003.
13     Q.   Before that, we know that Premier,
14 the investment vehicle, had to be created?
15     A.   Right.
16     Q.   Then it had to be marketed to --
17     A.   Right.
18     Q.   To whom?
19     A.   Marketed to whoever.  It had to be
20 marketed to the insurance carriers, had to be
21 marketed to the brokerage community.  It had to
22 be marketed to the wrap providers and then to the
23 ultimate user, the person or the organization
24 that wrote the check, and that became effective
25 12/29/03.
```

Page 97

```
1          E. Baptista, Jr.
```

REDACTED

| | |
|---|---|
| 1     E. Baptista, Jr.    Page 98<br><br>REDACTED | 1     E. Baptista, Jr.    Page 100<br><br>REDACTED |

**Page 98**

REDACTED

**Page 100**

REDACTED

**Page 99**

1     E. Baptista, Jr.

REDACTED

**Page 101**

1     E. Baptista, Jr.

REDACTED

4    Q.   Do you have any idea what that would
5  translate to in fees for FIDAC on an annualized
6  basis?
7    A.   Here's an issue that Mike Farrell
8  had told Jeff Messner to make sure to say to me
9  that I'm covered under a confidentiality
10  agreement.  It's a while back.  I'm not to tell
11  Mr. Peskoff or anyone how much money is in the
12  fund, what the fees are and so on and so forth.
13  I don't know if it applies to this deposition.
14    Q.   This deposition is all right,
15  because you're under subpoena, so you're
16  obligated to tell us, and we also have a
17  confidentiality order now.
18    A.   Okay.
19    Q.   But let's go back to what you're
20  talking about for a minute.  Back in 2002,
21  October 2002, you signed your agreement.  Gen
22  Advisors signed with FIDAC and as part of that,
23  there was a confidentiality agreement; right?
24    A.   Um-hum.
25    Q.   And that's a term and condition of

Page 102

1        E. Baptista, Jr.
2 that agreement; right?
3      A.   Correct.
4      Q.   And that's a material term of the
5 agreement, and Mike Farrell stressed that to you;
6 right?
7      A.   Yes.
8      Q.   Did he do it in person or did he say
9 it through Messner to you?
10     A.   He said it through Messner.
11     Q.   But you understood that you were not
12 to disclose how much was in the -- I have to
13 finish my sentence, though.  I know my voice
14 trails off as I gasp for air as I speak, but I'll
15 try again.  Mike Farrell made it clear to you,
16 through Jeff Messner, that you were not to
17 disclose the amounts that were being invested in
18 Premier; is that right?
19     A.   Correct.
20     Q.   And that included everyone,
21 including Steve Peskoff; correct?
22     A.   Correct.
23     Q.   And you understood that?
24     A.   Yes.
25     Q.   And you've always understood that?

Page 103

1        E. Baptista, Jr.
2      A.   Yes.
3      Q.   And up until today, have you ever
4 disclosed the amounts that were invested in
5 Premier to Mr. Peskoff or his counsel?

REDACTED

21     Q.   That's all you said?
22     A.   Yes.
23     Q.   You didn't say anything more?
24     A.   No.
25     Q.   Ever?

Page 104

1        E. Baptista, Jr.
2      A.   No.
3      Q.   You are sure?
4      A.   Um-hum.
5      Q.   Okay.  Was Mr. Messner talking to
6 Mr. Peskoff about Mike Farrell and Premier during
7 the period 2003 through 2005?
8      A.   I don't believe so.
9      Q.   If Mr. Peskoff got information about
10 Premier, to the best of your belief, it would
11 have been coming from you?
12     A.   It wouldn't have -- I don't know
13 where else he could have gotten any specific
14 information.
15     Q.   Did there come a time when
16 Mr. Peskoff told you that he wanted to try to
17 negotiate a fee from FIDAC?
18     A.   Yes.
19     Q.   When was that, the first time?
20     A.   Sometime in 2005, and then I was
21 contacted by Nicholas Singh, and I told him -- I
22 said, "You should have Mike Farrell and try to
23 negotiate this out."
24     Q.   Just to orient you, Mr. Ruben wrote
25 a very eloquent letter to FIDAC in September of

Page 105

1        E. Baptista, Jr.
2 2005 explaining his view of why Mr. Peskoff was
3 entitled to a fee from FIDAC.
4      A.   Um-hum.
5      Q.   FIDAC disputed that conclusion.  Can
6 you tell me, in relation to that letter being
7 sent, how long before or how long after you had
8 heard from Mr. Peskoff that he was going to be
9 asking for a fee from FIDAC?
10     A.   Oh, I knew before that letter, but I
11 can't pin it down to a certain date, but he told
12 me he was disappointed that he wasn't getting
13 paid and he was going to take action.
14     Q.   Did he tell you this sometime in
15 2005, do you think?
16     A.   Oh, yeah.
17     Q.   Would it have been within a few
18 months of his taking action?
19     A.   No.
20     Q.   A year before almost, would you say?
21     A.   No, it wasn't a year before, but --
22 the spring of 2005.
23     Q.   How did it come up for the first
24 time that you had a conversation with him about
25 that?

Page 106

1        E. Baptista, Jr.
2    A.   He called me.
3    Q.   Tell me what was said, please, about
4 this.
5    A.   "What's going on?" I said, "It's
6 doing well. Blah blah blah."

**REDACTED**

10   Q.   That's all?
11   A.   Yeah.
12   Q.   Go ahead.
13   A.   Now, I sensed by the question some
14 other things too, or some issues, and he told me
15 he hadn't been paid.
16   Q.   When Mr. Peskoff asked you some
17 questions about how Premier was doing, that's how
18 you sensed that he hadn't been paid?
19   A.   Well, he told me, he verified it,
20 but I said, "There must be an issue."
21   Q.   This is before he told you he hadn't
22 been paid, you sensed that?
23   A.   Yes, because I know he -- sometime
24 in 2004, or was it 2005 -- it could have been
25 2005, I'm getting confused -- he got a check from

Page 107

1        E. Baptista, Jr.
2 them and it was a check for 30,000.
3    Q.   Let me just tell you -- I'll help
4 you -- the check was cut in December 2003. He
5 may have gotten it in 2003 December, he may have
6 gotten it in 2004 January. For purposes --
7    A.   I knew about that, okay, and then I
8 ducked my head. I stayed away from it.
9    Q.   How did you know about the check?
10   A.   Steve told me.
11   Q.   What did he tell you?
12   A.   He said, "I got a check here for
13 $30,000 for the stuff that I've done up in," I
14 think it was Canada, "and they said final
15 payment."
16   Q.   What else did he say?
17   A.   He wasn't happy.
18   Q.   Because he thought he should get
19 more? Did he say to you he wanted more? How did
20 you know he hasn't happy?
21   A.   Because he told me.
22   Q.   What did he say, that he was
23 disappointed?
24   A.   "I want more. I brought in --
25 there's tens of millions of dollars I brought in

Page 108

1        E. Baptista, Jr.
2 and I get a check for 30,000."
3    Q.   He told you he understood that
4 Farrell was saying, "That's it, 30,000"?
5    A.   Well, in the letter he told me that
6 Ron Kazel signed the letter saying, "This is
7 final payment," or something. Maybe I'm not
8 saying that right.
9    Q.   You shouldn't be looking at
10 Mr. Peskoff as you're testifying because it's
11 better for you and for the process, I think, if
12 you wouldn't mind.
13        Do you remember learning about the
14 $30,000 check around the new year 2004?
15   A.   I think it was a couple of months
16 afterwards. I go down for the National Prayer
17 Breakfast every year in February, the
18 Congressional Prayer Breakfast, and I believe
19 that's when I found out.
20   Q.   He had told you about the $30,000
21 check?
22   A.   Yes.
23   Q.   He had expressed his disappointment
24 that that's all he got?
25   A.   Um-hum.

Page 109

1        E. Baptista, Jr.
2    Q.   Did he indicate to you that he had
3 spoken to Farrell or anyone else at FIDAC after
4 getting the check and saying, "No, I want more,"
5 or he just accepted that that's what he was
6 getting, as far as you could tell?
7    A.   I don't know.
8    Q.   You don't recall one way or the
9 other?
10   A.   No, I don't recall one way or the
11 other.
12   Q.   You just ducked your head?
13   A.   I ducked. You know --
14   Q.   Okay.
15   A.   -- the ostrich theory.
16   Q.   But after hearing that, what were
17 the other conversations with him which led you to
18 believe that there was an issue with regard to
19 Premier? You said you sensed that there was a
20 question about Premier.

**REDACTED**

Page 110

1          E. Baptista, Jr.
2 anything to him," and all those issues.  So
3 that's what I did.
4     Q.    So --
5     A.    I did what I was told by the
6 chairman and CEO.
7     Q.    You said you sensed that Mr. Peskoff
8 had not been paid by some questions he was
9 asking.  I'm asking you when --
10    A.    That was in 2005.
11    Q.    In 2005?
12    A.    Yes.
13    Q.    Before you testified here today, did
14 Mr. Peskoff ask you your recollection of any of
15 these events?  There's nothing wrong with him
16 having asked it, I want to be clear, but I'm
17 curious to know.
18    A.    He asked me some questions and I
19 told him where he was right and where he was
20 wrong, like he thought we originally met in
21 November.  That's when I met Mike Farrell, the
22 introduction.  Excuse me.  It was in January.
23 November is when he and I met for the first time,
24 and we met in August at the NIBA conference, and
25 then I met Farrell alone in November, and then

Page 111

1          E. Baptista, Jr.
2 the January meeting came with everyone.  And I
3 corrected him on that.
4     Q.    What else did you correct him on?
5     A.    Nothing.
6     Q.    Did he specifically ask you and hone
7 in on the issue of what Mike Farrell said at any
8 time about Mr. Peskoff being paid in connection
9 with his introduction?
10    A.    Yes, he asked me and I said, "This
11 is what was said."
12    Q.    Did he just ask you, or did he tell
13 you his recollection and ask you if you agreed
14 with it?
15    A.    I believe he just asked me what was
16 said.
17    Q.    And you told him what you testified
18 to today?
19    A.    Correct.
20    Q.    Before this discussion with
21 Mr. Peskoff you're now describing -- when did
22 that discussion take place, the one you just told
23 us about?
24    A.    That was in 2004 sometime, a
25 telephone conversation.  And that -- the

Page 112

1          E. Baptista, Jr.
2 reason -- money didn't come in and there was no
3 money to divvy up until like April or May of
4 2004.  So everything was a moot point.
5     Q.    After that conversation in 2004, did
6 you again have a conversation with Mr. Peskoff in
7 which he asked you your recollection of events
8 relating to whether he would be paid, or was that
9 the only one?
10    A.    No.  He asked me in 2005.  He asked
11 me in 2005.
12    Q.    Would that have been in the spring
13 of 2005?
14    A.    Um-hum.
15    Q.    And did you tell him the same thing
16 you testified to here today?
17    A.    Yes.  "He told us he'll take care of
18 you.  We're not to get in the middle."
19    Q.    He said, "I'll discuss it with
20 Steve."  That's what you testified to today.
21    A.    No, what he told us --
22    Q.    No, what Mike Farrell said at the
23 meeting.
24    A.    What Mike Farrell said is, "You
25 don't pay him.  We will take care of it with

Page 113

1          E. Baptista, Jr.
2 Steve.  We don't want him getting paid twice."
3     Q.    Did Mike Farrell explain why he
4 didn't want you to pay Steve?
5     A.    No.
6     Q.    Did he express anything about
7 conflicts of interest?
8     A.    Not that I recall.
9     Q.    When is the first time that
10 Mr. Peskoff hinted to you in any way, shape or
11 form, that Mike Farrell and FIDAC were not going
12 to pay him with respect to Premier?
13    A.    Boy, I think that would be the end
14 of 2004, somewhere in there.  Because he and I
15 have a relationship and we talk every couple of
16 months even -- once the project was done and it
17 was working and money was coming in and there was
18 fee income, everyone was happy.  It's strange how
19 dead presidents make everyone happy.
20    Q.    Did Mr. Peskoff ever show you any
21 letter agreement between him and FIDAC?
22    A.    No.
23    Q.    Did he ever refer to any such
24 agreement or --
25    A.    Yes.  He said, "I have an agreement

Page 114

E. Baptista, Jr.

1          E. Baptista, Jr.
2 with them, and that's what I've gotten paid on on
3 other things."
4      Q.   But he never showed you the
5 agreement?
6      A.   No.  It's none of my business.
7      Q.   And you didn't know the terms?
8      A.   No, none of my business.
9      Q.   Did you at any time counsel
10 Mr. Peskoff as to how he might approach Mike
11 Farrell to try to work out a businessman's
12 solution to the problem of payment?
13     A.   No, I didn't.  I had that
14 conversation with Nicholas Singh and I said,
15 "Here's two people who are friendly.  The
16 company, how it started, FBR, fees went back and
17 forth.  It's a shame that Mike and Steve can't
18 work it out."  And quite frankly, when he first
19 called me about the issues, and that must have
20 been in the fall of 2005, "I think you should get
21 Mike on the phone to talk to Steve and see if
22 they can work something out."
23     Q.   You will be gratified to know people
24 took your suggestion and it wasn't worked out.
25     A.   I understand that.  That's why I'm

Page 115

1          E. Baptista, Jr.
2 here.  So that's the only advice I gave, was to
3 Nick Singh.
4      Q.   Did you ever give any advice to
5 Mr. Peskoff as to how he might approach Mike
6 Farrell to work out some kind of arrangement?
7      A.   No.
8      Q.   You didn't give that advice in 2004?
9      A.   The only thing I could have told
10 him, I said, "Look, if you're not getting paid
11 and you don't like this," I said, "You know, get
12 to Mike Farrell as soon as possible.  You know,
13 conversation is a wonderful tool."  But it wasn't
14 like, "If you talk about this."
15         MR. NOVACK:  Can we mark as the next
16     exhibit, Baptista Exhibit 4, the Gen
17     Advisors agreement.
18         (Baptista Exhibit 4, Gen Advisors
19     agreement, was marked for identification.)
20     Q.   Do you have that in front of you,
21 Baptista Exhibit 4?
22     A.   Um-hum.
23     Q.   The first document is an October 10,
24 2002 letter to you from Mr. Farrell, a 12-page
25 letter.  That's the original agreement signed?

Page 116

1          E. Baptista, Jr.
2      A.   Um-hum.
3      Q.   And that was signed in October 2002?
4      A.   Correct.
5      Q.   Do you think it was signed on the
6 date that it's indicated?
7      A.   Yes.
8      Q.   Did you both sign at the same time
9 in person or --
10     A.   I don't believe so.  I believe it
11 was faxed to my office.
12     Q.   Then --
13     A.   Hold on one second.  Let me just --
14 yes, it was faxed to my office and then sent back
15 to Mike Farrell, because if you notice, I initial
16 pages.
17     Q.   Oh, I -- the initialing didn't come
18 out on my copy.
19     A.   On some of the pages, it did.
20     Q.   Okay, on the last page, all right.
21 There's an Exhibit A to the letter.  That's a
22 list of clients and it's blank.
23     A.   It's not a list of clients.  It's
24 the list that we add to of the distribution
25 systems, and insurance carriers.

Page 117

1          E. Baptista, Jr.
2      Q.   Distribution systems meaning the
3 brokers basically?
4      A.   Correct.
5      Q.   The brokerage network?
*REDACTED*
      Q.   I don't see anybody listed on
8 Exhibit A.
9      A.   No.  This is before we even went
10 there.

**REDACTED**

14     A.   Um-hum.
15     Q.   And is this the first time --
16     A.   Hold on one second.  Go ahead.
17     Q.   On here we see that Exhibit A
18 includes the following and it lists a whole
19 series of insurance companies and marketers.
20     A.   Um-hum.  Those are the distribution
21 systems.
22     Q.   The marketers are the distribution
23 system, and the insurance companies are the
24 insurance companies; right?
25     A.   Correct.

Page 118

```
1          E. Baptista, Jr.
2      Q.  And Exhibit 3, "List of funds,
3  includes the following," what was that referring
4  to?
```

**REDACTED**

```
 9      Q.  And this was modified effective June
10  26, 2003, according to this?
11      A.  Correct.
12      Q.  Then we have Amendment No. 2 that's
13  dated -- Amendment No. 2, which is effective
14  November 1, 2004.  What was the reason for this
15  amendment?
```

**REDACTED**

```
21      Q.  I want to ask you a question that
22  relates to the period December 2003, when Premier
23  first got its first dollars, up through the
24  present.  Has Mr. Peskoff made efforts to get
25  from you confidential information as to how much
```

Page 119

```
1          E. Baptista, Jr.
2  was taken in by the Premier Fund?
3      A.  He's asked those questions, yeah.
```

**REDACTED**

```
 6      A.  Yes.  I was on the ostrich theory.
 7      Q.  Did you explain to Mr. Peskoff that
 8  if you disclosed more than that, you might be
 9  breaching the contract and its confidentiality
10  provision?
11      A.  Right.  And when I had talked to
12  Mr. Ruben, I told him I couldn't, because of the
13  confidentiality.  That was a few months ago,
14  whenever the heck it was.  I don't know.
15          MR. NOVACK:  It probably would be
16      sometime around September.  I'm sure
17      Mr. Ruben can tell us.  I think I may be
18      done.  If you would give me two minutes to
19      talk to my brain, Sarah, then I'll tell
20      you.
21          (Recess taken.)
22      Q.  Mr. Baptista, did Mr. Peskoff ever
23  tell you that he had any oral agreements with
24  Mike Farrell or FIDAC with respect to
25  compensating either Underhill or him for any
```

Page 120

```
1          E. Baptista, Jr.
2  services that he rendered?
3      A.  I just heard the word "agreement."
4  The word "oral," I never heard.
5      Q.  And the context in which you heard
6  the word "agreement," you gave some testimony
7  earlier, but I want to make sure we're talking
8  about the same context.
9      A.  The exact same as before.  When we
10  talked, he said, "I have an agreement and I've
11  gotten paid by them on other stuff that I found
12  or acted as a finder," whatever -- he didn't say
13  that, no.  Excuse me, strike that, "act as a
14  finder."  "Other stuff that I brought in."
15      Q.  This conversation took place when?
16      A.  The first time that conversation
17  took place was before I even met Mike Farrell.
18      Q.  Was there a second time?  I'm not
19  saying there was, but since you said the first
20  time.
21      A.  Yes, there was.  In 2004, when we
22  were talking and 2005, he said, "You know, I have
23  an agreement, the same as they paid me before."
24  So I've never seen it.  Okay?
25          MR. NOVACK:  Okay.  There came a
```

Page 121

```
1          E. Baptista, Jr.
2      time when Gen Advisors assigned its rights
3      under the October 10, 2002 agreement.  I'm
4      going to mark that Baptista Exhibit 5.
5          (Baptista Exhibit 5, assignment of
6      rights, marked for identification.)
7      Q.  Is this the assignment, Baptista
8  Exhibit 5?
9      A.  It must be the one to Borealis?
10      Q.  Yes.
11      A.  Um-hum.
12      Q.  Can you tell me if that is the
13  agreement that was signed by you and Mr. Messner
14  and which you sent to Mr. Kazel?
15      A.  Yes.
```

**REDACTED**

Page 122

1          E. Baptista, Jr.
2     Q.    Is it correct that all the
3 obligations that Gen Advisors had under its
4 agreements that existed before the assignment
5 still exist now?
6     A.    Yes.
7     Q.    Did you or Mr. Messner or anyone
8 else ever send to Mr. Peskoff a copy of the
9 October 10, 2002 agreement between Gen Advisors
10 and FIDAC?
11    A.    I don't know if I did.  I might
12 have, or I don't know if Mike -- I don't think
13 Mike Farrell would have.
14    Q.    Doesn't that contain confidential
15 information as to percentages that people had
16 been paid or basis points that have been paid?
17    A.    I'm not sure I did, but I could
18 have.
19    Q.    If it did contain information as to
20 fees that were going to be paid, would that not
21 have been covered by the confidentiality
22 obligation contained in the agreement?  And
23 you're free to look at it.
24    A.    You know, I don't know.  I guess so.
25    Q.    Would you have any reason --

Page 123

1          E. Baptista, Jr.

**REDACTED**

12    Q.    That is not something that would be
13 distributed to the public; correct?
14    A.    No.
15    Q.    That is not something that in the
16 ordinary course would be given to Mr. Peskoff;
17 correct?
18    A.    Correct.
19    Q.    So if information was in here, it
20 still remained confidential vis-a-vis
21 Mr. Peskoff, as far as you knew; correct?
22    A.    Um-hum.
23    Q.    Did you have any other conversations
24 with Mr. Peskoff that you haven't testified to
25 today with respect to this dispute?

Page 124

1          E. Baptista, Jr.
2     A.    I'm sure we've had conversations
3 that we've talked about he's not happy and he
4 said he went through the process of suing and all
5 that other stuff, but if you're asking was there
6 anything outside of frustration addressed, no.
7          MR. NOVACK:  I don't have any more
8 questions for you right now.  Mr. Ruben has
9 a chance to ask you some questions and
10 occasionally Mr. Ruben may say something
11 which will cause me to realize I left out
12 something, for which I thank him in
13 advance.  Why don't you eat something and
14 take as much time as you want to organize.
15 I'll give you my seat.
16        (Discussion off the record.)
17 EXAMINATION
18 BY MR. RUBEN:
19    Q.    Mr. Baptista, my job here today is a
20 little bit more difficult than Mr. Novack's,
21 because like Mr. Novack, I prepared an outline,
22 but I don't want to waste your time by going
23 through things that have already been covered and
24 I also have to try to respond to things that he
25 covered.  And I know you're in a bit of a hurry

Page 125

1          E. Baptista, Jr.
2 and that this has already taken longer than you
3 expected, but please bear with me.
4          Back in 2001, when Mr. Peskoff
5 introduced you to Mike Farrell, did you know Mike
6 Farrell before then?
7     A.    No.
8     Q.    Had you had any dealings with him
9 whatsoever?
10    A.    No.
11    Q.    What about Ron Kazel, did you know
12 Ron Kazel prior to the introduction by
13 Mr. Peskoff?
14    A.    No.
15    Q.    Had you done any business with
16 Mr. Kazel?
17    A.    No.
18    Q.    Were you aware of FIDAC prior to the
19 introduction?
20    A.    No.
21    Q.    Had you done any business with
22 FIDAC?
23    A.    No.
24    Q.    Were you aware of Annaly Mortgage
25 prior to the introduction?

Page 126

1          E. Baptista, Jr.
2      A.    No.
3      Q.    I assume also you had done no
4  business with Annaly Mortgage?
5      A.    No.
6      Q.    Mr. Peskoff and no one else made
7  these introductions?
8      A.    Correct.
9      Q.    You testified earlier that during
10  the period of time between meeting the folks at
11  FIDAC and signing the contract, you hadn't made
12  up your mind about FIDAC and you were talking to
13  other money managers?
14      A.    Um-hum.
15      Q.    What ultimately made you decide to
16  go with FIDAC?
17      A.    In the spring, April-May sometime,
18  we had picked them as the leading candidate
19  because they understood the marketplace, in our
20  opinion, the mortgage-backed securities and the
21  volatility issues, the best.  So that's why we
22  wanted them.  Did we have backups?  Yes.  Were
23  the backups as good as Annaly/FIDAC?  No.
24      Q.    In your conversations during that
25  time with Mr. Peskoff, did he make any efforts to

Page 127

1          E. Baptista, Jr.
2  encourage you or convince you to go with FIDAC?
3      A.    He said that he's known Mike Farrell
4  for a long time.  He knows his history, knows the
5  character of the person, the quality of the
6  person and what his track record has been.  And
7  he said, "You know, you can't go wrong using
8  him."
9      Q.    Did Mr. Peskoff's recommendation
10  play a role in your ultimate decision?
11      A.    Sure, because I'm from Rhode Island.
12  Jeff is from Denver.  John Boma is from
13  Minneapolis.  We were playing in the major
14  leagues.  We were dealing with a New York Stock
15  Exchange company, albeit a different office for a
16  New York Stock Exchange company.  I don't know if
17  you ever saw their old offices, but it made a
18  difference in the relationship with Mike Farrell,
19  Steve made a difference, because there was a
20  personal relationship of trust.  And trust is the
21  most important word in the brokerage community.
22          They cannot be -- if you do 99
23  things right with a broker, and that's the world
24  we come from, and do one thing wrong, you're all
25  done.

Page 128

1          E. Baptista, Jr.
2      Q.    You said that Mr. Messner and
3  Mr. Boma are at FIDAC as we sit here today?
4      A.    No.  They are at another place right
5  now.
6      Q.    Earlier today --
7      A.    They were there at 8:30 this
8  morning.
9      Q.    Do you know what the agenda was for
10  that meeting?
11      A.    We are there every two weeks going
12  through new prospects, performance, stuff like
13  that.  They are there.  I haven't been there in
14  two years.  The last time was a Christmas party
15  in 2003 or 2004, I forget which.
16      Q.    What sort of services does Gen
17  Advisors or now Borealis -- let me back up.
18  First of all, does Gen Advisors provide any
19  services to FIDAC now?
20      A.    Yes.
21      Q.    Or is it only Borealis?
22      A.    Borealis accepts the money,
23  services, master consulting.  Gen Advisors,
24  Borealis, you can lump them all into one, it's
25  common ownership.  Regulatory issues dictate

Page 129

1          E. Baptista, Jr.
2  certain things.
3          The service we provide right now is
4  keeping their existing clientele happy, the
5  existing brokerage community that has money at
6  FIDAC happy, and last but not least to cajole
7  them and help them get new business coming out of
8  the tough time that it was in the industry for
9  them.

**REDACTED**

19      Q.    So you and the others at Gen
20  Advisors have direct contact with the clients?
21      A.    Direct contact with the brokers and
22  the insurance carriers, and the new cases they
23  are doing.  I don't.
24      Q.    But Mr. Messner and Mr. Boma do?
25      A.    Right.  I'm off doing other funds.

Page 130

```
1              E. Baptista, Jr.
2      Q.    How much equity is in the Premier
3 Fund today?
4      A.    What do you mean by equity?
5      Q.    Premium dollars before leverage.
6      A.    Am I violating anything here?
7      MR. NOVACK:  You can tell him
8 whatever information you have in this
9 deposition.  You are under compulsion to do
10 it and we're not going to claim that your
11 testimony here is violating anything.  We
12 have a confidentiality order that is going
13 to be signed by the parties which will keep
14 this confidential and after the deposition
15 is over, we will designate information in
16 here that will be kept confidential and you
17 will agree not to repeat what is said here.
18      THE WITNESS:  So I'm not -- I'm just
19 so cognizant of that.  That's why I'm
20 saying that.
21      MR. RUBEN:  Thank you for that.  Why
22 don't we do it this way.  I've created a
23 little chart, and I'd like you to fill it
24 out, and we can mark that whatever the next
25 exhibit is, Baptista Exhibit 6.
```

Page 131

```
1              E. Baptista, Jr.
2      (Baptista Exhibit 6, chart, was
3 marked for identification.)
4      MR. RUBEN:  I'll let him fill it out
5 and we can get some copies.
6      (Discussion off the record.)
7      MR. RUBEN:  Back on the record.
8      Q.   Mr. Baptista, is it your testimony
9 that you're not aware, for any of the calendar
10 years, 2003, 2004, or 2005 or 2006 what the
11 percentage fee is that your company, Gen
12 Advisors, receives?
```

REDACTED

```
19      Q.    Okay.  I'll settle for that.
20      A.    Okay.
21      Q.    For 2006 year to date, what would be
22 the dollar amount of Gen Advisors' fees,
23 approximately?
24      A.    Do I have to change it?
25      Q.    No.
```

Page 132

```
1              E. Baptista, Jr.
2      MR. NOVACK:  Did you mark something
3 on your copy of the exhibit?
4      THE WITNESS:  Yeah.
5      MR. RUBEN:  He has a copy.  He
6 doesn't have the original.
7      THE WITNESS:  No.  I gave him the
8 original.
9      MR. NOVACK:  Why don't you just
10 testify.
```

REDACTED

```
12      Q.    And do you know what FIDAC's fees
13 have been from the Premier Fund, year to date?
14      A.    I don't know exactly.  I would be
15 guessing.
16      Q.    Ballpark.
17      A.    It probably should be -- hold on a
18 second.
```

REDACTED

```
21      Q.    What about for 2004?
22      A.    I don't know.
```

REDACTED

Page 133

```
1              E. Baptista, Jr.
2      A.    Every deal we do has a separate LLC
3 for a variety of reasons.  That's the only
4 income, the only project that's in Gen Advisors.
5      Q.    If we can pierce all the corporate
6 veils, and I'm not going to ask you what you earn
7 personally in a year, but the money that
8 ultimately goes to you as income from Gen
9 Advisors, is that a significant portion of your
10 personal income?
11      A.    It's under 15 percent.
```

REDACTED

```
15      MR. RUBEN:  That's right.
16      MR. NOVACK:  So he could be getting
17 $10, and this is all a largely meaningless
18 exercise, unless I'm missing something in
19 the equation.
20      MR. RUBEN:  Would you like to
21 testify?
22      MR. NOVACK:  No I'm trying to
23 determine if I understand what this
24 question was producing.  It was actually
25 just collaborative to see where we're
```

Page 134

1        E. Baptista, Jr.
2    going.  Maybe there's some other way you
3    want to ask it.
4        MR. RUBEN:  I'm satisfied with the
5    answer, but thanks for the offer to help.

**REDACTED**

22    Q.    Why wasn't --
23        MR. RUBEN:  Off the record.
24        (Discussion off the record.)
25        (The record was read.)

Page 136

1        E. Baptista, Jr.
2    in advance.
3        MR. NOVACK:  Those bastards.
4        MR. RUBEN:  That's on the record.
5        MR. NOVACK:  I'm sure Judge Robinson
6    will appreciate that too.
7    Q.    Other than the October 10, 2002
8    contract as amended, are there any other
9    contracts between Gen Advisors or any affiliate
10    of yours and FIDAC or Annaly?
11    A.    No.  Let me say it this way:  None
12    that I know of, and I've never seen any.

**REDACTED**

Page 135

1        E. Baptista, Jr.

**REDACTED**

22    Q.    Have the payments all been timely?
23    A.    Exactly on the 20th or the following
24    day, if it's a weekend, the money is wired into
25    our account.  Although this month, they paid us

Page 137

1        E. Baptista, Jr.

**REDACTED**

17    Q.    At what point in time did you
18    believe that the project was going to be
19    successful?

**REDACTED**

Page 138

1        E. Baptista, Jr.

**REDACTED**

6    A.    No, no.  That's when the bet was
7  made.  The fund didn't go effective until
8  December 29, 2003, so when I thought it was going
9  to be successful was six months in advance.
10    Q.    Did you have any discussions with
11  anyone from FIDAC in which they expressed their
12  view of whether the project was successful?
13    A.    All I got was stuff through Steve
14  until -- you know, in the fall of 2003, when it
15  was really moving ahead.  Everything was in place
16  at that time.  There were complaints about
17  expenses, it takes too long, all that other
18  stuff, but no one expressed a negative opinion
19  that it wouldn't work.  It was just, "It takes
20  too long."
21    Q.    Let me ask you to try to focus on
22  April of 2004.  What was going on in the fund at
23  that time in terms of your recollection of
24  dollars in the door and the prospects for the
25  fund?

Page 139

1        E. Baptista, Jr.

**REDACTED**

4    Q.    Do you recall how much?
5    THE WITNESS:  Am I violating
6  anything here?
7    MR. NOVACK:  You can testify to
8  this, as I said, in the deposition.  You
9  will have to keep confidential what you've
10  said.

**REDACTED**

13    MR. NOVACK:  This is during the
14  period January through April 2004?
15    THE WITNESS:  Yes.
16    (Baptista Exhibit 7, letter to
17  Stephen Peskoff, dated April 20th, 2004,
18  signed by Mr. Kazel, was marked for
19  identification.)
20    Q.    I'm handing you what I've marked as
21  Baptista Exhibit 7.  Have you ever seen this
22  document before?
23    A.    No.  I've heard of it, but I've
24  never seen it.
25    Q.    Can you tell us briefly what it is?

Page 140

1        E. Baptista, Jr.
2    A.    It's a letter to Steve --
3    MR. NOVACK:  Hold on a minute.  He's
4  never seen it before.  Why are we asking
5  him questions as to what it is, to identify
6  it?
7    MR. RUBEN:  Don't worry about it.
8    MR. NOVACK:  It's a total waste of
9  time.  If you want to ask him what is said
10  in it, I have no objection.
11    MR. RUBEN:  Are you objecting?
12    MR. NOVACK:  Yes.  I'm objecting to
13  asking a question that is pointless,
14  because he can't tell you what it is
15  because he's never seen it before, he
16  didn't send it, and he didn't get a copy,
17  so you may as well ask the man in the moon.
18    Q.    What does it appear to be to you,
19  Mr. Baptista?
20    A.    It is a letter saying, "Here is a
21  check."  Or no, excuse me.  Can you give me a
22  minute to look at it?
23    Q.    Sure.
24    MR. NOVACK:  I apologize for my tone
25    to Mr. Ruben.  I'm hungry.

Page 141

1        E. Baptista, Jr.
2    A.    This is a letter stating they have
3  raised other money, some information that
4  supposedly came from me is inaccurate, and that
5  they said they haven't made a profit yet on the
6  Premier Fund.
7    Q.    Do you recognize Mr. Kazel's
8  signature at the bottom?
9    A.    No, I wouldn't know.
10    Q.    Do you have any reason to believe
11  that this letter is not authentic?
12    A.    No.
13    Q.    Turning your attention to the second
14  paragraph, the eighth line, I'll read it for you,
15  "Based upon the extensive development time and
16  costs involved for launching Premier and the
17  nominal level of assets currently in the fund, we
18  have yet to see a positive return on our
19  investment.  While we have a dedicated team of
20  investment professionals involved in the daily
21  management of the fund who are responsible for
22  its above market returns, we are dedicating
23  limited resources to the further marketing of
24  this product."  And this letter is dated April
25  20th, 2004.

Page 142

```
1         E. Baptista, Jr.
2    A.   Um-hum.
```

**REDACTED**

```
8    Q.   Do you share Mr. Kazel's view that
9  there was a nominal level of assets in the fund
10 in April of 2004?
11   A.   This is going to get me in trouble,
12 but I'm going to say yes and no. I'm trying to
13 be open and honest to this whole thing. In
14 answer to the question, the last chunk of money
15 came in April 15th. It takes 60 to 90 days to
16 move this through to get it leveraged. So when
17 you look at the amount of money that was in the
18 account, they had not recovered at that point
19 their investment in the account. When it gets
20 leveraged up over a period of time, and it takes
21 a while, I'm not so sure that it's accurate. And
22 it might be 90 to 120 to 180 days. Okay?
23   Q.   You've had a chance to look at the
24 letter.
25   A.   Yes.
```

Page 143

```
1         E. Baptista, Jr.
```

**REDACTED**

```
18   Q.   Okay. Earlier Mr. Novack asked you
19 if you believed that Mr. Farrell was being
20 unreasonable in complaining about the time it
21 took from inception to launch of the Premier Fund
22 and you testified that you didn't want to
23 speculate as to what was in his head. So I'm not
24 going to ask you that question. What I am going
25 to ask you is, in your view, was the time from
```

Page 144

```
1         E. Baptista, Jr.
2  inception to launch unreasonable?
3    A.   I don't think so, because we were
4  doing things that had never been done before.
5  And more importantly, we had to go to insurance
6  carriers, wrap providers, risk management
7  operations, and explain what it is we were doing,
8  just like the explanation of what the insurance
9  product is and all the lingo. It's much more
10 different when you ask people to go on the hook
11 for a couple of hundred million dollars.
12        So could it have been done quicker?
13 The answer is absolutely yes. Was it outrageous?
14 No. But remember, both companies were limited by
15 personnel.
16   Q.   In the early meetings in 2001 and
17 2002, you explained to Mr. Farrell and Mr. Kazel,
18 did you not, that it would take some time and
19 money?
20   A.   There was only one meeting in 2001,
21 and it was with Mike Farrell. I did not meet Ron
22 Kazel until the January meeting.
23
```

**REDACTED**

Page 145

```
1         E. Baptista, Jr.
```

**REDACTED**

```
5    Q.   Okay. Did you have specific
6  discussions with either Mr. Farrell or Mr. Kazel
7  concerning the amount of money that would have to
8  be expended prior to revenues starting to come
9  in?
10   A.   No.
11   Q.   Do you recall telling Mr. Peskoff in
12 December of 2004 that the deal was turning into a
13 huge success?
14   A.   Sometime in 2004, yes.
15   Q.   Now I'd like to take you back to
16 that October 2002 meeting that you talked about
17 earlier. And you testified that you didn't
18 recall who first brought up the prospect of
19 paying or taking care of Mr. Peskoff or
20 Underhill, but that somebody said, "What about
21 Steve?"
22   A.   Um-hum.
23   Q.   Does it make sense to you, as you
24 think about it a little more carefully, that
25 Mr. Farrell would have asked that question if he
```

Page 146

1          E. Baptista, Jr.
2 had a contract or an agreement to take care of
3 Steve?
4     A.   I don't know.
5          MR. NOVACK:  I'll just object to the
6     form, but you can certainly answer.
7     A.   I don't know.  Okay?  I don't know
8 if it was him that brought that up, me, Jeff or
9 whatever, but we had to resolve it.  That was the
10 final compensation issue as it relates to the
11 whole thing, so I don't know.
12    Q.   But this was the meeting at which
13 Mr. Farrell said that he would be paying Steve;
14 correct?
15         MR. NOVACK:  That's not what the
16    testimony was, that's not what he
17    testified.  He did not say he would be
18    paying Steve.  He said, "I will discuss
19    with Steve."  That's what his testimony was
20    this morning.
21         THE WITNESS:  I think I amended it a
22    little bit.  He said, "I will take care of
23    Steve."  He didn't say compensation.
24         MR. NOVACK:  Nor did he say, "I will
25    be paying Steve"?

Page 147

1          E. Baptista, Jr.
2          THE WITNESS:  He didn't say that.
3          MR. NOVACK:  Thank you.
4     Q.   Go ahead and tell us again his
5 words.
6     A.   My best recollection, he doesn't
7 want us to deal with Steve and paying, he doesn't
8 want him double dipping, he will take care of
9 Steve.  That's what was said.
10    Q.   Do you recall a February --
11    A.   Excuse me.  That could have also
12 been said, part of it, with Ron Kazel.  I'm just
13 telling you the gist of the conversation.  I
14 wouldn't swear on a stack of bibles those were
15 the exact words.
16    Q.   Do you recall a February 2003
17 meeting at which you were present and also
18 Mr. Farrell and Mr. Kazel?
19    A.   In?
20    Q.   February of 2003.
21    A.   No, but where was the meeting?
22    Q.   New York.
23    A.   New York?  There were numerous
24 meetings.  There was one in January that Steve
25 was at, and then every other month or every

Page 148

1          E. Baptista, Jr.
2 month, there was meetings taking place going
3 forward.
4          MR. NOVACK:  This is 2002 or '3?
5          MR. RUBEN:  '3.
6          THE WITNESS:  '3.  No, if it's 2003?
7          MR. NOVACK:  You were out of the
8     picture, you just told me.
9          THE WITNESS:  I thought he said '2,
10    I'm sorry.
11    Q.   I'm talking about 2003.
12    A.   No.  I was in two meetings in 2003.
13 One was a Christmas party.
14    Q.   Okay.
15    A.   Okay.  And the other one, I was
16 there for a short period of time, because quite
17 frankly, I fell asleep in the meeting.  I was
18 sick, and then I left.  So I was not attending
19 the meetings.  I was not in the technical aspect.
20 I was out of the equation.
21    Q.   Refresh my recollection.  Was it
22 Mr. Farrell or Mr. Kazel who used the term
23 "double dipping," and that they didn't want
24 Mr. Peskoff double dipping?
25    A.   I'm 90 percent sure, for whatever

Page 149

1          E. Baptista, Jr.
2 that means, in the legalistic, that it was
3 Mr. Farrell, but it could have been Mr. Kazel.
4 It was said.
5     Q.   What did you take that to mean, that
6 they didn't want him double dipping?
7     A.   They were going to take care of him
8 and they didn't want him to come to us and get
9 paid twice.
10    Q.   So you did understand, from the use
11 of the term "double dipping," that they intended
12 to pay Mr. Peskoff?
13    A.   They intended to take care of him.
14 They didn't use the word "pay."  That's my
15 interpretation, and I understand where you're
16 going.  Both sides are looking, but that's what
17 was said.  That's all I can tell you.
18    Q.   Let's assume for a second that you
19 were the one who asked, "What about Steve?  Who
20 is going to compensate him," or words to that
21 effect.
22    A.   Um-hum.
23    Q.   Couldn't we certainly infer from
24 that that if FIDAC were not paying him, that at
25 that time, again, October of 2002, that you would

Page 150

```
1            E. Baptista, Jr.
2  have paid him?
3       A.   I don't have any experience in that,
4  number one.  Number two, I don't know.
```

REDACTED

```
7       Q.   I'm only talking about 2002 right
8  now.
9       A.   I know, but I'm trying to give
10 you -- I don't know.  I honestly don't know.  But
11 if Farrell said, "You should give him" -- I'm
12 picking a number now, this is not my number, I'm
13 making a hypothetical -- "10 percent of your 10
14 percent, 1 percent," "Okay, Mike, if that's what
15 you feel."  I would never offer it.  But that's
16 why we had that conversation in October.  Steve
17 did make the introduction.
18      Q.   Do you recall a time when you made
19 an introduction to Steve of Gilbane Construction?
20      A.   Um-hum.
21      Q.   What was the purpose of that
22 introduction?
23      A.   He had a loan program that might
24 meet Gilbane's balance sheet issues.
25      Q.   And was there an understanding
```

Page 151

```
1            E. Baptista, Jr.
2  between the two of you of whether you would be
3  compensated for making that introduction?
4       A.   Yes, and I asked him to put it in an
5  e-mail, and he said if he got a dollar, I got 20
6  cents.
7       Q.   And that was acceptable to you?
8       A.   Yes.  It was found money for me, but
9  I asked him to put it in an e-mail simply because
10 that's the way business should be done.  By the
11 way, that was fully disclosed to Billy Gilbane,
12 the president.
13      Q.   Do you feel that your compensation
14 from FIDAC currently -- by you, I mean Gen
15 Advisors -- is in line with the market rate for
16 such services?
17           MR. NOVACK:  Objection to the form.
18 You can answer it.
19      A.   Based on the contracts we've got
20 with some of the other new funds, this is
21 really -- the answer is no, we're not overpaid.
22      Q.   That wasn't my question.
23      A.   Okay, repeat the question.
24      Q.   The question was simply whether you
25 believe that your compensation is in line with
```

Page 152

```
1            E. Baptista, Jr.
2  the market rate for such services.
3       A.   No.
4       Q.   Do you believe that it is below the
5  market rate?
6       A.   Based on new funds we're doing, yes.
7       Q.   So you don't think that you're being
8  overpaid?
9       A.   Correct.
10      Q.   You testified earlier about a
11 conversation that you had with Nick Singh about
12 the possible settlement of this dispute.  Do you
13 recall when that conversation took place?  First
14 of all, was it a telephone conversation or a
15 meeting?
16      A.   A telephone conversation.  He called
17 me along with -- I don't know if you were on that
18 call or not.
19           MR. NOVACK:  You will have to put me
20 under oath to find out.
21      A.   I'm not going to ask you, but there
22 were some other people.  Okay?
23      Q.   Okay.
24      A.   And we had a conversation, and then
25 I told Nick --
```

Page 153

```
1            E. Baptista, Jr.
2       Q.   Do you recall when it was?
3       A.   It was in the fall of '05, somewhere
4  in there.  Then I told Nick -- I had called him
5  back directly at FIDAC.  I said, "Look, I've got
6  to tell you, I think you should talk."  So then I
7  guess he talked to Mike Farrell and whoever else,
8  and he called me back for Steve's personal
9  telephone number."  I said, "For guys that are
10 really good friends, that's how far the
11 relationship deteriorated.  You don't have his
12 telephone number anymore," and I guess a call was
13 made and nothing ever happened.
14      Q.   Did you feel any pressure at that
15 point from Mr. Singh that how you testified in
16 this matter could affect your business
17 relationship with FIDAC?
18      A.   No.  The only thing they reminded me
19 of, which was legitimate in my opinion, is the
20 confidentiality, not to discuss what the fund is
21 doing and all that other stuff.
22      Q.   Do you understand your
23 confidentiality obligations to cover information
24 that is available in the public domain or would
25 that not be confidential information?
```

**Page 154**

```
1          E. Baptista, Jr.
2     A.   I think if it's in the public
3  domain, it's not confidential, but this is not
4  necessarily totally in the public domain, I
5  think.  But maybe there is.  I don't know.
6     Q.   The range -- the amount of equity in
7  the Premier Fund, within a range, could be
8  gleaned, could it not, from Annaly's public
9  filings?
10         MR. NOVACK:  If you know.  I think
11     he's asking if you know.
12     A.   If you look and know when certain
13 monies flow through, and then you looked at their
14 10-Q as it relates to FIDAC, and you see a
15 quarter where the assets went up significantly,
16 could you make an educated guess?  Probably.
17     Q.   Do you know what percentage of
18 FIDAC's revenue comes from the Premier Fund?
19     A.   I used to track that on a yearly
20 basis.  Do you mean today, 2006?
21     Q.   At any time that you want to tell me
22 about.
23     A.   I think it's over -- this is in this
24 confidentiality thing; right?
25     Q.   Sure.
```

**Page 155**

```
1          E. Baptista, Jr.
```

REDACTED

**Page 156**

```
1          E. Baptista, Jr.
```

REDACTED

```
14         MR. RUBEN:  If I could take one
15     minute and confer with my brain over there.
16     (Recess taken.)
17     Q.   Mr. Baptista, do you recall when you
18 and I last spoke, I asked you your opinion of the
19 value to FIDAC of Mr. Peskoff's services in
20 making the introduction and setting up meetings
21 and being the deflector shield, if you will,
22 whenever Mr. Farrell had a problem in the deal?
23     A.   Um-hum.
24     Q.   Do you remember me asking you that?
25     A.   Yes.
```

**Page 157**

```
1          E. Baptista, Jr.
2     Q.   Do you remember telling me that your
3  view was that FIDAC ought to pay 5 percent of its
4  gross -- of its fees after expenses to
5  Mr. Peskoff?  Do you recall that?
6     A.   You asked me for a number, and you
7  pushed me and pushed me.  If I had to take it
8  back, I would say I don't know, but I did say
9  that.
10     Q.   Do you recall also that I asked you
11 at that time whether in 2002, you would have been
12 willing to pay Mr. Peskoff or Underhill if a
13 representative of FIDAC had not said that they
14 were going to take care of him?
15     A.   Did I say I would?
16     Q.   That's my question.
17         MR. NOVACK:  Maybe you ought to read
18     back the question.
19     Q.   Let me ask it again.  It was sloppy.
20 When we last spoke, do you recall my asking you
21 whether you would have been willing in 2002 to
22 pay a fee for the introduction to Mr. Peskoff,
23 had FIDAC not said that it would take care of
24 Mr. Peskoff?  Now I'll tell you that you never
25 put a number on it.
```

Page 158

1           E. Baptista, Jr.
2      A.   I know.  What I told you, okay, is I
3  had no idea.  I hadn't considered, and to me it
4  was a moot point, because they told us in
5  October, when we finally knew what we were going
6  to get paid -- remember, up until that contract
7  was signed, we had nothing.  We had expended
8  time, money and so forth, and by the way, so had
9  FIDAC.  So I told you I had no idea and I hadn't
10  thought about it, but that, you know, I guess
11  everything was on the table, depending, but it
12  was a moot point.
13          MR. RUBEN:  I have nothing further.
14          MR. NOVACK:  I have some questions.
15  EXAMINATION
16  BY MR. NOVACK:
17      Q.   When was the conversation with
18  Mr. Ruben that he was just alluding to when you
19  told us that he pushed you to say 5 percent of
20  the fees?
21      A.   When or where or both?
22      Q.   When?
23      A.   Was that in September at the train
24  station in Maryland?  I can't remember the name
25  of that stop.

Page 159

1           E. Baptista, Jr.
2      Q.   Had you had a meeting with
3  Mr. Ruben?
4      A.   He called me, and I said, "I'm going
5  to be coming through and I'll be glad to sit down
6  with you."
7      Q.   And you sat down with Mr. Ruben?
8      A.   In the train station.
9      Q.   In Maryland?
10      A.   Yes.
11      Q.   When?
12      A.   In 2006, these past few months.
13      Q.   Who else was present?
14      A.   Just the two of us.
15      Q.   How long was the meeting?
16      A.   20 minutes.
17      Q.   Did he ask you other questions?
18      A.   Yes.
19      Q.   What are the other questions he
20  asked you?  Don't give me the answers that you
21  gave.  I just want to know what the questions
22  were.
23      A.   The questions were did Mr. Peskoff,
24  Steve, "Did he introduce you to Farrell?  How did
25  he introduce you to Farrell, and when did he do

Page 160

1           E. Baptista, Jr.
2  it?  Did he take part in any meetings, and did
3  you ever discuss compensation with Mr. Farrell or
4  anyone at FIDAC as it relates to Steve?"
5      Q.   And he also --
6      A.   And there was a couple of more
7  questions.  One, what role did Steve play?  Did
8  he find any money?  Was he involved in the
9  technical aspects of it?  Stuff like that.
10      Q.   It's correct Steve found no money in
11  connection with Premier; correct?
12      A.   Correct.
13      Q.   You say he pushed you to say 5
14  percent of the fees.  What do you mean by that,
15  he put pressure on you in some way?
16      A.   He said -- look, no one pushes me.
17      Q.   I only asked you what you meant.
18  You used the words, "You pushed me," so I assume
19  there was some kind of pressure --
20      A.   He asked me a question in an
21  informal setting.  He said, "What is a fair fee?"
22  I said 5 percent of someone's -- in other words,
23  if a person was making $1 million, and someone
24  introduced you and the finder was getting paid
25  $50,000 out of that, I thought that was fair from

Page 161

1           E. Baptista, Jr.
2  what I know now.  If he asked me that question in
3  2002, 2003, 2004, I wouldn't have a clue, because
4  I didn't do any of that.
5      Q.   And I am I correct that you have
6  absolutely no personal experience with situations
7  similar to the one that we have here where
8  Mr. Peskoff introduced you to FIDAC and FIDAC had
9  to develop a whole new product and go through all
10  of this rigamarole you've described?
11      A.   It's never been done before so --
12  from my knowledge, it's never been done before.
13      Q.   So is it fair to say the 5 percent
14  you gave in this conversation in which you were
15  pressured was a number that was plucked out of
16  the air by you?
17          MR. RUBEN:  I'm going to object as
18  to form.
19          MR. NOVACK:  You can, and you can
20  answer.
21      A.   If you want to say it was a PFA, you
22  can say that.  I looked at the numbers backwards
23  and if someone is making a million bucks, and you
24  pay him $50,000 for a period of time, but I don't
25  know.

Page 162

1         E. Baptista, Jr.
2     Q.    What period of time were you
3 thinking?
4     A.    Was I thinking?  No, I wasn't
5 thinking of any period of time.  I'm saying that
6 today.
7     Q.    The 5 percent you referred to in the
8 conversation at the train station, was that 5
9 percent for as long as FIDAC was earning fees or
10 5 percent of the first year or something else?
11     A.    Both.  What I know now, that a lot
12 of these deals, as we're negotiating with other
13 funds, have time limits on them.  And the time
14 limits in renewals are five to ten years.  I
15 didn't know that before.  In fact, I didn't know
16 that until 2006.
17     Q.    Let me try to understand something
18 and be clear about it.  In October 2002, you
19 attended a meeting at which someone on the FIDAC
20 side said, "We will discuss compensation with
21 Steve.  You don't pay him."
22     A.    No, that's not what they said.
23     MR. NOVACK:  I'm sorry.
24 Mr. Peskoff, are you having trouble
25     breathing?  Because I hear --

Page 163

1         E. Baptista, Jr.
2     MR. PESKOFF:  I have a sinus
3     condition.
4     MR. NOVACK:  Maybe we will stop
5     until you're done having trouble breathing,
6     and then I'll continue with my questions,
7     but if you're going to exhale to distract
8     me, then we will wait until you're done.
9     MR. PESKOFF:  I have a sinus
10     condition.
11     MR. NOVACK:  We will wait until
12     you're okay.
13     MR. PESKOFF:  I'm fine.
14     A.    What was said --
15     MR. NOVACK:  Let me have the
16     question read back.
17     (The record was read.)
18     Q.    Let me do it a different way.  There
19 was an October 2002 meeting which you testified
20 to.  At the meeting, someone at FIDAC said
21 something about whether or not you, meaning Gen
22 Advisors, should pay anything to Peskoff.  Right?
23     A.    No.  If I may say, I don't know if I
24 said it or whatever.  Steve Peskoff's name came
25 up, what do we do with him, and they said -- they

Page 164

1         E. Baptista, Jr.
2 said, being FIDAC -- and I could have brought
3 that first piece up.  They said, "We don't want
4 you -- we don't want him dealing with you or
5 being paid by you.  We will take care of him.  We
6 don't want double dipping."  That's the
7 recollection I have.
8     Q.    You remember the words "double
9 dipping," being used --
10     A.    I remember that clearly.
11     Q.    Let me finish.  Do you remember the
12 words "double dipping" being used at that
13 meeting, or are those words that you may have
14 been told by someone else after the meeting?
15     A.    I remember that at the meeting.
16     Q.    At the meeting.  Okay.  Did you
17 immediately call up Mr. Peskoff after the meeting
18 and tell him what was said?
19     A.    No.
20     Q.    Did you ever tell him what was said
21 at that meeting about that?
22     A.    Yes, I did.
23     Q.    When?
24     A.    Sometime afterwards.
25     Q.    When?

Page 165

1         E. Baptista, Jr.
2     A.    I can't tell you exactly.  I don't
3 know.
4     Q.    Give me the year.
5     A.    It was sometime in 2003.  I said,
6 "Look, you've got your deal and they said they
7 are going to take care of you."  That's it.
8 Double dipping was not mentioned.
9     Q.    What was the occasion -- what was
10 the occasion for you to say to Mr. Peskoff,
11 "Look, you've got your deal"?
12     A.    Well, we were having telephone
13 conversations every two weeks about the progress
14 of this.  It was in one of those conversations.
15 I said, "By the way, we brought up compensation.
16 They are going to take care of you.  That's it."
17     Q.    This was sometime in 2003?
18     A.    Yes.
19     Q.    Until that time --
20     A.    It could have been December 2002,
21 but it wasn't two hours after the meeting.
22     Q.    Right.
23     A.    It wasn't the next day.
24     Q.    Right.
25     A.    It was in the normal course of

Page 166

1        E. Baptista, Jr.
2  conversation back and forth with the frustration
3  levels building up and down, as to the progress.
4      Q.    The meeting was in October 2002, and
5  we know that it took a number of months before
6  the vehicle was developed, and that was around
7  March of 2003, as I recollect.
8      A.    March or June, before Deloitte got
9  the handle around it.
10      Q.    And it was around that time in 2003,
11  you think, that Mr. Peskoff, in one of the
12  conversations with you, was talking about getting
13  paid on Premier?
14      A.    No.  I think it was before then.
15      Q.    It was before then, but there was no
16  money coming in?

**REDACTED**

20      Q.    So it was around that time?
21      A.    It was before then.
22      Q.    And you didn't tell Mr. Peskoff
23  anything about double dipping?
24      A.    No.
25      Q.    And you just said that you had the

Page 167

1        E. Baptista, Jr.
2  conversation and were told that FIDAC would take
3  care of his compensation?
4      A.    Yes.  "They said they want to take
5  care of you."
6      Q.    Was Mr. Peskoff asking Gen Advisors
7  to pay him something?
8      A.    No.  No, I told him.
9      Q.    Why did the subject of his
10  compensation coming from FIDAC come up if he
11  wasn't asking you?
12      A.    I think there was a courtesy to tell
13  him that we had the discussion about that and
14  they are going to take care of him, and he always
15  told me he had a deal with them, so I just told
16  him as a common courtesy.  He introduced us.
17      Q.    Did he ask you what was said in
18  terms of the particulars of how he would be taken
19  care of, what the compensation was?
20      A.    No.
21      Q.    Did he make any effort to follow up
22  with you as to what was said?
23      A.    He might have asked.  I said, "Look,
24  I don't know.  They said they'll deal with you."
25  He always told me he had a deal, so that's why I

Page 168

1        E. Baptista, Jr.
2  assumed the deal was whatever it was.
3      Q.    Did Mr. Peskoff tell you that he
4  ever tried to follow up with Mike Farrell to
5  agree early on in the process, after you had your
6  contract, as to what his compensation would be,
7  Mr. Peskoff?
8      A.    I don't know.  I don't recall
9  anything at this time.
10      Q.    You said that the amount of equity
11  that was under management could be deciphered or
12  reverse engineered out of the publicly filed
13  papers; correct?
14      A.    Yes.
15      Q.    Do you regard that as meaning that
16  you would be free to go out and tell anybody you
17  wanted as to what the actual numbers were that
18  were under management in equity?
19      A.    No.
20      Q.    So the fact that there were some
21  numbers out publicly available doesn't mean that
22  you can give particulars as an insider as to what
23  you know; right?
24      A.    Correct.

REDACTED

Page 169

1        E. Baptista, Jr.

**REDACTED**

7        MR. RUBEN:  Objection to form.  That
8    wasn't his testimony.
9        MR. NOVACK:  He agrees with me.
10      Q.    Gilbane Building Company, did you
11  eventually get the e-mail with regard to --
12      A.    Yes.
13      Q.    And has money been paid?
14      A.    No.  Nothing has ever been done.
15      Q.    Nothing has ever been done?  So it's
16  20 cents on the dollar --
17      Q.    Of nothing.
18      Q.    -- of nothing?
19      A.    Correct.
20      Q.    Very generous.  Do you have any
21  other contractual arrangements with Mr. Peskoff
22  currently?
23      A.    No.
24      Q.    Have you ever in the past had any?
25      A.    No.

Page 170

```
1           E. Baptista, Jr.
2      Q.   Have you ever paid him or has he
3  ever paid you anything?
4      A.   No.
5      Q.   Did Mr. Peskoff ever say to you,
6  because of what had been said at the October 2002
7  meeting, he refrained from asking Mike Farrell
8  for compensation?
9      A.   No, I don't remember that.
```

**REDACTED**

```
17     A.   Yes.
18     Q.   I'm going to read something to you.
19 Okay?  Mr. Peskoff testified in a deposition, and
20 in that deposition, we were able to ask him
21 questions about notes he took of conversations
22 with you.
23     A.   Um-hum.
24     Q.   And I'm just going to read some of
25 this to you, not to ask you if it's accurate or
```

Page 172

```
1           E. Baptista, Jr.
```

**REDACTED**

```
4      A.   It's much more than that.  Look, I'm
5  trying to walk both sides.
6      Q.   I just want the facts.
7      A.   Yeah.
8      Q.   This is inconsistent?
9      A.   Yeah.
```

**REDACTED**

Page 171

```
1           E. Baptista, Jr.
```

**REDACTED**

```
11     A.   It is.
12     Q.   Does that refresh your
13 recollection --
14     A.   No.  I know -- maybe I just told him
15 in generalities that it was more than that, but I
16 didn't tell him the whole thing because I
17 couldn't.
18     Q.   The next line in the memo,
```

**REDACTED**

```
25     Q.   Okay.  It says, "If and when
```

Page 173

```
1           E. Baptista, Jr.
```

**REDACTED**

Page 174

1          E. Baptista, Jr.
2     A.    I don't know.
3     Q.    You don't know if that would be
4 confidential information?
5     A.    No, I don't know.
6     Q.    Why don't you know?
7     A.    Because I don't know.
8     Q.    I don't understand. You think it's
9 public knowledge as to what was pending?
10    A.    I don't know. There were
11 insurance -- there are other people involved. I
12 said I don't know. Okay? You're getting me at a
13 point where you're questioning my numbers. I
14 could be wrong. I make a lot of mistakes.
15    Q.    That's why I'm telling you this.
16 I'm not trying to sneak up on you. I'm telling
17 you I checked with the client, which would
18 presumably know what the numbers are that they
19 have under management. That's why I'm giving
20 you, out of a sense of an abundance of fairness,
21 I'm giving you -- I'm not hiding anything, I'm
22 telling you exactly why I'm asking the questions.
23 You may be wrong. Is there something available
24 in your office if you made a phone call you could
25 check?

Page 175

1          E. Baptista, Jr.
2     A.    I have all those --
3     Q.    I don't want detailed --
4     A.    I can get it tomorrow. All those
5 records are locked up with me because of the
6 confidentiality issue.
7     Q.    Okay. How much did Gen Advisors
8 invest, in terms of out-of-pocket expenses, in
9 the development of Premier?
10    A.    Out-of-pocket or time?
11    Q.    Out-of-pocket.
12    A.    About $75,000.
13    Q.    How much did Mr. Peskoff invest, do
14 you know?
15    A.    Zero. He also worked for two years,
16 so if you want to count that, we put that on our
17 books, our time, just like FIDAC did, when they
18 said they had $500,000. It wasn't all
19 out-of-pocket, it was their time too.
20    Q.    Do you know what proportion of the
21 500 was outside lawyers and auditors?
22    A.    I don't know for sure, but it was at
23 least 300,000 is my guess.
24    Q.    Right. So we will get to that.
25 Now, do you recall having a discussion with

Page 176

1          E. Baptista, Jr.
2 Mr. Peskoff in which you told him that he ought
3 to offer to pay the out-of-pocket expenses of
4 FIDAC?
5     A.    No.
6     Q.    No?
7     A.    He had a conversation that he told
8 me he had with Mike Farrell and he offered to pay
9 half of them, and Mike said no.
10    Q.    Did you have a conversation on April
11 19, 2005 -- and I'm asking you this because I
12 have a memo from Mr. Peskoff's file, just so you
13 know. I'm just asking what you remember -- in
14 which you said that you felt that Mike Farrell
15 forgot he had a contract with Steve Peskoff that
16 hasn't been terminated?
17    A.    No.
18    Q.    Did you tell Mr. Peskoff in April
19 2005 --
20    A.    Just let me --
21    Q.    I'm sorry.
22    A.    If he had a contract, I've never
23 seen it.
24    Q.    Right.
25    A.    So since no one showed me a

Page 177

1          E. Baptista, Jr.
2 contract --
3     Q.    Is it correct to say that you did
4 not tell Mr. Peskoff in April 2005 that you felt
5 that Mike Farrell forgot he had a contract with
6 Mr. Peskoff that hasn't been terminated?
7     A.    No.
8     Q.    It is not correct to say that?
9     A.    It is not correct.

REDACTED

15    A.    Absolutely not. It never, never was
16 anywhere near that.
17    Q.    And you did not ever tell him that?
18    A.    No.
19    Q.    Did you tell Mr. Peskoff in April
20 2005 -- did you suggest to him that he inform
21 Mr. Farrell of the offer that Mr. Peskoff made to
22 pay the $600,000 in expenses, have Farrell take
23 that off the top of whatever is owed to Peskoff,
24 and then Peskoff will get paid after that?
25    A.    I have a little recollection of

Page 178

1      E. Baptista, Jr.
2 someone saying that. I always thought the
3 expenses were $500,000, but that's --
4      Q.   Other than that, did you suggest
5 that he remind Farrell --
6      A.   Did I suggest?
7      Q.   Yes.
8      A.   No.
9      Q.   If the notes that Mr. Peskoff took
10 say, "E. Baptista suggests" --
11     A.   I didn't suggest any of that.
12     Q.   Let me just tell you what the notes
13 say, and tell me if you ever suggested it. "E.
14 Baptista suggests that SDP inform Farrell of the
15 offer he made to pay the $600,000 in expenses;
16 have Farrell take that off the top of whatever is
17 owed to SDP, and then SDP to get paid after
18 that." If that is in the memo, that is
19 incorrect?
20     A.   Hold on for a second. The way I
21 listen to it the second time, and I should have
22 kept my mouth shut, it says that I told Steve
23 Peskoff that he should remind Steve that he made
24 an offer to pay --
25     Q.   To remind Mike?

Page 179

1      E. Baptista, Jr.
2      A.   To remind Mike that he offered to
3 pay half the expenses. That's probably accurate.
4 Now, Mike never told me he made an offer. Steve
5 told me.

REDACTED

13     Q.   You certainly didn't tell him that
14 in 2005; correct?
15     A.   Correct.

REDACTED

22     Q.   So you disagree with that note.
23 Okay.
24      On June 1, 2005, there's a memo that
25 says, from Mr. Peskoff, "As per Baptista, an

Page 180

1      E. Baptista, Jr.

REDACTED

9      Q.   You're telling me you did not tell
10 Mr. Peskoff that?
11     A.   Correct.
12     Q.   So we can draw the conclusion as to
13 how accurate his memos are.
14      Do you remember that after the
15 initial discussions took place in 2002 with
16 regard to Premier, that there was some change
17 being discussed in the regulatory climate which
18 affected what kind of vehicle could be formulated
19 and whether or not the insurance companies could
20 market the product that was then under
21 discussion?
22     A.   There was an issue, and back then, I
23 wasn't involved in all this stuff, that Deloitte
24 had brought up, and Nick Singh's law firm, I'm
25 trying to remember the name of the firm --

Page 181

1      E. Baptista, Jr.
2      Q.   Crowell & Mooring?
3      A.   No. He was in D.C. Sidney and
4 Austin or something, one of those. Whatever.
5      There was an issue that eventually
6 got cleared up, but it delayed the progress.
7 Okay?
8      MR. NOVACK:  I don't have any more
9 questions.
10      THE WITNESS:  I'm sure you do.
11      MR. RUBEN:  Not much.
12 EXAMINATION
13 BY MR. RUBEN:
14     Q.   Let's go back to our meeting in
15 Maryland just for a second. I didn't intimidate
16 you in any way; did I?
17     A.   No. I was just tired and you pushed
18 me.
19      MR. NOVACK:  "No. I was just tired
20 and you pushed me," he said.
21     A.   It wasn't intimidation.
22     Q.   Did I get up out of my chair?
23     A.   No.
24     Q.   Did I use my size or stature in any
25 way?

Page 182

1          E. Baptista, Jr.
2     A.   No.
3     Q.   The 5 percent number, I didn't
4  suggest that number to you; did I?
5     A.   No.
6     Q.   I just have one more question,
7  because I sat here and I listened to Mr. Novack
8  reading from Mr. Peskoff's notes, and your
9  answers that the notes didn't accurately reflect
10 when money came into the fund.  I can't help but
11 wonder whether you were giving information to
12 Mr. Peskoff about the fund that was not true or
13 that was not accurate in order to get him off
14 your back, but at the same time, by giving him
15 information that wasn't true, perhaps you thought
16 you weren't giving him confidential information.
17 Is that a possibility?
18        MR. NOVACK:  Objection to the form.
19     Go ahead and answer that if you can.
20     A.   Here's what I was -- it seems to me
21 everyone knows the fund was doing well.  And he
22 had conversations with Mike Farrell and he said
23 some money has come in, and all that.
24     Q.   Can you give a time frame when you
25 said everyone knows the fund is doing well?

Page 183

1          E. Baptista, Jr.

REDACTED

14        MR. RUBEN:  I don't want to crucify
15     you and I have nothing further.
16 EXAMINATION
17 BY MR. NOVACK:
18     Q.   I just want to clarify.  Are you
19 telling us now that you believe that you did give
20 this information to Mr. Peskoff on the dates
21 indicated on the memos and you knew it was
22 incorrect?
23     A.   No.
24     Q.   So you're not saying you gave that
25 information?

Page 184

1          E. Baptista, Jr.

REDACTED

25     Q.   So the simple answer is you did not

Page 185

1          E. Baptista, Jr.
2  tell him that?
3     A.   That is correct.
4     Q.   And the memo, if it says that, is
5  incorrect?
6     A.   Correct.

REDACTED

Page 186

```
1        E. Baptista, Jr.
```

REDACTED

Page 188

```
1        E. Baptista, Jr.
2    than the fact that you testified and you
3    were asked questions, and then we will
4    designate what portions of the deposition
5    remain fully confidential for all time, and
6    which if we don't agree on it -- but I
7    think it's safer to just say everything is
8    confidential.
9        THE WITNESS:  That's fine.
10       MR. NOVACK:  Thanks.  Thank you very
11   much.
12       (Time noted:  3:01 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 187

```
1        E. Baptista, Jr.
```

REDACTED

```
11       MR. NOVACK:  I have no more
12   questions.  You clarified my confusion.
13       MR. RUBEN:  I have nothing further.
14       MR. NOVACK:  Will you go on the
15   assumption, Mr. Baptista, that what you
16   testified to today until further notice is
17   confidential?
18       THE WITNESS:  Yes.
19       MR. NOVACK:  And not to be repeated
20   to anyone?
21       THE WITNESS:  Yes.
22       MR. NOVACK:  If you have a lawyer
23   that you're ever talking to about this, you
24   certainly can, but this is confidential,
25   and that means no one hears about it, other
```

Page 189

```
1        E. Baptista, Jr.
2        I, the witness herein, having read
3    the foregoing testimony, do hereby certify
4    it to be a true and correct transcript,
5    subject to the corrections, if any, shown
6    on the attached page.
7
8
9
10
11   _____
12       ERNEST P. BAPTISTA, JR.
13
14
15   Subscribed and sworn to
16   before me this _____ day
17   of _____ 2006.
18
19
20
21   _____
22
23
24
25
```

Page 190

1              E. Baptista, Jr.
2              CERTIFICATE
3 STATE OF NEW YORK )
4              :
5 COUNTY OF NEW YORK)
6      I, ELEANOR GREENHOUSE, a Shorthand
7 Reporter and Notary Public within and for the
8 State of New York, do hereby certify:
9      That ERNEST P. BAPTISTA, JR., the witness
10 whose deposition is hereinbefore set forth, was
11 duly sworn by me and that such deposition is a
12 true record of the testimony given by such
13 witness.
14      I further certify that I am not related to
15 any of the parties to this action by blood or
16 marriage, and that I am in no way interested in
17 the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto set my
19 hand this 20th day of December, 2006.
20
21
22
23
24      _____
25              ELEANOR GREENHOUSE

Page 191

1              E. Baptista, Jr.
2              INDEX
3 WITNESS              EXAMINATION BY  PAGE
4 ERNEST P. BAPTISTA, JR.  MR. NOVACK     3
                          158
5                         183
6         MR. RUBEN     124
                        181
7
8
9         EXHIBITS
10 BAPTISTA EXHIBIT         PAGE  LINE
11 1, subpoena              3   13
12 2, diagram drawn by      20   6
      Mr. Baptista
13
      3, document entitled,   97  18
14   "Premier Mortgage Income
      Fund LLC, Confidential
15   Offering Circular," dated
      June 27, 2003, the first
16   page Bates stamped F 242
17 4, Gen Advisors agreement  115  18
18 5, assignment of rights    121  5
19 6, chart               131   2
20 7, letter to Stephen      139  16
      Peskoff, dated April
21   20th, 2004, signed by
      Mr. Kazel
22
23
24
25

Baptista - 12/12/06                                    Page 190 - Page 191

**A-234**



**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
 2

 3   UNDERHILL INVESTMENT        :  Civil Action
     CORPORATION, by and through :  NO. 06-0099-SLR
 4   Stephen D. Peskoff as       :
     successor in interest, and  :
 5   STEPHEN D. PESKOFF,         :
     individually,               :
 6          Plaintiffs           :

 7          vs.                  :

 8   FIXED INCOME DISCOUNT       :
     ADVISORY COMPANY,           :
 9          Defendant           :

10                      _____

11

12                   Oral Deposition of
                      RONALD D. KAZEL
13

14

15

16   Date:  Thursday, December 14, 2006

17   Time:  9:55 a.m.

18   Place:  Stevens & Lee, P.C.
               1818 Market Street
19             29th Floor
               Philadelphia, PA  19103
20

21                      _____

22

23          COMPUTERIZED REPORTING SERVICES, INC.
              By:  Roxanne Weaver, RPR, CRR
24                   3449 Penn Avenue
                  Sinking Spring, PA  19608
25
               Phone:  (610) 678-6652
```

**Page 2**

```
 1   APPEARANCES:

 2

 3        Stevens & Lee
          By:  G. Thompson Bell, III, Esq.
 4        111 North 6th Street
          P.O. Box 679
 5        Reading, PA  19603-0679

 6              and

 7        Ruben & Aronson, LLP
          By:  Robert L. Ruben, Esq.
 8        4800 Montgomery Lane
          Suite 150
 9        Bethesda, MD  20814
               For the Plaintiffs
10

11        Kirkpatrick & Lockhart Nicholson Graham LLP
          By:  Gerald A. Novack, Esq.
12        Sarah P. Kenney, Esq.
          599 Lexington Avenue
13        New York, NY  10022-6030
               For the Defendant
14

15   ALSO PRESENT:

16

17        R. Nicholas Singh, Esq.,
          General Counsel, FIDAC
18

19                      _____

20

21

22                      INDEX

23   Witness       Examined by        Page

24

25   Ronald D. Kazel   Mr. Bell         4
```

**Page 3**

```
 1                    EXHIBIT INDEX

 2                                            Page

 3   Kazel

 4   1   2/15/00 letter to Mr. Peskoff from     16
         Mr. Farrell re: consulting engagement
 5   2   10/10/02 agreement letter to Mr. Baptista  20
         from Mr. Farrell
 6   3   Series of e-mails                     59
 7   4   Fax cover sheet and 9/13/02 letter of  64
         intent
 8   5   Copies of checks                      82
 9   6   4/12/04 letter to Mr. Kazel from       86
         Mr. Peskoff
10   7   4/7/05 letter to Mr. Farrell from      94
         Mr. Peskoff
     8   Series of e-mails                     94
```

**Page 4**

```
 1                 P R O C E E D I N G S

 2            (It is hereby stipulated by and between

 3        counsel that all objections except as

 4        to the form of the question be

 5        reserved until the time of trial.)

 6            MR. BELL:  I assume we stipulate, Ms. Kenney,

 7   to the fact that objections except to the form of the

 8   question are reserved until the time of trial.

 9            MS. KENNEY:  With the exception of privilege.

10            MR. BELL:  Right.  And what do you want to do

11   about reading and signing?

12            MS. KENNEY:  We would like the witness to

13   have an opportunity to read it and sign.

14            MR. BELL:  Okay.

15                    RONALD D. KAZEL

16   was called as a witness and, having been duly sworn by

17   the Reporter-Notary Public, was examined and testified as

18   follows:

19   BY MR. BELL:

20        Q    Mr. Kazel, my name is Tom Bell.  We met

21   earlier this morning.  As I'm sure your counsel has

22   explained to you, we're here today to take your

23   deposition.  Have you had your deposition taken before?

24        A    No, I have not.

25        Q    It's essentially a question-and-answer
```

A-235

5

1  session. My job is to ask the questions, and your job is
2  to give the answers to the best of your ability and
3  recollection. If I'm not making any of my questions
4  clear at any time, please let me know, and I'll do my
5  best to clarify them.
6          When you respond, please try to respond
7  verbally instead of saying um-hum or aha or shrugging
8  your shoulder or nodding your head, because the court
9  reporter needs to take down what you're saying.
10    A   Okay.
11    Q   Also, please wait until I finish my question
12  before you start to give your answer, and I'll try to do
13  the same with respect to your answer, so that we're not
14  talking over each other.
15    A   Okay.
16    Q   Is that all understood?
17    A   Yes.
18    Q   You are currently employed by FIDAC; correct?
19    A   That is correct.
20    Q   FIDAC is an abbreviation for Fixed Income
21  Advisory Company; correct?
22    A   That is correct.
23        MS. KENNEY: Or could I just -- Fixed --
24        THE WITNESS: Fixed Income Discount Advisory
25  Company.

6

1          MR. BELL: I'm sorry.
2  BY MR. BELL:
3    Q   What is your position with FIDAC currently?
4    A   I am managing director of FIDAC.
5    Q   How long have you held the title managing
6  director?
7    A   Just about one year.
8    Q   Were you employed by FIDAC prior to that
9  time?
10    A   Yes, I was.
11    Q   In what capacity?
12    A   As an executive vice president.
13    Q   How long were you in that position?
14    A   From December of 2001.
15    Q   Is that when your employment with FIDAC
16  began?
17    A   Yes.
18    Q   What are your primary responsibilities as a
19  managing director?
20    A   My primary responsibilities are overseeing
21  the overall business operations of FIDAC and FIDAC's
22  parent company, Annaly, as it relates to investment
23  activities, portfolio management, as well as capital
24  markets activities, which would include the marketing and
25  sale of securities for our parent company, Annaly, as

7

1  well as for all the funds under advisement by FIDAC.
2    Q   Are you an Annaly employee?
3    A   Yes.
4    Q   What is your position with Annaly?
5    A   Managing director.
6    Q   Who do you get your paycheck from?
7    A   Annaly.
8    Q   Do you have an employment agreement with
9  Annaly?
10    A   Yes, I do.
11    Q   What were your primary responsibilities as
12  executive vice president of FIDAC?
13    A   As an executive vice president of FIDAC, my
14  role was limited to just overseeing the development and
15  management of the FIDAC products, as well as the capital
16  market activities of Annaly. The difference between my
17  role as executive vice president and managing director is
18  in my current role I oversee more of the general
19  operations of the company as a whole.
20    Q   Did you oversee the development and
21  management of all of FIDAC's products?
22    A   Yes.
23    Q   While you were executive vice president?
24    A   Correct.
25    Q   So that would include the Premier product as

8

1  well as the MBS Trust products?
2    A   Yes, it would.
3    Q   Are you familiar with the term finder in your
4  industry?
5    A   Yes, I am.
6    Q   What do you understand that term means?
7    A   A finder in our industry is usually a
8  relationship a money manager would enter into with
9  someone who can bring to them capital into their
10  business. As an investment manager, you're always
11  looking for ways to generate new assets under
12  management. So if you cannot directly solicit clients
13  yourself, you may engage a finder who can bring capital
14  to your firm.
15    Q   Since you've been employed by FIDAC -- Do
16  you understand you're a FIDAC employee or an Annaly
17  employee?
18    A   Well, I'm an Annaly employee. But FIDAC is a
19  wholly-owned subsidiary of Annaly, so it's theoretically
20  one and the same in my mind.
21    Q   Do you understand that FIDAC is a separate
22  legal entity than Annaly?
23    A   Yes, I do.
24    Q   Is my understanding correct that you regard
25  yourself to be employed by both Annaly and FIDAC?

**9**

1    A   Yes.

2    Q   Has Annaly or FIDAC employed finders since

3  you've been an Annaly or FIDAC employee?

4    A   Yes. We do have relationships that are

5  considered finders, and we have agreements with certain

6  finders.

7    Q   Have you always had a written agreement --

8  Has FIDAC always had a written agreement with any finder

9  that it's employed, to your knowledge?

10    A   To my knowledge, yes.

11    Q   Have you been involved in drafting those

12  agreements?

13    A   Yes, I have.

14    Q   What has your involvement been, generally?

15    A   Generally, when starting a new product that

16  involves a finder, I'll work with counsel to direct the

17  document and determine the economics that should go to

18  the finder based upon the amount of assets under

19  management that they bring to us under that agreement.

20    Q   Is there a formula that you normally use when

21  determining how to compensate a finder?

22    A   Usually it is -- it has to deal with how we

23  get paid. So whatever formula we're using for our

24  compensation as a manager, which is generally a certain

25  amount of basis points on assets under management, the

**10**

1  finder would receive a portion of the basis under

2  management, basis points on assets under management, as

3  well.

4    Q   In other words, the finder normally receives

5  some percentage of what FIDAC receives?

6    A   Right.

7    Q   How do you determine what that percentage is?

8    A   It's a negotiated amount with the finder.

9    Q   Is there a benchmark or rule of thumb that

10  FIDAC uses?

11    A   You know, we don't have any particular

12  benchmark or rule of thumb. It will depend upon the

13  extent of the relationship and how much money we think

14  that finder can bring to us.

15    Q   Do you sometimes adjust the compensation

16  terms of the agreement with the finder depending upon how

17  the relationship develops and how successful it is?

18    A   No, we haven't adjusted it based upon the

19  success of the finder's relationship. We will sometimes

20  have investors come to us and ask us to adjust our fees,

21  which, because the finder's formula is driven off of our

22  fees, it would, therefore, affect the finder.

23    Q   Tell me who are the finders that you are

24  aware of that FIDAC has used or Annaly has used since

25  you've been employed by FIDAC or Annaly.

**11**

1

2          REDACTED

3

4

5

6    Q   To your knowledge, did FIDAC or Annaly ever

7  have a finder relationship with Steve Peskoff or

8  Underhill Investments?

9    A   The only agreement I was aware of was with

10  FBR REIT.

11    Q   Are you aware of a written agreement that is

12  limited to the FBR REIT?

13    A   Yes, I am.

14    Q   We'll come back to that. Let me go back for

15  a minute to your employment prior to the time you were

16  employed by FIDAC in December of 2001. You were employed

17  by FBR prior to working for FIDAC; is that correct?

18    A   That's correct.

19    Q   What was your position with FBR?

20    A   I was an executive vice president in the

21  investment banking financial institutions group.

22    Q   How long were you in that position?

23    A   From February of '96 to October of 2001.

24    Q   Were you employed by FBR prior to February of

25  '96?

**12**

1    A   No, I was not.

2    Q   What did you do prior to February of '96?

3    A   I worked for a firm called Sandler O'Neill &

4  Partners.

5

6          REDACTED

7

8

9    Q   Did you have an understanding that you were

10  going to work for FIDAC at the time you left FBR?

11    A   Yes, I did.

12    Q   Are you aware of any role Steve Peskoff

13  played or any involvement that he had in you becoming

14  employed by FIDAC?

15    A   No, I'm not.

16    Q   You knew Steve from your days at FBR;

17  correct?

18    A   Yes, I did.

19    Q   What did you understand his role was for FBR?

20    A   I don't know if I had a complete

21  understanding of what his role was for FBR, because he

22  was not a direct FBR employee.

23    Q   So you knew he was not an FBR employee;

24  right?

25    A   Right.

**13**

1     Q   Did you know anything else about what he did

2 for FBR?

3     A   Well, I knew that he looked to facilitate or

4 bring transactions to the company.

5     Q   Did you understand that he was acting

6 essentially as a finder?

7     A   I didn't know what capacity.

8     Q   Did you know he had an office at FBR's

9 offices?

10    A   Yes, I did.

11    Q   Did you ever talk to him when you were at FBR

12 and he was in the office?

13    A   Yes, I did.

14    Q   Did you ever talk about any of the products,

15 FBR products, with him?

16    A   Yes, I did.

17    Q   What products did you discuss with him?

18    A   Well, one of the products that Steve and I

19 did discuss because we worked on it together was the

20 Annaly initial transaction.

21    Q   Is that the REIT?

22    A   Yes.

23    MR. NOVACK: I have not -- I'm --

24    MR. BELL: Is Ms. Kenney doing the defending

25 of this deposition?

**14**

1    MR. NOVACK: I wasn't objecting. I'm just

2 saying I was confused. She wasn't, I suppose.

3 BY MR. BELL:

4    Q   What REIT were you referring to?

5    A   I was referring to Annaly.

6    MS. KENNEY: Is that the Annaly REIT?

7    THE WITNESS: Yes, the Annaly REIT.

8 BY MR. BELL:

9    Q   So you and Mr. Peskoff worked together on the

10 Annaly REIT?

11    A   Correct.

12    Q   And what did you understand Mr. Peskoff's

13 role was in connection with the Annaly REIT?

14    A   Well, Mr. Peskoff introduced Mike Farrell to

15 FBR.

16    Q   How do you know that?

17    A   Because I was introduced to Mike Farrell and

18 the rest of -- other people at FBR introduced to Mike

19 Farrell in a meeting that Steve held.

20    Q   So you were -- You attended the initial

21 meeting that Steve set up between Mike Farrell and FBR?

22    A   That is correct.

23    Q   When did that meeting occur, approximately?

24    A   It would have occurred in the summer to fall

25 of 1996.

**15**

1    Q   Was it from that introduction that FIDAC was

2 retained by FBR to manage the FBR REIT?

3    A   Not at that time, no.

4    Q   At some later time, is it your understanding

5 that --

6    MS. KENNEY: We haven't established knowledge

7 yet about the FBR -- management about the FBR REIT.

8 Let's cover that first.

9    MR. BELL: That's fair.

10 BY MR. BELL:

11    Q   Was there such a thing as the FBR REIT?

12    A   Yes, there was.

13    Q   Were you involved in that when you were

14 working at FBR?

15    A   I was not involved in that.

16    Q   Was Mr. Peskoff involved in that, to your

17 knowledge?

18    A   Not to my knowledge.

19    Q   Are you aware that FIDAC was retained to

20 manage the FBR REIT at some point?

21    A   Yes, I am.

22    Q   Are you aware of any role that Mr. Peskoff

23 played in putting FBR and FIDAC together with respect to

24 the FBR REIT?

25    A   No, I'm not.

**16**

1    Q   I'm going to show you some documents which

2 we'll mark as exhibits.

3    A   Okay.

4    (Whereupon, the Reporter marked Kazel 1.)

5 BY MR. BELL:

6    Q   Mr. Kazel, let me give you a moment to take a

7 look at Kazel Exhibit 1, which is a three-page document

8 on FIDAC letterhead dated February 15th, 2000, and

9 addressed to Mr. Steve Peskoff. Have you seen that

10 document before?

11    A   Yes, I have.

12    Q   When was the first time you saw this

13 document?

14    A   The first time I saw this document is during

15 the document collection for these proceedings.

16    Q   So prior to the onset of this litigation, you

17 had not seen Kazel Exhibit 1; is that correct?

18    A   That is correct.

19    Q   Have you ever seen any drafts of that

20 document?

21    A   No.

22    Q   Kazel Exhibit 1.

23    A   No, I have not.

24    Q   Now, I think a few minutes ago you made

25 reference to the fact that you were aware of a written

17

1 finder's agreement between FIDAC and Mr. Peskoff or
2 Underhill.
3         MS. KENNEY: I think you're actually
4 mischaracterizing the testimony.
5         MR. BELL: Okay.

**REDACTED**

10 BY MR. BELL:
11         Q    I thought you also said that you were aware
12 of an agreement between FIDAC and Mr. Peskoff or
13 Underhill that was limited to the FBR REIT.
14         A    **I'm aware of the agreement, this agreement**
15 **that I saw now in these proceedings.**
16         Q    Is this the agreement that you're referring
17 to that is limited to the FBR REIT?
18         A    **Yes, it is.**
19         Q    What is the basis for your understanding that
20 this is limited to the FBR REIT?
21         A    **That is purely my understanding, because this**
22 **document was produced prior to me joining FIDAC, so I**
23 **don't know what this was to encompass, if it was beyond**
24 **that. But this was the only relationship that I'm aware**
25 **of that FIDAC had with Underhill prior to my joining the**

18

1 firm.
2         Q    So if I understand what you just said, you
3 don't know whether Kazel deposition Exhibit 1 is limited
4 to the FBR REIT or not; is that right?
5         A    **That's right.**
6         Q    I'll give you as much time as you need to
7 look at it, but tell me if you see anything in there that
8 indicates that it's limited to the FBR REIT.
9         MS. KENNEY: I think the witness has just
10 testified that he's only familiar with this document as
11 far as after the onset of the litigation. So his
12 understanding of the document isn't necessarily --
13         MR. BELL: I'm simply asking him if there's
14 any language in there that indicates that it's limited to
15 the FBR REIT.
16         MS. KENNEY: He wasn't involved in the
17 creation of the document.
18         MR. BELL: You can argue weight if you want
19 to some other time.
20         THE WITNESS: Well, as this document doesn't
21 make any specific mention of FBR REIT, from reading this
22 I can't determine if it is solely to that, if that was
23 the intention or not of the document.
24 BY MR. BELL:
25         Q    When you were working for FBR, did you have

19

1 any conversation with anyone at FBR about Mr. Peskoff's
2 role in bringing FIDAC in as the manager of the FBR REIT?
3         A    **No, I did not.**
4         Q    And you may have answered this question
5 before, and if you already did, I apologize, but I want
6 to make sure I'm clear on this. As I understand your
7 testimony, you did not have any conversation with
8 Mr. Peskoff about his role in bringing FIDAC in as the
9 manager of the FBR REIT; is that correct?
10         A    **That's correct.**
11         Q    When you first saw this document - and I
12 don't want you to tell me anything that involved a
13 communication with counsel for FIDAC - but when you first
14 saw this document, what were the circumstances under
15 which you saw it?
16         MR. NOVACK: Can I just have a minute. I
17 just wanted to confer with him and her about what the
18 privileges are, because he's testified this came up in
19 the context of the litigation, and I just want to clarify
20 something with him when he answers; all right?
21         MR. BELL: That's fine.
22         MR. NOVACK: Because I want you to get the
23 answers you want.
24         (Whereupon, a discussion was held off
25         the record.)

20

1         MR. NOVACK: I basically told him to try to
2 answer your questions.
3         MR. BELL: Can you read back that last
4 question, please.
5         (Whereupon, the Reporter read back the
6         **referred-to question.)**
7         THE WITNESS: I saw this as part of a package
8 of materials that were collected for the litigation.
9 BY MR. BELL:
10         Q    Who provided you with that packet?
11         A    **My counsel did.**
12         MR. BELL: Let's mark this as Exhibit 2.
13         (Whereupon, the Reporter marked Kazel 2.)
14 BY MR. BELL:
15         Q    Kazel Exhibit 2 is, I think, a 14-page
16 document on FIDAC letterhead dated October 10th, 2002,
17 addressed to Ernie Baptista at Gen Advisors LLC. Have
18 you seen that document before?
19         A    **Yes, I have.**
20         Q    Were you involved in drafting this document?
21         A    **Yes, I was.**
22         Q    Who else was involved in drafting this
23 document?
24         A    **Our counsel.**
25         Q    What was your role in drafting Kazel Exhibit

21

1  2?

2      A    My role was involved in drafting the general
3  business terms of the agreement.

4      Q    By the general business terms, I take it that
5  you mean, maybe among other things, the finder's fee
6  section, which is section 2 beginning at the bottom of
7  page 2 of the document?

8      MS. KENNEY:  We could just have the witness
9  explain what he meant by general business terms.

10     MR. BELL:  Well, we could, and I may ask him
11 to do that.  But right now I'm asking the question this
12 way.

13     MS. KENNEY:  Can you just clarify the
14 question.  Are you asking if he was involved in drafting
15 that paragraph regarding finder's fees?

16     MR. BELL:  What I'm asking is whether the
17 general business terms that he was involved in drafting
18 included section 2 involving finder's fees.

19     THE WITNESS:  The general business terms did
20 include section 2, finder's fees.

21 BY MR. BELL:

22

23 **REDACTED**

24

25

22

1

2  **REDACTED**

3

4

5

6

7

8

9      A    We determined that based upon what we as a
10 firm want to receive based on the fund's characteristics.

11     Q    What characteristics do you look at?

12     A    We look at the potential growth opportunities
13 for the fund in terms of assets under management, as well
14 as the time involved in managing the fund.

15     Q    So the things that you look at, as I
16 understand it, are asset potential in the fund?

17     A    That is correct.

18     Q    FIDAC's cost to develop and manage the fund?

19     A    That is correct.

20     Q    Anything else?

21     A    Those are the primary factors.

22

23 **REDACTED**

24

25     A    Could you clarify your question a little bit

23

1  for me.

2      Q    Yes.  How did the criteria that you just
3  mentioned lead you to the conclusion that the finder's
4  fee as reflected in Kazel Exhibit 2 was appropriate?

5      A    Well, the way we determine it for Gen
6  Advisors is similar to how we determine it for other
7  funds.  We will look at what the potential return profile
8  is for a fund on a gross basis and then determine what we
9  think is marketable on a net basis, so gross returns less
10 what potential fees you could take out of the fund, and
11 then determined what -- out of that what we need to make,
12 as well as what we think we need to pay people in order
13 to find the capital for us or raise the money for us.

14     Q    Is there a document that you created, a
15 spreadsheet, notes, anything of that nature, where you
16 did the calculations that led you to the finder's fee
17 that's in Kazel Exhibit 2?

18     A    I don't recall us creating a specific
19 analysis for this.

20     Q    Now, earlier you testified that the way that
21 the finder's fee was determined was based on negotiations
22 with the finder.

23     A    Right.

24     Q    Did you have any negotiations with
25 Mr. Baptista over the finder's fee reflected in Kazel

24

1  Exhibit 2?

2      A    I don't recall if we had negotiations before
3  we settled upon this amount.

4      Q    Is it your recollection that the finder's fee
5  reflected in Kazel Exhibit 2 was proposed by FIDAC
6  unilaterally and then accepted by Mr. Baptista?

7      A    Yes, that is my recollection.

8      Q    What other terms in Kazel Exhibit 2 were you
9  involved in drafting?

10     A    Give me a moment to review the document.

11     MS. KENNEY:  Could you define what you mean
12 by the term drafting and involvement so that we can
13 clarify for the witness.

14     MR. BELL:  Yeah.  I can broaden the question.

15 BY MR. BELL:

16     Q    What other terms in Kazel Exhibit 2 did you
17 have any involvement or input into?

18     MS. KENNEY:  By involvement --

19     MR. BELL:  Did you have any input into.

20     THE WITNESS:  Give me a moment to review.

21     MS. KENNEY:  Take your time.

22     THE WITNESS:  I think the primary areas that
23 I would have had involvement in drafting this document
24 would have related to the responsibilities of Gen
25 Advisors.

25

BY MR. BELL:

Q    That's section 1(v) of the --

A    That is correct, yes.

Q    So the responsibilities section and the finder's fee section were the sections that you had input into?

A    That is correct.

Q    Did you review the final version of Kazel Exhibit 2 before it was signed by Mr. Farrell and Mr. Baptista?

A    Yes, I did.

Q    Let me call your attention to the finder's fee section again, section 2, which makes reference to the payment of fees for advisory services for each fund specified on Exhibit B. I'm reading from the third line. Do you see that?

A    Yes, I do.

REDACTED

REDACTED

26

Q    Is it your understanding that FIDAC would pay Mr. Baptista a fee for any fund that he brought to FIDAC as long as FIDAC did the deal?

A    No, that is not my understanding.

Q    Is it your understanding that FIDAC would pay Mr. Baptista a fee only for certain funds he would -- or certain projects he would bring to FIDAC?

A    Yes, that is my understanding.

Q    And which projects or products would FIDAC pay Mr. Baptista for and which ones would you not pay Mr. Baptista for?

A    Well, we are currently paying Mr. Baptista for the Premier Mortgage Income Fund.

Q    So we know you would pay for that one.

A    Right.

Q    But would you agree with me that section 2 of Exhibit 2, the finder's fee section, is not limited to a single fund?

A    I would agree with you.

Q    If Mr. Baptista brought another fund to FIDAC that FIDAC was hired as the manager for and received revenues from, would FIDAC pay Mr. Baptista a fee on that fund?

27

A    If we agreed to list that as part of the fund under Exhibit B, yes.

REDACTED

Q    So how can you tell from this -- Can you tell from this agreement what funds Mr. Baptista is going to be paid on and what funds Mr. Baptista is not going to be paid on?

A    Under this agreement, you cannot.

Q    Is there any other written agreement that FIDAC has with Mr. Baptista which identifies the funds that he will be paid on and which funds he will not be paid on?

A    I believe there's amendments to this agreement that state what funds he's compensated on.

Q    Okay, we'll probably come back to that. Let me go for a minute to something I asked you about earlier but didn't ask you these specific questions earlier, and that is the FBR REIT. You were working at FBR when FIDAC became the manager of the FBR REIT; is that right?

A    Yes, I was.

Q    And at the time FIDAC became the manager of the FBR REIT, were you aware of the fact that FIDAC had become the manager of the REIT?

28

A    Yes, I was.

Q    That REIT was an existing fund; is that right?

A    That is correct.

Q    It had been in place for at least several years; correct?

A    Yes, it had.

Q    Prior to the time that FIDAC became the manager.

A    Yes.

Q    Is it your understanding that FBR, or at least some principals of FBR, knew principals of FIDAC prior to Mr. Peskoff introducing them, or is it your understanding that the only way they even met was through Mr. Peskoff's introduction?

A    It's my understanding that the only way they met was through Mr. Peskoff's introduction.

MS. KENNEY:    Can you clarify what introduction we're talking about there. I don't think it's clear, the time period we're discussing.

MR. BELL:    He testified earlier that there was an introduction from Mr. Peskoff to FIDAC, and that was the introduction I was referring to.

MS. KENNEY:    I just want to clarify as far as what time period we're talking about.

29

1    MR. BELL:  If you want to follow up with
2  questions later, you're free to do that.
3    MS. KENNEY:  I'm just trying to clarify what
4  the testimony was.
5  BY MR. BELL:
6    Q    Did you ever have - when I say ever, I mean
7  ever - have any discussions with Mr. Peskoff about the
8  fee to which he would be entitled for – as a finder for
9  FIDAC?
10    A    Can you – For FIDAC generally?  Can you
11  expand on that.  Or for a specific product?
12    MR. BELL:  Either one.
13    MS. KENNEY:  Can you explain what you mean by
14  finder.
15    MR. BELL:  Well, we've already defined
16  finder.  He's defined finder earlier in his testimony.
17    THE WITNESS:  So can you restate your
18  question.  I'm sorry.
19    MR. BELL:  Can you read that back, please.
20    (Whereupon, the Reporter read back the
21    referred-to question.)
22    THE WITNESS:  No, I did not.
23  BY MR. BELL:
24    Q    Just maybe to beat the dead horse, you didn't
25  have any discussion either when you were working for FBR

30

1  or when you were working for FIDAC/Annaly; is that right?
2    A    That is correct.
3    Q    Are you aware of anyone else who ever had
4  discussions on behalf of FIDAC with Mr. Peskoff about any
5  fee he might or might not be entitled to as a finder for
6  FIDAC?
7    A    I'm not aware of anyone having those
8  conversations as a finder.
9    Q    Do you ever make notes of meetings?  When you
10  go to a meeting, do you ever make notes of what's
11  occurring at the meeting?
12    A    Yes, I do.
13    Q    Is that your habit, to make those kinds of
14  notes?
15    A    Depending on the meeting, yes.
16    Q    What do you mean by depending on the meeting?
17    A    The content of the meeting, whether I need –
18  whether there's anything pertinent in the meeting that I
19  want to record for future reference.
20    Q    What do you do with those notes after you
21  make them?
22    A    They're maintained in one of my notebooks.
23    Q    Do you have notebooks that you keep on a –
24  that you keep like a running log of what you were doing?
25    A    Yes, I do.

31

1    Q    Where are those notebooks?
2    A    They reside in our offices.
3    Q    How far back do you keep those notebooks?
4    A    I couldn't tell you that.  I don't know how
5  far back they would go.
6    Q    Do they go back to the beginning of your
7  employment with FIDAC?
8    A    They may.
9    Q    What was your involvement generally in the
10  formation of the Premier Fund?
11    A    I was directly responsible for organizing the
12  fund structure and making sure that we understood all of
13  the various regulatory, tax, legal, insurance
14  considerations that had to go into managing a product
15  such as Premier.
16    Q    Were you involved in the introduction of Gen
17  Advisors to FIDAC?
18    A    In terms of – I was involved in the initial
19  meeting that occurred with Gen Advisors, if that's what
20  you're referring to.
21    Q    Yeah, that answers the question.  And is it
22  your understanding that Mr. Peskoff set up that meeting?
23    A    I don't know if it was Mr. Peskoff or
24  Mr. Baptista, but –
25    Q    What is your understanding of Mr. Peskoff's

32

1  role in bringing FIDAC and Gen Advisors together?
2    A    My understanding is that Mr. Peskoff
3  introduced Mr. Baptista to Michael Farrell with the
4  general idea that there was a potential business
5  opportunity to work together.
6    Q    Who was present at that first meeting between
7  FIDAC and Gen Advisors?
8    A    The meeting I attended had Michael Farrell,
9  Ernie Baptista, Steve Peskoff, Jeff Messner, and I
10  believe there was one other individual that came along
11  with Mr. Messner, but I don't recall his name.
12    Q    And you?
13    A    And myself, yes.
14    Q    Where was the meeting?
15    A    It was held at FIDAC's offices.
16    Q    Did you take notes of what occurred at that
17  meeting?
18    A    I don't recall.
19    Q    If you did, they would be in one of your
20  notebooks?
21    A    Yes, they would be.
22    Q    What do you recall happening at that meeting?
23    A    That meeting was a general meeting to discuss
24  with Mike and I the insurance industry and how investment
25  vehicles fit within the insurance industry and to

33

1  determine whether it was an opportunity for FIDAC to
2  manage a product that fit inside the insurance industry.
3       Q    Did you discuss any specific products or
4  potential products?
5       A    We didn't discuss any specific products,
6  other than it would just be a knock-off of one of our
7  existing funds or a strategy that was very similar to
8  what we were already doing.
9       Q    What was Mr. Peskoff's role at that meeting?
10      A    Mr. Peskoff was primarily just a listener
11 like Mike and I was, to learn more about the industry at
12 that point in time.
13      Q    Prior to attending -- Let me strike that.
14           Approximately when was that meeting?
15      A    February of '02, or maybe January of '02.
16      Q    You've got a good memory, or it's been
17 refreshed well.
18      A    It was the first transaction I worked on when
19 I came to the firm. That's how I can remember.
20      Q    Prior to that meeting, had you had any
21 conversation with either Mr. Peskoff or Mr. Farrell about
22 a possible opportunity with Gen Advisors?
23      A    No, I had not.
24      Q    So you went into that meeting cold?
25      A    Right.

34

1           MR. BELL: Let's just take a five-minute
2  break.
3           (Whereupon, at this time a recess was
4           held.)
5  BY MR. BELL:
6       Q    Mr. Kazel, let me go back and try to tie up a
7  few loose ends before we continue.
8
9
10
11
12
13
14
15           REDACTED
16
17
18
19
20
21
22
23
24
25

35

1
2
3
4
5
6           REDACTED
7
8
9
10
11           MS. KENNEY: When you're talking about this
12 document, the Premier, was it, this was in October of
13 2002. I just wanted to clarify the time. You're talking
14 about when FIDAC entered into this agreement?
15           MR. BELL: Yes.
16           MS. KENNEY: Before Premier was actually
17 developed?
18           MR. BELL: Right.
19 BY MR. BELL:
20      Q    Were you finished with your answer?
21      A    Yes, I was.
22      Q    Now, let's go back and talk a little bit more
23 about the development of the Premier Fund. You said that
24 there was a meeting that you attended near the time you
25 first became employed by FIDAC, and you thought it was

36

1  January or February of '02. What was the next major step
2  that you can recall after that meeting in the development
3  of the Premier Fund?
4
5
6
7
8           REDACTED
9
10
11
12      Q    What resulted from that introduction?
13      A    The initial results of that introduction were
14 that they wanted to pursue the development of a product
15 for their company, which we began discussing with them
16 via Jeff Messner.
17      Q    When you say for their company, what do you
18 mean by that?
19           REDACTED
20      Q    I guess what I meant was, would this be a
21 product that ING would sell?
22      A    Yes, it would be.
23
24
25           REDACTED

37

1  Q   What was the next major step that you can
2  recall?
3       A   The next major step was trying to develop a
4  relationship with someone who is what's called a wrap
5  provider of insurance products.
6       Q   And explain to me what a wrap provider is,
7  please. And this is with a w-r-a-p, not r-a-p; correct?
8       A   Yes, that is correct. A wrap provider is
9  someone who provides a guaranteed rate of payment on an
10 insurance investment product for a fixed period of time.
11
12 REDACTED
13
14
15      Q   Do you recall approximately when that was?
16      A   I do not.
17
18 REDACTED
19
20
21
22      A   I don't recall. And I wouldn't have
23 knowledge of the exact dates, because the agreement is
24 actually between the insurance carrier and the wrap
25 provider, not with FIDAC.

38

1
2
3  REDACTED
4
5
6
7       Q   Let me try to back into the question I just
8  asked then. When did you -- When was the agreement
9  reached with the insurance carriers with respect to the
10 Premier Fund?
11      A   The various carriers came in at different
12 points in time. It would have been throughout, I guess,
13 2003, because the first funding occurred of Premier at
14 the end of '03, I believe.
15
16 REDACTED
17
18      MS. KENNEY: Do you mean in relation to
19 Premier?
20      MR. BELL: With respect to Premier, yes.
21
22
23 REDACTED
24
25

39

1
2  REDACTED
3
4
5       A   It would have been sometime in '03.
6       Q   But you don't know when?
7       A   I don't know exactly when.
8       Q   Do you know whether that agreement had been
9  reached at the time FIDAC entered into Kazel Exhibit 2?
10      A   No, it would not have been.
11      Q   So it would have been sometime between
12 October 10th of 2002 and the end of '03?
13      A   That is correct.
14
15 REDACTED
16
17
18
19      Q   Now, you said the first funding came in at
20 the end of 2003, correct, for the Premier Fund?
21      A   Yes, I believe that to be correct.
22
23 REDACTED
24
25

40

1
2
3
4
5
6  REDACTED
7
8
9
10
11
12
13
14      Q   Are you involved in issuing invoices for
15 FIDAC's fees in connection with the Premier Fund?
16      A   No, I am not.
17      Q   Do you see those invoices?
18      A   No, I do not.
19      Q   Have you ever seen an invoice that's been
20 issued by FIDAC for fees for its services in connection
21 with the Premier Fund?
22      A   No.
23      Q   Do you know what FIDAC's revenues are as a
24 result of the Premier Fund?
25      A   Yes, I do.

41

```
1      Q   Do you know what FIDAC's revenues are, up to
2   this point, at least, for 2006 as a result of the Premier
3   Fund?
4      A   I believe they're approximately -- You know,
5   I don't know the exact number. I can take an educated
6   guess.
7      Q   That's fair. Let me tell you, you have
8   produced documents to us which we have reviewed that
9   reflect FIDAC's fees. And let me tell you what our
10  calculations are, and tell me whether these sound like
11  they're correct to you.
12     A   Okay.
13
14
15
16
17                  REDACTED
18
19
20
21
22
23          MS. KENNEY: I'm just going to object,
24  because he already said that he doesn't know the answer.
25          THE WITNESS: Yeah, I'm -- I don't -- I
```

42

```
1   don't know.
2   BY MR. BELL:
3
4
5
6
7
8
9
10                  REDACTED
11
12
13
14
15
16
17
18
19                  REDACTED
20
21
22
23
24          MR. NOVACK: Can we go off the record for a
25  second.
```

43

```
1          (Whereupon, a discussion was held off
2           the record.)
3          MR. BELL: Let's go back on the record.
4          We had an off-the-record discussion. It is
5   our understanding that FIDAC will provide to the
6   plaintiffs a written representation with respect to the
7   revenues, meaning the moneys received by FIDAC as a
8   result of the Premier Fund, as well as payments that were
9   made by FIDAC to distributors in connection with the
10  Premier Fund. Is that right, Mr. Novack?
11         MR. NOVACK: Yes.
12         MR. BELL: Let's go back off the record.
13         (Whereupon, a discussion was held off
14          the record.)
15         MR. BELL: There also has been a
16  representation that was off the record that the
17  distributor with respect to the Premier Fund is limited
18  to Gen Advisors. And it was further represented to us
19  off the record that the same representation that will be
20  provided with respect to revenues and distributions in
21  connection with the Premier Fund will also be provided
22  with respect to the Sentry Select funds; correct?
23         MS. KENNEY: The MBS Trusts?
24         MR. BELL: Yes.
25         MR. RUBEN: 1, 2 and 3.
```

44

```
1          MR. NOVACK: However many exist.
2          MR. BELL: However many there are.
3   BY MR. BELL:
4      Q   Mr. Kazel, let me follow up on our
5   off-the-record discussion a little bit. When I used the
6   term revenues earlier with respect to the questions I
7   asked you in connection with FIDAC's revenues from the
8   Premier Fund, I was using revenues to mean moneys
9   received by FIDAC in connection with the Premier Fund.
10  When you gave me answers, did you understand that that
11  was the definition I was using for revenues?
12     A   I was using the term revenues to mean gross
13  receipts of cash to FIDAC.
14     Q   Okay, we were on the same page then. We were
15  just using different words to say that.
16         In addition to those -- Well, strike that.
17         I also understand that there are
18  distributions of cash that FIDAC must make in connection
19  with the Premier Fund; is that correct?
20     A   Yes, that is correct.
21     Q   And the distributions of cash are limited to
22  Gen Advisors? In other words, the only party that FIDAC
23  distributes cash to is Gen Advisors?
24     A   That is correct.
25         MS. KENNEY: With respect to Premier?
```

45

1    MR. BELL: With respect to Premier.
2  BY MR. BELL:
3    Q    And I also understand that at the inception
4  of the fund, FIDAC was distributing cash to Gen Advisors
5  in connection with the -- or, excuse me, in accordance
6  with the finder fee provision of Kazel Exhibit 2.
7    MS. KENNEY: What do you mean by inception of
8  the fund?
9    MR. BELL: At the beginning of the fund.
10    THE WITNESS: As soon as assets came into the
11  fund, we were then making payments as -- out of part of
12  our advisory fees. As we began to earn advisory fees, we
13  would then make payments out of our advisory fees to Gen
14  Advisors, as stated in this agreement.
15  BY MR. BELL:
16
17
18
19
20
21    REDACTED
22
23
24
25

46

1
2
3
4
5
6
7
8
9
10
11
12
13    REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

47

1
2
3
4
5    REDACTED
6
7
8
9
10
11    Q    Do you know what the gross asset value was in
12  the Premier Fund as of the end of 2004?
13    A    No, I do not.
14    Q    Do you know what the gross asset value of the
15  fund was as of June 30th, 2004? When I say do you know,
16  I'm not asking for an exact dollar number. But if you
17  can give me an approximation, that would be fine.
18
19
20
21    REDACTED
22
23
24
25

48

1
2
3    REDACTED
4
5
6
7
8
9
10
11
12
13
14
15
16
17    REDACTED
18
19
20
21
22
23
24    MS. KENNEY: Can we go off the record for a
25  second?

A-246

**49**

1  MR. BELL: Yes.
2  (Whereupon, a discussion was held off
3  the record.)
4  MR. BELL: We've had another off-the-record
5  discussion, and it's our understanding that FIDAC will be
6  producing for us a chart of some sort which will show on
7  a monthly basis the net and gross asset values in the
8  Premier Fund. Again, can we do that with Sentry, as
9  well?
10  MR. NOVACK: Certainly.
11  MR. SINGH: Yes.
12  MS. KENNEY: Agreed.
13  MR. BELL: As well as the Sentry funds.
14  MS. KENNEY: Which would be the MBS Trusts.
15  BY MR. BELL:
16  Q    In addition to payments to Gen Advisors, what
17  other direct costs does FIDAC have in connection with
18  managing the Premier Fund?
19  A    The direct costs we had managing the Premier
20  outside of these would have to do with legal and
21  accounting, some of which are reimbursed by the fund
22  itself, and I should also say fund administration, costs
23  by the fund administrator.
24  MS. KENNEY: Can we just be clear what we
25  mean by the term management. It might be helpful to get

**50**

1  a definition for the purposes of --
2  MR. BELL: What I meant was services that
3  FIDAC provides in connection with the Premier Fund. Is
4  that how you understood my term?
5  THE WITNESS: That is how I understood your
6  term.
7  BY MR. BELL:
8
9  REDACTED
10
11
12
13
14  Q    Okay, yeah. I'm not expecting you to know
15  what those costs are.
16  MR. BELL: And again, Nick, maybe you can
17  help us on this.
18  BY MR. BELL:
19  Q    But what documents exist which would reflect
20  what those direct costs are?
21  A    The Premier audited and unaudited accounts
22  that we produce - unaudited accounts are produced
23  semi-annually and audited accounts annually for Premier -
24  break out the various expenses to the fund.
25  Q    Now, in addition to the costs of operating

**51**

1  the fund, or at least FIDAC's role in operating the fund,
2  there were costs involved in developing the fund that
3  FIDAC incurred; is that correct?
4  A    Yes, that is correct.
5  Q    Generally speaking, what were those costs?
6  Again, I'm not asking for dollars and cents at this
7  point. I'm asking for what kinds of things created costs
8  for FIDAC.
9  A    The kind of things that created costs for
10  FIDAC were dealing with legal counsel, primarily, to help
11  us address both the tax issues in managing an insurance
12  product, as well as there are diversification tests that
13  must be met in managing any insurance product. So legal
14  counsel, both corporate and tax, advised us on the
15  various rules on that. And additionally, we had
16  conversations with accountants on those same related
17  issues as it relates to our investment strategy.
18  Q    Over what period of time did FIDAC incur
19  development costs in connection with the Premier Fund?
20
21  REDACTED
22
23
24  it would have been sometime in '02, we would have engaged
25  counsel to help us review these matters. I couldn't tell

**52**

1  you when specifically. And then the fund was formed in
2  '03, so we would have had those development costs from
3  sometime in '02 till the formation of the fund in '03.
4  Q    Now, my understanding is that this fund is a
5  unique fund in your industry; is that --
6  A    Yes, that is correct.
7  Q    What is it that makes it unique?
8  A    There are -- To our knowledge, there are no
9  leveraged fixed-income funds inside variable life
10  insurance contract policies outside of the Premier Fund.
11  Q    Even today there are none other than the
12  Premier Fund?
13  A    That's correct.
14  Q    Were the costs of developing this fund
15  greater than the costs of developing other funds that
16  you've been involved in?
17  A    Yes, they were.
18  Q    Is that because this was a unique product?
19  A    Yes, it was.
20  Q    Did this product also take longer to develop
21  than other products that you've been involved in?
22  A    Yes, it did.
23  Q    Is that also because it was a unique product?
24  A    Yes, it is.
25  Q    What was Mr. Peskoff's role in the

53

1  development of the Premier Fund?

2      A    Mr. Peskoff really didn't have a role in

3  developing the fund.

4      Q    Wasn't he involved in assisting FIDAC with --

5  I'm going to call them miscellaneous issues that would

6  arise from time to time in connection with the Premier

7  Fund?

8      A    No, he was not.

9      Q    So you're not aware of any involvement that

10  Mr. Peskoff had in the development of the fund at all?

11      A    No.

12      Q    Who else was involved from FIDAC in the

13  development of the Premier Fund?  Obviously, you were.

14      A    Right.  It was primarily myself and my

15  colleague, Jay Diamond.

16      Q    What was Mr. Diamond's position at FIDAC at

17  that time?

18      A    Mr. Diamond was an executive vice president.

19      Q    One of the things I forgot to ask you earlier

20  is what securities licenses you have.

21      A    I do not have any securities licenses.

22      Q    How long do you expect the Premier Fund to

23  last?

24      A    I can't answer that.  Do you want to rephrase

25  your --

54

1      Q    Well, do you expect it to last forever?

2      A    I expect it to last as long as investors want

3  to put money with us.  It's an open-end fund, so it has

4  an infinite life.

5      Q    Are there any comparable funds - and I know

6  this is a unique fund - but are there any other, perhaps,

7  insurance products, insurance-based products that you

8  could use as a guidepost as to how long this fund might

9  go on?

10      A    I'm really not aware if there are any.

11      Q    As long as the fund does go on, though --

12  Strike that.

13          What is the term of FIDAC's agreement as

14  manager of the fund?

15      A    I believe it was an initial one-year

16  agreement that renewed automatically every year.  But I'd

17  have to review the advisory agreement.

18          MS. KENNEY:  Are you talking about the

19  agreement with the fund?

20          MR. BELL:  Yes.

21  BY MR. BELL:

22      Q    So your understanding is that it's an

23  automatically renewable one-year agreement?

24      A    Yes.

25      Q    Are there any plans right now that you're

55

1  aware of to discontinue the fund?

2      A    No.

3      Q    Do you have any reason to believe right now

4  that FIDAC would be terminated as the manager of the

5  fund?

6      A    No, I do not.

7      Q    Did you attend a meeting on Tuesday this week

8  with Jeff Messner?

9      A    No, I did not.

10      Q    Are you aware that there was a meeting on

11  Tuesday of this week between FIDAC representatives and

12  Jeff Messner?

13      A    No, I'm not.

14      Q    I want to shift gears a little bit and talk a

15  little bit about Sentry Select.  Is it -- Let me ask

16  you, first of all, what has been your involvement in the

17  Sentry Select funds on behalf of FIDAC?

18      A    I was involved directly with Sentry in

19  helping design the structure for the initial product with

20  Sentry, as well as the additional products we did with

21  Sentry.

22      Q    And those funds are called, as I understand

23  it, the MBS Trust 1, 2, 3 and 4; is that right?

24      A    The vehicles are -- MBS is the first one.

25  The second one is Adjustable Rate Income Fund I,

56

1  Adjustable Rate Income Fund II, and then SSF, Sentry

2  Select FIDAC fund.

3          MR. NOVACK:  Can we go off the record one

4  minute.

5          MR. BELL:  Yes.

6          (Whereupon, a discussion was held off

7           the record.)

8          MR. BELL:  Let's go back.  I want to make

9  sure I understand your last answer.

10  BY MR. BELL:

11      Q    There are four funds that have been created

12  as a result of the Sentry Select FIDAC relationship; is

13  that correct?

14      A    There are four Canadian Income trusts that

15  have been created, that is correct.

16      Q    Are there any vehicles other than those four

17  Canadian income trusts that have resulted from FIDAC's

18  relationship with Sentry Select?

19      A    Only the other vehicles that are used for us

20  to manage those four investment vehicles.

21      Q    Those four investment vehicles, the Canadian

22  income trusts, the first one was MBS; is that right?

23      A    That is correct.

24      Q    The second one was Adjustable Rate Income

25  Fund I.

A-248

57

1    A    Yes.

2    Q    Correct?

3    A    That is correct.

4    Q    The third one was Adjustable Rate Income Fund

5  II; is that right?

6    A    Yes, that is.

7    Q    And the fourth was called what?

8    A    Sentry Select FIDAC Mortgage Income Fund, or

9  something like that. SSF for short.

10    Q    And explain these funds to me.

11    A    The Canadian --

12        MS. KENNEY: Do you mean trusts, explain the

13  trusts?

14        MR. BELL: Let's start with MBS. Explain the

15  MBS vehicle to me.

16        THE WITNESS: Sure. The first MBS income

17  trust was set up to be the sole limited partner that

18  invests in a Delaware limited partnership called MBS LP.

19  And Sentry Select is the general partner to that limited

20  partnership in Delaware. So you have a publicly traded

21  Canadian income trust that is the sole investor into a

22  U.S. limited partnership. And that was the first vehicle

23  that we set up.

24  BY MR. BELL:

25    Q    And what was your involvement in setting up

58

1  that vehicle?

2    A    My involvement was as advisor to the limited

3  partnership, setting up the agreement between FIDAC to

4  manage the assets in the partnership in conjunction with

5  the terms set out by Sentry Select, the general partner

6  to the partnership.

7    Q    So if I'm understanding this correctly,

8  FIDAC's client, or the party with whom FIDAC has the

9  contractual relationship, is the limited partnership?

10    A    FIDAC's contractual relationship is with the

11  limited partnership, yes.

12    Q    And prior to the formation of the MBS income

13  trust, did you have any discussions with Mr. Peskoff

14  about the possibility of FIDAC and Sentry Select working

15  together on any investment vehicle?

16    A    My discussions were held with Raniero Corsini

17  of Sentry Select.

18    Q    Before you first met with Raniero Corsini,

19  did you have any discussions with Mr. Peskoff about FIDAC

20  working with Sentry Select?

21    A    Yes, I did.

22    Q    Is it your understanding that Mr. Peskoff was

23  responsible for introducing Sentry Select to FIDAC?

24    A    Yes, it is.

25    Q    And that prior to Mr. Peskoff's introduction

59

1  of Sentry Select to FIDAC, FIDAC did not have any

2  relationship with Sentry Select?

3    A    That is correct.

4    Q    And the four vehicles that you've identified,

5  these Canadian income trusts, are marketed in Canada; is

6  that right?

7    A    Yes, they are.

8    Q    And prior to FIDAC becoming involved in these

9  four vehicles, FIDAC had not had any -- had not marketed

10  any products or been the advisor to any products that

11  were marketed in Canada; is that correct?

12    A    Outside of our U.S. public company, Annaly,

13  that is correct.

14    Q    When did you first meet with Mr. Corsini?

15    A    I do not recall the exact date. I guess it

16  would have been sometime in -- I guess it would have

17  been sometime in 2002.

18    Q    That meeting was in Toronto?

19    A    My first meeting with Mr. Corsini was just

20  via telephone.

21    Q    First face-to-face meeting was in Toronto?

22    A    Yes, it was.

23        (Whereupon, the Reporter marked Kazel 3.)

24  BY MR. BELL:

25    Q    We've marked as deposition Exhibit 3 a

60

1  one-page string of two e-mails. The first one is --

2  meaning the one at the bottom of the page, is from you to

3  Mr. Messner and David Hauptman. I'm going back to

4  something that I forgot before. I'm sorry to throw you a

5  curve ball here.

6        That indicates that there was a meeting in

7  February 2002, because I'm looking at the first line of

8  your e-mail that says, gentlemen, glad we were able to

9  get together yesterday. Do you see that?

10    A    Yes, I do.

11    Q    My question is simply whether that is the

12  first meeting between you and representatives at Gen

13  Advisors.

14    A    That was the first meeting I had with

15  representatives from Gen Advisors.

16    Q    So that establishes that date at

17  February 6th, 2002; is that right?

18    A    Yes, that is correct.

19        MR. NOVACK: I'm sorry, I dozed off for a

20  second. Can I have the last -- next-to-last question and

21  answer.

22        (Whereupon, the Reporter read back the

23         referred-to questions and answers.)

24        MS. KENNEY: Can we go off the record.

25        (Whereupon, a discussion was held off

61

1    the record.)
2  BY MR. BELL:
3      Q    When you first met with Mr. Corsini, going
4  back to Sentry Select, did you discuss the structure of
5  the MBS Trust?
6      A    No, we did not.
7      Q    What did you discuss?
8      A    We just discussed what FIDAC's investment
9  strategy was, its track record, its general business, and
10 Mr. Corsini discussed how Sentry manages various income
11 trusts and how they're marketed in Canada. What I would
12 classify as a general get-to-know-you type of meeting.
13     Q    In the conversations that you had with
14 Mr. Peskoff prior to the first meeting with Mr. Corsini,
15 Mr. Peskoff gave you his thoughts on how Sentry Select
16 and FIDAC could work together; it that right?
17     A    Yes, he did.
18     Q    And is it correct that Mr. Peskoff saw some
19 opportunities for FIDAC to work with Sentry Select and
20 enter the Canadian market?
21     A    Yes, he did.
22     Q    What was the result of that first meeting
23 that you had with Mr. Corsini?
24     A    The result of the first meeting was that we
25 thought there was an opportunity for us to work together

62

1  In Canada to develop a product, but that we were going to
2  have to work out the exact structure for the Canadian
3  marketplace.
4      Q    Was Mr. Peskoff present at that meeting?
5      A    I don't believe he was.
6      Q    Was Mr. Peskoff present at any of the
7  meetings that you had with Mr. Corsini or any other
8  representatives of Sentry Select, as far as you can
9  recall?
10     A    I do not believe Mr. Peskoff was present at
11 any meetings I had with Sentry Select.
12     Q    Who else was involved for FIDAC in developing
13 the first Sentry Select fund, the MBS fund or trust?
14     A    I was the primary person involved. But as in
15 any product that we develop, we would bring in our
16 accounting staff and portfolio managers to review the
17 structure we were considering.
18     Q    What was Mr. Farrell's involvement in the
19 development of the MBS Trust?
20     A    Mr. Farrell wasn't particularly involved in
21 the development of the MBS Trust. That work was really
22 left up to me.
23     Q    What was Mr. Farrell's role in developing the
24 relationship between FIDAC and Sentry Select?
25     A    Maybe you can clarify your question a little

63

1  bit.
2      Q    Did Mr. Farrell attend any of the meetings
3  that you had with representatives of Sentry Select?
4      A    Yes, he did.
5      Q    Do you recall whether he attended one meeting
6  or more than one meeting?
7      A    I believe Mr. Farrell just attended the
8  initial meetings that we had.
9      Q    Was he -- Did he attend the first meeting in
10 Toronto?
11     A    Yes, I believe he did.
12     Q    But as far as you can recall, he did not
13 attend any meetings after that meeting with
14 representatives of Sentry Select?
15     A    No, he may have attended one or two after
16 that, but he was not involved in all meetings with Sentry
17 Select.
18     Q    At that first meeting, did you ask
19 Mr. Corsini questions to try to determine what the
20 opportunities were in the Canadian market?
21     A    Yes, I did.
22     Q    Did you -- Were you satisfied after that
23 meeting that there were opportunities in the Canadian
24 market?
25     A    Yes, I was.

64

1      MR. BELL:  Let's mark this as Exhibit 4.
2      (Whereupon the Reporter marked Kazel 4.)
3  BY MR. BELL:
4      Q    Mr. Kazel, we've marked as Exhibit 4 a
5  four-page document, the first page of which is a fax
6  cover sheet from FIDAC, or on FIDAC's letterhead. And
7  the fax to Steve Peskoff from you dated
8  September 25th, 2002; is that right?
9      A    Yes, it is.
10     Q    Is this a fax that you sent to Mr. Peskoff?
11     A    Yes, it is.

REDACTED

20     MS. KENNEY:  Anyone else knows.
21     MR. BELL:  Okay, anyone else knows.
22 BY MR. BELL:
23     Q    Is that right?
24     A    Yes, let me.
25     Q    Now, you were sending this agreement to

65

1  Mr. Peskoff because he had been involved in the
2  introduction of FIDAC to Sentry; correct?
3      A    That is correct.
4          MS. KENNEY:  Objection.  Could we just --
5  Objection to form, but go ahead.
6  BY MR. BELL:
7      Q    You were sending this to him at that time
8  because you considered him part of the FIDAC team, if you
9  will, in connection with Sentry?
10     A    No, that is not correct.
11     Q    You did not consider him part of the Sentry
12 team -- excuse me, the FIDAC team?
13     A    No, because Mr. Peskoff is not part of FIDAC.
14     Q    Well, he was someone that was working on
15 behalf of FIDAC in connection with the marriage between
16 Sentry and FIDAC; correct?
17     A    No, that is not correct.
18     Q    He didn't have any role in putting Sentry and
19 FIDAC together?
20     A    Yes, he did.
21     Q    And he was doing that on behalf of FIDAC,
22 wasn't he?
23     A    No, he was not.
24     Q    Did you think he was doing that for Sentry?
25     A    I cannot comment if he was.

66

1      Q    So you had no idea why he was introducing
2  Sentry to FIDAC?
3      A    He -- I don't know why -- He was
4  introducing Sentry to FIDAC as a potential business
5  opportunity for FIDAC, but he did not do that as asked by
6  FIDAC.
7      Q    But he was doing that for FIDAC's benefit;
8  correct?
9          MS. KENNEY:  Objection to form.
10         MR. BELL:  Okay, you can answer it.
11         THE WITNESS:  Could you repeat the question,
12 please.
13 BY MR. BELL:
14     Q    He was doing that for -- He was introducing
15 FIDAC to Sentry for FIDAC's benefit; correct?
16     A    If FIDAC received a benefit from the
17 relationship, yes.
18     Q    And FIDAC, in fact, has received a benefit
19 from the relationship; is that right?
20     A    Yes, we have.
21
22
23
24
25      REDACTED

67

REDACTED

8          MS. KENNEY:  Objection to form.
9          THE WITNESS:  Yes, that would be correct.
10 BY MR. BELL:

REDACTED

68

REDACTED

8      Q    I assume he asked you that in a phone call.
9      A    Yes, I believe that to be the case.
10     Q    Do you know whether he initiated that phone
11 call or did you initiate the phone call?
12     A    I believe he initiated the phone call.
13     Q    What else did you talk about during that
14 phone call?
15     A    I don't recall.
16     Q    Do you really recall that he did call you and
17 ask for this?
18     A    I would not have voluntarily sent this
19 agreement unless someone asked me for it.
20     Q    So you're making an assumption?
21     A    That is correct.
22     Q    You don't really recall whether he called you
23 and asked you to fax this agreement to him?
24     A    Again, I would not have voluntarily just
25 faxed this to Mr. Peskoff unless I had been asked.

A-251

**69**

1    Q    Well, but my question is whether you have a
2  recollection of a phone call with Mr. Peskoff in which he
3  asked you to send this --
4    A    I do not.
5    Q    -- as opposed to an assumption.
6    A    I do not have a specific recollection.
7    Q    Do you recall having any conversation with
8  Mr. Peskoff about Sentry Select after you had your first
9  meeting in Toronto with Mr. Corsini?
10    A    I'm sorry, can you repeat the question.
11    MR. BELL:  Can you read that back, please.
12    (Whereupon, the Reporter read back the
13    referred-to question.)
14    THE WITNESS:  I don't recall any specific
15  conversations with Mr. Peskoff.
16  BY MR. BELL:
17    Q    You may have already answered this question,
18  but let me ask it again.  Did you ever have any
19  conversation with Mr. Peskoff about fees that he may or
20  may not be entitled to in connection with FIDAC's
21  relationship with Sentry Select?
22    A    I did not have any conversations with
23  Mr. Peskoff relating to fees on the Sentry Select
24  products.
25    MR. BELL:  Let's go off the record for a

**70**

1  minute.
2    (Whereupon, a discussion was held off
3    the record.)
4    (Whereupon, at this time a lunch recess
5    was held.)
6  BY MR. BELL:
7    Q    Mr. Kazel, has FIDAC done any projections of
8  any sort with respect to the -- any of the Sentry funds?
9    A    We have not done any projections.
10    Q    Never have you done any projections?
11    A    We have done --
12    MS. KENNEY:  Can we just clarify.
13  Projections of what?
14    MR. BELL:  Projections of the funds -- Any
15  of the four.  I'm calling them funds, but I understand
16  they may be trusts.
17    THE WITNESS:  Yes.
18    MR. BELL:  But any of the four vehicles'
19  performance.
20    THE WITNESS:  No, we have not done any
21  projections on the funds' performance.
22  BY MR. BELL:
23    Q    To make sure I understand your testimony, you
24  are -- as I understand your testimony, it is that no one
25  on behalf of FIDAC has at any time done any projections

**71**

1  on the performance of any of the four Sentry vehicles.
2    A    I cannot testify that at any time we have
3  not, because I'm sure there have been instances over the
4  last couple years that we have.
5    Q    And who would you be sure had done that?
6    A    One of the portfolio managers would have
7  reviewed the portfolios and made projections.
8    MS. KENNEY:  What do you mean by projections
9  of performance?  Can we just define what kind of
10  performance we're talking about.
11  BY MR. BELL:
12    Q    Well, what kind of projections would the
13  portfolio managers have done?
14    A    The portfolio managers would have made
15  projections on the total returns for the funds.  They
16  would not make projections as it related to assets under
17  management.  Just to reiterate, the portfolio managers
18  would only do projections as it related to the
19  performance or total return of funds.  They don't do
20  projections as it relates to inflows and outflows of
21  capital, meaning increase in assets under management or
22  decrease in assets under management.
23    Q    Now, earlier I think you made reference to
24  something called a return profile.  Have you ever heard
25  that -- Have you heard that term?

**72**

1    A    I don't recall making that reference.
2    Q    Have you ever --
3    A    If you could reiterate that.
4    Q    Have you heard that term used, a return
5  profile?
6    A    Yes.
7    Q    What do you understand the term return
8  profile to be?
9    A    Return profile would be what is the expected
10  return to the investors on one of our investment
11  vehicles.
12    Q    So that's a kind of projection you think that
13  the portfolio managers would have done?
14    A    Yes, that is correct.
15    Q    At some point -- Well, let me ask this:
16  Before FIDAC entered into the letter of intent that has
17  been marked as Exhibit 4, did anyone on behalf of FIDAC
18  do any projections as to the asset value of the fund or
19  funds in order to attempt to determine what FIDAC might
20  be able to earn as a result of managing this fund?
21    A    I don't recall specifically whether we did or
22  not.  But we may have.
23    Q    Typically, isn't that something you would do?
24    A    Yes.  We would prepare what we think the fees
25  or revenue to FIDAC would be based upon certain capital

**A-252**

73

1 raises.

2      Q     And as part of FIDAC's annual budgeting

3 process, doesn't FIDAC do some sort of projections in

4 order to determine what revenues it expects to receive

5 from the funds it manages?

6      A     No, FIDAC does not do annual budgeting for

7 its business.

8      Q     Does Annaly do budgeting on an annual basis?

9      A     No, it does not.

10      Q     Do you do periodic budgeting?  If I take the

11 word annually out of that question, does that change your

12 answer?

13      A     No, it does not.  And to clarify, budgeting

14 in the asset-management business is very difficult,

15 because your assets can go up and down, so you have no

16 way of accurately projecting those.

17      Q     So as I understand what you've said, you

18 think that there might have been some projections as to

19 the asset value and, therefore, what FIDAC could expect

20 to receive in fees prior to the time that you entered

21 into the letter of intent?

22      A     Could you clarify what you mean by asset

23 value.

24      Q     The asset value in the funds.

25      A     Again, we wouldn't make projections related

74

1 to the asset value in the funds in considering launching

2 a new product, whether it be Sentry Select or any.  What

3 we would do, though, is make assumptions based on various

4 amounts of money that Sentry, in that example, their

5 particular clients, if they were to raise a certain

6 amount of money for us, what the fee contribution would

7 be to us.

8      Q     Okay.  And have those projections been

9 updated at any time since you first did them prior to the

10 time you entered into the letter of intent?

11      A     No, they have not.

12      Q     Have you done any projections or estimates of

13 how long any of the Sentry funds or vehicles might last?

14      A     I think the only time we did estimates of the

15 duration of the Sentry funds would have been in context

16 with the acquisition of FIDAC by Annaly.  And at that

17 time there would have been a schedule showing what the

18 duration of the assets under management would be.

19      Q     Was that part of the valuation process that

20 Annaly undertook of FIDAC?  In other words, is that part

21 of Annaly's attempt to value FIDAC?

22           MS. KENNEY:  Objection; form.

23           THE WITNESS:  The general matrix for valuing

24 any asset manager would be the volatility and growth or

25 lack of growth in their assets under management.  So that

75

1 was one of the considerations for Annaly in valuing

2 FIDAC.

3 BY MR. BELL:

4      Q     Were you involved in preparing those

5 projections?

6      A     Yes, I was.

7      Q     What was the estimated life of the Annaly

8 vehicles -- excuse me, the Sentry vehicles?

9      A     I wouldn't recall specifically, but I would

10 presume we had just used the -- They're ten-year trusts,

11 for most cases, so we would have just used the end of

12 their, you know, their final maturity on the trusts.

13      Q     Now, it's possible they could go out beyond

14 ten years, though; correct?

15      A     They can only be extended beyond ten years

16 with shareholder approval.

17           MR. BELL:  Let's go off the record for a

18 minute.

19           (Whereupon, a discussion was held off

20           the record.)

21           MR. BELL:  Let's go back on the record.

22           We just had a brief off-the-record

23 discussion, and Mr. Singh represented that as part of the

24 representation that FIDAC will provide to us with respect

25 to income and distributions will also be the percentage

76

1 of FIDAC's revenues that the revenues the various

2 investment vehicles represent.

3 BY MR. BELL:

4      Q     Excuse me for jumping around here a little

5 bit, but I want to go back and follow up on something we

6 talked about with respect to Premier earlier.

7

8

9

10

11

12

13

14

15 REDACTED

16

17

18

19

20

21

22

23

24

25

A-253



**A-254**

81

REDACTED

82

REDACTED

7  Q    That's fair enough. I want to make sure I'm
8  clear on something you testified to before. Have you
9  ever had any conversation with Mr. Peskoff at any time
10 about the fees that he might receive or might not receive
11 from FIDAC?
12    A    I have not had any specific conversations
13 with him regarding the fees on FIDAC.
14    Q    Have you had any conversation with
15 Mr. Farrell about the fees that Mr. Peskoff might receive
16 or might not receive from FIDAC?
17    A    Yes, I have.
18    Q    When was the first of those conversations
19 that you can recall?
20    A    I believe the first conversation was after
21 Mr. Farrell sent payment to Steve and issued payment to
22 him or sent him a check.
23        (Whereupon, the Reporter marked Kazel 5.)
24 BY MR. BELL:
25    Q    We've marked as Exhibit 5 a four-page

83

1  document -- excuse me, five-page document, the first page
2  of which at the top is a photocopy of a check from FIDAC
3  to Underhill Investments dated December 22nd, 2003. Is
4  that the check that you were referring to a moment ago in
5  your answer when you made reference to a payment?
6     A    Yes, it is.
7     Q    Were you involved in the issuance of this
8  check to Underhill Investments?
9     A    No, I was not.
10    Q    Have you ever seen this check before?
11    A    Only as part of the -- in the response to a
12 letter I received from Mr. Peskoff. I then inquired to
13 what kind of payments had been made to him. And that was
14 the first time I became aware of, you know, the check.
15    Q    Let me ask you to look at the handwriting on
16 the first page of the exhibit that is in the stub that
17 apparently accompanied the check. Do you see the
18 handwriting that seems to say, for Canadian deal with
19 Sentry Select, this is a one-time finder's fee?
20    A    Yes, I see that.
21    Q    Do you know whose handwriting that is?
22    A    I would presume it to be Mr. Farrell's.
23    Q    Are you familiar with Mr. Farrell's
24 handwriting?
25    A    Yes, I am.

84

1     Q    Do you recognize that to be his handwriting?
2     A    Yes.
3     Q    How long after -- Well, let me back up.
4  This check is dated December 22nd, 2003. And you
5  testified a few minutes ago that the first conversation
6  you had with Mr. Farrell about fees to Mr. Peskoff or
7  Underhill was sometime after the issuance of this check;
8  correct?
9     A    Yes.
10    Q    How long after the issuance of this check?
11    A    I don't recall when it would have been.
12    Q    Do you know -- Do you remember what caused
13 you to have that conversation with Mr. Farrell?
14    A    Yes. I received a letter from Mr. Peskoff.
15    Q    We'll get to that in a minute. When you
16 talked with Mr. Farrell about the payment to Mr. Peskoff,
17 or I should say what he was entitled to receive or not
18 receive, did he tell you at that time that he had sent a
19 check in the amount of $30,000 to Mr. Peskoff?
20    A    Yes, he did.
21    Q    Did he tell you that it was a one-time
22 finder's fee for the Sentry Select deal?
23    A    Yes, he did.
24    Q    So did he tell you essentially what is in his
25 handwriting on Exhibit 5, meaning that the fee was for

85

1  the Canadian deal with Sentry Select and a one-time
2  finder's fee?
3      A    Yes, he did.
4      Q    Now, earlier I thought you indicated that you
5  did not regard Mr. Peskoff as a finder for FIDAC; is that
6  right?
7      A    That is true.
8      Q    But in that conversation, Mr. Farrell
9  indicated to you that the payment was a finder's fee;
10  correct?
11      A    He did.
12      Q    When you talked with Mr. Farrell for the
13  first time about this $30,000 check that we've marked as
14  Exhibit 5, did he tell you that this check did not make
15  any mention of Premier or Gen Advisors?
16      A    He did not discuss Premier with me.
17      Q    Did he tell you that the check was a payment
18  for the introduction to Sentry Select?
19      A    He just told me that this one-time payment
20  had been made.
21      Q    Do you recall anything else from that
22  conversation?
23      A    No, I do not.
24          MR. NOVACK:  Would you keep your voice up a
25  little bit.  Your voice is almost --

86

1          THE WITNESS:  Sorry.
2  BY MR. BELL:
3      Q    You don't recall anything else from that
4  first conversation with Mr. Farrell?
5      A    No, I do not.
6      Q    Did he tell you during that conversation or
7  at any other time that Mr. Peskoff had agreed that the
8  $30,000 payment was all he was entitled to?
9      A    No, he did not.
10      Q    Now, you've mentioned that there were four
11  vehicles that FIDAC manages for Sentry Select.  The first
12  one you said was the MBS Trust fund; correct?
13      A    That is correct.
14      Q    Was that the only one of the four vehicles
15  that was formed as of December 22nd, 2003?
16      A    I don't recall the launch dates of the other
17  three investment vehicles.  It may have been the only one
18  that was launched at that point in time.
19          (Whereupon, the Reporter marked Kazel 6.)
20  BY MR. BELL:
21      Q    Exhibit 6 is a one-page letter dated
22  April 12th, 2004, from Steve Peskoff to you; correct?
23      A    Yes, it is.
24      Q    Is this the letter you were referring to a
25  few minutes ago when you said that you had received a

87

1  letter from Mr. Peskoff?
2      A    Yes, it is.
3      Q    As I understand your prior testimony, prior
4  to receiving this letter you had not had any conversation
5  with Mr. Peskoff about the fees that he might be entitled
6  to; is that correct?
7      A    Yes, that's correct.
8      Q    Let me call your attention first of all to
9  the second paragraph in this letter.  There are -- I'm
10  not going to read the whole paragraph, but there are some
11  statements that Mr. Peskoff makes about the Premier
12  Fund.  I want you to just take a minute to read that
13  paragraph, and then I want you to tell me whether
14  anything in that paragraph is inaccurate.
15      A    Okay.  Well, some of these numbers in here
16  are his comments.  I can't tell you whether they're
17  accurate or not.
18      Q    As you sit here right now, you're not sure
19  any of them are inaccurate, but you're also, as I
20  understand it, not prepared to agree that they're all
21  accurate; is that right?
22      A    That is correct.
23      Q    Aside from the numbers that are in there, is
24  any of that inaccurate that's in paragraph 2 of Kazel
25  Exhibit 6?

88

1      A    No.  The other numbers -- the other language
2  seems to be accurate.
3          MS. KENNEY:  Could we just be clear for the
4  record what you're talking about.  Which portions, just
5  for the record?
6          MR. BELL:  I'm talking about all of paragraph
7  2 of Kazel Exhibit 6.
8          MS. KENNEY:  Right.  I just meant if the
9  witness could tell us, just to be clear, just so we're
10  all on the same page.
11          MR. BELL:  Well, no, I think that's fine.
12  Again, if you want to follow up with questions, you're
13  free to.
14  BY MR. BELL:
15      Q    When you got this letter from Mr. Peskoff,
16  did you understand from reading it that he believed that
17  he was still owed fees from FIDAC?
18      A    Can you read that back.
19          (Whereupon, the Reporter read back the
20  referred-to question.)
21          THE WITNESS:  Yes.
22  BY MR. BELL:
23      Q    What did you do after you received this
24  letter?
25      A    After I received this letter, I went to

89

1   discuss it with Mr. Farrell, because I had not had
2   discussions directly with Mr. Peskoff regarding any
3   payments.
4       Q     And is that when the conversation between you
5   and Mr. Farrell occurred that you've already testified
6   to?
7       A     Yes.
8           MS. KENNEY:  Could we just specify what
9   conversation that was.
10          MR. BELL:  I think it's clear enough.
11  BY MR. BELL:
12      Q     What else did you do, if anything, after you
13  received this letter, other than talk to Mr. Farrell?
14      A     After I spoke to Mr. Farrell, then I drafted
15  a response to Mr. Peskoff's letter.
16      Q     Did you look at any documents after receiving
17  the letter from Mr. Peskoff and before you drafted your
18  response?
19      A     I saw the payment, the check that we
20  discussed earlier that had been made.
21      Q     Did you talk with anyone other than
22  Mr. Farrell?
23      A     I spoke with Kathryn Fagan, our CFO, who
24  showed me the check.
25      Q     Did Ms. Fagan say anything to you about fees

90

1   that were owed or not owed to Mr. Peskoff?
2       A     No, she did not.
3       Q     So all she did was show you the check?
4       A     That is correct.
5       Q     Did anyone give you any explanation of the
6   check?
7       A     Clarify what you mean by explanation.
8       Q     Did anyone tell you anything about the -- why
9   the check was issued, why it was issued when it was
10  issued, what was the basis for the $30,000 number, or
11  anything of that nature?
12      A     The only person I had a conversation with was
13  Mr. Farrell, and he, you know, told me essentially what
14  is stated on the check here, that he had discussed with
15  Mr. Peskoff that he would issue him this one-time payment
16  of $30,000.
17          (Whereupon, a discussion was held off
18          the record.)
19  BY MR. BELL:
20      Q     You've been given a copy of what was
21  previously marked as Deposition Exhibit 16 at
22  Mr. Peskoff's deposition.  This is your letter of
23  April 20th, 2004, responding to Mr. Peskoff's letter of
24  April 12th, 2004; is that right?
25      A     Yes, that is correct.

91

1       Q     Was Mr. Farrell aware that you were sending a
2   letter to Mr. Peskoff in response to Mr. Peskoff's
3   April 12th, 2004 letter?
4       A     Yes, he was.
5       Q     Did you draft this letter --
6       A     Yes, I did.
7       Q     -- that is Peskoff Exhibit 16?
8       A     Yes, I did.
9       Q     Did Mr. Farrell or anyone else at FIDAC
10  review the letter before you sent it out?
11      A     I may have shown it to Mr. Farrell before I
12  sent it out.
13      Q     But you're not sure whether you did or not?
14      A     I'm not sure.
15      Q     Now, at the end of the second paragraph of
16  this letter, you indicate that FIDAC is dedicating
17  limited resources to the further marketing of this
18  product.  Do you see that?
19      A     Yes, I do.
20      Q     What did you mean by that?
21      A     The limited resources really refer to myself
22  and my colleague, Jay Diamond.
23      Q     In what way were the resources limited?
24      A     Well, we were limiting our daily involvement
25  and working with Jeff Messner or Gen Advisors in the

92

1   marketing of this product.  It was taking up too much of
2   our time, and we had other business activities that we
3   needed to focus on.
4       Q     So it wasn't like you actually took -- FIDAC
5   didn't take certain people that had been working on this
6   product and shifted them away, entire people away.  They
7   just shifted some of your time to other projects; is that
8   right?
9       A     Yes, that is correct.
10      Q     Now, despite that dedicating limited
11  resources, the fund ended up doing well; correct?
12      A     Could you define well.

REDACTED

93



REDACTED

18    Q    Now, the people that were at Mr. Baptista's
19  deposition a couple days ago will have to correct me if
20  I've got this wrong, but it's my understanding that
21  Mr. Baptista testified that the Premier Fund is either
22  the first or second most successful insurance-based fund
23  that's been launched in the last four years. Assuming
24  I've got his testimony right, would you agree with that
25  or disagree with that?

94

1    A    I have no way to prove or disprove that
2  statement.
3    Q    In the -- Strike that.
4        (Whereupon, the Reporter marked Kazel 7.)
5  BY MR. BELL:
6    Q    Exhibit 7 is an April 7th, 2005 letter from
7  Mr. Peskoff to Mr. Farrell. Have you seen that letter
8  before today?
9    A    The first time I saw this letter was in the
10  compilation of the documents for this.
11    Q    So at the time this was -- Back in April of
12  2005, you didn't see this letter?
13    A    I did not see this letter.
14    Q    Did you have any communication with
15  Mr. Farrell about the fact that Mr. Peskoff had sent him
16  a letter?
17    A    No, I did not.
18    Q    So is it your recollection that you didn't
19  have any communications with Mr. Farrell in or about
20  April of 2005 regarding Mr. Peskoff?
21    A    I don't recall if we spoke about Mr. Peskoff
22  back then.
23    Q    Let me -- This might refresh your
24  recollection.
25        (Whereupon, the Reporter marked Kazel 8.)

95

1  BY MR. BELL:
2    Q    I'll give you a moment to look at that.
3    A    Okay.
4    Q    Exhibit 8 is a one-page string of two
5  e-mails. The first one appears to be from Mr. Farrell to
6  you and Ms. Fagan dated April 9th, 2005, and the one at
7  the top is your reply on April 10th, 2005; is that right?
8    A    Yes, that is correct.
9    Q    Seeing this, do you recall that you did have
10  some communication with Mr. Farrell about the fact that
11  he had received a communication from Mr. Peskoff in April
12  of 2005?
13    A    I don't recall us having a conversation
14  outside of this e-mail communication, though.
15    Q    My question might not have been clear. But I
16  was really looking for any communication that you had.
17    A    Oh.
18    Q    So you did have this one, you know, very
19  limited communication, at least; is that right?
20    A    Yes, that is correct.
21    Q    Does this refresh your recollection to think
22  that you had any communication of any sort with
23  Mr. Farrell about the letter he received in April of 2005
24  from Mr. Peskoff, other than this very brief e-mail
25  exchange?

96

1    A    I don't recall if I did. I only remember
2  gathering materials to provide to Nick, as stated in the
3  e-mail.
4    Q    So you don't recall having any conversation
5  with Mr. Farrell about -- about the fact that he had
6  gotten the letter from Mr. Peskoff or any response to the
7  letter?
8    A    No, I'm sorry, I don't recall.
9        MR. BELL:  Let's take a short break.
10        (Whereupon, at this time a recess was
11        held.)
12  BY MR. BELL:
13    Q    Let me ask you to go back and look at your
14  April 20th, 2004 letter --
15    A    Yes.
16    Q    -- which was the document that was previously
17  marked as Peskoff Exhibit 16. Again, looking at the
18  language at the end of the second paragraph where you
19  make reference to limited resources, did that change at
20  some point in time after April 20th, 2004?
21    A    Can you clarify.
22
23
24
25

REDACTED

97

**REDACTED**

5  Q    Did the time that you spent on Premier or the
6  time Mr. Diamond spent on Premier increase after
7  April 20th, 2004?
8  A    No, it did not.
9  Q    Now, looking at the last paragraph of Peskoff
10  Exhibit 16, which is your letter of April 20th, 2004, you
11  indicate that -- I mean, let me try to paraphrase this
12  and make sure you agree with my paraphrase.
13       You're essentially telling Mr. Peskoff there
14  that FIDAC doesn't intend to pay him any more money for
15  MBS Trust and Premier because they haven't been
16  successful, he had limited involvement, and he got
17  that $30,000 check at the end of 2003.
18       MS. KENNEY:  Object to form.
19  BY MR. BELL:
20  Q    Is that right?
21  A    I think you're interpreting my comments that
22  I have there.
23  Q    No, I definitely am.  The question is whether
24  I'm interpreting them accurately.
25  A    I don't know if I understand your question

98

1  correctly, because I think the statements there are
2  straightforward.
3       MR. BELL:  Can you read back the question.
4       (Whereupon, the Reporter read back the
5       referred-to question.)
6       THE WITNESS:  Yes, that would be correct.
7       MS. KENNEY:  You got my objection on that?
8       MR. BELL:  Yes.
9  BY MR. BELL:

**REDACTED**

13  Q    Is it still your view that Mr. Peskoff is not
14  entitled to any payment on the MBS Trust and Premier
15  Funds, even though they have become far more successful?
16  A    Yes, that is my view.
17  Q    So did the -- Was the success of the funds a
18  reason why Mr. Peskoff was not in your view owed any more
19  money as of April 20th, 2004?
20  A    That was Mr. Farrell's view --
21       MS. KENNEY:  Objection.
22       THE WITNESS:  -- which I was reiterating in
23  my letter.
24  BY MR. BELL:
25  Q    Did you have a view as to whether or not

99

1  Mr. Peskoff was entitled to any more money from FIDAC as
2  of April 20th, 2004?
3  A    Yes, I did have a view.
4  Q    What was your view?
5  A    My view is that I didn't think he needed to
6  receive any additional compensation either.
7  Q    And was one of the reasons why you didn't
8  think that he was entitled to any additional compensation
9  the fact that at that time Premier and MBS Trust had not
10  been successful?
11  A    That was one of the reasons, but not the only
12  reason.
13  Q    Were the other reasons that he had limited
14  involvement and that he had already received a $30,000
15  check?
16  A    Yeah, those would be two separate and
17  distinct reasons.
18  Q    So there are three reasons we're talking
19  about, as I understand it, right - the success of the
20  funds, his involvement in the funds, and the payment that
21  he received in December of 2003; correct?
22  A    Yes.

**REDACTED**

100

**REDACTED**

5  Q    Gen Advisors has.  Thank you.
6       As far as Mr. Peskoff's involvement with the
7  MBS Trust and the Premier Funds, his involvement, number
8  one, was to introduce FIDAC to, in the case of MBS Trust,
9  Sentry, and in the case of Premier, Gen Advisors;
10  correct?
11  A    Yes, his involvement was the introduction of
12  those two entities or individuals.
13  Q    He also had the original concept for the MBS
14  Trust fund; correct?
15  A    Could you clarify what you mean by concept.
16  Q    Yeah.  It was his idea that FIDAC and Sentry
17  together could put together a fund that would be marketed
18  in Canada; is that right?
19  A    No.  I would say more accurately that his
20  idea was that Sentry would be a business partner for us
21  that could help distribute our product in Canada.
22  Q    So that concept -- Strike that.
23       So he was involved in at least the general
24  concepts of FIDAC's relationship with Sentry; correct?
25  A    He was involved in the concept, just as any

101

1  other person introduces me to any distributor of
2  financial products, because that's what Sentry is.
3      Q    And that introduction and that
4  conceptualization, if you will, are valuable to FIDAC,
5  are they not?
6      A    The introduction was valuable to FIDAC.
7          MS. KENNEY:  Could we clarify what
8  valuable –
9          MR. BELL:  Again, you can ask that question
10  if you want to.
11  BY MR. BELL:
12      Q    In your experience, do you think that
13  Mr. Peskoff's introduction of FIDAC to Gen Advisors is
14  worthy of some compensation?
15      A    In my experience, generally people that make
16  introductions in the normal course of a business
17  relationship do not receive fees.
18      Q    Is it your understanding that Mr. Peskoff
19  expected to be paid for the introduction he made of FIDAC
20  to Gen Advisors?
21      A    I don't know what Mr. Peskoff's expectations
22  were.
23      Q    Did you think that he was doing that as a
24  favor?
25      A    I can't opine to what he was thinking.

102

1      Q    Did he – Strike that.
2          Why do you say that in your experience
3  persons who make business introductions are typically not
4  paid?
5      A    Well, in my experience, I give colleagues and
6  past colleagues business introductions all the time.
7  It's the way you help friends out and other business
8  associates.  I don't expect any form of remuneration for
9  that.  It's just a way of doing business.
10      Q    Is it your understanding that that was the
11  relationship between FIDAC and Mr. Peskoff, or don't you
12  have a basis for opining on that?
13      A    I don't really have a view on what
14  Mr. Peskoff thought the relationship was with FIDAC,
15  because Mr. Peskoff's primary relationship was with
16  Mr. Farrell at the firm.  So I don't know if he was
17  acting, you know, as I just said, as a general business
18  colleague in making introductions or he was looking for
19  compensation out of all of this.
20      Q    You may have answered this before, but are
21  you aware of the fact that FIDAC did pay
22  Underhill/Mr. Peskoff for his introduction of FIDAC to
23  FBR?
24      A    Yes.  And there's an agreement you showed me
25  here to that extent.

103

1      Q    Well, I think – But correct me if I'm
2  wrong, but you agreed with me that that agreement is not
3  limited to FBR.  In fact, it makes no mention of FBR;
4  correct?
5      A    I said it's not specific to FBR, that's
6  correct, because it doesn't make any reference to FBR.
7          (Whereupon, a discussion was held off
8              the record.)
9  BY MR. BELL:
10      Q    Were you in attendance at the meeting in
11  October 2002 attended by Mr. Baptista, Mr. Farrell, and
12  perhaps others?  In other words, I'm asking whether you
13  were there.
14      A    I don't recall if I was in attendance at the
15  meeting.
16      Q    Do you recall attending any meeting at which
17  Mr. Baptista and Mr. Farrell were present in which
18  payment to Mr. Peskoff was discussed?
19      A    No, I don't recall any meeting that that was
20  discussed.
21      Q    Did you ever have any discussion with
22  Mr. Baptista about payment to Mr. Peskoff?
23      A    No, I have had no discussions with
24  Mr. Baptista.
25      Q    About that?

104

1      A    Regarding payment, right.
2      Q    As I understand your – FIDAC's
3  arrangement – Strike that.
4          As I understand it, Mr. Baptista testified
5  the other day that there was a meeting at which you were
6  present in which payments to Mr. Peskoff were discussed.
7  And one of the things that was apparently said at that
8  meeting was that Mr. Baptista and Mr. Farrell didn't want
9  Mr. Peskoff double-dipping; in other words, getting paid
10  by both Gen Advisors and FIDAC.  Do you recall ever
11  hearing that phrase used, double-dipping, in any meeting
12  that you attended with Mr. Baptista or Mr. Farrell?
13      A    I'm sorry, I don't recall.
14      Q    Did you take notes of your meetings with
15  Mr. Baptista?
16      A    I may have.
17      Q    Did you review any of your notes before
18  testifying today in preparation for your deposition?
19      A    No, I did not.
20      Q    Did you review any of your files?
21      A    No, I did not.
22      Q    Did you talk to anyone other than counsel
23  about your deposition today?
24      A    No, I did not.
25      Q    You didn't talk to Mr. Farrell about it?

A-260



105

1  A  No. I've been traveling this whole week.
2  Q  But, I mean, you didn't talk to him by cell
3  phone or even communicate by e-mail?
4  A  No, I did not.
5     MR. NOVACK:  Tom, your question was like in
6  the last day or so. Maybe two months ago when they got a
7  notice of deposition, they may have said that they're
8  being deposed. That was not how I interpreted the
9  question, and I don't think he did.
10    MR. BELL:  My question was in preparation for
11 his deposition.
12    MR. NOVACK:  I wasn't sure, because the way
13 you asked it was very broad; did you ever talk about your
14 deposition.
15    MR. BELL:  Let me just check my notes for a
16 minute, please.
17    I think we're finished.
18    MS. KENNEY:  I think we need to get on the
19 record as far as all the discussions about fees are
20 protected by the confidentiality order that are on the
21 record.
22    MR. BELL:  The discussions about fees not
23 only with Mr. Peskoff but with Gen Advisors and --
24    MS. KENNEY:  Yes, everything, all those
25 discussions, and about FIDAC's business practices as

106

1  being confidential in accordance with the terms of the
2  order.
3     MR. BELL:  I think what's going to be helpful
4  is for you to designate the pages of the deposition
5  transcript as confidential.
6     MR. NOVACK:  So the understanding is nobody
7  releases it until we designate.
8     MR. BELL:  Right. I think that's the terms
9  of the confidentiality agreement in any event.
10    (Whereupon, a discussion was held off
11    the record.)
12    (Whereupon, at 2:28 p.m. the deposition was
13    concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

107

1          C E R T I F I C A T E
2    I have read my deposition, and it is true and
3  correct to the best of my knowledge and belief, except
4  for any corrections listed on the enclosed Errata Sheet.
5
6
7
8           RONALD D. KAZEL
9
10 _____
   Witness
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

108

1          CERTIFICATE
2    I, Roxanne Weaver, the officer before whom
3  the deposition of RONALD D. KAZEL was taken, do hereby
4  certify that RONALD D. KAZEL, the witness whose testimony
5  appears in the foregoing deposition, was duly sworn by me
6  on Thursday, December 14, 2006, and that the transcribed
7  deposition of said witness is a true record of the
8  testimony given by him; that the proceedings here are
9  recorded fully and accurately; that I am neither attorney
10 nor counsel for, nor related to, any of the parties to
11 the action in which this deposition was taken; and
12 further that I am not a relative of any attorney or
13 counsel employed by the parties, nor financially
14 interested in this action.
15
16
17    _____
      Roxanne Weaver, RPR, CRR
18
      COMPUTERIZED REPORTING SERVICES, INC.
19
      Notary Public in and for the
20    Commonwealth of Pennsylvania
21    My Commission expires August 9, 2007.
22
23
24
25



**Page 1**

```
                                                    1
         IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT      : Civil Action
CORPORATION, by and through : NO. 06-0099-SLR
Stephen D. Peskoff as     :
successor in interest, and :
STEPHEN D. PESKOFF,       :
individually,             :
            Plaintiffs  :
                          :
        vs.               :
                          :
FIXED INCOME DISCOUNT     :
ADVISORY COMPANY,         :
            Defendant     :


                ─────────────


                Oral Deposition of
               MICHAEL A.J. FARRELL


        Date:  Friday, December 15, 2006

        Time:  9:33 a.m.

        Place: Stevens & Lee, P.C.
               1818 Market Street
               29th Floor
               Philadelphia, PA  19103




        COMPUTERIZED REPORTING SERVICES, INC.
        By:  Roxanne Weaver, RPR, CRR
               3449 Penn Avenue
             Sinking Spring, PA  19608

            Phone:  (610) 678-6652
```

**Page 2**

```
APPEARANCES:


        Stevens & Lee
        By:  G. Thompson Bell, III, Esq.
        111 North 6th Street
        P.O. Box 679
        Reading, PA  19603-0679
                and

        Ruben & Aronson, LLP
        By:  Robert L. Ruben, Esq.
        4800 Montgomery Lane
        Suite 150
        Bethesda, MD  20814
             For the Plaintiffs


        Kirkpatrick & Lockhart Nicholson Graham LLP
        By:  Gerald A. Novack, Esq.
        599 Lexington Avenue
        New York, NY  10022-6030
             For the Defendant

ALSO PRESENT:

        R. Nicholas Singh, Esq.,
          General Counsel, FIDAC


                ─────────────


                INDEX

Witness         Examined by        Page

Michael A.J. Farrell   Mr. Bell       4
                Mr. Novack       102
```

**Page 3**

```
                EXHIBIT INDEX

                                        Page
Farrell
  1   Copies of invoices and checks      13
  2   12/16/03 e-mail from Mr. Farrell to  81
        Mr. Kazel
  3   Series of e-mails                  94


        (Marked question, page 73, line 3.)
```

**Page 4**

```
            P R O C E E D I N G S
        (It is hereby stipulated by and between
    counsel that all objections except as
    to the form of the question be
    reserved until the time of trial.)
        MICHAEL A.J. FARRELL
was called as a witness and, having been duly sworn by
the Reporter-Notary Public, was examined and testified as
follows:
BY MR. BELL:
    Q    Good morning, Mr. Farrell.
    A    Good morning.
    Q    How are you today?
    A    Good, thank you.
    Q    We met a few minutes ago.  As you know, along
with Rob Ruben, I represent Steve Peskoff and Underhill
Investments in a claim that's been brought against
FIDAC.
```

REDACTED

**5**

**REDACTED**

Q    Well, as you may remember then, essentially what this is is a question-and-answer session. And my job is to ask questions, hopefully fairly clearly. But if I don't make any of my questions clear, please let me know, and we'll do our best to clarify them.

Your job is to answer the questions to the best of your ability and recollection. Please try to answer the questions verbally as opposed to nodding your head or shrugging your shoulder, because the court reporter has to take down your answer.

Please try to wait until I finish my question before giving your answer, and I'll try to do the same with respect to your answers, so we're not both talking at the same time; okay?

A    Okay. Thank you.

Q    What is your current position with FIDAC?

A    I'm the chairman, CEO, and president.

Q    How long have you held those three titles?

A    I'm the founder of the company, and I would guess that that goes back to the beginning, 1994.

**6**

Q    Have you been employed by Annaly at any point in time?

A    Yes. That's another company that I founded in 1996.

Q    What have your positions with Annaly been?

A    Chairman, chief executive officer, and president.

Q    Do you hold those titles for Annaly today?

A    Yes, I do.

Q    So you have held those titles at all times since Annaly was founded in 1996?

A    I think I added president after someone left the firm. I just merged the positions, but I don't recall exactly when.

Q    When did you meet Steve Peskoff?

A    1996.

Q    What were the circumstances?

A    Steve was a contact of a bond trader that I knew that had -- he had a relationship at FBR. We thought he worked at FBR at the time.

**REDACTED**

**REDACTED**

**7**

A    Yes. Through that connection of Steve to this bond trader, they reached out to us. We went down there in the summer of 1996.

Q    When you say you went down there, you went to FBR?

A    We went to FBR. We met in their offices in a conference room, myself and I, think, at least one other individual. Met Steve really for the first time there. He sat in the conference room with all the FBR principals, and we went through our track record. And they were very interested in putting money into the fund. Simultaneously, they were very interested in our overall business model and asked at the conclusion of the meeting was there anything that we ever had done domestically that they could somehow wrap up for us and put into the U.S. markets. And that's where the relationship began to take place.

**REDACTED**

Q    But after that occasion, you developed a relationship with Mr. Peskoff; is that right?

A    Well, really, our relationship was with FBR. We did not know at the time that Steve was not an

**8**

employee of FBR. His offices were located in FBR. The staff that worked with him, mostly junior staff, I think, had FBR business cards actually who were assigned to work with him, and we just assumed that he was part of FBR.

Q    My question really was more toward the relationship.

A    Sorry.

Q    Although I understand you may have had a relationship with FBR, you also developed -- you personally developed a relationship with Mr. Peskoff, didn't you?

A    Yes, I did.

Q    And the relationship was, as I understand it, really both a business and a personal relationship over the next few years.

**REDACTED**

Q    What were your dealings with Mr. Peskoff in connection with those transactions with FBR?

A    Essentially, the first meeting was --

9

1    MR. NOVACK: Let me just say, I think he's
2   asking for a general overview as opposed to each detail.
3   Then if he wants to get more, he'll get it. I just think
4   he's giving you more detail than you want.
5    MR. BELL: No, he's doing great. Thanks.
6
7   **REDACTED**
8
9
10
11    In the first meeting that we had at our
12   office, which was represented to us as a due-diligence
13   meeting by FBR, Steve sent up a very junior young guy to
14   help manage that meeting. Steve did not attend it, nor
15   did any of the FBR principals. And I ended the meeting
16   very quickly, because I was very angry about it. I had
17   brought in underwriter's counsel, issuer's counsel, and,
18   you know, the level of detail and the level of
19   professionalism in that meeting was not up to the
20   standards that I as a Wall Street professional had been
21   used to.
22    So, you know, at that point I had gone back
23   to Steve and I said, you know, you're wasting my time,
24   this is not a good thing here. I've just spent three or
25   four thousand dollars in legal fees, and you sent up a

10

1   junior assistant, and he has no clue how to run this
2   process.
3    That was the first meeting. Then there was
4   some backtracking, and FBR at that point brought up other
5   people to do the due diligence who were more in the
6   banking division.
7   BY MR. BELL:
8    Q    What was the nature of your contacts? And
9   let's try to put a time period on this; from 1996, which
10   I understand is when you first met Mr. Peskoff. Is that
11   right?
12    A    Yes. Summer of '96, I would say.
13    Q    From 1996 through 1999, what was the nature
14   of your dealings with Mr. Peskoff?
15    A    Once the FBR people took over the
16   due-diligence process for Annaly and the day-to-day work
17   that was done in bringing us to the public markets first
18   in a private placement transaction and then eventually to
19   the IPO, we really did not have very much discussion with
20   Steve in general. We were talking more to the investment
21   banking people at FBR. It also became clear to us during
22   that period - and I don't know exactly when - that Steve
23   wasn't even really an employee of FBR and that he was
24   some sort of consultant to them that worked on their
25   premises, and he had a personal relationship with a

11

1   number of the FBR principals that led to that.
2    So I would say for '97, '98, there was really
3   very little talking to Steve outside of family, how are
4   you, what's going on, those kinds of things. And, you
5   know, at the offshoot, at first I was upset because I
6   felt like he did not -- was not clear about who he
7   represented. And then eventually I just figured that he
8   was just kind of a quirky character, and I let it go.
9   And he was -- he's a genuinely nice guy, so, you know,
10   not badly intentioned at the time, I didn't feel. So
11   from my perspective, I just continued to have some sort
12   of personal relationship with him.
13    Q    What was the nature of your personal
14   relationship?
15    A    More by phone, an occasional visit down to
16   the FBR offices where he was still located, you know.
17   But that would be in the context of general business
18   activity about our capital-raising efforts or our
19   business activities. Occasionally he would try to come
20   to me with deals along the way that just did not fit our
21   structure, and I would politely accept meetings, but
22   generally, those meetings would not lead anywhere.
23    Q    Did you see him socially during that
24   '96-to-'99 period?
25    A    Socially to include a dinner or a lunch, you

12

1   know, one on one, maybe, mostly in New York. He was
2   invited to my 50th birthday party by people who organized
3   the party. I didn't invite him. But, I mean, that's
4   kind of how it was limited to.
5    Q    Now, Mr. Peskoff was instrumental in having
6   FIDAC hired as manager of the FBR REIT; is that right?
7    A    That's what I believed at the time, although
8   I've learned differently since then.
9    Q    What did you believe at the time? Or let me
10   rephrase that question. What did you believe at the time
11   Mr. Peskoff had done to promote FIDAC and assist in
12   having FIDAC hired as the manager of the FBR REIT?
13
14
15
16
17
18   **REDACTED**
19
20
21
22
23
24
25

13

**REDACTED**

1
2
3
4
5
6     Q    Now, at the time Steve talked to you about
7  becoming manager of the FBR REIT, was that 1999?
8     A    I honestly can't remember when the time
9  frames were.
10    Q    At the time he came to you and said -- and
11 talked to you about becoming manager of the FBR REIT to
12 replace BlackRock, did you have any sort of written
13 agreement with him at that time?
14    A    No.  No.
15    Q    Did you understand -- Well, let me back up,
16 make this easy.  FIDAC eventually did compensate
17 Mr. Peskoff for the FBR REIT?
18    A    That's correct.
19    Q    My understanding is that what FIDAC did was
20 pay Mr. Peskoff 20 percent of FIDAC's fees in connection
21 with the FBR REIT.
22    A    I'm not sure what the number is.
23        (Whereupon, the Reporter marked Farrell 1.)
24 BY MR. BELL:
25    Q    Farrell Exhibit 1 is really a collection of

14

1  documents which were produced to us by FIDAC.
2        MR. NOVACK:  Are you sure about that?  It
3  says P.
4        MR. BELL:  Actually, you're correct.  The
5  first page was -- first two pages were not produced by
6  FIDAC.  Actually, the fourth page was not produced by
7  FIDAC.
8  BY MR. BELL:
9     Q    But I want to take these one page at a time.
10    A    Okay.
11    Q    Let's look at the first page, first of all.
12 Do you recognize that as a FIDAC document, first of all?
13    A    It's nothing I've seen before.  I see it says
14 FIDAC at the top.  But this could be something from our
15 accounting department.
16    Q    But this is not -- You have not seen
17 documents in this form that you're familiar with at
18 FIDAC?
19    A    I can't say that I have, no.
20
21
22   **REDACTED**
23
24
25    Q    And in the memo line in the lower left-hand

15

1  corner it says FBR asset.  Do you see that?
2     A    Yes.
3     Q    Do you recall seeing this check before?
4     A    No.
5     Q    Do you know whose signature that is on the
6  check?
7     A    Yes.
8     Q    Whose signature?
9     A    Tim Guba, G-u-b-a.
10    Q    Who was Tim Guba, or how was he employed in
11 May of 2000?
12    A    Tim was one of the original executives in
13 Annaly and served as president of Annaly and FIDAC up
14 until sometime in the early 2000s period.
15    Q    Was Tim authorized to issue checks such as
16 this at that time?
17    A    Yes.
18    Q    Authorized on behalf of FIDAC to issue checks
19 such as this?
20    A    Yes.
21    Q    Was it FIDAC's practice in May of 2000 to
22 issue checks that were handwritten as opposed to
23 processed by a computer or typed out?
24    A    Yeah.  I would say if you'll look at our
25 business model, it's very simple, very few line items.

16

1  The check writers -- They're on a monthly basis.
2  Probably wasn't a very big number of bills going out, so
3  it was just easier to hand-write them.
4     Q    So the practice was to hand-write checks in
5  May of 2000?
6     A    I would guess, yeah.
7     Q    Do you know?  Your lawyer is going to tell
8  you not to guess.  He probably already did.
9     A    I don't know.
10        MR. NOVACK:  He doesn't listen to me, so
11 there was no point in me telling him.
12        THE WITNESS:  Yeah, I don't know.
13 BY MR. BELL:
14    Q    Were you aware in May of 2000 that FIDAC was
15 making payments to Mr. Peskoff in connection with the FBR
16 REIT?
17    A    Yes.
18    Q    And did you authorize the payments to
19 Mr. Peskoff?
20    A    Not specifically.  I -- I gave him something
21 in writing to cover payments that might be made from time
22 to time, but -- as a consultant, but in this case I don't
23 remember, you know, exactly what I said and when I said
24 it.
25    Q    Do you recall any discussion that you had



17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25     Q     He was going to help manage it in the sense

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

18

1     that he wasn't managing -- doing money management;
2     correct?
3         A     That's correct. He was managing the client,
4     because he had day-to-day contact with the client.
5         Q     FIDAC stopped being the advisor to the FBR
6     REIT sometime in 2002, I believe; is that correct?
7         A     I think that's correct, yes.
8         Q     Up until the time that FIDAC stopped being
9     the manager of the FBR REIT, it continued to pay 20
10    percent of its fees to Mr. Peskoff; is that right?
11        A     I think that's correct.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16        Q     Mr. Farrell, I'm going to show you what was
17    marked at Ron Kazel's deposition yesterday as Kazel
18    Exhibit -- deposition Exhibit 1. I think you made
19    reference to this document a few minutes ago. Have
20    you -- You have seen this document; correct?
21        A     Yes.
22        Q     Did you draft this, what is Kazel Exhibit 1?
23        A     I may have.
24        Q     Let me ask you to look at the last page of
25    the exhibit. Is that your signature under Fixed Income

21

1  Discount Advisory Company?
2      A    Yes, it is.
3      Q    Do you recall drafting any portion of this
4  document?
5      A    Not specifically.
6      Q    Do you recall consulting with anyone about
7  the contents of this document?
8      A    Not specifically.
9      Q    Do you have any reason to believe anyone
10  other than you drafted this document?
11      A    No.
12      Q    Now, the date on this is February 15th,
13  2000. Do you recall whether that date is before or after
14  Mr. Peskoff called you to discuss FIDAC becoming the
15  manager of the FBR REIT?
16      A    I would say that this is after.
17      Q    Why do you say that? Anything in particular
18  that causes you to recall that?
19      A    Yes; because we had no other agreements like
20  this in our universe, and I specifically wanted to have
21  something in writing that designated him as a consultant
22  for accounting purposes so that I could pay him fees and
23  demonstrate some sort of obligation for those fees. And,
24  you know, I don't think we had this with anybody else.
25      Q    So you think the sequence of events was,

22

1  first, he called you and discussed you becoming the
2  manager of the FBR REIT?
3      A    Um-hum.
4      Q    You then put -- You then had some
5  discussions with FBR about you becoming the manager of
6  the FBR REIT?

REDACTED

10      Q    Do I understand you correctly that your
11  communication with FBR - when I say your, I mean FIDAC's
12  communication with FBR - that resulted in FIDAC being
13  hired as manager of the FBR REIT was entirely through
14  Mr. Peskoff?

REDACTED

18      Q    In any event, back to our sequence of events,
19  so he was dealing with you and FBR in connection with
20  having you -- FIDAC hired as the manager of the FBR REIT?
21      A    Um-hum.
22      Q    And then you put this letter in place, and
23  then you started paying him fees. Is that the sequence?
24      A    I believe so, yes.
25      Q    Now, when you sent this letter to him -- Let

23

1  me ask it this way:  Prior to sending Kazel Exhibit 1 to
2  Mr. Peskoff, did you have any discussion with him about
3  the -- about putting a written agreement in place with
4  him?
5      A    Yes.
6      Q    When did those discussions take place?
7          MR. NOVACK:  He said, did you have any
8  discussion. Then you said, when did those discussions.
9  You changed --
10          MR. BELL:  I said, did you have any
11  discussion, I think was my question.
12          MR. NOVACK:  And he said yes. And then you
13  said, when did you have those discussions.
14          MR. BELL:  Right.
15          MR. NOVACK:  Suggesting he had testified
16  there were discussions. There may or may not be. I'm
17  just saying you went beyond his testimony.
18  BY MR. BELL:
19      Q    Did you have more than one discussion with
20  Mr. Peskoff about the contents of a written agreement?
21      A    I don't think so. You know, my recollection
22  is, is that my concern with any agreement that I pay to
23  anyone was conflicts of interest. And I specifically
24  wanted to know that Steve was acting in the best interest
25  of us and the client and not accepting compensation from

24

1  FBR simultaneously. That was the general focus of the
2  first conversation we had about having an agreement
3  between the two of us.
4      Q    So you just said the first conversation,
5  going back to --
6          MR. NOVACK:  As I said, I don't know.
7          MR. BELL:  -- Mr. Novack's point. I thought
8  he said he only had one conversation. But now he's
9  indicating two.
10          MR. NOVACK:  You said, did you have any
11  discussion, and he said yes.
12          MR. BELL:  That's all right.
13  BY MR. BELL:
14      Q    Did you have more than one discussion with
15  Mr. Peskoff about entering into a written agreement?
16      A    I don't recall specifically. But there were
17  a lot of discussions about family events or things going
18  on at any time with Steve, so --
19      Q    Do you recall the substance of any of the
20  discussions that you had with him about entering into a
21  written agreement prior to February 15th, 2000?
22      A    I think at first I would say yeah. You know,
23  as I said earlier, my concern was, is that I wanted to
24  make sure that Steve was not conflicted and that he was
25  not receiving fees from two sides of a party, which was

25

1  always something that I think Steve had a difficult
2  method of understanding.
3       Q    Now, I don't see anything in here - but I
4  might be missing it, and I ask you to correct me if you
5  disagree - that addresses conflicts of interest.
6       A    I don't see anything in here specifically
7  that talks about that either.
8       Q    Did you in your discussion or discussions
9  with Mr. Peskoff about a written agreement prior to
10  February 15th, 2000, negotiate with him any of the terms
11  of Kazel Exhibit 1?
12       A    No.
13       Q    As I understand what happened here was you
14  sent him this letter, and he signed it and sent it back
15  to you; is that correct?
16       A    I think that's accurate.
17       Q    So there was really no negotiation with him
18  over the terms of the agreement, either before you sent
19  it or after you sent it?
20       A    That's correct.
21       Q    Now, this letter is addressed to Mr. Steve
22  Peskoff, Underhill Investment Corp. What did you
23  understand Underhill Investment Corp. to be?
24       A    Essentially a consulting company.
25       Q    Did you know that Mr. Peskoff was essentially

26

1  a one-man band, if you will?
2       A    By this time I had understood that, yes.
3       Q    I mean, he was Underhill, as far as you knew;
4  correct?
5       A    That's correct. I don't even know where 7414
6  Old Maple Square is.
7       Q    The first sentence of the letter says, this
8  letter will confirm our engagement regarding the
9  provision of consulting services by Underhill Investment
10  Corp. to Fixed Income Discount Advisory Company; correct?
11       A    Um-hum, yes.
12       Q    Incidentally, let's go off the record a
13  second.
14            (Whereupon, a discussion was held off
15            the record.)
16  BY MR. BELL:
17       Q    This sentence suggests that there was at
18  least an oral agreement that was in place before you sent
19  this letter to the effect that FIDAC was engaging
20  Underhill to provide consulting services. Is that the
21  case?
22       A    I don't know.
23       Q    Let me move to the next paragraph. The next
24  paragraph starts by saying, for good and valuable
25  consideration, the receipt and sufficiency of which are

27

1  hereby acknowledged. Now, first of all, that sounds like
2  lawyer's words, not layman's words. You are not a
3  lawyer; correct?
4       A    No, I'm not.
5       Q    Where do you think you got that language
6  from?
7       A    You know, it may be that there was a draft of
8  a letter that was a framework for this that I used. But
9  I honestly don't recall where I got it from.
10       Q    What consideration had FIDAC received from
11  Mr. Peskoff as of February 15th, 2000?
12       A    I don't know the time line, but I would say
13  that this letter was referenced to the FBR REIT. So we
14  can assume that at that point, it had been agreed that we
15  were going to sign a contract with the FBR REIT.
16       Q    Let's look at paragraph 1, consulting
17  services. It indicates that Underhill would provide
18  FIDAC with such consulting services as they shall agree
19  from time to time. Do you agree with me that that
20  contemplates agreement in the future, after
21  February 15th, 2000, or at least the possibility of
22  agreement in the future for Underhill to provide FIDAC
23  with consulting services?
24       A    As regards the FBR REIT, I would agree with
25  that, yes.

28

1       Q    It's not limited to the FBR REIT, is it?
2       A    This letter for my intents and purposes was
3  designed to cover that relationship specifically.
4       Q    Does it say that anywhere in this letter?
5       A    No. But I had no intention of using Steve to
6  do anything else.
7       Q    So does this -- So even though this letter
8  does not say that it's limited to the FBR REIT, that was
9  your intention; correct? That's your testimony?
10       A    Yes.
11       Q    Did you ever tell Mr. Peskoff that in
12  writing?
13       A    Not that I'm aware.
14       Q    So the only thing that Mr. Peskoff had in
15  writing relating to consulting services for FIDAC was
16  Kazel Exhibit 1?
17       A    As far as I'm aware, yes.
18       Q    Now, paragraph number 1, consulting services,
19  goes on and says that as they shall agree from time to
20  time, and the assets managed by FIDAC for those clients.
21  And then it defines that as the accounts.
22       A    Um-hum.
23       Q    Now, that is -- refers to multiple clients;
24  correct?
25       A    It could be multiple accounts for the same

29

1  client.

2      Q    It says clients, plural, doesn't it?

3      A    There could be multiple legal structures of

4  the same client.

5      Q    The FBR REIT was one account for one client;

6  correct?

7

8  REDACTED

9

10     Q    Was it one client and one account as of

11 February 15th, 2000?

12     A    I don't know.

13     Q    Did you discuss with Mr. Peskoff what you

14 meant by consulting services in Kazel Exhibit 1?

15     A    I was clear with Steve that getting this

16 account was important to us and that I expected him to

17 manage the relationship, given his ability to deliver the

18 account to us.

19     Q    Okay, thanks.  That's not exactly my

20 question.  My question is, did you say to him what you

21 meant by the phrase consulting services in Kazel Exhibit

22 1?

23         MR. NOVACK:  Let me just object to the form.

24 Are you asking him whether he referred to the words

25 consulting services in this letter and, referencing the

30

1  letter, said, what I mean in this letter is so-and-so?

2         MR. BELL:  Yes.

3         MR. NOVACK:  You can answer that question.

4         THE WITNESS:  I don't remember.

5  BY MR. BELL:

6      Q    Now, in paragraph number 2, compensation, it

7  says, FIDAC shall pay to Underhill a fee equal to per

8  anum of the fees paid by the accounts, payable by FIDAC

9  to Underhill monthly and calculated in accordance with

10 the formula described in the -- Then it says,

11 parenthesis, the accounts agreement, close parenthesis,

12 period.  What did you mean by that?

13

14 REDACTED

15

16

17

18 think at the time that we were discussing setting up

19 multiple accounts, good assets, bad assets, as a way to

20 isolate for FBR the ability for them to see how these

21 things would perform in different interest-rate

22 environments.  Those accounts, if they were going to be

23 formed - and I forget exactly what the resolution was, if

24 we put it in one account or multiple accounts - were

25 combined up into one agreement that had a formula in it

31

1  on how our fees would be calculated, and then those fees

2  would be split between ourselves and Mr. Peskoff or

3  Underhill.

4      Q    Does this say how they would be split

5  between --

6      A    No.

7      Q    -- FIDAC and Underhill?

8      A    No.  And we didn't know at the time how much

9  we would be paid, I don't think.

10     Q    As it turns out, as we talked about earlier,

11 FIDAC paid Mr. Peskoff 20 percent of the fees it received

12 in connection with the FBR REIT; right?

13     A    Yes.

14     Q    That 20 percent number was determined by

15 FIDAC; correct?

16     A    Yes.

17     Q    It wasn't an amount that was negotiated

18 between Mr. Peskoff and FIDAC?

19     A    That's correct.

20     Q    Let me call your attention to the next

21 paragraph, paragraph 3, term, termination.  And

22 specifically, I'll give you a minute to read the last

23 sentence of that paragraph.

24     A    Okay, I've read it.

25     Q    Do you see that that indicates that either

32

1  Underhill or FIDAC may terminate the agreement by

2  delivering written notice to the other party?

3      A    Yes.

4      Q    Has FIDAC ever delivered written notice to

5  Mr. Peskoff that it was terminating this agreement?

6      A    I don't know.

7      Q    As far as you know, that has not been done;

8  is that right?

9      A    I don't know.

10     Q    You're not aware of it being done?

11     A    Yes, that's correct.  I'm not aware.

12     Q    Mr. Farrell, was it FIDAC's practice in

13 February of 2000 to enter into written agreements without

14 consultation with legal counsel?

15     A    No.

16     Q    But to the best of your recollection, that's

17 what was done with Mr. Peskoff; is that right?

18     A    That's true.

19     Q    Why was it that you didn't consult with legal

20 counsel with respect to Mr. Peskoff's agreement?

21     A    This agreement was a very specific agreement

22 to the FBR account.  I felt that as long as the account

23 was alive, that this letter would cover it, and that I

24 had a personal relationship with Steve specific to

25 consulting services.  So I felt that if we terminated the

33

1  agreement, that this would no longer go forward.  So this
2  to me was a very specific agreement.
3       Q     Let me just try to clear up something,
4  Mr. Farrell.  You testified a few minutes ago that there
5  was no negotiation with Mr. Peskoff about the 20 percent
6  fee for the FBR REIT.  Did you ever or did anybody else
7  on behalf of FIDAC, to your knowledge, ever inform
8  Mr. Peskoff that he was going to be getting 20 percent,
9  or did you just start sending him checks?
10      A     When I said there was no negotiation, I meant
11 that that was my determination of what was -- what I was
12 going to pay him.  Steve wanted more, if I remember
13 correctly, but it was a nonnegotiable item in my mind.
14      Q     Well, let's follow up on that then.  When you
15 say Steve wanted more, was there a point in time when you
16 informed Steve that it was going to be 20 percent and he
17 said, gee, I think I ought to get something more than
18 that?
19      A     I'm sure there was a conversation like that.
20      Q     Do you recall specifically any particular
21 conversation with Mr. Peskoff to that effect?
22      A     No, I don't.
23      Q     Do you recall when that kind of conversation
24 occurred?
25      A     It would have been over the period before we

34

1  drafted this letter.
2       MR. NOVACK:  Just object to the form.  It
3  sounded to me like the witness was speculating, and now
4  we're building on that speculation.  I'm sure it sounds
5  to me like he deduced, because he doesn't remember any
6  conversation.
7       MR. BELL:  I agree with you.  I think it did
8  sound like the witness was speculating.  Let me go back
9  and clarify that.
10      MR. NOVACK:  Because otherwise you're
11 building on this premise in all the questions which may
12 not be correct.
13 BY MR. BELL:
14      Q     I think your phraseology was, you were sure
15 that kind of conversation occurred.  Are you speculating
16 as to whether a conversation with Mr. Peskoff about the
17 percent he would be paid on the FBR REIT actually
18 occurred?
19      A     Yes, I -- it is speculation.
20      MR. NOVACK:  Okay, I'm going to ask you now,
21 don't speculate anymore today.
22      THE WITNESS:  Thank you, Doctor.
23      MR. NOVACK:  Take two aspirin, call me in the
24 morning.
25 BY MR. BELL:

35

1       Q     Okay, so you don't recall specifically
2  whether there was any negotiation with Mr. Peskoff over
3  the percentage of his fee?
4       A     No.
5       Q     You do not recall; is that correct?
6       A     I do not recall, yes.  Sorry.
7       Q     That's all right.
8            Let's move on to something else, which is Gen
9  Advisors.  Actually, I'll tell you what; why don't we
10 take a real short break at this point before we do that.
11      (Whereupon, at this time a recess was
12 held.)
13 BY MR. BELL:
14      Q     During the break, Roxanne pointed out to me
15 that it would be helpful if you stated your name and
16 address on the record.  So can you do that, please.
17      MR. NOVACK:  Is his business address okay?
18      MR. BELL:  Sure.
19      THE WITNESS:  It's Michael Austin John
20 Farrell, F-a-r-r-e-l-l, and it's 1211 Avenue of the
21 Americas, New York, New York, 10036.
22 BY MR. BELL:
23      Q     Before you put away Kazel Exhibit 1,
24 Mr. Farrell, let me just ask you one other question about
25 it.

36

1            Paragraph 2, the compensation, which we
2  talked a little bit about a while ago, seems to --  One
3  way of reading it would indicate that there's some words
4  or phrases missing in that sentence.  Is that a complete
5  sentence?  Is that what you intended to say, or is there
6  anything missing from that sentence?  And take a minute
7  and reread it if you need to.
8       A     This is just basically a business letter, so
9  it doesn't have as much specifics as one might desire in
10 a contract.  You know, it starts off by saying this is a
11 letter that will confirm.  And it was designed to be
12 general, because the terms and conditions of how many
13 assets were we going to take, how many accounts were we
14 going to have to open for them, were all unknown at the
15 time that I wrote this.
16      Q     So the answer to the question is?
17      A     I think it's as complete as it could be under
18 the circumstances at the time.
19      Q     So the answer, as I understand it, is that
20 this is -- this sentence is what you intended to write.
21 It's not like there was something missing from this
22 sentence as a result of an oversight.
23      A     I can't speculate to that.
24      Q     Well, is there anything as you sit here now
25 and you read this sentence that you think is missing from

**37**

1 that sentence?

2          MR. NOVACK: Which is a different question.

3          MR. BELL: Yeah.

4          THE WITNESS: I can't say that, no.

5 BY MR. BELL:

6     Q    What did you intend the phrase, a fee equal

7 to per anum of the fees paid by the accounts, to mean?

8          MR. NOVACK: If you remember now what you

9 were thinking then as opposed to trying to interpret it

10 now.

11         MR. BELL: That's right.

12         MR. NOVACK: Okay, just to be clear.

13         MR. BELL: That is the question.

14         THE WITNESS: I can't speak to that. The

15 document is six years old. I can't remember what I was

16 intending back then.

17 BY MR. BELL:

18    Q    So now, today, you don't know what you meant

19 by that phrase at that time; is that correct?

20    A    I can only speak to the intention, not to the

21 specifics of it grammatically. Once again, this was not

22 intended to be a contract. It's a business letter.

23    Q    My question, if I'm not making it clear, is

24 not anything about the grammar. My question simply is,

25 do you know today what you intended by the phrase, a fee

**38**

1 equal to per anum of the fees paid by the accounts?

2          MR. NOVACK: He's answered that, I don't know

3 what I meant then.

4          THE WITNESS: Then, yeah.

5          MR. BELL: That didn't come across clearly to

6 me.

7          THE WITNESS: I don't know what I meant then.

8          MR. BELL: Okay, now it's clear.

9          MR. NOVACK: I thought that he had

10 testified. I don't think I was supplying the answer. I

11 think that's what he had said. But in any event, we have

12 it.

13 BY MR. BELL:

14    Q    Okay, now, let's talk a little bit about Gen

15 Advisors and Premier. FIDAC currently manages a fund

16 called the Premier Fund; is that right?

17    A    That's correct.

18    Q    The Premier Fund, as I understand it, was

19 developed by FIDAC in conjunction with Gen Advisors; is

20 that right?

21    A    That's correct.

22    Q    The principals, or at least some of the

23 principals, of Gen Advisors are Ernie Baptista and Jeff

24 Messner. Is that also right?

25    A    Yes.

**39**

1     Q    And you have met Mr. Baptista and

2 Mr. Messner?

3     A    Yes.

4     Q    When did you first meet them?

5     A    I don't recall. I can speak to not specific

6 times, but I can speak to instances where I met them.

7     Q    I'm going to show you what was marked

8 yesterday as Kazel Exhibit 2 in order to maybe orient you

9 date-wise a little bit.

10    A    Thank you. Okay.

11    Q    Let me just find my other copy. Kazel

12 Exhibit 2 is a letter agreement dated October 10th, 2002,

13 on FIDAC letterhead addressed to Mr. Baptista; correct?

14    A    Yes.

15    Q    And let me ask you to look at page 12 of that

16 document.

17    A    Yes.

18    Q    Is that your signature under Fixed Income

19 Discount Advisory Company?

20    A    It is.

21    Q    Now, recognizing that this agreement was

22 entered into with Gen Advisors on October 10th, 2002,

23 does that allow you to at least approximate when you

24 first met Mr. Baptista or Mr. Messner?

25    A    Yes. I would say it -- I probably had met

**40**

1 them approximately a year beforehand.

2     Q    So you think sometime in maybe late 2001?

3     A    I would be speculating, but I would assume it

4 was at least a year beforehand.

5     Q    When you first met Mr. Baptista or

6 Mr. Messner, where did that meeting take place?

7     A    I met Mr. Baptista first in my office at 12

8 East 41st Street.

9     Q    Who else was present at that meeting?

10    A    No one except for myself and Mr. Baptista.

11    Q    Was that meeting arranged by Mr. Peskoff?

12    A    Yes, it was. At the time I was doing estate

13 planning. And Steve was aware that I was doing that, and

14 he suggested that I meet an insurance salesman who dealt

15 with specifically estate planning and general insurance

16 needs. And he asked me to meet with Ernie Baptista to

17 talk about that. In effect, I was a reference for Steve

18 for Baptista to do insurance payments, just general

19 personal insurance planning.

20    Q    What do you recall about the substance of

21 that first meeting with Mr. Baptista?

22    A    I felt that it was not a productive meeting

23 for me, because many of the concepts of the insurance

24 plans that he was presenting to me were not things that I

25 hadn't already covered in my own personal life or felt

**A-271**

41

1   that I had already covered, and that that meeting was not
2   a productive meeting from that aspect whatsoever.
3       Q    Did you then have subsequent meetings or
4   discussions or did anybody else on behalf of FIDAC have
5   subsequent meetings or discussions with representatives
6   of Gen Advisors which led to the Premier Fund?
7       A    Well, when I first met with Ernie Baptista,
8   he was not, I don't believe, a representative of Gen
9   Advisors.
10      Q    Okay, fair enough.  Did you have future
11  meetings with Mr. Baptista or Mr. Messner, or did anybody
12  else on behalf of FIDAC have meetings with them or
13  discussions with them which led to the development of the
14  Premier Fund?
15      A    There came a time when we began a process
16  which, I think - and would I speculate on this - that
17  Mr. Baptista felt there were other business opportunities
18  he could take advantage of either from Annaly or FIDAC,
19  and that he approached us about using our strategy to run
20  money for insurance companies directly.
21      Q    When do you recall that occurring?
22      A    Sometime after that first meeting.
23      Q    And before October of 2002?
24      A    Yes.  At the time Gen Advisors did not
25  exist.  And Mr. Baptista felt that his contacts in the

42

1   insurance world would help bring in other managed
2   accounts to the FIDAC umbrella.
3       Q    What was your involvement in the
4   communications with Mr. Baptista prior to October 10th of
5   2002 about those concepts?
6
7
8
9
10
11
12
13
14
15              REDACTED
16
17
18
19
20
21
22
23
24
25

43

1
2
3
4
5              REDACTED
6
7
8
9
10
11      Q    What was it that got you over that belief?
12      A    I think in the discussion with Messner
13  specifically, Messner understood the concept that I just
14  described to you of the challenges of putting that
15  leverage on the balance sheet of an insurance company,
16  and he felt that he could structure it as a limited
17  partnership, which gave me some comfort, but I had
18  already, as I explained earlier, explored almost every
19  aspect of ways to get insurance companies as clients.
20  And they during the course of that meeting explained to
21  me that there was a wide range of different kinds of
22  products that I was not aware of.  And they mentioned
23  words like BOLI, COLI, TOLI, IOLI, which I had never
24  heard of before.  And I reluctantly agreed at that point
25  that I didn't know everything that there was about the

44

1   insurance company business, and since you're a principal
2   at ING, I would be willing to listen to you and expend
3   some resources in that respect.
4       Q    When did that occur?
5       A    I can't say.
6       Q    Prior to October 10th, 2002?
7       A    Yes.  Messner was -- As far as I was
8   concerned, Ernie Baptista was still an insurance salesman
9   at that point, and Jeff Messner was an employee of ING.
10      Q    Going back to what your role was on behalf of
11  FIDAC in this process, I believe Mr. Kazel testified
12  yesterday that he was the point person for FIDAC on
13  the -- in the conceptualization and development of the
14  Premier Fund.  Is that your understanding?
15      A    I assigned this to Ron as our
16  business-development person to explore it at the time.
17      Q    So was he the person that was the primary
18  contact with Mr. Messner and Mr. Baptista on behalf of
19  FIDAC?
20      A    Yes.  But there was no discussion at the time
21  that there would be a Premier Fund.
22      Q    How much contact did you have prior to
23  October 10th, 2002, with either Mr. Baptista or
24  Mr. Messner?
25      A    Very little.  Occasional updates.  They would

45

REDACTED

REDACTED

11  Q    Prior to October 10th, 2002, what discussions
12 had you had with Mr. Peskoff about Mr. Baptista or
13 Mr. Messner or Gen Advisors or the possibility of a fund
14 that became the Premier Fund?

REDACTED

---

46

REDACTED

3    Q    Did you ask Mr. Peskoff to do anything to
4 attempt to assist FIDAC in that process?
5    A    Steve was not really involved in discussions
6 with Baptista and Messner at that point.  He had no
7 understanding of the investment process that we managed,
8 and he had no relationships in large insurance companies
9 at the institutional level.  He may have had discussions
10 with Ernie and Jeff, but I was unaware of that.  Probably
11 what I heard from me was more frustration with bringing
12 me people who were essentially costing us money and
13 resources.
14    Q    The question was whether you asked
15 Mr. Peskoff to do anything in that process.
16    A    I don't recall.
17    Q    I take it from your answer that you don't
18 recall asking him to do anything --
19    A    Not a specific.  I just don't want -- I want
20 you to understand that there was always an ongoing
21 dialogue for a number of personal reasons with Steve at
22 the time because of health considerations.  His parents
23 were sick.  Steve had a way of always linking those
24 conversations to what's happening with whatever else is
25 going on in FIDAC's life or business life, Annaly's life

---

47

1 especially.  So it's hard to separate those conversations
2 when it comes to that.
3    Q    Let me make sure I understand your
4 testimony.  As I understand what you're saying, you had a
5 fair -- quite a bit of conversation with Mr. Peskoff
6 during this period of time prior to October 10th, 2002,
7 but you don't recall any specific conversations in which
8 you asked him to do anything in connection with
9 Mr. Baptista or Mr. Messner?
10    MR. NOVACK:  I'm going to object to the form
11 only insofar as the prefatory material, that you had
12 quite a bit of conversation with him.  I don't think he
13 said that.
14    MR. BELL:  No, he didn't use that.
15    MR. NOVACK:  So maybe if you just ask a
16 shorter question, the tail end of it or, you know --  But
17 that's my objection to the form.
18    MR. BELL:  I understand your objection.
19 BY MR. BELL:
20    Q    My understanding of your testimony,
21 Mr. Farrell - I just want to make sure my understanding
22 is correct - is that during this period of time from,
23 let's say, late 2001 till October of 2002, you had
24 ongoing conversations with Mr. Peskoff, but that you
25 cannot recall any specific conversations in which you

---

48

1 asked him to do anything on behalf of FIDAC in connection
2 with your dealings with Mr. Baptista or Mr. Messner or
3 Gen Advisors?
4    MR. NOVACK:  Again, if you could just ask the
5 question as to whether during this period he asked him to
6 do anything with respect to Gen Advisors or Baptista or
7 Messner, I would have no objection.  Now you said he had
8 ongoing discussions.  Again, it's characterization of how
9 frequent they were.
10    MR. BELL:  You can object, Jerry.
11    MR. NOVACK:  I am objecting.  That's the only
12 basis for my objection.  You can answer his question.
13    MR. BELL:  Could you read it back so he hears
14 the question.
15    (Whereupon, the Reporter read back the
16    referred-to question.)
17    THE WITNESS:  I don't recall any specific
18 conversations with Steve about Gen Advisors or Messner or
19 Baptista.
20 BY MR. BELL:

REDACTED

**49**

1  was —

2  MR. NOVACK: No more information. There was

3  no question beyond that.

4  BY MR. BELL:

5  Q   What were you going to say a minute ago?

6  MR. NOVACK: No, I'm going to object. Show

7  me the relevance. If you're trying to key him into a

8  time — I'm objecting and I'm telling him not to answer

9  unless you tell me the relevance to this, because I'm not

10 getting into personnel issues at FIDAC that are unrelated

11 to the case and appeal only perhaps to prurient

12 interest. I have no idea what he's going to say. It's

13 the first I've heard of it. So unless you tell me why

14 this is relevant, I'm directing him not to answer.

15 MR. BELL: It goes directly to the last

16 answer he gave.

17 REDACTED

18

19 MR. BELL: Yes.

20 MR. NOVACK: I gave you that question because

21 I thought you were going to ask him in relation to that

22 event when you learned that, can you tell me now what a

23 time was. That's all you were using it for. I thought

24 that's the only reason. I'm going to direct him not to

25 answer unless you tell me the relevance.

**50**

1  MR. BELL: Let me ask some more questions. I

2  think you'll see the relevance.

3  MR. NOVACK: If you give me the relevance,

4  then I may very well let him answer. I think this is

5  improper so far.

6  MR. BELL: I don't think it is. And we're

7  objecting only to form of the question.

8  MR. NOVACK: Ordinarily, when something is

9  palpably improper and appealing to someone's prurient

10 interest, I will object. And so far that's all I see.

11 MR. BELL: That's ridiculous.

12 MR. NOVACK: Show me that it's not, and I'll

13 let him answer.

14 BY MR. BELL:

15

16

17

18 REDACTED

19

20

21

22 BY MR. BELL:

23 Q   Now, let's go back to the October 10th, 2002

24 agreement with -- between FIDAC and Gen Advisors. Did

25 you draft this agreement?

**51**

1  A   No, I did not.

2  Q   Who did?

3  A   Probably Ron Kazel, with the help of counsel.

4  Q   Did you read it before you signed it?

5  A   Yes.

6  Q   And I take it you agreed with FIDAC agreeing

7  to these terms.

8  A   Yes, I did.

9  Q   At this point in time, meaning October 10th,

10 2002, what did you expect Gen Advisors to do as a finder

11 under this agreement?

12 MR. NOVACK: Let me just say, the agreement

13 is quite long. If you want to ask him his general idea

14 as to what he thought was going to happen and what this

15 agreement dealt with, that's fine. But if you're asking

16 him to give you an interpretation of a twelve-page

17 agreement —

18 MR. BELL: That's not what I'm asking.

19 MR. NOVACK: I want to be clear. That's all.

20 MR. BELL: I'm just asking what his

21 expectation was.

22 MR. NOVACK: Okay.

23 THE WITNESS: I need to give you the context

24 of my expectation then to fully answer your question.

25 MR. BELL: Go ahead.

**52**

1

2

3

4

5

6

7  REDACTED

8

9

10

11

12

13 BY MR. BELL:

14 Q   As I understand it, not only had FIDAC not

15 created a product like this, but nobody had created a

16 product like this; is that correct?

17 A   That's correct. And Ron Kazel's expertise

18 and intellectual capital in devising, investigating, and

19 coordinating this effort was a critical element in

20 putting together this product.

21 Q   I want to make sure you answered my

22 question.

23 MR. BELL: Can you read back the question,

24 please.

25 (Whereupon, the Reporter read back the

53

1       referred-to question.)
2           THE WITNESS:  Their job was to find capital
3   under the concept of BOLI, TOLI, IOLI, COLI, for
4   investment in this fund for management buyouts.
5   BY MR. BELL:
6       Q       As of October 10th, 2002, had the fund been
7   structured?
8       A       I don't know.
9       Q       Now, the fund became the Premier Fund;
10  correct?
11      A       The fund I'm referring to with this letter is
12  the Premier Fund, yes.
13      Q       Thank you.  Did you meet with Ernie Baptista
14  around October 10th, 2002, to discuss the terms of this
15  letter or the structure of the fund or anything else?
16      A       I don't recall.
17      Q       Do you recall how many meetings you had with
18  Mr. Baptista prior to the time that you signed the
19  October 10th, 2002 letter?
20      A       Me personally?
21      Q       Yes.
22      A       Maybe three.
23      Q       Do you recall discussing Mr. Peskoff with
24  Mr. Baptista?
25      A       Yes.

54

1       Q       Do you recall discussing what fees
2   Mr. Peskoff might be paid with Mr. Baptista?
3       A       Specifically fees?
4       Q       Yes.
5       A       No.
6       Q       You might be aware that Mr. Baptista
7   testified that there was a meeting attended by you at
8   which the issue of how Mr. Peskoff was going to be
9   compensated was discussed.  Have you heard that that's
10  what Mr. Baptista testified to?
11      A       Yes.
12          MR. BELL:  I'm sorry.
13          MR. NOVACK:  Thanks.  You're not supposed to
14  disclose what I may have said.  It leads to other
15  questions.  Why don't you just pose to him --
16          MR. BELL:  I apologize for that.
17  BY MR. BELL:
18      Q       You do not, though, have any recollection of
19  discussing how Mr. Peskoff would be compensated with
20  Mr. Baptista; is that right?
21      A       I'm unclear as to your question.  Are you
22  asking me specific numbers or --
23      Q       No.  I'm asking, do you recall any
24  conversation with Mr. Baptista prior to October 10th,
25  2002, about how Mr. Peskoff would be compensated?  Let me

55

1   take the word how out of that question, because I think
2   maybe that's what is causing the confusion.  Did you have
3   any discussion with Mr. Baptista that you can recall
4   prior to October 10th, 2002, about compensating
5   Mr. Peskoff?
6       A       Yes.
7       Q       Approximately when did that conversation
8   occur?
9
10
11
12
13              REDACTED
14
15
16
17
18
19
20      Q       Do you recall making a statement to the
21  effect that FIDAC would take care of Steve?
22      A       In the context of what I just testified, yes.
23      Q       I understand your context.
24      A       Um-hum.
25      Q       Did you also make a statement that you can

56

1   recall to the effect that you wanted to make sure that
2   Steve didn't double-dip?
3       A       Absolutely.
4       Q       You don't recall when that meeting occurred;
5   is that right?
6       A       It was early on in the process.  As I said
7   earlier, I think it was the first time I met Messner.
8       Q       Did you have any discussion with Mr. Baptista
9   at any time after October 10th, 2002, about compensating
10  Mr. Peskoff, that you can recall?
11      A       Not that I recall.
12      Q       Now, FIDAC has not paid Mr. Peskoff anything
13  as a result of the Premier Fund; is that right?
14      A       That's correct.  Can I qualify that answer?
15          MR. NOVACK:  Sure.
16          MR. BELL:  Sure.
17          THE WITNESS:  FIDAC has not directly paid
18  Steve Peskoff anything from the proceeds that have been
19  received on the Premier Fund.  But we are not aware that
20  he did not receive or did receive compensation from Gen
21  Advisors.
22  BY MR. BELL:
23      Q       Are you --
24      A       Or any other source.
25      Q       Are you saying that it is possible that

57

1  Mr. Peskoff has received fees from Gen Advisors or
2  another source in connection with the Premier Fund?
3        A    I don't know all of the agreements that Steve
4  has in his universe.  But it wouldn't surprise me.
5        Q    You don't have any evidence, I take it, that
6  he has received payments from anyone else in connection
7  with the Premier Fund; is that right?
8        A    No, I do not.
9        Q    Now, Mr. Peskoff also introduced FIDAC to a
10 company known as Sentry Select; correct?
11       A    We received a phone call from Sentry Select
12 that they had heard from Steve Peskoff, yes.
13       Q    Who was that phone call from; Mr. Corsini?
14       A    Raniero Corsini, right.
15       Q    Was that phone call to you or to someone else
16 at FIDAC?
17       A    I believe it was to me.
18       Q    Do you recall approximately when that phone
19 call occurred?
20       A    No, I don't.
21       Q    What do you recall Mr. Corsini saying to you
22 during that call?
23       A    Essentially, that he had met Mr. Peskoff on a
24 plane and that Mr. Peskoff had told him that he should
25 look at what we do in Annaly and FIDAC.  Apparently they

58

1  struck up a conversation on a plane.  That's my
2  recollection.
3        Q    Do you recall how you responded to that?
4        A    I invited him to come for a meeting to New
5  York the next time he was in New York, if it was
6  convenient, and we would explain it further to him.  I
7  directed him to the Web site where he could get
8  information about FIDAC, and I directed him to the SEC
9  filings of Annaly, where he could do more due diligence
10 before the meeting so he could be prepped if he wanted to
11 learn more.
12       Q    Are you aware that Mr. Kazel met with
13 Mr. Corsini in Toronto?
14       A    May have happened.  I'm not -- I'm not a
15 hundred percent certain of when and if, how that
16 happened.
17       Q    Do you recall asking Mr. Kazel to attend a
18 meeting with Mr. Corsini in Toronto?
19       A    I don't think after the first time that we
20 met -- I think Raniero came to New York first, but I
21 can't recall the sequence.
22       Q    Before you started talking - and when I say
23 you, I mean FIDAC - started talking with -- Well, strike
24 that.
25            Prior to that call you got from Mr. Corsini,

59

1  had anyone at FIDAC, to your knowledge, had any
2  communication with anyone at Sentry?
3        A    Not that I'm aware.
4        Q    Now, as I understand it, the FIDAC-Sentry
5  Select relationship has resulted in four different
6  investment vehicles; is that right?
7        A    Correct.
8        Q    All four of those investment vehicles are
9  marketed in Canada; correct?
10       A    They're directly marketed by Sentry, yes.
11       Q    But for the Canadian market?
12       A    That's correct.  I would like to also point
13 out that all four of the structures are not the same
14 legal structure.
15       Q    Okay.  Would you prefer that I use the word
16 structure as opposed to vehicle?
17       A    I'll take either one.
18       Q    That's why I was trying to use a general
19 word, to capture all four of them.
20       A    Yeah, I just don't want to lump them all
21 together, because they are very different instruments
22 with very different risk characteristics and very
23 different legal structures to them.
24            MR. NOVACK:  Can I just suggest that for
25 purposes of these questions, we make clear some early

60

1  part in the record that there's a trust which solicits
2  people in Canada, and the trust invests its assets in a
3  vehicle.  And it's the vehicle in which the investment is
4  being made that we're talking about, or is it the form of
5  the trust that you're talking about?  I think you better
6  clear that up.
7            MR. BELL:  Let me come back to that.
8            MR. NOVACK:  Please.
9            MR. BELL:  If that becomes pertinent.  I'm
10 not sure it does.
11           MR. NOVACK:  When he says there's four
12 different vehicles, I don't know whether he's referring
13 to the trust or he's referring to the entity who is
14 holding the assets that have been invested by the trust
15 which he's advising.  So that's the ambiguity in the
16 question.
17           MR. BELL:  All right.
18 BY MR. BELL:
19
20
21
22           REDACTED
23
24
25

A-276

REDACTED

61

```
6    Q    Now, the first deal that you're referring to
7  is the MBS trust; is that right?
8    A    That's correct.
9    Q    What is the MBS Trust?  What is the structure
10 of that?
11   A    It's a Canadian income trust that holds
12 dollar-denominated assets and is exposed to currency risk
13 as well as interest-rate risk.
```

REDACTED

```
20   Q    Who was primarily responsible for those
21 refinements on -- for FIDAC?
22   A    Well, Ron Kazel was the business-development
23 person who acted as an intermediary.  But the structuring
24 and the refinements took place in Canada under the
25 advisement and under the development at their own expense
```

62

```
1  of those large banks, as well as Sentry.
```

REDACTED

63

REDACTED

```
3    Q    Before you - when I say you, I'm talking
4  about FIDAC - started talking to Mr. Corsini, FIDAC had
5  not been involved with any products marketed in Canada;
6  is that right?
7    A    No.
8    Q    Yes, that is right?
9    A    That's correct, yes.  No, we were not
10 involved.  Sorry.
11   Q    That's all right.  The double negatives get
12 tough sometimes.
13        Did you ever have any discussion with
14 Mr. Corsini or anyone else representing Sentry Select
15 about payment of compensation to Mr. Farrell -- excuse
16 me, to Mr. Peskoff?
17   A    No.
18   Q    Now, we're going to get a little bit into the
19 $30,000 check you issued to Mr. Peskoff and events
20 subsequent to that.  But prior to the issuance of that
21 $30,000 check and a conversation which I understand may
22 have taken place shortly before that with Mr. Peskoff,
23 did you have any conversation with Mr. Peskoff about
24 compensating him for Sentry Select?
25   A    I would say that Steve and his proxy, Spencer
```

64

```
1  Brown, both had called me over the years of development
2  or months of development to get Steve more money in a lot
3  of different products.
4    Q    Let's start with Spencer Brown.  Can you tell
5  me approximately how many conversations you had with
6  Spencer Brown on this.
7    A    I can't recall the exact number.  Steve and
8  Spencer were very close friends.  Spencer was an
9  independent director of the board of Annaly since
10 inception.  So I can't recall an exact number of
11 conversations.
12   Q    Can you give me an idea?  Was it in the
13 magnitude of two or three or four, or was it more in the
14 magnitude of twenty or more?
15   A    I can't recall.
16   Q    Over what period of time did you have these
17 conversations with Mr. Brown?
18   A    I would guess over a two-year period,
19 probably.
20   Q    Now, you said that Mr. Peskoff and Mr. Brown
21 talked to you about trying to get Steve more money for a
22 number of different deals.  I'm not sure that was your
23 word.  But other than the -- in connection with Sentry
24 Select and possibly Gen Advisors, what other deals did
25 Spencer Brown and Mr. Peskoff talk to you about?
```

A-277

65

1    A    Specifically about Annaly's underwriting.
2  They wanted -- Both of them wanted Steve to be
3  compensated in some way from Annaly, which I already felt
4  that he was already being paid. He had made statements
5  to me that he was being taken care of by FBR. He wanted
6  options and warrants, cash related to the Annaly
7  transaction, which I didn't feel was a warranted
8  compensation in any way, shape, or form.
9    Q    And you thought it was unwarranted because he
10 was already being paid for that by FBR?
11   A    I have a moral obligation to my shareholders,
12 and I also have a moral objection to creating conflicts
13 in business relationships. And I felt that that was part
14 of that judgment.
15   Q    What role did Mr. Peskoff play in the
16 creation of Annaly?
17   A    Well, as I said earlier in my testimony, he
18 originally represented to me that he represented FBR and
19 that FBR became Annaly's lead underwriter in that respect
20 and helped us raise capital in the capital markets. It
21 was only later that I realized and became aware that he
22 was not an employee of FBR. In fact, he was some sort of
23 consultant or a finder for them and had negotiated a
24 contract with them directly.
25   Q    I think the way you answered that question

66

1  answered what FBR did in connection with the creation of
2  Annaly. My question was intended to go to specifically
3  what did Mr. Peskoff do in connection with the creation
4  of Annaly, if you know.
5    A    I don't know. And he worked within FBR, as
6  far as I was concerned, initially. That was the point I
7  was trying to make. After that, I have no idea what he
8  did.
9    Q    Did you ever hear Mr. Peskoff referred to as
10 the grandfather of Annaly?
11   A    By himself, yeah. Success has many fathers.
12   Q    Did you ever hear anyone else refer to
13 Mr. Peskoff as the grandfather of Annaly?
14   A    No.
15   Q    Were there any other transactions that --
16 other than the creation of Annaly, Sentry Select, Gen
17 Advisors, that Mr. Brown talked to you about getting more
18 money for Mr. Peskoff?
19   A    Mr. Brown never spoke to me directly about
20 Premier or Gen Advisors. As far as Sentry, he never
21 spoke Sentry's name. He always called it the Canadian
22 deal. But, you know, Annaly as a sequential issuer of
23 equity was always in the markets to raise equity. So
24 there was always an opportunity for Steve, as long as FBR
25 was the lead underwriter, for him to receive some fee

67

1  income from Annaly's capital raising. And in FBR's eyes,
2  as I've learned through the depositions of Steve,
3  apparently he represented to them that he was the link to
4  Annaly, and, in fact, they approached him about having
5  Annaly and FIDAC run the money for them. So, you know, I
6  can't speak to what compensations he received in any of
7  the other transactions from FBR. I have not seen any
8  evidence to that nature. But I suspect that he did get
9  paid on other things that he did within that framework.
10   Q    My question just had to do with what
11 Mr. Brown discussed with you.
12   A    I mean, I think I answered that.
13   Q    Well, let me make sure I understand it. Were
14 there any other specific transactions other than the
15 creation of Annaly that you recall discussing with
16 Mr. Brown for which Mr. Brown was attempting to get
17 payment for Mr. Peskoff?
18   A    There were a number of conversations in the
19 course of our lives together where Steve would needle
20 Spencer to needle me to try to get him money for things
21 that he thought he was involved in at a higher level, and
22 as Spencer was aware from my conversations with him, that
23 I was always concerned about Steve's double-dipping, and
24 I was always concerned about the conflicts that could be
25 arisen out of that kind of payment stream from two

68

1  different counter-parties on the same transaction, and
2  that, in fact, Steve and I really had no business
3  relationship other than just the FBR REIT. That was --
4  He was never employed by us to go out and solicit
5  business.
6    Q    Okay. Again, I just want to make sure I
7  understand your answer to the question, which is, are
8  there any other matters other than the creation of Annaly
9  that you recall talking to Mr. Brown about in which he
10 was trying to obtain money for Mr. Peskoff?
11   A    Other than the Canadian deal, no.
12   Q    Okay. Now, other than -- Strike that.
13       You also had conversations with Mr. Peskoff
14 prior to the events surrounding the issuance of this
15 $30,000 check --
16   A    Yes.
17   Q    -- in which he was seeking payment for
18 services; is that correct?
19   A    That's correct.
20   Q    How many of those conversations occurred?
21   A    I don't recall.
22   Q    Was it less than five?
23   A    Probably.
24   Q    And over what period of time did they occur?
25   A    Over several months of frustration with

69

1  Steve, I believe at the same time we were going through
2  the disappointments of putting together the insurance
3  arrangements.  *REDACTED*
4  *REDACTED*  So we were building infrastructure and
5  expenses into our structure that, you know, were
6  frustrating to me along the way.  And I -- And Steve had
7  nothing to do with those transactions, as far as I was
8  concerned.  And he continued to try to wheedle cash
9  through his relationship with Spencer with me.  And I
10  tried to explain to Steve a number of times that this is
11  not what FIDAC was designed to do, nor was this what we
12  do for a living.  We manage accounts.  We manage direct
13  capital.  That's what we do.  We don't create products.
14  We don't create groundbreaking products.  We pay others
15  to do that.  So during the course of those months, I
16  would definitely say I expressed my frustration to
17  Steve.  And he kept on trying to introduce stranger and
18  stranger deals to me, and I kept on politely saying no or
19  taking the meeting and then telling him, please, don't do
20  that again.
21      Q    Do you consider the Premier fund to be a
22  groundbreaking product?
23
24          REDACTED
25

70

1
2
3
4
5          REDACTED
6
7
8
9
10
11      Q    What cost has FIDAC incurred in connection
12  with Premier?  I'm not asking for dollars and cents.
13  What types of things has FIDAC incurred costs for?
14      A    Legal, accounting, and personnel management,
15  portfolio management, systems development, a full
16  plethora, basis of controls and programing especially,
17  because there are a number of controls that have to be
18  built into that product that are unique to that product.
19  Everything from systems development through portfolio
20  management and investment banker-like time in the case of
21  Ron Kazel and his intellectual contribution to that.
22      Q    Has FIDAC made any attempt to calculate those
23  costs?
24      A    Not that I'm aware of.
25      Q    If you were to -- If you were going to

71

1  calculate those costs, what -- are there documents that
2  would reflect what the costs are?
3      A    Other than the hard expenses of accounting
4  and legal, I don't believe outside of that that we have
5  records like that inside the company of how people's time
6  was allocated.
7      Q    So the out-of-pocket costs for things like
8  accounting and legal, obviously, there would be documents
9  that you would be able to look at to calculate those
10  costs.
11      A    Um-hum.
12      Q    But there are no records of the other types
13  of costs that you're referring to; is that right?
14      A    Not that I'm aware of.
15          MR. BELL:  Let's take a couple minutes.
16          (Whereupon, at this time a recess was
17          held.)
18  BY MR. BELL:
19      Q    Mr. Farrell, during the conversations you had
20  with Mr. Peskoff in which he was seeking additional
21  payments - again, this is prior to the issuance of the
22  $30,000 check - did he at any point tell you specifically
23  what he thought he was entitled to?
24      A    No, not that I recall.
25      Q    But did you understand from those

72

1  conversations that he was not making the -- at least in
2  his mind, he was not making the introductions to Sentry
3  Select, Gen Advisor, and others gratuitously?
4      A    You know, in our business, we meet people all
5  the time and refer people with specific expertise across
6  the board when we don't have it internally.  Very rarely,
7  if ever, do those lead to payments of fees.  And, in
8  fact, I had no basis by which I owed Steve anything.  I
9  had no contract with him.  As far as I was concerned, our
10  consulting services ended when I got rid of the FBR REIT.
11      Q    But that's what was in your mind; correct?
12      A    I can't speak to what was in his mind.
13      Q    I'm not asking you to read his mind.  I'm
14  asking you whether, based on the conversations that you
15  had with him, whether it was apparent to you that in his
16  mind, he was entitled to be paid for those introductions.
17      A    Not totally, because he was unaware of any
18  process that was going on.  Some things were in
19  development, so there was no basis for understanding what
20  the income or expenses would be against it.  I did have
21  discussions with him one time explaining to him that he
22  had no idea about the capital market structures that were
23  being created, nor did he have any meaningful
24  contribution that he was adding to that, because he kept
25  on trying to add value in some way, shape, or form, but I

73

1  told him that I didn't consider his expertise to be in
2  that arena.
3      Q    Did you understand that he was attempting to
4  add value in order to convince you that he should be
5  paid?
6      A    Apparently.
7          MR. NOVACK:  You're asking him what was in
8  Peskoff's mind.  Before you were saying you don't want
9  him to read his mind, and he's speculating that's what he
10 may be thinking.
11         MR. BELL:  No.  I'm asking him.
12         MR. NOVACK:  Do you want to read the question
13 back then, because I think --
14         MR. BELL:  He's answered the question.
15         MR. NOVACK:  I'd like the question back or
16 marked, in any event.  You can keep going.  Would you
17 mark the question so I can come back to it later.
18 BY MR. BELL:
19     Q    Are you aware of any role that Mr. Peskoff
20 played in having Spencer Brown appointed to the Annaly
21 board?
22     A    No.
23     Q    How did Mr. Brown come to be appointed to the
24 Annaly board, if you know?
25     A    Manny Friedman, who was at the time the

74

1  chairman of FBR, asked me to consider taking on Spencer
2  because of his expertise as an attorney and also with
3  running real estate investment trusts, which was one of
4  the concerns that they had about our board-level
5  expertise at that time.  No one with real estate
6  investment trust, and Spencer was the guy who had that.
7      Q    You don't know whether or not Mr. Peskoff had
8  any communication with Manny Friedman about Mr. Brown
9  being on the Annaly board?
10     A    No, I don't.
11     Q    We've talked about what I'm going to call the
12 Sentry Select vehicles.  The first one that was formed
13 was the MBS Trust; correct?
14     A    Yes.  I believe that's the name of it.
15     Q    What was the name of the second one that was
16 formed?
17     A    I don't recall.
18     Q    I think Mr. Kazel testified yesterday that
19 the second one was called the Adjustable Rate Income Fund
20 I.  Does that sound right?
21     A    Could be.  We didn't name the funds.  The
22 funds were named by Sentry since it was their product.
23     Q    Well, assuming Mr. Kazel was right that that
24 is the name of that fund, do you consider -- Strike
25 that.  Let's put the name aside.

75

REDACTED

76

REDACTED

13     Q    Let me show you what was marked yesterday at
14 Mr. Kazel's deposition as Kazel Exhibit 5, which is a
15 copy -- at least the first page is a copy of a check
16 dated December 22nd, 2003, in the amount of $30,000
17 payable to Underhill Investments and drawn on a FIDAC
18 account.  Do you recall seeing that check before today?
19     A    Yes.
20         MR. NOVACK:  Other than -- other than in
21 preparation for the litigation.
22         MR. BELL:  Yes.  I'm not interested in that.
23         MR. NOVACK:  He doesn't care about if you may
24 have seen it through the course of the litigation
25 process.  He meant, I think, sometime before this dispute

77

1  arose.
2          THE WITNESS:  Well, I signed it.  I signed
3  it, so yes, that's my signature.
4  BY MR. BELL:
5      Q    That is your signature on that?
6      A    Yes.
7      Q    I can't imagine why I didn't recognize that.
8          MR. NOVACK:  There are two signatures on
9  there.
10         MR. BELL:  Let's clear that up.
11 BY MR. BELL:
12     Q    There are two signatures on the authorized
13 signature line of the check?
14     A    That's correct.
15     Q    One of them is yours?
16     A    That's correct.
17     Q    And who is the other one?
18     A    Wellington Denahan.  I believe it's -- I
19 think it's just Wellington Denahan.  Her married name is
20 Wellington Denahan-Norris.  At this point I think she was
21 still Denahan.
22     Q    What was her position with FIDAC as of
23 December of 2003?
24     A    She was the vice chairman and CIO, chief
25 investment officer.

78

1      Q    Now, the bottom part of the first page of
2  this exhibit appears to be a check stub; is that right?
3      A    Yes.
4      Q    And there is a notation.  First there's a
5  typewritten notation that says consulting expense, and
6  then under that there is a handwritten notation.  Do you
7  see that?
8      A    Yes.
9      Q    And that handwriting is yours; is that right?
10     A    That's correct.
11     Q    What you have written there says, for
12 Canadian deal with Sentry Select.  This is a one-time
13 finder's fee.  Is that right?
14     A    That's correct.
15     Q    So this payment had to do strictly with
16 Sentry Select; correct?
17     A    That's correct.
18     Q    It had nothing to do with Premier?
19     A    That is correct.
20     Q    It was only for the first Sentry Select fund,
21 the MBS fund?
22     A    It's the only one that existed at the time,
23 yes.
24     Q    So the answer is yes?
25     A    Yes.

79

1      Q    How did you determine to pay Mr. Peskoff
2  $30,000 for the first Sentry Select deal?
3
4
5
6
7
8
9
10
11
12          **REDACTED**
13
14
15
16
17
18
19
20
21
22
23
24     Q    My question simply is -- Let me put it this
25 way:  Have there been any other moneys paid by FIDAC to
   Mr. Peskoff other than the money that was paid in

80

1  connection with the FBR REIT and this $30,000 check?
2      A    Not that I'm aware of.
3      Q    Prior to issuing this check to Mr. Peskoff
4  for $30,000, did you reach any agreement with him as to
5  the amount of compensation he would receive for the first
6  Sentry Select deal?
7      A    No.
8      Q    The determination to pay him $30,000 was one
9  that you alone made; is that right?
10     A    That's correct.
11     Q    As I said a minute ago, the typewritten
12 notation on the stub says consulting expense.  And then
13 underneath in your handwritten note, you refer to it as a
14 finder's fee; right?
15     A    That's correct.
16     Q    In your mind, in this context, at least, was
17 consulting the equivalent of finding?
18     A    No.  I don't know who typed consulting
19 expense on here.  But the context of this check was
20 against the background of Steve needling Spencer and
21 Spencer, in turn, needling me, telling me that Steve was
22 sick and he had a bad year and he really needed the
23 money, he needed some income, is there anything we can do
24 before the end of the year to help him take care of some
25 tax issues that he had.  And I had no obligation to do

81

1  that - I had said that a number of times to Spencer - and
2  finally just made a determination that I was just going
3  to write him and check and that would be the end of it.
4      Q    I was just trying to determine whether there
5  was any negotiation or agreement between you and
6  Mr. Peskoff regarding the amount of the check.  And I
7  think you've answered it that there was not; is that
8  right?
9      A    Not that I'm aware.
10         (Whereupon, the Reporter marked Farrell 2.)
11         MR. NOVACK:  This is Farrell Exhibit 2?
12         MR. BELL:  Yes.
13  BY MR. BELL:
14      Q    Farrell Exhibit 2 is an e-mail dated
15  December 16th, 2003, from you to Ron Kazel, with a carbon
16  copy to Kathryn Fagan; is that right?
17      A    Yes.
18      Q    What was Kathryn Fagan's position with FIDAC
19  as of December 16th, 2003?
20      A    Chief financial officer.
21      Q    Do you remember seeing or do you remember --
22  Strike that.
23         Do you remember writing this e-mail?
24      A    I don't recall it specifically.
25      Q    Do you recall why you sent this e-mail to

82

1  Mr. Kazel?
2      A    We had to make accruals for year-end.  I note
3  that the date on this is December 16th, 2003.  I believe
4  that Steve had called me that morning to wish me happy
5  holidays, understanding that I probably wouldn't be in
6  the office through the end of the year.  And he again was
7  complaining about not being paid.  And I had already had
8  a conversation with Spencer, and I informed him of that
9  conversation during that personal conversation.
10      Q    You informed Mr. Peskoff of your conversation
11  with Spencer Brown --
12      A    Right.
13      Q    -- during the conversation you had with
14  Mr. Peskoff on December 16th --
15      A    Right.
16      Q    -- 2003?
17      A    Which was primarily personal at the time.
18      Q    Now, the first line, the e-mail states that
19  Mr. Peskoff would not be getting paid anything on
20  insurance.  Do you see that?
21      A    That's correct.
22      Q    Is that a reference to the Premier Fund?
23      A    Yes.  Well, actually, I don't know if Premier
24  was launched at this time.  I don't know what phase we
25  were in of development.  But it meant the relationship

83

1  around the insurance products.
2      Q    And --
3      A    Not specific --
4      Q    The relationship around Gen Advisors?
5      A    I don't know when -- So I would assume, yes,
6  it was Gen Advisors.
7      Q    And as I understand your e-mail, the
8  conversation -- during the conversation with Mr. Peskoff,
9  you told him that you would make one payment to him, but
10  you didn't commit to any dollar amount; is that right?
11

12

13                    REDACTED
14

15

16

17      Q    You might have, but you might not have?
18      A    Right.
19      Q    What did Mr. Peskoff say that you can recall
20  during this conversation?
21         MR. NOVACK:  Can we -- Is it possible just
22  to ask him what the conversation was, because it's kind
23  of like you haven't asked him what else he may have said,
24  if anything, and you have Peskoff -- So you're getting
25  it disjointed, piecemeal, and I don't think an entirely

84

1  fairly presented recitation.  If you want to do it that
2  way, all right.  But I'm going to ask him on redirect,
3  give me the whole conversation.
4         MR. BELL:  Well, okay.
5         MR. NOVACK:  So you can do it whichever way
6  you want.
7         MR. BELL:  I think we're going to get there.
8         MR. NOVACK:  It's just hard for him to say
9  what Mr. Peskoff said without knowing what he said to
10  Peskoff.  So if Peskoff said the word yes, but you don't
11  know what he said, it's useless.
12         MR. BELL:  Jerry, I understand your point.
13         MR. NOVACK:  I have a cajoling, not an
14  objection.
15         MR. BELL:  Can you read back the question,
16  please.
17         (Whereupon, the Reporter read back the
18         referred-to question.)
19         THE WITNESS:  The context of the
20  conversation, as I said earlier, was more along personal
21  lines.  Steve had had some health issues.  He understood
22  that his relationship with Annaly and FIDAC was over at a
23  lot of different levels and that -- Specifically, I
24  can't recall, but I know that he had a tax credit that he
25  had an issue with, and he was complaining about that

A-282

85

1 almost in every phone call, because he had losses from
2 prior years. And we were talking about specifically --
3 I think his parents were sick at the time, and he had
4 gone through some health issues. But there was no
5 negotiation. There was no -- I had told him that I
6 talked to Spencer. He had been calling Spencer and
7 complaining that he felt like he was due something,
8 apparently, and Spencer in turn was saying, I understand
9 you think he isn't doing anything, but he's a good guy
10 and he's really sick and he needs the money, et cetera.
11 So I made a judgment call on my own behalf, because this
12 is a private company, to write him a check. And that's
13 pretty much the gist of that conversation.
14 BY MR. BELL:
15    Q    Did you say anything else during that
16 conversation other than what is reflected in Exhibit 2?
17    A    Not that I can recall.
18    Q    After you sent the $30,000 check to
19 Mr. Peskoff in December of 2003, did you have any
20 communication with him about -- specifically about that
21 payment?
22    A    Not that I recall. I think he may have
23 called me to thank me for the check, but I don't recall
24 it specifically.
25    Q    Incidentally, do you keep notes of

86

1 conversations and meetings that you have with people?
2    A    Not necessarily.
3    Q    Do you sometimes do that?
4    A    Occasionally. I rely on my staff more to
5 keep the notes. I'm typically a listener rather than a
6 driver of the conversations.
7    Q    Do you have either a notebook or a date book
8 or calendar or anything of that nature that you, when you
9 do make notes, that you make it on?
10    A    Not that I haven't given in to counsel under
11 any kind of disclosure. I don't have a personal calendar
12 that I write on. I tend to be more electronic, with
13 e-mails and things like that.
14    Q    Okay, so let me make sure I'm clear on the
15 question. You don't have any sort of notebook or --
16    A    Or diary, no.
17    Q    -- diary, calendar, that you make notations
18 on about either phone conversations or things that are
19 occurring at meetings?
20    A    No.
21    Q    I'm going to show you what was marked
22 yesterday as Kazel Exhibit 6. Have you ever seen that
23 letter, again, not including preparation for the
24 deposition?
25    A    Yes, I have.

87

1    Q    Did you see it at about April 12th, 2004?
2    A    I would guess that it was contemporaneous
3 with Ron showing it to me.
4    Q    Did you understand when you saw this letter
5 that Mr. Peskoff thought he was still owed compensation
6 from FIDAC?
7    A    I remember being quite angry that this letter
8 arrived at Ron's desk.
9    Q    Did you understand that Mr. Peskoff thought
10 he was still owed compensation by FIDAC?
11    A    I can't figure out what Steve understood.
12 But apparently this letter indicates that. And he
13 doesn't have any discussion in here of any basis for that
14 compensation.
15    Q    What did you do, if anything, in reaction to
16 this letter?
17    A    When Ron showed it to me, he asked me if I
18 had had any conversation with Steve about any
19 compensation that was due him on any of these things, and
20 I told him, of course not. And I instructed him to
21 answer the letter in no uncertain terms, that we have
22 been extremely clear with this over a number of years
23 already, and the case was closed. I don't know what
24 basis Steve thought that this letter would do him in
25 terms of sending it to Ron.

88

REDACTED

15    Q    Let me show you what -- And I think we only
16 have one copy of this. It was marked previously as
17 Peskoff Exhibit 16.
18       MR. NOVACK: What's the date of the letter,
19 just so when we read the transcript, we'll know as we
20 read it?
21       MR. BELL: You mean Peskoff Exhibit 16?
22       MR. NOVACK: Yes.
23       MR. BELL: It's April 20th, 2004.
24       MR. NOVACK: That's the letter from Ron
25 Kazel; right?

89

1          MR. BELL:  Yes.
2  BY MR. BELL:
3       Q    Did you review that letter before it was sent
4  by Mr. Kazel?
5       A    I don't recall.
6       Q    Did you review it at about the time it was
7  sent, either before or shortly thereafter?
8          MR. NOVACK:  He just said, I don't recall if
9  I reviewed it, so how can you ask him at what time he
10  reviewed it?
11          MR. BELL:  He said he didn't review it before
12  it was sent.
13          MR. NOVACK:  Oh.
14          THE WITNESS:  I don't recall reviewing the
15  letter.
16          MR. NOVACK:  I thought he had answered it
17  reviewing it, period.
18  BY MR. BELL:
19       Q    So do you recall ever seeing that letter
20  before?
21          MR. NOVACK:  Other than in the context of the
22  litigation.
23          MR. BELL:  Before preparing for this
24  deposition.
25          THE WITNESS:  Maybe in the collection of the

90

1  documents for disclosure.
2  BY MR. BELL:
3       Q    But it sounds like you're speculating.
4       A    Yes, I am speculating.  I directed Ron to be
5  clear to Steve in his reply.  And Ron is a senior guy in
6  my company, and I trust his judgment, and I trust his
7  ability to write a business letter.
8       Q    Mr. Farrell, let me show you what was marked
9  yesterday as Kazel Exhibit 7, which is an April 7th, 2005
10  letter to you from Steve Peskoff.  Do you recall seeing
11  that letter in April of 2005?
12       A    Yes.
13       Q    Did you understand when you saw that letter
14  that Mr. Peskoff wanted to meet with you to discuss
15  compensation that he claimed was owed to him by FIDAC?
16       A    No.  I received this letter on a Saturday at
17  my home.  You can see the address here is to me as a
18  person, not as a business person.  I received it at
19  home.  I first assumed it was a birthday greeting,
20  because it was my birthday weekend.  When I opened the
21  letter, it was very confusing to me.
22       Q    So just so I'm clear on your testimony, you
23  did understand that Mr. Peskoff wanted to meet with you;
24  is that correct?
25       A    Mr. Peskoff always wanted to meet with me,

91

1  yes.
2       Q    But in any event, when you got this letter
3  and it says, I would like to meet with you, I assume you
4  understood that he would like to meet with you; is that
5  right?
6       A    I assumed when I first got it that it was,
7  happy birthday, Mike.  And as you can see from the
8  context of the letter, he speaks about his health issues
9  in the opening paragraph, difficulty he's had being
10  productive in the past year, he's feeling much better.
11  He congratulates me on apparently what he's learned about
12  the Toronto Stock Exchange and Ernie Baptista and Jeff
13  Messner.  Then he asked me to meet him for breakfast or
14  lunch to catch up.  And then he says, I hope your family
15  are all well, and looking forward to a meeting.
16  Essentially, I had no idea what this letter was about.  I
17  received it at home, at my personal residence.
18       Q    Let me show you what was marked yesterday as
19  Kazel deposition Exhibit 8.  Kazel deposition Exhibit 8
20  is a one-page e-mail string.  The first e-mail, meaning
21  the one at the bottom of the page, or actually not at the
22  top of the page, is an e-mail dated April 9th, 2005 from
23  you to Kathryn Fagan, copied to Ron Kazel; correct?
24       A    Yes, written at around 5:00 in the afternoon
25  on April 9th.

92

1       Q    You say that you received a FedEx package
2  with a personal and confidential letter enclosed from
3  Steve Peskoff.
4       A    That's correct.
5       Q    Would that letter be the April 7th, 2005
6  letter that we were just looking at that's marked as
7  Kazel Exhibit 7?
8       A    I think it's the same letter that I had
9  received early that morning from FedEx, yes.
10       Q    That's the letter that's marked as Kazel
11  deposition Exhibit 7; right?
12       A    That's correct.
13       Q    And you go on to say that you want to have
14  all of the relevant documents, checks, check stubs, et
15  cetera, collected for your review; correct?
16       A    That's correct.
17       Q    Now, didn't you want to look at those because
18  you understood that Mr. Peskoff was still claiming that
19  money was owed to him by FIDAC?
20       A    Well, as I said in the letter here, in the
21  text message, this is several hours after I first read
22  the letter.  And after thinking about it for several
23  hours and not being clear, as I said earlier, why I had
24  received this letter at my personal residence, and I even
25  reference in here it's a personal and confidential letter

A-284

93

```
1   sent to me from Steve Peskoff, it occurred to me that
2   this could only be some sort of threat.  And I knew that
3   he had gone behind my back with Ron sometime in 2004 and
4   that Ron had replied in either writing or e-mail.  And in
5   the interest of protecting the shareholders, I decided
6   that we needed to put together all the documentation,
7   because we recently hired Nick, and I wanted to make sure
8   that we had everything that we had internally available
9   to him in the event that we ever had to defend ourselves.
10      Q   Now, did you respond to Mr. Peskoff's request
11  for a meeting?
12      A   I don't recall.
13      Q   You were not willing to meet with him; is
14  that correct?
15      A   I had cut off this relationship at the end of
16  the FBR REIT termination, and I felt that this was over.
17  And Steve continued to try to wheedle his way through
18  every crack that he could, whether it was Spencer Brown
19  or go behind my back to my employees.  So I had concluded
20  that this was no longer a personal relationship or even a
21  friendly relationship.
22      Q   As a result, you were not willing to meet
23  with him?
24      A   I don't remember if I did meet with him or
25  not.  But if I did so, I did so reluctantly.
```

94

```
1           MR. BELL:  Let's mark this as Farrell 3.
2           (Whereupon, the Reporter marked Farrell 3.)
3   BY MR. BELL:
4       Q   I've given you what's marked as Farrell
5   Exhibit 3, which again is an e-mail string.  The first
6   one chronologically is from -- Is that Natalie?
7       A   It's Natalie.
8       Q   Uribe to you dated April 11th, 2005.  And the
9   second one is your response about eleven minutes later.
10  In your response, you say that you're unavailable for
11  meetings with Mr. Peskoff; right?
12      A   That's correct.
13      Q   I take it that that means you were not
14  available at any time for a meeting with Mr. Peskoff.
15      A   That's apparently what this means, yes.
16          MR. BELL:  Give me a moment, if I can.
17          (Whereupon, at this time a recess was
18          held.)
19  BY MR. BELL:
20
21
22
23
24
25
```

REDACTED

95

REDACTED

96

REDACTED

97

REDACTED

11  Q    But in either event, in either of those

12  scenarios, FIDAC earns fees; right?

13  A    That's correct. And it has different

14  obligations and responsibilities underneath each one of

15  them.

REDACTED

20  MR. NOVACK: I'm sorry, I think he -- I

21  don't think he said they would definitely pay him a fee.

22  I think he said they would negotiate something with

23  them. So it wasn't like --

24  MR. BELL: Well, what I understood -- I can

25  try to clear that up. But what I understood that to mean

98

1  was they would pay him a fee. The question is, how much.

2  THE WITNESS: Yeah. I mean, I would further

3  clarify that by saying that I can remember in very

4  distinct conversations telling Steve that if he wanted to

5  get paid on the insurance product, he should talk to Gen

6  Advisors, because they were the structure by which he

7  would best fit. And as I also testified earlier, I made

8  comments that he should not be paid from both sides.

9  MR. BELL: Can you read the question back,

10  please.

11  (Whereupon, the Reporter read back the

12  referred-to question.)

13  THE WITNESS: I didn't have an agreement with

14  him to do that.

15  BY MR. BELL:

16  Q    You didn't have --

17  A    For either one of those cases.

REDACTED

23  A    We would have had to give him --

24  MR. NOVACK: Account, I think he said a

25  separately managed account.

99

1  THE WITNESS: A separately managed account,

2  right. So long as he was not receiving fees from any

3  other entity regarding the moneys that came from that

4  account.

5  BY MR. BELL:

6  Q    Now, I want to make sure I understand your

7  testimony about the first meeting that you had with

8  Mr. Baptista. As I understand the testimony you gave

9  earlier, the discussion that you had with Mr. Baptista

10  was -- really didn't have anything to do with FIDAC's

11  business. Is that your recollection?

12  A    That's my recollection.

13  Q    Now, Mr. Baptista testified, I believe, a few

14  days ago that it did have something to do with FIDAC's

15  business. And I'm not going to ask you to call

16  Mr. Baptista a liar, but is it possible that your

17  recollection of that meeting is not entirely complete?

18  A    I doubt it.

19  Q    Did you take any notes of that meeting with

20  Mr. Baptista?

21  A    Not if it was a personal meeting.

22  Q    It occurred in 2001?

23  A    I don't remember when.

24  Q    I think you said it was at least a year prior

25  to --

100

1  A    The Gen Advisor letter.

2  Q    -- the Gen Advisor agreement, which is dated

3  October 10th, 2002. So that would put it sometime in

4  2001; correct?

5  A    Right. And I don't think that Mr. Baptista

6  would have been viewed in any context as being licensed

7  or even familiar with investment management at our level

8  prior to that meeting. He didn't come to me as a money

9  manager, nor as someone who ran institutional money.

10  Q    Had you investigated Mr. Baptista's

11  background prior to that meeting?

12  A    Only through discussion with Steve Peskoff,

13  which the goal was, what have you done on estate planning

14  and life insurance.

15  Q    Do you have any securities licenses?

16  A    No.

17  Q    Do you recall Mr. Peskoff -- Do you remember

18  talking to Mr. Peskoff about Mr. Baptista prior to your

19  meeting with Mr. Baptista? You've already said you had

20  conversations with him.

21  A    Just in the context of my personal estate

22  planning and insurance.

23  Q    Do you remember telling Mr. Peskoff during

24  those conversations that you didn't want Mr. Baptista

25  attempting to sell personal life insurance to you?

A-286

101

1    A    Afterwards I told him that.

2    Q    So you recall a conversation after the

3 meeting with Mr. Baptista in which you told Mr. Peskoff

4 you didn't want to have Mr. Baptista attempt to sell you

5 personal life insurance?

6    A    Essentially what I said is that I had -- I

7 saw no value add in my personal estate planning from that

8 relationship at that level with Ernie.

9    Q    When you agreed to meet with Mr. Baptista,

10 what did you think the subject of the meeting was going

11 to be?

12    A    Personal estate planning and life insurance.

13    Q    And that was based on conversations you had

14 with Mr. Peskoff?

15    A    Yes. Steve Peskoff represented to me that he

16 was an expert in life insurance and that, in fact, that

17 was something that he had done in one of his prior lives,

18 and that since I apparently to him did not know very much

19 about it, that I should speak to somebody about it, and

20 he had a friend that he wanted to introduce to me. And

21 he inferred in that conversation that there had been a

22 number of changes in the way that you could invest in

23 life insurance over the years and that I just wasn't

24 familiar with the state of the art, if you will. And I

25 agreed to take the meeting with Mr. Baptista. And then

102

1 after I had the meeting with him, I made it clear to

2 Steve that I didn't think there was any value add, and

3 that I felt that there was nothing different than what I

4 was already planning to do with my life going forward or

5 that I was covered for life insurance. We had company

6 life insurance that covered me for certain aspects of

7 that, as well. So that was the nature of that

8 conversation.

9        MR. BELL: Okay, I don't have anything else

10 for Mr. Farrell.

11        MR. NOVACK: I might have like about five

12 minutes, if you just give me a chance to check my notes.

13        MR. BELL: I do have, I think, a few

14 questions for Mr. Singh. It shouldn't be long at all.

15        MR. NOVACK: Let me ask him a couple

16 questions. I'm going to sit here. But when you answer,

17 look at them so the court reporter can hear you, okay.

18 BY MR. NOVACK:

19    Q    Earlier in your testimony, you were looking

20 at the February 15th, 2000 letter which had a termination

21 provision in there that you referred to. And in your

22 testimony, you said, if we terminated the agreement, then

23 this letter would no longer apply going forward. What

24 agreement were you referring to?

25    A    The FBR agreement.

103

1    Q    The agreement between FIDAC --

2    A    And FBR assets.

3    Q    Pursuant to which FIDAC was managing?

4    A    Their assets, that's correct.

5    Q    The FBR REIT?

6    A    And it was a separately managed account.

**REDACTED**

12    Q    And let's go to the reasons that you were

13 unavailable for meetings with Mr. Peskoff. Can you

14 explain to us whether or not you were upset or angry with

15 Mr. Peskoff when you got this letter, and, if so, why.

16    A    I was angry when I got the letter. First

17 off, I was surprised that it came to my house, because I

18 considered my relationship with Steve to be more

19 business, less personal, although the blend definitely

20 was there over time.

21        I also felt betrayed, because after

22 reflecting on it for several hours, I realized that

23 despite as many times as we have been clear with him that

24 he had no relationship, he had no authority to represent

25 the firm, he was not entitled to any incomes that had

104

1 come out of these deals, and, in fact, we were struggling

2 with these deals, that he continued to go behind my back

3 not only to Spencer Brown but also in writing to Ron

4 Kazel, after I had been very clear with him on the

5 phone.

6        And in giving him the last check in

7 settlement of the argument that I was having with Spencer

8 at the time and regarding Steve, he had called me and

9 thanked me and never made reference to anything else

10 going forward. He seemed resigned to the fact that the

11 relationship was over. And all of this collectively to

12 me was just either the rantings of somebody who clearly

13 didn't understand the business or clearly didn't

14 understand what I was saying. And I thought I was being

15 very clear.

16        So it was a distraction. It was definitely

17 something that we had discussed on the phone a number of

18 times. And to me, this relationship was over and was now

19 turning into stalking from the grandfather of Annaly, if

20 you want to call him that. So I was angry. I was angry,

21 and I refused to meet with him as a result. I didn't

22 want to have any more one-on-one meetings with him

23 without other people being there, and I didn't want to

24 have meetings with him generally. They were not

25 productive meetings, unproductive.



105

1    Q    When you wrote the e-mail to Ron and to
2    Kathryn, you mentioned you were writing them an e-mail to
3    tell them about the fact that you had had a conversation
4    with Mr. Peskoff in December 2003, and you had told him
5    with respect to the insurance situation and Sentry that
6    you were going to make one payment.  How does that relate
7    to accruals?  What were you referring to?
8
9
10
11
12
13
14
15                    REDACTED
16
17
18
19
20
21
22
24    Q    When you told Mr. Peskoff that you were going
25    to send him a check, and you were clear that this was

106

1    going to be one payment to cover the insurance situation
2    and the Sentry situation, did he say to you, no, I'm
3    entitled to more, don't send me that check, I'm not
4    agreeing to this?
5         MR. BELL:  Objection; leading.
6         MR. NOVACK:  You can answer the question.
7         THE WITNESS:  At no time did Steve refuse
8    money or imply that he was entitled to something more or
9    even plead that he had a contract that said he was
10    entitled to more.
11   BY MR. NOVACK:
12        Q    Are you saying that at no time did
13   Mr. Peskoff, before this dispute arose, ever say to you
14   he was entitled under any contract to get either a fee
15   with respect to the insurance situation or Sentry Select?
16        A    He never made --
17        MR. BELL:  Objection; leading.
18        MR. NOVACK:  You can answer.
19        THE WITNESS:  He never made a representation
20   to me that he had a contract of any nature or form with
21   Annaly or FIDAC.
22        MR. NOVACK:  Okay, that's all.
23        MR. BELL:  I have nothing else.  Thank you.
24        (Whereupon, at 12:55 p.m. the deposition was
25        concluded.)

107

1                    C E R T I F I C A T E
2         I have read my deposition, and it is true and
3    correct to the best of my knowledge and belief, except
4    for any corrections listed on the enclosed Errata Sheet.
5
6
7
8              MICHAEL A.J. FARRELL
9
10
11   Witness
12
13
14
15
16
17
18
19
20
21
22
23
24
25

108

1                    CERTIFICATE
2         I, Roxanne Weaver, the officer before whom
3    the deposition of MICHAEL A.J. FARRELL was taken, do
4    hereby certify that MICHAEL A.J. FARRELL, the witness
5    whose testimony appears in the foregoing deposition, was
6    duly sworn by me on Friday, December 15, 2006, and that
7    the transcribed deposition of said witness is a true
8    record of the testimony given by him; that the
9    proceedings here are recorded fully and accurately; that
10   I am neither attorney nor counsel for, nor related to,
11   any of the parties to the action in which this deposition
12   was taken; and further that I am not a relative of any
13   attorney or counsel employed by the parties, nor
14   financially interested in this action.
15
16
17
18        Roxanne Weaver, RPR, CRR
19        COMPUTERIZED REPORTING SERVICES, INC.
20        Notary Public in and for the
          Commonwealth of Pennsylvania
21        My Commission expires August 9, 2007.
22
23
24
25