## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **UNDERHILL INVESTMENT CORPORATION**, *by and through Stephen D. Peskoff as successor in interest* and **STEPHEN D. PESKOFF**, *individually*, | : : : : : : : | |
| Plaintiffs, | : : | C.A. No. 06-99-SLR |
| v. | : : : | |
| **FIXED INCOME DISCOUNT ADVISORY COMPANY**, | : : : | |
| Defendant. | : : : | |

### APPENDIX TO DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
### (Pages B-1 – B-86)

**EDWARDS ANGELL PALMER & DODG LLP**
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770
302.777.7263 (Fax)

**OF COUNSEL:**
Gerald A. Novack (*pro hac vice*)
Sarah P. Kenney (*pro hac vice*)
**KIRKPATRICK & LOCKHART
   PRESTON GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
212.536.3900
212.536.3901 (Fax)

DATED: June 26, 2007

I, John L. Reed, being first duly sworn according to law, do hereby depose and state as follows:

1.    I am a member of the Bar of the State of Delaware and I am a partner with the law firm of Edwards Angell Palmer & Dodge LLP, located at 919 North Market Street, 15th Floor, Wilmington, Delaware, co-counsel to Fixed Income Discount Advisory Company ("FIDAC"), the Defendant in this action.

2.    Attached hereto are true and correct copies of the following documents which constitute the Appendix (B-1 through B-86) to Defendant Fixed Income Discount Advisory Company's Answering Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment:

|  | DEPOSITION EXIBITS | PAGE NUMBERS |
|---|---|---|
| 1 | Cocke Ex. 10<br><br>Underhill Investment Corporation's 2004 U.S. Corporation Income Tax Return, Form 1120. | B-1-B-17 |
| 2 | Peskoff Ex. 31<br><br>Collateral Assignment, Pledge Agreement and Security Agreement between Underhill Investment Corporation and Stephen D. Peskoff, dated December 6, 2006.  (P-339 – P-341) | B-18-B-20 |
| 3 | Peskoff Ex. 32<br><br>August 23, 2004 Certified Minutes of Meeting of the Board of Directors of Underhill Investment Corporation, dated December 6, 2006 to be effective August 23, 2004.  (P-342 – P-343) | B-21-B-22 |

| 4 | Peskoff Ex. 33<br><br>August 23, 2004 Certified Minutes of Meeting of the Board of Shareholders of Underhill Investment Corporation, dated December 6, 2006 to be effective August 23, 2004.  (P-344 – P-345) | B-23-B-24 |
|---|---|---|
| 5 | Peskoff Ex. 34<br><br>August 23, 2004 Certified Resolutions of Board of Directors of Underhill Investment Corporation in Accordance with Plan of Complete Liquidation Under Ohio Revised Code 1701.88, dated December 6, 2006 to be effective August 23, 2004. (P-346 – P-347) | B-25-B-26 |
| 6 | Peskoff Ex. 35<br><br>June 13, 2005 Certified Resolutions of Board of Directors of Underhill Investment Corporation in Furtherance of Plan of Complete Liquidation Under Ohio Revised Code 1701.88, dated December 6, 2006 to be effective June 13, 2005.  (P-348) | B-27 |
| 7 | Peskoff Ex. 36<br><br>August 23, 2004 Certified Resolution of Shareholders of Underhill Investment Corporation in Accordance with a Plan of Complete Liquidation Under Ohio Revised Code 1701.88, dated December 6, 2006 to be effective August 23, 2004. (P-349 – P-350) | B-28-B-29 |
| | **DOCUMENT PRODUCTIONS** | |
| 8<br><br>**(FILED UNDER SEAL)** | P-1 – P-4<br><br>September 25, 2002 Facsimile from Ronald Kazel to Stephen D. Peskoff. | B-30-B-33 |
| 9 | OR 60 – OR 65<br><br>Underhill Investment Corporation's dissolution papers. | B-34-B-39 |

| | **DEPONENTS** | |
|----|----------------------------|------------|
| 10 | Charles P. Cocke – 8/10/06 | B-40-B-62 |
| 11 | John P. Devlin – 8/16/06   | B-63-B-86 |

 */s/ John L. Reed*
JOHN L. REED (I.D. No. 3023)

SWORN TO AND SUBSCRIBED before
me this 26th day of June, 2007.

 */s/ Joseph B. Cicero*
Joseph B. Cicero (I.D. No. 4388)
Pursuant to 29 *Del. C.* § 4323(a)(3)

**1**

**Form 1120**
Department of the Treasury
Internal Revenue Service

# U.S. Corporation Income Tax Return

For calendar year 2004 or tax year
beginning **APRIL 1, 2004**, ending **NOVEMBER 30, 2004**
**EXTENSION GRANTED TO 08/15/05**

OMB No. 1545-0123

**2004**

| A Check if: | Use IRS label. Otherwise, print or type. | | |
|---|---|---|---|
| 1 Consolidated return (attach form 851) ☐ | | Name **UNDERHILL INVESTMENT CORP.** | B Employer identification number **34-1183443** |
| 2 Personal holding co. (attach Sch. PH) ☐ | | Number, street, and room or suite no. If a P.O. box, see page 9 of instructions. **7414 OLD MAPLE SQUARE** | C Date incorporated **03/11/1976** |
| 3 Personal service corp. (see instructions) ☐ | | City or town, state, and ZIP code **MCLEAN, VA  22102-2817** | D Total assets (see page 8 of instr.) $ **0.** |
| 4 Schedule M-3 required (attach Sch. M-3) ☐ | | | |

E Check if: (1) ☐ Initial return (2) ☒ Final return (3) ☐ Name change (4) ☐ Address change

| | | | | | | |
|---|---|---|---|---|---|---|
| Income | 1 a Gross receipts or sales | 67,500. | b Less returns and allowances | | c Bal ▶ | 1c | 67,500. |
| | 2 Cost of goods sold (Schedule A, line 8) | | | | | 2 | |
| | 3 Gross profit. Subtract line 2 from line 1c | | | | | 3 | 67,500. |
| | 4 Dividends (Schedule C, line 19) | | | | | 4 | |
| | 5 Interest | | | SEE STATEMENT 1 | | 5 | 112. |
| | 6 Gross rents | | | | | 6 | |
| | 7 Gross royalties | | | | | 7 | |
| | 8 Capital gain net income (attach Schedule D (Form 1120)) | | | | | 8 | |
| | 9 Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | | | | 9 | -17,942. |
| | 10 Other income (attach schedule) | | | | | 10 | |
| | 11 Total income. Add lines 3 through 10 | | | | ▶ | 11 | 49,670. |

| | | | | | |
|---|---|---|---|---|---|
| Deductions | 12 Compensation of officers (Schedule E, line 4) | | | | 12 | |
| | 13 Salaries and wages (less employment credits) | | | | 13 | |
| | 14 Repairs and maintenance | | | | 14 | |
| | 15 Bad debts | | | | 15 | |
| | 16 Rents | | | | 16 | 27,716. |
| | 17 Taxes and licenses | | SEE STATEMENT 2 | | 17 | 1,570. |
| | 18 Interest | | | | 18 | 687. |
| | 19 Charitable contributions | | SEE STATEMENT 3 | | 19 | 0. |
| | 20 Depreciation (attach Form 4562) | 20 | 1,892. | | | |
| | 21 Less depreciation claimed on Schedule A and elsewhere on return ▶ | 21a | | | 21b | 1,892. |
| | 22 Depletion | | | | 22 | |
| | 23 Advertising | | | | 23 | |
| | 24 Pension, profit-sharing, etc., plans | | | | 24 | |
| | 25 Employee benefit programs | | | | 25 | 8,050. |
| | 26 Other deductions (attach schedule) | | SEE STATEMENT 4 | | 26 | 137,873. |
| | 27 Total deductions. Add lines 12 through 26 | | | ▶ | 27 | 177,788. |
| | 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | | | 28 | -128,118. |
| | 29 Less: a Net operating loss deduction | STATEMENT 5 | 29a | 0. | | |
| | b Special deductions (Schedule C, line 20) | | 29b | | 29c | |

| | | | | | |
|---|---|---|---|---|---|
| Tax and Payments | 30 Taxable income. Subtract line 29c from line 28 | | | | 30 | -128,118. |
| | 31 Total tax (Schedule J, line 11) | | | | 31 | 0. |
| | 32 Payments: a 2003 overpayment credited to 2004 | 32a | | | | |
| | b 2004 estimated tax payments | 32b | | | | |
| | c Less 2004 refund applied for on Form 4466 | 32c | | d Bal ▶ | 32d | |
| | e Tax deposited with Form 7004 | | | | 32e | |
| | f Credit for tax paid on undistributed capital gains (attach Form 2439) | | | | 32f | |
| | g Credit for Federal tax on fuels (attach Form 4136). See instructions | | | | 32g | 32h |
| | 33 Estimated tax penalty (see page 17 of instructions). Check if Form 2220 is attached | | | ▶ ☐ | 33 | |
| | 34 Tax due. If line 32h is smaller than the total of lines 31 and 33, enter amount owed | | | | 34 | 0. |
| | 35 Overpayment. If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | | | | 35 | |
| | 36 Enter amount of line 35 you want: Credited to 2005 estimated tax ▶ | | Refunded ▶ | | 36 | |

EXHIBIT
10-Coke
8/7/06CC

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date 8/8/05    Title Secretary & Sole Stockholder

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

| Paid Preparer's Use Only | Preparer's signature _____ | Date 8/5/05 | Check if self-employed ☒ | Preparer's SSN or PTIN **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** |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | **JOHN P. DEVLIN C.P.A.** **1501 LEE HIGHWAY, SUITE 102** **ARLINGTON, VIRGINIA  22209-1109** | EIN **52 1324044** Phone no. **(703) 524-0900** | |

411801 12-24-04    JWA    For Privacy/Paperwork Reduction Act Notice, see instructions.    1    Form 1120 (2004)

15030804 756985 2111    B-1    2004.05002 UNDERHILL INVESTMENT CORP.    2111    1

Form 1120 (2004)    UNDERHILL INVESTMENT CORP.    34-1183443   Page **2**

## Schedule A    Cost of Goods Sold (see page 17 of instructions)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases | 2 | |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) | 5 | |
| 6 | Total. Add lines 1 through 5 | 6 | |
| 7 | Inventory at end of year | 7 | |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | |

9 a  Check all methods used for valuing closing inventory:

    (i) ☐ Cost as described in Regulations section 1.471-3

    (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

    (iii) ☐ Other (Specify method used and attach explanation.) ▶

  b  Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c) .............................. ▶ ☐

  c  Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) .................. ▶ ☐

  d  If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO | 9d | |

  e  If property is produced or acquired for resale, do the rules of section 263A apply to the corporation? ......... ☐ Yes ☐ No

  f  Was there any change in determining quantities, cost, or valuations between opening and closing inventory?

    If "Yes," attach explanation ........... ☐ Yes ☐ No

## Schedule C    Dividends and Special Deductions (see page 18 of instructions)

| | | (a) Dividends received | (b) % | (c) Special deductions (a) x (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations that are subject to the 70% deduction (other than debt-financed stock) | | 70 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations that are subject to the 80% deduction (other than debt-financed stock) | | 80 | |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 42 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 48 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs that are subject to the 70% deduction | | 70 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs that are subject to the 80% deduction | | 80 | |
| 8 | Dividends from wholly owned foreign subsidiaries subject to the 100% deduction (section 245(b)) | | 100 | |
| 9 | Total. Add lines 1 through 8 | | | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from affiliated group members and certain FSCs that are subject to the 100% deduction | | 100 | |
| 12 | Dividends from controlled foreign corporations subject to the 85% deduction (attach Form 8895) | | 85 | |
| 13 | Other dividends from foreign corporations not included on lines 3, 6, 7, 8, 11, or 12 | | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | | | |
| 15 | Foreign dividend gross-up (section 78) | | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 (section 246(d)) | | | |
| 17 | Other dividends | | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 19 | Total dividends. Add lines 1 through 17. Enter here and on page 1, line 4 ▶ | | | |
| 20 | Total special deductions. Add lines 9, 10, 11, 12, and 18. Enter here and on page 1, line 29b ..... ▶ | | | |

## Schedule E    Compensation of Officers

(see instructions for page 1, line 12, on page 13 of instructions)

Note: Complete Schedule E only if total receipts (line 1a plus lines 4 through 10 on page 1) are $500,000 or more.

| | (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|---|
| | | | | (d) Common | (e) Preferred | |
| 1 | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 2 | Total compensation of officers | | | | | |
| 3 | Compensation of officers claimed on Schedule A and elsewhere on return | | | | | |
| 4 | Subtract line 3 from line 2. Enter the result here and on page 1, line 12 | | | | | |

411611
12-22-04  JWA

**B-2**

2

Form **1120** (2004)

5030804 756985 2111         2004.05002 UNDERHILL INVESTMENT CORP.   2111      1

Form 1120 (2004) UNDERHILL INVESTMENT CORP.                                      34-1183443  Page 3

## Schedule J    Tax Computation (see page 20 of instructions)

| | | | | |
|---|---|---|---|---|
| 1 | Check if the corporation is a member of a controlled group (see sections 1561 and 1563) ............... ▶ ☐ | | | |
| | Important: Members of a controlled group, see page 20 of instructions. | | | |
| 2a | If the box on line 1 is checked, enter the corporation's share of the $50,000, $25,000, and $9,925,000 taxable income brackets (in that order): | | | |
| | (1) $_____   (2) $_____   (3) $_____ | | | |
| b | Enter the corporation's share of:   (1) Additional 5% tax (not more than $11,750) $_____ | | | |
| | (2) Additional 3% tax (not more than $100,000) $_____ | | | |
| 3 | Income tax. Check if a qualified personal service corporation under section 448(d)(2) (see page 21) ............................................................................ ▶ ☐ | | 3 | 0. |
| 4 | Alternative minimum tax (attach Form 4626) ..................................................... | | 4 | |
| 5 | Add lines 3 and 4 ........................................................................... | | 5 | 0. |
| 6a | Foreign tax credit (attach Form 1118) ...................................... | 6a | | |
| b | Possessions tax credit (attach Form 5735) .................................. | 6b | | |
| c | Check: ☐ Nonconventional source fuel credit ☐ QEV credit (attach Form 8834) | 6c | | |
| d | General business credit. Check box(es) and indicate which forms are attached: | | | |
| | ☐ Form 3800 ☐ Form(s) (specify) ▶ _____ | 6d | | |
| e | Credit for prior year minimum tax (attach Form 8827) ......................... | 6e | | |
| f | Qualified zone academy bond credit (attach Form 8860) ...................... | 6f | | |
| 7 | Total credits. Add lines 6a through 6f ........................................................... | | 7 | |
| 8 | Subtract line 7 from line 5 .................................................................... | | 8 | 0. |
| 9 | Personal holding company tax (attach Schedule PH (Form 1120)) .................................... | | 9 | |
| 10 | Other taxes. Check if from:  ☐ Form 4255  ☐ Form 8611  ☐ Form 8697 ☐ Form 8866   ☐ Other (attach schedule) | | 10 | |
| 11 | Total tax. Add lines 8 through 10. Enter here and on page 1, line 31 ............................... | | 11 | 0. |

## Schedule K    Other Information (see page 23 of instructions)

| | | Yes | No | | | | Yes | No |
|---|---|---|---|---|---|---|---|---|
| 1 | Check accounting method: a ☒ Cash b ☐ Accrual | | | 7 | At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of (a) the total voting power of all classes of stock of the corporation entitled to vote or (b) the total value of all classes of stock of the corporation? | | | X |
| | c ☐ Other (specify) ▶ _____ | | | | | | | |
| 2 | See page 25 of the instructions and enter the: | | | | If "Yes," enter: (a) Percentage owned ▶ _____ | | | |
| a | Business activity code no. ▶ 561490 | | | | and (b) Owner's country ▶ _____ | | | |
| b | Business activity ▶ BUSINESS SERVICES | | | c | The corporation may have to file Form 5472, information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter number of Forms 5472 attached ▶ _____ | | | |
| c | Product or service ▶ MGMT & FINL SERVICES | | | | | | | |
| 3 | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) ...... | | X | 8 | Check this box if the corporation issued publicly offered debt instruments with original issue discount ............ ▶ ☐ | | | |
| | If "Yes," attach a schedule showing: (a) name and employer identification number (EIN), (b) percentage owned, and (c) taxable income (or loss) before NOL and special deductions of such corporation for the tax year ending with or within your tax year. | | | | If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount Instruments. | | | |
| 4 | Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? ..................... | | X | 9 | Enter the amount of tax-exempt interest received or accrued during the tax year ▶ $ _____ | | | |
| | If "Yes," enter name and EIN of the parent corporation ▶ _____ | | | 10 | Enter the number of shareholders at the end of the tax year (if 75 or fewer) ▶ 1 | | | |
| 5 | At the end of the tax year, did any individual, partnership, corporation, estate, or trust own, directly or indirectly, 50% or more of the corporation's voting stock? (For rules of attribution, see section 267(c).) STATEMENT 6 | X | | 11 | If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here ... ▶ ☐ If the corporation is filing a consolidated return, the statement required by Temporary Regulations section 1.1502-21T(b)(3)(i) or (ii) must be attached or the election will not be valid. | | | |
| | If "Yes," attach a schedule showing name and identifying number. (Do not include any information already entered in 4 above.) Enter percentage owned ▶ 100.00 | | | 12 | Enter the available NOL carryover from prior tax years (Do not reduce it by any deduction on line 29a.) ▶ $ 650,230. | | | |
| 6 | During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See sections 301 and 316.) ............. | | X | 13 | Are the corporation's total receipts (line 1a plus lines 4 through 10 on page 1) for the tax year and its total assets at the end of the tax year less than $250,000? | | | X |
| | If "Yes," file Form 5452, Corporate Report of Nondividend Distributions. | | | | If "Yes," the corporation is not required to complete Schedules L, M-1, and M-2 on page 4. Instead, enter the total amount of cash distributions and the book value of property distributions (other than cash) made during the tax year. ▶ $ 0. | | | |
| | If this is a consolidated return, answer here for the parent corporation and on Form 851, Affiliations Schedule, for each subsidiary. | | | | | | | |

Note: If the corporation, at any time during the tax year, had assets or operated a business in a foreign country or U.S. possession, it may be required to attach Schedule N (Form 1120), Foreign Operations of U.S. Corporations, to this return. See Schedule N for details.

Form 1120 (2004)  UNDERHILL INVESTMENT CORP.                              34-1183443  Page 4

Note: The corporation is not required to complete Schedules L, M-1, and M-2 if Question 13 on Schedule K is answered "Yes."

## Schedule L  Balance Sheets per Books

| Assets | Beginning of tax year (a) | Beginning of tax year (b) | End of tax year (c) | End of tax year (d) |
|---|---|---|---|---|
| 1  Cash | | 168,784. | | |
| 2a Trade notes and accounts receivable | | | | |
| b Less allowance for bad debts | | | | |
| 3  Inventories | | | | |
| 4  U.S. government obligations | | | | |
| 5  Tax-exempt securities | | | | |
| 6  Other current assets (att. sch.) | | | | |
| 7  Loans to shareholders | | | | |
| 8  Mortgage and real estate loans | | | | |
| 9  Other investments (att. sch.)  STMT 7 | | 33,503. | | |
| 10a Buildings and other depreciable assets | 122,228. | | | |
| b Less accumulated depreciation | 26,296. | 95,932. | | |
| 11a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 12 Land (net of any amortization) | | | | |
| 13a Intangible assets (amortizable only) | | | | |
| b Less accumulated amortization | | | | |
| 14 Other assets (att. sch.)  STMT 8 | | 283,258. | | |
| 15 Total assets | | 581,477. | | 0. |
| **Liabilities and Shareholders' Equity** | | | | |
| 16 Accounts payable | | | | |
| 17 Mortgages, notes, bonds payable in less than 1 year | | 17,638. | | |
| 18 Other current liabilities (att. sch.)  STMT 9 | | 50. | | 50. |
| 19 Loans from shareholders | | 6,392,309. | | 6,033,944. |
| 20 Mortgages, notes, bonds payable in 1 year or more | | 38,365. | | |
| 21 Other liabilities (att. sch.) | | | | |
| 22 Capital stock: a Preferred stock | | | | |
| b Common stock | 172,550. | 172,550. | 172,550. | 172,550. |
| 23 Additional paid-in capital | | 1,561,153. | | 1,561,153. |
| 24 Retained earnings - Appropriated (attach schedule) | | | | |
| 25 Retained earnings - Unappropriated | | -7,600,588. | | -7,767,697. |
| 26 Adjustments to shareholders' equity (attach schedule) | | | | |
| 27 Less cost of treasury stock | | | | |
| 28 Total liabilities and shareholders' equity | | 581,477. | | 0. |

## Schedule M-1  Reconciliation of Income (Loss) per Books With Income per Return (see page 24 of instructions)

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | -157,108. | 7 Income recorded on books this year not included on this return (itemize): | |
| 2 Federal income tax per books | | Tax-exempt interest  $ _____ | |
| 3 Excess of capital losses over capital gains | | | |
| 4 Income subject to tax not recorded on books this year (itemize): | | | |
| | | 8 Deductions on this return not charged against book income this year (itemize): | |
| 5 Expenses recorded on books this year not deducted on this return (itemize): | | a Depreciation  $ _____ | |
| a Depreciation  $ _____ | | b Charitable contributions  $ _____ | |
| b Charitable contributions  $ _____ | | | |
| c Travel and entertainment  $ 107.  STMT 10  28,883. | 28,990. | 9 Add lines 7 and 8 | |
| 6 Add lines 1 through 5 | -128,118. | 10 Income (page 1, line 28) - line 6 less line 9 | -128,118. |

## Schedule M-2  Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)

| | | | |
|---|---|---|---|
| 1 Balance at beginning of year | -7,600,588. | 5 Distributions: a Cash | |
| 2 Net income (loss) per books | -157,108. | b Stock | |
| 3 Other increases (itemize): | | c Property | |
| | | 6 Other decreases (itemize):  SEE STATEMENT 11 | 10,001. |
| | | 7 Add lines 5 and 6 | 10,001. |
| 4 Add lines 1, 2, and 3 | -7,757,696. | 8 Balance at end of year (line 4 less line 7) | -7,767,697. |

411821 12-22-04  JWA                  B-4              4              Form 1120 (2004)

**SCHEDULE D**
**(Form 1120)**
Department of the Treasury
Internal Revenue Service

# Capital Gains and Losses

▶ Attach to Form 1120, 1120-A, 1120-F, 1120-FSC, 1120-H,
1120-IC-DISC, 1120-L, 1120-ND, 1120-PC, 1120-POL, 1120-REIT,
1120-RIC, 1120-SF, 990-C, or certain Forms 990-T.

OMB No. 1545-0123

**2004**

| Name | Employer identification number |
|------|-------------------------------|
| UNDERHILL INVESTMENT CORP. | 34-1183443 |

## Part I   Short-Term Capital Gains and Losses - Assets Held One Year or Less

| (a) Description of property (Example: 100 shares of Z Co.) | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Sales price (see instructions) | (e) Cost or other basis (see instructions) | (f) Gain or (loss) (Subtract (e) from (d)) |
|---|---|---|---|---|---|
| 1 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | | | |
|---|---|---|---|
| 2 | Short-term capital gain from installment sales from Form 6252, line 26 or 37 | 2 | |
| 3 | Short-term gain or (loss) from like-kind exchanges from Form 8824 | 3 | |
| 4 | Unused capital loss carryover (attach computation)   SEE STATEMENT 12 | 4 | ( 453,878. ) |
| 5 | Net short-term capital gain or (loss). Combine lines 1 through 4 | 5 | -453,878. |

## Part II   Long-Term Capital Gains and Losses - Assets Held More Than One Year

| 6 | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | | | |
|---|---|---|---|
| 7 | Enter gain from Form 4797, column (g), line 7 or 9 | 7 | |
| 8 | Long-term capital gain from installment sales from Form 6252, line 26 or 37 | 8 | |
| 9 | Long-term gain or (loss) from like-kind exchanges from Form 8824 | 9 | |
| 10 | Capital gain distributions (see instructions) | 10 | |
| 11 | Net long-term capital gain or (loss). Combine lines 6 through 10 | 11 | |

## Part III   Summary of Parts I and II

| | | | |
|---|---|---|---|
| 12 | Enter excess of net short-term capital gain (line 5) over net long-term capital loss (line 11) | 12 | |
| 13 | Net capital gain. Enter excess of net long-term capital gain (line 11) over net short-term capital loss (line 5) | 13 | |
| 14 | Add lines 12 and 13. Enter here and on Form 1120, page 1, line 8, or the proper line on other returns | 14 | |

**Note: If losses exceed gains, see Capital losses on page 2.**

JWA    For Privacy Act and Paperwork Reduction Act Notice, see the instructions for Forms 1120 and 1120-A.

Schedule D (Form 1120) 2004

B-5

421051
12-22-04

5

Form **4562**

Department of the Treasury
Internal Revenue Service

## Depreciation and Amortization
(Including Information on Listed Property)    **SUMMARY**

▶ See separate instructions.    ▶ Attach to your tax return.

OMB No. 1545-0172

**2004**

Attachment
Sequence No. 67

| Name(s) shown on return | Business or activity to which this form relates | Identifying number |
|---|---|---|
| UNDERHILL INVESTMENT CORP. | ALL BUSINESS ACTIVITIES | 34-1183443 |

**Part I  Election To Expense Certain Property Under Section 179 Note: If you have any listed property, complete Part V before you complete Part I.**

| | | | |
|---|---|---|---|
| 1 | Maximum amount. See instructions for a higher limit for certain businesses | 1 | 102,000. |
| 2 | Total cost of section 179 property placed in service (see instructions) | 2 | |
| 3 | Threshold cost of section 179 property before reduction in limitation | 3 | 410,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | 4 | 0. |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | 5 | 102,000. |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | 7 | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | 8 | |
| 9 | Tentative deduction. Enter the smaller of line 5 or line 8 | 9 | |
| 10 | Carryover of disallowed deduction from line 13 of your 2003 Form 4562 | 10 | 10,000. |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | 11 | 0. |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11 | 12 | 0. |
| 13 | Carryover of disallowed deduction to 2005. Add lines 9 and 10, less line 12  ▶ | 13 | 10,000. |

Note: Do not use Part II or Part III below for listed property. Instead, use Part V.

**Part II  Special Depreciation Allowance and Other Depreciation (Do not include listed property.)**

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions) | 14 | |
| 15 | Property subject to section 168(f)(1) election (see instructions) | 15 | |
| 16 | Other depreciation (including ACRS) (see instructions) | 16 | |

**Part III  MACRS Depreciation (Do not include listed property.) (See instructions.)**

**Section A**

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2004 | 17 | |
| 18 | If you are electing under section 168(i)(4) to group any assets placed in service during the tax year into one or more general asset accounts, check here  ▶ ☐ | | |

**Section B - Assets Placed in Service During 2004 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property | | | | | | |
| **b** 5-year property | | | | | | |
| **c** 7-year property | | | | | | |
| **d** 10-year property | | | | | | |
| **e** 15-year property | | | | | | |
| **f** 20-year property | | | | | | |
| **g** 25-year property | | | 25 yrs. | | S/L | |
| **h** Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| **i** Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

**Section C - Assets Placed in Service During 2004 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life | | | | | S/L | |
| **b** 12-year | | | 12 yrs. | | S/L | |
| **c** 40-year | / | | 40 yrs. | MM | S/L | |

**Part IV  Summary (See instructions.)**

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | 21 | |
| 22 | Total. Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | 22 | |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | 23 | |

416251
11-15-04    LHA  For Paperwork Reduction Act Notice, see separate instructions.

6

B-6

Form **4562** (2004)

| Form **4562** | **Depreciation and Amortization** (Including Information on Listed Property) OTHER ▶ See separate instructions.    ▶ Attach to your tax return. | | OMB No. 1545-0172 **2004** Attachment Sequence No. **67** |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | | |
| Name(s) shown on return | | Business or activity to which this form relates | Identifying number |
| UNDERHILL INVESTMENT CORP. | | OTHER DEPRECIATION | 34-1183443 |

**Part I**  Election To Expense Certain Property Under Section 179 Note: If you have any listed property, complete Part V before you complete Part I.

| | | | |
|---|---|---|---|
| 1 Maximum amount. See instructions for a higher limit for certain businesses | | 1 | 102,000. |
| 2 Total cost of section 179 property placed in service (see instructions) | | 2 | |
| 3 Threshold cost of section 179 property before reduction in limitation | | 3 | 410,000. |
| 4 Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | | 4 | |
| 5 Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | | 5 | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 Listed property. Enter the amount from line 29 | 7 | | |
| 8 Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | | 8 | |
| 9 Tentative deduction. Enter the smaller of line 5 or line 8 | | 9 | |
| 10 Carryover of disallowed deduction from line 13 of your 2003 Form 4562 | | 10 | |
| 11 Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | | 11 | |
| 12 Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11 | | 12 | |
| 13 Carryover of disallowed deduction to 2005. Add lines 9 and 10, less line 12 ▶ | 13 | | |

Note: Do not use Part II or Part III below for listed property. Instead, use Part V.

**Part II**  Special Depreciation Allowance and Other Depreciation (Do not include listed property.)

| | | | |
|---|---|---|---|
| 14 Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions) | | 14 | |
| 15 Property subject to section 168(f)(1) election (see instructions) | | 15 | |
| 16 Other depreciation (including ACRS) (see instructions) | | 16 | |

**Part III**  MACRS Depreciation (Do not include listed property.) (See instructions.)

**Section A**

| | | | |
|---|---|---|---|
| 17 MACRS deductions for assets placed in service in tax years beginning before 2004 | | 17 | |
| 18 If you are electing under section 168(i)(4) to group any assets placed in service during the tax year into one or more general asset accounts, check here | | ▶ ☐ | |

**Section B - Assets Placed in Service During 2004 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a 3-year property | | | | | | |
| b 5-year property | | | | | | |
| c 7-year property | | | | | | |
| d 10-year property | | | | | | |
| e 15-year property | | | | | | |
| f 20-year property | | | | | | |
| g 25-year property | | | 25 yrs. | | S/L | |
| h Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| i Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

**Section C - Assets Placed in Service During 2004 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a Class life | | | | | S/L | |
| b 12-year | | | 12 yrs. | | S/L | |
| c 40-year | / | | 40 yrs. | MM | S/L | |

**Part IV**  Summary (See instructions.)

| | | | |
|---|---|---|---|
| 21 Listed property. Enter amount from line 28 | | 21 | 1,892. |
| 22 Total. Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | | 22 | 1,892. |
| 23 For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | | 23 | |

416251 11-16-04    LHA  For Paperwork Reduction Act Notice, see separate instructions.

7

B-7

Form **4562** (2004)

15030804 756985 2111           2004.05002 UNDERHILL INVESTMENT CORP   2111      1

Form 4562 (2004)  UNDERHILL INVESTMENT CORP.                              34-1183443  Page **2**

**Part V** Listed Property (Include automobiles, certain other vehicles, cellular telephones, certain computers, and property used for entertainment, recreation, or amusement.)
Note: For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete only 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution: See instructions for limits for passenger automobiles.)**

24a  Do you have evidence to support the business/investment use claimed?  [X] Yes  [ ] No  24b If "Yes," is the evidence written?  [X] Yes  [ ] No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use ......... | | | | | | 25 | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| SEE STATEMENT 13 | : : | % | | | | | 1,892. | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | | S/L - | | |
| | : : | % | | | | S/L - | | |
| | : : | % | | | | S/L - | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 .................... | | | | | 28 | 1,892. | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 ......................... | | | | | | 29 | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person.
If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (do not include commuting miles) ............... | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year ... | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven........................ | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 ................... | | | | | | | | | | | | |
| 34 Was the vehicle available for personal use during off-duty hours? | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35 Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use? ................. | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who are not more than 5% owners or related persons.

| | Yes | No |
|---|---|---|
| 37 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees?.......................... | | |
| 38 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See instructions for vehicles used by corporate officers, directors, or 1% or more owners ........... | | |
| 39 Do you treat all use of vehicles by employees as personal use? .................... | | |
| 40 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? ........... | | |
| 41 Do you meet the requirements concerning qualified automobile demonstration use? ........... | | |
| Note: If your answer to 37, 38, 39, 40, or 41 is "Yes," do not complete Section B for the covered vehicles. | | |

**Part VI** Amortization

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2004 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| 43 Amortization of costs that began before your 2004 tax year ................................. | | | | 43 | |
| 44 Total. Add amounts in column (f). See instructions for where to report ..................... | | | | 44 | |

416262/11-15-04                                    B-8                          Form 4562 (2004)

8

15030804 756985 2111        2004.05002 UNDERHILL INVESTMENT CORP.    2111    1

| Form **4797** | **Sales of Business Property** | OMB No. 1545-0184 |
|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | (Also Involuntary Conversions and Recapture Amounts Under Sections 179 and 280F(b)(2)) ▶ Attach to your tax return. | **2004** Attachment Sequence No. **27** |

| Name(s) shown on return | Identifying number |
|---|---|
| UNDERHILL INVESTMENT CORP. | 34-1183443 |

1  Enter the gross proceeds from sales or exchanges reported to you for 2004 on Form(s) 1099-B or 1099-S (or substitute statement) that you are including on line 2, 10, or 20 (see instructions) .......... | 1 |

**Part I    Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft - Most Property Held More Than 1 Year**

| (a) Description of property | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Depreciation allowed or allowable since acquisition | (f) Cost or other basis, plus improvements and expense of sale | (g) Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|
| 2 | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| 3   Gain, if any, from Form 4684, line 39 ...................................................... | 3 | |
| 4   Section 1231 gain from installment sales from Form 6252, line 26 or 37 ................... | 4 | |
| 5   Section 1231 gain or (loss) from like-kind exchanges from Form 8824 ..................... | 5 | |
| 6   Gain, if any, from line 32, from other than casualty or theft ............................. | 6 | |
| 7   Combine lines 2 through 6. Enter the gain or (loss) here and on the appropriate line as follows: | 7 | |

Partnerships (except electing large partnerships) and S corporations. Report the gain or (loss) following the instructions for Form 1065, Schedule K, line 10, or Form 1120S, Schedule K, line 9. Skip lines 8, 9, 11, and 12 below.

All others. If line 7 is zero or a loss, enter the amount from line 7 on line 11 below and skip lines 8 and 9. If line 7 is a gain and you did not have any prior year section 1231 losses, or they were recaptured in an earlier year, enter the gain from line 7 as a long-term capital gain on Schedule D and skip lines 8, 9, 11, and 12 below.

| | | |
|---|---|---|
| 8   Nonrecaptured net section 1231 losses from prior years (see instructions) ............... | 8 | |
| 9   Subtract line 8 from line 7. If zero or less, enter -0-. If line 9 is zero, enter the gain from line 7 on line 12 below. If line 9 is more than zero, enter the amount from line 8 on line 12 below and enter the gain from line 9 as a long-term capital gain on Schedule D (see instructions) ................................... | 9 | |

**Part II    Ordinary Gains and Losses**

10  Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less):

| 1999 MERCEDES SL500 | | | | | | |
|---|---|---|---|---|---|---|
| | 013099 | 043004 | 26,702. | 14,094. | 58,738. | -17,942. |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| 11   Loss, if any, from line 7 .................................................................. | 11 ( | ) |
| 12   Gain, if any, from line 7 or amount from line 8, if applicable ........................... | 12 | |
| 13   Gain, if any, from line 31 ................................................................ | 13 | |
| 14   Net gain or (loss) from Form 4684, lines 31 and 38a ................................... | 14 | |
| 15   Ordinary gain from installment sales from Form 6252, line 25 or 36 .................... | 15 | |
| 16   Ordinary gain or (loss) from like-kind exchanges from Form 8824 ...................... | 16 | |
| 17   Combine lines 10 through 16 ............................................................ | 17 | -17,942. |

18   For all except individual returns, enter the amount from line 17 on the appropriate line of your return and skip lines a and b below. For individual returns, complete lines a and b below:

a  If the loss on line 11 includes a loss from Form 4684, line 35, column (b)(ii), enter that part of the loss here. Enter the part of the loss from income-producing property on Schedule A (Form 1040), line 27, and the part of the loss from property used as an employee on Schedule A (Form 1040), line 22. Identify as from "Form 4797, line 18a."
See instructions .......................................................................... | 18a |

b  Redetermine the gain or (loss) on line 17 excluding the loss, if any, on line 18a. Enter here and on Form 1040, line 14 ................................................................................. | 18b |

JWA   For Paperwork Reduction Act Notice, see page 8 of the instructions.                          Form **4797** (2004)

**B-9**

418001 11-09-04

5030804  756985 2111          2004.05002 UNDERHILL INVESTMENT CORP    2111     1

UNDERHILL INVESTMENT CORP.                                                34-1183443

Form 4797 (2004)                                                           Page 2

| **Part III** Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255 | | | | | | |
|---|---|---|---|---|---|---|
| **19 (a)** Description of section 1245, 1250, 1252, 1254, or 1255 property: | | | | | **(b) Date acquired (mo., day, yr.)** | **(c) Date sold (mo., day, yr.)** |
| A | | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |

| These columns relate to the properties on lines 19A through 19D. ► | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|
| 20 | Gross sales price (Note: See line 1 before completing.) | 20 | | | | |
| 21 | Cost or other basis plus expense of sale | 21 | | | | |
| 22 | Depreciation (or depletion) allowed or allowable | 22 | | | | |
| 23 | Adjusted basis. Subtract line 22 from line 21 | 23 | | | | |
| 24 | Total gain. Subtract line 23 from line 20 | 24 | | | | |
| 25 | If section 1245 property: | | | | | |
| | a Depreciation allowed or allowable from line 22 | 25a | | | | |
| | b Enter the smaller of line 24 or 25a | 25b | | | | |
| 26 | If section 1250 property: If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| | a Additional depreciation after 1975 | 26a | | | | |
| | b Applicable percentage multiplied by the smaller of line 24 or line 26a | 26b | | | | |
| | c Subtract line 26a from line 24. If residential rental property or line 24 is not more than line 26a, skip lines 26d and 26e | 26c | | | | |
| | d Additional depreciation after 1969 and before 1976 | 26d | | | | |
| | e Enter the smaller of line 26c or 26d | 26e | | | | |
| | f Section 291 amount (corporations only) | 26f | | | | |
| | g Add lines 26b, 26e, and 26f | 26g | | | | |
| 27 | If section 1252 property: Skip this section if you did not dispose of farmland or if this form is being completed for a partnership (other than an electing large partnership). | | | | | |
| | a Soil, water, and land clearing expenses | 27a | | | | |
| | b Line 27a multiplied by applicable percentage | 27b | | | | |
| | c Enter the smaller of line 24 or 27b | 27c | | | | |
| 28 | If section 1254 property: | | | | | |
| | a Intangible drilling and development costs, expenditures for development of mines and other natural deposits, and mining exploration costs | 28a | | | | |
| | b Enter the smaller of line 24 or 28a | 28b | | | | |
| 29 | If section 1255 property: | | | | | |
| | a Applicable percentage of payments excluded from income under section 126 | 29a | | | | |
| | b Enter the smaller of line 24 or 29a | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| | | | | |
|---|---|---|---|---|
| 30 | Total gains for all properties. Add property columns A through D, line 24 | 30 | | |
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | 31 | | |
| 32 | Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 33. Enter the portion from other than casualty or theft on Form 4797, line 6 | 32 | | |

| **Part IV** Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less (see instructions.) | | | **(a) Section 179** | **(b) Section 280F(b)(2)** |
|---|---|---|---|---|
| | **B-10** | | | |
| 33 | Section 179 expense deduction or depreciation allowable in prior years | 33 | | |
| 34 | Recomputed depreciation. See instructions | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | |

418002
11-08-04   JWA                                        10

.5030804  756985 2111          2004.05002 UNDERHILL INVESTMENT CORP     2111      1

UNDERHILL INVESTMENT CORP.                                    34-1183443

| FORM 1120 | INTEREST INCOME | STATEMENT | 1 |
|-----------|----------------|-----------|---|

| DESCRIPTION | US | OTHER |
|-------------|----|-------|
| CARDINAL BANK | | 104. |
| SMITHBARNEY CITIGROUP | | 8. |
| TOTAL TO FORM 1120, LINE 5 | | 112. |

| FORM 1120 | TAXES AND LICENSES | STATEMENT | 2 |
|-----------|--------------------|-----------|---|

| DESCRIPTION | AMOUNT |
|-------------|--------|
| LICENSES & REGISTRATION | 76. |
| PERSONAL PROPERTY | 1,444. |
| OHIO TAXES - BASED ON INCOME | 50. |
| TOTAL TO FORM 1120, LINE 17 | 1,570. |

B-11

UNDERHILL INVESTMENT CORP.                                    34-1183443

| CONTRIBUTIONS | STATEMENT 3 |
|---|---|

CARRYOVER OF PRIOR YEARS UNUSED CONTRIBUTIONS
   FOR TAX YEAR 1999
   FOR TAX YEAR 2000
   FOR TAX YEAR 2001
   FOR TAX YEAR 2002                                    662
   FOR TAX YEAR 2003

TOTAL CARRYOVER                                                        662
TOTAL CURRENT YEAR CONTRIBUTIONS

TOTAL CONTRIBUTIONS                                                    662
10% OF TAXABLE INCOME AS ADJUSTED                                       0

EXCESS CONTRIBUTIONS                                                   662

ALLOWABLE CONTRIBUTIONS DEDUCTION                                        0

B-12

UNDERHILL INVESTMENT CORP.                                    34-1183443

| FORM 1120 | OTHER DEDUCTIONS | STATEMENT 4 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| CONSULTING | 79,759. |
| DUES & SUBSCRIPTIONS | 250. |
| OFFICE SUPPLIES & EXPENSE | 2,698. |
| PROFESSIONAL FEES | 5,823. |
| COMMUNICATIONS | 4,995. |
| AUTOMOBILE EXPENSE | 1,717. |
| TRAVEL | 33,692. |
| EQUIPMENT LEASE | 8,832. |
| MEALS AND ENTERTAINMENT | 107. |
| TOTAL TO FORM 1120, LINE 26 | 137,873. |

| | NET OPERATING LOSS DEDUCTION | STATEMENT 5 |
|---|---|---|

| TAX YEAR | LOSS SUSTAINED | LOSS PREVIOUSLY APPLIED | LOSS REMAINING |
|---|---|---|---|
| 03/31/90 | 5,710. | | 5,710. |
| 03/31/91 | 5,558. | | 5,558. |
| 03/31/92 | 102,663. | | 102,663. |
| 03/31/94 | 29,199. | | 29,199. |
| 03/31/03 | 65,683. | | 65,683. |
| 03/31/04 | 441,417. | | 441,417. |
| NOL CARRYOVER AVAILABLE THIS YEAR | | | 650,230. |

B-13

5030804 756985 2111          2004.05002 UNDERHILL INVESTMENT CORP  2111    1

UNDERHILL INVESTMENT CORP.                                    34-1183443

---

OTHER INFORMATION    50% OR MORE OF VOTING STOCKS OWNED BY       STATEMENT    6

(A) NAME                STEPHEN D. PESKOFF
    ADDRESS             7414 OLD MAPLE SQUARE  MCLEAN, VA 22102
    IDENTIFYING NUMBER 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
(B) PERCENT OF STOCK    100.00%

---

SCHEDULE L                        OTHER INVESTMENTS                  STATEMENT    7

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| VARIOUS INVESTMENTS | 33,503. | 0. |
| TOTAL TO SCHEDULE L, LINE 9 | 33,503. | 0. |

---

SCHEDULE L                        OTHER ASSETS                      STATEMENT    8

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| DUE FROM AFFILIATE | 278,478. | 0. |
| DEPOSITS | 4,780. | 0. |
| TOTAL TO SCHEDULE L, LINE 14 | 283,258. | 0. |

---

SCHEDULE L                  OTHER CURRENT LIABILITIES               STATEMENT    9

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| STATE ACCRUED TAXES | 50. | 50. |
| TOTAL TO SCHEDULE L, LINE 18 | 50. | 50. |

B-14

15030804 756985 2111        2004 05002 UNDERHILL INVESTMENT CORP    2111    1

UNDERHILL INVESTMENT CORP.                                    34-1183443

---

| SCHEDULE M-1 | OTHER EXPENSES RECORDED ON BOOKS NOT DEDUCTED IN THIS RETURN | STATEMENT  10 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| OFFICER'S DISABILITY INSURANCE | 779. |
| KEYMAN LIFE INSURANCE | 28,042. |
| TAX PENALTIES | 62. |
| TOTAL TO SCHEDULE M-1, LINE 5 | 28,883. |

---

| SCHEDULE M-2 | UNAPPROPRIATED RETAINED EARNINGS - OTHER DECREASES | STATEMENT  11 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| UNUSED SECTION 179 DEDUCTION | 10,000. |
| ROUNDING | 1. |
| TOTAL TO SCHEDULE M-2, LINE 6 | 10,001. |

B-15

UNDERHILL INVESTMENT CORP.                                    34-1183443

| SCHEDULE D | CAPITAL LOSS CARRYOVER | | STATEMENT 12 |
|---|---|---|---|
| LOSS YEAR | ORIGINAL LOSS SUSTAINED | LOSS PREVIOUSLY APPLIED | LOSS REMAINING |
| 1999 | | | |
| 2000 | 193,413 | | 193,413 |
| 2001 | 243,589 | | 243,589 |
| 2002 | 12,193 | | 12,193 |
| 2003 | 4,683 | | 4,683 |
| TOTAL CAPITAL LOSS CARRYOVER TO CURRENT TAX YEAR | | | 453,878 |

B-16

UNDERHILL INVESTMENT CORP.                                    34-1183443

FORM 4562, PART V    LISTED PROPERTY INFORMATION-MORE THAN 50%    STATEMENT  13

| (A)<br>DESCRIPTION | (B)<br>DATE | (C)<br>BUS. % | (D)<br>COST | (E)<br>BASIS | (F)<br>LIFE | (G)<br>MTH/CV | (H)<br>DEDUCTION | (I) 179<br>ELECTED |
|---|---|---|---|---|---|---|---|---|

| (J)<br>AUTO<br>NO | (K)<br>TOTAL<br>MILES | (L)<br>BUSINESS<br>MILES | (M)<br>COMMUTING<br>MILES | (N)<br>PERSONAL<br>MILES | (O)<br>WAS VEH.<br>AVAIL.?<br>Y  N | (P)<br>> 5%<br>OWNER?<br>Y  N | (Q)<br>ANOTHER VEH.<br>AVAILABLE?<br>Y  N |
|---|---|---|---|---|---|---|---|

```
1999           10/17/98
MERCEDES
E320W                  80.00  48,806.  39,045. 5.00 200DB-HY       946.

1999           01/30/99
MERCEDES
SL500                  80.00  73,422.  58,738. 5.00 200DB-HY       946.


TOTAL TO FORM 4562, PART V, LINE 26                             1,892.
```

B-17

3030804 756985 2111        2004 05002 UNDERHILL INVESTMENT CORP   2111

**2**



# COLLATERAL ASSIGNMENT,
# PLEDGE AGREEMENT
# AND
# SECURITY AGREEMENT

**THIS AGREEMENT** is made and entered this ⁶ᵗʰ day of Dec. 2006 by and between Underhill Investment Corporation (hereinafter referred to as **"Pledgor"**) and Stephen D. Peskoff (hereinafter referred to as "Pledgee"), his heirs, successors and assigns.

**WHEREAS**, this Agreement is made as security for the following:

a) Loans and Advances made to the Pledgor, which Loans and Advances are carried on the books of the Pledgor and remain due and payable to the Pledgee; b) the payment to Pledgee of the Loans and Advances pursuant to the Plan of Liquidation adopted by the Pledgor, on August 23, 2004.

(all of the aforementioned are hereby incorporated herein by reference and together are referred to as the "Liquidation Agreements").

For and in consideration of the mutual covenants and agreements contained herein, and in consideration of the terms, covenants and agreements contained in the Liquidation Agreements, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

1.    <u>Pledge</u>.  The Pledgor hereby assigns and transfers, and grants a security interest to the Pledgee in all right, title, and interest in those claims of Pledgor against Fixed Income Discount Advisory Company (the "Collateral") now existing or hereafter

298569                                1

P - 339

arising in favor of Underhill Investment Corporation, an Ohio corporation. The·Pledgor hereby appoints and constitutes the Pledgee, or its duly authorized representative, as true and lawful attorney in fact for the assignment, transfer and perfection of this pledge of the Collateral, to the interest and name of the Pledgee. The Pledgee shall hold this security interest in the pledged Collateral as security for the repayment of the debt evidenced by the Liquidation Agreements and for Pledgor's obligations and duties under the respective Liquidation Agreements.

2.     Payment Rights.  During the term of this pledge, and as long as Pledgor is not in default of any terms of this Agreement, all payments and other amounts arising from the Collateral shall be paid to Pledgee.

3.     Authority.  During the term of this pledge, and so long as Pledgor is not in default in the performance of any of the terms of this Agreement, the Pledgee shall have all authority to prosecute, settle or compromise any and all claims in favor of the corporation, to employ one or more persons as liquidators and to cause title to assets of the corporation to be conveyed to the liquidators, and after payment of all obligations of the corporation to distribute the remainder of the assets among the shareholders of the corporation.

4.     Payment of Debt.  Upon payment at maturity of the principal and interest of the debt, and full performance by Pledgor of all of its respective obligations and duties under the Liquidation Agreements, the Pledgee's rights under this Agreement shall become null and void.

5.     Endorsement, Assignment and Transfer.  Execution hereof by the Pledgor constitutes consent to endorsement, assignment and transfer of the Collateral to the Pledgee·or its duly authorized representative and a warranty, ratification and guarantee of

the signatures of the individuals executing this Agreement on behalf of the Pledgor and that their signatures are genuine and that the signers are the appropriate persons to endorse the Collateral for transfer and that the signers have legal capacity to sign therefor.

6.    <u>Binding on Heirs, Successors and Assigns.</u>    This Agreement is binding on the heirs, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this ____ day of ___Duc.____, 2006.

PLEDGOR:

**Underhill Investment Corporation**

By: _Stephen D. Peskoff_

Printed Name: _Stephen D. Peskoff_

Title: _President & SoleShareholder_

PLEDGEE:

Stephen D. Peskoff

_Stephen D. Peskoff_

Stephen D. Peskoff

298569                                  3

**B-20**                                          P - 341

**3**



CERTIFIED
MINUTES OF MEETING OF THE BOARD OF DIRECTORS
OF
UNDERHILL INVESTMENT CORPORATION

The undersigned, being the President of Underhill Investment Corporation (the "Corporation") hereby certifies that the following action was taken at a meeting of the Directors of the Corporation held on the 23rd day of August, 2004.

WHEREAS, the Board of Directors believe it to be in the best interests of the Corporation and its Shareholders that the Corporation be completely liquidated.

Now, therefore, be it,

RESOLVED: That subject to the ratification of the Shareholders, the Corporation be completely liquidated in accordance with the provisions of Section 336 of the Internal Revenue Code of 1986, as amended, and be it;

FURTHER RESOLVED, that in accordance with such plan of liquidation, the officers and directors and counsel for the Corporation are authorized and directed:

1. That within thirty (30) days after the date of the meeting at which the Shareholders adopt the plan of liquidation, the accountant for the Corporation shall file Form 966 with the District Director of Internal Revenue, Cincinnati, Ohio.

2. That after the plan of liquidation is adopted the Corporation shall make a distribution to its Shareholders pursuant to such plan.

3. That the Corporation shall proceed as far as possible to collect all accounts receivable and to settle any claims of or against it.

4. That thereafter, as soon as practicable, the Corporation, by its duly authorized officers and directors, shall distribute all assets, subject to any unpaid liabilities, to the Shareholders in redemption and cancellation of all the outstanding capital stock of the Corporation, using their discretion as to how the assets and liabilities will be apportioned among the Shareholders.

5. That the proper officers of the Corporation shall file a Certificate of Dissolution pursuant to Section 1701.86, Ohio Revised Code.

6. That the proper officers and Corporate counsel shall file all other forms and documents required by the State of Ohio and the Federal Government, including tax returns, as soon as possible after distribution of the corporate assets.

P - 342

**B-21**

7. That specific authorization is given to the accountants for the Corporation, to prepare, sign and forward to the Commissioner of Internal Revenue, after the final tax return has been filed for the Corporation, a request for prompt assessment of all federal taxes due from the Corporation.

8. That the officers and directors of the Corporation are empowered, authorized, and directed to carry out the provisions of this resolution, and to adopt any further resolutions that may be necessary in liquidating and dissolving the Corporation in accordance with the expressed intent of the Shareholders under the plan adopted.

UNDERHILL INVESTMENT CORPORATION

Executed this __6__ day of
December 2006 to be effective
August 23, 2004.

By: _____

Printed Name: Stephen D. Peskoff
Title: President

**B-22**

**4**



### CERTIFIED MINUTES OF MEETING
### OF THE SHAREHOLDERS
### OF
### UNDERHILL INVESTMENT CORPORATION

The undersigned, being the President of Underhill Investment Corporation (the "Corporation") hereby certifies that the following action was taken at a meeting of the Shareholders of the Corporation held on the 23rd day of August, 2004.

WHEREAS, the Shareholders believe it to be in the best interests of the Corporation that the Corporation be liquidated.

Now, therefore, be it,

RESOLVED: That subject to the ratification of the Shareholders, the Corporation be completely liquidated in accordance with the provisions of Section 336 of the Internal Revenue Code of 1986, as amended, and be it;

FURTHER RESOLVED, that in accordance with such plan of liquidation, the officers and directors and counsel for the Corporation are authorized and directed:

1. That within thirty (30) days after the date of the meeting at which the Shareholders adopt the plan of liquidation, the accountant for the Corporation shall file Form 966 with the District Director of Internal Revenue, Cincinnati, Ohio.

2. That after the plan of liquidation is adopted the Corporation shall make a distribution to its Shareholders pursuant to such plan.

3. That the Corporation shall proceed as far as possible to collect all accounts receivable and to settle any claims of or against it.

4. That thereafter, as soon as practicable, the Corporation, by its duly authorized officers and directors, shall distribute all assets, subject to any unpaid liabilities, to the Shareholders in redemption and cancellation of all the outstanding capital stock of the Corporation, using their discretion as to how the assets and liabilities will be apportioned among the Shareholders.

5. That the proper officers of the Corporation shall file a Certificate of Dissolution pursuant to Section 1701.86, Ohio Revised Code.

6. That the proper officers and Corporate counsel shall file all other forms and documents required by the State of Ohio and the Federal Government, including tax returns, as soon as possible after distribution of the corporate assets.

P - 344

7. That specific authorization is given to the accountants for the Corporation, to prepare, sign and forward to the Commissioner of Internal Revenue, after the final tax return has been filed for the Corporation, a request for prompt assessment of all federal taxes due from the Corporation.

8. That the officers and directors of the Corporation are empowered, authorized, and directed to carry out the provisions of this resolution, and to adopt any further resolutions that may be necessary in liquidating and dissolving the Corporation in accordance with the expressed intent of the Shareholders under the plan adopted.

UNDERHILL INVESTMENT CORPORATION

Executed this __6__ day of
December 2006 to be effective
August 23, 2004.

By: _Stephen D. Peskoff_

Printed Name: Stephen D. Peskoff
Title: President

**B-24**

P - 345

**5**



CERTIFIED
RESOLUTIONS OF BOARD OF DIRECTORS
OF UNDERHILL INVESTMENT CORPORATION
IN ACCORDANCE WITH PLAN OF COMPLETE LIQUIDATION
UNDER OHIO REVISED CODE 1701.88

The undersigned, being the President of Underhill Investment Corporation (the "Corporation") hereby certifies that the following action was taken at a meeting of the Board of Directors of the Corporation held on the 23rd day of August, 2004.

WHEREAS, on or about August 23, 2004, a plan of liquidation was adopted by the directors to effect the liquidation and dissolution of the Corporation, in accordance with the following resolutions; and

WHEREAS, pursuant to Ohio Revised Code 1701.88, the directors of the Corporation and their successors shall act as a board of directors until the affairs of the Corporation are completely wound up; and

WHEREAS, the directors shall proceed as speedily as practicable and shall exercise all authority of the corporation;

NOW, THEREFORE, BE IT

RESOLVED, that a plan of liquidation be, and it hereby is, formulated to effect such liquidation and dissolution in accordance with the following resolutions;

RESOLVED, that the proper officers of the Corporation be, and they hereby are, authorized to proceed to liquidate and wind up the affairs of the Corporation, and in furtherance thereof to sell or otherwise liquidate any or all of the assets of the Corporation, which in their judgment should be so sold or liquidated and to take all action necessary to facilitate the liquidation of the Corporation, including but not limited to fill vacancies, elect officers, carry out contracts of the corporation, make new contracts, borrow money, mortgage or pledge the property of the corporation as security, sell its assets at public or private sale, make conveyances in the corporate name, lease real estate for any term, including ninety-nine years renewable forever, prosecute, settle or compromise claims in favor of or against the corporation, employ one or more persons as liquidators to wind up the affairs of the corporation with such authority as the directors see fit to grant, cause the title to any of the assets of the corporation to be conveyed to such liquidators for that purpose, apply assets to the payment of obligations, and after paying or adequately providing for the payment of all known obligations of the corporation, distribute the remainder of the assets either in cash or in kind among the shareholders according to their respective rights and interests. In addition they may perform all other acts necessary or expedient to the winding up of the affairs of the corporation.

RESOLVED, that the proper officers of the Corporation be, and they hereby are, authorized and directed to file a Certificate of Dissolution with the Secretary of State of Ohio;

RESOLVED, that, after providing for the payment of all the proper debts of the Corporation, including any debt owed to Stephen D. Peskoff, the remaining assets of the Corporation, including cash, furniture and fixtures, be distributed to the Shareholders of the Corporation;

RESOLVED, that as part of the complete liquidation of the corporation, the officers are directed to proceed to take all action necessary to liquidate, prosecute, settle or compromise any claim of the corporation in due course;

RESOLVED, that the actions provided for in the foregoing resolutions providing for the complete liquidation of the corporation and the distribution of all its assets be commenced immediately, and that its subsequent dissolution and the distribution of all its assets be completed as soon as practicable; and

RESOLVED, that all proper officers of the Corporation be, and they hereby are, authorized and directed to pay all such fees and taxes and to do or cause to be done such further acts and things as they may deem necessary or proper in order to carry out the liquidation and dissolution of the Corporation and fully to effectuate the purposes of the foregoing resolutions.

UNDERHILL INVESTMENT CORPORATION

Executed this **6** day of December 2006 to be effective August 23, 2004.

By: _____
Printed Name:  Stephen D. Peskoff
Title:  President

**B-26**

P - 347

**6**



CERTIFIED
RESOLUTIONS OF BOARD OF DIRECTORS
OF UNDERHILL INVESTMENT CORPORATION
IN FURTHERANCE OF PLAN OF COMPLETE LIQUIDATION UNDER OHIO
REVISED CODE 1701.88

The undersigned, being the President of Underhill Investment Corporation (the "Corporation") hereby certifies that the following action was taken at a meeting of the Board of Directors of the Corporation held on the _13ᵗʰ_ day of _June_, 2005.

WHEREAS, on or about August 23, 2004, a plan of liquidation was adopted by the directors to effect the liquidation and dissolution of the Corporation; and

WHEREAS, pursuant to Ohio Revised Code 1701.88, the directors of the Corporation and their successors shall act as a board of directors until the affairs of the Corporation are completely wound up; and

WHEREAS, the directors shall proceed as speedily as practicable and shall exercise all authority of the corporation;

NOW, THEREFORE, BE IT

RESOLVED, that as part of the complete liquidation of the corporation, and for the sole purpose of winding up the affairs of the corporation, and settling the accounts owed to its creditors, the officers are directed to proceed to take all action necessary to liquidate, prosecute, settle or compromise any claim of the corporation against Fixed Income Discount Advisory Company in due course, including commencement of litigation if necessary; and

FURTHER RESOLVED, that the corporation shall pledge or assign any right of recovery in that claim to Stephen D. Peskoff as security for loans and advances made to the corporation, and that the officers of the corporation are hereby authorized to execute any and all documents to effect the terms of this resolution.

UNDERHILL INVESTMENT CORPORATION

Executed this _6_ day of
December 2006 to be effective
_June 13_, 2005

By: _[signature]_
Printed Name: Stephen D. Peskoff
Title: President

P - 348

**B-27**

7



CERTIFIED
RESOLUTION OF SHAREHOLDERS
OF
UNDERHILL INVESTMENT CORPORATION
IN ACCORDANCE WITH A PLAN OF COMPLETE LIQUIDATION
UNDER OHIO REVISED CODE 1701.88

The undersigned, being the President of Underhill Investment Corporation (the "Corporation") hereby certifies that the following action was taken at a meeting of the Shareholders of the Corporation held on the 23rd day of August, 2004.

WHEREAS, on or about August 23, 2004, a plan of liquidation was adopted by the shareholders to effect the liquidation and dissolution of the Corporation, in accordance with the following resolutions; and

WHEREAS, pursuant to Ohio Revised Code 1701.88, the shareholders of the Corporation and their successors shall remain until the affairs of the Corporation are completely wound up; and

WHEREAS, the shareholders shall proceed as speedily as practicable and shall exercise all authority of the corporation;

NOW, THEREFORE, BE IT

RESOLVED, that a plan of liquidation be, and it hereby is, formulated to effect such liquidation and dissolution in accordance with the following resolutions;

RESOLVED, that the proper officers of the Corporation be, and they hereby are, authorized to proceed to liquidate and wind up the affairs of the Corporation, and in furtherance thereof to sell or otherwise liquidate any or all of the assets of the Corporation, which in their judgment should be so sold or liquidated and to take all action necessary to facilitate the liquidation of the Corporation, including but not limited to fill vacancies, elect officers, carry out contracts of the corporation, make new contracts, borrow money, mortgage or pledge the property of the corporation as security, sell its assets at public or private sale, make conveyances in the corporate name, lease real estate for any term, including ninety-nine years renewable forever, prosecute, settle or compromise claims in favor of or against the corporation, employ one or more persons as liquidators to wind up the affairs of the corporation with such authority as the directors see fit to grant, cause the title to any of the assets of the corporation to be conveyed to such liquidators for that purpose, apply assets to the payment of obligations, and after paying or adequately providing for the payment of all known obligations of the corporation, distribute the remainder of the assets either in cash or in kind among the shareholders according to their respective rights and interests. In addition they may perform all other acts necessary or expedient to the winding up of the affairs of the corporation.

**B-28**

RESOLVED, that the proper officers of the Corporation be, and they hereby are, authorized and directed to file a Certificate of Dissolution with the Secretary of State of Ohio;

RESOLVED, that, after providing for the payment of all the proper debts of the Corporation, including any debt owed to Stephen D. Peskoff, the remaining assets of the Corporation, including cash, furniture and fixtures, be distributed to the Shareholders of the Corporation;

RESOLVED, that as part of the complete liquidation of the corporation, the officers are directed to proceed to take all action necessary to liquidate, prosecute, settle or compromise any claim of the corporation in due course;

RESOLVED, that the actions provided for in the foregoing resolutions providing for the complete liquidation of the corporation and the distribution of all its assets be commenced immediately, and that its subsequent dissolution and the distribution of all its assets be completed as soon as practicable; and

RESOLVED, that all proper officers of the Corporation be, and they hereby are, authorized and directed to pay all such fees and taxes and to do or cause to be done such farther acts and things as they may deem necessary or proper in order to carry out the liquidation and dissolution of the Corporation and fully to effectuate the purposes of the foregoing resolutions.

UNDERHILL INVESTMENT CORPORATION

Executed this __6__ day of
December 2006 to be effective
August 23, 2004.

By: _X_____
Printed Name: Stephen D. Peskoff
Title: President

P - 350

**8**

# DOCUMENT
# FILED UNDER SEAL

**9**



| DATE | DOCUMENT ID | DESCRIPTION | FILING | EXPED | PENALTY | CERT | COPY |
|------|-------------|-------------|--------|-------|---------|------|------|
| 11/04/2004 | 200430802442 | DOMESTIC/DISSOLUTION (DIS) | 50.00 | .00 | .00 | .00 | .00 |

**Receipt**

This is not a bill. Please do not remit payment.

DIANA THEOLOGOU
11200 ROCKVILLE PIKE
STE 301
N BETHESDA, MD 20852

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, J. Kenneth Blackwell

478633

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**UNDERHILL INVESTMENT CORPORATION**

and, that said business records show the filing and recording of:

Document(s)                                          Document No(s):
**DOMESTIC/DISSOLUTION**                             **200430802442**



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 1st day of November,
A.D. 2004.

Ohio Secretary of State

**B-34**

OR 60



Prescribed by **J. Kenneth Blackwell**
Ohio Secretary of State
Central Ohio: (614) 466-3910
Toll Free: 1-877-SOS-FILE (1-877-767-3453)

www.state.oh.us/sos
e-mail: busserv@sos.state.oh.us

| Expedite this Form: (Select One) |
|---|
| **Mail Form to one of the Following:** |
| ○ Yes  PO Box 1390  Columbus, OH 43216 |
| *** Requires an additional fee of $100 *** |
| ⊗ No  PO Box 1028  Columbus, OH 43216 |

## CERTIFICATE OF DISSOLUTION BY
## SHAREHOLDERS, DIRECTORS, OR INCORPORATORS
*(Domestic Profit)*
(Filing Fee $50.00)

**[CHECK ONLY ONE (1) BOX]**

| (1) ☒ Shareholders (150-DISS) | (2) ☐ Directors (137-DISD) | (3) ☐ Incorporators (138-DISI) |
|---|---|---|

*Complete the general information in this section for the box checked above.*

Underhill Investment Corporation
*(Exact Name of Corporation)*

478633
*(Charter Number)*

Stephen D. Peskoff , who is President
*(Name)* *(Title)*

of the above named Ohio corporation, articles of Incorporation of which were filed in the office of the secretary of
state on March 11, 1976 do hereby certify that:
*(Date)*

**Effective Date (Optional)** _____ *Date specified can be no more than 90 days after date of filing. If a date is*
*(mm/dd/yyyy)* *specified, the date must be a date on or after the date of filing.*

The place where its principal office in Ohio is or is to be located is:

Toledo , Ohio Lucas
*(City, Township or Village)* *(County)*

The name and Ohio address of statutory agent is:

CSC-Lawyers Incorporation Service
*(Name)*

50 W. Broad St.
*(Street)* NOTE: P.O. Box Addresses are NOT acceptable.

Columbus , Ohio 43215
*(City)* *(Zip Code)*

NOTE: If the statutory agent listed has changed or differs from the agent currently appearing on the corporate records
in the secretary of state's office, the named agent must acknowledge and accept the appointment as statutory agent.

### ACCEPTANCE OF APPOINTMENT

The Undersigned, _____ , named herein as the

Statutory agent for the corporation named herein, hereby acknowledges and accepts the appointment of
statutory agent for said corporation.

Signature: _____
*(Statutory Agent)*

*(vertical text at right:)* 2004 NOV -1 PM 2:30

561 Page 1 of 5 Last Revised: June 2004

**B-35**

OR 61

---

Complete the information in this section if box (1) or (2) is checked.

The names and complete street addresses of the DIRECTORS are:
Note: P.O. Box Addresses are NOT acceptable.

| Name | Street | City & State | Zip Code |
|------|--------|--------------|----------|
| Stephen D. Peskoff | 7414 Old Maple Square | McLean, VA 22102 | |

The names and complete street addresses of the OFFICERS are:
Note: P.O. Box Addresses are NOT acceptable.

| Name | Street | City & State | Zip Code |
|------|--------|--------------|----------|
| Stephen D. Peskoff | 7414 Old Maple Square | McLean, VA 22102 | |

---

Complete the information in this section if box (1) is checked.

The undersigned have been authorized to execute and file this certificate by a resolution adopted:
(Check one of the following)

[X] at a special meeting of the shareholders of said corporation, notice of which was given to all shareholders of every
class, whether entitled to vote or not, by the votes cast in person or by proxy, by the holders of record of shares entitling
them to exercise ___100___ % of the voting power

[ ] in writing signed under provisions of section 1701.54 of the ORC by all the shareholders who would be entitled to
a notice of a meeting held for such purpose declaring that the corporation elects to wind up its affairs and dissolve

**REQUIRED**
Must be authenticated (signed)
by an authorized representative

Authorized Representative _____    Date 8/11/04

---

B-36

OR 62

*Complete the information in this section if box (2) is checked.*

The undersigned have been authorized to execute and file this certificate by a resolution of the Board of Directors adopted pursuant to section 1701.86(D)     (_____) (must insert proper paragraph of the ORC)

(Check one of the following)

☐ at a meeting duly called and held on _____

☐ in writing signed by all of the directors pursuant to section 1701.43 of the ORC declaring that the corporation elects to wind up its affairs and dissolve

**REQUIRED**
Must be authenticated (signed)
by an authorized representative

| | |
|---|---|
| Authorized Representative | Date |

---

*Complete the information in this section if box (3) is checked.*

The names and complete street addresses of the INCORPORATORS are:
*Note: P.O. Box Addresses are NOT acceptable.*

| Name | Street | City & State | Zip Code |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Whereas, the corporation has not begun business, or, subscriptions to shares have not been received as set forth in the articles, the incorporators elect to dissolve the corporation.

**REQUIRED**
Must be authenticated (signed)
by an authorized representative

| | |
|---|---|
| Authorized Representative | Date |
| Authorized Representative | Date |
| Authorized Representative | Date |

561                          Page 3 of 5                    Last Revised: June 2004

**B-37**

Complete the information in this section if box (1), (2) or (3) is checked.

### AFFIDAVIT

In lieu of dissolution releases from various governmental authorities (1701.86'H)(6; ORC)

Underhill Investment Corporation
_____
(Exact Name of Corporation)

The undersigned, being first duly sworn, declares that on the dates indicated below, each of the named state governmental agencies was advised IN WRITING of the scheduled date of filing of the Certificate of Dissolution and was advised IN WRITING of the acknowledgement by the corporation of the applicability of the provisions of Section 1701.95 of the ORC.

| AGENCY | DATE NOTIFIED |
|---|---|
| Ohio Department of Taxation<br>Dissolution Section<br>Box 182382<br>Columbus, Ohio 43218-2382 | 8/11/04 |
| Ohio Job and Family Services<br>Status & Liability Section<br>P.O. 182404<br>Columbus, Ohio 43218-2404 | 8/11/04 |
| The treasurer of any County named below:<br>Lucas County Treasurer<br>One Government Center, Ste. 500<br>Toledo, OH 43604 | 8/11/04 |
| Ohio Bureau of Workers' Compensation<br>30 W. Spring Street<br>Columbus, Ohio 43215 | 10/14/04 |

( Note: This affidavit must be signed by one or more persons executing the certificate of dissolution or by an officer of the corporation)

By: _____    Title: **President**

Name: Stephen D. Peskoff

7414 Old Maple Square, McLean, VA 22102
_____
(Street)                    NOTE: P.O. Box Addresses are NOT acceptable.

_____
(City)                        (State)            (Zip Code)

Sworn before me and subscribed in my presence on    8/16/04   10/14/04
                                                    (Date)

_____    _____ 10/14/04
                             (Notary Public)

Commission Expires  May 30, 2005
                    (Date)

(Notary Seal)

561                    Page 4 of 5                    Last Revised: June 2004

**B-38**

OR 64

Complete the information in this section if box (1), (2) or (3) is checked.

STATE OF ~~OHIO~~ Virginia

County of _____ :SS

Stephen D. Peskoff _____, being first duly sworn, deposes and says that she/he is

President of Underhill Investment Corporation
(Title)

that this affidavit is made in compliance with section 1701.86 of the ORC:
(Section #)

That said corporation has (Check one of the following)

☒ A. has no personal property in any county in the State of Ohio;

☐ B. personal property only in the following county(ies)

_____    .    _____    .    _____

and that the net assets of said corporation are sufficient to pay all personal property taxes accrued to date.

Signature: _____

Name: Stephen D. Peskoff

Sworn before me and subscribed in my presence on    8/16/04  10/14/04
(Date)

_____ 10/14/04
(Notary Public)

(Notary Seal)    Commission Expires May 30, 2005
(Date)

561    Page 5 of 5    Last Revised: June 2004

**B-39**

OR 65

**10**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF DELAWARE

 3   UNDERHILL INVESTMENT CORPORATION )

 4   and STEPHEN D. PESKOFF,              )

 5               Plaintiffs,             )

 6          v.                    ) No. 06-99-SLR

 7   FIXED INCOME DISCOUNT ADVISORY    )

 8   COMPANY,                          )

 9               Defendant.            )

10

11                    Washington, D.C.

12                    Thursday, August 10, 2006

13   Deposition of CHARLES P. COCKE, called for

14   examination by counsel for Defendant in the

15   above-entitled matter, the witness being duly sworn

16   by CHERYL A. LORD, a Notary Public in and for the

17   District of Columbia, taken at the offices of

18   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP, 1601 K

19   Street, N.W., Washington, D.C., at 11:03 a.m., and

20   the proceedings being taken down by Stenotype by

21   CHERYL A. LORD, RPR, CRR.

22
```

**B-40**

Charles P. Cocke                                    August 10, 2006

Washington, DC

Page 2

```
1   APPEARANCES:
2
3   On behalf of Plaintiffs:
4      ROBERT L. RUBEN, ESQ.
5      RUBEN & ARONSON LLP
6      4800 Montgomery Lane, Suite 150
7      Bethesda, MD 20814
8      (301) 951-9696
9
10  On behalf of Defendant:
11     GERALD A. NOVACK, ESQ.
12     SARAH P. KENNEY, ESQ.
13     KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
14     599 Lexington Avenue
15     New York, NY 10022-6030
16     (212) 536-3900
17
18
19
20
21
22
```

Page 3

```
1              C O N T E N T S
2   WITNESS              EXAMINATION
3                        PAGE NO.
4   CHARLES P. COCKE
5      By Mr. Novack           4
6      By Mr. Ruben           84
7      By Mr. Novack          84
8
9              E X H I B I T S
10     (Exhibits retained by counsel.)
11  COCKE EXHIBIT NO.         PAGE NO.
12  EXHIBIT NO. 1             8
13  EXHIBIT NO. 2             13
14  EXHIBIT NO. 3             14
15  EXHIBIT NO. 4             29
16  EXHIBIT NO. 5             48
17  EXHIBIT NO. 6             49
18  EXHIBIT NO. 7             52
19  EXHIBIT NO. 8             55
20  EXHIBIT NO. 9             58
21  EXHIBIT NO.10             60
22
```

Page 4

```
1              P R O C E E D I N G S
2
3   Whereupon,
4              CHARLES P. COCKE
5   was called as a witness by counsel for Defendant,
6   and, having been duly sworn by the Notary Public, was
7   examined and testified as follows:
8
9      EXAMINATION BY COUNSEL FOR DEFENDANT
10     BY MR. NOVACK:
11     Q.  Mr. Cocke, would you give us your full
12  name, the name of your firm, and your business
13  address, please.
14     A.  It's Charles Pollard Cocke. The firm is
15  Cocke, Szpanka & Taylor, CPAs, PC, at 1800 Robert
16  Fulton Drive, Reston, Virginia.
17         She has my card.
18     Q.  Oh, okay.
19         MR. NOVACK: Before I mark an exhibit, why
20  don't I go on the record, and I'm going to suggest we
21  have the following stipulations with regard to the
22  deposition, and if Mr. Ruben is agreeable, then we'll
```

Page 5

```
1   agree to it.
2         I would stipulate that all objections
3   except those as to form are preserved for trial.
4         MR. RUBEN: That's fine.
5         MR. NOVACK: That the deposition can be
6   signed in front of any notary public, not only the
7   one who is taking the testimony.
8         MR. RUBEN: That's fine.
9         MR. NOVACK: That the reading of the
10  deposition has not been waived, and we're going to
11  furnish a copy to the witness so he has the
12  opportunity to look at it and make any corrections
13  that he sees fit.
14         Is that all right?
15         MR. RUBEN: That's fine.
16         MR. NOVACK: We'll waive any filing of the
17  deposition at this time if it's agreeable to you, and
18  the parties will just hold onto them.
19         MR. RUBEN: That's fine as well.
20         MR. NOVACK: And we will furnish you with
21  copies of any exhibits which we mark for
22  identification, and those will be clean copies. If
```

2 (Pages 2 to 5)

Charles P. Cocke                                                              August 10, 2006

Washington, DC

---

Page 6

1  you agree, we will take back the exhibits that we
2  have marked today, photocopy them clean, and have
3  them sent directly to you.
4      MR. RUBEN: To the extent you make any
5  markings on them that you show the witness, we'd like
6  copies of those as well.
7      MR. NOVACK: Well, when I said, clean,
8  what I meant was that whatever the witness is using
9  here today, you will get exactly what has been marked
10 and done.
11     MR. RUBEN: That's fine.
12     MR. NOVACK: I was distinguishing between
13 the ones I'm showing him and something I may have
14 been using as a working copy or you may be using
15 because I give it to you as a courtesy during the
16 deposition.
17     MR. RUBEN: That's fine.
18     MR. NOVACK: Are there any other
19 stipulations you think we need, are or we okay?
20     MR. RUBEN: I just want to clarify the
21 first stipulation on objections.
22     I can't imagine it coming up, but if a

Page 7

1  privilege comes up, we will not hold that for trial.
2  We will assert that today, as well as objections to
3  the form of the question.
4      I don't know that Mr. Cocke has any
5  deposition -- any documents that would involve waiver
6  of a privilege belonging to my client, but if he
7  does, I would assert that objection today.
8      MR. NOVACK: That's fine.
9      And I actually should have included that.
10 I'm sorry.
11     I agree that all objections for privilege
12 or any work product have to be asserted today. They
13 can't be held back.
14     MR. RUBEN: Okay. Then I just would ask
15 whether the court reporter prior to us going on the
16 record or prior to my arrival was given any special
17 instructions by you.
18     MR. NOVACK: No.
19     Were there some I should have given?
20     MR. RUBEN: Well, sometimes people ask the
21 court reporter to note the time of pauses, or the
22 duration of pauses, that sort of thing, and I always

Page 3

1  like to know whether there have been any special
2  instructions so that I'm not surprised when I receive
3  the transcript.
4      MR. NOVACK: All right. Why don't we mark
5  as Cocke exhibit 1 the subpoena that was served upon
6  Mr. Cocke.
7          (Cocke Exhibit No. 1
8           was marked for
9           identification.)
10     BY MR. NOVACK:
11     Q.  Mr. Cocke, this is the subpoena that you
12 received in connection with this deposition. I think
13 included in it is a copy of the proof of service,
14 which wasn't on it when you received it, but other
15 than that --
16     MS. KENNEY: I took that out.
17     MR. NOVACK: Then, fine. It's not in it.
18     BY MR. NOVACK:
19     Q.  After you or your firm received the
20 subpoena, did you have any involvement in obtaining
21 the records that were called for by it?
22     A.  Yes.

Page 9

1      Q.  What was your involvement?
2          Could you please tell us?
3      A.  I requested the dead files with regard to
4  Underhill Corporation and with respect to Stephen
5  Peskoff.
6      Q.  How did you make -- I'm sorry.
7      A.  I pulled a current file also, I should
8  add.
9      Q.  To whom did you make the request, a
10 secretary?
11     A.  Yes, secretary.
12     Q.  And did the secretary bring back the files
13 to you personally?
14     A.  Yes.
15     Q.  All right. Did you personally review the
16 files that were returned to you?
17     A.  Yes.
18     Q.  And did you make the decisions what in the
19 files should be produced pursuant to the subpoena?
20     A.  Yes.
21     Q.  Were there any documents as to which you
22 had any questions and you did not produce them?

Alderson Reporting Company
1-800-FOR-DEPO

**B-42**

1111 14th Street , NW  Suite 400                              Washington, DC  20005

Charles P. Cocke                                                    August 10, 2006
Washington, DC

Page 10

1    A.  No.
2    Q.  Did you consult with anyone within your
3  firm as to what documents should be produced?
4    A.  No.
5    Q.  Did you consult with anyone outside your
6  firm as to what documents should be produced?
7    A.  No.
8    Q.  You're the only person who made the
9  decision on the selection of documents to be
10  produced; is that right?
11   A.  Yes.
12   Q.  Have you refrained from producing any
13  documents on any ground of privilege of any sort that
14  you're aware of?
15   A.  No.
16   Q.  Can you tell me, please, if you're here
17  today without counsel on your own?
18   A.  Yes.
19   Q.  Mr. Ruben, in other words, is not your
20  lawyer?
21   A.  No.
22   Q.  All right.  Can you tell me when you first

Page 11

1  met Mr. Stephen Peskoff, approximately?
2    A.  I would say sometime in the mid-'90s.
3    Q.  And when is the first time that you or
4  your firm provided any services to him or any of his
5  companies?
6    A.  At the same time.
7    Q.  Generally speaking, prior to the year
8  2004, can you tell me in the very, very general sense
9  what the nature was of the services that you or your
10  firm provided?
11   A.  I consulted with Mr. Peskoff on tax
12  planning, essentially only tax planning, except one
13  instance of a later-discovered partnership interest
14  that he owned that I got involved in in terms of
15  trying to decide how best for him to derive value
16  from this interest investment.
17   Q.  What investment was that?
18   A.  Goodness.  I don't remember the name of
19  it.
20      It was a shopping center in New Jersey.
21   Q.  That's enough.
22      When was this discovery?

Page 12

1      Was this in the '90s, early 2000?
2    A.  No.
3      That's in '02, 3.
4    Q.  Did that shopping center investment have
5  anything to do with Underhill Investment Corp. to
6  your knowledge?
7    A.  No.
8    Q.  Do you have an area of specialization that
9  you practice in?
10   A.  Taxes, tax planning.
11   Q.  Does your firm generally specialize in tax
12  planning as opposed to regular accounting services or
13  auditing services?
14   A.  No.
15      We're a full-service accounting firm, 35
16  employees and audit tax.
17   Q.  Is there someone else in your firm that
18  Mr. Peskoff has dealt with since the year 2000?
19   A.  Not to my knowledge.
20   Q.  Have all of your dealings with Mr. Peskoff
21  since the year 2000 been with regard to tax advice
22  with the one exception you've told us about?

Page 13

1    A.  I believe so.
2      MR. NOVACK:  Let's mark as Cocke exhibit 2
3  a fax dated August 8, 2006, from Mr. Cocke's firm to
4  Todd, T-O-D-D, and attached to it -- or accompanying
5  it was a single page of handwritten notes and some
6  other documents.  I'm going to go through the
7  document separately.  Let's make Cocke exhibit 2 the
8  fax transmittal page, please.
9            (Cocke Exhibit No. 2
10             was marked for
11             identification.)
12      BY MR. NOVACK:
13   Q.  Do you have Cocke exhibit 2 in front of
14  you?
15   A.  Yes.
16   Q.  This is a fax that you sent to Todd as one
17  of the lawyers representing Mr. Peskoff; is that
18  right?
19   A.  Yes.
20   Q.  And this fax is the means by which you
21  transmitted the documents that you selected in
22  response to the subpoena; is that right?

4  (Pages 10 to 13)

**B-43**

1111 14th Street , NW  Suite 400                    Washington, DC  20005

Charles P. Cocke                                                        August 10, 2006
Washington, DC

Page 14

1    A.  Right.
2         MR. NOVACK:  I've identified this fax
3    as -- with the Bates number CST 1 just for the
4    record.
5         Let's mark as Cocke exhibit 3 a single
6    page of handwritten notes which have the Bates number
7    CST 2.
8              (Cocke Exhibit No. 3
9              was marked for
10             identification.)
11   BY MR. NOVACK:
12   Q.  You have exhibit 3 in front of you?
13   A.  Yes.
14   Q.  Are these notes in your handwriting?
15   A.  Yes.
16   Q.  Could you please tell me the circumstances
17   that led you to take these notes?
18   A.  I was on a telephone conversation with
19   Mr. Peskoff and his CPA, John Devlin.
20   Q.  Will you move your hand away from your
21   mouth so the reporter can hear the words.
22   A.  Yes.

Page 15

1    Q.  Thank you.
2    A.  And the notes are the resulting -- from
3    that conversation.
4    Q.  Could you tell me the circumstances that
5    led up to you participating in the conversation,
6    please.
7    A.  I would have to speculate to some degree
8    that Mr. Peskoff called me and wanted to get a
9    conference call on, but I don't remember how the call
10   originated.
11   Q.  You have a general recollection that you
12   participated in a call, and you don't recall
13   specifically, you know, what you were told about the
14   purpose of the call beforehand?
15   A.  Right.
16   Q.  Okay.  Now, can you tell me whether this
17   page that we've marked as Cocke exhibit 3 comprises
18   all the notes you took during the call?
19   A.  Yes.
20   Q.  Okay.  It's about 10 lines or so more or
21   less.
22        Can you please just quickly tell me if I'm

Page 16

1    correct when I read through it.
2         First line top right-hand corner, it says,
3    CPC 5-21-04.
4         That's your initials and the date of the
5    call?
6    A.  Yes.
7    Q.  Left-hand side seems to say, call P?
8    A.  PV.
9    Q.  P who?
10   A.  PV.
11   Q.  PV secretary.
12        Who is PV?
13   A.  Patrick Vaughn.
14   Q.  Who is Patrick Vaughn?
15   A.  An attorney in Tysons.
16   Q.  Tysons, Virginia?
17   A.  Yes.
18   Q.  Was Mr. Vaughn on the call?
19   A.  No.
20   Q.  Do you recall what the notation you made
21   about calling him signified?
22   A.  Yes.

Page 17

1    Q.  Tell us, please.
2    A.  Pat is an attorney who Steve -- who
3    originally sent Steve to me as a client, I believe,
4    and was to help Steve with the legal issues with
5    respect to liquidating the corporation, as you will
6    see in later paperwork.  Steve did not use him.
7    Q.  Can you tell me, were you told during a
8    conversation by someone to call Mr. Vaughn?
9    A.  By Steve.
10   Q.  Did you in fact call Mr. Vaughn?
11   A.  Yes.
12   Q.  I'll come back to that in a minute.
13        Let's go to the next line down.
14        Top of the center of the page, it says,
15   Steve Peskoff.
16        That refers to Mr. Peskoff being on the
17   call.
18        Is there any -- withdrawn.
19   A.  Excuse me.
20        You asked about the name at the top?
21   Q.  Yes.
22   A.  Steve Peskoff.  That's my client file

5  (Pages 14 to 17)

**B-44**

Charles P. Cocke

August 10, 2006

Washington, DC

---

**Page 18**

1   reference. I labeled it to go into that file.

2   Q.   And Mr. Peskoff was on the call, though?

3   A.   Yes, telephone with Steve and with John

4   Devlin, next line.

5   Q.   Next line says, NOLs in Underhill all used

6   up or expired, semicolon.

7      Can you read the next line?

8   A.   The check mark is what I use for ditto, so

9   Underhill makes dollars now, is the way that would

10  read.

11  Q.   Can you tell me what that meant, Underhill

12  makes dollars now?

13  A.   It was showing a profit. It had used up

14  its tax shelter of the net operating losses, NOLs.

15  Q.   Next line says, Underhill owes Steve 6

16  million dollars?

17  A.   Yes.

18  Q.   Next line says, PB, and I can't read the

19  rest.

20  A.   Owned by.

21  Q.   I think before the word owned, it says --

22  A.   PB Partners.

---

**Page 19**

1   Q.   Okay. PB Partners.

2   A.   Owned by Underhill. Fair market value

3   600,000. Book value 375,000.

4   Q.   Next line?

5   A.   Decided to liquidate Underhill and

6   Renaissance, take capital losses, 5.5 million.

7   Q.   "5.5 million" is in brackets?

8   A.   Right.

9   Q.   Next line.

10  A.   Create new S corp. in Virginia to receive

11  commissions.

12  Q.   Next line.

13  A.   Steve has 1 million dollars of capital

14  gain this year.

15  Q.   Now, can you tell us as best you can what

16  you recall about the conversation, and you can

17  certainly refresh your recollection with these notes.

18     For example, I'm trying to find out if

19  Mr. Peskoff started the call by explaining what the

20  purpose was and what he wanted and what your role

21  would be, so if you could tell us what you said, what

22  he said, what Mr. Devlin said as best you can recall.

---

**Page 20**

1   A.   I have no memory of anybody saying

2   anything in particular.

3      The general concept -- substance of the

4   conversation was that this corporation owed Steve a

5   lot of money, which when liquidated would create a

6   capital loss on Steve's tax return that would shelter

7   the 1 million dollars of capital gain that he was

8   showing on his personal return.

9   Q.   Did Mr. Peskoff indicate to you what his

10  reason was for liquidating beyond what you've told

11  us?

12  A.   I believe it was my idea to liquidate the

13  corporation.

14  Q.   Before you had this conference call, I

15  presume you were in 3 different locations, you,

16  Mr. Devlin, and Mr. Peskoff.

17     It was a conference call?

18  A.   I believe so too.

19  Q.   Before you had the call, had you talked

20  with Mr. Peskoff about the idea of liquidating

21  Underhill?

22     Was it your idea?

---

**Page 21**

1   A.   I believe so.

2   Q.   Was Mr. Peskoff -- withdrawn.

3      How long before the conference call had

4   you raised this idea?

5   A.   I have my time records.

6   Q.   Please consult them.

7   A.   I believe I had a meeting with him in

8   January of '04 --

9   Q.   M-hm.

10  A.   -- with respect to tax planning. I seem

11  to have no notes from that meeting.

12  Q.   Was it just with Mr. Peskoff, the meeting?

13  A.   Yes.

14  Q.   And was it at that meeting that you came

15  up with the idea of possibly liquidating Underhill?

16  A.   Yes.

17  Q.   Did Mr. Peskoff express any reluctance at

18  that meeting?

19  A.   No.

20  Q.   Okay. Was the next time you discussed the

21  liquidation of Underhill with Mr. Peskoff during the

22  May 21 meeting -- phone call?

---

6 (Pages 18 to 21)

---

Page 22

1    A.   To the best of my memory.
2    Q.   Do you recall anything happening in the
3  interim with respect to the idea of liquidating
4  Underhill?
5    A.   No.
6    Q.   Do you have any recollection of why
7  between January and May, there was no further
8  discussion as far as you can recall about liquidating
9  Underhill?
10   A.   That was my busy season, and I think we
11 agreed it could be done any time during the year and
12 we could talk about it later.
13   Q.   All right. Now, going back to the
14 conversation on May 21, could you give me a little
15 bit more of what you recall?
16      Again, if you want to refresh your
17 recollection by looking at the notes, it's fine.
18   A.   I created a memo of action items --
19   Q.   Right.
20   A.   -- as a followup to that meeting, if
21 that's what you're asking.
22   Q.   Actually, I will get to that, but what I'm

---

Page 23

1  trying to get is something that might not be in the
2  memo, if you recall.
3       For example, during the meeting, did
4  Mr. Peskoff say anything about any reluctance he
5  might have to liquidate Underhill for any reason?
6    A.   No.
7       I think he thought it was a great idea.
8    Q.   What was your understanding why Mr. Devlin
9  was on the call?
10      I know he was the regular accountant.
11   A.   John does all the tax returns.
12   Q.   Okay.
13   A.   I'm a consultant who comes in on occasion.
14   Q.   So basically, the actual filling out of
15 the forms and what I will call the fact research and
16 the filing, that gets done by Mr. Devlin's firm?
17   A.   Yes.
18   Q.   You're a strategist, more or less?
19   A.   Yes.
20   Q.   That's what I thought from looking at the
21 papers. I wish I could become a strategist one day.
22   A.   The big idea guy.

---

Page 24

1    Q.   Yeah.
2          * * *
3       (Comments deleted by agreement of
4       counsel.)
5          * * *
6       MR. NOVACK: Why don't we take that off.
7       MR. RUBEN: We can take that off the
8  record.
9       (Discussion off the record.)
10      BY MR. NOVACK:
11   Q.   During the conversation that you had with
12 Mr. Peskoff and Mr. Devlin, is it fair to say that
13 you basically were giving your strategic ideas and
14 the details were going to be followed up on by
15 Mr. Devlin?
16   A.   Yes.
17   Q.   And in addition, you anticipated that the
18 details insofar as they were legal will be followed
19 up on by Mr. Vaughn.
20      At the time, that was your thinking?
21   A.   Yes.
22   Q.   Okay. Can you tell me whether you had any

---

Page 25

1  understanding during the conversation as to what the
2  assets and liabilities were of Underhill?
3    A.   I believe my note about BP Partners must
4  have been about an asset that Underhill owned.
5    Q.   Okay.
6    A.   But that's the extent of the discussion.
7    Q.   Did you understand at the time what BP
8  Partners was, generally, other than a partnership?
9    A.   I'm sure I did.
10   Q.   You don't have --
11   A.   I don't remember what BP stands for
12 anymore.
13   Q.   Okay. Other than knowing of the ownership
14 interest, if that's what it was, in BP Partners, did
15 you know of any other assets that Mr. Peskoff
16 identified as being owned by Underhill?
17   A.   I have no recollection of any such.
18   Q.   Is it fair to say that insofar as you were
19 aware during this conversation, the only asset that
20 you were aware of that was owned by Underhill was the
21 investment in BP -- PB Partners?
22   A.   I'm not willing to make the statement

Charles P. Cocke                                                    August 10, 2006
                        Washington, DC

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  that's the only asset. It's certainly the only one I
2  made a note of. I had no trial balance or general
3  ledger for this client.
4     Q.   Have you ever seen a trial balance or
5  general ledger for Underhill Investment Corp.
6     A.   I've seen prior year tax returns. I've
7  not seen a general ledger that I remember.
8        Excuse me.
9        The prior year tax returns have balance
10  sheets on them --
11    Q.   Right.
12    A.   -- but that would have been in the '90s.
13    Q.   Just in the very briefest of terms tell me
14  what Renaissance was.
15    A.   It's a sister corporation to Underhill.
16    Q.   What was your understanding at the time of
17  this conversation on May 21, 2004, as to what the
18  business was of Underhill?
19    A.   It was receiving some type of commission
20  income. I'm not sure from where. I think it had
21  something to do with Friedman Billings, but I may be
22  wrong.

**Page 27**

1        MR. NOVACK: Friedman, F-R-I-E-D-M-A-N,
2  Billings, B-I double L I-N-G-S.
3        BY MR. NOVACK:
4     Q.   Did you have any idea what this commission
5  revenue was for, what services?
6     A.   Steve talked about deals he was doing for
7  Friedman Billings. I know Emanuel Friedman from the
8  time they started this business, and Steve had
9  mentioned the deals he was doing that created
10  commission.
11    Q.   Did he tell you what kind of deals he was
12  doing?
13       I'm talking about what your understanding
14  was back in May of 2004 as to what the business was
15  of --
16    A.   I have no memory of --
17    Q.   -- Underhill -
18    A.   -- what type of deals they were.
19    Q.   Did you have any understanding what the
20  business was of Renaissance, if it was different than
21  Underhill?
22    A.   I don't.

**Page 28**

1     Q.   Did you know what the business of
2  Renaissance was?
3     A.   At one time, from prior year tax returns
4  back in the '90s.
5     Q.   So as you sit here today, you don't know
6  what the business was of Renaissance?
7     A.   No.
8     Q.   You don't remember. Okay.
9        These notes indicate that there was some 6
10  million dollars owed by Underhill.
11       Can you tell me what you understood as to
12  how that debt came about?
13    A.   My very faint memory is that Underhill was
14  involved in real estate at one time in Arizona, but
15  that all happened long before I first ever met with
16  Steve.
17    Q.   Right.
18       But how does that translate into Underhill
19  owing Mr. Peskoff 6 million dollars?
20    A.   He had funded the losses on a real estate
21  deal --
22    Q.   He had made --

**Page 29**

1     A.   -- is my recollection, yes.
2     Q.   Okay. There's a reference in your notes
3  which are Cocke exhibit 3 to taking capital losses of
4  5.5 million.
5        Was that a loss that was going to be
6  capital loss for both Renaissance and Underhill, or
7  with respect to both or just one?
8     A.   That would be a loss on Steve's return
9  from liquidating Underhill -- excuse me -- Underhill
10  and Renaissance.
11       I don't remember how to break it down.
12    Q.   Okay. All right.
13       Okay. Do you remember anything more about
14  the conversation of May 21st, 2004?
15    A.   No.
16    Q.   Okay. Now, why don't we go and mark next
17  the May 26, 2004, letter to Mr. Peskoff from you,
18  which attaches a memo of 2 pages. Those have Bates
19  numbers CST 3, 4, and 5.
20            (Cocke Exhibit No. 4
21            was marked for
22            identification.)

Alderson Reporting Company        **B-47**
1111 14th Street, NW Suite 400      1-800-FOR-DEPO        Washington, DC 20005

Charles P. Cocke                                                                August 10, 2006

Washington, DC

Page 30

1       BY MR. NOVACK:
2       Q.   Do you have Cocke exhibit 4 in front of
3   you?
4       A.   I do.
5       Q.   Mr. Cocke, it might be safer for you if
6   you were to use the actual marked copies when we talk
7   as opposed to the ones I brought, because when I
8   refer to them by that designation, we'll know we're
9   talking about the same page.  I have no objection if
10  you look at the originals as well, but we
11  Bates-numbered because it's sometimes easier to
12  direct you to a page.
13      But it's totally up to you.  I'm perfectly
14  happy either way.
15      Is the claimant's (sic) exhibit 4, the top
16  page, a letter you wrote to Mr. Peskoff --
17      A.   Yes.
18      Q.   -- on May 26, 2004?
19      A.   Yes.
20      Q.   Did you send the attached memo to him on
21  that date?
22      A.   I did.

Page 31

1       Q.   I see that has a fax banner line at the
2   top of the page.  We can disregard that.  That was
3   something that came about because you were kind
4   enough to furnish this to us in advance of the
5   deposition.
6       A.   That's true.
7       Q.   We'll all agree that the 2006 banner line
8   has nothing to do with what was existing at the time.
9       A.   Right.
10      Q.   In the original that you produced from
11  your file this morning, may I just see that for one
12  minute, the May 26 memo?
13      THE WITNESS:  Off the record.
14      MR. NOVACK:  We can go off the record on
15  this.  Generally speaking, she won't go off the
16  record if you ask her, but that's fine with me.
17      (Discussion off the record.)
18      BY MR. NOVACK:
19      Q.   Okay.  Let's go to Cocke's exhibit 4.
20      The attached memo, is that something that
21  you dictated?
22      A.   Yes.

Page 32

1       Q.   When did you dictate it in relation to
2   when the call took place?
3       A.   I stopped dictating sometime.
4       But I believe that would have been
5   dictated -- it's dated 2 days later, so probably
6   dictated it the next day, the same day.
7       Q.   The memo -- the handwritten notes, Cocke's
8   exhibit 3, indicates the call was on May 21.
9       A.   Excuse me.
10      5 days later.
11      Q.   All right.  Now, I guess my question is,
12  the contents of the memo, that comes from both your
13  memory and your notes that are Cocke's exhibit 3?
14      A.   Yes.
15      Q.   Okay.  Am I correct, you're the architect
16  of things that had to be done?
17      In other words, you came up with this
18  plan?
19      A.   Yes.
20      Q.   Okay.  Going back to the conversation for
21  a moment, during the conversation of May 21, was
22  there any agreement reached with any more specificity

Page 33

1   as to what Mr. Vaughn would do and when he would do
2   it?
3       A.   Liquidate the corporation prior to
4   December 31 was the only legal item that I had.
5       Q.   Okay.
6       (Cellular phone ringing.)
7       MR. RUBEN:  Excuse me.
8       Can we take a minute?
9       MR. NOVACK:  Yeah.  Sure.
10      Why don't we go off the record.
11      (Discussion off the record.)
12      MR. NOVACK:  Can we go back on the record,
13  please.
14      BY MR. NOVACK:
15      Q.   I want to direct your attention to your
16  memo, slash, action items.
17      Did anyone else in your firm participate
18  with you in the drafting or editing of this memo?
19      A.   Only my secretary.
20      Q.   Okay.  Let me go to item 1.  I'm not going
21  to read the whole thing.  I'm just going to direct
22  your attention to certain parts of it.

9  (Pages 30 to 33)

Charles P. Cocke                                                          August 10, 2006

Washington, DC

| Page 34 | Page 36 |
|---|---|

**Page 34**

1    In item 1, it refers to before December
2  31, 2004, Underhill and Renaissance being liquidated.
3    What do you mean when you said,
4  liquidated?
5    A.  From a tax perspective, all assets would
6  be distributed to the shareholder, creating a taxable
7  event to the shareholder.
8    Q.  Would that have any tax consequences on
9  the corporation?
10    A.  Yes.
11    Q.  And what would generally those be?
12    A.  Mr. Devlin would have done a return, but
13  distribution of assets is treated as a sale of the
14  assets at then current value.
15    Q.  And that is something that would be
16  reported by the corporation?
17    A.  Yes.
18    Q.  Where would it report that?
19    A.  On its tax return.
20    Q.  Okay.  Is there a special spot on the tax
21  return or line item or description of where it would
22  appear?

**Page 35**

1    A.  Depending on assets, it would be treated
2  as triggering ordinary income or capital gain or
3  whatever the types of asset sale.
4    Q.  Okay.  In connection with the
5  distribution -- let me ask a different question.
6    I want to be very careful about the words
7  I use because I know tax lawyers are very precise.
8    Is there a -- what is the difference
9  between a liquidation -- let's deal with Underhill.
10    Start again.
11    Underhill was going to be liquidated by
12  December 31, 2004.  The liquidation is the
13  distribution of its assets to its shareholders.
14    A.  I believe that's the legal --
15    Q.  Right?
16    A.  -- definition.
17    Q.  And in connection with that, I presume --
18  or before that occurs, the corporation would pay its
19  debts to whoever its third-party creditors were, and
20  would martial its assets to make sure all the debts
21  were paid before you would distribute anything to the
22  shareholders.

**Page 36**

1    Would that be the ordinary sequence of
2  events?
3    A.  I would tell you, many times a shareholder
4  assumes debts too, but you would try to pay whatever
5  corporate debts at the corporate level.
6    Q.  Is it correct as a general matter that
7  unless there's an assumption by the sole shareholder
8  that a corporation like Underhill would in the
9  ordinary course of liquidating martialed its assets,
10  paid its creditors, and then distributed whatever
11  other assets remained to its shareholder?
12    A.  To the extent there are sufficient assets,
13  I think that would be normal.
14    Q.  And when the corporation distributes the
15  assets to its shareholder, can you tell me, does it
16  follow any procedure in terms of documentation as a
17  general matter?
18    A.  I don't practice law.  I don't know.
19    Q.  I understand.
20    I'm not asking you as a lawyer.
21    I'm asking you as someone who seems to be
22  a pretty experienced accountant whether in all your

**Page 37**

1  years of practice you've ever been involved in a
2  liquidation of a corporation that's closely held
3  where there's been a distribution of assets to the
4  sole shareholder or shareholders?
5    MR. RUBEN:  Jerry, let me just interrupt
6  for a second as to the form of the question and the
7  purpose for Mr. Cocke being here.  This is not an
8  expert witness --
9    MR. NOVACK:  No, he's a fact witness.
10    MR. RUBEN:  -- deposition.
11    MR. NOVACK:  I understand.
12    MR. RUBEN:  And I don't know that it's
13  fair without having handed him a check for you to --
14  to seek expert advice on tax matters.
15    MR. NOVACK:  Well, I'm not actually.
16    What I'm trying to understand is what his
17  understanding was in the liquidation process, because
18  later in the memo, we talk about certain things, and
19  I want to have a general context.
20    This is not a hypothetical and academic
21  exercise to educate me, because I've educated myself
22  already.  And I'm trying to be very considerate of

Alderson Reporting Company

**B-49**

1111 14th Street , NW  Suite 400          1-800-FOR-DEPO          Washington, DC  20005

Charles P. Cocke                                                    August 10, 2006
Washington, DC

Page 38

1  the witness's time actually and move this along as
2  fast as I can.
3      I will try to take into account what you
4  said so that you see I'm taking it into account, but
5  I have been all along.
6      All right?
7      So let me go back.
8      All right?
9      BY MR. NOVACK:
10     Q.  My question is not to you as a lawyer but
11  as an accountant.
12     Have you been involved in liquidations of
13  closely held corporations where there have been
14  distributions to the shareholders?
15     A.  Yes.
16     Q.  Okay.  In those instances, have you
17  observed one way or another whether there has been
18  any documentation created that reflects what is being
19  distributed to the shareholders?
20     A.  In many cases, it's required.
21     A car would be retitled, a bank account
22  would be closed, and a check written --

Page 39

1  Q.  M-hm.
2  A.  -- real estate would be retitled, et
3  cetera.
4  Q.  Have you ever been involved in a situation
5  where a contract existed in favor of the corporation
6  and there was some attempt made to distribute any
7  rights under that contract or to distribute the
8  contract as an asset?
9  A.  I don't remember the specifics, but I
10  would -- my understanding of corporate law with
11  respect to this, is that all assets would be
12  distributed out pursuant to the liquidation to the
13  shareholder.
14     Q.  I am not asking you about corporate law
15  now.
16     I'm asking you if you've ever seen a piece
17  of paper that reflects any distribution of rights
18  under a contract to a shareholder.
19     In your experience, have you ever seen any
20  such document?
21     A.  I believe I've seen assignments of
22  accounts receivable or some such, yes.

Page 40

1  Q.  Those were written documents which --
2  A.  I think so.
3  Q.  M-hm.  Do you have any understanding
4  whether or not it is -- well, withdrawn.
5      Let's go to item A under 1:  John will
6  prepare final form 1120 for the year beginning April
7  1, 2004, through date of liquidation for each
8  corporation.
9      The form 1120 you're referring to is what?
10     A.  The federal corporate income tax return.
11     Q.  And next line:  B, John will prepare 1099
12  DIV -- David, Idaho, Victor -- to reflect the
13  liquidating dividends, if any.
14     And it reads in parentheses:  Renaissance
15  will probably have a liquidating dividend and
16  Underhill would repay debt and have no liquidating
17  dividend, close paren.
18     What is the form 1099 DIV to which you're
19  referring?
20     A.  That is the form that the government
21  requires for distributions paid to shareholders.
22     Q.  Does the -- are you familiar with that

Page 41

1  form?
2  A.  Yes.
3  Q.  Does the form have on it a box for noncash
4  distributions?
5  A.  Yes.
6  Q.  Can you tell us what is supposed to be
7  entered in that box as a general matter?
8  A.  The value of noncash assets distributed to
9  shareholders.
10     Q.  If a contract right was distributed to a
11  shareholder, would that be a noncash distribution?
12     A.  To the extent of its value, yes.
13     Q.  All right.  And do you recall in 2004 what
14  the cutoff number was for noncash distributions in
15  order to require that they be placed in box 9 of the
16  form 1099 DIV?
17     Was it 600 dollars or thereabouts?
18     A.  I think it's 10 dollars.
19     Q.  Oh, 10 dollars.  Okay.
20     Did you ever have any discussion with
21  anyone in connection with the liquidation of
22  Underhill with respect to whether there would be any

11  (Pages 38 to 41)

Charles P. Cocke                                                    August 10, 2006
                          Washington, DC

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  noncash distribution of any contract rights to
2  Mr. Peskoff?
3      **A.   I had no such conversation.**
4      Q.   In subdivision B of Roman numeral 1 on
5  this exhibit, you state: Underhill would repay debt
6  and have no liquidating dividend.
7          Does that refresh your recollection at all
8  as to what you understood the value was of
9  Underhill's assets at the time and whether there was
10  going to be any distribution to the shareholder,
11  Mr. Peskoff?
12      **A.   The purpose of this liquidation was that**
13  **there was no -- there were insufficient assets to pay**
14  **the debt.**
15          **So therefore -- and therefore, no**
16  **distributions to a shareholder as a shareholder.**
17      Q.   Did you have any information as of the
18  time you wrote this memo, which is part of Cocke
19  exhibit 4, as to what assets would be used to
20  partially repay the debt owed by Underhill to
21  Mr. Peskoff?
22      **A.   I have no memory of discussion of**

**Page 43**

1  **particular assets, no.**
2      Q.   Do you have any general memory whatsoever
3  beyond the fact that there was a partnership interest
4  that you previously referred to?
5      **A.   No.**
6      Q.   Do you recall that there was going to be
7  an assignment to Mr. Peskoff of the partnership
8  interest in PB Partners?
9      **A.   Could you repeat the question.**
10          MR. NOVACK:  Could you read it back,
11  please.
12          (The reporter read the last
13          question.)
14      **A.   I don't remember the discussion.**
15          **It certainly was an assumption that all**
16  **the assets would have been distributed out in payment**
17  **of the debt.**
18          BY MR. NOVACK:
19      Q.   Well, going back to Cocke exhibit 3, your
20  handwritten notes, you make a reference to PB
21  Partners owned by Underhill with a fair market value
22  of 600,000 dollars.

**Page 44**

1      Does that refresh your recollection that
2  you understood at the time that there would be some
3  assignment of that partnership interest to
4  Mr. Peskoff in partial satisfaction of the 6
5  million-dollar debt?
6      **A.   That certainly would have been my**
7  **understanding.**
8          **I don't remember the discussion.**
9      Q.   Were there any other assets that you were
10  aware of at the time in May of 2004 that could be
11  used to repay part of this 6 million-dollar debt owed
12  by Underhill to Mr. Peskoff?
13      **A.   No.**
14      Q.   Did Mr. Peskoff say to you in any of your
15  conversations with him in May 2004 that he had any
16  contract claims or -- rather -- excuse me -- in your
17  conversations with Mr. Peskoff in May 2004, did he
18  indicate to you in any way that he believed that
19  Underhill Investment Corporation had any contract
20  claims against any third parties?
21      **A.   I don't remember any such conversations.**
22      Q.   Could you please go to the second page of

**Page 45**

1  your memo, Roman numeral 4, headed, PB partnership,
2  subdivision A.
3          It reads in part:  Distribution by
4  Underhill to Steve as repayment of loan will be
5  valued at fair market value, which will reflect
6  significant discounts for lack of marketability and
7  lack of control.
8          You make a reference there to a
9  distribution by Underhill to Steve as repayment of a
10  loan.
11          Technically speaking, that was not a
12  distribution by the corporation to Mr. Underhill in
13  his capacity as a shareholder, was it?
14      **A.   True.**
15          **It was not a dividend.  It was a**
16  **distribution of the repayment of a loan.**
17      Q.   Well, does the word distribution have a
18  specialized meaning to a tax lawyer when it comes to
19  a liquidation?
20      **A.   With respect to a shareholder.**
21      Q.   Go ahead.
22      **A.   It's considered a dividend, if you're**

12  (Pages 42 to 45)

**B-51**

Charles P. Cocke                                                                    August 10, 2006

Washington, DC

Page 46

1  talking about passing out assets to a shareholder in
2  liquidation. I was using this in a generic term of
3  distribution as a repayment of loan.
4      Q.  Right.
5          That's what I wanted to clarify for the
6  nontax lawyers who will be hearing this.
7          Okay?
8          Let me take it just -- a simple
9  hypothetical so that we know which terminology we're
10 using here.
11         Let's take the case of a corporation, X
12 company, that owes 10 dollars to a shareholder as a
13 loan.
14         If that loan is repaid by transfer of
15 assets or assignment of assets, that would be
16 repayment of the loan in the capacity as a creditor.
17 Right?
18         That would not be considered a
19 distribution by the corporation to its shareholder as
20 a dividend as part of a liquidation; is that right?
21     A.  Right.
22     Q.  Okay. The repayment of the 6 million

Page 47

1  dollars by whatever assets were used, that was not a
2  distribution by Underhill in the sense of a
3  liquidated dividend that was given to Mr. Peskoff; is
4  that right?
5      A.  Right.
6          It was a distribution as per the memo as
7  repayment of the loan, so if we were distributing out
8  the asset is the context of the language of my memo.
9      Q.  If you were to take 10 dollars out of the
10 cash register and pay off the debt, you could call
11 that a distribution if you wish, but you're speaking
12 colloquially?
13     A.  True.
14     Q.  Just like if you paid the landlord for
15 Underhill whatever he was owed, that would not be a
16 distribution to -- through --
17     A.  Disbursement would be a better term in
18 that case.
19     Q.  Okay. All right.
20         Now, do you have any recollection as you
21 sit here today what assets were used to repay the
22 loan to Mr. Peskoff other than what you've testified

Page 48

1  to?
2      A.  All the assets of the corporation were to
3  be assigned if that's the right term --
4      Q.  M-hm.
5      A.  -- as repayment of the loan.
6      Q.  Was it your understanding that after all
7  of the assets of the corporation were assigned, there
8  would be nothing left to distribute to Mr. Peskoff in
9  his capacity as a shareholder?
10     A.  That was my understanding.
11     Q.  Am I correct, as you sit here today, you
12 don't know what the assets were of the corporation at
13 the time that Mr. Peskoff was repaid the loan?
14     A.  Right.
15     Q.  Okay. Why don't we go to the August 10,
16 2004, memo from Mr. Peskoff to you, Mr. Cocke.
17         MR. NOVACK: And we'll mark that as Cocke
18 exhibit 5, please.
19         (Cocke Exhibit No. 5
20         was marked for
21         identification.)
22         MR. NOVACK: Page 6, CST 6, the Bates

Page 49

1  number.
2          Let's mark as Cocke exhibit 6 -- I'm
3  sorry --
4          MR. RUBEN: What are we marking as 6?
5          MR. NOVACK: We just marked as 5 the
6  August 10 memo. CST 6 is the Bates number. That's
7  what confused me. The last word I heard in my memory
8  is 6.
9          Let's mark as Cocke exhibit 6 a
10 single-page document which purports to be a memo to
11 Mr. Cocke and Mr. Devlin to Mr. Peskoff dated August
12 10, 2004, bears Bates numbers CST 7.
13         (Cocke Exhibit No. 6
14         was marked for
15         identification.)
16         BY MR. NOVACK:
17     Q.  Okay. Mr. Cocke, would you look at
18 claimant's -- excuse me -- Cocke exhibit 5.
19         Did you receive that memo from Mr. Peskoff
20 on or around August 10, 2004?
21     A.  Yes.
22         The banner is dated August 10, so I would

13 (Pages 46 to 49)

Charles P. Cocke                                                    August 10, 2006

Washington, DC

## Page 50

1   have seen it that same -- that day, yes.
2   Q.   Okay.  Then let's go to Cocke exhibit 6,
3   which is a memo to you and Mr. Devlin from
4   Mr. Peskoff dated August 10.  I want to read a part
5   of it to you.
6        First let me ask you:  This is the memo
7   that came along with the fax cover page, which is
8   Cocke exhibit 5?
9   A.   Yes.
10  Q.   Cocke exhibit 6 reads in part:  It is the
11  beginning of August, and I would like to begin the
12  process of transferring assets from PB Partners to me
13  and get the ball rolling on the liquidation of UIC.
14  I have not had a response from Paul O'Reilly, but
15  contacted Patrick Vaughn to work with Charles to
16  handle the legal side.
17       Then it goes on to say they want to set up
18  a conference call.
19       Do you recall aside from looking at the
20  memo having any conversations with Mr. Peskoff or
21  Mr. Devlin or Mr. O'Reilly or Mr. Vaughn around
22  August of 2004 with respect to the liquidation?

## Page 51

1   A.   No.
2   Q.   Is it fair to say that -- well, withdrawn.
3        As of August 10, 2004, your role in this
4   liquidation matter remained the same.
5        You were just basically the strategist.
6   A.   Yes.
7   Q.   Do you recall anything being discussed
8   between May of 2004 and August 2004 when you received
9   this memo from Mr. Peskoff with respect to the
10  liquidation, or was it not the subject of any
11  communications insofar as you can recall?
12  A.   I don't remember any subsequent
13  conversations.
14  Q.   Okay.
15       MR. NOVACK:  Let's mark as -- 2-page
16  document as Cocke exhibit 7.
17       The top page is an August 18 -- what
18  appears to be an August 18, 2004, memo from
19  Mr. Peskoff to Mr. Cocke.  And the second page is
20  what appears to be a memo to Patrick Vaughn from
21  Mr. Peskoff, copies to Mr. Cocke and Mr. O'Reilly
22  with regard to the liquidation of Underhill.  That's

## Page 52

1   dated August 18, 2004.
2             (Cocke Exhibit No. 7
3             was marked for
4             identification.)
5        BY MR. NOVACK:
6   Q.   Mr. Cocke, is Cocke exhibit 7 a fax that
7   you received on the 18th of August, 2004, and is the
8   attached page with Bates number CST 9 the
9   accompanying memo?
10  A.   Yes.
11  Q.   Thank you.
12       Let's go to the memo, which is the second
13  page of the exhibit.
14       It reads in part:  Yesterday, I received
15  some important documents in the mail regarding the
16  liquidation of Underhill Investment Corporation from
17  the office of O'Reilly & Mark.  Therefore, I will not
18  need your assistance in this process.  However, I
19  will need your continued assistance on both the
20  personal and estate planning that will be tied into
21  the liquidation process.  I'm looking to set up a
22  conference call between you and Charles Cocke in

## Page 53

1   early September to reaffirm the path that Charles
2   outlined.  At this time, I've signed the liquidation
3   papers for Underhill, but unsure whether Renaissance
4   should be liquidated.
5        And then I've omitted the rest.
6        Do you recall having any conversation with
7   either Mr. Vaughn, Mr. Peskoff, or Mr. O'Reilly
8   about this subject matter in August of 2004?
9        MR. RUBEN:  Excuse me.
10       Before he answers that, I want to preserve
11  for this record a privilege objection on this
12  document.
13       Excuse me, Jerry.
14       It's between attorney and client, and I
15  haven't had an opportunity to determine with
16  Mr. Peskoff whether this was intended to be a
17  confidential communication.  I'm not -- I'm not going
18  to tell him not to answer the question.  I just want
19  to preserve that objection.
20       MR. NOVACK:  That's fine.
21       And I'm not going to say that the
22  production of this is a waiver, as long as you're not

Alderson Reporting Company
1-800-FOR-DEPO

**B-53**

1111 14th Street , NW  Suite 400                    Washington, DC  20005

Charles P. Cocke                                                                August 10, 2006
Washington, DC

Page 54

1  going to use it as a sword and a shield situation.
2  I'm willing to accommodate inadvertent turnovers.
3  Okay.
4        MR. RUBEN:  Thank you.
5        MR. NOVACK:  I'm not sure that I agree
6  that it was confidential or that it was ever intended
7  to be, but we don't have to argue that today.
8        MR. RUBEN:  That was the purpose of
9  preserving it.  Thank you for your courtesy.
10       BY MR. NOVACK:
11    Q.   So I guess my question is -- do you
12  remember my question?
13    A.   I have no memory of conversation with
14  Peskoff, Vaughn, or O'Reilly with respect to this.
15    Q.   Do you have any recollection at all what
16  the documents were that were referred to in this
17  memorandum?
18    A.   I never knew.
19    Q.   Let's go to what's going to be marked as
20  Cocke exhibit 8, which is an August 23, 2004 -- what
21  purports to be an August 23, 2004, letter from
22  Mr. Peskoff to Mr. O'Reilly, copies to Mr. Cocke and

Page 55

1  to Mr. Devlin.
2              (Cocke Exhibit No. 8
3               was marked for
4               identification.)
5        BY MR. NOVACK:
6    Q.   Do you have Cocke exhibit 8 in front of
7  you?
8    A.   I do.
9    Q.   Do you recall receiving this -- well, did
10  you receive this on or around August 23rd or 24th?
11    A.   My firm's stamp is August 24th.
12    Q.   Okay.  Did you ever see the documentation
13  that is referred to in this letter?
14    A.   No.
15       MR. RUBEN:  Jerry, I'm going to
16  preserve --
17       MR. NOVACK:  Okay.
18       MR. RUBEN:  -- the same privileged
19  objection on this document.
20       MR. NOVACK:  Can we go off the record a
21  second?
22       (Discussion off the record.)

Page 56

1        MR. NOVACK:  Back on the record.
2        BY MR. NOVACK:
3    Q.   After you received this copy of the letter
4  which is dated August 23, which is Cocke exhibit 8,
5  did you have any further involvement in the
6  liquidation of Underhill?
7    A.   No.
8    Q.   Okay.  Did you ever again discuss with
9  anyone anything to do with the liquidation of
10  Underhill?
11       And I'm excluding anything that might have
12  taken place in the last couple of months in
13  connection with this lawsuit.  We'll come to that
14  later.
15    A.   Right.
16       I don't think so.
17    Q.   Did you learn at any time that Underhill
18  had been liquidated?
19    A.   I assumed it.  I don't know that I had
20  that assumption affirmed.
21    Q.   Did you ever see any tax returns from
22  Underhill after the discussions had begun about

Page 57

1  liquidation?
2    A.   No.
3    Q.   Did Mr. Peskoff ever have any followup
4  communications with you with regard to his personal
5  tax planning as a result of the liquidation of
6  Underhill?
7    A.   Not with respect to the liquidation, no.
8    Q.   What about with respect to the
9  consequences of the liquidation?
10    A.   I don't think so.
11    Q.   Am I correct that you don't prepare his
12  tax returns?
13    A.   Right.
14    Q.   That would be Mr. Devlin or his firm?
15    A.   Right.
16       Yes.
17    Q.   Do you remember any other conversations
18  occurring in which you participated or which you were
19  present that you haven't testified to already with
20  regard to the liquidation of Underhill?
21    A.   No.
22    Q.   Why don't we look at your time records

15  (Pages 54 to 57)

Page 58

1  that you produced, and I'm going to mark them as
2  Cocke exhibit 9. It's 2 pages bearing Bates numbers
3  CST 11 and 12.
4       (Cocke Exhibit No. 9
5       was marked for
6       identification.)
7       BY MR. NOVACK:
8       Q.  Do you have the exhibit in front of you,
9  Cocke exhibit 9?
10      A.  Yes.
11      Q.  The second page of the exhibit, Bates
12  number 12, refers to services you provided in April
13  and May 2004.
14      A.  Right.
15      Q.  And then we go to the top page, with Bates
16  number 11, which refers to services you provided in
17  August and November 2004.
18      I see in November, you spent .25 hours.
19      It's probably a safe bet you don't recall
20  what that was?
21      A.  Right.
22      Q.  All right. Now, I see one other entry on

Page 59

1  that page which refers to services provided,
2  four-tenths of an hour, on February 1, 2006.
3       Can you tell me what that was in relation
4  to?
5       A.  Steve called me regarding tax planning. I
6  don't remember what it was.
7       Q.  In this conversation with you, did he
8  discuss Underhill?
9       A.  I don't think so.
10      Q.  Did he discuss any claims he was making or
11  Underhill was making?
12      A.  I don't know when I heard about this
13  lawsuit.
14      I think the first I heard was when he
15  called me a couple weeks ago to tell me I was being
16  deposed. I don't think I heard it in February.
17      MR. NOVACK: Why don't we take a short
18  break.
19      You have to feed the meter, what time?
20      Off the record, please.
21      (Recess.)
22      MR. NOVACK: Why don't we mark as Cocke

Page 60

1  exhibit 10 a copy of the form 1120 tax return for
2  Underhill Investment Corp. for the period ending
3  November 30, 2004.
4       (Cocke Exhibit No. 10
5       was marked for
6       identification.)
7       BY MR. NOVACK:
8       Q.  Mr. Cocke, we did not get this from your
9  file.
10      We got this as a courtesy from counsel for
11  the plaintiffs. We asked them if they could locate
12  one for us, and so I don't want to suggest that this
13  came from your file.
14      This appears to be the final tax return
15  for Underhill Investment Corp.
16      Am I correct that this is what it purports
17  to be?
18      A.  It's marked, final, in box E 2.
19      Q.  M-hm. Now, can you tell me where on here
20  the repayment of the debt that's referred to in your
21  strategy memo is reflected if it's reflected at all,
22  or any of the facts relating to that repayment?

Page 61

1       A.  It's reflected -- well, it's not reflected
2  the way I would have reflected it. It appears to
3  still be on the balance sheet.
4       Q.  If you could give us a page.
5       A.  Yes.
6       On page 4.
7       Q.  All right. Page 4 of Cocke exhibit 10.
8       A.  It's a balance sheet at the beginning of
9  the year in columns A and B and the end of the year
10  in columns C and D --
11      Q.  Right.
12      A.  -- showing no assets but still unpaid
13  liabilities.
14      Q.  Let's just slow down for one minute.
15      You want to give us the lines that you're
16  referring to here, or are we looking at a summary
17  line?
18      A.  Lines 1 through 15 --
19      Q.  Right.
20      A.  -- are the assets --
21      Q.  Right.
22      A.  -- showing zero at the end the year in

16 (Pages 58 to 61)

Charles P. Cocke                                                          August 10, 2006

Washington, DC

---

Page 62

1  column D.
2      Q.  Right.
3          So at the beginning of the year -- the
4  beginning of the year referring to April 1, 2004 --
5      A.  Yes.
6      Q.  -- the tax returns reflect assets of
7  581,477 dollars?
8      A.  Right.
9      Q.  At the end of the year, on line 15, column
10  D, it shows zero.
11         That indicates that all of those assets
12  were, what?
13     A.  Distributed, liquidated, paid out.
14     Q.  Well, let me ask you -- when we use the
15  term distributed, just for purposes of my discussion
16  with you here, what we're talking about, a payment to
17  a third party in satisfaction of an obligation to the
18  third party as a creditor?
19     A.  Assigned.
20     Q.  All right.  In other words, based upon
21  what we see here at the time of the filing of this
22  tax return, there was zero assets to distribute to

---

Page 63

1  shareholders -- the shareholder, qua shareholder,
2  Mr. Peskoff, the 581,471 dollars in assets -- let's
3  just see what they were first.  It might make it
4  easier.
5          We have cash of 168,000 -- I'm going to
6  round -- right?
7      A.  I don't think your question works the way
8  you want it to work.
9          If I may tell you that beginning assets
10  are used to generate revenues and pay expenses and
11  for the next 9 months of this tax return, which is
12  not quite 9 months, 8 months, there were transactions
13  going on and assets changed and liabilities changed.
14     Q.  Right.
15     A.  If you went to page 1, it reflects that we
16  lost a hundred and 28 thousand dollars during that
17  period.
18     Q.  That Underhill lost?
19     A.  Yes.
20     Q.  Okay.  Go ahead.
21     A.  And that -- so some of the assets were
22  used to pay those expenses --

---

Page 64

1      Q.  Okay.
2      A.  -- in excess of revenue.
3      Q.  M-hm.  What does schedule L indicate with
4  respect to whether or not at the conclusion of the
5  liquidation there were any assets left in the
6  corporation after payment of all creditors, including
7  Mr. Peskoff in his capacity as a creditor?
8          What was left to distribute?
9          Zero?
10     A.  It shows zero assets, but it does not show
11  that all the creditors were paid.
12     Q.  I understand.
13         But we do agree that the tax return shows
14  there were no assets to distribute to Mr. Peskoff as
15  a shareholder?
16     A.  Yes.
17     Q.  Okay.  Now, what do the liabilities and
18  shareholder equity lines indicate to you with respect
19  to the repayment of Mr. Peskoff, if anything?
20     A.  Line 19 --
21     Q.  Right.
22     A.  -- reflects that it began the year with 6

---

Page 65

1  million 3 92 3 0 9, and that some 360,000 dollars was
2  used to reduce indebtedness during the year.
3      Q.  Is there any way by looking at the tax
4  returns we can see what assets were used to reduce
5  the indebtedness necessary?
6      A.  No.
7      Q.  We'd have to look at the general ledger or
8  other books of account?
9      A.  Yes.
10     Q.  Okay.  Does -- withdrawn.
11         Is there anything in this tax return which
12  indicates that there are any claims against third
13  parties by way of damage claims, breach of contract
14  claims, or anything of the sort?
15     A.  It only -- I assume by that, that would be
16  an asset.
17     Q.  Right.
18     A.  If it had value or had created a taxable
19  event --
20     Q.  M-hm.
21     A.  -- to create the asset, contingent claims
22  which would not be valued would not be reflected on

---

Alderson Reporting Company
1111 14th Street , NW  Suite 400          1-800-FOR-DEPO          **B-56**          Washington, DC  20005

Charles P. Cocke                                                      August 10, 2006
Washington, DC

Page 66

1  the tax return --
2      Q.   Right.
3      A.   -- at the beginning of the year.
4          At the end of the year, it shows zero
5  assets.
6      Q.   Which indicates that there were no
7  contingent claims available to distribute?
8      A.   It doesn't show that.  They may have been
9  distributed, or assigned to be a better term.  It
10 shows no value of any assets, which is the way a
11 final return should be.
12     Q.   Again, I want to clarify that.
13         When you referred to the distribution in
14 your last answer, you were referring to an assignment
15 or a transfer to an outside third party, not in the
16 capacity as a distribution to that person as a
17 shareholder; is that right?
18     A.   Yes.
19     Q.   Okay.  Only a few more questions and we're
20 done.
21     A.   May I correct?
22     Q.   Oh, absolutely.  Please correct anything

Page 67

1  that I have said wrong or you may have misspoken.
2      A.   All right.  I spoke with incomplete facts
3  without reading throughout the tax return.  I
4  referred you back to page 1, showing a loss of a
5  hundred and 28,000.
6      Q.   Yes.
7      A.   There were nondeductible expenses as
8  reflected on page 4 below the balance sheet on the
9  schedule M 1.  The net loss was really a hundred and
10 57,108 per the books.
11     Q.   On page 4, that's the balance sheet per
12 the books.
13         What line item, if any, would contain a
14 reference to a claim against a third party on a
15 contract, if it had any value at the time?
16     A.   It would be a receivable.
17     Q.   What line number would that be?
18     A.   Receivables to the extent that the money
19 had been earned --
20     Q.   Right.
21     A.   -- as opposed to future services to be
22 earned --

Page 68

1      Q.   Right.
2      A.   -- it would probably be on line 2 A as
3  trade receivables.  Could be under, other current
4  assets, on line 6.
5      Q.   Would there be a schedule -- well, there's
6  nothing on this, so there's nothing listed there.
7          Am I correct, there's nothing listed as an
8  asset on line 2 A or line 6?
9      A.   Yes.
10     Q.   Is there anyplace else on the balance
11 sheet that you think that a claim under a contract
12 for some commissions that were due would be listed?
13     A.   Well, there is line 14, other assets,
14 statement 8, which shows, due from affiliate -- when
15 I go to statement 8, and then, deposits, but it's not
16 in that either.
17     Q.   Let me just see.
18         Statement 8 on is page -- what page did
19 you say it was on?
20     A.   Page 14 of the tax return.
21     Q.   Okay.  Due from affiliate.  Okay.
22         Anywhere else that you can think of we

Page 69

1  would look to find such an asset if it existed?
2      A.   Again, I want to point out to you that
3  assets sometimes have a balance and sometimes don't.
4      Q.   Right.
5      A.   Goodwill is an asset.  The value of the
6  customer base is never -- typically not on the books
7  to the extent it's created by the company, so there
8  are assets not on the balance sheet.
9      Q.   So let me clarify so there will be no
10 confusion, and I appreciate your helping me out here.
11         I want you to for purposes of my questions
12 assume I'm speaking about a contract claim for
13 commissions that Underhill has against an unrelated
14 third party.  And these commissions are allegedly
15 owed for services already rendered by Underhill, and
16 it has to do no more work.
17         My question is, on the tax return, where
18 would such an asset be listed?
19         MR. RUBEN:  Object as to form of the
20 question.
21         BY MR. NOVACK:
22     Q.   You can answer.

18  (Pages 66 to 69)

Charles P. Cocke                                                        August 10, 2006
Washington, DC

Page 70

1    A.   This tax return is prepared on the cash
2    method of accounting as reflected on page 3, schedule
3    K, box 1 A.
4    Q.   Go ahead.
5    A.   And in answer to your question, amounts
6    which have been earned but not yet received would not
7    be reflected on the tax return on the balance sheet,
8    on the income statement, until the cash is in hand.
9    Q.   So that on this tax return, there would be
10   no place that the asset would be reflected; is that
11   correct?
12   A.   Right.
13   Q.   Where would such an asset be reflected?
14        On the general ledger of a corporation?
15   A.   Not if they maintain their books on a cash
16   method.
17   Q.   Do you know if Underhill Investment
18   Corporation maintained its books on a cash or accrual
19   basis?
20   A.   I do not.
21   Q.   Did you ever see any financial statements
22   for Underhill Investment Corporation other than what

Page 71

1    you may see on this tax return?
2    A.   I don't think so.
3    Q.   When is the first time you heard the name
4    Fixed Income Discount Advisory Company, or FIDAC?
5    A.   In the deposition.
6    Q.   This deposition?
7    A.   Excuse me.
8         The subpoena.
9    Q.   In the subpoena.
10        When is the first time you ever heard the
11   name Annaly Mortgage, A-N-N-A-L-Y?
12   A.   When I bought the stock.
13   Q.   When was that?
14   A.   Or sometime prior to that.
15        1996 -- 8, some time frame.
16   Q.   Did you -- do you still hold the stock?
17   A.   Yes.
18   Q.   Other than knowing the name because you
19   bought some stock in it, did you ever hear the name
20   mentioned by Mr. Peskoff?
21   A.   I've had discussions with Mr. Peskoff
22   about Annaly, yes.

Page 72

1    Q.   When is the first time you've --
2    withdrawn.
3         Have you ever heard the name Gen Advisers?
4    A.   No.
5    Q.   Have you ever heard the name Ernie
6    Baptista?
7    A.   No.
8    Q.   Have you ever heard the name Jeff Mesner?
9    A.   No.
10   Q.   Have you ever heard the name Mr. Corsini?
11   A.   No.
12   Q.   C-O-R-S-I-N-I.
13        Have you ever heard the name Century
14   Select?
15   A.   No.
16   Q.   Have you ever heard the name Premier, as
17   the name of an investment vehicle?
18   A.   There are lots of investment vehicles that
19   put "premier" in the name.  If you're thinking of a
20   stock, I don't think I know that name.
21   Q.   Have you ever had any conversations with
22   Mr. Peskoff in which he referred to an investment

Page 73

1    product called Premier?
2    A.   No.
3    Q.   Have you ever heard the name Michael
4    Farrell, or Mike Farrell?
5    A.   I don't think so.
6    Q.   Have you heard the name MBS -- M, Mary, B
7    as in boy, S, Sam -- Trusts?
8    A.   Mortgage-backed securities?
9    Q.   No.
10        As a proper name, MBS Trusts.
11   A.   No.
12   Q.   Have you ever spoken with Mr. Peskoff
13   about the subject matter of the dispute in this
14   lawsuit?
15   A.   When he called and told me I was going to
16   be deposed.
17   Q.   And you said that was several weeks ago?
18   A.   Yeah.
19   Q.   Before he called you to tell you you were
20   going to be deposed several weeks ago, had
21   Mr. Peskoff ever spoken to you about any of his
22   dealings with FIDAC?

19 (Pages 70 to 73)

Charles P. Cocke                                                                August 10, 2006
Washington, DC

Page 74

1    That's Fixed Income Discount Advisory
2    Company.
3        A.  I don't think so.  But I've heard him say
4    that he had done big deals with Friedman Billings.  I
5    know the Friedman Billings firm, and he told me he
6    was going to make a lot of money off deals, and
7    that's the extent of the conversation as I remember.
8        Q.  I was asked about FIDAC, Fixed Income
9    Discount Advisory Company, and you referred to
10   Friedman Billings in response to my question.  I just
11   want to make sure we're on the same page here.
12       When you said you had spoken with
13   Mr. Peskoff about Friedman Billings, I understand
14   that, but other than the --
15       MR. RUBEN:  Objection.
16       I don't believe that he said he had spoken
17   to Mr. Peskoff about Friedman Billings.
18       MR. NOVACK:  I thought he just said he was
19   told that he had done big deals with Friedman
20   Billings and he was going to make a lot of money.
21       But it's not important.  That's okay.
22       BY MR. NOVACK:

Page 75

1        Q.  Let's go back to clarify.
2        With respect to this company that I call
3    FIDAC, other than the call when he told you about the
4    deposition, had you ever before spoken with
5    Mr. Peskoff about FIDAC or his dispute with FIDAC?
6        A.  No.
7        Q.  Okay.  Were you surprised when he called
8    you to find out that there was litigation between
9    Mr. Peskoff on the one hand and FIDAC on the other?
10       A.  No more surprised than any other
11   litigation, I guess.
12       Q.  Did Mr. Peskoff say anything to you in
13   this phone conversation when he told you you were
14   going to be a witness other than telling you you were
15   going to be a witness?
16       A.  Yes.
17       He said he didn't understand why they
18   wanted to talk to me.
19       Q.  Tell me everything that you can remember
20   he said about either FIDAC or this dispute or your
21   possible testimony.
22       A.  Oh, he told me it related to the Underhill

Page 76

1    liquidation and assignment of the claim that somebody
2    was trying to contest, he didn't have the right to
3    sue.
4        Q.  What else did he say about the contest as
5    to whether he had the right to sue and the
6    assignment?
7        A.  It was a 2-minute conversation, maybe 4 or
8    some such, but he told me I would be subpoenaed.  I
9    said, fine.
10       Q.  What did he say about the assignment?
11       Did he say there was an assignment?
12       A.  I used that term.  I don't know that he
13   used it in terms of there was anything.  I think he
14   might have used the word right as opposed to
15   assignment.
16       Q.  Let's try and focus the best we can.
17       Is it correct that Mr. Peskoff did not use
18   the word assignment?
19       A.  I have no memory of that.
20       Q.  He said to you he didn't understand why
21   someone was contesting his right to bring a claim?
22       He told you that much?

Page 77

1        A.  No.
2        Q.  What did he say?
3        A.  He told me he didn't understand why they
4    wanted to take my deposition.
5        Q.  Right.
6        A.  He said they were contesting his right to
7    bring the suit.
8        Q.  His personal right?
9        A.  Yes.
10       Q.  Did he refer -- did he distinguish between
11   any right by Underhill versus any personal right that
12   he had as an individual?
13       A.  We had a conversation, and I made the
14   comment that I thought he would have obtained title
15   to all assets under normal course of law, but that
16   was my interpretation of the basis for the claim.
17       Q.  What did he say?
18       A.  In the same context, he was the sole
19   person to have received any assets.  I don't know who
20   said that.  He or I said that.  But that was the
21   thrust of the conversation.
22       Q.  Did you ask Mr. Peskoff whether or not in

20 (Pages 74 to 77)

**B-59**

1111 14th Street , NW  Suite 400                                    Washington, DC  20005

Page 78

1    connection with the liquidation, he had taken any
2    written assignment of any claims that Underhill might
3    have?
4        A.   No.
5        Q.   I think based on your testimony earlier
6    today, you were of the view that there were no assets
7    to be distributed to Mr. Peskoff in his capacity as a
8    shareholder.
9             Right?
10       A.   Yes.
11       Q.   So if Mr. Peskoff were to have any right
12   under any contract that belonged to Underhill, it
13   would have to have been by virtue of an assignment to
14   him in repayment of the debt; is that right?
15       A.   I defer to the courts.
16       Q.   I'm only asking you your understanding --
17       A.   I don't practice law.
18       Q.   I understand that.
19            And I'm not asking you as a lawyer,
20   believe me.
21            I'm asking you as an accountant and
22   someone who has some familiarity with these matters.

Page 79

1             Now, I can have the question read back if
2    you want.
3        A.   I would have assumed that all rights,
4    title, and interest would have been distributed to
5    him as noteholder, slash, shareholder.
6             Where you draw the line, I defer to the
7    lawyers.
8        Q.   Well, let me ask you just to see how far
9    you'll defer to a lawyer.
10            If there's 10 dollars in a corporation and
11   it's used to pay General Electric, there's no dollars
12   lefts and no other assets, nothing can be distributed
13   to the shareholder.
14            Right?
15       A.   Nothing physical.
16            Certainly claims can be assigned.
17       Q.   No other assets meaning any claims of any
18   sort?
19       A.   Nobody would pay a lawyer to prepare an
20   assignment if there's no assets.
21       Q.   Well, if you accept that there are no
22   assets, meaning no claims against third parties that

Page 80

1    exist, and all of the assets have been paid out to a
2    third-party creditor, there's nothing to distribute
3    to the shareholder.
4             Right?
5        A.   I think that's a fair statement.
6        Q.   So in the case of Mr. Underhill's
7    corporation, you have no information that there was
8    anything left to distribute to him as a shareholder
9    as a result of the liquidation.
10            Correct?
11       A.   I have no information with respect to the
12   liquidation at all.
13       Q.   You have some information about the
14   liquidation, because we had testimony --
15       A.   I told him what ought to be done, and they
16   used a lawyer I never talked to and don't know what
17   they did.
18       Q.   Have you talked to any lawyers for
19   Mr. Peskoff or Underhill other than giving him, say,
20   here is my documents?
21       A.   Pat Vaughn?
22       Q.   Yes, that would be one of them.

Page 81

1        A.   I've spoken to Pat.
2        Q.   Have you spoken to Mr. Vaughn with respect
3    to the liquidation of Underhill?
4        A.   In '04. You saw the note.
5             I called his secretary and told him,
6    and he got the correspondence saying he would be
7    engaged to do this liquidation, and then they did
8    not.
9        Q.   Other than that conversation and what
10   you've testified to, do you recall any other
11   conversations with Mr. Vaughn?
12       A.   About Peskoff?
13            He's my next-door neighbor. I talk to him
14   all the time.
15       Q.   I only meant about --
16       A.   College friend and --
17       Q.   I only meant Peskoff or Underhill.
18       A.   No.
19       Q.   What about Mr. O'Reilly?
20       A.   I don't know him. I don't think I've ever
21   spoken with him, although there was a brother-in-law
22   in Phoenix that way back when -- it might have been

**B-60**

Charles P. Cocke
August 10, 2006

Washington, DC

## Page 82

1   O'Reilly. Maybe I have spoken to him, but not in the

2   last 4 years.

3       Q.   What about Mr. Ruben or anyone from his

4   firm?

5       Have you spoken with them before this

6   morning?

7       A.   I spoke with Todd.

8       Q.   He's with Stevens and Lee, isn't

9   he?

10      MR. RUBEN: M-hm.

11      MR. NOVACK: Right.

12      BY MR. NOVACK:

13      Q.   What was your conversation with Todd?

14      A.   He called to tell me that you wanted some

15   documents early, and -- but there were very few, and

16   I'd be happy to fax them as opposed to Fed Ex'ing

17   them, and he said, fine.

18      Q.   Other than that, no conversations with

19   anyone representing either Underhill or Peskoff with

20   regard to this lawsuit; is that right?

21      A.   Right.

22      Q.   Okay. Have you had any more conversations

## Page 83

1   with Mr. Peskoff with regard to his dealings with

2   FIDAC other than what you've testified to

3   today?

4       A.   No.

5       Q.   Mr. Peskoff still a client of

6   yours?

7       A.   Well, he shows up when he has a need.

8       Q.   Right.

9       And do you represent -- I don't know their

10   names -- but do you represent any corporations that

11   he owns or controls as well -- not "represents."

12      Do you do any work for corporations

13   that he owns or controls from time to

14   time?

15      A.   No.

16      I have done work for Underhill and

17   Renaissance, but as far as I know, they're out of

18   business.

19      MR. NOVACK: I don't think I have

20   any more questions of you at this time. And

21   I thank you very much for giving us those

22   documents in advance also, made it a little faster

## Page 84

1   for you believe it or not.

2       Mr. Ruben may have some questions.

3

4       EXAMINATION BY COUNSEL FOR PLAINTIFFS

5       BY MR. RUBEN:

6       Q.   I just have a couple questions.

7       When Mr. Peskoff called you to tell you

8   that you would be receiving a subpoena and that you

9   would be deposed, he didn't tell you to testify

10   untruthfully in any way, did he?

11      A.   No.

12      Q.   Okay. You said you are a shareholder of

13   Annaly Mortgage.

14      Did Mr. Peskoff recommend that you

15   purchase the stock or bring the company and its stock

16   to your attention?

17      A.   No.

18      I found that one on my own.

19      MR. RUBEN: I have no further questions.

20

21   FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

22      BY MR. NOVACK:

## Page 85

1       Q.   Would you have any objection to telling me

2   the size of your -- within a range the sizes of your

3   share holding in Annaly?

4       MR. RUBEN: We're off the record.

5       (Discussion off the record.)

6       MR. NOVACK: When we were off the record,

7   I asked the witness to give me an idea of the size of

8   his investment in Annaly so that we could evaluate

9   his neutrality here, and I'm not asking him to

10   provide details. I'm not interested in prying into

11   his personal life.

12      BY MR. NOVACK:

13      Q.   But when we were off the record, you

14   indicated it's a minuscule portion of your portfolio;

15   is that right?

16      A.   That's true.

17      Q.   And your ownership interest in Annaly has

18   not affected your testimony one way or another here

19   today; is that right?

20      A.   Right.

21      MR. NOVACK: Okay. That's sufficient for

22   my purposes. Thank you for your time.

22 (Pages 82 to 85)

Charles P. Cocke                                                              August 10, 2006

Washington, DC

Page 86

```
 1        Off the record.
 2        (Whereupon, at 12:45 p.m., the taking of
 3    the instant deposition ceased.)
 4
 5
 6        _____
 7            Signature of the Witness
 8    SUBSCRIBED AND SWORN to before me this _____ day of
 9    _____, 20_____.
10
11        _____
12            Notary Public
13    My Commission Expires:_____
14
15
16
17
18
19
20
21
22
```

Page 87

```
 1        CERTIFICATE OF COURT REPORTER
 2    UNITED STATES OF AMERICA    )
 3    DISTRICT OF COLUMBIA        )
 4        I, CHERYL A. LORD, the reporter before
 5    whom the foregoing deposition was taken, do hereby
 6    certify that the witness whose testimony appears in
 7    the foregoing deposition was sworn by me; that the
 8    testimony of said witness was taken by me in machine
 9    shorthand and thereafter transcribed by
10    computer-aided transcription; that said deposition is
11    a true record of the testimony given by said witness;
12    that I am neither counsel for, related to, nor
13    employed by any of the parties to the action in which
14    this deposition was taken; and, further, that I am
15    not a relative or employee of any attorney or counsel
16    employed by the parties hereto, or financially or
17    otherwise interested in the outcome of this action.
18
19        CHERYL A. LORD
20        Notary Public in and for
21        the District of Columbia
22    My Commission expires April 30, 2011
```

23 (Pages 86 to 87)

**11**

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
2       - - - - - - - - - - - - - - - X

3       UNDERHILL INVESTMENT,            :

4       CORPORATION and STEPHEN D.       :

5       PESKOFF,                         :

6               Plaintiffs,              :

7          v.                           :    Civil Action No.

8       FIXED INCOME DISCOUNT            :    06-99-SLR

9       ADVISORY COMPANY,                :

10              Defendant.               :

11      - - - - - - - - - - - - - - - X
                                Washington, D.C.
12                              Wednesday, August 16, 2006

13              Deposition of JOHN P. DEVLIN, a witness

14      herein, called for examination by counsel for the

15      Defendant in the above-entitled matter, pursuant to

16      subpoena, the witness being duly sworn by PENNY M.

17      DEAN, a Notary Public in and for the District of

18      Columbia, taken at the offices of Kirkpatrick &

19      Lockhart, 1601 16th Street, Washington, D.C., at

20      12:15 p.m., Wednesday, August 16, 2006, and the

21      proceedings being taken down by Stenotype by PENNY M.

22      DEAN, RPR, and transcribed under her direction.
```

John P. Devlin                                                    August 16, 2006
                              Washington, DC

| Page 2 | Page 4 |
|---|---|

**Page 2**

1    APPEARANCES:
2
3        On behalf of the Plaintiffs:
4            MARSHALL F. BERMAN, ESQ.
5            Law Offices Ruben & Aronson, LLP
6            4800 Montgomery Lane, Suite 150
7            Bethesda, MD  20814
8            (301) 951-9636
9
10       On behalf of the Defendant:
11           GERALD A. NOVACK, ESQ.
12           SARAH P. KENNEY, ESQ.
13           Kirkpatrick & Lockhart Nicholson
14           Graham, LLP
15           599 Lexington Avenue
16           New York, NY  10022-6030
17           (212) 536-3900
18
19
20
21
22

**Page 4**

1              P R O C E E D I N G S
2    Whereupon,
3            JOHN P. DEVLIN, CPA
4    business address at 1501 Lee Highway, Suite 102,
5    Arlington, VA, was called as a witness by counsel for
6    Defendant, and having been duly sworn by the Notary
7    Public, was examined and testified as follows:
8        EXAMINATION BY COUNSEL FOR DEFENDANT
9        BY MR. NOVACK:
10       Q.  Good afternoon, I'm going to ask if you
11   would please tell the reporter what your current
12   professional affiliation is and the address, as well
13   as giving a full name, middle name as well.
14       **A.  My name is John P. Devlin.  I'm a**
15   **certified public accountant in Virginia.  My address**
16   **is 1501 Lee Highway, Suite 102, Arlington, Virginia,**
17   **22209.**
18       Q.  And Mr. Devlin, I'm going to mark as
19   Devlin Exhibit 1 the subpoena which was served on
20   you?
21           (Devlin Exhibit No. 1 was
22           marked for identification.)

**Page 3**

1              C O N T E N T S
2    WITNESS        EXAMINATION BY COUNSEL FOR
3    JOHN P. DEVLIN      PLAINTIFFS    DEFENDANT
4    By Mr. Novack              4, 74
5    By Mr. Berman         70, 87
6
7
8              E X H I B I T S
9    DEVLIN EXHIBIT NO.          PAGE NO.
10   No. 1  Subpoena served on Devlin         4
11   No. 2  Letter, 1/3/05 Peskoff to Knoll   55
12   No. 3  8/23/04 letter, Peskoff to
13       O'Reilly, Devlin             56
14   No. 4  Partial subpoena, with handwritten
15       notes on pp. 2-3             60
16   No. 5  Peskoff letter, 5/26/04       78
17    * Exhibits retained by counsel.
18
19
20
21
22

**Page 5**

1        BY MR. NOVACK:
2        Q.  Do you have that exhibit in front of you?
3        **A.  Yes.**
4        Q.  That's the subpoena which you received
5    from us. After you received that subpoena, did you
6    personally retrieve the documents that were requested
7    or did you delegate any part of that task to anyone
8    else?
9        **A.  I personally retrieved it.  Is there a**
10   **page 4 on this?**
11       Q.  Evidently -- off the record.
12           (Discussion off the record.)
13       MR. NOVACK: Mr. Devlin asked a question
14   whether or not there was a page 4.  If there was a
15   page 4, it appears to have been something that is of
16   no consequence and we agreed that in terms of the
17   documents requested and the terms of the subpoena
18   there are embodied in Devlin Exhibit 1.  Is that all
19   right, Mr. Berman?
20       MR. BERMAN: Agreed.
21       MR. NOVACK: Is that all right with you,
22   Mr. Devlin?

2 (Pages 2 to 5)

**B-64**

Page 6

1     THE WITNESS: Sure.
2     BY MR. NOVACK:
3     Q.   Can you tell me what you did to retrieve
4  the documents, what files you went to?
5     A.   The files that I had in my office.
6     Q.   Where are they kept?
7     A.   In my office, either in my room. They are
8  not off site, they are in my office.
9     Q.   And how are the files labeled that you
10 went to?
11    A.   They are by year, by fiscal year of the
12 corporation.
13    Q.   Did you go to files that were labeled
14 Underhill Corporation and year by year?
15    A.   Yes.
16    Q.   Do there exist any files for other
17 corporations that Mr. Peskoff is a shareholder in?
18    A.   Yes.
19    Q.   Do you have separate files labeled
20 separately for him, necessarily?
21    A.   Yes.
22    Q.   Did you go and look at any of the personal

Page 7

1  files for Mr. Peskoff to see if there were any
2  documents that might be responsive to this subpoena?
3     A.   Not in the personal files, but there
4  wouldn't be anything in there.
5     Q.   Why do you say that?
6     A.   The personal files are for the individual
7  tax returns and the corporate files are set up either
8  for the tax return itself or the work papers.
9     Q.   Is --
10    A.   Anything with Underhill, anything with
11 Underhill would be in the Underhill work papers by
12 fiscal year, anything that would be with Steve
13 Peskoff, the individual tax would be in those
14 particular files.
15    Q.   If Mr. Peskoff would have received a
16 transfer from Underhill in satisfaction of the debt
17 that Underhill owed to him, would there be any papers
18 in his personal files that would relate to that?
19    A.   If he were -- if he were to receive a
20 satisfaction from Underhill?
21    Q.   A partial satisfaction of the debt, yes.
22    A.   Like a loan repayment?

Page 8

1     Q.   Yes.
2     A.   There would be nothing in Peskoff's
3  personal files, it would be in Underhill's showing
4  the repayment of the debt.
5     Q.   Was there a Mercedes Benz automobile
6  transferred to Mr. Peskoff in connection with the
7  liquidation?
8     A.   Yes, it was transferred from Underhill.
9     Q.   To?
10    A.   Peskoff.
11    Q.   Individually?
12    A.   Um-hum.
13    Q.   Was there a transfer of title?
14    A.   I don't know.
15    Q.   And was a value -- withdrawn.
16         Did the transfer of the Mercedes have a
17 value ascribed to it?
18    A.   It was the book value at the date of
19 dissolution.
20    Q.   And I believe on the tax return, we'll get
21 to it later that the Mercedes had I guess -- you can
22 tell me, is it 26,000 or 14,000?

Page 9

1     A.   That wasn't -- that didn't refer to that.
2     Q.   No?
3     A.   That's the -- the -- that particular
4  notation was -- there was -- that Mercedes was traded
5  in for another vehicle.
6     Q.   Oh, I see. So this wasn't a transfer,
7  so --
8     A.   What happened -- let me correct that.
9     Q.   Sure.
10    A.   The Mercedes was -- it wasn't -- the
11 Mercedes was owned by the -- by Underhill.
12    Q.   Right.
13    A.   And it was traded in for a leased vehicle,
14 so it was used as a trade for a leased vehicle. And
15 since the leased vehicle wouldn't be on the books, it
16 would just be shown as a vehicle rental, basically.
17    Q.   All right.
18    A.   Equipment rental. You'd have to recognize
19 a gain or loss on the disposition of that vehicle.
20    Q.   On the Mercedes or --
21    A.   If it were accounting for tax purposes, if
22 an owned vehicle is traded in for another owned

3 (Pages 6 to 9)

Page 10

1  vehicle --

2     Q.  You can talk at normal pace.

3     A.  If an owned vehicle is traded in for

4  another owned vehicle there would be no recognition

5  of gain or loss.

6     Q.  All right.

7     A.  But if an owned vehicle is either sold or

8  used as a trade-in for a leased vehicle, you have to

9  recognize gain or loss, which is what you're showing

10 there.

11    Q.  When did this occur, the trade-in?

12    A.  Whatever the date is on that.

13    Q.  Well, there is no date.

14      MR. BERMAN:  Can he see the paper, please?

15      THE WITNESS:  The date sold is 4/30/04.

16      BY MR. NOVACK:

17    Q.  So that's when it occurred?

18    A.  Um-hum.

19    Q.  When the corporation was liquidated, was

20 the leased vehicle leased in the name of Underhill?

21    A.  I don't know.

22    Q.  Do you know what happened to the leased

Page 11

1  vehicle?

2     A.  No.

3     Q.  You don't know whether or not Mr. Peskoff

4  drives that car now?

5     A.  No.

6     Q.  What kind of car was it?

7     A.  You know -- initially there were two

8  Mercedes prior. And during the course of '04 both of

9  them were owned and both of them got traded in or

10 both of them went to leased vehicles, one in this

11 year. I just forget -- I know a Jaguar is involved.

12 I'm not sure if it is a Jaguar and Mercedes, or now

13 currently there is a Jaguar and Mercedes I believe.

14    Q.  During the course of time before November

15 2004 were there two vehicles that were owned by

16 Underhill that were Mercedes that were traded in as

17 part of the lease transaction?

18    A.  The vehicle there, that's shown there, the

19 '99 Mercedes was traded in for, I think that was for

20 traded in for a leased Mercedes.

21    Q.  Um-hum.

22    A.  I believe that particular vehicle is

Page 12

1  Karen's vehicle. I believe Steve's was done the

2  prior fiscal year.

3     Q.  2003?

4     A.  Before this year.

5     Q.  Okay.

6     A.  And prior to -- this year started April 1

7  of '04.

8     Q.  Right.

9     A.  And it was prior to this year, so the

10 other year.

11    Q.  At the time of the --

12    A.  I think that one was Steve's and it went

13 from a Mercedes to a Jaguar, I believe.

14    Q.  At the time of the liquidation --

15    A.  There were two leased vehicles.

16    Q.  At the time of the liquidation?

17    A.  Correct.

18    Q.  At the time of the liquidation, what

19 happened to those leases, do you have any

20 information?

21    A.  I have no idea.

22    Q.  No information at all? You don't know one

Page 13

1  way or another whether the leases were assumed?

2     A.  Do not know.

3     Q.  Okay. Is it your understanding that

4  Mr. Peskoff was repaid a portion of his loan to

5  Underhill as part of the liquidation -- dissolution

6  process?

7     A.  Yes.

8     Q.  What's your understanding please as to how

9  that occurred?

10    A.  The -- whatever assets that the

11 corporation owned on November 1st of '04, whatever

12 was on the books of the corporation at that point,

13 and it was minimal, it was taken off the books and

14 recorded as a loan repayment at that point.

15    Q.  Do you have any recollection from having

16 looked at the documents recently or from the time you

17 actually did it what the value was of the amount that

18 was transferred to Mr. Peskoff in partial repayment

19 of the loan?

20    A.  No, it's not -- it's not -- it wasn't

21 substantial. It was very minimal. I mean, by

22 minimal I would say 10 or 20 -- I don't think it was

Page 14

1    very --
2       Q.    Would looking at the tax return, the final
3    tax return assist you in any way?
4       A.    No.
5       Q.    What documents would you look at to
6    determine what comprised the value that was
7    transferred to Mr. Peskoff --
8       A.    I made a journal entry on the books.
9       Q.    On --
10      A.    On my work papers.
11      Q.    Those work papers were prepared in
12   connection with the preparation of the tax return?
13      A.    Yes.
14      Q.    Were they prepared -- withdrawn.
15           Do those work papers -- well withdraw that
16   question.
17           Can you describe for me how many pages the
18   work papers are?
19      A.    (Indicating).
20      Q.    The witness is indicating about three
21   inches thick.  Who prepared the work papers, you
22   alone?

Page 15

1       A.    Yes.
2       Q.    Can you tell me by category what kind of
3    documents constitute the work papers, are they
4    handwritten notations or copies of ledgers that you
5    marked up?  Just give us an idea?
6       A.    I mean, typically they are copies of the
7    bank statements.
8       Q.    Right.
9       A.    We try to, try to verify as best we can
10   all the balance sheet items, whatever is reported on
11   the balance sheet and the typical ones would be, you
12   know from the beginning cash all the way to the
13   ending cash, any other assets that are there and any
14   liabilities.  We're trying to document the assets and
15   liabilities to get a confidence that the balance
16   sheet is correct.
17      Q.    And putting aside the documents that
18   constitute the books and records of Underhill and
19   focusing solely on the work papers that were created
20   by you, can you tell us how thick a pile is it?
21      A.    Maybe -- the whole thing constitutes the
22   work papers, because when you're going to the clients

Page 16

1    and getting copies of the bank statements and copies
2    of, you know, not in this case, but payroll
3    liabilities and any, you know -- that becomes part of
4    the work papers.
5       Q.    Um-hum.
6       A.    And from that you're going to generate a
7    trial balance, any adjusting entries and then a
8    final -- an adjusted balance.
9       Q.    Um-hum.
10      A.    And then from that adjusted balance, you
11   will use that adjusted balance to create the tax
12   return you're looking at.
13      Q.    How many pages, how high, if that's the
14   way you want to do it, are pages which have your
15   handwritten entries on them, other than tick marks
16   alongside --
17      A.    None would be my handwriting, it would all
18   be on a computer.
19      Q.    You make your entries only on a computer?
20      A.    Typically, yes.
21      Q.    You don't use pencil or pen to write down
22   handwritten notes in connection with the work papers?

Page 17

1       A.    Typically it is just on the computer,
2    yeah.
3       Q.    Okay.
4       A.    I mean, that's typically what it is.
5       Q.    And how were the work papers preserved, as
6    hard copy or an electronic file?
7       A.    Well, they are hard -- there is a paper
8    file, but it is also, you know on the computer, but,
9    you know in some cases, well, in some cases you
10   do one year you delete, you know, to move everything
11   from one year to the next you will delete the
12   electronic trail of the prior years.
13           So what's on the computer right now is
14   only the most current, the most current year, but in
15   terms of hard copies, I have hard copies.
16      Q.    So we would know, we would be able to see
17   what you did by looking at the hard copy as it stood
18   as of November -- at the time you filed the final
19   return for Underhill?
20      A.    Um-hum.
21      Q.    It looks like you filed the final return
22   around August of 2005; is that correct?

5  (Pages 14 to 17)

| Page 18 | Page 20 |
|---|---|
| 1    A.  Correct. | 1         MR. BERMAN:  The subpoena was Exhibit 1. |
| 2    Q.  Now, did you get the information that is | 2         MR. NOVACK:  Cocke Exhibit 1.  Oh, I'm |
| 3  on these work papers solely from a review of | 3  sorry, Cocke Exhibit 10.  You can take a look at it |
| 4  documents or did you use any other source, human or | 4  and tell me if that helps you. |
| 5  electronic? | 5         THE WITNESS:  On page 4 of the 1120 on |
| 6    **A.  Review of documents, you know, I would** | 6  line 9 it says, other investment statements 7, column |
| 7  **question either Steve or his assistant.** | 7  B is 33,503. |
| 8    Q.  Josie? | 8         BY MR. NOVACK: |
| 9    **A.  Yes.** | 9    Q.  Right. |
| 10   Q.  What's her last name? | 10   **A.  And then if you go to statement 7 it says** |
| 11   **A.  Zellers.** | 11 **various investments, that was the book value as of** |
| 12   Q.  Z-e-l-l-e-r-s? | 12 **the beginning of the year.  And the beginning of the** |
| 13   **A.  Correct.  If there was unclarity, if I** | 13 **year was April 1 of 2004.** |
| 14 **didn't understand something, if it wasn't apparent** | 14   Q.  Um-hum. |
| 15 **from me looking at this, I would question either** | 15   **A.  And since it was, you know, they were --** |
| 16 **Steve or Josie.  If there were gaps, or if there was** | 16 **my assumption what was transferred out 33,503, any** |
| 17 **something missing, I would question and ask for** | 17 **gains or losses would be reported.  These were set up** |
| 18 **information.** | 18 **as partnerships, any gains or losses would be on a** |
| 19       **One example of that that you have as a** | 19 **K-1 for the calendar year 2004.  And since it was** |
| 20 **document, there is the request to FBR for the** | 20 **transferred out before the end of the year,** |
| 21 **technology venture partner thing, you know --** | 21 **partnership losses shows that you just recognize any** |
| 22   Q.  I'll come to that. | 22 **gain or loss as of who owns -- who is an owner at the** |

| Page 19 | Page 21 |
|---|---|
| 1    **A.  That was one example and you can see it,** | 1  **end of the fiscal year; in this calendar year,** |
| 2  **you can see the fax date time and everything.  There** | 2  **Underhill didn't own it as of 12/31/04.** |
| 3  **was an example that there were some investments and I** | 3    Q.  Right. |
| 4  **just, you know, was looking to distribute everything** | 4    **A.  So there would have been no changes to the** |
| 5  **to repayment of the loan and I just reminded, you** | 5  **33,503.** |
| 6  **know I think I was talking to Josie at the time that** | 6    Q.  So it's your conclusion that the two |
| 7  **this, as part of the liquidation, all the assets are** | 7  investment partnerships had a value of some 33,500? |
| 8  **to be transferred and these are two that, you know,** | 8    **A.  On the books, yeah.** |
| 9  **you have to notify, you know.  And that's when she** | 9    Q.  Okay. |
| 10 **sent me that other exhibit here.** | 10   **A.  I would have to look at my work papers,** |
| 11   Q.  So it's your recollection there were two | 11 **I'm assuming if I saw the journal entry there would** |
| 12 FBR investments? | 12 **have been a credit to that on the journal entry, I** |
| 13   **A.  Right.** | 13 **could confirm that.  But that's -- looking at that,** |
| 14   Q.  Do you remember what the value was you | 14 **that's what I would say.** |
| 15 ascribed to them? | 15   Q.  How far is your office from here? |
| 16   **A.  No.** | 16   **A.  An $11 cab ride.** |
| 17   Q.  Any range, can you give me a range? | 17   Q.  Can you tell by looking at the tax return |
| 18   **A.  If you could show me the tax return.** | 18 which is Cocke Exhibit 10, what the total amount that |
| 19   Q.  Sure, if we have a clean copy -- | 19 was paid toward the debt with more specificity? |
| 20       MS. KENNEY:  Yes, we do. | 20   **A.  My -- no.** |
| 21       MR. NOVACK:  We previously marked it as | 21   Q.  So there's nothing on here that would give |
| 22 Cocke Exhibit 1. | 22 us any information? |

6 (Pages 18 to 21)

**B-68**

John P. Devlin                                                    August 16, 2006

Washington, DC

---

**Page 22**

1    A.   No, because the only way you're showing it
2    is the balance sheet, you're seeing on page 4 at the
3    beginning of the year, just to give an example, there
4    was 168,000 of cash, 33,000 of other investments, and
5    the book values of the vehicles were 95,000 at the
6    beginning of the year, but since that time, you know,
7    activity happened over the --
8    Q.   Right.
9    A.   -- from April 1 of '04 to November 30th of
10   '04. Activity for example, if you look at the first
11   page, page 1, there was $128,000 loss, just looking
12   at the face of it. So, you know --
13   Q.   What about line 19 on page 4, it's
14   entitled loans from shareholders, it goes from 6.3
15   million to approximately -- to 6 million
16   approximately.
17   A.   Right.
18   Q.   What does that signify, if anything?
19   A.   Approximately there was 360,000 paid.
20   Q.   That is before November 1st?
21   A.   During the period from April 1 of '04 to
22   November 30th of '04 there was 360,000 paid down.

**Page 23**

1    Q.   Now, was there something beyond the 360
2    paid down toward the debt to your knowledge?
3    A.   No.
4    Q.   Well, doesn't this then indicate to us how
5    much of the debt was paid down?
6    A.   During this period, yes.
7    Q.   Right. Well, was there some other amount
8    paid down toward the debt after November 1 of 2004?
9    A.   Was there something else paid down after
10   November 1 of '04?
11   Q.   Right.
12   A.   It wouldn't be reflected on this, though.
13   Q.   I'm not asking you that. I'm asking you
14   whether or not you have any information that after
15   November 1, 2004 Underhill paid any more toward
16   reduction of the loan?
17   A.   I don't know.
18   Q.   You have no information one way or
19   another?
20   A.   Not as I'm sitting here now, no.
21   Q.   Do you have any general recollection of
22   whether or not Mr. Peskoff took a capital loss with

**Page 24**

1    respect to this loan?
2    A.   Yes, that $6 million, yes.
3    Q.   If he was going to be paid more money
4    after the liquidation, then he would have to file an
5    amended return, I guess, to reflect the fact that his
6    capital loss was less?
7    A.   No.
8    Q.   He wouldn't, okay. So as of November 1,
9    then, you believe assets had been used to repay some
10   $300,000 toward the loan?
11   A.   No, I didn't say that.
12   Q.   No? Okay.
13   A.   I said that during the period April 1 of
14   '04 to November 30th of '04 approximately 360,000 of
15   the loan was paid back.
16   Q.   And this was paid back with assets from
17   Underhill, transferred to Peskoff?
18   A.   It could have been and I don't know this,
19   but I could find out easily. But it would be a
20   simple matter of cash being paid.
21   Q.   Cash from whom to whom?
22   A.   Well, at the beginning of the year there

**Page 25**

1    was $168,000 of cash in the bank. There were -- you
2    can see that, you know, that they wound up going to
3    zero, so that clearly there was money being paid.
4    I'd have to go look to see exactly.
5    Q.   Maybe my question wasn't clear. I'm
6    asking you whether or not the reduction of some
7    $300,000 in the loan resulted from the transfer of
8    assets from Underhill to Mr. Peskoff. By assets I
9    include cash?
10   A.   Yes, yes, absolutely.
11   Q.   We don't think some third party came in --
12   A.   No, no, no, no. Absolutely not.
13   Q.   And you have no information that anything
14   more than this approximately $300,000 was ever repaid
15   on the loan; is that right?
16   A.   During this period, yes.
17   Q.   And you have no information as you sit
18   here today that any more was ever repaid on the loan
19   after this period, right?
20   A.   Correct.
21   Q.   And all of this information you could find
22   in your work papers, correct?

Page 26

1    A.    Yes.

2    Q.    Now, you said before that you made an

3  entry in your work papers, you list it as an asset, I

4  believe, the value of the partnerships or some other

5  asset. Do you recall which it was? I don't recall

6  now.

7    A.    The -- you're asking about the

8  partnerships?

9    Q.    You said I made a notation, I made a

10  journal entry on the work papers.

11    A.    Right.

12    Q.    What was that journal entry referring to

13  again? I'm sorry, I forgot.

14    A.    It was the, you know, the liqui -- it

15  was -- as of November -- the corporation was

16  dissolved as of November 1. And so at that point

17  there was assets in the corporation, cash,

18  partnership, whatever.

19    Q.    All right.

20    A.    And those had to be distributed.

21    Q.    Right.

22    A.    They had to go to zero, because the

Page 27

1  corporation didn't exist, they had to have zero

2  assets.

3    Q.    When you say distributed, what do you mean

4  as an accountant?

5    A.    When a corporation dissolves, de facto,

6  there are no assets.

7    Q.    What do you mean by distributed?

8    A.    They had -- they had to go someplace, in

9  the vernacular. They had to go somewhere and in this

10  case they were -- it was my journal entry that, like

11  I said, I don't have it here, but I know that there

12  was -- whatever the assets were from an accounting

13  perspective we had to credit those assets in the

14  debit. The offsetting debit was lump payment to

15  Steve Peskoff the shareholder. What I don't know is

16  what that is.

17    Q.    You don't know what that is?

18    A.    I can't tell you right now because I don't

19  have the work papers.

20    Q.    The work papers would be helpful, I guess.

21    A.    I could tell you very easily -- as I said,

22  I don't think it was much, because at this point when

Page 28

1  you're seeing 360,000 loan repayment, that loan

2  repayment you're focusing on dissolution or

3  liquidation of the corporation, it very well could

4  have been. I don't know that it was, but it very

5  well could have been payments of 20,000 a month or

6  30,000 a month, April, May, June, July. I'm not

7  suggesting it was, but it could have.

8    Q.    I understand.

9    A.    It could have been 330,000 in normal cash

10  coming out of the company and then a final

11  liquidation to close the account.

12    Q.    Right. Do your work papers contain any

13  entries where you list any information about the

14  assets of the company other than giving a journal

15  entry for the particular item you described?

16    A.    The only assets that I was aware of were

17  the cash assets and the investments, I believe, and

18  I've given as part of the deposition you asked about

19  what assets there were as of August of '04, I believe

20  I gave you three pages or three different documents

21  of the cash accounts.

22        So in addition -- there's very minimal,

Page 29

1  $1,000 or something very minor at that point. And

2  then it was just the partnerships basically of

3  33,000. It was very minimal, my recollection was.

4    Q.    Going back to your file system, the files

5  for Mr. Peskoff, do they have work papers?

6    A.    Yes.

7    Q.    And do those work papers reflect the

8  receipt of whatever value came during the period

9  reflected by Cocke Exhibit 10?

10    A.    No. And the reason why is the work papers

11  reflect a tax return, okay? And it's, again

12  documentation reflects the tax return that I prepared

13  for the Peskoffs for '04 and that tax return has

14  nothing to do with loan repayments. Loans are not

15  taxable income so there would be no documentation.

16  The work papers for the tax return are only going to

17  reflect what was put on the 1040, wages, interest,

18  dividends.

19        MR. BERMAN: Excuse me, I'm a bit

20  confused. Was this cash or accrual system?

21        THE WITNESS: Which system?

22        MR. BERMAN: The Underhill system.

## Page 30

1    THE WITNESS:  Underhill was cash.  Steve
2  Peskoff was cash, everything's cash.
3      BY MR. NOVACK:
4    Q.   Is it your testimony that your work papers
5  will have no entries -- withdrawn.
6      Is it your testimony that the Peskoff tax
7  return work papers for the year 2004 in which he
8  received repayment of the loan in part will have no
9  entries in them that refer to the amount of that
10  repayment?
11    **A.   Yes.**
12    Q.   And your testimony is based on the
13  conclusion that it is not income to him?
14    **A.   Correct.  Any -- for any client.**
15    Q.   I understand.
16    **A.   Any loan repayments do not get reflected**
17  **in the tax return so there are no client work papers.**
18    Q.   Did Mr. Peskoff take a tax loss as a
19  result of the failure of Underhill to pay the full
20  amount of the loan?
21    **A.   He took a short term capital -- he took a**
22  **non-business bad debt in '04.**

## Page 31

1    Q.   Did that require that you know the amount
2  that had been paid during '04 toward reduction of the
3  indebtedness?
4    **A.   Yes, I knew that I -- I had to do the tax**
5  **return, the 2004 Underhill return in order to do Mr.**
6  **Peskoff's personal 2004 return.**
7    Q.   In doing Mr. Peskoff's personal 2004
8  return, did you have to know the amount that had been
9  paid in respect of the loan in the period covered by
10  Cocke's Exhibit 10?
11    **A.   No.**
12    Q.   You didn't have to know that?
13    **A.   No, what I had to know was because it was**
14  **liquidated and what I had to know was the amount on**
15  **line 19, 19 column D, which is 6,033,944.  I needed**
16  **to know that number, because that was the**
17  **non-business bad debt.  Because it was liquidated in**
18  **'04, I needed to know that to report on Peskoff '04**
19  **tax return.**
20    Q.   So there is no entry of any sort in your
21  work papers from Mr. Peskoff personally for 2004 that
22  reflects the transfer of specific amounts or values

## Page 32

1  or assets; is that right?
2    **A.   Correct.**
3    Q.   Have you done the 2005 return?
4    **A.   No.**
5    Q.   Have you started work on it?
6    **A.   Minimally, no -- yes, we have, but not**
7  **much.**
8    Q.   I presume Mr. Peskoff -- without knowing
9  the amount, I don't care about amounts -- I presume
10  Mr. Peskoff has made all of his payments for the 2005
11  return?
12    **A.   Yes.**
13    Q.   I presume that you gave him some estimates
14  as to how much he should pay; is that right?
15    **A.   Um-hum.**
16    Q.   And in giving him those estimates did you
17  perform any calculations?
18    **A.   Yes.**
19    Q.   Did you perform any calculations which
20  involved calculating what this unpaid debt from
21  Underhill would result in tax-wise?
22    **A.   Yes.**

## Page 33

1    Q.   And did you use the 6,033,000 number again
2  or did you use a different number in your
3  calculations?
4    **A.   When I did the 2004 tax return, the $6**
5  **million number would show on schedule D of the 2004**
6  **return.**
7    Q.   Right.
8    **A.   As I sit here, I don't know what's 2004 --**
9  **he may have had gains or other losses, I don't**
10  **remember.  But clearly, when all the schedule D on**
11  **his 1040 was done in '04 he had a good size loss**
12  **carrying forward into '05, in the millions of**
13  **dollars, I don't remember what.**
14      **I know that he -- and so I know that**
15  **that's coming forward into '05.  And I know that he**
16  **hasn't had anything close to -- I don't know the**
17  **number, but nowhere close to -- he wouldn't use up**
18  **all of that loss in '05.**
19    Q.   You did not perform additional calculation
20  or inspection of any books and records to see whether
21  or not the corporation had paid anything more in
22  respect of that loan to the corporation, right?

John P. Devlin                                                        August 16, 2006
                        Washington, DC

| Page 34 | Page 36 |
|---|---|

**Page 34**

1    A.   No.

2    Q.   Okay. Do you know of any assets that

3    existed as of the end of November -- as of the

4    beginning of November 2004 that could have been used

5    by the corporation to make payments to Mr. Peskoff in

6    respect of the loan after November 1, 2004? Were

7    there any assets left insofar as you were aware?

8    A.   No.

9    Q.   So you have no reason to believe that any

10   further payments have been made in respect of that

11   loan?

12   A.   Oh, on the -- well, no, I mean because the

13   loan was -- the $6 million loan we took a capital

14   loss for in '04. If there's any -- I mean, any

15   payment -- any monies coming to Peskoff, it's not

16   paying off that loan for sure.

17   Q.   In fact, there were no assets that you

18   were aware of as of November 1 --

19   A.   No, not on Underhill, it was closed.

20   Q.   Let me finish. Insofar as you're aware on

21   November 1, 2004, there were no assets left --

22   A.   In Underhill.

**Page 36**

1    he wants to clarify his testimony, that's fine. I'm

2    talking about any asset, I'm not distinguishing

3    between cash and accrual. In my view an asset is an

4    asset.

5        BY MR. NOVACK:

6    Q.   Let's go back to my question. Am I

7    correct as of November 1, 2004, insofar as you're

8    aware, there were no assets in Underhill which would

9    distributed to Mr. Peskoff in his capacity as a

10   shareholder?

11   A.   There were no assets, as of November 1,

12   2004 there were no assets in Underhill on the cash

13   basis and so there was nothing to distribute.

14   Q.   Is it correct that in your understanding

15   whatever claim Underhill Investment Corp. may have

16   against FIDAC was not distributed as a liquidating

17   dividend to Mr. Peskoff as part of the dissolution?

18   A.   From my view, since I didn't know there

19   was any claim, there was never distributed, that was

20   never reflected on that 2004 tax return. Nor should

21   it have been in my view.

22   Q.   My short question is, am I correct, in

**Page 35**

1    Q.   -- in Underhill?

2    A.   No.

3    Q.   Is it correct that as of November 1, 2004

4    there were no assets that Underhill could distribute

5    to Mr. Peskoff as a shareholder as a liquidating

6    dividend?

7    A.   There were no assets so I guess the answer

8    to that would be -- there were no assets to

9    distribute as a creditor or as a shareholder, so the

10   answer I guess would be no to that. There were no

11   assets so --

12       MR. BERMAN: May I just interject for a

13   second?

14       MR. NOVACK: It depends what you're going

15   to do. If you're going to make a speaking objection,

16   I would object to it. If it's something that you

17   want to say and it's neutral, I have no problem at

18   all. It depends what you want to do.

19       MR. BERMAN: Are we talking about cash or

20   accrual?

21       MR. NOVACK: We're not differentiating and

22   the witness is not. If you want to ask him later if

**Page 37**

1    your view as Mr. Peskoff's accountant and Underhill's

2    accountant, there was no distribution of any contract

3    claim against FIDAC to Mr. Peskoff in his capacity as

4    a shareholder?

5    A.   There was no distribution.

6    Q.   If in fact there had been such a

7    distribution, it would have been a distribution of an

8    intangible asset in your view?

9    A.   If there were a distribution,

10   hypothetically if there were a distribution it would

11   have been a loan repayment.

12   Q.   I think you're confused. If there were a

13   distribution in his capacity as a shareholder, it

14   would have been in his capacity as a shareholder by

15   definition.

16   A.   (No response.)

17   Q.   Do you follow my distinction or do you

18   want me to lay it out?

19   A.   Lay it out.

20   Q.   Okay. Mr. Peskoff loaned $6 million and

21   change to the corporation, as a creditor he was

22   entitled to be paid with all the assets available

10 [Pages 34 to 37]

**B-72**

Page 38

1 before the corporation could distribute any remaining
2 assets to the shareholder, who happens to be Mr.
3 Peskoff wearing his shareholder hat, correct?
4     A.   Yes.
5     Q.   We know the loan was not paid in full?
6     A.   Correct.
7     Q.   We know there was no reference in any
8 documents that you're aware of stating that any
9 contract claim held by Underhill was being
10 distributed to Mr. Peskoff as an asset of the
11 corporation, which is going to him in his capacity as
12 a shareholder; isn't that right?
13     A.   Correct.
14     Q.   Am I correct that Mr. Peskoff never said
15 to you at any time that he had a contract claim
16 against this company called FIDAC or that Underhill
17 had a contract claim against this company called
18 FIDAC?
19     A.   Correct.
20     Q.   Is there some reason why you didn't
21 furnish us copies of at least a portion of the work
22 papers that had some reference to the calculation of

Page 39

1 what was being done in the dissolution on
2 liquidation?
3     A.   No.
4     Q.   Did you --
5     A.   I would be glad to, if you --
6     Q.   I'm not sure there's anything in it, but
7 it sounds to me like it would have helped us get
8 answers to certain questions and it may have other
9 information, it certainly would assist us in seeing
10 the level of detail and attention.
11     A.   The only thing -- there was one entry for
12 the liqui -- I mean there was only one entry for the
13 liquidation. Like I said before, all we're doing at
14 that point is we record the incoming expense through
15 November 1 and whatever was on the books of record as
16 of November 1 we closed it out.
17          And it was like I said, the entry -- and
18 I'd be glad to give it to you if you'd like, because
19 it was one entry to show the taking so-called taking
20 off the books whatever assets were there, and it was
21 offset by a loan payable.
22     Q.   And --

Page 40

1     A.   As we can see there was -- again, from
2 looking at the records, I'm just going from memory
3 now, I gave you the three cash statements, I think
4 the two with Cardinal Bank and one with I think Smith
5 Barney. I think there was like, less than 5,000
6 collectively from there.
7     Q.   Um-hum.
8     A.   The only other asset distributed would
9 have been these partnerships which was like 33,000 as
10 we're seeing. So the entry, just from memory it
11 would have to have been less than 40,000. You know,
12 it would have been 40,000 crediting the assets
13 40,000, repaying the loan 40,000 and that would be
14 it. I mean, it's not all that informative, I don't
15 think, but I would be glad to produce it.
16     Q.   Let me see if I can quickly summarize it,
17 I think that's helpful. And then maybe we'll ask to
18 see the documents later. But without bothering you
19 to come back, assuming there's no new issues raised,
20 but let's just see if we can sketch a picture of
21 where we stood on the day of the dissolution and then
22 we'll move forward.

Page 41

1          I'm going to ask you a series of questions
2 Mr. Devlin, and they relate to what the assets were
3 of the corporation that you were aware of at the time
4 of the dissolution on November 1, 2004, all right?
5 Do you understand my question will relate to that
6 time period?
7     A.   Right.
8     Q.   Am I correct in stating the following: At
9 the time of the dissolution your goal was to identify
10 all of the assets of the corporation that could be
11 used to repay Mr. Peskoff on his loan?
12     A.   Say again.
13     Q.   At the time of the dissolution your goal
14 was to identify all of the assets of the corporation
15 that could be transferred to Mr. Peskoff in repayment
16 partially of the loan he had made to the corporation?
17     A.   Right. And what I was doing, it's --
18 it's --
19     Q.   Let me ask short questions, it will be
20 simpler.
21          MR. BERMAN: Excuse me. I'm going to
22 object.

Page 42

1       MR. NOVACK: That's fine, just note your
2   objection and I'll go on. That's the way we do it.
3       I don't mean to cut you off if you have
4   something more to say, but the rules we follow are we
5   don't do speaking objections, unless you have an
6   issue as to privilege or the question as to form.
7   And I'll go on and I'll take the chance.
8       Can you read back the question and answer,
9   please?
10      THE REPORTER: "Question: At the time of
11  the dissolution your goal was to identify all of the
12  assets of the corporation that could be transferred
13  to Mr. Peskoff in repayment partially of the loan he
14  had made to the corporation?"
15      "Answer: Right and what I was doing,
16  it's -- it's --"
17      BY MR. NOVACK:
18      Q.   In performing that task you had work
19  papers where you made certain notations, correct?
20      A.   Yes.
21      Q.   It is your recollection as you sit here
22  today that the only assets that were transferred to

Page 43

1   Mr. Peskoff in repayment of the loan are the ones
2   which you're now going to list for me; is that
3   correct?
4       A.   Correct.
5       Q.   Could you briefly list what those assets
6   were, please?
7       A.   The cash -- there were two cash accounts
8   with Cardinal Bank.
9       Q.   Approximately?
10      A.   $1,000 each or so.
11      Q.   Under $10,000?
12      A.   Yes. And then again, the assumption I
13  made earlier was looking at the 1120, there was
14  33,503 of investments.
15      Q.   Okay. And those investments --
16      A.   Those were the two partnerships with FBR.
17      Q.   And we know the name of one of the
18  partnerships because we've seen a letter here, FBR
19  Technology Fund, that's the shorthand. And there was
20  another FBR --
21      A.   I think the other one you have is FBR
22  Technology Fund 2, I believe, the other one.

Page 44

1       Q.   In connection with the dissolution and the
2   transfer to Mr. Peskoff of assets and repayment of
3   the loan, were there any other assets that you were
4   aware of that were being transferred to him?
5       A.   (No response.)
6       Q.   You mentioned earlier there was a leased
7   car. You're not clear --
8       A.   Well, the leased car -- the leased car
9   since it's leased, from an accounting perspective it
10  is not, quote, "on the books," it is not recorded as
11  if it was a purchased car, a car that was owned.
12      Q.   All right.
13      A.   So for accounting purposes it is quote,
14  "not on the books" so it doesn't have to be taken off
15  the books from my perspective.
16      Q.   So what we're talking about then is the
17  cash and the two investments in FBR.
18      A.   Right.
19      Q.   Am I correct that at no time did Mr.
20  Peskoff ever indicate to you in any way that he felt
21  that Underhill had a claim against FIDAC?
22      A.   Correct.

Page 45

1       Q.   Have you ever had any discussions about
2   this lawsuit in this dispute with Mr. Peskoff?
3       A.   No, other than -- the only thing I --
4   other than just noting that I was deposed, that's all
5   for this.
6       Q.   I think when we were off the record you
7   mentioned -- I say this is just to refresh your
8   recollection. You said you had a conversation with
9   Mr. Peskoff in which you mentioned Yankee tickets and
10  Mike Farrell, and in that conversation you learned
11  about the lawsuit?
12      A.   But that -- yes.
13      Q.   That was some time after the lawsuit had
14  begun and you knew that you were going to be a
15  deponent?
16      A.   No, I had no idea.
17      Q.   Okay.
18      A.   I didn't even -- the discussion at that
19  point, I can't tell you the time, but I didn't even
20  know that it was going forward. I mean I knew there
21  was an issue, but that, you know, I moved right on.
22  It was a --

12 (Pages 42 to 45)

John P. Devlin

August 16, 2006

Washington, DC

**Page 46**

1    Q.   How did you know there was an issue and
2    what was the issue you thought you knew about?
3    A.   It was just, he just said he had some
4    issue with FIDAC or the entity Farrell or FIDAC, I'm
5    not sure who. And it was lighthearted banter about
6    the Yankees and it became clear that we were not
7    going to discuss it any more and that was it. That
8    was just a sidebar, it was nothing to do with
9    Underhill or anything at that point.
10   Q.   I understand.
11   A.   I didn't even know -- he went no further
12   with me about what the issue was. I mean, I just --
13   other than there was some disagreement and that was
14   it.
15   Q.   How did FIDAC come up in the conversation?
16   A.   I mean, FIDAC never really came up, it was
17   just me just sort of joking about the Yankees and
18   that was about it.
19   Q.   And what did you say and what did he say
20   that led to a reference to Mike Farrell of FIDAC?
21   Tell me?
22   A.   My son's a Yankee fan and over the course

**Page 47**

1    of the years I knew that Farrell was, it was just a
2    very -- and I was the one that initiated, I had no
3    idea that any of this --
4    Q.   Well, at the time you had the
5    conversation --
6    A.   Steve had mentioned it to me, I --
7    Q.   Let me finish my question, sometimes I
8    pause to take a breath, believe it or not. I know
9    you may think I'm a serpent who breathes through my
10   skin, but I'm not.
11        Before this conversation you were telling
12   us about with Mr. Peskoff, in which you raised the
13   subject of the Yankees, is it correct you didn't have
14   any information that there was any dispute between --
15   A.   Correct.
16   Q.   -- FIDAC on the one hand --
17   A.   Yes.
18   Q.   -- and Mr. Peskoff or Underhill on the
19   other?
20   A.   Yes.
21   Q.   What was your understanding before this
22   conversation as to the relationship between Mr.

**Page 48**

1    Peskoff and Mr. Farrell at FIDAC?
2    A.   What was my understanding about the
3    relationship?
4    Q.   Yeah.
5    A.   It was a business relationship as far as I
6    knew.
7    Q.   This conversation that we're referring to
8    took place sometime after February of 2006, am I
9    right? That's when the lawsuit began.
10   A.   Right.
11   Q.   Now --
12   A.   I'm not exactly -- back up. I don't
13   exactly remember the date. I mean, it was just --
14   I -- I don't remember. I honestly don't know.
15   Q.   Without knowing there was any dispute, you
16   raised the subject of the Yankees and Mike Farrell
17   and that led Mr. Peskoff to say something to you.
18   What did he say?
19   A.   I -- I -- truthfully, I don't remember.
20   In my mind I'm just thinking there was some
21   disagreement, but that was the limit of it.
22   Q.   You can't remember anything he said?

**Page 49**

1    A.   Honestly, no. I don't remember that there
2    was any talk of -- it was -- it was -- he just didn't
3    want to discuss it. He said it was a disagreement
4    and I had no idea what the source of it was or
5    anything. I mean, the conversation was just a very
6    lighthearted conversation, and you sort of bring up a
7    topic that nobody wants to discuss, it gets left
8    aside, and I left it aside. You know, not knowing
9    whether it was serious disagreement or there was any
10   issue, I had no idea. It didn't bother me, to be
11   honest.
12   Q.   Before this conversation sometime in 2006,
13   had Mr. Peskoff ever referred to Mike Farrell as
14   being a good guy?
15   A.   He never got me Yankee tickets.
16   Q.   That's not my question.
17   A.   It was a business associate. You know, I
18   assume -- I don't know, I mean, a business associate
19   I assume whatever -- he never said he's a great guy.
20   Q.   Did Mr. Peskoff ever indicate to you that
21   Mr. Farrell had been very solicitous of Mr. Peskoff
22   when his mother was ill and his mother passed away

13 (Pages 46 to 49)

John P. Devlin
Washington, DC
August 16, 2006

---

**Page 50**

1  and things like that?

2  **A.  (The witness nodded.)**

3  Q.  No?

4  Before this conversation in 2006 with Mr.

5  Peskoff, had Mr. Peskoff ever complained to you about

6  Mike Farrell?

7  **A.  No.**

8  Q.  Had Mr. Peskoff ever complained to you

9  about FIDAC?

10  **A.  No.**

11  Q.  Insofar as you were aware, Mr. Peskoff had

12  no complaint about Mr. Farrell or anyone else at

13  FIDAC; is that correct?

14  **A.  Correct.**

15  Q.  Have you ever spoken to Josie about the

16  liquidation?

17  **A.  Have I ever spoken to Josie about it?  No,**

18  **I would say no.**

19  Q.  Have you ever spoken to Mr. Peskoff about

20  the liquidation after it occurred?  After November

21  2004 did you have any conversations Mr. Peskoff about

22  the liquidation or the dissolution?

---

**Page 51**

1  **A.  I don't -- none that I can remember.**

2  Q.  Do you think you may have had some

3  conversations, but you can't remember their content?

4  **A.  My -- you know, I can't remember details**

5  **at all, but just as a -- typically when I would give**

6  **the returns, I would -- we would discuss, but since**

7  **there's really not, if you look at the return there's**

8  **not much there.  At the end of the date there's not**

9  **much there, there's no assets.  What Steve was**

10  **focusing on was the capital loss, the $6 million**

11  **loan, as the shareholder.  That was the number he was**

12  **looking at.  And so I'm sure that we discussed -- you**

13  **know, because he wanted to know what that number was.**

14  **So to the extent we discussed that, yes.**

15  **I mean, usually what he would do in just**

16  **discussing the returns is making sure the income's**

17  **reported, you know.  I mean, it was perfunctory, but**

18  **he would have a sense of it.  But he was definitely**

19  **focusing on the capital loss because he -- that was**

20  **part of the, you know, the tax planning.**

21  MR. NOVACK:  Read back my question.

22  THE REPORTER:  "Question:  Do you think

---

**Page 52**

1  you may have had some conversations, but you can't

2  remember their content? "

3  THE WITNESS:  And I said --

4  BY MR. NOVACK:

5  Q.  Other than what you've testified to in

6  answer of the that question before, do you recall any

7  conversations with Mr. Peskoff after November 1, 2004

8  in which you discussed the status of any claim

9  against FIDAC?

10  **A.  No, never got brought up.**

11  Q.  Did you ever discuss with Mr. Reilly --

12  **A.  O'Reilly.**

13  Q.  -- the liquidation of Underhill?

14  **A.  Only to -- no, I mean, no, I mean, other**

15  **than -- other than Mr. O'Reilly, other -- other than**

16  **referring Steve Peskoff to Mr. O'Reilly to have him**

17  **do the dissolution in Ohio, and I stayed out of that,**

18  **I mean Mr. O'Reilly's office took care of that, and I**

19  **was out of -- all I required from Mr. O'Reilly's**

20  **office, which I gave you the copy, was the**

21  **dissolution papers from Ohio.**

22  Q.  Now, you told us earlier, it may have been

---

**Page 53**

1  when we were off the record, that you on your own had

2  contacted someone in Mr. Peskoff's office, maybe

3  Josie, to ask her what evidence she had that there

4  had been a transfer of the partnership interest to

5  Mr. Peskoff; do you remember telling us that?

6  **A.  And you have a copy of that.**

7  Q.  And you furnished us two letters that were

8  written by Mr. Peskoff or his office to FBR advising

9  them of the transfer of the partnership interest?

10  **A.  I gave you one letter, it was a five-page**

11  **document.**

12  Q.  Why don't we mark that?

13  **A.  That was the one that at the time I was --**

14  **the way I thought about it at the time, you know, was**

15  **I was, you know, I was doing the de facto journal**

16  **entry but I was sort of doing some housekeeping to**

17  **make sure that I was doing it, that they were**

18  **notifying, you know, the partnership and it had**

19  **already been done.  I'm sorry.**

20  Q.  What was the purpose in notifying the

21  partnership of the transfer of ownership?  What

22  purpose did you have in mind?

---

14 (Pages 50 to 53)

**B-76**

John P. Devlin                                                                August 16, 2006

Washington, DC

Page 54

1    A.   What purpose did I have in mind?

2    Q.   Yes.

3    A.   For partnership taxation, whatever income

4  taxable items that are on the partnership return for

5  the given year, these partnerships were both calendar

6  year, and what I wanted to ensure was that they knew

7  that there -- that the partnership knew that there

8  was a -- Underhill wasn't the owner anymore, that

9  Steve Peskoff was the owner, because I wanted to make

10 sure that when they issued the K-1s for '01, Steve

11 Peskoff would pick up in taxable items on that

12 return, not Underhill, because in the past I had

13 always reflected the K-1 on Underhill's return, but I

14 wanted to make sure that it was -- I was going to do

15 it the right way, but I wanted to make sure that it

16 was reflected by the owners.

17   Q.   How would you treat it when it is a

18 partial year before the transfer of ownership occurs?

19   A.   You don't.  You do it at the year end.

20   Q.   So if -- withdrawn.

21        Was cash received from either of these two

22 partnerships during the course of the year?

Page 55

1    A.   I have no idea.

2    Q.   If cash had been received, would that be

3  irrelevant for tax purposes; it's what's going to be

4  on the K-1?

5    A.   Right.

6    Q.   And even though Peskoff would only own

7  effective as of November 1, whatever happened for the

8  full year would be attributable to him?

9    A.   Yes.  The classic case in that would be if

10 this law firm that you're a part of -- well, it's an

11 L.L.P., if you happen to drop dead right here, God

12 forbid, that your estate would get whatever monies

13 you would earn.  And all your estimated tax payments

14 that you had made in April, June and you're going to

15 be making in September would be credited to you

16 personally, but meanwhile the estate is paying it, so

17 it is a classic case.

18        MR. NOVACK:  Let's mark this as Devlin

19 Exhibit 2.

20        (Devlin Exhibit No. 2 was

21        marked for identification.)

22        BY MR. NOVACK:

Page 56

1    Q.   This is what purports to be a letter,

2  dated January 3, 2005 to Kristin Knoll from Stephen

3  Peskoff.

4        Off the record.

5        (Discussion off the record.)

6        BY MR. NOVACK:

7    Q.   Have you seen Devlin Exhibit 2 before

8  today?

9    A.   No.

10   Q.   Why don't we mark as Devlin Exhibit 3 what

11 purports to be an August 23, 2004 letter from Mr.

12 Peskoff to Mr. O'Reilly, copy to Mr. Devlin.

13        (Devlin Exhibit No. 3 was

14        marked for identification.)

15        BY MR. NOVACK:

16   Q.   Do you have Devlin Exhibit 3 in front of

17 you?

18   A.   Yes.

19   Q.   Did you receive that letter around August

20 23, 2004?

21   A.   Yes.

22   Q.   Can you tell us what documentation you

Page 57

1  were referring to that you that was closed -- excuse

2  me, can you tell us what documentation he was

3  referring to, Mr. Peskoff, did you see --

4    A.   I received no enclosures.

5    Q.   I see.

6    A.   I just got this letter.

7    Q.   All right, okay.  Did you have any

8  meetings or conversations with Mr. O'Reilly with

9  regard to the liquidation and dissolution before

10 November 1, 2004?

11   A.   Other than, you know, letting him know

12 that Steve would be calling him to effect that, no.

13   Q.   Did you have any conversation with

14 Mr. O'Reilly in which you allocated between you who

15 would take responsibility for dealing with any

16 non-cash assets in terms of --

17   A.   It never was discussed.

18        MR. NOVACK:  Off the record.

19        (Discussion off the record.)

20        BY MR. NOVACK:

21   Q.   You currently do work for Mr. Peskoff I

22 guess and his wife -- is he married?

15 (Pages 54 to 57)

| Page 58 | Page 60 |
|---|---|
| 1   A.  Yes. | 1   your lawyer, you're here without a lawyer today, |
| 2   Q.  Do you do any work for any other members | 2   right? |
| 3   of the Peskoff family, extended family? | 3   A.  (The witness nodded.) |
| 4   A.  Yes. | 4   Q.  Neither Mr. Berman's firm or Todd's firm |
| 5   Q.  Who? | 5   are representing you in connection with this? |
| 6   A.  His son Jeremy. | 6   A.  No. |
| 7   Q.  Is that personal or -- | 7       MR. NOVACK:  Why don't we take a break of |
| 8   A.  Just personal. | 8   about ten minutes.  I will marshal my thoughts and |
| 9   Q.  And how many companies do you do work for | 9   perhaps we will be soon done.  Is that okay? |
| 10  for Mr. Peskoff, how many -- | 10      MR. BERMAN:  If you're going to marshal |
| 11  A.  He has a -- | 11  your thoughts, I can do it for you. |
| 12  Q.  I don't want details of other companies, | 12      MR. NOVACK:  Off the record. |
| 13  I'm not trying to pry. | 13      (Discussion off the record.) |
| 14  A.  Several. | 14      (Recess.) |
| 15  Q.  Several companies? | 15      (Devlin Exhibit No. 4 was |
| 16  A.  And -- well, loosely termed companies. | 16      marked for identification.) |
| 17  Q.  All right. | 17      BY MR. NOVACK: |
| 18  A.  They are not companies in the sense that | 18  Q.  Mr. Devlin, I've marked as Devlin Exhibit |
| 19  like Underhill, they are partnerships. | 19  4 a document that is a copy of the subpoena in part |
| 20  Q.  Okay. | 20  that we served on you which has some handwritten |
| 21  A.  They are entities. | 21  notations on pages 2 and 3 referring to the Bates |
| 22  Q.  And do you consider Mr. Peskoff a good | 22  stamp numbered JPD 2 and 3.  Is that your |

| Page 59 | Page 61 |
|---|---|
| 1   client? | 1   handwriting? |
| 2   A.  Yeah, he's fine. | 2   A.  Yes. |
| 3   Q.  Do you have any social dealings with him | 3   Q.  The word none appears after items 4 and 8, |
| 4   at any time? | 4   that indicates there were no such documents in your |
| 5   A.  No. | 5   files? |
| 6   Q.  Have you ever seen him socially? | 6   A.  I was just trying to keep track of what I |
| 7   A.  No, other than going to lunch. | 7   was sending to you, that I thought -- I was ticking |
| 8   Q.  And I think you said in the late 90s is | 8   off and putting in, preparing the package for you. |
| 9   when you started doing his tax returns? | 9   Q.  And I thank you for organizing it.  Am I |
| 10  A.  Yes, late 90s, yes. | 10  correct that since you wrote you were sending none |
| 11  Q.  Have you spoken to anyone from | 11  for items categories 4 and 8, you found no documents |
| 12  Mr. Berman's firm about this lawsuit other than | 12  in your files? |
| 13  conversations we've had right here, right now? | 13  A.  Right. |
| 14  A.  Who is Todd? | 14  Q.  You found no documents in your files that |
| 15  Q.  Todd is with another law firm that is | 15  fit those categories? |
| 16  representing -- | 16  A.  Right.  I know how important it is to have |
| 17  A.  That's the only other person.  The only | 17  organization as best you can. |
| 18  other person other than Mr. Berman has been Todd. | 18      MR. BERMAN:  The voice of the CPA. |
| 19  Q.  Did Todd ask you any questions about the | 19      THE WITNESS:  Yeah, really. |
| 20  facts? | 20      BY MR. NOVACK: |
| 21  A.  No.  I mean he's just -- no. | 21  Q.  I think you told us earlier when we had an |
| 22  Q.  I presume that Mr. Berman is not here as | 22  off the record discussion that you considered |

16 (Pages 58 to 61)

**B-78**

John P. Devlin

Washington, DC

August 16, 2006

---

Page 62

1  yourself to be somewhat, quote "anal" in terms of
2  paperwork in connection with your practice as an
3  accountant.
4      **A.   Yeah, I was just referring to trying to**
5  **doc -- and again, since my, what I'm preparing**
6  **typically is tax returns, I'm not doing financial**
7  **statements at all for example, I'm doing tax returns,**
8  **you're trying to, you know, have some believability**
9  **to what you're putting in the tax return.  And trying**
10 **to back up -- I was trained to back up everything**
11 **that's on the tax return, balance sheet items, income**
12 **statement items that I -- as best I can try to go**
13 **through it with a fairly fine tooth comb.**
14     Q.   Am I correct have you never seen any
15 document that purports to reflect a transfer to Mr.
16 Peskoff of any claims against FIDAC?
17     **A.   Correct.**
18     Q.   Am I correct that you have never heard
19 anyone say they believe that FIDAC had any --
20 withdrawn.
21     Am I correct that you have never heard
22 anyone say that they believe that either Underhill or

---

Page 63

1  Peskoff had a valid claim against FIDAC?
2      **A.   Correct.**
3      Q.   Am I correct that you have absolutely no
4  information insofar as you are aware that would
5  support an allegation that Underhill or Mr. Peskoff
6  had a claim against FIDAC?
7      **A.   Correct.**
8      Q.   I just want to quickly ask you about the
9  form 1099-DIV, that's a federal government form
10 that's used in connection with tax filings is it not?
11     **A.   Um-hum, yes.**
12     Q.   The purpose of the form is to report to
13 the federal government on what?
14     **A.   You're going to be reporting any**
15 **distributions, you know, that it would be clearly**
16 **from stockholders, so it would be stockholder**
17 **distributions out of earnings and profits of the**
18 **corporation.**
19     Q.   Let me just clarify who the stockholders
20 are. The form 1099 would be filed -- would be
21 prepared rather -- withdrawn.
22     The form 1099 is prepared by the

---

Page 64

1  corporation and furnished to the recipient --
2      **A.   Correct.**
3      Q.   -- of the distribution?
4      **A.   Correct.**
5      Q.   And it is used when there has been a
6  distribution to a shareholder in his capacity as a
7  shareholder?
8      **A.   From earnings and profits.**
9      Q.   Of the corporation?
10     **A.   Correct.**
11     Q.   And if there were a contract claim that
12 existed in favor of Underhill against FIDAC and the
13 intention were to distribute that to Mr. Peskoff
14 individually, would that be a distribution that would
15 be reflected on the form 1099-DIV?
16     **A.   No, because there's no earnings and**
17 **profits in Underhill, never has been from what I can**
18 **see.**
19     Q.   So --
20     **A.   For example, if you're getting**
21 **distributions, you know, because when you're getting**
22 **a 1099-DIV it is taxable income to the recipient.**

---

Page 65

1      Q.   The shareholder.
2      **A.   To the shareholder.  And so that you're**
3  **only getting that if the corporation has accumulated**
4  **earnings and profits and is distributing those**
5  **accumulated earnings and profits to the shareholder,**
6  **they've been paid tax at the corporate level and it**
7  **is now going to get paid tax at the individual level.**
8      **If there are no accumulated earnings and**
9  **profits in the corporation, which is the case with**
10 **Underhill, there -- any distributions to the**
11 **shareholder would be considered return of capital and**
12 **a non-taxable distribution.**
13     Q.   Could there be a return of capital in the
14 situation where a loan in the amount of over
15 $6 million remains unpaid to a creditor?
16     **A.   That's a loan, not -- you're -- you're**
17 **getting confused between shareholders and creditors.**
18     Q.   No, I'm not, no I'm not.
19     **A.   Say that again, then.**
20     Q.   We know that in the case of Underhill
21 there was a loan of some $6 million that remained
22 unpaid.

---

17 (Pages 62 to 65)

**B-79**

John P. Devlin                                                        August 16, 2006
Washington, DC

---

Page 66

1    A.  Correct.
2    Q.  And I'm asking you whether or not there
3  could ever be a distribution to any shareholder of
4  Underhill, as long as that loan remained unpaid?
5    A.  That doesn't have anything to do with the
6  loan at all.  What the distribution to the
7  shareholder -- again a corporate distribution, a
8  distribution to the shareholder is always out of
9  accumulated earnings and profits, unless it is a
10  liquidating distribution.  There is no liquidating
11  distribution because there is no earnings and profits
12  in this case.  Again the balance -- the accumulated
13  retained earnings is way negative, it is 6 million
14  whatever it is.
15    Q.  What I'm trying to understand, and I'll
16  give you -- if I don't understand it this time.  As I
17  understood it, at the time of the liquidation
18  Underhill owed Mr. Peskoff something over $6 million
19  on a loan.
20    A.  Correct.
21    Q.  As I understand it there was some
22  $6 million remaining unpaid on the loan when the

---

Page 67

1  liquidation was completed?
2    A.  Correct.
3    Q.  As I understand it, if a corporation is
4  insolvent and owes money to a creditor, by definition
5  there are no assets which can be distributed as a
6  liquidating dividend to its shareholder?
7    A.  Correct.
8    Q.  Am I correct in that?
9    A.  Correct.  And that's duly noted in Cocke's
10  memo, I believe.
11    Q.  Am I correct you cannot understand any way
12  in which any contract claim that belonged to
13  Underhill could be distributed to Mr. Peskoff as a
14  shareholder, as long as this debt to Mr. Peskoff in
15  his capacity as a creditor remained unpaid?
16    A.  I don't know.  I mean you're giving a
17  hypothetical here.
18    Q.  Well, assume my hypothetical is a fact for
19  purposes of my question and I'll repeat the
20  hypothetical.  I'm not asking to you tell me whether
21  it's based on fact or not, although I can't believe
22  we have any dispute as to that.

---

Page 68

1    Actually I will ask you, because I want to
2  be clear here, I'm not sure why you're having
3  difficulty.  We agree there was over $6 million
4  remaining underpaid when the dissolution occurred of
5  Underhill?
6    A.  Correct.
7    Q.  We agree $6 million was owed to Mr.
8  Peskoff in his capacity as a creditor?
9    A.  Um-hum.
10    Q.  We agreed that there could be no
11  distribution to shareholders in return of their
12  capital or distribution of equity --
13    A.  Because there were no assets.
14    Q.  -- when you are insolvent?
15    A.  Right.
16    Q.  Therefore I'm asking you do you agree
17  there is no way upon the dissolution of Underhill
18  that any contract claim that belonged to Underhill
19  could have been distributed to Mr. Peskoff in his
20  capacity as a shareholder?
21    A.  Correct, because there were no assets.
22    Q.  All right.  Is it your testimony that if a

---

Page 69

1  corporation does not have to pay any tax on certain
2  revenues it receives in a certain year because it is
3  carrying -- that net operating losses for whatever
4  reason and the corporation then pays out a dividend,
5  a cash dividend that same year to a shareholder, that
6  the shareholder does not have to pay any tax on it in
7  his individual capacity?
8    A.  If there's not accumulated earnings and
9  profits in the corporation.  Accumulated earnings and
10  profits is a different concept than net operating
11  loss.
12    Q.  You're telling me then that a corporation
13  can pay a dividend to a shareholder and that
14  shareholder does not have a taxable event or taxable
15  reporting event on his individual income tax return?
16    A.  If a sharehold -- they won't issue a 1099
17  for that.  You will typically see, typically you will
18  see this where they'll report it as -- they may --
19  you know, you will see it occasionally where you have
20  REITS --
21    Q.  R-E-I-T-S.
22    A.  Right, real estate investment trusts, when

---

18 (Pages 66 to 69)

**B-80**

John P. Devlin                                                                    August 16, 2006
Washington, DC

Page 70

1   they issue a first -- they will come back and they
2   will show it as a return of capital on a corrected
3   1099, but no, it won't get reported, there is no
4   place to report it on there, on the tax return.
5        MR. NOVACK: I think I may be done at this
6   time with two exceptions. One I have to check with
7   Ms. Kenney, who is the left half of my brain. And
8   the other is I reserve the right to call you back if
9   it is needed when I see the work papers we have
10  produced. I'm not asking you to agree to come back
11  or not, but I am just noting that I reserve.
12       The left half of my brain tells me that I
13  have nothing more to ask you now, so that's it.
14       EXAMINATION BY COUNSEL FOR PLAINTIFFS
15       BY MR. BERMAN:
16   Q.   I would just like to ask a couple of
17  follow-up questions here to make sure we all
18  understand what transpired during some of the prior
19  exchange.
20       Is or was Underhill on a cash or accrual
21  basis?
22   A.   It was a cash basis, corporate.

Page 71

1    Q.   So that on a cash basis would there be any
2   record in their tax returns of a claim against
3   somebody else?
4    A.   No.
5    Q.   When you wound down or were winding down
6   the affairs of Underhill, did you follow Generally
7   Accepted Accounting Principles?
8    A.   Yes.
9    Q.   And did the absence of any notation on the
10  tax returns with respect to the FIDAC matter comport
11  with the GAAP?
12       MR. NOVACK: I'm going to object to the
13  form, you can answer the question.
14       MR. BERMAN: Noted.
15       THE WITNESS: Did the -- was the tax
16  return prepared correctly, is that what you're
17  asking?
18       MR. BERMAN: Um-hum.
19       THE WITNESS: Yes.
20       BY MR. BERMAN:
21   Q.   After explaining to us that -- counsel for
22  FIDAC, after explaining to us in his questions he was

Page 72

1   not distinguishing cash assets from accrual assets,
2   he asked you, did you have a duty to collect all the
3   assets, and you answered yes.
4        Now, let's try the other -- that's under
5   his definition of assets.
6        MR. NOVACK: I'm going to object to the
7   prefatory aspect of the questioning as to the form of
8   it once again. I don't mind the question, it is just
9   the speech part that I'm objecting to. I'm sure I
10  won't have an objection to your question ultimately,
11  when I hear it.
12       BY MR. BERMAN:
13   Q.   Assuming a cash basis at Underhill, did
14  you have a duty to collect non-cash assets, like
15  claims for example?
16   A.   Again, the term collection, what I'm doing
17  is taking the cash assets and accounting for them in
18  the proper way. So I'm really not collecting assets,
19  I'm, you know, as assets, you know, as money comes in
20  and out of the company in any -- if there is any
21  non-cash items, the typical non-cash items would be
22  like depreciation on some fixed assets. But I mean

Page 73

1   I'm not collecting -- it isn't my duty to go out and
2   look for any assets or claims that are outside, you
3   know, the cash assets.
4        I mean, they are -- as we spoke earlier
5   there could be all kinds of potential receivables or
6   things that may be due Underhill. If they are not
7   collected, they are not cash and they are not
8   reported on the tax return.
9    Q.   You told us earlier that you attended a
10  meeting I believe in the spring of 2004 at which you
11  were told that Underhill was to be liquidated.
12   A.   Um-hum.
13   Q.   Did you leave that meeting with an
14  understanding of what was to become of any assets?
15   A.   Yes.
16   Q.   What was your understanding?
17   A.   They were to be distributed to the sole
18  shareholder.
19   Q.   And the sole shareholder was?
20   A.   Mr. Peskoff.
21       MR. BERMAN: Thank you, that's all I have.
22       MR. NOVACK: I have a few.

**B-81**

Alderson Reporting Company
1111 14th Street , NW  Suite 400            1-800-FOR-DEPO            Washington, DC  20005

John P. Devlin

August 16, 2006

Washington, DC

---

**Page 74**

1   FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

2      BY MR. NOVACK:

3      Q.   Let's go to the meeting. Where did the

4   meeting take place you just testified to?

5      A.   I think -- I'm just trying to think where

6   Steve's office was at that point.

7      Q.   You can just tell me at Steve's office.

8      A.   In his office.

9      Q.   Who was present?

10     A.   It was Steve and Charles Cocke and I.

11     Q.   How long did it last?

12     A.   Hour -- I mean, it wasn't long, it wasn't

13   short. Maybe 45 minutes to an hour, half hour.

14   There was a lot of discussion. I mean about not only

15   Underhill, but Steve, you know.

16     Q.   This was in May 2004 to the best of your

17   recollection?

18     A.   Yeah.

19     Q.   Is there any reason why you can place it

20   being around that time? As you relate it to some

21   other event?

22     A.   That's what I'm trying to think. I

---

**Page 75**

1   remember, you know, Steve had Charles and I there.

2   mean, it wasn't normal to have Charles. I'd only met

3   him several times so it wasn't normal to have both of

4   us there and, you know, Charles just came up with

5   some planning ideas at the time, that's all.

6      Q.   At the meeting you say there was an

7   understanding you had as to what was to become of the

8   assets. Could you tell us everything you remember

9   that Mr. Peskoff said that you said and Mr. Cocke

10  said on that subject?

11     A.   I can't tell you exactly, but the memo

12  that you have there that Charles Cocke sent to Steve

13  was sort of a to-do list of do this, do that, some

14  things happened, some things didn't.

15          On the question of the assets, you know,

16  when a -- typically you find when a corporation winds

17  down that the assets have to go someplace and you

18  know, I don't want to, you know, there's all this

19  discussion of where do the assets go, who should be

20  getting them. I mean, you know, I have to make the

21  assumption it is a reasonable assumption that they

22  are going to go to the sole shareholder, whether, you

---

**Page 76**

1   know from a legal perspective, you know, they have to

2   be disposed of, they have to go somewhere and the

3   question would be where do they go.

4      Q.   I guess my question to you, though, that

5   I'm asking to you answer in the deposition, is not

6   your musings about that. My question was very

7   simple, what did you say, what did Peskoff say, what

8   did Cocke say on the subject of what was to become of

9   the assets as best you recall?

10     A.   I don't remember.

11     Q.   Do you remember a single thing that was

12  said by anyone about that subject?

13     A.   I mean, the understanding -- you know, we

14  talked about it, and this was the result of the

15  letter because we were -- it was three people and who

16  was doing what, and we wanted to make sure that this

17  was occurring. And I mean, the letter encapsules

18  what the plan going forward was, you can see that I'd

19  have to look at it. I don't believe there's anything

20  in that letter that says, you know, the assets will

21  be transferred to here, there or other where.

22     Q.   Is it your testimony you can't recall

---

**Page 77**

1   anything without refreshing your recollection?

2      A.   Right, yes.

3      Q.   So when you testified a moment ago as to

4   what your understanding was as a result of the

5   meeting, you have this conclusion in your mind, but

6   you can't tell us the facts on which you base it?

7      A.   Well, I mean --

8      Q.   Is that correct?

9      A.   Yes, but the --

10     Q.   So it's not a yes?

11     A.   But recognize -- yes, but recognize that

12  neither Mr. Cocke nor Mr. Peskoff are producing a

13  tax -- producing work papers and producing a tax

14  return; I'm doing that. I had to have some

15  justification for doing it. I didn't just do it out

16  of the --

17     Q.   I understand. You're reasoning backwards

18  that there must have been an understanding that

19  you would do this or you --

20     A.   I wouldn't have done it --

21     Q.   You have to let me finish my sentences.

22  You're almost through this, you have to let me finish

---

20 (Pages 74 to 77)

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street , NW  Suite 400                                    Washington, DC  20005

Page 78

1    my sentences.
2         You're reasoning backwards that since you
3    did this work and you were qualified to do the work
4    in preparation of the return, the discussion was you
5    would do that; is that right?
6    A.   Correct.
7         Q.   Am I correct you don't remember a thing
8    about the meeting, other than what you've just
9    testified to?
10   A.   Correct.
11        Q.   Let me show you and read to you actually
12   what's been marked as Cocke's Exhibit 4. I'm just
13   going to read a part of it to you, this was a memo
14   that was written to Steve Peskoff, it is not clear to
15   me that you ever received it.
16        Did you receive a copy of that that comes
17   from his file?
18        MS. KENNEY:  Yes.
19        MR. NOVACK:  Oh, no. It doesn't indicate
20   that you did, but perhaps you did.
21        Let's mark as Devlin Exhibit 5.
22             (Devlin Exhibit No. 5 was

Page 79

1             marked for identification.)
2        BY MR. NOVACK:
3        Q.   This was produced by you in response to
4    our subpoena. Did you have a copy of this letter
5    from Mr. Peskoff on or around the 26th of May -- May
6    26th, 2004?
7    A.   This is the one that I sent that had the
8    copies, I believe. The answer is yes, I didn't get
9    this letter, but I got a copy. I think the one I
10   gave you I think said cc, that's the one I'm
11   referring to.
12        Q.   There's another letter that you're
13   referring to that we're not showing you?
14   A.   Let me see. No, you're correct.
15        Q.   Sarah's correct.
16        You say you sent it to us, you mean that's
17   what you produced in response to the subpoena?
18   A.   That's correct.
19        Q.   Would you look at Devlin Exhibit 5, the
20   first page indicates there was a conference call on
21   Friday May 21. Does that refresh your recollection
22   at all as to whether or not this meeting was really a

Page 80

1    conference call and you participated with Mr. Cocke
2    and Mr. Peskoff? Or was there also a meeting and a
3    conference call around this time?
4    A.   I think -- again, my recollection is hazy.
5    I think there was a meeting before this.
6        Q.   All right.
7    A.   I think -- I think -- I think -- I'm going
8    back looking at this, I believe this was the May
9    26th, you know, sort of putting in writing what was
10   discussed in the conference call, I believe.
11        Q.   Right.
12   A.   My recollection is sometime prior to this
13   conference -- because this was sort of the action
14   items, I believe the philosophy or vision or whatever
15   you want to call it that happened I believe was in a
16   meeting with the three of us at some point, but I
17   have no record of when that is. It could have been
18   before this. Obviously it was before this.
19        Q.   I'm going to just represent to you that
20   when Mr. Cocke testified he had some handwritten
21   notes and it indicated on May 21st, 2004, which is
22   several days before this May 26th letter, Devlin

Page 81

1    Exhibit 5, there was a telephone call with you and
2    Steve Peskoff, which referred to upcoming decision to
3    liquidate, et cetera.
4    A.   Um-hum.
5        Q.   I'm just bringing that to your attention
6    to see if it refreshes your recollection at all. If
7    not --
8    A.   No, I'm fine with --
9        Q.   Okay.
10   A.   This is what I was working, you know this
11   to me encapsules -- the decision was made before
12   this, but this was just, you know, Cocke is stating
13   John's going to do this, Steve will do this,
14   different things will happen. I was using this as a
15   road map.
16        Q.   Okay. Here's my question to you, as a
17   result of the meeting and as a result of the
18   conference call and as a result of the memo, did you
19   have any understanding as to who was taking overall
20   responsibility for making sure that the dissolution
21   was done properly?
22   A.   As a result of this meeting --

21 (Pages 78 to 81)

Page 82

1    Q.    As a result of the conference calls --
2    A.    Right.
3    Q.    -- the meeting you've described and this
4    memo --
5    A.    Right.
6    Q.    -- that we've looked at, which is Devlin
7    Exhibit 5, did you have an understanding as to who
8    had responsibility overall to make sure that the
9    dissolution was done properly?
10   A.    I mean ult --
11   Q.    The question is did you have an
12   understanding?
13   A.    Yes -- here is --
14   Q.    Only one of us can talk at a time. I'll
15   let you finish what you were saying and then let me
16   finish what I was saying, but we are talking over
17   each other and she can't get both. I don't mind if
18   you interrupt me, that's fine, but I have to let her
19   hear you alone so I have to be quiet now.
20        Can you read back the question and let him
21   finish his answer.
22        THE REPORTER: "Question: As a result of

Page 83

1    the conference calls --
2        "Answer: Right.
3        "Question: -- the meeting you've
4    described and this memo --
5        "Answer: Right.
6        "Question: -- that we've looked at, which
7    is Devlin Exhibit 5, did you have an understanding as
8    to who had responsibility overall to make sure that
9    the dissolution was done properly?"
10       BY MR. NOVACK:
11   Q.    As a result of the various discussions,
12   either by telephone or in person or the memo you
13   received from Mr. Cocke around May 2004, did you have
14   an understanding as to whether there was any person
15   who had the overall responsibility to make sure that
16   the dissolution of Underhill was done properly?
17   A.    My understanding was that -- what I had to
18   do. Whether it was done properly or not, is somebody
19   else's call, but if you look at -- I was working
20   under 1A, 1B, John will, John will, that's what I was
21   focusing on.
22   Q.    My question --

Page 84

1    A.    And in answering to your question, did I
2    leave that meeting with an idea who was responsible
3    for the dissolution going properly, ultimately it is
4    the owner, the president of the company, would be
5    ultimately responsible and everybody had different
6    tasks to perform.
7        And this memo here outlines my tasks, and
8    you know, as the person that's doing the tax returns,
9    I don't feel personally it is incumbent on me to, you
10   know, to worry about the larger issue of whether the
11   dissolution was going properly.
12       For example, I had no knowledge and no
13   insight into apparently, and this is a legal issue,
14   for a dissolution of an Ohio a corporation, certain
15   things have to be done with Ohio. I had zero --
16   other than referring the lawyer, which Steve had
17   already worked with at one point, so it wasn't a new
18   referral so to speak, but I let the lawyer know that
19   Steve -- or Mr. O'Reilly know that Steve might be
20   calling him on the dissolving this corporation.
21       Other than that, I had zero to do with the
22   legal dissolution with Ohio. So I was aware that

Page 85

1    something was going on, but I had no -- it wasn't
2    part of my to do list.
3    Q.    Insofar as you knew as a matter of fact
4    there was nobody in charge overall; is that your
5    understanding?
6    A.    I wasn't the quarterback, Charles Cocke
7    wasn't the quarterback.
8    Q.    And Mr. Peskoff did not say to you one way
9    or the other whether he was taking responsibility
10   overall, did he?
11   A.    Didn't -- didn't -- he didn't say to me,
12   John, I'm taking charge of this, did not say that.
13   Q.    Insofar as you knew, based on all these
14   conversations that occurred in May, there was no one
15   person in overall charge of the dissolution; is that
16   right?
17   A.    I -- no.
18   Q.    No what?
19   A.    I've said everything I can say, I didn't
20   know who -- again, the president's in charge, we all
21   have our different attorneys doing different things,
22   accountants doing different things, ultimately Mr.

22 (Pages 82 to 85)

**B-84**

Page 86

1   **Peskoff is responsible for everybody doing their**
2   **part.**
3       Q.   I take it from your prior testimony that
4   in none of these conversations with you or Mr. Cocke
5   was there any mention of FIDAC by Mr. Peskoff; is
6   that right?
7       A.   Correct.
8       Q.   Let's go to the action items here, I want
9   to direct your attention to Roman Numeral I, small a,
10  that's on page JPD 7 of Devlin Exhibit 5, it says
11  John will prepare the final form 1120 through the
12  date of liquidation. In fact you did that, correct?
13      **A.   Correct.**
14      Q.   Small item b says, John will prepare
15  1099-DIV, Dog, Iowa, Victor, to reflect the
16  liquidating dividends, if any. It goes on to say
17  Renaissance will probably have a liquidating dividend
18  and Underhill would repay debt and have no
19  liquidating dividend.
20      Am I correct it was your understanding as
21  a result of these conversations in May that there
22  would be no liquidating dividends made by Underhill?

Page 87

1       A.   Yes.
2       Q.   And that is because as we discussed before
3   it was insolvent and all of its assets would have to
4   be used to repay its creditor, Mr. Peskoff, correct?
5       A.   Yes.
6       Q.   Therefore, you would not prepare a
7   1099-DIV in connection with this liquidation,
8   correct?
9       A.   Correct.
10      MR. NOVACK: I don't have any more
11  questions, unless Mr. Marshal comes back in this
12  case.
13      (Discussion off the record.)
14  FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
15      BY MR. BERMAN:
16      Q.   I think you've told us that you do a
17  number of these dissolutions of closely held
18  corporations.
19      **A.   Actually, no, I don't. The truth of the**
20  **matter is most people just close the door and leave**
21  **so --**
22      Q.   I'm not going ask any more questions.

Page 88

1       MR. NOVACK: Okay, we're finished. Thank
2   you, subject to the reservations. I'd like to you
3   produce those work papers and we'll take a look at
4   them.
5       THE WITNESS: You want just the adjusting
6   entries or what do you --
7       MR. NOVACK: I would like to see the
8   work -- it is easier to just give us the work papers
9   and we'll look at them, as opposed to you selecting
10  out things. That way we won't have any issues.
11  We'll pay the copying expense.
12      THE WITNESS: Fine. I mean, there's a
13  lot, but --
14      MR. NOVACK: You said it is about three
15  inches high, right?
16      THE WITNESS: Yeah, I mean, it's -- a lot
17  of it, to be honest, a lot of it is, you know, eight
18  month's worth of bank statements for three things.
19      MR. NOVACK: I tell you what --
20      THE WITNESS: Even I don't look at that,
21  to be honest with you, you know.
22      MR. NOVACK: I think --

Page 89

1       THE WITNESS: I mean, I get it, because
2   truthfully as I'm looking at all of the activity
3   through the, you know, through the Quicken, I want to
4   make that sure everything is recorded. If it is not
5   recorded, I have to find out why and so that's why I
6   get them. But once I've ensured that everything's
7   recorded, it's kind of superfluous, to be honest.
8       MR. NOVACK: I think it would be simpler
9   and I wouldn't have to worry that I'm inadvertently
10  leaving something out that might be a notation on
11  something. If you would just copy them, give them to
12  us, give us the bill, we'll pay for them. And give
13  them a copy as well -- you can let Mr. Berman know.
14      MR. BERMAN: Make two copies.
15      MR. NOVACK: Right. Give them to both of
16  us.
17      MR. BERMAN: Send them to us, because we
18  want to send them to our local counsel which does
19  actual screening of things and they can help.
20      We'll get the stuff to you.
21
22

23 (Pages 86 to 89)

**B-85**

John P. Devlin                                                        August 16, 2006
Washington, DC

```
                                  Page 90
 1          MR. NOVACK:  Off the record, off the
 2   record.
 3          (Discussion off the record.)
 4          (Whereupon, at 2:11 p.m., the taking of
 5   the instant deposition ceased.)
 6
 7
 8          _____
 9          Signature of the Witness
10
11   SUBSCRIBED AND SWORN to before me this _____ day of
12   _____, 20_____.
13
14          _____
15          Notary Public
16
17   My Commission Expires:_____
18
19
20
21
22
```

## CERTIFICATE OF SERVICE

I, John L. Reed, hereby certify that on June 26, 2007 the attached **APPENDIX TO DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** was hand delivered to the following persons and electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

> Joseph Grey, Esq.
> Stevens & Lee, P.C.
> 1105 North Market Street, Seventh Floor
> Wilmington, DE 19801

DATED: June 26, 2007                    **EDWARDS ANGELL PALMER & DODGE LLP**


  _/s/ John L. Reed_
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No.  4388)
919 N. Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770
302.777.7263
jreed@eapdlaw.com
jcicero@eapdlaw.com