# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **UNDERHILL INVESTMENT CORPORATION**, *by and through Stephen D. Peskoff as successor in interest* and **STEPHEN D. PESKOFF**, *individually*, | : : : : : : : | |
| Plaintiffs, | : : | C.A. No. 06-99-SLR |
| v. | : : : | |
| **FIXED INCOME DISCOUNT ADVISORY COMPANY**, | : : : | |
| Defendant. | : : : | |

## DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PAYMENT OF DISCOVERY EXPENSES

EDWARDS ANGELL PALMER & DODGE LLP
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770 (Phone)
302.777.7263 (Fax)

OF COUNSEL:
  Gerald A. Novack (*pro hac vice*)
  Sarah P. Kenney (*pro hac vice*)
  **KIRKPATRICK & LOCKHART
    PRESTON GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
212.536.3900 (Phone)
212.536.3901 (Fax)

DATED:    June 29, 2007

# TABLE OF CONTENTS

**PAGE**

NATURE AND STAGE OF PROCEEDINGS ....................................................1

SUMMARY OF ARGUMENT ....................................................1

STATEMENT OF THE FACTS ....................................................1

The Buchwald Report Should Never Have Been Submitted ....................................................3

Non-reimbursable And Apparently Excessive Charges ....................................................8

ARGUMENT ....................................................10

I. FIDAC SHOULD NOT BE REQUIRED TO REIMBURSE ANY ADDITIONAL FEES OR EXPENSES ....................................................10

A. No Fees Or Expenses Should Be Awarded ....................................................10

(1) Manifestly unjust and unreasonable ....................................................10

(2) Non-reimbursable categories ....................................................12

B. No Award Without A Buchwald Deposition ....................................................13

II. PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES SHOULD BE DENIED ....................................................17

CONCLUSION ....................................................18

**TABLE OF AUTHORITIES**

**PAGE**

**CASES**

*Benjamin v. Gloz,*
    130 F.R.D. 455 (D. Colo. 1990) ........................................................................ 14

*Boos v. Prison Health Svcs.,*
    212 F.R.D. 578 (D. Kansas 2002) ..................................................................... 16

*Byrne v. Liquid Asphalt Sys., Inc.,*
    250 F.Supp.2d 84 (E.D.N.Y. 2003) ................................................................. 11

*Collins v. Village of Woodridge,*
    197 F.R.D. 354 (N.D. Ill. 1999) ....................................................................... 14

*Constellation Power Source, Inc. v. Select Energy, Inc.,*
    No. 04 cv 983, 2007 U.S. Dist. LEXIS 4583 (D. Conn. Jan. 23, 2007) .............. 12

*Fisher v. Accor Hotels, Inc.*
    No. 02-cv-8576, 2004 U.S. Dist. LEXIS 516 (E.D. Pa. Jan. 12, 2004) .......... 12, 14

*Fisher-Price, Inc. v. Safety 1st, Inc.,*
    217 F.R.D. 329 (D. Del. 2003) .................................................................. 10-11, 13

*M. T. McBrian, Inc. v. Liebert Corp.,*
    173 F.R.D. 491 (N.D. Ill. 1997) ....................................................................... 14

*New York v. Solvent Chemical Co.,*
    210 F.R.D. 462 (W.D.N.Y. 2002) .................................................................... 16

*Patterson Farm, Inc. v. City of Britton,*
    22 F.Supp.2d 1085 (S.D. 1998) ...................................................................... 12

*Rhee v. Witco Chem. Corp.,*
    126 F.R.D. 45 (N.D. Ill. 1989) ........................................................................ 12

*S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District,*
    154 F.R.D. 212 (E.D. Wisc. 1994) .................................................................. 15

**STATUTES**

Fed. R. Civ. P. 26(b)(4)(C) ............................................................................ 10-12, 16

## NATURE AND STAGE OF PROCEEDINGS

Defendant Fixed Income Discount Advisory Company ("FIDAC") submits this Answering Brief in opposition to Plaintiffs' Motion To Compel Payment of Discovery Expenses relating to the time spent by its purported expert, Lee E. Buchwald, in responding to FIDAC's discovery requests. Separate motions for summary judgment made by FIDAC and Plaintiffs are currently pending, with the briefing on those motions not yet completed.

## SUMMARY OF ARGUMENT

Plaintiffs' Motion To Compel Payment Of Discovery Expenses should be denied on the following grounds:

1.    Ordering FIDAC to reimburse any more of Buchwald's fees and expenses would result in manifest injustice and be unreasonable.

2.    Some of the fees and expenses are for non-reimbursable activities.

3.    In no event should the motion be granted without giving FIDAC an opportunity to depose Plaintiffs' expert, Mr. Buchwald, to learn the facts relating to the highly questionable and evidently excessive time charges listed on his invoices.

## STATEMENT OF THE FACTS

In their motion, Plaintiffs are seeking to compel FIDAC to be responsible for $18,104.15 in claimed fees that Mr. Buchwald supposedly ran up in responding to FIDAC's discovery requests. This $18,104.15 is close to 50% of the $37,884.86 that Plaintiffs paid Mr. Buchwald for creating his nine-page report and all his work for them since he was first engaged. It is somewhat ironic that Plaintiffs are seeking to compel FIDAC to pay this relatively huge sum, when the evidence, discussed below (and in the

supporting Declarations), shows that Mr. Buchwald should never have been proffered as an expert in this case. Moreover, Plaintiffs are seeking to recover for charges by Mr. Buchwald that are not considered compensable as a matter of law, and which are – on their face – excessive.

Plaintiffs contend that Mr. Buchwald ran up these time charges (at his $450 per hour expert rate) as follows. In anticipation of taking Mr. Buchwald's deposition, FIDAC requested that he produce certain documents that should have been readily available to him because they were considered by him while preparing his report or related to the terms of his engagement by Plaintiffs. (A-1-A-11) Mr. Buchwald now claims it took him 2 hours to review the document requests and 8.5 hours to gather these documents, and Plaintiffs contend that FIDAC should pay Mr. Buchwald $4,725 for doing so. (A-13) Mr. Buchwald also claims that he spent 19 hours preparing to testify about his nine-page report at his three-hour deposition, and that FIDAC should pay $8,550 for this time. (*Id.*) Although not compelled to do so, Mr. Buchwald chose to spend, according to an invoice he prepared, six hours reading the 132-page transcript of his deposition before he signed it, without making any corrections, and he seeks to be paid $2700 for this exercise. (A-16; B-72-B-107; Buchwald, pp. 1-132) Mr. Buchwald is also seeking reimbursement for expenses totaling $329.15. (A-13, A-16) Mr. Buchwald's charges total $18,104.15, or 47.8% of the $37,884.86 that Mr. Buchwald has charged the Plaintiffs.

At the outset, FIDAC rejects Plaintiffs' contention that FIDAC's counsel gave Mr. Buchwald a "blank check" to charge whatever he wished, and thus waived its rights under the Federal Rules of Civil Procedure to resist these unjust, unreasonable and non-compensable reimbursement claims.  (*See* Novack Declaration, ¶¶ 5-7)

### The Buchwald Report Should Never Have Been Submitted

Mr. Peskoff admits that he was not asked to introduce Gen Advisors and Sentry Select to FIDAC, and never promised that he would be paid for making introductions of business partners.  (B-44, B-53, Peskoff pp. 285), 427)   During his deposition, Mr. Peskoff also admitted that he did not know of any instance in which someone had provided an introduction to a business partner and been paid a fee for that introduction (*See* Novack Declaration, ¶ 10).  The Buchwald report was submitted for the ostensible purpose of filling this hole in Plaintiffs' case.

During his deposition, Mr. Buchwald admitted his lack of experience and expertise on the subject at hand:

> Q. … Is it fair to say that never in your life before this engagement had you ever done anything in the area of determining what is a fair fee for someone who acts as an intermediary for an investment advisor?
> A.      Yes.

(B-95 Buchwald, p. 91)

During his deposition, Mr. Buchwald also admitted that he has: never worked with any investment advisers; never dealt with any persons or firms who made any introductions to investment advisers; never spoken with any investment adviser about what types of fees they pay and under what circumstances; has no personal experience with fees paid by investment advisers; and he "wouldn't consider [himself] an expert" on

the issue of what investment advisory firms pay to finders, not even those who produce clients.  (B-74, B-78-B80, B-83; Buchwald, pp. 7, 24-26, 28-29, 41)   All of Mr. Buchwald's "knowledge" about the fees paid by investment advisers was gained in preparing his report, principally by looking on the internet and at public filings of other investment advisers (which do not deal with the situation presented here, as we shall explain).  (B-79-B-80; Buchwald, pp. 28-29)

Even outside the area of investment advisers' practices, Mr. Buchwald could provide no help to Plaintiffs.  Mr. Buchwald explained that, over the course of his 20 years of experience in investment banking, he could not recall a single instance in which a fee has been paid to someone who "introduces A to B where B is simply going to be a future business partner."  (B-92-B-93; Buchwald, pp. 77-83)

In his deposition, Mr. Buchwald admitted that he invented the methodology used in his report for the purposes of this litigation.  (B-99, B-101-B-103; Buchwald, pp. 108, 115-17,124)  Mr. Buchwald additionally conceded that: his methodology was entirely "subjective;" was not based upon any "objective data;" had never been seen by anyone (other than Plaintiffs' counsel) before this report; he was unaware of it ever being used by anyone else; and it was a "totally untested formulation."   (B-101, B-103; Buchwald, pp. 113-14, 122-24)  Nor could Mr. Buchwald identify any support for his methodology in any publications.  (B-101; Buchwald, p. 114)

As an accompaniment to his new methodology, Mr. Buchwald also coined a new term: "Business Intermediary Services."  (B-3; Buchwald Report, p. 2)  Mr. Buchwald admitted that he made up this term for this report, and it is just another way of referring

4

to Mr. Peskoff having arranged for these introductions to Gen Advisors and Sentry Select. (B-95-B-96; Buchwald, pp. 92-93)

The report states that there are five basic elements in his methodology used to determine the "fair market value" of these so-called "Business Intermediary Services." Mr. Buchwald then assigns a percentage weight to each of the elements, based upon such subjective considerations as he deems relevant. (B—3-B-8; Buchwald Report, pp. 2-7; B-101; Buchwald, pp. 114-15) The report then applies these weighted elements to a "benchmark" fee of 20% of the management fees earned by FIDAC. Through the use of this methodology Mr. Buchwald concludes that "the fair market value of the services provided in the Gen Advisors and Sentry transactions were 11% and 10% of, respectively, of FIDAC's fees for those transactions." (B-10; Buchwald Report, p. 9; *see id.* at p. 4)

Mr. Buchwald's use of the FBR REIT fee of 20% appears to be based upon misinformation provided to him by Plaintiffs. As fully explained in FIDAC's summary judgment papers, in the FBR REIT transaction, Mr. Peskoff was paid 20% for providing consulting advice to FIDAC with respect to how it should manage its client's account. (Defendant Fixed Income Discount Advisory Company's Answering Brief In Opposition To Plaintiffs' Motion For Partial Summary Judgment, p. 3, D.I. 66) As Mr. Farrell testified, the decision to retain Mr. Peskoff to provide these consulting services was motivated in part by Mr. Farrell's (mistaken) belief that Mr. Peskoff had somehow promoted FIDAC to be the manager of the FBR REIT, and thus provided meaningful help in obtaining this new client. The services to be rendered, and for which the 20% was paid, however, were ongoing advice about FBR's thinking about the handling of the

FBR account, which Mr. Peskoff was in a unique position to give because he shared office space with FBR and was friendly with its management.  (B-63-B-65, B-68; Farrell, pp. 12, 16-18, 29)

There is thus a fundamental difference between the services provided by Mr. Peskoff in connection with the FBR REIT and the services Mr. Buchwald was asked to evaluate in terms of their "fair market value."   In the former, Mr. Peskoff's services related to advice with regard to the ongoing management of a client's account.  (B-64-B-65, B-68; Farrell, pp. 16-18, 29)  Here, Mr. Peskoff never rendered any advice about any client's account.  (B-28, B-30-B-32, B-41; Peskoff, pp. 44, 131-32, 137-38, 279)

Mr. Buchwald was evidently told by Mr. Peskoff or his counsel that it was Peskoff who introduced the FBR REIT to FIDAC as a client.  (B-75-B-76; Buchwald, pp. 10-14)  Based upon this incorrect understanding, Mr. Buchwald believed that Mr. Peskoff had brought the FBR REIT to FIDAC as a client.  (B-5; Buchwald Report, p. 4)

Mr. Buchwald also sought to "validate" his 20% benchmark by looking to "referral" fees paid by FIDAC and other investment advisers to finders who introduce clients to them.  These fee agreements between investment advisers, which are required by federal law to contain specific provisions not found in this case, are disclosed to the Securities and Exchange Commission on Form ADV.  (B-8-B-10; Buchwald Report, pp. 7-9)  Prior to this engagement, Mr. Buchwald had never before seen a Form ADV. (B-81-B-82; Buchwald, pp. 36-37)

These "referral" fees to which Mr. Buchwald refers are paid to finders who introduce clients.  When a client is introduced, all that FIDAC or any other investment adviser need do is immediately start managing the client's money.   The situation

presented by the introduction of a potential business partner is in no way comparable. As this case illustrates, there is a long period of time during which the investment adviser must conceptualize, develop and market a new product, and undertake the expense, effort and risk of failure of the product and the marketing campaign. Mr. Buchwald was aware that none of these investment advisers or FIDAC reported paying a fee for an introduction to a potential business partner. (B-82-B-87; Buchwald, pp. 39-41, 48, 50-51, 56, 57-58)

Therefore, it was improper to base any conclusion on a benchmark percentage that reflects the fee paid for introducing a client, with a ready pool of capital to be managed, to an investment adviser.

Based upon all these admissions during Mr. Buchwald's deposition, FIDAC concluded that Mr. Buchwald was not an expert in the field in which he purported to opine, and was not qualified to render an expert opinion on the issue of the "fair market value" of Mr. Peskoff's services in introducing Gen Advisors and Sentry Select to FIDAC. Therefore, all of FIDAC's effort and expense directed to responding to Mr. Buchwald's expert report could have been avoided had the Plaintiffs not put Mr. Buchwald forward as an expert.[1] It would be unjust to require FIDAC to relieve the Plaintiffs of any obligation they may have to pay Mr. Buchwald for putting FIDAC to the trouble and expense to prove that Mr. Buchwald was not an expert.[2]

---

[1]    As previously discussed, there is no custom and practice to pay for introductions to potential business partners, and it is not surprising that Plaintiffs could not find any other person willing to render an expert opinion that there was. In this connection, we note that Plaintiffs' counsel apparently located Mr. Buchwald because he co-authored an article with one of the lawyers in one of the firms representing the Plaintiffs. (B-13-1A-14)

[2]    FIDAC has not made an *in limine* motion because of the pendency of its summary judgment motion. If that motion were granted it would moot the need for the Court to make any

**<u>Non-reimbursable And Apparently Excessive Charges</u>**

Mr. Buchwald has submitted two invoices, one dated April 1, 2007 and the other dated May 1, 2007. Those invoices are included as Exhibits 2 and 4 to Certificate of Counsel Regarding Exhibits to Plaintiffs' Opening Brief. Both invoices charge $450 per hour. (A-13, A-16) Plaintiffs have not submitted any sworn statement to support these invoices.

As more fully discussed in the Novack Declaration, and below, Mr. Buchwald's invoices reflect charges for categories of activity that are, in some instances, not reimbursable as a matter of law. In other instances, his invoices reflect what appear to be excessive charges.

On their face, the invoices appear to reflect an excessive number of hours spent on various tasks. Moreover, Mr. Buchwald evidently seeks to be paid $450 per hour for performing essentially administrative tasks such as gathering his existing case file for production. (A-13; A-16) A few examples give the flavor of the invoices.

Mr. Buchwald's deposition lasted three hours and took place about three weeks after he issued his expert report. The questioning produced 132 pages of testimony transcript. Mr. Buchwald made no changes or corrections to this transcript before he signed it and returned it to FIDAC. (B-72-B-107; Buchwald, pp. 1-132) Plaintiffs contend that Mr. Buchwald spent six hours reading his transcript of the expert deposition. (Plaintiffs' Opening Brief, p. 4, D.I. 60) At $450 per hour, the charge for reviewing his transcript was $2,700. If it took six hours to read this transcript, then Mr. Buchwald was reading at a rate of 71 words per minute. (*See* Frenzel Declaration) According to the

---

formal ruling on the admissibility of the Buchwald report. Since any trial would be non-jury, a ruling on admissibility could easily be made close to the time of trial or even during trial.

National Institute for Literacy, a first grader typically reads at this rate of speed.  (B-15-A-23)

Mr. Buchwald also claims to have spent 8.5 hours (a typical work day for many people), at a charge to FIDAC of $3,825, to gather his files for production in response to FIDAC's document requests.  (A-13)  The materials produced by Mr. Buchwald should all have been easily gathered by him in less than an hour, since they were presumably considered by him in creating his report or memorializing his engagement.

Mr. Buchwald claims to have spent 19 hours (close to 2 ½ work days) preparing to testify about his nine-page report, which he had just finished three weeks earlier.  For this Plaintiffs seek to force FIDAC to pay $8,550.  (A-13)

## ARGUMENT

### I.    FIDAC SHOULD NOT BE REQUIRED TO REIMBURSE ANY ADDITIONAL FEES OR EXPENSES

Under the Federal Rules of Civil Procedure, FIDAC has no obligation to pay an expert's fees when "manifest injustice" would result, or where the fees are not "reasonable." Rule 26(b)(4)(C), provides as follows:

> (C) <u>Unless manifest injustice would result</u>, (i) the court shall require that the party seeking discovery pay the expert a <u>reasonable</u> fee for time spent in responding to discovery under this subdivision; and (ii) with respect to discovery obtained under subdivision (b)(4)(B) of this rule the court shall require the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.

*Id.* (emphasis added).

Here, manifest injustice would result from requiring FIDAC to pay the Buchwald fees or expenses sought by the Plaintiffs' motion. The only "reasonable" fee for the unnecessary work that Mr. Buchwald's report created is $0. In any event, the fees being sought are either non-reimbursable or so unreasonable in their amount due to excessive time spent that no relief should be granted to Plaintiffs prior to Mr. Buchwald being deposed by FIDAC as to the basis for these time charges.

### A.    No Fees Or Expenses Should Be Awarded

#### (1)  Manifestly unjust and unreasonable

In *Fisher-Price, Inc. v. Safety 1st, Inc.*, this Court explained the balancing test used to determine whether manifest injustice would result from compelling a party to pay the other side's expert's fees:

> [D]etermining whether manifest injustice would occur requires weighing the possible hardships imposed on the respective parties . . . [and] balancing the need for doing justice on the merits between

> the parties . . . against the need for maintaining orderly and
> efficient procedural arrangements.

*Fisher-Price, Inc. v. Safety 1st, Inc.*, 217 F.R.D. 329, 332 (D. Del. 2003) (internal

quotations omitted) (ellipses in original).

Plaintiffs suggest that manifest injustice only can exist when a party cannot afford

to pay the expenses. (Plaintiffs' Opening Brief, pp. 8-9, D.I. 60) There does not appear

to be any such hard and fast rule. Despite being narrowly construed, concerns about

manifest injustice have not been limited to monetary concerns. The Advisory Committee

Notes list indigency as an example of manifest injustice, but provide no indication the

Committee intended monetary concerns to be the exclusive consideration. Fed. R. Civ. P.

26(b)(4)(C) Notes of Advisory Committee, 1970 Amendment. Also, at least one court

has concluded that manifest injustice may be found under other circumstances. In *Byrne*

*v. Liquid Asphalt Sys., Inc.*, 250 F.Supp.2d 84, 90 n. 2 (E.D.N.Y. 2003), the court

explained that it would constitute manifest injustice to require a party to pay the opposing

expert's fees when that expert was introduced to the action 16 months after discovery

concluded. *See also Fisher-Price*, 217 F.R.D. at 333 (requiring a "balance of all of the

equities"). There is no indication that the financial condition of the party resisting

payment was a factor.

Here, Plaintiffs' counsel was presumably aware that Mr. Buchwald had no

experience whatsoever in the dealings and customs of investment advisers. Yet, they

proffered Mr. Buchwald as an expert in this area, and caused FIDAC to have to undergo

the expense of taking Mr. Buchwald's deposition. It would be manifestly unjust to now

make FIDAC pay twice for the privilege of proving that Mr. Buchwald was not an expert.

Alternatively, the Court can rule that Mr. Buchwald should not be reimbursed for any fees because doing so would not be "reasonable" in the present circumstances for the same reason that it would be manifestly unjust.

### (2) <u>Non-reimbursable categories</u>

Time spent reviewing a transcript is not compensable, unless the party seeking discovery strongly encouraged its review. *Patterson Farm, Inc. v. City of Britton*, 22 F.Supp.2d 1085, 1096 (S.D. 1998). Because Plaintiffs have not alleged that FIDAC "strongly" encouraged Buchwald to review his transcript, the 6 hours Buchwald spent reviewing his transcript may not be charged to FIDAC.

Additionally, reimbursement of expenses under Rule 26(b)(4)(C) is only proper for expert witnesses who are not expected to be called at trial. *See* Fed. R. Civ. P. 26(b)(4)(C) (limiting reimbursement of expenses to non-testifying witnesses); *see Fisher v. Accor Hotels, Inc.* No. 02-cv-8576, 2004 U.S. Dist. LEXIS 516, at *5 (E.D. Pa. Jan. 12, 2004) (denying request for transcript reimbursement because expert was expected to testify at trial). Because Buchwald has been identified as a testifying expert witness, his expenses are not compensable.

Further, time spent with counsel preparing for the deposition is not compensable. *Constellation Power Source, Inc. v. Select Energy, Inc.*, No. 04 cv 983, 2007 U.S. Dist. LEXIS 4583, at *23-24 (D. Conn. Jan. 23, 2007) (reducing the hours of deposition preparation compensable to the number of hours the deposition lasted, 6, because of the risk of abuse given that deposition preparation often includes trial preparation time); *Rhee v. Witco Chem. Corp.*, 126 F.R.D. 45, 47-48 (N.D. Ill. 1989). Because Buchwald's invoices do not define what he did other than "Prepare for deposition", FIDAC presumes

that Buchwald spent at least some of these 19 hours meeting with Plaintiffs' counsel to prepare his testimony.  That time is not compensable.  (A-13)

### B.    No Award Without A Buchwald Deposition

There are a number of serious questions that arise simply by virtue of the time entries on Mr. Buchwald's invoices, and it would be unfair to accept those entries at face value and rule that they are unreasonable.

This Court has refused to require a party to pay another party's proposed expert's standard hourly rate for performing administrative tasks, such as photocopying and mailing documents when responding to a subpoena.  *See*, *e.g.*, *Fisher-Price, Inc. v. Safety 1st, Inc.,* 217 F.R.D. 329, 334 (D. Del. 2003) (reducing preparation time fee of $495 to $50 per hour because it involved "administrative tasks" such as reviewing boxes in storage files, sending Federal Express requests, and copying protective orders, reasoning that such tasks could have been delegated to someone with a cheaper hourly rate).

Here, Plaintiffs seek compensation for the claimed 10.5 hours of administrative work that Buchwald spent reviewing the Subpoena, gathering documents, and producing those documents in response to FIDAC's document requests.  (A-13)  Because these tasks are administrative in nature, it would be unreasonable to require FIDAC to pay Buchwald's expert rate for those 10.5 hours, even if he actually spent that much time.

It is, moreover, difficult to accept that assertion of time spent gathering the file. Buchwald's invoices indicate that he spent two hours reviewing the 1.5 pages of document requests; and it does not appear that he produced any documents from outside of his case file.  The Court should not accept the invoice statement at face value.

With respect to deposition preparation time, the courts are divided over whether it is compensable. *See*, *e.g.*, *Benjamin v. Gloz*, 130 F.R.D. 455, 457 (D. Colo. 1990) (finding such time not compensable); *M. T. McBrian, Inc. v. Liebert Corp.*, 173 F.R.D. 491, 493 (N.D. Ill. 1997) (deposition preparation is only compensable in complex cases where there was a considerable lapse of time between the deposition and the expert's work on the case). But, even courts that have awarded fees for preparation time have limited those awards to "reasonable" amounts. *See*, *e.g.*, *Collins v. Village of Woodridge*, 197 F.R.D. 354, 357-58 (N.D. Ill. 1999) (justifying award in part because report was "quite extensive").

In this context, one court defined "reasonable" time as time "necessary to refresh the expert's memory regarding the material reviewed and the opinions reached." *Collins*, 197 F.R.D. at 358. This same court explained that compensation is unreasonable for time an expert spends "reinventing the wheel" when the deposition is close in time to completion of the expert report. *Collins*, 197 F.R.D. at 358 ("It is not our intention to allow the experts to seek compensation for reinventing the wheel.") Given Buchwald's lack of expertise, and the fact that his deposition took place only three weeks after he completed his report, it is clear that spending 19 hours is excessive.

Moreover, many courts have refused to order awards of fees for deposition preparation time unless: (1) the case involves complex issues; (2) the expert report is lengthy; or (3) there is a considerable length of time between the expert's completion of the report and the deposition. *Compare Fisher v. Accor Hotels, Inc.* No. 02-cv-8576, 2004 U.S. Dist. LEXIS 516, at *5-6 (E.D. Pa. Jan. 12, 2004) (refusing to award preparation time because the report was short and it was only written two months before

14

the deposition), *with S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District*, 154 F.R.D. 212, 214 (E.D. Wisc. 1994) (finding preparation time compensable where deposition occurred four to five months after completion of report and report was complex). Buchwald's report was only 9 pages long and, as the following discussion shows, the issues were not complex and the deposition and report were completed within a short time frame. Therefore, preparation time should not be awarded here.

Plaintiffs' characterize the issue presented to Buchwald as complex in order to fall within the line of cases awarding preparation time to experts. (Plaintiffs' Opening Brief, p. 7, D.I. 60) But the issue presented to Buchwald was simple – whether investment advisors pay fees for unsolicited introductions to business partners. And that question has a simple answer, "no." Thus, Buchwald did not need to (and in fact did not) understand the complexities of the underlying transactions. (B-89; Buchwald p. 65)

Plaintiffs also attempt to justify the number of hours Buchwald spent preparing for the deposition by claiming he had to "review[] the extensive factual record and other sources cited in his expert report . . . ." (Plaintiffs' Opening Brief, p. 7, D.I. 60) But, Buchwald had completed his report three weeks before the deposition and should therefore only have required a quick review of the materials to refresh his memory.

Like deposition preparation time, Buchwald's charge for reading his transcript (even if it were a reimbursable category) also seems excessive. According to the invoice, Buchwald spent 6 hours reviewing his own testimony, much of which was very general in nature (involving his background and experience) and could be skimmed very quickly. FIDAC has calculated that Buchwald must have been reading at 71 words per minute, the rate of a first grader. According to the National Institute for Literacy:

> Students should be reading approximately 60 words per minute correctly by the end of first grade, 90 to 100 words per minute correctly by the end of second grade, and approximately 114 words per minute correctly by the end of third grade.

(*See* Novack Declaration ¶¶ 33-34; Frenzel Declaration)

Even when courts have found deposition preparation time to be compensable, they have often reduced both the hourly rate and number of hours of work for which an expert may be paid. *See*, *e.g.*, *New York v. Solvent Chemical Co.*, 210 F.R.D. 462, 471-72 (W.D.N.Y. 2002) (reducing amount of compensable hours to 3 because 17.75 hours is excessive given that deposition took place one week after report was finished); *Boos v. Prison Health Svcs.*, 212 F.R.D. 578, 580 (D. Kansas 2002) (reducing preparation time hourly rate from $500 to $200).

Moreover, Rule 26(b)(4)(C) was created under the assumption that: "[I]t is unfair to permit one side to obtain the benefit of an expert's work for which the other side has paid, often a substantial sum." Fed. R. Civ. P. 26(b)(4)(C) Notes of Advisory Committee, 1970 Amendment (emphasis added). Here, Buchwald has provided, and thus FIDAC has obtained, no benefit since he lacks any experience with the relevant issue. Thus, awarding any compensation would be unreasonable since it would not achieve the purpose for which Rule 26(b)(4)(C) was designed to apply.

## II.    PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES SHOULD BE DENIED

In addition to seeking reimbursement for Buchwald's fees, Plaintiffs are seeking reimbursement for their attorneys' fees and costs incurred in connection with this motion. (Plaintiffs' Opening Brief, pp. 9-10, D.I. 60)  Plaintiffs cite FIDAC's failure to respond to Plaintiff's counsel's letter demanding the identification of case law as its sole evidence for its claim that FIDAC acted in bad faith.  (*Id.*, p. 10 (deeming FIDAC's counsel's actions "baseless, unfounded, unreasonable and vexatious"))    This is a meritless contention.  By email dated May 15, 2007, FIDAC's counsel advised Plaintiffs' counsel that FIDAC's legal position that it need not pay Buchwald's fees was based on Rule 26(b)(4)(C) and the grounds of manifest injustice and unreasonableness.  (A-17-A-18)

FIDAC's refusal to pay is grounded in a solid foundation in both statutory and case law.  It is ironic that Plaintiffs seek to collect fees from FIDAC when it was Plaintiffs that proffered an admittedly unqualified expert witness and thus started this whole exercise in motion.

## <u>CONCLUSION</u>

For the foregoing reasons, FIDAC respectfully requests that this Court deny Plaintiffs' Motion To Compel Payment of Discovery Expenses, and deny Plaintiffs' request for attorneys fees and costs made under 28 U.S.C. § 1927.

Dated:  June 29, 2007                    **EDWARDS ANGELL PALMER & DODGE LLP**


   _/s/ John L. Reed_____
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770 (Phone)
302.777.7263 (Fax)
jreed@eapdlaw.com
jcicero@eapdlaw.com

    - and -

Gerald A. Novack (_pro hac vice_)
Sarah P. Kenney (_pro hac vice_)
**KIRKPATRICK & LOCKHART
PRESTON    GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
212.536.3900 (Phone)
212.536.3901 (Fax)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

UNDERHILL INVESTMENT CORPORATION, *by and* :
*through Stephen D. Peskoff as successor in interest*, and :
STEPHEN D. PESKOFF, *individually*, :
                                 :

                Plaintiffs, :

             v. :    Civil Action No. 06-99-SLR

FIXED INCOME DISCOUNT ADVISORY :
COMPANY, :

                Defendant. :

---------------------------------------------------------------x

## DECLARATION IN OPPOSITION TO PLAINTIFFS'
## MOTION TO COMPEL PAYMENT OF EXPERT DISCOVERY EXPENSES

I, Gerald A. Novack, hereby state as follows:

1.    I am a member of the firm of Kirkpatrick & Lockhart Preston Gates Ellis LLP, co-counsel with Edwards Angell Palmer & Dodge LLP, for the Defendant Fixed Income Discount Advisory Company ("FIDAC"). I submit this Declaration in opposition to "Plaintiffs' Motion To Compel Payment Of Expert Discovery Expenses" arising out of FIDAC's refusal to pay anything more than the $900 it has already paid towards the invoices submitted by Plaintiffs' expert, Lee E. Buchwald, for responding to FIDAC's document requests and being deposed by FIDAC. This Declaration sets forth the factual basis for FIDAC's position. The legal authorities supporting FIDAC's position are discussed in Defendant Fixed Income Discount Advisory Company's Answering Brief In Opposition To Plaintiffs' Motion To Compel Payment of Expert Discovery Expenses (the "FIDAC Answering Brief").

2.    Plaintiffs assert that FIDAC's refusal to pay more than this $900 for the time allegedly spent by Mr. Buchwald responding to the discovery sought by FIDAC is an "arbitrary change of course in bad faith . . . ." (*See* "Opening Brief In Support Of Plaintiffs' Motion To Compel Payment Of Expert Discovery Expense ("Plaintiffs' Opening Brief")," p. 10.) I was the attorney who made the judgment that FIDAC should pay only $900 for Mr. Buchwald's time. I made this judgment after hearing Mr. Buchwald testify and reviewing the invoices he submitted for the time he contends he spent responding to FIDAC's discovery requests.

3.    Mr. Buchwald has testified that he has charged Plaintiffs $37,884.86 for all of his work from the time he was engaged up through the time he submitted his report.

2

(B-12)  Plaintiffs now seek to have FIDAC held responsible to pay Mr. Buchwald another $18,104.15 – or close to 50% of the amount that Plaintiffs have already paid Mr. Buchwald for his work in creating the report.

    4.    Plaintiffs contend that Mr. Buchwald ran up these time charges (at his $450 per hour expert rate) as follows.  In anticipation of taking Mr. Buchwald's deposition, FIDAC requested that he produce certain documents that should have been readily available to him because they were considered by him while preparing his report or related to the terms of his engagement by Plaintiffs.  (A-1-A-11)  Mr. Buchwald now claims it took him 2 hours to review the document requests and 8.5 hours to gather these documents, and Plaintiffs contend that FIDAC should pay Mr. Buchwald $4,725 for doing so.  (A-12-A-13)  Mr. Buchwald also claims that he spent 19 hours preparing to testify about his nine-page report at his three-hour deposition, and that FIDAC should pay $8,550 for this time.  Although not compelled to do so, Mr. Buchwald chose to spend, according to an invoice he prepared, six hours reading the 132-page transcript of his deposition before he signed it, without making any corrections, and he seeks to be paid $2700 for this exercise.  (A-16; B-72-B-107, Buchwald, pp. 1-132)  Mr. Buchwald is also seeking reimbursement for expenses totaling $329.15.  (A-13; A-16)  Mr. Buchwald's charges total $18,104.15, or 47.8% of the $37,884.86 that Mr. Buchwald has charged the Plaintiffs.

<div align="center">

**Plaintiffs' Claim Of A "Blank Check"**

</div>

    5.    Plaintiffs are asserting that, in a March 15, 2007 conversation that I had with one of Plaintiffs' attorneys, I essentially gave Mr. Buchwald a "blank check" to bill

FIDAC whatever he wished. (*See* Plaintiffs' Opening Brief, p. 3) I did no such thing.

That conversation occurred after we had received Mr. Buchwald's report, but before he

had produced any documents pursuant to FIDAC's request or testified. During that

discussion I explained to Plaintiffs' counsel that FIDAC would not agree in advance to

pay whatever Mr. Buchwald charged. I did say that FIDAC intended to act in good faith

and fulfill its obligations under the Federal Rules of Civil Procedure. (This statement

was also made in an email sent to Plaintiffs' counsel that same day, by my associate

Sarah Kenney. (B-11)) I also believe that I said during the conversation that it seemed to

me that $450 per hour for an expert was a reasonable hourly rate. I made it clear,

however, that no final decision would be made until after we had deposed Mr. Buchwald

and seen his invoices.

      6.     At the time we had this conversation, I did not have any idea that Mr.

Buchwald would, in FIDAC's view, essentially admit during his deposition that he was

not qualified to offer the expert opinion he gave, and that he had simply invented the

methodology used in his report to justify his conclusions. Nor could I have anticipated

that Mr. Buchwald would assert that he spent so much time performing the tasks that he

now claims. In FIDAC's view, Mr. Buchwald's report should never have been submitted

because he was so clearly and admittedly unqualified to offer any expert opinion, and on

this ground alone no reimbursement should be required.

      7.     Moreover, Mr. Buchwald's invoices seek reimbursement for non-

reimbursable items, and also raise serious questions about whether he actually spent the

time he claims. If Plaintiffs' motion is not denied in its entirety and outright, then Mr.

4

Buchwald should be compelled to submit to a deposition where the facts relating to his unsworn invoices' claims can be examined.[1]

## Mr. Buchwald's Lack Of Expertise

8.      From the extensive briefing in connection with the parties' respective summary judgment motions, the Court is aware that Mr. Peskoff seeks to be paid for introducing Gen Advisors and Sentry Select to FIDAC. Months after these introductions, Gen Advisors and Sentry Select became business partners of FIDAC. Together with FIDAC, Gen Advisors and Sentry Select developed, conceptualized and marketed new investment vehicles throughout the United States and Canada. Various clients throughout these two countries ultimately chose to invest in those new vehicles, for which FIDAC serves as the investment adviser.

9.      Mr. Peskoff admits that he was never asked by FIDAC to make these introductions of Gen Advisors and Sentry Select, nor promised that if he did so he would be paid anything for the introductions. (B-27, B-30, B-31, B-44, B-53; Peskoff, pp. 40-41, 131, 134-35, 285, 427; B-58-B-60; Baptista, pp. 44-49) Mr. Buchwald's report assumes that there was no promise made by FIDAC to pay Mr. Peskoff anything for these introductions. (B-91; Buchwald, pp. 73-75) The ostensible purpose of the report was to establish that, in the absence of any such promise, it nevertheless was the custom and practice in the industry to pay the fees set out in Mr. Buchwald's report.

---

[1]      FIDAC has paid $900 towards the time that Mr. Buchwald spent having his deposition taken. (A-20-A-21) This payment was not meant to be anything more than a good faith gesture for having Mr. Buchwald appear for his deposition at the offices of FIDAC's counsel for the session, and in no way was intended to imply that a rate of $450 per hour for his "non-expert" testimony is reasonable here.

10.    During his deposition, Mr. Peskoff admitted that he did not know of any

instance in which someone had provided an introduction to a business partner and been

paid a fee for that introduction:

> Q.    . . . Paragraph 37 [of the Complaint] refers to industry
> custom. What industry custom are you referring to?
> A.    I am referring to the type of business that FIDAC
> manages for clients, institutions and others and what is the
> customary fee that is paid, you know, for somebody who
> brings business in to be managed by that account.
> Q.    Can you give me one example of industry custom
> where the person who is paid the fee has merely made an
> introduction to someone who turns out to be a business
> partner to the investment advisor and is not providing their
> own money, their own pool of capital?
>
> A.    I -- in this specific example, I mean, since my
> experience in this area was limited to FBR REIT and the
> circumstances with that and GenCorp and Sentry, those -- you
> know, I -- and that's not my area of expertise, that's the limit
> of my experience. (B-46; Peskoff, pp. 329-30; *see* B-31-B-
> 32; Peskoff, pp. 135-38)

11.    Mr. Buchwald's report does not provide any proof that there exists any

such custom or practice.

12.    Mr. Buchwald's report gives his opinion as to the "fair market value of

Plaintiffs' services . . . ." (B-2; Buchwald Report, p. 1)  For purposes of Mr. Buchwald's

"fair market value" analysis, the relevant "market" is that involving dealings between

investment advisers and intermediaries or finders who introduce potential business

partners to the investment advisers.  (B-86-B-88; Buchwald, pp. 56-64)

13.    During his deposition, Mr. Buchwald admitted his lack of experience and

expertise on the subject at hand:

> Q. ... Is it fair to say that never in your life before this engagement had you ever done anything in the area of determining what is a fair fee for someone who acts as an intermediary for an investment advisor?
> A.   Yes. (B-95; Buchwald, p. 91)

14.   During his deposition Mr. Buchwald also admitted that he has: never worked with any investment advisers; never dealt with any persons or firms who made any introductions to investment advisers; never spoken with any investment adviser about what types of fees they pay and under what circumstances; has no personal experience with fees paid by investment advisers; and he "wouldn't consider [himself] an expert" on the issue of what investment advisory firms pay to finders, not even those who produce clients. (B-74, B-78-B-80, B-83; Buchwald, pp. 7, 24-26, 28-29, 41)  All of Mr. Buchwald's "knowledge" about the fees paid by investment advisers was gained in preparing his report, principally by looking on the internet and at public filings of other investment advisers (which do not deal with the situation presented here, as we shall explain). (B-79-B-80; Buchwald, pp. 28-29)

15.   Even outside the area of investment advisers' practices, Mr. Buchwald could provide no help to Plaintiffs.  Mr. Buchwald explained that, over the course of his 20 years of experience in investment banking, he could not recall a single instance in which a fee has been paid to someone who "introduces A to B where B is simply going to be a future business partner." (B-92-B-93; Buchwald, pp. 77-83)

## Mr. Buchwald's Newly-Invented Methodology

16.   In his deposition, Mr. Buchwald admitted that he invented the methodology used in his report for the purposes of this litigation. (B-99, B-101-B-102, B-103;

7

Buchwald, pp. 108, 115-17, 124)  Mr. Buchwald additionally conceded that: his

methodology was entirely "subjective;" was not based upon any "objective data;" had

never been seen by anyone (other than Plaintiffs' counsel) before this report; he was

unaware of it ever being used by anyone else; and it was a "totally untested formulation."

(B-101, B-103; Buchwald, pp. 113-14, 122-24)  Nor could Mr. Buchwald identify any

support for his methodology in any publications.  (B-101; Buchwald, p. 114)

     17.    As an accompaniment to his new methodology, Mr. Buchwald also coined

a new term: "Business Intermediary Services."  (B-3; Buchwald Report, p. 2)  Mr.

Buchwald admitted that he made up this term for this report, and it is just another way of

referring to Mr. Peskoff having arranged for these introductions to Gen Advisors and

Sentry Select.  (B-95-B-96; Buchwald, pp. 92-93)

     18.    The report states that there are five basic elements in his methodology used

to determine the "fair market value" of these so-called "Business Intermediary Services."

Mr. Buchwald then assigns a percentage weight to each of the elements, based upon such

subjective considerations as he deems relevant.  (B-3-B-8; Buchwald Report, pp. 2-7; B-

101; Buchwald, pp. 114-15)  The report then applies these weighted elements to a

"benchmark" fee of 20% of the management fees earned by FIDAC.  Through the use of

this methodology Mr. Buchwald concludes that "the fair market value of the services

provided in the Gen Advisors and Sentry transactions were 11% and 10% of,

respectively, of FIDAC's fees for those transactions."  (B-10; Buchwald Report, p. 9; *see*

B-5; p. 4)

     19.    The error in using this 20% as a benchmark is addressed in the next section.

<div align="center">8</div>

## Use Of An Improper "Benchmark" Fee

20.     Mr. Buchwald's use of the FBR REIT fee of 20% appears to be based upon misinformation provided to him by Plaintiffs. (B-75-B-76; Buchwald, pp. 10-14)

21.     As fully explained in FIDAC's summary judgment papers, in the FBR REIT transaction, Mr. Peskoff was paid 20% for providing consulting advice to FIDAC with respect to how it should manage its client's account. (Defendant Fixed Income Discount Advisory Company's Answering Brief In Opposition To Plaintiffs' Motion For Partial Summary Judgment, p. 3) As Mr. Farrell testified, the decision to retain Mr. Peskoff to provide these consulting services was motivated in part by Mr. Farrell's (mistaken) belief that Mr. Peskoff had somehow promoted FIDAC to be the manager of the FBR REIT, and thus provided meaningful help in obtaining this new client. The services to be rendered, and for which the 20% was paid, however, were ongoing advice about FBR's thinking about the handling of the FBR account, which Mr. Peskoff was in a unique position to give because he shared office space with FBR and was friendly with its management. (B-63-B-65, B-68; Farrell, pp. 12, 16-18, 29)

22.     There is thus a fundamental difference between the services provided by Mr. Peskoff in connection with the FBR REIT and the services Mr. Buchwald was asked to evaluate in terms of their "fair market value." In the former, Mr. Peskoff's services related to advice with regard to the ongoing management of a client's account. (B-64-B-65, B-68; Farrell, pp. 16-18, 29) Here, Mr. Peskoff never rendered any advice about any client's account. (B-28, B-30-B-32, B-41; Peskoff, pp. 44, 131-32, 137-38, 279)

23.    Mr. Buchwald was evidently told by Mr. Peskoff or his counsel that it was Peskoff who introduced the FBR REIT to FIDAC as a client. (B-75-B-76; Buchwald, pp. 10-14) Based upon this incorrect understanding, Mr. Buchwald believed that Mr. Peskoff had brought the FBR REIT to FIDAC as a client. (B-5; Buchwald Report, p. 4)

24.    Mr. Buchwald also sought to "validate" his 20% benchmark looking to "referral" fees paid by FIDAC and other investment advisers to finders who introduce clients to them. These fee agreements between investment advisers, which are required by federal law to contain specific provisions not found in this case, are disclosed to the Securities and Exchange Commission on Form ADV. (B-8-B-10; Buchwald Report, pp. 7-9) Prior to this engagement, Mr. Buchwald had never before seen a Form ADV. (B-81-B-82; Buchwald, pp. 36-37)

25.    These "referral" fees to which Mr. Buchwald refers are paid to finders who introduce clients. When a client is introduced, all that FIDAC or any other investment adviser need do is immediately start managing the client's money. The situation presented by the introduction of a potential business partner is in no way comparable. As this case illustrates, there is a long period of time during which the investment adviser must conceptualize, develop and market a new product, and undertake the expense, effort and risk of failure of the product and the marketing campaign. Mr. Buchwald was aware that none of these investment advisers or FIDAC reported paying a fee for an introduction to a potential business partner. (B-82-B-87; Buchwald, pp. 39-41, 48, 50-51, 56, 57-58)

26.    Therefore, in FIDAC's view, it is improper to base any conclusion on a benchmark percentage that reflects the fee paid for introducing a client, with a ready pool of capital to be managed, to an investment adviser.

### The Basis For The Refusal To Pay

27.    Based upon all these admissions during Mr. Buchwald's deposition, FIDAC concluded that Mr. Buchwald was not an expert in the field in which he purported to opine, and was not qualified to render an expert opinion on the issue of the "fair market value" of Mr. Peskoff's services in introducing Gen Advisors and Sentry Select to FIDAC.  Therefore, all of FIDAC's effort and expense directed to responding to Mr. Buchwald's expert report could have been avoided had the Plaintiffs not put Mr. Buchwald forward as an expert.[2]  It would be unjust to require FIDAC to relieve Plaintiffs of any obligation they may have to pay Mr. Buchwald for putting FIDAC to the trouble and expense to prove that Mr. Buchwald was not an expert.[3]

### Non-reimbursable And Apparently Excessive Charges

28.    Mr. Buchwald has submitted two invoices, one dated April 1, 2007 and the other dated May 1, 2007.  Those invoices are included as Exhibits 2 and 4 to Certificate of Counsel Regarding Exhibits to Plaintiffs' Opening Brief.  Both invoices charge $450

---

[2]    Since there is no custom and practice to pay for introductions to potential business partners, and it is not surprising that Plaintiffs could not find any other person willing to render an expert opinion that there was. In this connection, we note that Plaintiffs' counsel apparently located Mr. Buchwald because he co-authored an article with one of the lawyers in one of the firms representing Plaintiffs. (B-13-B-14)

[3]    FIDAC has not made an *in limine* motion because of the pendency of its summary judgment motion.  If that motion were granted it would moot the need for the Court to make any formal ruling on the admissibility of the Buchwald report.  Since any trial would be non-jury, a ruling on admissibility could easily be made close to the time of trial or even during trial.

11

per hour. (A-13; A-16) Plaintiffs have not submitted any sworn statement to support these invoices.

29.     Preliminarily, as noted in FIDAC's answering brief on this motion, the time spent by Mr. Buchwald reading his deposition should not be reimbursable in any event. Nor should the expenses Mr. Buchwald incurred be reimbursed by FIDAC. This Declaration will focus, however, on the factual issues and the serious questions raised by the entries on the invoices.

30.     On their face, the invoices appear to reflect an excessive number of hours spent on various tasks. Moreover, Mr. Buchwald evidently seeks to be paid $450 per hour for performing essentially administrative tasks such as gathering his existing case file for production. (A-13; A-16)

31.     Mr. Buchwald's deposition lasted three hours and took place about three weeks after he issued his expert report. The questioning produced 132 pages of testimony transcript. Mr. Buchwald made no changes or corrections to this transcript before he signed it and returned it to FIDAC. (B-72-B-107; Buchwald, pp. 1-132)

32.     Plaintiffs' Opening Brief, citing his May 1 invoice, states that Mr. Buchwald spent "6 hours reviewing and certifying the transcript of the expert deposition . . . ." (Plaintiffs' Opening Brief, p. 4) At $450 per hour, the charge for reviewing his transcript was $2,700.

33.     On its face, six hours seemed an excessive amount of time. Mr. Buchwald's testimony was very general in nature (involving his background and (lack of) relevant experience) and could be skimmed over very quickly. To test this view, FIDAC

calculated the number of words per minute that Mr. Buchwald must have been reading

the transcript, if he took six hours to do so.

34.    If Mr. Buchwald's statement that he spent six hours reading his transcript is

correct, then he was reading at a rate of 71 words per minute. [4] According to the National

Institute for Literacy, a first grader typically reads at this rate of speed:

> Students should be reading approximately 60 words per
> minute correctly by the end of first grade, 90 to 100 words per
> minute correctly by the end of second grade, and
> approximately 114 words per minute correctly by the end of
> third grade. National Institute For Literacy, *Fluency
> Instruction*, available at
> http://www.nifl.gov/partnershipforreading/publications/readin
> g_first1fluency.html (last visited June 28, 2007). (B-15-B-
> 23)

35.    Mr. Buchwald also claims to have spent 8.5 hours (a typical work day for

many people), at a charge to FIDAC of $3,825, to gather his files for production in

response to FIDAC's document requests. (A-13) The materials produced by Mr.

Buchwald should all have been easily gathered by him in less than an hour since they

were presumably considered by him in creating his report or memorializing his

engagement. In any event, Plaintiffs have not offered any explanation why it supposedly

took Mr. Buchwald a full work-day to simply sweep up these papers and put them in a

box to deliver to counsel.

36.    Mr. Buchwald additionally asserts that he spent 19 hours (close to 2 ½

work days) preparing to testify about his nine-page report, which he had just finished

---

[4]    Also submitted in opposition to the Plaintiffs' motion is the Declaration of our firm's paralegal,
Eugenia Frenzel, who performed the words per minute calculation, and who described how it was done
and the results obtained. (Frenzel Declaration)

three weeks earlier. (A-13) For this Plaintiffs seek to force FIDAC to pay $8,550. Mr. Buchwald's claim that he needed so much time is difficult to accept at face value.

37.    As I believe the foregoing discussion shows, FIDAC's refusal to pay has ample basis and is in no way arbitrary or in bad faith, as Plaintiffs contend. (Plaintiffs' Opening Brief, p. 9)

38.    For the foregoing reasons, and those set out in FIDAC's Answering Brief, it is respectfully requested that Plaintiffs' motion to compel be denied, along with the request for attorneys fees and expenses made under 28 U.S.C. § 1927.

39.    If Plaintiff's motion to compel is not denied outright, then it is respectfully requested that the Court order Plaintiffs to produce Mr. Buchwald for a deposition in which he can be meaningfully questioned about the claims he has made in his invoices before any ruling is made on the reasonableness of any categories of otherwise recoverable fees.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on June 29, 2007.

_Gerald A. Novack_
_____
Gerald A. Novack

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

UNDERHILL INVESTMENT CORPORATION, *by*
*and through Stephen D. Peskoff as successor in*
*interest*, and
STEPHEN D. PESKOFF, *individually*,

                Plaintiffs,

                v.

FIXED INCOME DISCOUNT ADVISORY
COMPANY,

                Defendant.

-------------------------------------------------------------x

Civil Action No. 06-99-SLR

## DECLARATION IN OPPOSITION TO THE PLAINTIFFS'
## MOTION TO COMPEL PAYMENT OF EXPERT DISCOVERY EXPENSES

I, Eugenia Frenzel, hereby state as follows:

1.       I am a Paralegal at Kirkpatrick & Lockhart Preston Gates Ellis, LLP.

2.       This Declaration is submitted to outline the steps I took in calculating Mr. Lee E. Buchwald's word per minute reading rate for reviewing his deposition transcript.

3.       I calculated how many words per minute Mr. Buchwald must have been reading if he spent six hours reviewing his 132 page deposition transcript.  Following are the steps I took to arrive at my calculation:

4.       I worked with the electronic version of the transcript from the floppy disk, which was provided by Greenhouse Reporting, Inc. with the final version of Mr. Buchwald's deposition transcript.

5.       I opened the file on the floppy disk which contains Mr. Buchwald's deposition transcript using Microsoft Word.

6.       I deleted  the caption page and the Reporter's Certification page from the document.

7.       Using the Word Count feature of Microsoft Word, under the Tools menu, I ran the word count program.

8.       Microsoft Word counted 25,567 words.

9.      I divided the total word count by 360 minutes (6 hours that Mr. Buchwald spent reviewing his transcript) and arrived at the 71.0194444... rate of words per minute. I rounded off to the nearest whole number to arrive at the reading rate of 71 words per minute.

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.  Executed on June 29, 2007.

_____

Eugenia Frenzel

## <u>CERTIFICATE OF SERVICE</u>

I, John L. Reed, hereby certify that on June 29, 2007 the attached **DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PAYMENT OF DISCOVERY EXPENSES, and supporting documents** were hand delivered to the following persons and electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Joseph Grey, Esq.
Stevens & Lee, P.C.
1105 North Market Street, Seventh Floor
Wilmington, DE 19801


DATED: June 29, 2007                  **EDWARDS ANGELL PALMER & DODGE LLP**


_/s/ John L. Reed_
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 N. Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770
302.777.7263
jreed@eapdlaw.com
jcicero@eapdlaw.com