## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **UNDERHILL INVESTMENT CORPORATION**, *by and through Stephen D. Peskoff as successor in interest* and **STEPHEN D. PESKOFF**, *individually*, | : : : : : : | |
| Plaintiffs, | : : | C.A. No. 06-99-SLR |
| v. | : : | **REDACTED -** |
| **FIXED INCOME DISCOUNT ADVISORY COMPANY**, | : : : | **PUBLIC VERSION 07/03/07** |
| Defendant. | : : : | |

### DEFENDANT FIXED INCOME DISCOUNT ADVISORY COMPANY'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EDWARDS ANGELL PALMER & DODGE LLP**
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770
302.777.7263 (Fax)

**OF COUNSEL:**
Gerald A. Novack (*pro hac vice*)
Sarah P. Kenney (*pro hac vice*)
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS** LLP
599 Lexington Avenue
New York, New York 10022
212.536.3900
212.536.3901 (Fax)

DATED:  June 26, 2007

# **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION...................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDING............................................. 6

SUMMARY OF ARGUMENT ............................................................................. 6

STATEMENT OF FACTS ..................................................................................... 7

A.    The Undisputed Evidence ......................................................................... 7

      (1)    No claim under the Letter or of any oral promises ................................... 10

      (2)    No claim discussed in Underhill's dissolution process........................... 12

      (3)    Praising Farrell as "good" and "generous" ................................. 12

      (4)    No "consulting services" requested or rendered ....................................... 13

B.    Peskoff's Misrepresentations Of The Record Evidence ........................ 14

ARGUMENT ......................................................................................................... 22

I.    THE CLAIMS ARE BARRED BY THE STATUTE OF FRAUDS.................. 22

II.    THE UNDISPUTED FACTS SHOW THERE IS  NO MERIT TO THE UNDERLYING CLAIMS FOR QUANTUM MERUIT AND PROMISSORY ESTOPPEL ................................................................................ 24

III.    FIDAC'S ACCORD AND SATISFACTION DEFENSE PRECLUDES SUMMARY JUDGMENT IN PESKOFF'S FAVOR ................................................................................................................ 27

IV.    ISSUES OF FACT CONCERNING UNDERHILL'S STANDING PRECLUDE SUMMARY JUDGMENT AGAINST FIDAC ............................ 30

CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

**PAGE**

<u>CASES</u>

*Abington Heights Sch. Dist. v. Speedspace Corp.,*
    693 F.2d 284 (3d Cir. 1982) ................................................................. 30

*Bain Builders v. Huntington Nat'l Bank,*
    No. 78442, 2001 Ohio App. LEXIS 3025
    (Ct. App. June 5, 2001) ..................................................................... 31

*Benefit Mgmt. Consultants, Inc. v. Gencorp, Inc.,*
    1996 Ohio App. LEXIS 2013 (Ct. App. May 22, 1996) ...................................... 31

*Candlewood Forest v. Reynolds Constr. Co.,*
    No. L-85-075, 1985 Ohio App. LEXIS 7266
    (Ct. App. Oct. 4, 1985) ................................................................. 31, 32

*Deerfield Specialty Papers, Inc. v. Black Clawson Co.,*
    751 F. Supp. 1578 (S.D.N.Y. 1990) ...................................................... 30

*Grandell Rehabilitation & Nursing Center, Inc. v. Victory Serby,*
    21 A.D.3d 346,  800 N.Y.S.2d 188 (2d Dep't 2005) ........................................ 27

*Gruppo, Levey & Co. v. ICOM Info. & Commc'ns, Inc.,*
    No. 01 Civ. 8922, 2004 U.S. Dist. LEXIS 27320 (S.D.N.Y. June 28, 2004 ........ 22

*Jasin v. Wolfgang Doerschlag Architect,*
    L-84-185, 1984 Ohio App. LEXIS 11859 (Ct. App. Dec. 14, 1984) ................... 32

*Kiraly v. Francis A. Bonanno, Inc.,*
    No. 18250, 1997 Ohio App. LEXIS 4753 (Ct. App. Oct. 29, 1997) .................... 31

*Landers v. State of New York,*
    373 N.E.2d 281, 402 N.Y.S.2d 386 (N.Y. 1977) ................................... 27

*Landis v. Science Mgmt. Corp.,*
    No. Civil Action No. 7483, 1991 Del. Ch. LEXIS 19
    (Del. Ch. Feb. 14, 1991) ................................................................. 22

**<u>STATUTES</u>**

Fed. R. Civ. P. 17(b)...................................................................................................... 30

Ohio Rev. Code. Ann. § 1701.88(A)................................................................................. 31

Ohio Rev. Code. Ann. § 1701.88(D)................................................................................. 31

# INTRODUCTION[1]

FIDAC's opening brief in support of its motion for partial summary judgment ("FIDAC Brief," D.I. 51) cautioned the Court to be skeptical of any argument by Peskoff that the February 2000 Letter, signed in connection with the FBR REIT transaction, supported his claims here. Peskoffs' opening brief in support of their motion for partial summary judgment (the "Peskoff Brief," D.I. 47, 54) shows why that warning was well advised.

The central theme of the Peskoff Brief is that all of Peskoff's actions were induced by his belief that the February 2000 Letter entitled him to a percentage of whatever fees FIDAC ultimately might earn from any investment vehicles FIDAC developed and marketed in conjunction with Gen Advisors and Sentry Select. This theme is directly contrary to Peskoff's deposition testimony in which he admitted that the February 2000 Letter was meant only to document for FIDAC's internal accounting purposes the basis upon which FIDAC was paying Peskoff (through Underhill) in connection with the FBR REIT transaction (A-159, A-182; Peskoff, pp. 325, 427), and Peskoff's further admission that, at the time the Letter was written, there was never any discussion about paying Peskoff for making unsolicited introductions to FIDAC of potential business partners for it (A-93, A-181-A-182[2]; Peskoff, pp. 74-77, 426-27).

---

[1]    This brief uses the same defined terms as were utilized in FIDAC's opening brief in support of its motion for summary judgment. (D.I. 51.) As in FIDAC Brief, for convenience we often refer to Underhill and Peskoff as "Peskoff," and distinguish only when required by the context. Thus, although the causes of action asserted herein belong to Underhill, not Peskoff personally (*see* pp. 30-34 below), for ease of reference we sometimes refer to them as Peskoff's claims.

[2]    All citations to "A-___" herein refer to the Appendix in support of the FIDAC Brief, filed on May 29, 2007. (D.I. 53.)

1

Indeed, the entire record of proof in this case demonstrates that Peskoff's current claim that he was relying upon the February 2000 Letter is nothing but a belated litigation afterthought. More than four years elapsed between the time (in late 2001) that Peskoff first introduced Baptista to Farrell and September 2005, when Peskoff's attorneys wrote to FIDAC contending that FIDAC owed Underhill over $17 million as Peskoff's share of FIDAC's past and anticipated management fees from Premier and the MBS Trusts. (A-30–A-34; Pesk. Ex. 5, p. 4.)

Yet, Peskoff concedes that <u>not once</u> during these four years did he ever mention the February 2000 Letter in discussion with, or in any document sent to, FIDAC asking to be paid for initiating the Baptista and Corsini introductions. Similarly, <u>not once</u> during these four years did Peskoff ever say or write to anyone at FIDAC to tell them that he believed he was <u>entitled</u> to any compensation. Although Peskoff would from time-to-time <u>ask</u> to be paid something, he never once took the position that he was entitled to be paid anything, either by virtue of the Letter, because of any promise made by Farrell or on any other basis. This claim of entitlement first appears in the September 2005 demand letter sent by Peskoff's counsel. (A-82, A-94-A-95, A-132–A-133, A-143, A-182; Peskoff, pp. 30-32, 81-85, 219-20, 263, 427; A-30–A-34; Pesk. Ex. 5; A-94; Peskoff, p. 80.)

The Peskoff Brief also makes repeated statements that there were "numerous promises" by FIDAC to pay Peskoff and that it was these alleged promises that induced Peskoff's performance. (Peskoff Brief, pp. 3 ("numerous promises"), 24 (Farrell promised to pay Peskoff "multiple times"), D.I. 47, 54.) This claim is also demonstrably untrue. (A-100, A-149, A-182; Peskoff, pp. 102, 285, 427.) Peskoff has not cited to any

conversation in which Farrell promised to pay Peskoff for doing something, and Peskoff relied on such promise in providing any services to FIDAC.  Nor has Peskoff cited to any document – and there is none – containing any promise by Farrell relating to Gen Advisors or Sentry Select.

This pattern of baseless and irresponsible allegations found in the Peskoff Brief is a continuation of the cavalier approach to the requirement of candor and good faith that Peskoff has displayed since the outset of this dispute.  The September 9, 2005 demand letter sent by Peskoff's counsel to FIDAC stated that the February 2000 Letter constituted a contract that, by its terms, required FIDAC to pay 10% of any fees earned in connection with transactions arising out of the Gen Advisors and Sentry Select relationships.  (A-30–A-34; Pesk. Ex. 5.)  Counsel's letter asserted that there was a 10% figure specified in the February 2000 Letter, and that in connection with the FBR REIT transaction FIDAC had paid Underhill "10% of FIDAC's fees . . . all **precisely as contemplated by the February 2000 [Letter] agreement**."  (Pesk. Ex. 5, at p. 2) (emphasis added.)

As the documentary evidence shows, this contention was baseless.  Even the most cursory reading of the February 2000 Letter discloses that it does not specify any percentage that Underhill was to be paid.  (A-35–A-37; Pesk. Ex. 6.)  Similarly irresponsible and baseless was the assertion in counsel's letter that Peskoff was paid 10% of FIDAC's fees from the FBR REIT.  (A-30-A-34; Pesk. Ex. 5, p. 2.)  In fact, Underhill was paid 20%.  (A-79; Peskoff, pp. 18-19.)

This complete disregard for the most obvious facts was further evidenced by the original Complaint in this action, which asserted as Count I a breach of contract claim based upon the failure to pay the 10% fee allegedly specified in the February 2000 Letter.

(A-43–A-51; Pesk. Ex. 21, p. 5.)   The Complaint alleged that the "language of the [Letter] Agreement and the parties' course of dealing demonstrate parties' joint intent that Underhill was to receive ten percent (10%) of the revenues received by FIDAC." (A-44; Pesk. Ex. 21, p. 2.)   The Complaint further alleged that FIDAC had "breached the Agreement by failing and refusing to pay Underhill or Peskoff 10% of all revenues it has received . . . [resulting] from Underhill introductions."   (A-47; Pesk. Ex. 21, p. 5.)   This breach of contract Count was dropped, and an Amended Complaint filed, only after Peskoff was forced to concede during his deposition that these allegations upon which Count I was based were untrue.   (*See* A-98–A-101, A-134, A-160–A-161; Peskoff, pp. 96-106, 226, 330-33.)

These are only some of the examples of unfounded allegations made by Peskoff. In this brief, FIDAC will expose his most recent egregious and significant misstatements, and will demonstrate that there can be no genuine dispute that: (a) the introductions of Baptista and Corsini were done wholly on Peskoff's own initiative; (b) Peskoff admittedly provided no post-introduction services at all with respect to Sentry Select; and (c) with respect to the Gen Advisors transaction, the only post-introduction services that Peskoff claims to have provided were to listen to his friend Farrell's complaints about the pace and expense of the development process for Premier, and sometimes pass these complaints on to Baptista.

The evidence is also undisputed that:  (a) Peskoff was never promised that if he made these introductions, or listened to Farrell's complaints, Peskoff would be paid a share of FIDAC's management fees (A-149, A-182; Peskoff, pp. 285, 427); and

(b) Peskoff never performed any services for FIDAC with respect to Gen Advisors or Sentry Select in reliance upon any promises of payment (A-147; Peskoff, p. 279).

The undisputed evidence also established that Farrell never had any reason to think that by meeting Baptista and Corsini, or complaining to his "friend" Peskoff about the delay and expense in developing Premier, Farrell was somehow making Peskoff FIDAC's partner, entitled to share in the management fees that FIDAC eventually might earn if Premier and the MBS Trusts turned out to be successful. Although the Peskoff Brief contends that FIDAC previously had paid Peskoff for performing services that Peskoff contends were "virtually identical" to those allegedly provided by Peskoff here, that is not correct.

Peskoff earned the fees paid in connection with the FBR REIT transaction by providing information and advice to FIDAC, during the life of the FBR REIT account, concerning the thinking and goals of the client's executives at Friedman Billings Ramsey ("FBR"), with whom Peskoff shared offices and had a relationship. That advice assisted Farrell in managing the FBR REIT account. (A-266, A-269; Farrell, pp. 17-18, 29.) Here, Peskoff never even knew the identity of the many, many members of the public who eventually became FIDAC's clients with Premier and the MBS Trusts and never provided any advice about the management of any of these client accounts. (A-108–A-109, A-147; Peskoff, p.p. 135, 137-38, 279.)

As more fully set out in FIDAC's opening brief and below, the same reasons that entitle FIDAC to summary judgment dismissing the Complaint require that Peskoff's motion for partial summary judgment be denied.

There are two additional and independent reasons why Plaintiffs are not entitled to summary judgment. One reason is that the claims in the Amended Complaint are time-barred under the relevant Ohio statute governing claims brought by Ohio corporations (such as Underhill) that have been dissolved. Another ground is FIDAC's accord and satisfaction defense. At the very least, the proof relating to these grounds is sufficient to raise material issues of fact which, if resolved favorably to FIDAC, would completely defeat Underhill's causes of action that Peskoff here seeks to enforce.

## NATURE AND STAGE OF THE PROCEEDING

This is FIDAC's opposition to Plaintiffs' motion for partial summary judgment. FIDAC's motion for summary judgment is currently pending.

## SUMMARY OF ARGUMENT

Plaintiffs' motion for partial summary judgment as to liability on Counts I and II of the Amended Complaint (quantum meruit and promissory estoppel, respectively) should be denied on four independent grounds:

(1)      Both claims are barred by New York's Statute of Frauds.

(2)      The undisputed facts show there is no merit to the underlying claims for quantum meruit and promissory estoppel in any event.

(3)      FIDAC's accord and satisfaction defense precludes summary judgment against FIDAC.

(4)      Issues of fact concerning Underhill's standing preclude summary judgment against FIDAC.

## STATEMENT OF FACTS

In section "A" below, we briefly recapitulate the actual undisputed record evidence. In section "B," we point out the more egregious factual misrepresentations by Peskoff.

### A.    The Undisputed Evidence

**THE FBR REIT transaction and the Letter**. As explained in the FIDAC Brief (D.I. 51), in early 2000, Peskoff was asked by a senior FBR executive to make a phone call to Farrell, inquiring whether he would agree to manage the FBR REIT account. This request to Peskoff came out of the blue, in the sense that Peskoff had not been lobbying with anyone at FBR to switch the investment advisers for the FBR REIT account to FIDAC. Peskoff was asked to make the call only because FBR management knew that Peskoff was friendly with Farrell, and FBR was concerned that Farrell might be reluctant to become involved because FBR had originally committed to give this account to FIDAC, but then did not do so. (A-92–A-93; Peskoff, pp. 73-75.)

After Farrell learned that FIDAC would be given the opportunity to manage the FBR REIT account, he telephoned Peskoff and told him that he would send him a document that would allow Peskoff to earn a fee from this transaction. (A-93; Peskoff, pp. 75-77.) Farrell testified that "I specifically wanted to have something in writing that designated him as a consultant for accounting purposes so that I could pay him fees and demonstrate some sort of obligation for those fees." (A-267; Farrell, p. 21.) Peskoff agreed that the Letter was solely intended to document the transaction for FIDAC's accounting purposes. (A-159; A-181–A-182; Peskoff, pp. 325-26, 426-27.)

- 7 -

Farrell's decision was partially motivated by his mistaken sense of gratitude for Peskoff having helped FIDAC obtain the FBR REIT as a new client account. (It was only in this litigation that Farrell learned the truth, that Peskoff was asked to place this call and did not lobby for FIDAC with FBR (A-264; Farrell, pp. 12-13)). As Farrell explained, Peskoff could provide valuable services in advising Farrell as to how to keep FIDAC's new client happy: "Steve, because of his presence in the FBR structure, was supposed to keep me advised of any changes in direction of the company or represent our interest and keep us best informed as to . . . what the desire of the client was." (A-266; Farrell, p. 17.) Peskoff was "managing the client because he had day to day contact with the client." (*Id.* at p. 18.)

Consistent with this obligation on Peskoff's part, the February 2000 Letter drafted by Farrell did not mention paying any finder's fee, then or in the future. (A-35–A-37; Pesk. Ex. 6) Nor did it provide that Peskoff had already earned the fees contemplated by the Letter. By its terms, the Letter required Peskoff to provide services in the future, stating that Peskoff was to provide FIDAC with "such consulting services as they shall agree from time to time. ..." (*Id.* at ¶ 1.) Peskoff's consulting fees were tied to the services he was to perform with respect to FIDAC's "client" and its client's "accounts." (*Id.*)

Peskoff's deposition testimony establishes that he knew that the Letter was simply intended to document the basis for paying him a fee in connection with the FBR REIT transaction. (A-182; Peskoff, p. 427.) Testifying to his understanding based upon his brief conversation with Farrell (discussed above), which occurred shortly before the Letter arrived, Peskoff stated as follows:

> Q.    And you understood at the time you got it that the [L]etter was intended to provide a written record as to what was the reason you were being paid money by FIDAC in connection with the investment management fees it was earning from FBR REIT; right?
> A.    That is correct.

(A-182; Peskoff, p. 427.)

Similarly, Peskoff admitted that the "accounts" referred to in the February 2000 Letter were any accounts opened by the FBR REIT:

> Q.    All right.  So basically you are saying that this agreement had to be interpreted in light of what had been done already with the FBR REIT?
> A.    That's the only way I could interpret it.  Okay?
> Q.    Okay.  All right.
> A.    Okay?
> Q.    I got it.
> A.    Okay?
> Q.    So in the case of the FBR REIT, "the account" [referred to in the Letter]  would be the account that contains the money that the FBR REIT was having managed by FIDAC; right?
> A.    I would agree.
> Q.    So it is the pool of money that has got the name on it FBR REIT account?  That is what we are talking about when we say "the account"?
> A.    I would think so.
> Q.    That's the only understanding in light of the history of the transaction that led to this document?
> A.    Correct.

(A-159; Peskoff, pp. 325-26.)

In short, Peskoff admits that the Letter was intended to provide for fees based upon consulting services requested and agreed to by FIDAC with respect to the management of client accounts.  There was never any discussion about the Letter covering any unsolicited introductions to possible business partners, such as occurred here.  (A-82, A-93–A-94, A-181–A-182; Peskoff, pp. 31, 75-78, 426-27.)

- 9 -

**No oral promises to pay.** Peskoff has conceded in his deposition that Farrell never orally promised to pay him for any introductions, whether to business partners or clients. (A-149, A-181–A-182; Peskoff, pp. 285, 426-27.) In the brief conversation with Farrell leading up to the sending of the February 2000 Letter, there was no such promise. (A-93, A-182; Peskoff, pp. 75-77, 427.) Nor was there any such promise at any later time. Peskoff conceded that, after the Letter was received, Farrell <u>never</u> promised to pay Peskoff for bringing in any new business:

> Q.    And there was no discussion at all at about the time this letter was sent to you by Mr. Farrell other than what you previously testified to; correct?
>
> A.    That is correct.
>
> Q.    And there was no later oral agreement that you reached with Mr. Farrell at any time in which he said, "I will pay you X or Y or anything else for bringing me new business from somebody"; isn't that correct?
>
> A.    That is correct.

(A-182; Peskoff, p. 427.)

**Peskoff's inconsistent contemporaneous conduct.** Throughout the four-year period between Baptista's introduction to Farrell and September 2005, Peskoff never acted in a manner consistent with his current claim that he believed he was entitled to any compensation. To the contrary, all of Peskoff's actions were inconsistent with the position he has adopted for this litigation.

### (1)   <u>No claim under the Letter or of any oral promises</u>

<u>Not once</u> during these years when Peskoff was asking to be paid something  for his involvement (A-127, A-129; Peskoff, pp. 199, 204; A-278–A-279; Farrell, pp. 68-69), did Peskoff even <u>mention</u> the Letter or any alleged oral promise by Farrell to pay Peskoff (A-97, A-82, A-94, A-95, A-132–A-133, A-182; Peskoff, pp. 93, 30-32, 80-85, 219-20,

427). Had Peskoff truly believed what he now contends, there can be no doubt that Peskoff would have brought up the February 2000 Letter with FIDAC.

Of particular significance is Ronald Kazel's April 20, 2004 letter to Peskoff. (A-42; Pesk. Ex. 16.) Kazel's letter was sent in response to Peskoff's April 12, 2004 letter asking for money for introducing Baptista. (A-41; Pesk. Ex. 15.) Peskoff's letter made no mention of any right to more money, either under the February 2000 Letter or based upon any promise by Farrell. (*Id.*)

After checking with Farrell, Kazel responded on April 20 flatly rejecting Peskoff's request, and told Peskoff that he would receive nothing more than the $30,000 paid several months earlier.[3] (A-42; Pesk. Ex. 16; A-257; Kazel, pp. 90-91.) Peskoff never wrote back or called anyone at FIDAC to complain that this refusal to pay was contrary to the provisions of the Letter, or a breach of any alleged oral promise made by Farrell. (A-143; Peskoff, p. 262.) Nor did Peskoff ever again ask for any more money (A-132–A-133; Peskoff, pp. 219-220), and Peskoff maintained what he described as a "close" friendship with Farrell thereafter, without any complaints that he had been wronged by Farrell (A-123; Peskoff, p. 180) .

It was only with the surprise arrival of the September 2005 demand letter sent by Peskoff's counsel – almost 1½ years later – that the first claim of some entitlement under the Letter appeared. (A-82, A-94–A-95, A-132–A-133, A-143; Peskoff, pp. 30-32, 80-85, 219-20, 262; A-30–A-34; Pesk. Ex. 5.)

---

[3]    It will be recalled that during the last few months of 2003, Farrell yielded to the hardship entreaties of Peskoff and his friend Spencer Brown, and FIDAC paid Peskoff a one-time fee of $30,000. (A-127, A-129; Peskoff, pp. 199, 204; A-273, A-227–A-279, A-281–A-283, A-288; Farrell, pp. 46-47, 63-69, 80-82, 84-85, 105) (*See* FIDAC Brief, pp. 17-19, D.I. 51, and the discussion of accord and satisfaction below, at pages 27-30).

### (2)   No claim discussed in Underhill's dissolution process

According to Peskoff, Kazel's April 20, 2004 letter constituted a wrongful repudiation of a multi-million dollar obligation by FIDAC. (A-30–A-34; Pesk. Ex. 5). This claimed breach by FIDAC would therefore surely have been uppermost in Peskoff's mind when he began having conversations concerning the dissolution of Underhill the very next month, in May 2004, and those discussions continued until Underhill was dissolved in November 2004. (B-45-B-46; Cocke, pp. 21-23)

Yet, Peskoff concedes that he never once made an allusion to any such claim against FIDAC to either his lawyers or to the accountants advising him on the Underhill dissolution and effecting it. (A-156, A-168–A-169; Peskoff, pp. 313-14, 374-76.) No provision was made in any of the dissolution documents for the survival, existence or transfer of any alleged claim against FIDAC. (B-72, B-74, B-79, B-85; Devlin, pp. 37, 42-44, 62, 86-87.) The failure to do so further supports the conclusion that Peskoff's current claim that FIDAC breached some obligation is nothing but a litigation afterthought.

### (3)   Praising Farrell as "good" and "generous"

Similarly, if Kazel's April 20 letter constituted the wrongful repudiation that Peskoff now claims, Peskoff's view of Farrell would have been negatively effected. Yet, Peskoff continued to consider himself a close friend of Farrell's. Peskoff has described his relationship with Farrell at the time as "very close" and "intimate." (A-123; Peskoff, p. 180; *see* A-267; Farrell, p. 24 ("[T]here were a lot of discussions about family events or things going on at any time with [Peskoff]").) Concrete evidence of Peskoff's view

that Farrell had done him no wrong is seen in the note Peskoff wrote to Farrell, in the Spring of 2005, praising Farrell as a "good and generous friend." (A-38; Pesk. Ex. 7.)

### (4) No "consulting services" requested or rendered

Peskoff concedes that he was never requested by Farrell or anyone else at FIDAC to find business partners for FIDAC, and that the introductions to Baptista and Corsini were arranged by Peskoff entirely on his own initiative. (A-149, A-181–A-182; Peskoff, pp. 285, 426-27.)

Similarly, Peskoff admits that he never performed any post-introduction services for FIDAC with respect to Sentry Select. (A-108; Peskoff, p. 137 ("[T]here wasn't a place for me other than me being willing, and I was turned down consistently to saying that I can provide other kinds of services if you need them to get this [Sentry Select] deal finalized"); *see* A-147; Peskoff, p. 279.)

With respect to Premier, the undisputed evidence was that Peskoff did nothing at all, except listen to, and sometimes pass on, the complaints of his friend Farrell. Baptista's testimony concerning what Peskoff did was as follows:

> Q. What is your understanding of what Mr. Peskoff did with regard to the eventual creation of Premier beyond introducing you to Mike Farrell?
> A. He introduced us to -- let me answer it this way: He made an introduction to Mike Farrell, ran the first full meeting with everyone, getting everyone on board. As far as the technical aspects of the fund or raising money for the fund, nothing.
> Q. I'm correct that Mr. Peskoff didn't go out and meet with the insurance brokerage community?
> A. No.
> Q. He didn't go out and meet with the insurance companies?
> A. No.

> Q.   He didn't go out and meet with the corporations and banks that were going to make the determination of what investment vehicle to use if they went into the life insurance products?
> A.   No.
> Q.   He didn't meet with the banks that were doing the wrapping?
> A.   No.
> Q.   Is it fair to say all he did was introduce you to Mr. Farrell and help arrange for that first meeting in January?
> A.   Well, just one other thing, and it's not on the technical side. Every time there was a problem, Mike Farrell would call him saying, "It's costing me a fortune. Tell Ernie he's got to get his act together, this, that, problems." He acted as I'll call it Mike Farrell's representative when there was a problem that Mike Farrell didn't want to call. For about a year, when Mike got pissed off, pardon the language, about the cost or the time and this wasn't happening first enough, so on and so forth, I got a call from Steve, and that's usually every two weeks or at least once a month for a year.

(A-210; Baptista, pp. 94-95.)

Peskoff does not contend that he ever warned his close friend Farrell that if Peskoff listened to Farrell's complaints the price Peskoff expected to be paid was a percentage of the management fees earned by FIDAC if and when Premier was ultimately successful.

**B.    Peskoff's Misrepresentations Of The Record Evidence**

In this section, we point out the more egregious misstatements and misrepresentations made by Peskoff.

**The FBR REIT transaction and the Letter**. Peskoff asserts that:

> Peskoff helped bring FIDAC together with FBR and **transition** the management of the FBR REIT from Blackrock to FIDAC … Farrell recognized that FIDAC had an **obligation** to pay Peskoff for the services rendered in connection with the FBR transaction.

(Peskoff Brief, pp. 4-5, D.I. 47, 54) (emphasis added.)  In fact, Peskoff did nothing to "transition" the management of the FBR REIT account. All that Peskoff did was place a

- 14 -

single phone call, at the unsolicited request of FBR, asking if Farrell would meet with FBR. (A-93; Peskoff, pp. 74-75.)

The assertion that Farrell felt he had an "obligation" to pay Peskoff for making this call is false. Peskoff has testified that Farrell's decision to pay him was entirely "voluntary on [Farrell's] part" (A-100; Peskoff, p. 102), and completely within Farrell's discretion (A-99; Peskoff, p. 101).

Peskoff additionally contends that he "performed almost identical services in connection with the Sentry Select and Gen Advisors transactions as he performed in the FBR transaction," for which Peskoff was paid by FIDAC. (Peskoff Brief, p. 22, D.I. 47, 54.) In fact, the services were not "identical."

In connection with the FBR REIT transaction, Peskoff earned his fees by advising FIDAC concerning the handling of the FBR REIT account. (A-266, A-269; Farrell, pp. 12-18, 29.) Here, Peskoff concedes that he did <u>nothing</u> by way of consulting services with respect to the MBS Trusts and Sentry Select. (A-108–A-109; Peskoff, pp. 137-38) With respect to Gen Advisors, Peskoff had no ability to provide any assistance in the development or marketing of Premier.[4] All that Peskoff claims to have done was to lend a sympathetic "ear" to his friend Farrell's complaints about how expensive and time consuming the Premier development process had become. (*See* Peskoff Brief, pp. 7-8, D.I. 47, 54.) In contrast to his role with respect to the FBR REIT account, Peskoff never

---

[4]    Peskoff admits that he had no experience, knowledge or understanding of the products, regulatory environment or laws governing Premier and was not in a position to provide any assistance to FIDAC (A-100; Peskoff, p. 104 (stating that investment products for the insurance industry are "stuff that [Peskoff] did not have any particular expertise in"); A-160; Peskoff, pp. 329-30 (stating that his experience was limited to circumstances like the FBR REIT rather than Premier and the MBS Trusts).)

provided any advice as to how FIDAC should deal with the clients invested in either the MBS Trusts or Premier.  (A-147; Peskoff, p. 279.)

It is frivolous to suggest that the services for which Peskoff was compensated in the FBR REIT transaction were in any meaningful way similar, much less "identical," to what Peskoff has done here.

Peskoff also asserts that "industry custom and FIDAC's own practice of paying finders such as Peskoff" support his claims here.  (Peskoff Brief, p. 2, D.I. 47, 54.)

# REDACTED

Rounding out his argument, Peskoff makes the extraordinary statement that Gen Advisors and Sentry Select were valuable "client" introductions to FIDAC that justify payment in accordance with industry custom:

> Peskoff made extremely valuable **client introductions** to FIDAC with the expectation that he would be paid for his services, as is customary in the industry and the parties' past course of dealings."

(Peskoff Brief, p. 3, D.I. 47, 54) (emphasis added.)

This entire line of argument is yet another instance of a deliberate misrepresentation of the record evidence.

Investment advisors do sometimes enter into finder's fee agreements with parties who introduce new clients who open accounts for investment advisors like FIDAC to manage.  As explained in the FIDAC Brief (p. 5), federal law requires that these finder's

- 16 -

fee agreements contain specific provisions (not found in the Letter), and they also provide that if a "finder" brings a client to the investment adviser then the finder will be paid a specified fee. The Letter contains no such provisions. Although Peskoff states that he made "valuable client introductions," this statement is untrue. Neither Gen Advisors nor Sentry Select was a client of FIDAC. Both Gen Advisors and Sentry Select were potential business partners working with FIDAC to find a way to attract clients.

With respect to Premier, Peskoff admitted that it was others that went out and found the clients, not him:

> Q.    In the case of Premier the clients of the fund or FIDAC's clients were insurance companies, savings banks, and what was the third you described?
>
> A.    Other institutions, as far as I was – other large financial institutions.
>
> Q.    Am I correct that you did not introduce any of those institutions to FIDAC?
>
> A.    You are correct.
>
> Q.    Okay. Am I correct that it was either Mr. Baptista or Mr. Messner that did that?
>
> A.    That's correct.
>
> Q.    All you did was introduce Mr. Baptista and/or Mr. Messner. Did you introduce Mr. Messner as well or was it --
>
> A.    Yes, it came as a package.
>
> Q.    Okay. You introduced Mr. Baptista and Mr. Messner to FIDAC; is that right?
>
> A.    Correct.
>
> Q.    Okay. And then after you introduced Mr. Baptista and Mr. Messner to FIDAC, there were a series of aborted attempts to create a product, and eventually Premier was created; right?
>
> A.    I think that's a fair statement.
>
> Q.    Okay. And when Premier was created, it was Mr. Baptista and Mr. Messner that went out and found the clients or the people

who invested the money in the fund; correct?

A.    Correct.

(A-107; Peskoff, pp. 131-32.)

Peskoff similarly testified with respect to Sentry Select:

Q.    . . . The money that eventually finds it way into the pool that is managed by FIDAC comes from many, many, many individuals throughout Canada who invest in the trusts. And Sentry along with the investment bankers raises the money from these many, many, many individuals. Is that right?

A.    You are hired.

Q.    Okay. Now, is it correct that you did not introduce any of these many, many, many individuals to FIDAC and other people found the money that FIDAC was going to be managing as part of this trust?

A.    That's correct.

(A-108; Peskoff, p. 135.)

**The alleged oral promises to pay**. The Peskoff Brief argues that there were "numerous promises" by FIDAC to pay Peskoff:

FIDAC made numerous promises to pay Peskoff. (Peskoff Brief, p. 3)

*        *        *

Despite acknowledging that Peskoff made the vital introduction [to Baptista] and promising to pay him for same, FIDAC has refused to pay . . . . (Peskoff Brief, p. 8, D.I. 47, 54.)

*        *        *

FIDAC promised to pay Peskoff for his services concerning Gen Advisors multiple times. (Peskoff Brief, p. 24, D.I. 47, 54.)

These allegations are also unsupported by any record evidence.

The first alleged promise to which Peskoff points is that supposedly embodied in the February 2000 Letter. (Peskoff Brief, p. 24, D.I. 47, 54.) But, as previously

- 18 -

demonstrated, the Letter contains no promise to pay for unsolicited introductions.  (A-35–A-37; Pesk. Ex. 6.)

With respect to Sentry Select, Peskoff does not allege any other promise to pay.

The only other promise alleged by Peskoff relates to Gen Advisors.  (*See* Peskoff Brief, p. 25, D.I. 47, 54.)  Peskoff contends that there was a "second promise of payment" made when Farrell allegedly said to Baptista, at one of the initial meetings, that Gen Advisors should not compensate Peskoff for any introduction and that Peskoff would be FIDAC's responsibility.  (*Id.*)  During his deposition, Peskoff testified precisely to the contrary:

> Q.    Am I correct that at that time Mr. Farrell made no promise
> to you to pay anything?
>
> A.    That is correct.

(A-182; Peskoff, p. 429.)

In any event, Peskoff could not have introduced Baptista to Farrell in reliance upon any promise at this meeting because the introduction had already been made.[5]

**The alleged consulting services**.  Not only did Peskoff not provide any services in connection with the development of Sentry Select and Premier, when he did offer to provide his services Farrell rejected the offer.  As Peskoff testified: "Underhill offered to do certain things with both companies [Gen Advisors and Sentry Select], and they said they didn't need our help."  (A-147; Peskoff, p. 279; *see also* A-108 ; Peskoff, p. 137) (

---

[5]    This statement was allegedly made at the first or second meeting of the parties, when it was anticipated that a rather straightforward venture with ING was contemplated, not the two-year long product development that ultimately followed.  The ING venture never took place, and Farrell's statement is thus irrelevant to the present case.  (A-85, A-107, A-110; Peskoff, pp. 44, 132, 145; A-243; Kazel, pp. 35-36; A-275, A-285; Farrell, pp. 55, 95.)

"I was turned down consistently to saying that I can provide other kinds of services if you need them to get this deal finalized").)

Other than "put[ting] Corsini in contact with Farrell," Peskoff does not make any claim that he ever provided any consulting services with respect to Sentry Select. (*See* Peskoff Brief, pp. 8-9, D.I. 47, 54.)

With respect to Premier, the Peskoff Brief seeks to give the impression that Peskoff provided invaluable consulting services to FIDAC:

> "Peskoff then introduced FIDAC to Baptista, attended meetings and took telephone calls trying to help create and maintain a new business relationship between Gen Advisors and FIDAC." (Peskoff Brief, p. 25, D.I. 47, 54.)

> \*      \*      \*

> "During the course of those months [after the Gen Advisors agreement was signed but before Premier launched], Peskoff received frequent calls from Farrell about the Gen Advisors deal wherein Farrell would voice his frustrations with the deal. For example, Peskoff was called in to help resolve interpersonal issues between FIDAC and Gen Advisors." (Peskoff Brief, p. 7, D.I. 47, 54.)

> \*      \*      \*

> "Peskoff also fielded numerous telephone calls from both parties regarding the Gen Advisors transaction and personally attended at least one meeting between FIDAC and Gen Advisors." (Peskoff Brief, p. 22, D.I. 47, 54)

> \*      \*      \*

> "Peskoff dedicated his time and energies marketing FIDAC's services and capabilities to Ernie Baptista and persuading Baptista to pursue a business venture with FIDAC. . . . Peskoff continued to make himself available to both FIDAC and Gen Advisors to help maintain the relationship and ease problems that arose prior to

consummation of the transaction."  (Peskoff Brief, p. 25, D.I. 47, 54)

*     *     *

"With respect to the Gen Advisors transaction, Peskoff also personally flew to New York to participate in at least one joint meeting with FIDAC and Gen Advisors and took innumerable telephone calls from both Baptista and Farrell as the parties hashed out the terms of the deal."  (Peskoff Brief, p. 20, D.I. 47, 54)

The record evidence, however, shows that Peskoff did nothing to advance the project other than to attend an early meeting where he made no substantive contribution, and thereafter listen to Farrell's complaints and sometimes pass them on to Baptista. (A-264, A-267, A-282-83; Farrell, pp. 11, 24, 84-85; A-85; Peskoff, p. 42.)

# ARGUMENT

## I.    THE CLAIMS ARE BARRED BY THE STATUTE OF FRAUDS

Peskoff cannot succeed on his motion for partial summary judgment for the same reasons that FIDAC is entitled to summary judgment dismissing the Plaintiffs' Complaint.  The FIDAC Brief (D.I. 51) has demonstrated that:  under Delaware conflicts principles New York's Statute of Frauds applies here;[6] the Statute of Frauds covers not only pure finder's fee claims based solely on introductions, but also claims that the plaintiff should be compensated for allegedly "assisting in the negotiation or consummation of the transaction;" and New York's Statute bars claims in quantum meruit as well.  (*See* FIDAC Brief, p. 25-27, D.I. 51.)[7]

To avoid summary judgment, Peskoff must produce a writing or writings that establish that FIDAC employed the plaintiff to perform the services in dispute.  *Gruppo, Levey & Co. v. ICOM Info. & Commc'ns, Inc.*, No. 01 Civ. 8922, 2004 U.S. Dist. LEXIS 27320, at *36 (S.D.N.Y. June 28, 2004); *Landis v. Science Mgmt. Corp.*, No. Civil Action No. 7483, 1991 Del. Ch. LEXIS 19, at *13 (Del. Ch. Feb. 14, 1991).

Peskoff relies on three documents to satisfy the writing requirement: (1) the February 2000 Letter; (2) Kazel's April 20, 2004 letter to Peskoff denying any obligation to pay anything to Peskoff; and (3) a copy of the Letter of Intent between FIDAC and Sentry Select.  (Peskoff Brief, p.18, D.I. 47, 54.)  Peskoff never explains how these

---

[6]    In the FIDAC Brief, FIDAC pointed out that New York's Statute of Frauds is considered a fundamental policy when examining New York's contacts for a choice of law analysis. (FIDAC Brief, pp. 27-28, D.I. 51.)  Plaintiffs claim it is not.  (Peskoff Brief, pp. 14-15.)  But the cases they cite all involve a choice of law provision, which is absent here because the Letter containing the choice of law clause relied upon by Peskoff does not govern this dispute.

[7]    As explained in the FIDAC Brief, a plaintiff cannot invoke promissory estoppel to defeat application of the Statute of Frauds unless there is a showing of unconscionable injury, and the loss of a fee does not constitute any such injury.  (FIDAC Brief, pp. 29-30, D.I. 51.)

writings satisfy the Statute of Frauds, simply arguing that "there is a series of writings . . . that individually and/or collectively satisfy New York's statute of frauds." (Peskoff Brief, p. 18, D.I. 47, 54.)

As previously explained, the Letter was limited to the FBR REIT transaction, and it has nothing to do with the Gen Advisors and Sentry Select transactions, which are wholly different from the FBR REIT transaction. (A-35–A-37.)

The Sentry Select-FIDAC Letter of Intent does not mention Peskoff or Underhill. And in no way does it reflect any agreement between FIDAC and Peskoff or Underhill. (B-30–B-33.)

Peskoff's reliance on Kazel's letter is mystifying. In that letter, Kazel makes no reference to any agreement entitling Peskoff to any compensation and denies that there existed any agreement to pay him anything:

> Mike discussed with you in December 2003 that he would compensate you for your limited involvement in these products and a check was issued to you on December 22, and cashed by you, for $30,000. It was also explicitly explained that there would be no further consideration paid to you and this letter serves as a further reiteration of that position.

(A-42; Pesk. Ex. 16.)

II.    **THE UNDISPUTED FACTS SHOW THERE IS NO MERIT TO THE UNDERLYING CLAIMS FOR QUANTUM MERUIT AND PROMISSORY ESTOPPEL**

Peskoff's motion for partial summary judgment must also be denied (and FIDAC's summary judgment motion granted) because the undisputed facts show that there is no merit to Peskoff's underlying claims for quantum meruit and promissory estoppel.

The FIDAC Brief established that Peskoff could not prove a quantum meruit or promissory estoppel claim under New York law unless he could demonstrate: that he acted in reliance upon a request or promise from FIDAC that induced Peskoff's actions. (FIDAC Brief, pp. 30-31, D.I. 51.)  Peskoff must also show that FIDAC had reason to be on notice that Peskoff expected that he would be paid.  (Peskoff Brief, p. 18, D.I. 47, 54.) (Although Delaware law should not apply here, even if it did, Peskoff's claims would fail.  The same basic showing must be made under Delaware law.  (*See* Peskoff Brief, pp. 16-17, D.I. 47, 54.))

The Peskoff Brief sets out six different reasons why FIDAC supposedly "was on notice that Peskoff made the Sentry Select and Gen Advisors introductions with the expectation of being paid for his services." (*Id.* at pp. 22-23.)

Peskoff first relies upon the February 2000 Letter.  (Peskoff Brief, p. 22, D.I. 47, 54.)  Besides the fact that Peskoff understood the Letter had no application here at all, he could in no event have relied upon it for another reason.  The Letter's payment obligation is triggered only when the parties have "agreed upon" the service to be provided.  (A-35; Pesk. Ex. 6, ¶ 1.)  Here, there was no agreement that Peskoff was to introduce any future business partners.  The introductions were made wholly on Peskoff's own initiative.

- 24 -

Peskoff next argues that he performed "almost identical services" here as he performed in the FBR REIT transaction, for which FIDAC paid Peskoff. (Peskoff Brief, p. 22, D.I. 47, 54.) As shown above, the services were not even similar, much less identical.

# REDACTED

Peskoff further asserts that the "course of dealings" between Peskoff and FIDAC relating to the FBR REIT put FIDAC on notice that Peskoff expected to be paid. (Peskoff Brief, pp. 22-23, D.I. 47, 54.) Once again, that transaction was entirely different than those in issue here.

Peskoff additionally argues that FIDAC "generally understands that finders such as Peskoff expect to be paid for introductions . . . [and] FIDAC has several finders agreements" where it pays for "services similar to those performed by Peskoff" relating to Gen Advisors and Sentry Select. (Peskoff Brief, p. 23, D.I. 47, 54.)  As discussed above, the custom and practice and agreements to which Peskoff refers are for finders who bring clients to investment advisors, not potential business partners such as Gen Advisors and Sentry Select. (*See* pages 16-18 above)

Peskoff finally argues that FIDAC "acknowledged the role Peskoff played in both deals and promised to pay Peskoff." (Peskoff Brief, p. 23, D.I. 47, 54.)  The only authority given for this statement is the April 20, 2004 Kazel letter to Peskoff. (A-42; Pesk. Ex. 16.)  That letter establishes just the opposite conclusion to that urged by Peskoff.  The letter contains no acknowledgement of any right on Peskoff's part to be paid.  Instead, the letter reminds Peskoff that whatever Farrell chose to pay before (the $30,000) was all that Peskoff would receive in connection with both Gen Advisors and Sentry Select. (A-42; Pesk. Ex. 16.)

Peskoff's quantum meruit and promissory estoppel claims also fail on the additional ground that he cannot show that he took any action in reliance upon any promise by Farrell or anyone else at FIDAC.

The introductions could not have been made in reliance upon the February 2000 Letter because FIDAC never requested them, and the Letter only contemplates payment when services are "agreed upon." (A-35-A-37; Pesk. Ex. ¶ 1.)

As for post-introduction activities, Peskoff makes no claim that he ever did anything with respect to Sentry Select, except to make the introduction. Accordingly, Peskoff cannot establish that he performed any services at all, much less in reliance upon any oral promise. (That is presumably why Peskoff has apparently only argued for partial summary judgment on the Gen Advisors claim based upon the theory of promissory estoppel. (*See* Peskoff Brief, pp. 24-26, D.I. 47, 54.))

With respect to Gen Advisors, as previously explained, Peskoff makes no claim that his decision to listen to his friend Farrell's complaints and to pass them on to Baptista was motivated by some oral promise made by Farrell to pay Peskoff a share of the management fees.

## III.   FIDAC'S ACCORD AND SATISFACTION DEFENSE PRECLUDES SUMMARY JUDGMENT IN PLAINTIFFS' FAVOR

Irrespective of the merits of Peskoff's underlying claims, FIDAC's accord and satisfaction defense precludes summary judgment in Plaintiffs' favor. An accord and satisfaction defense is established by showing that a party accepted a check in full settlement of a disputed, unliquidated claim. *Grandell Rehabilitation & Nursing Center, Inc. v. Victory Serby*, 21 A.D.3d 346, 347, 800 N.Y.S.2d 188, 190 (2d Dep't 2005); *see Landers v. State of New York*, 373 N.E.2d 281, 281, 402 N.Y.S.2d 386, 387 (N.Y. 1977) (proof of acceptance of payment in full satisfaction of claim, coupled with other undisputed evidence of claimant's cooperation, established accord and satisfaction defense).

The FIDAC Brief generally described the events leading up to the $30,000 payment to Peskoff sent in December 2003. (FIDAC Brief, pp. 15-19, D.I. 51.) FIDAC

did not move for summary judgment on this defense because Peskoff partially disputed the substance of the conversation between him and Farrell which preceded the sending of the check. The fact that FIDAC did not choose to move for summary judgment does not, of course, mean that the evidence is not sufficient to defeat any motion by Peskoff for summary judgment dismissing the defense.

FIDAC's position is that this $30,000 covered both the Sentry Select and Gen Advisors transactions. (As Farrell explained, the payment was made as a result of the hardship entreaties of Peskoff and Spencer Brown. (*See* FIDAC Brief, p. 18, D.I. 51.)) In Farrell's December 2003 conversation with Peskoff, Farrell told him that the $30,000 payment was going to be the only payment that Peskoff would get in connection with both transactions. (A-282; Farrell, pp. 82-83; *see* A-29; Farrell Ex. 2.)

Peskoff testified that Gen Advisors was not referred to during the conversation, but does not disagree with the balance of the Farrell testimony. (A-129-A-130; Peskoff, pp. 204-07; A-29; Farrell, Ex. 2.) Thus, Peskoff admitted in his deposition that he clearly understood that Farrell was offering this as a one-time payment only:

> A.    . . . Mike said that he either had sent me or was sending me a check     for $30,000, and I said oh. He said and this was for the Sentry situation. . . .
> Q.    What else was said, if anything?
> A.    He mentioned – he said that, you know, that, you know, this should be considered, you know, a one-time payment.
> Q.    What else was said?
> A.    And that was – and then I sort of laughed at that, you know, just said, "That's nice."
> Q.    What else was said, if anything?
> A.    That was 99 percent of what was said.

(A-83; Peskoff, pp. 36-37.)

Peskoff had no doubt that he was told in this conversation that this was all he would get on the Sentry Select deals. (*See* A-142; Peskoff, pp. 256-57; *see also* A-83, A-129, A-130, A-141; Peskoff, pp. 36-37, 207, 209, 254-55.)  Peskoff fully understood that FIDAC considered that payment to be "obviously, a termination of the [Sentry Select] transaction." (A-154; Peskoff, p. 305.)

Even though Peskoff has testified that he disagreed with Farrell's position, he never told him so at the time, and simply cashed the check without any protest or indication that he was not accepting it on the terms upon which it was sent:

> A.     . . . So the fact that he sent me a check for $30,000 – okay?
> –     really didn't mean a thing to me. All right?  That was his way of trying to push this thing without talking about it.
> Q.     You disagreed with Mr. Farrell's view?
> A.     Absolutely.
> Q.     You were disputing his view?
> A.     That's why you have a lawsuit.  Okay?
> Q.     You understood you had a disagreement with Mr. Farrell when you got the check?
> A.     That's correct.
> Q.     You cashed the check?
> A.     That's correct.
> Q.     You didn't write "under protest," did you? Did you?
> A.     I didn't think I had to.
> Q.     You didn't call Mr. Farrell up and say, "I don't want to take this.  I disagree."  You chose to take the money; right?
> A. The check was cashed.

(A-130-A-131; Peskoff, pp. 210-12.)

Until his counsel's September 2005 demand letter, Peskoff never told Farrell that he disagreed with this payment being a one-time payment.  (A-131-A-133; Peskoff, pp. 211-12, 219-20.)

Farrell's testimony, Peskoff's admissions, and the contemporaneous documentary evidence are at least sufficient for requiring trial on the question whether Peskoff

accepted this payment knowing that it covered both the Sentry Select and Gen Advisors transactions, precluding summary judgment for Plaintiffs.  (*See* FIDAC Brief, pp. 18-19, D.I. 51.)

## IV.    ISSUES OF FACT CONCERNING UNDERHILL'S STANDING PRECLUDE SUMMARY JUDGMENT AGAINST FIDAC

The September 2005 demand letter from counsel stated that the client asserting the claim was "Underhill, which has not been compensated for its undeniably crucial role in FIDAC's, and thus Annaly's, success."  (A-30; Pesk. Ex. 5.)  Peskoff was not described as having any right to bring the claims asserted here.  In his December 2006 deposition testimony, Peskoff similarly testified that the claim asserted here belongs to Underhill:

> Q.    The claim still belongs to Underhill; correct?
> A.    That is correct.
>
> *    *    *
>
> Q.    So we both agree that the claim, if there is a claim, still resides with Underhill; is that right?
> A.    That's what it says, yes.

(A-171; Peskoff, p. 383.)

Under the governing Ohio law, Underhill had a limited time to bring this action. FIDAC's position is that Underhill did not comply with this time requirement.  Again, because it raises factual issues, FIDAC did not move for summary judgment on this ground.  But FIDAC is entitled to defeat any claim for summary judgment by Plaintiffs on this ground, since all that need be shown is a triable issue of material fact on this issue. The record so demonstrates.

Underhill was an Ohio corporation prior to its dissolution, and therefore Ohio law determines whether Underhill has standing to bring this action at this time.  See Fed. R.

Civ. P. 17(b); *see, e.g., Abington Heights Sch. Dist. v. Speedspace Corp.*, 693 F.2d 284, 285 (3d Cir. 1982) (California law applies to determine whether dissolved California corporation can be sued); *Deerfield Specialty Papers, Inc. v. Black Clawson Co.*, 751 F. Supp. 1578, 1581 (S.D.N.Y. 1990) (Delaware law governs whether plaintiffs have standing to bring claims allegedly assigned to them by dissolved corporation because the corporation had been incorporated in Delaware).

Once dissolved, an Ohio corporation may only act for the limited purpose of winding up its affairs. Ohio Rev. Code. Ann. § 1701.88(A). That winding up process must be accomplished "as speedily as is practicable". § 1701.88(D). The relevant statute provides, in pertinent part:

> When a corporation is dissolved voluntarily . . . the corporation shall cease to carry on business and **shall do only such acts as are required to wind up its affairs** . . . . The directors of the corporation and their survivors or successors shall act as a board of directors in accordance with the regulations and bylaws **until the affairs of the corporation are completely wound up**. [T]he directors shall proceed **as speedily as is practicable** to a complete winding up of the affairs of the corporation . . . .

Ohio Rev. Code. Ann. § 1701.88(A) & (D) (emphasis added).

Dissolved Ohio corporations only have capacity to commence actions that are brought as part of the winding up process. *Kiraly v. Francis A. Bonanno, Inc.*, No. 18250, 1997 Ohio App. LEXIS 4753, at *7 (Ct. App. Oct. 29, 1997); *see Bain Builders v. Huntington Nat'l Bank*, No. 78442, 2001 Ohio App. LEXIS 3025, at *10-11 (Ct. App. June 5, 2001) (corporation lacked standing to raise a claim for breach of a partially performed contract because that action was not related to winding up when the claim was made 18 months after dissolution); *see also Benefit Mgmt. Consultants, Inc. v. Gencorp,*

*Inc.*, 1996 Ohio App. LEXIS 2013, at *9 (Ct. App. May 22, 1996) (discussing Ohio's public policy "to deter organizations from doing business as a corporation under the mantle of state approval when, in fact, that approval has been revoked") (internal citation omitted); *Candlewood Forest v. Reynolds Constr. Co.*, No. L-85-075, 1985 Ohio App. LEXIS 7266, at * 2 (Ct. App. Oct. 4, 1985) ("Ohio courts, in applying and interpreting these statutes, have uniformly manifested a *strict reluctance to permit post-dissolution corporate activities* unless such activities are undertaken for the *sole purpose* of winding up corporate business.") (emphasis added) (quoting *Jasin v. Wolfgang Doerschlag Architect*, L-84-185, 1984 Ohio App. LEXIS 11859, at *5-6 (Ct. App. Dec. 14, 1984).

Ohio courts examine the length of time between a corporation's dissolution and commencement of an action to determine whether the action was brought within the winding up period. *See, e.g.*, *Candlewood Forest v. Reynolds Constr. Co.*, No. L-85-075, 1985 Ohio App. LEXIS 7266, at * 3 (Oct. 4, 1985) (action to enforce deed restrictions was not brought as speedily as practicable, and thus was not related to winding up, when it was commenced one year after the corporation's articles were cancelled and the corporation became aware of the deed violations).

In August 2004, Underhill applied for dissolution, which became effective November 1, 2004. (B-34-B-39.) Within the three months after dissolution, Peskoff wound up Underhill's affairs. He assigned Underhill's assets, including cash accounts and two partnerships with Friedman Billings Ramsey, to himself. (B-74; Devlin, pp. 42-44; A-2; Devlin Ex. 2.) Nonetheless, as Peskoff admits, he never assigned any claims against FIDAC at that time. (A-172; Peskoff, p. 388.)

In August 2005, Peskoff executed Underhill's final tax return. (B-1-B-17; Cocke, Ex. 10; B-55; Cocke, p. 60; B-67-B-68; Devlin, pp. 17-18.) That return did not reflect the distribution of any claims to Peskoff. (B-50-B-51; Cocke, pp. 40-42, 64; *see also* B-49, B-50; Cocke, pp. 34-35, 39.) By filing that return, Peskoff concluded Underhill's affairs.

This action was not commenced until February 2006 – over one year and two months after the dissolution. Peskoff has given no excuse for this inordinate delay in pursuing what he now contends is a $17 million claim against FIDAC. [8]

This evidence precludes summary judgment for either Underhill or Peskoff, since it is sufficient to raise at least a triable issue of fact as to whether Underhill's alleged claim against FIDAC is time-barred by the Ohio dissolution statute.

---

[8]    Following his deposition admitting that he had not been assigned any claim against FIDAC, Peskoff executed a series of documents in an attempt to assign Underhill's claims to himself as a creditor of Underhill. (B-18-B-29; Pesk. Exs. 31-36.) By his own admission, the claims belonged to Underhill at that time. (A-170-71; Peskoff, pp. 382-83.) As Peskoff explained, by executing the assignment documents, he sought to assign to himself (as a creditor of Underhill) a security interest in Underhill's claims against FIDAC. (A-176; Peskoff, p. 404.) The underlying claim remained with Underhill. (A-171; Peskoff, p. 383.)

The validity of these assignment documents is questionable. Peskoff waited two years after the completion of Underhill's dissolution before executing them, and then attempted to make the documents valid by listing earlier effective dates on them. The documents state they were approved at Underhill shareholder and director meetings held on August 23, 2004. Yet, Peskoff admits that there were no such meetings on that date. (A-171-75; Peskoff, pp. 385, 387-89, 390, 396, 398, 399, 401.)

In any event, by the time of this purported assignment – whose validity and bona fides FIDAC challenges – Underhill either had or had not lost the right to pursue this claim against FIDAC. If it had been lost, any attempted assignment was ineffective.

## CONCLUSION

For all the foregoing reasons and those listed in the FIDAC Brief, FIDAC respectfully requests that this Court deny Plaintiffs' partial motion for summary judgment.

Dated: June 26, 2007                          **EDWARDS ANGELL PALMER & DODGE LLP**


 */s/ John L. Reed*
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770 (Phone)
302.777.7263 (Fax)
jreed@eapdlaw.com
jcicero@eapdlaw.com

- and -

Gerald A. Novack (*pro hac vice*)
Sarah P. Kenney (*pro hac vice*)
**KIRKPATRICK & LOCKHART**
**PRESTON GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
212.536.3900 (Phone)
212.536.3901 (Fax)