

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT
CORPORATION, *by and through*
*Stephen D. Peskoff as successor in*
*interest*, and STEPHEN D. PESKOFF,
*individually*,
                   Plaintiffs

    v.

FIXED INCOME DISCOUNT
ADVISORY COMPANY,
                   Defendant.

: : : : : : : : : : : : : : :

Civil Action No. 06-0099-SLR

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

**This document is not to be opened or its**
**contents displayed, copied, or revealed except**
**by Court Order or by agreement of the parties**
**to this action.**

### CERTIFICATE OF COUNSEL REGARDING EXHIBITS TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Todd J. Cook hereby certify as follows:

1.    I am an associate with the law firm Stevens & Lee, P.C., counsel for the Plaintiffs

in this action. I have been admitted to practice in the United States District Court for the District

of Delaware *pro hac vice* in this action. I offer this Certificate in support of the Plaintiffs'

Answering Brief in opposition to Defendant's motion for summary judgment, which is being

filed contemporaneously herewith.

2.    Attached to this Certificate are true and correct copies of the following

documents:

*[Table begins on following page.]*

SL1 732611v1/100409.00001

| ITEM | EXHIBIT |
|------|---------|
| Excerpts of Deposition of Michael A.J. Farrell, December 15, 2006 | 1 |
| Excerpts of Depositions of Stephen D. Peskoff, October 10, 2006 and December 12, 2006 | 2 |
| Letter between Michael A.J. Farrell to Stephen D. Peskoff dated February 15, 2000 (the "Consulting Agreement") | 3 |
| Excerpts of Deposition of Ronald D. Kazel, December 14, 2006 | 4 |
| FIDAC payment statements and checks to Peskoff for FBR transaction | 5 |
| Excerpts of Deposition of Ernest P. Baptista, December 12, 2006 | 6 |
| Letter from Ronald D. Kazel to Stephen D. Peskoff dated April 20, 2004 | 7 |
| Agreement between Gen Advisors and FIDAC dated October 10, 2002 | 8 |
| FIDAC Tables showing fees from Premier fund and MBS Trusts | 9 |
| Agreement between Sentry Select and FIDAC dated September 13, 2002 | 10 |
| Letter from Stephen Peskoff to Michael Farrell dated March 13, 2003 re payment for Gen Advisors and Sentry Select transactions pursuant to Consulting Agreement | 11 |
| Peskoff notes regarding expectation of payment under Consulting Agreement | 12 |
| **REDACTED** | 13 |

Todd J. Cook

2

STEVENS & LEE, P.C.

By: _____

Joseph Grey (DE Bar No. 2358)
G. Thompson Bell, III, *pro hac vice*
Pa. Attorney I.D. No. 32649
Todd J. Cook, *pro hac vice*
Pa. Attorney I.D. No. 89041
1105 North Market Street
Seventh Floor
Wilmington, DE 19801
TEL: (302) 654-5180
FAX: (302) 654-5181
EMAIL: jg@stevenslee.com
       gtb@stevenslee.com
       tjc@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP

    Robert L. Ruben, *pro hac vice*
    D.C. Attorney I.D. No. 414580
    Marshall F. Berman, *pro hac vice*
    D.C. Attorney I.D. No. 020743
    4800 Montgomery Lane, Suite 150
    Bethesda, MD 20814
    TEL: (301) 951-9696
    FAX: (301) 951-9636
    EMAIL: rruben@randalaw.com
         mberman@randalaw.com

*Attorneys for Plaintiffs Underhill Investment Corp.
and Stephen D. Peskoff*

# EXHIBIT
# 1

09:32a

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2

3   UNDERHILL INVESTMENT          :   Civil Action
    CORPORATION, by and through   :   NO. 06-0099-SLR
4   Stephen D. Peskoff as         :
    successor in interest, and    :
5   STEPHEN D. PESKOFF,           :
    individually,                 :
6                   Plaintiffs    :
                                  :
7            vs.                  :
                                  :
8   FIXED INCOME DISCOUNT         :
    ADVISORY COMPANY,             :
9                   Defendant     :

10

11                    _____

12              Oral Deposition of
              MICHAEL A.J. FARRELL

13

14                    _____

15

16      Date:   Friday, December 15, 2006

17      Time:   9:33 a.m.

18      Place:  Stevens & Lee, P.C.
                1818 Market Street
19              29th Floor
                Philadelphia, PA  19103

20

21                    _____

22

23        COMPUTERIZED REPORTING SERVICES, INC.
            By:  Roxanne Weaver, RPR, CRR
24               3449 Penn Avenue
             Sinking Spring, PA  19608
25
            Phone:  (610) 678-6652  ORIGINAL

                            1

09:33a

**REDACTED**

6    Q    Well, as you may remember then, essentially

what this is is a question-and-answer session. And my

job is to ask questions, hopefully fairly clearly. But

if I don't make any of my questions clear, please let me

know, and we'll do our best to clarify them.

Your job is to answer the questions to the

best of your ability and recollection. Please try to

answer the questions verbally as opposed to nodding your

head or shrugging your shoulder, because the court

reporter has to take down your answer.

Please try to wait until I finish my question

before giving your answer, and I'll try to do the same

with respect to your answers, so we're not both talking

at the same time; okay?

A    Okay. Thank you.

Q    What is your current position with FIDAC?

A    I'm the chairman, CEO, and president.

Q    How long have you held those three titles?

A    I'm the founder of the company, and I would

guess that that goes back to the beginning, 1994.

5

09:35a

1     Q    Have you been employed by Annaly at any point

2  in time?

3     A    Yes.  That's another company that I founded

4  in 1996.

5     Q    What have your positions with Annaly been?

6     A    Chairman, chief executive officer, and

7  president.

8     Q    Do you hold those titles for Annaly today?

9     A    Yes, I do.

10     Q    So you have held those titles at all times

11  since Annaly was founded in 1996?

12     A    I think I added president after someone left

13  the firm.  I just merged the positions, but I don't

14  recall exactly when.

15     Q    When did you meet Steve Peskoff?

16     A    1996.

17     Q    What were the circumstances?

18     A    Steve was a contact of a bond trader that I

19  knew that had -- he had a relationship at FBR.  We

20  thought he worked at FBR at the time.  And FBR had

21

22

23                  **REDACTED**

24

25

6

09:36a

1      A    Yes.  Through that connection of Steve to

2  this bond trader, they reached out to us.  We went down

3  there in the summer of 1996.

4      Q    When you say you went down there, you went to

5  FBR?

6      A    We went to FBR.  We met in their offices in a

7  conference room, myself and, I think, at least one other

8  individual.  Met Steve really for the first time there.

9  He sat in the conference room with all the FBR

10  principals, and we went through our track record.  And

11  they were very interested in putting money into the

12  fund.  Simultaneously, they were very interested in our

13  overall business model and asked at the conclusion of the

14  meeting was there anything that we ever had done

15  domestically that they could somehow wrap up for us and

16  put into the U.S. markets.  And that's where the

17  relationship began to take place.

18

19                  **REDACTED**

20

21

22      Q    But after that occasion, you developed a

23  relationship with Mr. Peskoff; is that right?

24      A    Well, really, our relationship was with FBR.

25  We did not know at the time that Steve was not an

7

09:38a

1    employee of FBR.  His offices were located in FBR.  The

2    staff that worked with him, mostly junior staff, I think,

3    had FBR business cards actually who were assigned to work

4    with him, and we just assumed that he was part of FBR.

5        Q    My question really was more toward the

6    relationship.

7        A    Sorry.

8        Q    Although I understand you may have had a

9    relationship with FBR, you also developed -- you

10   personally developed a relationship with Mr. Peskoff,

11   didn't you?

12       A    Yes, I did.

13       Q    And the relationship was, as I understand it,

14   really both a business and a personal relationship over

15   the next few years.

16

17

18

19               REDACTED

20

21

22

23       Q    What were your dealings with Mr. Peskoff in

24   connection with those transactions with FBR?

25       A    Essentially, the first meeting was --

8

09:42a

1    number of the FBR principals that led to that.

2                So I would say for '97, '98, there was really

3    very little talking to Steve outside of family, how are

4    you, what's going on, those kinds of things.  And, you

5    know, at the offshoot, at first I was upset because I

6    felt like he did not -- was not clear about who he

7    represented.  And then eventually I just figured that he

8    was just kind of a quirky character, and I let it go.

9    And he was -- he's a genuinely nice guy, so, you know,

10   not badly intentioned at the time, I didn't feel.  So

11   from my perspective, I just continued to have some sort

12   of personal relationship with him.

13        Q    What was the nature of your personal

14   relationship?

15        A    More by phone, an occasional visit down to

16   the FBR offices where he was still located, you know.

17   But that would be in the context of general business

18   activity about our capital-raising efforts or our

19   business activities.  Occasionally he would try to come

20   to me with deals along the way that just did not fit our

21   structure, and I would politely accept meetings, but

22   generally, those meetings would not lead anywhere.

23        Q    Did you see him socially during that

24   '96-to-'99 period?

25        A    Socially to include a dinner or a lunch, you

---

11

09:44a

1  know, one on one, maybe, mostly in New York.  He was

2  invited to my 50th birthday party by people who organized

3  the party.  I didn't invite him.  But, I mean, that's

4  kind of how it was limited to.

5       Q    Now, Mr. Peskoff was instrumental in having

6  FIDAC hired as manager of the FBR REIT; is that right?

7       A    That's what I believed at the time, although

8  I've learned differently since then.

9       Q    What did you believe at the time?  Or let me

10  rephrase that question.  What did you believe at the time

11  Mr. Peskoff had done to promote FIDAC and assist in

12  having FIDAC hired as the manager of the FBR REIT?

13

14

15

16

17                    REDACTED

18

19

20

21

22

23

24

25

12

09:51a

1    The check writers -- They're on a monthly basis.

2    Probably wasn't a very big number of bills going out, so

3    it was just easier to hand-write them.

4        Q    So the practice was to hand-write checks in

5    May of 2000?

6        A    I would guess, yeah.

7        Q    Do you know?  Your lawyer is going to tell

8    you not to guess.  He probably already did.

9        A    I don't know.

10           MR. NOVACK:  He doesn't listen to me, so

11   there was no point in me telling him.

12           THE WITNESS:  Yeah, I don't know.

13   BY MR. BELL:

14       Q    Were you aware in May of 2000 that FIDAC was

15   making payments to Mr. Peskoff in connection with the FBR

16   REIT?

17       A    Yes.

18       Q    And did you authorize the payments to

19   Mr. Peskoff?

20       A    Not specifically.  I -- I gave him something

21   in writing to cover payments that might be made from time

22   to time, but -- as a consultant, but in this case I don't

23   remember, you know, exactly what I said and when I said

24   it.

25       Q    Do you recall any discussion that you had

16

09:53a

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



REDACTED

Q     He was going to help manage it in the sense

10:02a

1  first, he called you and discussed you becoming the

2  manager of the FBR REIT?

3        A        Um-hum.

4        Q        You then put --  You then had some

5  discussions with FBR about you becoming the manager of

6  the FBR REIT?

7                    REDACTED

8

9

10        Q    Do I understand you correctly that your

11  communication with FBR - when I say your, I mean FIDAC's

12  communication with FBR - that resulted in FIDAC being

13  hired as manager of the FBR REIT was entirely through

14  Mr. Peskoff?

15                    REDACTED

16

17

18        Q     In any event, back to our sequence of events,

19  so he was dealing with you and FBR in connection with

20  having you -- FIDAC hired as the manager of the FBR REIT?

21        A        Um-hum.

22        Q        And then you put this letter in place, and

23  then you started paying him fees.  Is that the sequence?

24        A        I believe so, yes.

25        Q        Now, when you sent this letter to him --  Let

10:19a

1  Underhill or FIDAC may terminate the agreement by

2  delivering written notice to the other party?

3         A    Yes.

4         Q    Has FIDAC ever delivered written notice to

5  Mr. Peskoff that it was terminating this agreement?

6         A    I don't know.

7         Q    As far as you know, that has not been done;

8  is that right?

9         A    I don't know.

10        Q    You're not aware of it being done?

11        A    Yes, that's correct.  I'm not aware.

12        Q    Mr. Farrell, was it FIDAC's practice in

13  February of 2000 to enter into written agreements without

14  consultation with legal counsel?

15        A    No.

16        Q    But to the best of your recollection, that's

17  what was done with Mr. Peskoff; is that right?

18        A    That's true.

19        Q    Why was it that you didn't consult with legal

20  counsel with respect to Mr. Peskoff's agreement?

21        A    This agreement was a very specific agreement

22  to the FBR account.  I felt that as long as the account

23  was alive, that this letter would cover it, and that I

24  had a personal relationship with Steve specific to

25  consulting services.  So I felt that if we terminated the

32

10:43a

1    them approximately a year beforehand.

2        Q    So you think sometime in maybe late 2001?

3        A    I would be speculating, but I would assume it

4    was at least a year beforehand.

5        Q    When you first met Mr. Baptista or

6    Mr. Messner, where did that meeting take place?

7        A    I met Mr. Baptista first in my office at 12

8    East 41st Street.

9        Q    Who else was present at that meeting?

10       A    No one except for myself and Mr. Baptista.

11       Q    Was that meeting arranged by Mr. Peskoff?

12       A    Yes, it was.  At the time I was doing estate

13   planning.  And Steve was aware that I was doing that, and

14   he suggested that I meet an insurance salesman who dealt

15   with specifically estate planning and general insurance

16   needs.  And he asked me to meet with Ernie Baptista to

17   talk about that.  In effect, I was a reference for Steve

18   for Baptista to do insurance payments, just general

19   personal insurance planning.

20       Q    What do you recall about the substance of

21   that first meeting with Mr. Baptista?

22       A    I felt that it was not a productive meeting

23   for me, because many of the concepts of the insurance

24   plans that he was presenting to me were not things that I

25   hadn't already covered in my own personal life or felt

                              40

10:48a

1

2

3

4

5

6 **REDACTED**

7

8

9

10

11    Q    What was it that got you over that belief?

12    A    I think in the discussion with Messner

13 specifically, Messner understood the concept that I just

14 described to you of the challenges of putting that

15 leverage on the balance sheet of an insurance company,

16 and he felt that he could structure it as a limited

17 partnership, which gave me some comfort, but I had

18 already, as I explained earlier, explored almost every

19 aspect of ways to get insurance companies as clients.

20 And they during the course of that meeting explained to

21 me that there was a wide range of different kinds of

22 products that I was not aware of.  And they mentioned

23 words like BOLI, COLI, TOLI, IOLI, which I had never

24 heard of before.  And I reluctantly agreed at that point

25 that I didn't know everything that there was about the

10:50a

1    insurance company business, and since you're a principal

2    at ING, I would be willing to listen to you and expend

3    some resources in that respect.

4         Q    When did that occur?

5         A    I can't say.

6         Q    Prior to October 10th, 2002?

7         A    Yes.  Messner was -- As far as I was

8    concerned, Ernie Baptista was still an insurance salesman

9    at that point, and Jeff Messner was an employee of ING.

10        Q    Going back to what your role was on behalf of

11   FIDAC in this process, I believe Mr. Kazel testified

12   yesterday that he was the point person for FIDAC on

13   the -- in the conceptualization and development of the

14   Premier Fund.  Is that your understanding?

15        A    I assigned this to Ron as our

16   business-development person to explore it at the time.

17        Q    So was he the person that was the primary

18   contact with Mr. Messner and Mr. Baptista on behalf of

19   FIDAC?

20        A    Yes.  But there was no discussion at the time

21   that there would be a Premier Fund.

22        Q    How much contact did you have prior to

23   October 10th, 2002, with either Mr. Baptista or

24   Mr. Messner?

25        A    Very little.  Occasional updates.  They would

44

11:07a

1  take the word how out of that question, because I think

2  maybe that's what is causing the confusion.  Did you have

3  any discussion with Mr. Baptista that you can recall

4  prior to October 10th, 2002, about compensating

5  Mr. Peskoff?

6      A    Yes.

7      Q    Approximately when did that conversation

8  occur?

9

10

11

12

13              REDACTED

14

15

16

17

18

19

20      Q    Do you recall making a statement to the

21  effect that FIDAC would take care of Steve?

22      A    In the context of what I just testified, yes.

23      Q.   I understand your context.

24      A    Um-hum.

25      Q    Did you also make a statement that you can

11:09a

1  recall to the effect that you wanted to make sure that

2  Steve didn't double-dip?

3       A    Absolutely.

4       Q    You don't recall when that meeting occurred;

5  is that right?

6       A    It was early on in the process.  As I said

7  earlier, I think it was the first time I met Messner.

8       Q    Did you have any discussion with Mr. Baptista

9  at any time after October 10th, 2002, about compensating

10 Mr. Peskoff, that you can recall?

11      A    Not that I recall.

12      Q    Now, FIDAC has not paid Mr. Peskoff anything

13 as a result of the Premier Fund; is that right?

14      A    That's correct.  Can I qualify that answer?

15      MR. NOVACK:  Sure.

16      MR. BELL:  Sure.

17      THE WITNESS:  FIDAC has not directly paid

18 Steve Peskoff anything from the proceeds that have been

19 received on the Premier Fund.  But we are not aware that

20 he did not receive or did receive compensation from Gen

21 Advisors.

22 BY MR. BELL:

23      Q    Are you --

24      A    Or any other source.

25      Q    Are you saying that it is possible that

56

11:11a

1    Mr. Peskoff has received fees from Gen Advisors or

2    another source in connection with the Premier Fund?

3         A    I don't know all of the agreements that Steve

4    has in his universe.  But it wouldn't surprise me.

5         Q    You don't have any evidence, I take it, that

6    he has received payments from anyone else in connection

7    with the Premier Fund; is that right?

8         A    No, I do not.

9         Q    Now, Mr. Peskoff also introduced FIDAC to a

10   company known as Sentry Select; correct?

11        A    We received a phone call from Sentry Select

12   that they had heard from Steve Peskoff, yes.

13        Q    Who was that phone call from; Mr. Corsini?

14        A    Raniero Corsini, right.

15        Q    Was that phone call to you or to someone else

16   at FIDAC?

17        A    I believe it was to me.

18        Q    Do you recall approximately when that phone

19   call occurred?

20        A    No, I don't.

21        Q    What do you recall Mr. Corsini saying to you

22   during that call?

23        A    Essentially, that he had met Mr. Peskoff on a

24   plane and that Mr. Peskoff had told him that he should

25   look at what we do in Annaly and FIDAC.  Apparently they

57

11:13a

1   struck up a conversation on a plane. That's my

2   recollection.

3        Q    Do you recall how you responded to that?

4        A    I invited him to come for a meeting to New

5   York the next time he was in New York, if it was

6   convenient, and we would explain it further to him.   I

7   directed him to the Web site where he could get

8   information about FIDAC, and I directed him to the SEC

9   filings of Annaly, where he could do more due diligence

10  before the meeting so he could be prepped if he wanted to

11  learn more.

12       Q    Are you aware that Mr. Kazel met with

13  Mr. Corsini in Toronto?

14       A    May have happened.  I'm not -- I'm not a

15  hundred percent certain of when and if, how that

16  happened.

17       Q    Do you recall asking Mr. Kazel to attend a

18  meeting with Mr. Corsini in Toronto?

19       A    I don't think after the first time that we

20  met --  I think Raniero came to New York first, but I

21  can't recall the sequence.

22       Q    Before you started talking - and when I say

23  you, I mean FIDAC - started talking with --  Well, strike

24  that.

25            Prior to that call you got from Mr. Corsini,

11:14a

1    had anyone at FIDAC, to your knowledge, had any

2    communication with anyone at Sentry?

3           A    Not that I'm aware.

4           Q    Now, as I understand it, the FIDAC-Sentry

5    Select relationship has resulted in four different

6    investment vehicles; is that right?

7           A    Correct.

8           Q    All four of those investment vehicles are

9    marketed in Canada; correct?

10          A    They're directly marketed by Sentry, yes.

11          Q    But for the Canadian market?

12          A    That's correct.  I would like to also point

13   out that all four of the structures are not the same

14   legal structure.

15          Q    Okay.  Would you prefer that I use the word

16   structure as opposed to vehicle?

17          A    I'll take either one.

18          Q    That's why I was trying to use a general

19   word, to capture all four of them.

20          A    Yeah, I just don't want to lump them all

21   together, because they are very different instruments

22   with very different risk characteristics and very

23   different legal structures to them.

24              MR. NOVACK:  Can I just suggest that for

25   purposes of these questions, we make clear some early

11:20a

# REDACTED

1

2

3     Q    Before you - when I say you, I'm talking

4  about FIDAC - started talking to Mr. Corsini, FIDAC had

5  not been involved with any products marketed in Canada;

6  is that right?

7     A    No.

8     Q    Yes, that is right?

9     A    That's correct, yes.  No, we were not

10  involved.  Sorry.

11     Q    That's all right.  The double negatives get

12  tough sometimes.

13     Did you ever have any discussion with

14  Mr. Corsini or anyone else representing Sentry Select

15  about payment of compensation to Mr. Farrell -- excuse

16  me, to Mr. Peskoff?

17     A    No.

18     Q    Now, we're going to get a little bit into the

19  $30,000 check you issued to Mr. Peskoff and events

20  subsequent to that.  But prior to the issuance of that

21  $30,000 check and a conversation which I understand may

22  have taken place shortly before that with Mr. Peskoff,

23  did you have any conversation with Mr. Peskoff about

24  compensating him for Sentry Select?

25     A    I would say that Steve and his proxy, Spencer

11:30a

1    Steve, I believe at the same time we were going through

2    the disappointments of putting together the insurance

3    arrangements.          **REDACTED**

4    **REDACTED**      So we were building infrastructure and

5    expenses into our structure that, you know, were

6    frustrating to me along the way. And I -- And Steve had

7    nothing to do with those transactions, as far as I was

8    concerned. And he continued to try to wheedle cash

9    through his relationship with Spencer with me. And I

10   tried to explain to Steve a number of times that this is

11   not what FIDAC was designed to do, nor was this what we

12   do for a living. We manage accounts. We manage direct

13   capital. That's what we do. We don't create products.

14   We don't create groundbreaking products. We pay others

15   to do that. So during the course of those months, I

16   would definitely say I expressed my frustration to

17   Steve. And he kept on trying to introduce stranger and

18   stranger deals to me, and I kept on politely saying no or

19   taking the meeting and then telling him, please, don't do

20   that again.

21        Q    Do you consider the Premier fund to be a

22   groundbreaking product?

23

24                    REDACTED

25

69

11:51a

1    conversations that he was not making the -- at least in

2    his mind, he was not making the introductions to Sentry

3    Select, Gen Advisor, and others gratuitously?

4         A    You know, in our business, we meet people all

5    the time and refer people with specific expertise across

6    the board when we don't have it internally.  Very rarely,

7    if ever, do those lead to payments of fees.  And, in

8    fact, I had no basis by which I owed Steve anything.  I

9    had no contract with him.  As far as I was concerned, our

10   consulting services ended when I got rid of the FBR REIT.

11        Q    But that's what was in your mind; correct?

12        A    I can't speak to what was in his mind.

13        Q    I'm not asking you to read his mind.  I'm

14   asking you whether, based on the conversations that you

15   had with him, whether it was apparent to you that in his

16   mind, he was entitled to be paid for those introductions.

17        A    Not totally, because he was unaware of any

18   process that was going on.  Some things were in

19   development, so there was no basis for understanding what

20   the income or expenses would be against it.  I did have

21   discussions with him one time explaining to him that he

22   had no idea about the capital market structures that were

23   being created, nor did he have any meaningful

24   contribution that he was adding to that, because he kept

25   on trying to add value in some way, shape, or form, but I

72

11:53a

1   told him that I didn't consider his expertise to be in

2   that arena.

3        Q      Did you understand that he was attempting to

4   add value in order to convince you that he should be

5   paid?

6        A      Apparently.

7            MR. NOVACK:  You're asking him what was in

8   Peskoff's mind.  Before you were saying you don't want

9   him to read his mind, and he's speculating that's what he

10  may be thinking.

11           MR. BELL:  No.  I'm asking him.

12           MR. NOVACK:  Do you want to read the question

13  back then, because I think --

14           MR. BELL:  He's answered the question.

15           MR. NOVACK:  I'd like the question back or

16  marked, in any event.  You can keep going.  Would you

17  mark the question so I can come back to it later.

18  BY MR. BELL:

19       Q      Are you aware of any role that Mr. Peskoff

20  played in having Spencer Brown appointed to the Annaly

21  board?

22       A      No.

23       Q      How did Mr. Brown come to be appointed to the

24  Annaly board, if you know?

25       A      Manny Friedman, who was at the time the

73

# EXHIBIT

# 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNDERHILL INVESTMENT CORPORATION:

and STEPHEN D. PESKOFF,

                                    :

            Plaintiffs,

                                    :

        vs.                         Civil Action No.

                                    :     06-99 SLR

FIXED INCOME DISCOUNT ADVISORY

COMPANY,                            :

            Defendant.    :

                          — — —

            Deposition of STEPHEN D. PESKOFF,

taken pursuant to notice in the law offices of Edwards

Angell Palmer & Dodge LLC, Suite 1500, 919 North

Market Street, Wilmington, Delaware, on Tuesday,

October 10, 2006, at 1:12 p.m., before Lorraine B.

Marino, Registered Diplomate Reporter and Notary

Public.

                          — — —



S. D. Peskoff

73

1   A.      I wouldn't call it the F -- you know, I

2   wouldn't call it -- there may have been an FBR entity

3   that was responsible for the management of the REIT.

4   Stop.

5   Q.      Okay.

6

7                    REDACTED

8

9

10

11

12

13

14

15                   REDACTED

16

17

18

19

20

21

22

23

24



S. D. Peskoff

75

1

2

3

**REDACTED**

4

5

6

7

8

9   Q.     Did that meeting take place?

10  A.     Yes.

11  Q.     When was that in relation to when you called

12  Mike?

13  A.     Certainly within a week after that.

14  Q.     Where did the meeting take place?

15  A.     My understanding, my understanding --

16  okay? -- was that -- I wasn't there -- it was at

17  Friedman, Billings & Ramsey.

18  Q.     How did you learn about the meeting having

19  occurred, not that it was going to happen but that it

20  did occur?

21  A.     Because Mike and I talked, you know, after,

22  and he said -- he told me that he has got the

23  management responsibility and that he appreciated

24  everything that I, you know, that I did, putting a



S. D. Peskoff

76

1    good word in for him, et cetera, et cetera, and, you

2    know, he would take care of me financially, putting

3    together a contract for me.

4    Q.        All right.  And then what is the next

5    time -- what is the next event that occurred in FIDAC

6    being retained as the subadvisor for --

7    A.        I don't know what you mean.  I don't know

8    what you mean by the question.

9    Q.        Well, we talked about the meeting that

10   occurred --

11   A.        Right.

12   Q.        -- when Mike came in to see FBR.

13   A.        Right.

14   Q.        And he reports back to you and had the

15   conversation you have just described.  What is the

16   next event in the sequence of events that led to FIDAC

17   actually entering into an agreement with the

18   investment manager for the REIT?

19   A.        There obviously was a meeting with Farrell.

20   Q.        Another meeting with Farrell?

21   A.        A meeting.  You know, I don't know whether

22   there is one, two or three meetings with him.

23   Q.        Right.

24   A.        But it was done very quickly.



S. D. Peskoff

77

REDACTED

4      And he was very thankful

5  and told me that, you know, he negotiated, you know, a

6  contract, you know, with them, and that he was going

7  to put in the mail to me a contract that was, you

8  know, reasonable and consistent with what was done in

9  that business, and, you know, that he would take care

10  of me.

11  Q.      And what is the next conversation you had

12  with him about this contract that you have referred

13  to?

14  A.      I got, I think, a day or two later I got a

15  contract in the mail, which I signed, and I sent back

16  to him.

17  Q.      What did you do with the contract, your copy

18  of it?

19  A.      What did I do with it?

20  Q.      Did you keep it?

21  A.      Yes, sure.

22  Q.      Did you put it in a file?

23  A.      Yes.

24  Q.      Did you read it?

S. D. Peskoff

95

1   Q.       You just reread the whole contract?

2   A.       Yes.

3   Q.       And after you read the whole contract, did

4   you do anything with respect to the contract?

5   A.       Did I do anything --

6   Q.       Yes.

7   A.       -- with respect to the contract?  No.  I

8   thought that part of the general consulting contract

9   that I had signed with Mike Farrell covered bringing

10  in customers, just like I brought in FBR REIT, and

11  that I was covered under that agreement because the

12  agreement says specifically that in order for the

13  agreement not to be in effect, we both have to sign

14  and terminate, and any clients or relationships that I

15  bring in -- okay? -- you cannot terminate the contract

16  with them unless we mutually sign.

17          So both clients were brought in.  Business

18  was ongoing.  And I felt within that paragraph that I

19  was totally covered in terms of a fee arrangement that

20  he and I would, you know, would --

21  Q.       Would work out?

22  A.       Would work out.  Correct.

23  Q.       Now, did you think about anything more at

24  the time you read the February 15 letter?



S. D. Peskoff

96

1   A.      At that time?

2   Q.      Yes.

3   A.      No.

4   Q.      "That time" meaning that you referred to two

5   times, once at about the time you introduced Sentry --

6   A.      No, no.

7   Q.      -- and once at about the time you introduced

8   GenCorp, or Baptista.  Excuse me.

9   A.      Right.

10  Q.      And you told us everything you thought at

11  that time?

12  A.      Well, as I said to you -- you asked me

13  whether I read the contracts.  I read the contracts at

14  that time just to make sure what, you know, what the

15  general consulting contract covered.  And I felt that

16  I was covered under those for, A, introducing the

17  client and, B, there was a possibility of ongoing

18  business, and that, you know, the deciding factor

19  would be, you know, what kind of business that they

20  brought in, the volume of business they brought,

21  because all these things determine the ultimate price

22  that you get paid.

23  Q.      When you say "you," you mean you,

24  Mr. Peskoff or Underhill, or you meaning FIDAC or



S. D. Peskoff

97

1   both?

2   A.     Both.

3   Q.     Okay.

4   A.     Yes.

5   Q.     Now, what are the factors that go into

6   determining what Underhill should get paid?

7   Withdrawn.

8         Did you have any view at the time -- you are

9   laughing. I am glad I have amused you finally,

10   finally.

11   A.     No. You have amused me consistently. But

12   that's --

13   Q.     Thank you. Thank you for the compliment.

14   Maybe I should change careers.

15   A.     No. You are good. But that's -- go ahead.

16   Q.     Whenever I get a compliment, I always

17   look --

18   A.     No. It is -- hey, look.

19   Q.     I know. It is just business.

20   A.     It is.

21   Q.     I know.

22   A.     Believe me, it is.

23   Q.     Let me go back to the time you read the

24   February agreement. Tell you what. We got --

S. D. Peskoff

98

1    A.        You got notes from Nick.

2    Q.        No.  These are two minutes of tape

3    remaining.  That's what these notes are.

4    A.        Oh.

5    Q.        Let me ask you, let me go back --

6    A.        Now I know what it is.

7    Q.        Okay.  Now, I want to direct your attention

8    to the time you looked at the February 15 letter with

9    relation to Sentry Select and with relation to the

10   introduction of Ernie Baptista.  At that time what did

11   you believe were the factors that you would want to

12   have Mike Farrell take into account in negotiating a

13   fee for Underhill?

14   A.        Well, the most important factor is

15   introducing a client -- okay? -- where there is a

16   revenue stream, you know, that is developed and that

17   FIDAC/Annaly or any other company that is the

18   recipient of the relationship makes a substantial

19   amount of money, you know, from that relationship, or

20   whether it is substantial or not, you know, amount,

21   that they are willing to enter into the relationship

22   with the client that I introduced.

23   Q.        I understand that.  But in addition, in

24   terms of what percentage Underhill would be paid by



S. D. Peskoff

99

1    FIDAC of the fees that FIDAC earned --

2    A.        Yes.

3    Q.        -- what were the factors that you

4    anticipated that you and Mr. Farrell would discuss and

5    take into account in negotiating a percent for Sentry

6    Select and for Mr. Baptista or GenCorp?

7    A.        Okay.  First of all, it would be, A, the

8    client, the longevity of that client in a

9    relationship.  In other words, there are clients --

10   just like when FBR did work for Annaly, drawing an

11   analogy, we did many transactions with that client,

12   many.  All right?  And we did -- okay? -- both public,

13   private, et cetera.

14             Secondly, until you actually go out and

15   transact the business, the size and volume of the

16   dollars that are in the pot for FIDAC specifically to

17   manage, the larger the pot, the lesser the fee that

18   normally institutions will pay.  In other words, if

19   you are managing billions rather than hundreds of

20   millions, like they manage at FBR Asset -- okay? --

21   the fees can't be as large.

22             So the variables are the client, the length

23   of the client relationship --

24                  THE VIDEOGRAPHER:  We are out of time.



S. D. Peskoff

101

1    you wanted FIDAC to pay Underhill, that fee?  Okay?

2    A.        Okay.  And in respect to that, you look at

3    the client that you bring in, the size, the amount of

4    money that FIDAC would be managing.  Until you know

5    the fee that Mr. Farrell is getting paid, you know,

6    for his management, you know, everything is a

7    hypothesis.  All right?  Until you know that the deal

8    closes with X amount of money under management, it is

9    a hypothesis, and until you know how much leverage

10   Mr. Farrell is going to use in this transaction,

11   whether it is four or five times the money raised or

12   eight times, because it is his discretion, depending

13   upon the contract that he has with the client and the

14   kinds of returns.  So that I am essentially a

15   recipient of those kinds of things down the end.  So

16   any fee that I would receive would be subject to the

17   above.

18          Secondly, or equally important, is in the

19   Sentry situation, FIDAC had -- I was the one that

20   unilaterally went to Canada to open up the market for

21   FIDAC.  FIDAC never even had an anticipation of going

22   to Canada at that point in time.  As far as I know,

23   hadn't had any discussions or anything else.  So when

24   I opened up discussions with Sentry on my own buck --



S. D. Peskoff

103

1    all those variables -- okay? -- went into my thinking.

2          Now, until the deck was cast --

3    Q.    The die was cast.

4    A.    The die and the deck.

5    Q.    The deck was cut.  The die was cast.

6    A.    The deck was cut.  Okay.

7    Q.    Let's start again.  I apologize.  I couldn't

8    resist.

9    A.    That's okay.

10   Q.    You said until?

11   A.    Until all those things happen, you know, I

12   mean, a discussion of what the end game is is

13   irrelevant.  It is like, you know, trying to bet a

14   ten-team parlay, you know, in basketball.  Until the

15   ten teams are in, you don't know where you have been.

16         So, I mean, all these have factors to

17   determine Mike's end, Mike determining what my end

18   would be, with a relevance to what is reasonable

19   within the industry for the size that is managed.  The

20   bigger the size -- when you get into the billions --

21   okay? -- which is essentially what he was managing for

22   Sentry on a composite basis, you know, versus what he

23   was managing on, you know, for FBR Asset, you know,

24   the numbers are different, so your expectations would

S. D. Peskoff

145

1    BY MR. NOVACK:

2        Q.        Of?

3        A.        Of FIDAC/Annaly, not the new Fox stuff that

4    they have.  Okay?

5        Q.        Right.

6        A.        All right?  After the meeting was over --

7    and we had several people from Annaly.  We had

8    Mr. Diamond there.  Mike Farrell came in late to the

9    meeting.  Kazel was there.  I was there, and Messner,

10   you know, his partner.  Baptista said to Mike Farrell,

11   he said "Mike, look, let's get this out of the way.  I

12   want to know how Steve is being compensated."  Mike's

13   quote:  "That's not any of your responsibility.  I'm

14   taking care of that.  We have a prior relationship and

15   understanding."  End of story.

16              If that response was not done, I probably

17   would have pursued some kind of relationship with

18   Baptista from a compensation point of view because it

19   was only logical.

20       Q.        What was the month in which this meeting

21   took place and the year?

22       A.        I think it was February 2'02.  It may have

23   been --

24       Q.        You remember it was before FIDAC ceased



S. D. Peskoff

196

1   of what rate you were going to be paid if you were

2   paid something by FIDAC?  In other words, you were

3   just going to pay half.

4       A.      I was going to pay half of the expenses --

5       Q.      Okay.

6       A.      -- to avoid the constant haranguing from

7   Farrell and disappointment because of our prior

8   relationship and on a going-forward kind of basis.

9   Right?  But --

10      Q.      Okay.  Now, this is where I got confused.

11      A.      Okay.

12      Q.      At the time you dictated your thoughts, in

13  your own mind you had not come to a conclusion as to

14  what percent FIDAC would pay to Underhill in

15  connection with the GenCorp deal.  Is that correct?

16      A.      That's correct.

17      Q.      And you explained to us yesterday what the

18  various factors are one would have to consider --

19      A.      Yes.

20      Q.      Let me finish my question, please.  Am I

21  correct that you explained to us yesterday the various

22  factors that would have to be considered by you and

23  Mr. Farrell when you negotiated a percent?  Is that

24  correct?



# EXHIBIT
# 3

**FIDAC**

*Fixed Income Discount Advisory Company*



February 15, 2000

Mr. Steve Peskoff
Underhill Investment Corp.
7414 Old Maple Square
McLean , VA 22102

Re:  Consulting Engagement

Dear  Mr. Peskoff :

This letter will confirm our engagement regarding the provision of consulting services by  Underhill Investment Corp.  ("Underhill") to Fixed Income Discount Advisory Company ("FIDAC").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Underhill and FIDAC agree as follows:

1.  **Consulting Services.**  Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the "Accounts").

2.  **Compensation.**  FIDAC shall pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC to Underhill monthly and calculated in accordance with the formula described in the (the "Accounts Agreements").

3.  **Term; Termination.**  Unless earlier terminated in ordinance with this paragraph, this Agreement shall be for an initial term of one year, commencing on February 15, 2000, and ending on  February 15, 2001.  Upon expiration of the initial term, and provided that neither party shall be in default hereunder, this Agreement shall be automatically renewed under the same terms and conditions for successive one-year terms, each expires and ending on the same date one year later.  Either Underhill or FIDAC may terminate this Agreement by delivering written notice to the other party; provided, however, that neither party shall terminate this Agreement without written consent of the other party so long as any of the Account Agreements remain in effect.

F 00180

4. **Notices**. Unless otherwise directed, all communications or notices required or permitted hereunder will be directed to Underhill at the address set forth above. Likewise, if you wish to communicate with us or serve any notice required or permitted under this Agreement, please contact us at:

> Fixed Income Discount Advisory Company
> 12 E. 41st Street
> Suite 700
> New York, NY 11021

5. **Assignability**. Our relationship is a personal one and cannot be assigned, sold or in any manner hypothecated or pledged by either of us without the written consent of the other party. No merger, sale, or consolidation will effect the transfer of this Agreement.

6. **Amendment**. This Agreement may be amended only by a writing executed by both parties.

7. **Binding Affect**. This Agreement shall be binding upon, and shall insure the benefit of, the parties hereto and their respective heirs, successors, and assigns.

8. **Governing Law**. This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware.

9. **Independent Contractor**. Underhill is and shall hereafter be an independent contractor vis-à-vis FIDAC, and nothing herein may be interpreted or construed so as to create any employment, partnership, joint venture, or other relationship, between Underhill and FIDAC or their respective employees, representatives and agents.

10. **Best Efforts; Liability**. Underhill shall exercise its best efforts and judgement in the performance of its duties hereunder. Neither Underhill nor its owners, officers, directors, or employees, shall incur, any liability in connection with the performance of such duties, and obligations, except, in the case of bad faith, willful misfeasance and gross negligence.

F 00181

If the foregoing accurately states our agreement, please signify your acceptance by signing and dating below where indicated.

Very truly yours,

FIXED INCOME DISCOUNT
ADVISORY COMPANY

By _____

Michael A. J. Farrell, Chairman

ACCEPTED AND AGREED
To as of the February 15, 2000

Underhill Investment Corp.

_____ President
Steve Peskoff

F 00182

# EXHIBIT
# 4

09:24a

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2

3  UNDERHILL INVESTMENT              :   Civil Action
   CORPORATION, by and through      :   NO. 06-0099-SLR
4  Stephen D. Peskoff as            :
   successor in interest, and       :
5  STEPHEN D. PESKOFF,              :
   individually,                    :
6                    Plaintiffs      :
                                     :
7            vs.                     :
                                     :
8  FIXED INCOME DISCOUNT            :
   ADVISORY COMPANY,                :
9                    Defendant       :

10

11

12                  Oral Deposition of
                    RONALD D. KAZEL
13

14

15       Date:    Thursday, December 14, 2006

16       Time:    9:55 a.m.

17       Place:   Stevens & Lee, P.C.
18                1818 Market Street
                  29th Floor
19                Philadelphia, PA   19103

20

21

22

23       COMPUTERIZED REPORTING SERVICES, INC.
           By:  Roxanne Weaver, RPR, CRR
24                3449 Penn Avenue
              Sinking Spring, PA   19608
25
           Phone:   (610) 678-6652    ORIGINAL

                                  1

10:43a

1     A     My understanding is that Mr. Peskoff

2  introduced Mr. Baptista to Michael Farrell with the

3  general idea that there was a potential business

4  opportunity to work together.

5     Q     Who was present at that first meeting between

6  FIDAC and Gen Advisors?

7     A     The meeting I attended had Michael Farrell,

8  Ernie Baptista, Steve Peskoff, Jeff Messner, and I

9  believe there was one other individual that came along

10  with Mr. Messner, but I don't recall his name.

11     Q     And you?

12     A     And myself, yes.

13     Q     Where was the meeting?

14     A     It was held at FIDAC's offices.

15     Q     Did you take notes of what occurred at that

16  meeting?

17     A     I don't recall.

18     Q     If you did, they would be in one of your

19  notebooks?

20     A     Yes, they would be.

21     Q     What do you recall happening at that meeting?

22     A     That meeting was a general meeting to discuss

23  with Mike and I the insurance industry and how investment

24  vehicles fit within the insurance industry and to

25  determine whether it was an opportunity for FIDAC to

10:44a

1   manage a product that fit inside the insurance industry.

2        Q     Did you discuss any specific products or

3   potential products?

4        A     We didn't discuss any specific products,

5   other than it would just be a knock-off of one of our

6   existing funds or a strategy that was very similar to

7   what we were already doing.

8        Q     What was Mr. Peskoff's role at that meeting?

9        A     Mr. Peskoff was primarily just a listener

10  like Mike and I was, to learn more about the industry at

11  that point in time.

12       Q     Prior to attending -- Let me strike that.

13             Approximately when was that meeting?

14       A     February of '02, or maybe January of '02.

15       Q     You've got a good memory, or it's been

16  refreshed well.

17       A     It was the first transaction I worked on when

18  I came to the firm.  That's how I can remember.

19       Q     Prior to that meeting, had you had any

20  conversation with either Mr. Peskoff or Mr. Farrell about

21  a possible opportunity with Gen Advisors?

22       A     No, I had not.

23       Q     So you went into that meeting cold?

24       A     Right.

25             MR. BELL:  Let's just take a five-minute

10:46a

1    break.

2                    (Whereupon, at this time a recess was

3                    held.)

4    BY MR. BELL:

5         Q    Mr. Kazel, let me go back and try to tie up a

6    few loose ends before we continue.

7                    You mentioned that in addition to Gen

8    Advisors, that FIDAC also has an agreement with a finder

9    in connection with a Japan fund; is that correct?

10        A    Yes, that's correct.

11        Q    Who is the finder in that case?

12        A    It's a company called Alternative Investment

13   Partners.

14        Q    Where is Alternative Investment Partners

15   located?

16        A    They are located in Tokyo, Japan.

17        Q    What is the fee arrangement with Alternative

18   Investment Partners?

19        A    The fee arrangement varies by share class we

20   have in that fund, but I believe it is a similar split to

21   how we have with Gen Advisors, whereby FIDAC receives 20

22   basis points and AIP, or Alternative Investment Partners,

23   receives 10.

24        Q    Incidentally, at the time FIDAC entered into

25   Kazel Exhibit 2, which is the letter agreement with Gen

11:03a

1   up using in the Premier Fund?

2        A    We have several different insurance carriers

3   that invest in the fund today.  Nationwide Insurance is

4   one of them, a predominant one, as well as Hartford

5   Insurance.

6        Q    Let me try to back into the question I just

7   asked then.  When did you -- When was the agreement

8   reached with the insurance carriers with respect to the

9   Premier Fund?

10       A    The various carriers came in at different

11  points in time.  It would have been throughout, I guess,

12  2003, because the first funding occurred of Premier at

13  the end of '03, I believe.

14       Q    So when do you believe the agreement was

15  reached between the insurance carrier and Bank of America

16  to provide the wrap?

17            MS. KENNEY:  Do you mean in relation to

18  Premier?

19            MR. BELL:  With respect to Premier, yes.

20            THE WITNESS:  We never reached an agreement

21  with Bank of America to wrap.

22  BY MR. BELL:

23       Q    I understand that.  I understand that the

24  agreement was between the insurance carrier and Bank of

25  America; correct?  I'm sorry.  I stand corrected.

38

11:06a

1          When was the insurance --  When was the

2    agreement reached between the carrier and Royal Bank of

3    Canada?

4          A    It would have been sometime in '03.

5          Q    But you don't know when?

6          A    I don't know exactly when.

7          Q    Do you know whether that agreement had been

8    reached at the time FIDAC entered into Kazel Exhibit 2?

9          A    No, it would not have been.

10          Q    So it would have been sometime between

11    October 10th of 2002 and the end of '03?

12          A    That is correct.

13          Q    What was Gen Advisors' role in bringing Royal

14    Bank of Canada to the project?

15          A    Jeff Messner, who is affiliated with Gen

16    Advisors, had a preexisting relationship with Royal Bank

17    of Canada.

18          Q    Now, you said the first funding came in at

19    the end of 2003, correct, for the Premier Fund?

20          A    Yes, I believe that to be correct.

21          Q    Is it fair to say that the funding continued

22    to increase over the next couple of years into the

23    Premier Fund?

24          A    The funding has increased since the initial

25    launch in December of '03 to today.

39

11:34a

1              MR. BELL:  What I meant was services that

2    FIDAC provides in connection with the Premier Fund.  Is

3    that how you understood my term?

4              THE WITNESS:  That is how I understood your

5    term.

6    BY MR. BELL:

7         Q     So as I understand it, there are some legal

8    costs and there's some accounting costs, some of which

9    are reimbursed by the fund manager, some of which are not

10   reimbursed by the fund manager; is that right?

11        A     No, some of which are reimbursed by the fund

12   itself, the entity Premier, and some of which are not.

13        Q     Okay, yeah.  I'm not expecting you to know

14   what those costs are.

15             MR. BELL:  And again, Nick, maybe you can

16   help us on this.

17   BY MR. BELL:

18        Q     But what documents exist which would reflect

19   what those direct costs are?

20        A     The Premier audited and unaudited accounts

21   that we produce - unaudited accounts are produced

22   semi-annually and audited accounts annually for Premier -

23   break out the various expenses to the fund.

24        Q     Now, in addition to the costs of operating

25   the fund, or at least FIDAC's role in operating the fund,

11:37a

1    '03, so we would have had those development costs from

2    sometime in '02 till the formation of the fund in '03.

3        Q    Now, my understanding is that this fund is a

4    unique fund in your industry; is that --

5        A    Yes, that is correct.

6        Q    What is it that makes it unique?

7        A    There are --  To our knowledge, there are no

8    leveraged fixed-income funds inside variable life

9    insurance contract policies outside of the Premier Fund.

10       Q    Even today there are none other than the

11   Premier Fund?

12       A    That's correct.

13       Q    Were the costs of developing this fund

14   greater than the costs of developing other funds that

15   you've been involved in?

16       A    Yes, they were.

17       Q    Is that because this was a unique product?

18       A    Yes, it was.

19       Q    Did this product also take longer to develop

20   than other products that you've been involved in?

21       A    Yes, it did.

22       Q    Is that also because it was a unique product?

23       A    Yes, it is.

24       Q    What was Mr. Peskoff's role in the

25   development of the Premier Fund?

11:48a

1          A      My involvement was as advisor to the limited

2     partnership, setting up the agreement between FIDAC to

3     manage the assets in the partnership in conjunction with

4     the terms set out by Sentry Select, the general partner

5     to the partnership.

6          Q      So if I'm understanding this correctly,

7     FIDAC's client, or the party with whom FIDAC has the

8     contractual relationship, is the limited partnership?

9          A      FIDAC's contractual relationship is with the

10    limited partnership, yes.

11         Q      And prior to the formation of the MBS income

12    trust, did you have any discussions with Mr. Peskoff

13    about the possibility of FIDAC and Sentry Select working

14    together on any investment vehicle?

15         A      My discussions were held with Raniero Corsini

16    of Sentry Select.

17         Q      Before you first met with Raniero Corsini,

18    did you have any discussions with Mr. Peskoff about FIDAC

19    working with Sentry Select?

20         A      Yes, I did.

21         Q      Is it your understanding that Mr. Peskoff was

22    responsible for introducing Sentry Select to FIDAC?

23         A      Yes, it is.

24         Q      And that prior to Mr. Peskoff's introduction

25    of Sentry Select to FIDAC, FIDAC did not have any

01:49p

1     Q    In the --  Strike that.

2          (Whereupon, the Reporter marked Kazel 7.)

3  BY MR. BELL:

4     Q    Exhibit 7 is an April 7th, 2005 letter from

5  Mr. Peskoff to Mr. Farrell.  Have you seen that letter

6  before today?

7     A    The first time I saw this letter was in the

8  compilation of the documents for this.

9     Q    So at the time this was --  Back in April of

10  2005, you didn't see this letter?

11    A    I did not see this letter.

12    Q    Did you have any communication with

13  Mr. Farrell about the fact that Mr. Peskoff had sent him

14  a letter?

15    A    No, I did not.

16    Q    So is it your recollection that you didn't

17  have any communications with Mr. Farrell in or about

18  April of 2005 regarding Mr. Peskoff?

19    A    I don't recall if we spoke about Mr. Peskoff

20  back then.

21    Q    Let me --  This might refresh your

22  recollection.

23          (Whereupon, the Reporter marked Kazel 8.)

24  BY MR. BELL:

25    Q    I'll give you a moment to look at that.

02:19p

1    limited to FBR.  In fact, it makes no mention of FBR;

2    correct?

3          A     I said it's not specific to FBR, that's

4    correct, because it doesn't make any reference to FBR.

5                  (Whereupon, a discussion was held off

6                   the record.)

7    BY MR. BELL:

8          Q     Were you in attendance at the meeting in

9    October 2002 attended by Mr. Baptista, Mr. Farrell, and

10   perhaps others?  In other words, I'm asking whether you

11   were there.

12         A     I don't recall if I was in attendance at the

13   meeting.

14         Q     Do you recall attending any meeting at which

15   Mr. Baptista and Mr. Farrell were present in which

16   payment to Mr. Peskoff was discussed?

17         A     No, I don't recall any meeting that that was

18   discussed.

19         Q     Did you ever have any discussion with

20   Mr. Baptista about payment to Mr. Peskoff?

21         A     No, I have had no discussions with

22   Mr. Baptista.

23         Q     About that?

24         A     Regarding payment, right.

25         Q     As I understand your -- FIDAC's

# EXHIBIT
# 5

FIXED INCOME DISCOUNT
12 E 41ST ST
NEW YORK, NY 10017

297

WCMA® WorkingCapital
Management® Account

22-30/440

PAY TO THE ORDER OF Underhill Investments    DATE 5/15/02

REDACTED

REDACTED

⑤ Merrill Lynch

BANK ONE, VIRGINIA, NORTHERN VA

029↑

⑆044000804⑆ 04↓↓23623656⑆ 029↑

REDACTED

Steve Reshoff
7414 Old Maple Sq
Mclean, VA
22102

Clerk:
Underhill Invest.

REDACTED

CONFIDENTIAL

F 00005

FIXED INCOME DISCOUNT ADVISORY COMPANY

FBR Investment Management, Inc.
INVOICE # 05

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**REDACTED**

**CONFIDENTIAL**

F 00006

FIDAC

File: Steve Peskoff

*FIXED INCOME DISCOUNT ADVISORY COMPANY*

FBR Investment Management, Inc.
INVOICE # 08

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|

## REDACTED

Steve Peskoff
7414 Old Maple Sq.
McClean, VA
Check:      22102
Underhill Invest.

## REDACTED

**CONFIDENTIAL**

F 00007

*FIXED INCOME DISCOUNT ADVISORY COMPANY*

FBR Investment Management, Inc.
INVOICE # 08

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 5 |

### REDACTED

**CONFIDENTIAL**

F 00008

file: Steve Peskoff

FIXED INCOME DISCOUNT ADVISORY COMPANY

*Christie set up FIDAC Advsy Fees*

FBR Investment Management, Inc.
INVOICE # 02

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

## REDACTED

*Statement*

P - 25

FIXED INCOME DISCOUNT ADVISORY CO.
1600 HARBOR BLVD.
WEEHAWKEN, NJ 07087

1489

5-271 293
212

5/5/2000    19____

PAY
TO THE
ORDER OF____ Steve Peskoff — Underhill Investment _____    | REDACTED

REDACTED

THE BANK OF NEW YORK
NATIONAL COMMUNITY DIVISION
1209 HARBOR BOULEVARD, WEEHAWKEN, NJ 07087

FOR 2-14-00 - 4-1-2000  P&R Asset _____

REDACTED

P - 26

FIXED INCOME DISCOUNT ADVISORY COMPANY

FBR Investment Management, Inc.
INVOICE # 94

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | | Total FIDAC Fees Paid | Date | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## REDACTED

P - 30

FIXED INCOME DISCOUNT ADVISORY COMPANY

FBR Investment Management, Inc.
INVOICE # 05

| Beginning Date | Ending Date | # of Days | Beginning Gross Assets | Ending Gross Assets | Average Gross Assets | Fee Percentage per Annum | Days in Year | Total FIDAC Fees | | Total FIDAC Fees Paid | Date | Fees Paid to Steve Peskoff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## REDACTED

Payable to Underhill Investment Corp.

P-32

FIDAC
4-18-01
Dep # 154

# EXHIBIT
# 6

Page 1

1

2      IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE

3      ---------------------------------------x

4      UNDERHILL INVESTMENT
        CORPORATION, by and through

5      Stephen D. Peskoff as successor in
        interest, and STEPHEN D. PESKOFF,

6      individually,
                          Plaintiffs,      Civil Action No.

7          -against-                       06-99-SLR

8      FIXED INCOME DISCOUNT
        ADVISORY COMPANY,

9                          Defendant.

10     ---------------------------------------x

11                    December 12, 2006
                       10:02 a.m.

12

13

14          DEPOSITION of ERNEST P. BAPTISTA, JR.,

15     taken by Defendant, pursuant to Subpoena, at the

16     law offices of Kirkpatrick & Lockhart Nicholson

17     Graham LLP, 599 Lexington Avenue, New York, New

18     York, 10022-6030, before Eleanor Greenhouse, a

19     Shorthand Reporter and Notary Public within and

20     for the State of New York.

21

22

23                    GREENHOUSE REPORTING, INC.

24              363 Seventh Avenue - 20th Floor
                  New York, New York  10001

25                     (212) 279-5108

Page 30

E. Baptista, Jr.

1
2    Q.  Okay. What did you say and what did
3 he say at this first meeting? What did you
4 discuss?
5    A.  I explained who M was, what we were
6 doing in private placement, why I think this
7 works in private placement. Private placement
8 has been around for a while, but really coming
9 into its own actually in the last couple of
10 years. I said, "We're ahead of the curve. If
11 you want to be ahead of the curve, it's going to
12 require some time on your part or your staff's
13 part." So I said, "Let's set up a meeting with
14 the people from Mullen and myself and maybe
15 someone from M and Steve Peskoff in January."
16 And we had a meeting in January.
17    Q.  Before you get to that meeting, tell
18 me what else was said at the first meeting.
19    A.  I said, "This is an opportunity for
20 you to pick up assets you normally would not have
21 any access to. They are going to be sticky, but
22 it's not going to be easy, because we're blazing
23 a new trail."
24    Q.  When you say sticky, do you mean
25 they are likely to be kept under this management

Page 31

E. Baptista, Jr.

1
2 once they are invested with them?
3    A.  Right. In BOLI, if you do the job
4 and everyone understands what they've bought and
5 its asset allocation, because you never get 100
6 percent of the money, because they are modified
7 endowment contracts, the money stays in those
8 accounts anywhere from 10 to 20 years. That's
9 what I mean by sticky money.
10    Q.  Now, would you explain to me, when
11 you met with Mike the first time, what you were
12 proposing that the structure be of whatever
13 transaction you were contemplating? Can you
14 simplify for us what you were proposing?
15    A.  We were talking conceptually, "If
16 you're willing to work with us, we might be able
17 to help you structure an insurance dedicated
18 fund, IDF" -- that's what you have to have to be
19 on these platforms -- "for mortgage-backed
20 securities that can pick the low-hanging fruit,"
21 because the interest rates were dropping and
22 interest rates were low and the interest rates
23 insurance companies' general accounts were paying
24 were starting their precipitous drop and everyone
25 saw that coming and knew it was going to get

Page 32

E. Baptista, Jr.

1
2 worse no matter what. So there was a product
3 needed that banks understood -- mortgage-backed
4 securities, they understand that -- AAA paper,
5 bank eligible investments, using leverage that
6 would get a return of anywhere from 3 to 400
7 basis points over ten-year Treasury. That's the
8 goal. That's all we talked about, not in that
9 much detail, was the conceptual how to do
10 something in an insurance contract, that "I
11 should bring in some people who can also bring
12 the distribution of the product and let you talk
13 to them because if they are going to sell it, you
14 want to hear what they have to say."
15    Q.  So let me summarize and expand in
16 some respects. At the first meeting, you
17 discussed with Mike Farrell the possibility of
18 finding new sources of money for him to manage?
19    A.  Correct.
20    Q.  The potential new sources of money
21 would come from either the corporate-owned life
22 insurance or the bank-owned life insurance?
23    A.  Um-hum.
24    Q.  And the means by which Mike would be
25 able to compete to get this would require that he

Page 33

E. Baptista, Jr.

1
2 establish a fund which would meet the
3 requirements for investment that the banks and
4 the corporations had to comply with.
5    A.  As well as the insurance carriers.
6    Q.  As well -- okay, because it's the
7 banks and the corporations that will want a
8 certain structure or characteristics in this fund
9 and the insurance carriers will want that as
10 well.
11    A.  Correct.
12    Q.  And what didn't exist at the time
13 was a fund that necessarily met the requirements
14 of both the banks, the corporations, and the
15 insurance carriers. Mullen Consulting would come
16 in to help structure that fund?
17    A.  Yes.
18    Q.  And --
19    A.  Well, I brought them to the meeting.
20    Q.  No. This is the first meeting.
21 This is what you were proposing at the first
22 meeting. What role --
23    A.  I didn't bring up the name Mullen at
24 the first meeting. I just had it in the back of
25 my mind.

Page 34

1     E. Baptista, Jr.
2     Q.    So you said to Mike that, "We have
3    to find a way to create a fund or a vehicle where
4    you will be the investment advisor which will
5    qualify for investment by the insurance companies
6    as part of their COLI and BOLI programs"; is that
7    right?
8        A.    Correct.  And we talked a little bit
9    about M being the largest producer group in the
10   country, largest premium -- in other words,
11   there's only two carriers in the United States
12   that produce more premium, Northwestern Mutual
13   and Metropolitan.
14       Q.    Slowly.  You're speaking too fast
15   for the reporter.
16       A.    There are only two insurance
17   carriers that produce more new premium a year,
18   Northwestern Mutual and Metropolitan and our
19   group.  Therefore, that's what we talked about.
20   We didn't talk specifically about Mullen.  We
21   said also we've got to bring in some people who
22   actually sell the product.
23       Q.    The product being the COLI and BOLI?
24       A.    Correct.  So that you know you have
25   distribution if you spend some time, effort, and

Page 35

1     E. Baptista, Jr.
2    money, that you just don't have a product sitting
3    on a platform that no one sells.
4        Q.    Okay.  So you have, first, FIDAC
5    would have to design and create a fund which had
6    the characteristics necessary to attract COLI and
7    BOLI and the insurance companies' investment?
8        A.    Um-hum.
9        Q.    Second, FIDAC had to be sure that
10   the insurance product that was going to be the
11   vehicle for making the investment in this new
12   vehicle that was going to be created was going to
13   be marketed by someone?
14       A.    Um-hum.

## REDACTED

21       Q.    And what happens is the brokers go
22   to the people at the corporations and the banks
23   and they talk to the executives that make
24   the decisions?
25       A.    Correct.

Page 36

1     E. Baptista, Jr.
2        Q.    And they say, "If you buy this
3    insurance product, one of the available
4    investment options is going to be this FIDAC
5    fund"?
6        A.    Correct.  Our job, when you look at
7    our contract that was signed on October 10, 2002,
8    was to advise FIDAC how to do all these thing and
9    to be the liaison with the insurance carriers and
10   the liaison with the brokerage community.
11   Between Jeff Messner and John Boma, and myself,
12   we knew all the carriers and we knew all the top
13   brokers.
14       Q.    The ultimate source of the money in
15   these situations was going to either be the banks
16   or the corporations.
17       A.    Correct.
18       Q.    Did you, at the first meeting with
19   Mr. Farrell in November 2001, get any more
20   specific than this general concept?
21       A.    No.
22       Q.    How was it left at the conclusion of
23   the meeting?
24       A.    I told him I would get back to him
25   and try to set up a meeting.  I would get back to

Page 37

1     E. Baptista, Jr.
2    him and try to set up a meeting after the first
3    of the year, with all the different parties that
4    I think could bring something to the table so we
5    could discuss it and drill it down a little bit
6    and be more specific and it's something that we
7    should pursue or not pursue.
8        Q.    At the first meeting, was there any
9    discussion of Mr. Peskoff or Underhill, his
10   company?
11       A.    Yes.
12       Q.    What was the discussion?
13       A.    The discussion was very simple.
14   "Steve set up the meeting.  How do you know
15   Steve?"
16       Q.    And what was said?
17       A.    I said, "I met him in August at an
18   investment banking conference and I was telling
19   him what I was doing, and he said you should talk
20   to Mike Farrell.  I think the two of you can do
21   some things together."
22       Q.    Am I correct nothing else was said
23   about Steve or his company, Underhill, at this
24   first November meeting?
25       A.    Outside of he explained that they

10 (Pages 34 to 37)

Page 50

```
1              E. Baptista, Jr.
2    summary form the various steps that have to be
3    taken by Gen Advisors in order to result in this
4    new source of funds coming into FIDAC's
5    management sphere. Did you lay all of this out
6    in words or substance at the January meeting?
7       A.   No.
8       Q.   What part of it didn't you explain
9    at the January meeting?
10      A.   We didn't go into all the
11   particulars, because quite frankly, you cannot be
12   in a meeting with people who are going to develop
13   a fund and just do the shortened version. There
14   were subsequent meetings in the end of February,
15   March, April, May, and June when they decided to
16   go ahead with it. Okay? And each one got into
17   more particular details.
18      Q.   Can you tell me more or less --
19      A.   And at one of the meetings, we
20   brought in the number one BOLI broker in the
21   country.
22      Q.   We will come to that. Can you tell
23   me more or less what was disclosed by you or
24   discussed by you at the meeting with respect to
25   what Gen Advisors was proposing to FIDAC?
```

Page 51

```
1              E. Baptista, Jr.
2       A.   We didn't propose anything at the
3    January meeting. We just told them what had to
4    be done. Because remember, I want you to
5    understand, the contract with FIDAC/Gen Advisors
6    wasn't signed for another ten months.
7       Q.   I understand that.
8       A.   So the roles, the compensation and
9    so on and so forth, were being meshed out between
10   February and October.
11      Q.   But in the January meeting, what was
12   the sum and substance of what you told the people
13   at FIDAC as to what would --
14      A.   Our role would be consultive and we
15   would help them with the insurance carriers. We
16   would help them in design and we would help them
17   with the brokerage end or the distribution end.
18      Q.   And this was a very, very general
19   and conceptual meeting?
20      A.   Very, very general.
21      Q.   Was there any discussion of
22   compensation at that meeting?
23      A.   Specific compensation, no.
24      Q.   What about any discussion at all
25   about compensation at that meeting?
```

Page 52

```
1              E. Baptista, Jr.
2       A.   Yeah. We told them we had to get
3    paid.
4       Q.   Can you tell me as best you recall
5    how that came up? Did someone ask you, "Are you
6    doing this for free," and you said, "No. We have
7    to get paid"? How did it come up if you recall
8    anything about that?
9       A.   You know, Steve was at the meeting,
10   and the only thing I remember with any certainty,
11   okay, is -- and I believe it was Steve, I'm
12   pretty certain, and said, "You've got to work out
13   contracts and how everyone gets paid here." And
14   everyone went, "Yeah, yeah, yeah, yeah." We were
15   working with other money managers at the time.
16   We hadn't settled on FIDAC yet.
17      Q.   Other than what you've just
18   testified to, do you recall anything else being
19   said at this meeting about anybody's
20   compensation, if you went forward?
21      A.   Not at that time. At subsequent
22   meetings, yes.
23      Q.   When is the next time that you met
24   or spoke with Mike Farrell or anyone at FIDAC
25   about this?
```

Page 53

```
1              E. Baptista, Jr.
2       A.   I believe it was March of 2002. I
3    could be off on this, but it was sometime in late
4    winter-early spring.
5       Q.   And where was that meeting? Was it
6    a meeting?
7       A.   Yeah, at FIDAC.
8       Q.   Who attended the meeting?
9       A.   We had -- was that the meeting with
10   Bobby Long or was it the next one? At that
11   meeting was Jeff, John. I did not attend. I had
12   my partner, Bob Padula, with me and we just came,
13   said hi, and left, because Jeff thought we would
14   have too many people. So that's the extent of
15   what I know about that meeting, except I got a
16   report later.
17      Q.   Before you get to that, just tell me
18   you were at the meeting in March very briefly?
19      A.   Yes.
20      Q.   Just to make introductions?
21      A.   Yes.
22      Q.   And then you left?
23      A.   Um-hum.
24      Q.   What was discussed when you were
25   there, if you recall?
```

14 (Pages 50 to 53)

Page 54

E. Baptista, Jr.
1
2    A.    "Hi. How are you?"
3    Q.    Just pleasantries?
4    A.    Yes. Let me explain what my role
5  is. I find things.
6    Q.    Right.
7    A.    And then I hire people to do the T's
8  and the I's and the nitty-gritty. I really
9  don't —
10   Q.    To cross the T's and dot the I's?
11   A.    That's not me.
12   Q.    Not to tease anybody?
13   A.    Yeah.
14   Q.    At the January meeting, Messner was
15  there?
16   A.    Yes.
17   Q.    And Messner was at the March
18  meeting?
19   A.    Um-hum.
20   Q.    Messner is still with Gen Corp.;
21  right?
22   A.    Yes.
23   Q.    Gen Advisors?
24   A.    Gen Advisors, yes.
25   Q.    Today?

Page 55

E. Baptista, Jr.
1
2    A.    Yes. In fact, they were at FIDAC
3  about two hours ago, Jeff and John.
4    Q.    Put aside the report for a minute.
5  Did you speak with anybody at FIDAC between the
6  January meeting and the March meeting, if that's
7  when it occurred, other than to set up the second
8  meeting?
9    A.    Just to set it up. And you know,
10  and I could have talked to Mike. I said, "Look,
11  I think this could be really good." Okay?
12  Because we were getting more and more comfortable
13  with FIDAC and their strategy.
14   Q.    At the March meeting — withdrawn.
15  What, as you understood it, was the purpose of
16  the March meeting?
17   A.    Just to keep on pushing it forward
18  and see if there was common interest, common
19  goals.
20   Q.    During the period January through
21  March, had there been any change or developments
22  either in the regulatory landscape or in your
23  thinking, or was it just basically keeping on
24  pushing with the concept that had been broadly
25  outlined in January?

Page 56

E. Baptista, Jr.
1
2    A.    Just with the concept.
3    Q.    Had anybody, to your knowledge, ever
4  created a fund like the fund or vehicle that you
5  were proposing FIDAC create in order to
6  participate —
7    A.    Not up to that time. That's why I
8  said we were breaking new ground.
9    Q.    In what way was this new ground?
10  Why was it new ground? Was it the leverage
11  aspect of FIDAC's?
12   A.    No one has done a mortgage-backed
13  security in an insurance contract with leverage.
14   Q.    I see.
15   A.    And had a track record going back to
16  the quote-unquote dollar fund that we were
17  looking at back to 1994 where there were only
18  three or four down months in a six or seven-year
19  period of time.
20   Q.    So that's what was so far
21  unprecedented?
22   A.    Yeah. In an insurance contract.
23   Q.    Yes. That's what we're talking
24  about here. The whole premise here was this was
25  going to be FIDAC's investment vehicle, that it

Page 57

E. Baptista, Jr.
1
2  managed anyway, in the insurance contract?
3    A.    Correct. Excuse me. Can I do one
4  thing? Can I just call someone I'm supposed to
5  meet?
6        MR. NOVACK:  Off the record.
7        (Recess taken.)
8    Q.    You say you got a report after the
9  March meeting.
10   A.    Um-hum.
11   Q.    Who gave you the report?
12   A.    Jeff Messner.
13   Q.    Was it oral?
14   A.    Yes.
15   Q.    Can you tell me what you remember of
16  the report?
17   A.    He told me — he said, "Done
18  properly, this could be a home run, because this
19  is what the distribution systems are looking
20  for," and he talked to some of the distribution
21  systems.
22   Q.    When you say the distribution
23  systems —
24   A.    The people, brokers who actually
25  sell the product on the firing line.

15 (Pages 54 to 57)

Page 78

E. Baptista, Jr.

1 people at FIDAC or their lawyers?
2 A. Totally FIDAC. As a matter of fact,
3 I believe it was all Nick Singh, who is now
4 general counsel.
5 Q. The meeting that you had in October
6 2002, did we go over how long it lasted? I'm not
7 quite sure I remember.
8 A. No, but it was a short meeting, less
9 than an hour. Because everything was agreed to
10 beforehand.
11 Q. Was it your understanding that the
12 structure of the vehicle that was going to be
13 newly created by FIDAC was set and agreed upon by
14 that time?
15 A. No.
16 Q. That still had to be developed?
17 A. That was in process, both with
18 Deloitte and Nick Singh, who was working on the
19 structuring and the legal limited partnership or
20 the private placement memorandum. It was a work
21 in progress.
22 Q. At the meeting, can you tell me what
23 was discussed?
24 A. We just went over the contract.
25

Page 79

E. Baptista, Jr.

1 Q. Take your hand away from your mouth,
2 please. What happened at the meeting in October
3 2002?
4 A. We went over the contract: "Is
5 there are any issues?" "No." The question of
6 Steve Peskoff.
7 Q. With regard to this, please tell me
8 who said what, as opposed to a summary of the
9 substance. Try to recall. What was said at this
10 meeting about Mr. Peskoff?
11 A. I can't tell you for sure who said
12 this part, what I'm going to say. "Okay, what do
13 we do about Steve Peskoff?" I don't know if I
14 said it, I don't know if Mike Farrell, Ron Kazel
15 said it. I really don't remember. Okay. All I
16 know is the answer to it is, "We don't want you
17 paying him. We will discuss it with him."
18 Q. Okay.
19 A. Okay?
20 Q. What else was said, if anything?
21 A. And the word "double dip," was
22 mentioned. I can't tell you if it was Ron Kazel
23 or Mike Farrell.
24 Q. What else was said about that?
25

Page 80

E. Baptista, Jr.

1 A. That's it.
2 Q. Those few words are the only words
3 that were uttered with regard to Steve Peskoff
4 and compensation; is that right?
5 A. Um-hum.
6 Q. After that time, did you ever again
7 have a conversation with anyone at FIDAC about
8 compensation for Steve Peskoff?
9 A. No.
10 Q. To your knowledge, did anyone else
11 at Gen Advisors after that have any discussion?
12 A. I don't think so. I don't have any
13 knowledge.
14 MR. NOVACK: Can we take maybe a
15 15-minute break?
16 (Recess taken.)
17 Q. Am I correct that other than the one
18 comment that was made at the meeting in October
19 2002, you're not aware of any other comment or
20 statement made by anyone at FIDAC with respect to
21 compensating Steve Peskoff or Underhill for
22 services rendered in connection with Gen
23 Advisors?
24 A. Could you rephrase that question?
25

Page 81

E. Baptista, Jr.

1 Q. Sure. What part of it is unclear?
2 A. When you say the Gen Advisors, do
3 you mean — be more specific. A finder's fee for
4 Premier or whatever you want to call it.
5 Q. Let me ask it a different way, then.
6 That's a fair thing. You went to law school for
7 a little while, you said; right?
8 A. I got a lot of lawyers floating
9 around.
10 Q. Mr. Peskoff gave you the
11 introduction to Mike Farrell; right?
12 A. Um-hum. Yes.
13 Q. Other than the comment that was made
14 in the October 2002 meeting, are you aware of any
15 other comment or statement made by anyone at
16 FIDAC with respect to possibly compensating
17 Mr. Peskoff or Underhill for this introduction?
18 A. I do not recall any other meetings,
19 although people have told me that there was a
20 meeting where he said, "We will take care of
21 Steve." I don't recall that. But I do recall in
22 the October meeting, that's —
23 Q. Am I correct that you've given us
24 the full and best recollection you have of what
25

21 (Pages 78 to 81)

Page 94

```
1              E. Baptista, Jr.
2   compensation of Mr. Peskoff --
3      A.   No.
4      Q.   -- or Underhill?
5      A.   No.
6      Q.   What is your understanding of what
7   Mr. Peskoff did with regard to the eventual
8   creation of Premier beyond introducing you to
9   Mike Farrell?
10     A.   He introduced us to -- let me answer
11  it this way:  He made an introduction to Mike
12  Farrell, ran the first full meeting with
13  everyone, getting everyone on board.  As far as
14  the technical aspects of the fund or raising
15  money for the fund, nothing.
16     Q.   I'm correct that Mr. Peskoff didn't
17  go out and meet with the insurance brokerage
18  community?
19     A.   No.
20     Q.   He didn't go out and meet with the
21  insurance companies?
22     A.   No.
23     Q.   He didn't go out and meet with the
24  corporations and banks that were going to make
25  the determination of what investment vehicle to
```

Page 95

```
1              E. Baptista, Jr.
2   use if they went into the life insurance
3   products?
4      A.   No.
5      Q.   He didn't meet with the banks that
6   were doing the wrapping?
7      A.   No.
8      Q.   Is it fair to say all he did was
9   introduce you to Mr. Farrell and help arrange for
10  that first meeting in January?
11     A.   Well, just one other thing, and it's
12  not on the technical side.  Every time there was
13  a problem, Mike Farrell would call him saying,
14  "It's costing me a fortune.  Tell Ernie he's got
15  to get his act together, this, that, problems."
16  He acted as I'll call it Mike Farrell's
17  representative when there was a problem that Mike
18  Farrell didn't want to call.  For about a year,
19  when Mike got pissed off, pardon the language,
20  about the cost or the time and this wasn't
21  happening first enough, so on and so forth, I got
22  a call from Steve, and that's usually every two
23  weeks or at least once a month for a year.
24     Q.   Do you think that Mr. Farrell was
25  acting unreasonably in being upset that it had
```

Page 96

```
1              E. Baptista, Jr.
2   cost so much money to try to develop this
3   product?
4      A.   I'm not going to -- I have no idea
5   what was in his head.
6      Q.   Did you, during the course of the
7   period 2003 -- let me withdraw that.  When was,
8   to your recollection, Premier established, the
9   vehicle established?
10     A.   It was opened with the first dollars
11  put in, which was established December 29th,
12  2003.
13     Q.   Before that, we know that Premier,
14  the investment vehicle, had to be created?
15     A.   Right.
16     Q.   Then it had to be marketed to --
17     A.   Right.
18     Q.   To whom?
19     A.   Marketed to whoever.  It had to be
20  marketed to the insurance carriers, had to be
21  marketed to the brokerage community.  It had to
22  be marketed to the wrap providers and then to the
23  ultimate user, the person or the organization
24  that wrote the check, and that became effective
25  12/29/03.
```

Page 97

```
1              E. Baptista, Jr.
```

**REDACTED**

25 (Pages 94 to 97)



Page 174

E. Baptista, Jr.

1
2     A.    I don't know.
3     Q.    You don't know if that would be
4  confidential information?
5     A.    No, I don't know.
6     Q.    Why don't you know?
7     A.    Because I don't know.
8     Q.    I don't understand.  You think it's
9  public knowledge as to what was pending?
10    A.    I don't know.  There were
11  insurance -- there are other people involved.  I
12  said I don't know.  Okay?  You're getting me at a
13  point where you're questioning my numbers.  I
14  could be wrong.  I make a lot of mistakes.
15    Q.    That's why I'm telling you this.
16  I'm not trying to sneak up on you.  I'm telling
17  you I checked with the client, which would
18  presumably know what the numbers are that they
19  have under management.  That's why I'm giving
20  you, out of a sense of an abundance of fairness,
21  I'm giving you -- I'm not hiding anything, I'm
22  telling you exactly why I'm asking the questions.
23  You may be wrong.  Is there something available
24  in your office if you made a phone call you could
25  check?

Page 175

E. Baptista, Jr.

1
2     A.    I have all those --
3     Q.    I don't want detailed --
4     A.    I can get it tomorrow.  All those
5  records are locked up with me because of the
6  confidentiality issue.
7     Q.    Okay.  How much did Gen Advisors
8  invest, in terms of out-of-pocket expenses, in
9  the development of Premier?
10    A.    Out-of-pocket or time?
11    Q.    Out-of-pocket.
12    A.    About $75,000.
13    Q.    How much did Mr. Peskoff invest, do
14  you know?
15    A.    Zero.  He also worked for two years,
16  so if you want to count that, we put that on our
17  books, our time, just like FIDAC did, when they
18  said they had $500,000.  It wasn't all
19  out-of-pocket, it was their time too.
20    Q.    Do you know what proportion of the
21  500 was outside lawyers and auditors?
22    A.    I don't know for sure, but it was at
23  least 300,000 is my guess.
24    Q.    Right.  So we will get to that.
25  Now, do you recall having a discussion with

Page 176

E. Baptista, Jr.

1
2  Mr. Peskoff in which you told him that he ought
3  to offer to pay the out-of-pocket expenses of
4  FIDAC?
5     A.    No.
6     Q.    No?
7     A.    He had a conversation that he told
8  me he had with Mike Farrell and he offered to pay
9  half of them, and Mike said no.
10    Q.    Did you have a conversation on April
11  19, 2005 -- and I'm asking you this because I
12  have a memo from Mr. Peskoff's file, just so you
13  know.  I'm just asking what you remember -- in
14  which you said that you felt that Mike Farrell
15  forgot he had a contract with Steve Peskoff that
16  hasn't been terminated?
17    A.    No.
18    Q.    Did you tell Mr. Peskoff in April
19  2005 --
20    A.    Just let me --
21    Q.    I'm sorry.
22    A.    If he had a contract, I've never
23  seen it.
24    Q.    Right.
25    A.    So since no one showed me a

Page 177

E. Baptista, Jr.

1
2  contract --
3     Q.    Is it correct to say that you did
4  not tell Mr. Peskoff in April 2005 that you felt
5  that Mike Farrell forgot he had a contract with
6  Mr. Peskoff that hasn't been terminated?
7     A.    No.
8     Q.    It is not correct to say that?
9     A.    It is not correct.

REDACTED

15    A.    Absolutely not.  It never, never was
16  anywhere near that.
17    Q.    And you did not ever tell him that?
18    A.    No.
19    Q.    Did you tell Mr. Peskoff in April
20  2005 -- did you suggest to him that he inform
21  Mr. Farrell of the offer that Mr. Peskoff made to
22  pay the $600,000 in expenses, have Farrell take
23  that off the top of whatever is owed to Peskoff,
24  and then Peskoff will get paid after that?
25    A.    I have a little recollection of

45 (Pages 174 to 177)

# EXHIBIT

# 7

# FIDAC

*Fixed Income Discount Advisory Company*

April 20, 2004

Mr. Steve Peskoff
Underhill Investment Corporation
1660 International Drive
Suite 400
McLean, VA 22102

Dear Steve:

I received your letter dated as of the 12th of this month and wanted to respond to you in a timely manner.

During the last two years FIDAC has successfully grown its business through the launch of five different investment vehicles which are marketed in China, Japan, Latin America, Canada (MBS Trust) and the US life insurance market (Premier). The latter two of which you provided the initial introduction to the principals involved in their formation. Although I understand that you have a personal relationship with Mr. Baptista, you should realize that not only is the information he provided you incorrect, but it is in direct violation of the terms of the Confidentiality Agreement entered into between us and his organization. Based upon the extensive development time and costs involved for launching Premier, and the nominal level of assets currently in the fund, we have yet to see a positive return on our investment. While we have a dedicated team of investment professionals involved in the daily management of the fund who are responsible for its above market returns, we are dedicating limited resources to the further marketing of this product.

On numerous prior occasions Mike has mentioned to you that the least successful of products we launched in the past two years have been MBS Trust and Premier. Nonetheless, Mike discussed with you in December 2003 that he would compensate you for your limited involvement in these products and a check was issued to you on December 22, and cashed by you, for $30,000. It was also explicitly explained that there would be no further consideration paid to you and this letter serves as a further reiteration of that position.

Regards,

Ronald D. Kazel

P - 6

# EXHIBIT
# 8

## FIDAC
*Fixed Income Discount Advisory Company*



October 10, 2002

Mr. Ernest P. Baptista
Gen Advisors LLC
16 Main Street
East Greenwich, RI 02818

Dear Mr. Baptista:

# REDACTED

P-114

October 10, 2002
Page 2

REDACTED

P - 115

October 10, 2002
Page 3

REDACTED

P - 116

October 10, 2002
Page 8

REDACTED

P - 117

October 10, 2002
Page 9

P - 118

October 10, 2002
Page 4

REDACTED

Mr. Ernest F. Bapnsta
October 10, 2002
Page 5

REDACTED

P - 120

Mr. Ernest F. Baptista
October 10, 2002
Page 6

REDACTED

P - 121

CPB

October 10, 2002
Page 7

REDACTED

P - 122

Mr. Ernest F. Dapusta
October 10, 2002
Page 10

REDACTED

P - 123

Mr. Ernest F. Dapusar
October 10, 2002
Page 11

# REDACTED

[Remainder of Page Intentionally Left Blank]

P - 124

Mr. Ernest P. Bapusta
October 10, 2002
Page 12

REDACTED

REDACTED

P - 125

CPB

EXHIBIT A

# REDACTED

A-1

P - 126

EXHIBIT B

# REDACTED

B-1

P – 127

# EXHIBIT
# 9

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

CONFIDENTIAL

F 00291

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

CONFIDENTIAL

F 00292

**FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)**
**OVERVIEW OF ADVISORY FEES**

REDACTED

CONFIDENTIAL

F 00293

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

F 00294

CONFIDENTIAL

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

F 00295

CONFIDENTIAL

FIXED INCOME DISCOUNT ADVISORY COMPANY (FIDAC)
OVERVIEW OF ADVISORY FEES

REDACTED

CONFIDENTIAL

F 00296

# EXHIBIT
# 10



# FIXED INCOME DISCOUNT ADVISORY COMPANY

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Steve Peskoff | Ron Kazel |
| **COMPANY:** | **DATE:** |
| Underhill | 9-25-02 |
| **FAX NUMBER:** | **TOTAL NO. OF PAGES INCLUDING COVER:** |
| 703-287-4235 | 4 |
| **PHONE NUMBER:** | **SENDER'S PHONE NUMBER:** |
| 703-287-4234 | 212-696-0100 |
| **RE:** | **SENDER'S FAX NUMBER:** |
| | 212-696-9809 |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY

# REDACTED

1211 AVENUE OF THE AMERICAS
SUITE 2902
NEW YORK, NY 10036

P-1

REDACTED

P-2

REDACTED

P-3

REDACTED

P-4

# EXHIBIT
# 11

# Underhill Investment
## Corporation

March 13, 2003

Mike Farrell
Annaly Mortgage Management
1211 Avenue of the Americas
Suite 2902
New York, NY 10036

Dear Mike:

It was good speaking with you yesterday. I am looking forward to seeing you either next week or the week after when I go home to visit my mother.

Mike, it's been over 6 years since we first met and I view my relationship with you as the best thing that happened during my career at Friedman, Billings, Ramsey. We have both been supportive of each other and trust each other which is a rare commodity.

Over the past years, we've had discussions about my further involvement with FIDAC & Annaly. Therefore, I would never do anything to jeopardize the relationship we've created together. For the written record, there have never been discussions with Sentry Select or Gencorp about my compensation. We signed an agreement several years ago that allows me to share fees with you. I have never had a complaint.

When you ultimately decide to review your estate planning, etc, I'm there for you if you need me. I'll see you soon.

Sincerely,

Steve Peskoff

F 00174

# EXHIBIT
# 12

**REDACTED**

December 22, 2004

**REDACTED**

**Problems**

- Ernie is dealing with Kazel and Diamond who are inflexible

SDP Outlook
- SDP needs to set up meeting with Mike Farrell in January 05
  - SDP had offered to pay ½ of the $600K of expenses in the past and Farrell declined
  - However, contract between FIDAC and UIC was signed in 2000 and still in effect
    - Contract also applied to Canada
    - Therefore SDP is set to receive a fee (according to contract) because he introduced NLY and Gencorp to each other
- SDP to also set up call with Henry Fan, Baptista, Gilbane to discuss Education REIT
  - Baptista to golf with Billy Gilbane in January

P - 136

# EXHIBIT
# 13

**REDACTED**

August 26, 2002

**REDACTED**

Other Updates

- Levy Group is ready to go with Holliwell and they are bullish about moving ahead

August 29, 2002

- Raniero Corsini has drawn up a prospectus for Annaly look-alike
- He's set to launch product in October or November after Annaly/FIDAC signs subadvisor agreement
- A meeting has been set for September 9, 2002 for Kazel and Corsini et. Al. to discuss and finalize a subadvisor relationship
- Once letter (i.e. agreement) has been signed, Corsini will file product
- Corsini will have at least 14 underwriters and 14 distributors in Canada to assist with product
- RBC is part of their selling group and will be involved with the syndicate package

**REDACTED**

P - 111

REDACTED

REDACTED

P - 132

## CERTIFICATE OF SERVICE

I, Joseph Grey, hereby certify that on this 26th day of June, 2007, I caused true and

correct copies of the foregoing Certificate of Counsel to be served by the means indicated below

addressed to Defendant's counsel as follows:

John L. Reed, Esquire
Denise Seastone Kraft, Esquire
EDWARD'S ANGELL PALMER & DODGE LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
BY HAND DELIVERY

Gerald A. Novack, Esquire
KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
BY FEDERAL EXPRESS

Joseph Grey

SL1 732611v1/100409.00001