IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNDERHILL INVESTMENT CORPORATION, *by and through Stephen D. Peskoff as successor in interest*, and STEPHEN D. PESKOFF, *individually*,<br><br>Plaintiffs<br><br>v.<br><br>FIXED INCOME DISCOUNT ADVISORY COMPANY,<br><br>Defendant. | Civil Action No. 06-0099-SLR<br><br>**REDACTED VERSION**<br><br>**ORIGINAL FILED UNDER SEAL** |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND LEGAL ISSUES PURSUANT TO COURT ORDER OF FEBRUARY 13, 2008**

Dated: February 29, 2008

STEVENS & LEE, P.C.
Joseph Grey (DE Bar No. 2358)
G. Thompson Bell, III, *pro hac vice*
Pa. Attorney I.D. No. 32649
Todd J. Cook, *pro hac vice*
Pa. Attorney I.D. No. 89041
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
TEL: (302) 654-5180
EMAIL:   jg@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP
Robert L. Ruben, *pro hac vice*
D.C. Attorney I.D. No. 414580
Marshall F. Berman, *pro hac vice*
D.C. Attorney I.D. No. 020743
4800 Montgomery Lane, Suite 150
Bethesda, MD 20814
TEL: (301) 951-9696
EMAIL:   rruben@randalaw.com
         mberman@randalaw.com

*Attorneys for Plaintiffs Underhill Investment Corp. and Stephen D. Peskoff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNDERHILL INVESTMENT CORPORATION, *by and through Stephen D. Peskoff as successor in interest*, and STEPHEN D. PESKOFF, *individually*,<br><br>         Plaintiffs<br><br>   v.<br><br>FIXED INCOME DISCOUNT ADVISORY COMPANY,<br><br>         Defendant. | Civil Action No. 06-0099-SLR<br><br>**REDACTED VERSION**<br><br>**ORIGINAL FILED UNDER SEAL** |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND LEGAL ISSUES PURSUANT TO COURT ORDER OF FEBRUARY 13, 2008**

Pursuant to the Court's Order of February 13, 2008 [D.I.. 85], Plaintiffs Underhill Investment Corporation ("Underhill") and Stephen D. Peskoff ("Peskoff" or, together with Underhill, "Plaintiffs") file this statement of (a) material facts as to which Plaintiffs contend there is no genuine issue to be tried and (b) legal issues upon which Plaintiffs seek the entry of summary judgment.

**UNDISPUTED MATERIAL FACTS**

1. Peskoff introduced Defendant Fixed Income Discount Advisory Company ("FIDAC") to Sentry Select and Gen Advisors.

**Background of Underhill-FIDAC Relationship**

2. FIDAC is a money manager. [*See* Exhibit "1" at 69:12-13 (excerpts of the Deposition of Michael A.J. Farrell, December 15, 2007) (hereinafter Exhibit "1" will be cited as "Farrell Dep.")].[1]

---

[1] Unless otherwise noted, all references to exhibits are to the Certificate of Counsel Regarding Exhibits to Plaintiffs' Motion for Partial Summary Judgment that was filed under seal in this action.

1

### Background of Underhill-FIDAC Relationship

2. FIDAC is a money manager. [*See* Exhibit "1" at 69:12-13 (excerpts of the Deposition of Michael A.J. Farrell, December 15, 2007) (hereinafter Exhibit "1" will be cited as "Farrell Dep.")].[1]

3. FIDAC is incorporated under the law of Delaware.

4. Peskoff is, among other things, an independent consultant operating in the financial services and investment banking industries.

5. Underhill was a corporation wholly-owned by Peskoff through which Peskoff provided his consulting services.

6. Underhill, a dissolved Ohio corporation, assigned to Peskoff its rights to bring the claims set forth in the Amended Complaint.

7. Prior to the transactions giving rise to the instant claims, Peskoff had a personal and business relationship with Mike Farrell ("Farrell"), who is, and since founding the company in 1994 has been, the President, Chief Executive Officer and Chairman of the board of directors of FIDAC. [Farrell Dep. at 5, 8, 11-12].

8. Friedman Billings Ramsey ("FBR") had a real estate investment trust (the "FBR REIT") that prior to 2000 was managed by another money manager. [*See* Exhibit "2" at 73-74 (excerpts of the Deposition of Stephen D. Peskoff, October 10, 2006 and December 12, 2006) (hereinafter Exhibit "2" will be cited as "Peskoff Dep.")].

**REDACTED**

---

[1] Unless otherwise noted, all references to exhibits are to the Certificate of Counsel Regarding Exhibits to Plaintiffs' Motion for Partial Summary Judgment that was filed under seal in this action.

10. FIDAC took over the management of the FBR REIT in or about May 2000. [Peskoff Dep. at 73-75; Farrell Dep. at 22:7-17].

11. Farrell recognized that FIDAC had an obligation to pay Peskoff for the services rendered in connection with the FBR transaction.

12. On or about February 15, 2000, Farrell drafted and sent to Peskoff at Underhill's office in McLean, Virginia, a letter agreement to govern the consulting relationship between Peskoff and FIDAC going forward. [*See* Exhibit "3" (hereinafter cited as the "Consulting Agreement"); *see also* Peskoff Dep. 75:18-76:3].

13. In the Consulting Agreement, FIDAC and Plaintiffs agreed their relationship would be governed by Delaware law.

14. In the Consulting Agreement, FIDAC promised to "pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC to Underhill monthly." [Consulting Agreement ¶ 2].

15. Pursuant to the Consulting Agreement, FIDAC paid Underhill twenty percent (20%) of the management fees received by FIDAC from its business relationship with the FBR REIT. [*See* Exhibit "4"; Farrell Dep. at 16:14-17:4].

16. The Consulting Agreement is forward looking and contemplates its application to future accounts. [*See* Consulting Agreement].

17. The Consulting Agreement does not make reference to the FBR transaction, but instead refers to "accounts."

18. FIDAC only ever had one account with FBR, the FBR REIT.

19. FIDAC and Peskoff agreed that the Consulting Agreement would be terminable during the life of the accounts only with the written consent of both parties. [Consulting Agreement ¶ 3].

20. FIDAC has never provided notice of termination and Peskoff has never consented, orally or in writing, to the termination of the Consulting Agreement. [Farrell Dep. at 32; Peskoff Dep. at 95].

### The Gen Advisors Transaction

21. With the Consulting Agreement in hand, and in light of the past course of dealings wherein Peskoff was paid twenty percent of FIDAC's management fees for the FBR REIT account, Peskoff introduced FIDAC to Ernie Baptista, who is a principal of Gen Advisors. [See Exhibit "5"; Exhibit "6" at 37 (excerpts of deposition of Ernest P. Baptista, December 12, 2006 (hereinafter Exhibit "6" will be cited to as "Baptista Dep."); Exhibit "7" at 32-33 (excerpts of deposition of Ronald D. Kazel, December 14, 2006 (hereinafter Exhibit "7" will be cited to as "Kazel Dep."); Peskoff Dep. at 94].

22. Baptista and his partners in Gen Advisors had special knowledge regarding insurance-based investment vehicles. [See Farrell Dep. at 43-44].

23. Peskoff thought that Baptista and his company would make good business partners for FIDAC. [See Baptista Dep. at 37:8-21].

24. Peskoff first introduced and arranged for a meeting between Baptista and Farrell. [See Farrell Dep. at 40; Baptista Dep. at 37].

25. After the initial meeting, Peskoff arranged for and attended a second meeting with Baptista, his partner Jeff Messner, Farrell and Kazel, which took place in January or February of 2002. [See Kazel Dep. at 32; Baptista Dep. at 52, 94 (testifying that Peskoff "ran the first full meeting with everyone, getting everyone on board")].

26. The purpose of the meeting was for Baptista and his partner to explain the insurance industry to FIDAC to explain "how investment vehicles fit within the insurance industry and to determine whether it was an opportunity for FIDAC to manage a product that fit inside the insurance industry." [*See* Kazel Dep. at 32-33].

27. At the close of this meeting, Baptista asked Farrell how Peskoff would be compensated for putting FIDAC and Gen Advisors together.

28. Farrell responded that Peskoff was FIDAC's responsibility and Gen Advisors should not pay Peskoff. [*See* Peskoff Dep. at 145; Farrell Dep. at 55-56].

29. After several subsequent discussions, FIDAC and Gen Advisors, on October 10, 2002, signed an agreement to work together on an insurance-based investment product. [*See* Exhibit "8" (Gen Advisors-FIDAC agreement dated October 10, 2002)].

30. Again, prior to signing the agreement Baptista asked Farrell about Peskoff's compensation for the deal.

31. Again, Farrell said Peskoff was FIDAC's responsibility and Gen Advisors should not pay Peskoff. [*See* Baptista Dep. at 79].

32. Farrell wanted to make certain that Peskoff did not "double-dip" with both FIDAC and Gen Advisors paying him for putting the parties together for the transaction. [*See id.*; Farrell Dep. at 56].

33. The insurance-based fund FIDAC and Gen Advisors planned to launch was a groundbreaking and unique investment product. [*See* Farrell Dep. at 69:21-24; Baptista Dep. at 56; Kazel Dep. at 52].

34. Therefore, it took several more months after signing the FIDAC-Gen Advisors agreement before the product went to market. [*See* Kazel Dep. at 38-39].

35. During the course of those months, Peskoff received frequent calls from Farrell about the Gen Advisors deal wherein Farrell would voice his frustrations with the deal.

36. For example, Peskoff was called in to help resolve interpersonal issues between FIDAC and Gen Advisors. [*See* Baptista Dep. at 94-95 (testifying that Peskoff "acted as . . . Mike Farrell's representative when there was a problem that Mike Farrell didn't want to call [Baptista]. For about a year, when Mike got pissed off, pardon the language, about the cost or the time and this wasn't happening [fast] enough, so on and so forth, [Baptista] got a call from Steve [Peskoff], and that's usually every two weeks or at least once a month for a year.")].

37. Farrell also frequently shared his frustrations with Peskoff regarding the start-up costs associated with launching the insurance-based investment product.

38. In response, Peskoff offered to reimburse Farrell for half of the start-up costs FIDAC had incurred in connection with the Gen Advisors transaction. [Peskoff Dep. at 196; Baptista Dep. at 176:7-9].

39. Ultimately, FIDAC and Gen Advisors successfully created the Premier fund, which FIDAC has managed since December 2003.

**REDACTED**

42. Despite acknowledging that Peskoff made the vital introduction and promising to pay him for the same, FIDAC has refused to pay Peskoff a single dime for his crucial role in bringing Gen Advisors and Premier to FIDAC. [*See* Farrell Dep. at 56].

### The Sentry Select Transaction

43. In mid-2002, several months after the Gen Advisors introduction, Peskoff introduced FIDAC to Raniero Corsini of Sentry Select Capital Corp ("Sentry Select"). [*See* Kazel Dep. at 58; Farrell Dep. at 57].

44. Sentry Select is a Canadian wealth management company that designs and markets investment vehicles for the Canadian market.

45. Peskoff met Corsini while traveling in Canada. After discussing Sentry Select's business with Corsini, Peskoff thought that Sentry Select would make a good business partner for FIDAC and would afford FIDAC an entry point into the Canadian money management market.

46. Accordingly, Peskoff put Corsini in contact with Farrell. [*See* Farrell Dep. at 57; *see also* Kazel Dep. at 58 (testifying that Peskoff spoke to Kazel about Sentry Select before Kazel met with Corsini)].

47. By September 2002, Sentry Select and FIDAC had executed an agreement to work together. [*See* Exhibit "10"].

**REDACTED**

49. Ultimately, the Corsini introduction resulted in FIDAC serving as the manager of four investment vehicles -- (i) MBS Trust, (ii) Adjustable Rate Income Fund I, (iii) Adjustable Rate

Income Fund II, and (iv) Sentry Select FIDAC Mortgage Income Fund (SSF) (collectively, "MBS Trusts" and respectively, MBS Trusts I-IV) -- that Sentry Select created and markets in Canada. [*See* Kazel Dep. at 59].

50. As Peskoff had envisioned, the MBS Trusts represented FIDAC's first entry into the Canadian money management market. [*See* Farrell Dep. at 63].

**REDACTED**

53. Nevertheless, FIDAC has paid Peskoff only a single payment of $30,000 for a single year of managing MBS Trust I and <u>nothing at all</u> for MBS Trusts II-IV. The $30,000 payment had nothing to do with the Gen Advisors transaction. [*See* Farrell Dep. at 78].

54. At the time of FIDAC's $30,000 payment in December 2003, there was no *bona fida* dispute between Plaintiffs and FIDAC regarding FIDAC's obligation to compensate Plaintiffs for their role in the Sentry Select Transactions.

55. The $30,000 payment was not made as an offer to settle a disputed claim.

56. FIDAC did not state that the $30,000 payment was offered in settlement of any outstanding dispute and Plaintiffs were not informed that acceptance of the check would discharge the plaintiffs' claims against FIDAC. *Accord Merrill Lynch Realty/Carll Burr, Inc. v. Skinner*, 483 N.Y.S.2d 979, 982-83 (N.Y. 1984).

**REDACTED**

## LEGAL ISSUES FOR SUMMARY JUDGMENT

58. Plaintiffs assert claims of quantum meruit and promissory estoppel.

59. Plaintiffs have standing to bring both claims.

### I.  *Delaware Law Governs Plaintiffs' Claims*

60. Plaintiffs are entitled to a finding that Delaware law governs their claims for quantum meruit and promissory estoppel.

61. Delaware courts apply the law selected by the parties unless (i) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (ii) application of the law of the chosen state (a) would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state and (b) would otherwise be the state of the applicable law.

62. Here, (i) the parties chose Delaware law to govern their relationship, (ii) Delaware has a substantial relationship to the case because FIDAC (the party who drafted the agreement choosing Delaware law) is incorporated under Delaware law, (iii) application of Delaware law is not contrary to a fundamental policy of the state of New York (the state whose law Defendant contends governs this matter), and (iv) there is no actual conflict between Delaware and New York law and therefore New York law would not apply had the parties not chosen Delaware law to govern their relationship.

63. Thus, the Court should determine that Delaware law governs Plaintiffs' quasi-contract claims of quantum meruit and promissory estoppel.

**II.     *Plaintiffs Are Entitled to Summary Judgment as to Liability on Their Claim for Quantum Meruit***

64. Plaintiffs are entitled to summary judgment as to liability on their claim for promissory estoppel.

65. "To prevail on a *quantum meruit* claim, a plaintiff must show that it performed services with an expectation that the defendant would pay for them, and that the services were performed under circumstances which should have put the defendant on notice that the performing party expected to be paid by the defendant." *State ex rel. Structa-bond, Inc. v. Mumford & Miller Concrete, Inc.*, 2002 WL 31101938, *3 & n.9, No. 98C-10-327-JEB (Del. Super. Sept. 17, 2002).

66. The undisputed facts demonstrate that (i) Plaintiffs made the Gen Advisors and Sentry Select introductions with the expectation that FIDAC would compensate Plaintiffs for the introductions and (ii) under circumstances (*i.e.*, pursuant to the open-ended, forward looking consulting agreement) that should have (and in fact did) put FIDAC on notice that Plaintiffs expected to be paid by FIDAC for their services.

67. There is no accord and satisfaction to bar Plaintiffs' quantum meruit claim.

68. Thus, the Court should grant summary judgment in favor of Plaintiffs as to the issue of liability for Plaintiffs' claim for quantum meruit.

**III.    *Plaintiffs Are Entitled to Summary Judgment as to Liability on Their Claim for Promissory Estoppel***

69. Plaintiffs are entitled to summary judgment as to liability on their claim for promissory estoppel.

70. To establish Defendant's liability on this claim, Plaintiffs must demonstrate: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and

10

took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise. *Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).

71. The undisputed facts establish: (i) FIDAC promised to pay Plaintiffs for their consulting services; (ii) FIDAC's reasonable expectation in making this promise was to induce Peskoff to act – *i.e.*, to provide the consulting services; (iii) Plaintiffs reasonably relied on FIDAC's promise by expending time and money to make the Gen Advisors introduction; and (iv) injustice can only be avoided by enforcing FIDAC's promise to pay Plaintiffs' for their consulting services.

72. There is no accord and satisfaction to bar Plaintiffs' promissory estoppel claim.

73. Thus, the Court should grant summary judgment in favor of Plaintiffs as to the issue of liability for Plaintiffs' claim for promissory estoppel.

Dated: February 29, 2008

STEVENS & LEE, P.C.

By: _____
Joseph Grey (DE Bar No. 2358)
G. Thompson Bell, III, *pro hac vice*
Pa. Attorney I.D. No. 32649
Todd J. Cook, *pro hac vice*
Pa. Attorney I.D. No. 89041
1105 North Market Street
Seventh Floor
Wilmington, DE 19801
TEL: (302) 654-5180
FAX: (302) 654-5181
EMAIL: jg@stevenslee.com
       gtb@stevenslee.com
       tjc@stevenslee.com

OF COUNSEL:

RUBEN & ARONSON, LLP

Robert L. Ruben, *pro hac vice*
D.C. Attorney I.D. No. 414580
Marshall F. Berman, *pro hac vice*
D.C. Attorney I.D. No. 020743
4800 Montgomery Lane, Suite 150
Bethesda, MD 20814
TEL: (301) 951-9696
FAX: (301) 951-9636
EMAIL: rruben@randalaw.com
       mberman@randalaw.com

*Attorneys for Plaintiffs Underhill Investment Corp. and Stephen D. Peskoff*

**CERTIFICATE OF SERVICE**

I, Joseph Grey, hereby certify that on this 5th day of March, 2008, I caused true and correct copies of the foregoing PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND LEGAL ISSUES PURSUANT TO COURT ORDER OF FEBRUARY 13, 2008 (Redacted Version) to be served by first class United States mail, postage prepaid and addressed to Defendant's counsel as follows:

>John L. Reed, Esquire
>Denise Seastone Kraft, Esquire
>EDWARD'S ANGELL PALMER & DODGE LLP
>919 North Market Street, 15th Floor
>Wilmington, DE 19801
>
>Gerald A. Novack, Esquire
>KIRKPATRICK & LOCKHART
>PRESTON GATES ELLIS LLP
>599 Lexington Avenue
>New York, New York 10022

>*/s/ Joseph Grey*
>Joseph Grey

SL1 797761v1/100409.00001