**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **UNDERHILL INVESTMENT CORPORATION**, *by and through Stephen D. Peskoff as successor in interest* and **STEPHEN D. PESKOFF**, *individually*, | : : : : : : : |  |
| Plaintiffs, | : : | C.A. No. 06-99-SLR |
| v. | : : : | **PUBLIC VERSION** |
| **FIXED INCOME DISCOUNT ADVISORY COMPANY**, | : : : | |
| Defendant. | : : : | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF
UNDISPUTED MATERIAL FACTS AND LEGAL ISSUES
<u>PURSUANT TO COURT ORDER OF FEBRUARY 13, 2008</u>**

**EDWARDS ANGELL PALMER & DODGE LLP**
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770 (Phone)
302.777.7263 (Fax)
jreed@eapdlaw.com
jcicero@eapdlaw.com

OF COUNSEL:
Gerald A. Novack (*pro hac vice*)
Sarah P. Kenney (*pro hac vice*)
**KIRKPATRICK & LOCKHART
    PRESTON GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
212.536.3900 (Phone)
212.536.3901 (Fax)

Defendant Fixed Income Discount Advisory Company ("FIDAC"), through its counsel Edwards Angell Palmer & Dodge LLP and Kirkpatrick & Lockhart Preston Gates Ellis LLP, hereby submits its response to the Plaintiffs' Statement of Undisputed Material Facts and Legal Issues Pursuant to Court Order of February 13, 2008 (the "Plaintiffs' Statement") submitted by Plaintiffs Stephen D. Peskoff ("Peskoff") and Underhill Investment Corporation ("Underhill").

## PRELIMINARY STATEMENT

The Court's order dated February 13, 2008 asked the parties to file a short and concise statement of the material facts and legal issues upon which judgment is sought. That order did not ask the parties to submit statements setting forth legal and factual argument in evidentiary detail. Nonetheless, rather than setting forth simple statements of the material facts, many of the assertions in the Plaintiffs' Statement combine snippets from documents or testimony with characterizations and argument. Likewise, Plaintiffs' statement of legal issues summarizes the legal analysis and conclusions set forth in Plaintiffs' brief rather than simply setting forth the legal issues presented to the Court. The Plaintiffs' Statement thus is little more than a reiteration of the Plaintiffs' brief, cut-and-pasted into numbered paragraphs.

For these reasons, it is difficult to simply dispute or admit many of the allegations set forth in the Plaintiffs' Statement. Therefore, FIDAC has been compelled to respond to each such allegation briefly in kind, in order to avoid any suggestion that it agrees with the objectionable characterizations, omissions of context, and arguments contained therein. Similarly, FIDAC has been compelled, out of an abundance of caution, to

reference the portions of its brief that rebut the legal arguments referenced throughout the Plaintiffs' Statement.

## UNDISPUTED MATERIAL FACTS[1]

1.      Peskoff introduced Defendant Fixed Income Discount Advisory Company ("FIDAC") to Sentry Select and Gen Advisors.

**Response**: Undisputed.

2.      FIDAC is a money manager.    [*See* Exhibit "1" at 69:12-13 (excerpts of the Deposition of Michael A.J. Farrell, December 15, 2007) (hereinafter Exhibit "1" will be cited as "Farrell Dep.")].

**Response**: Undisputed.

3.      FIDAC is incorporated under the law of Delaware.

**Response**: Undisputed.

4.      Peskoff is, among other things, an independent consultant operating in the financial services and investment banking industries.

**Response**: Undisputed.

5.      Underhill was a corporation wholly-owned by Peskoff through which Peskoff provided his consulting services.

**Response**: Undisputed.

---

[1] Citations styled "A-__" refer to the designated pages of the Appendix submitted in support of FIDAC's opening brief regarding its motion for summary judgment (the "FIDAC Brief"). Citations styled "B-__" refer to the designated pages of the Appendix submitted in support of FIDAC's answering brief opposing Plaintiffs' motion for summary judgment (the "FIDAC Answering Brief"). Following each such citation is the corresponding citation to the relevant transcript or deposition exhibit, providing the name of the deponent and the page number of the testimony, as appropriate.

6.     Underhill, a dissolved Ohio corporation, assigned to Peskoff its rights to bring the claims set forth in the Amended Complaint.

**Response**:  Disputed.   Although FIDAC admits that Underhill is a dissolved Ohio corporation, Underhill failed to assign to Peskoff any rights to bring any claims against FIDAC.  At the time of Underhill's dissolution, Underhill assigned its assets, including cash accounts and two partnerships with Friedman Billings Ramsey, to Peskoff.  (A-2; Devlin Ex. 2; B-50-B-51; Cocke, pp. 40-43; B-67-B-68; Devlin, pp. 17-19.)  But Peskoff never assigned any claims against FIDAC to himself at that time. (A-166, A-172; Peskoff, pp. 364-66, 388.)   Peskoff completed the winding up period of Underhill's affairs by filing its final tax return in August 2005, yet that return did not reflect the distribution of any legal claims to Peskoff.  (B-1-B-18; Cocke Ex. 10; B-50-B-51, B-55-B-56; Cocke, pp. 40-42, 60-64; B-67-B-68; Devlin, pp. 17-18; *see* B-49, B-50; Cocke, pp. 34-35, 39.) (*See* FIDAC Answering Brief, pp. 32-33.)

7.     Prior to the transactions giving rise to the instant claims, Peskoff had a personal and business relationship with Mike Farrell ("Farrell"), who is, since founding the company in 1994 has been, the President, Chief Executive Officer and Chairman of the board of directors of FIDAC.  [Farrell Dep. at 5, 8, 11-12].

**Response**:  Disputed insofar as it asserts that Farrell became the president of FIDAC when he founded the company.   Farrell became its President at a later time.  (A-265; Farrell, p. 15.)

8.     Friedman Billings Ramsey ("FBR") had a real estate investment trust (the "FBR REIT") that prior to 2000 was managed by another money manager.  [*See*

Exhibit "2" at 73-74 (excerpts of the Deposition of Stephen D. Peskoff, October 10, 2006 and December 12, 2006) (hereinafter Exhibit "2" will be cited as "Peskoff Dep.")].

**Response**: Undisputed.

# REDACTED

**Response**: Disputed. On its own initiative, Friedman Billings Ramsey ("FBR") asked FIDAC to assume the management of the pre-existing FBR REIT from another investment manager; Peskoff merely placed a call to Farrell, at the request of FBR, asking Farrell to meet with FBR to discuss assuming management responsibility of the FBR REIT. FIDAC subsequently managed the assets of the FBR REIT. (A-92-93, A-106; Peskoff, pp. 73-76, 129; A-267; Farrell, p. 22.)

10. FIDAC took over the management of the FBR REIT in or about May 2000. [Peskoff Dep. at 73-75; Farrell Dep. at 22:7-17].

**Response**: Undisputed.

11. Farrell recognized that FIDAC had an obligation to pay Peskoff for the services rendered in connection with the FBR transaction.

**Response**: Disputed. FIDAC did not have any "obligation" to pay Peskoff (or Underhill) for any services Plaintiffs rendered in connection with the FBR REIT. As Peskoff has conceded, FIDAC's decision to make some payment to Underhill based upon the fees FIDAC earned from the FBR REIT account was entirely "voluntary" on Farrell's part. (A-93, A-99-A-100, A-155; Peskoff, pp. 75-76, 100-03, 309.) FIDAC drafted a letter in February 2000 (the "February 2000 Letter"), designating Underhill as a

consultant in order to document, for accounting purposes, a basis on which to pay fees to Underhill. (A-267, A-271; Farrell; pp. 21, 37.)

12.    On or about February 15, 2000, Farrell drafted and sent to Peskoff at Underhill's office in McLean, Virginia, a letter agreement to govern the consulting relationship between Peskoff and FIDAC going forward. [*See* Exhibit "3" (hereinafter cited as the "Consulting Agreement"); *see also* Peskoff Dep. 75:18-76:3].

**Response**:  Disputed in part.  On or about February 15, 2000, Farrell did draft and send a letter, *i.e.* the February 2000 Letter, to Peskoff.  However, the February 2000 Letter, and the parties' consulting relationship, was limited to the FBR REIT; that letter was solely intended to document the transaction for FIDAC's accounting purposes. (A-93, A-159; A-181-A-182; Peskoff, pp. 75-76, 325-26, 426-27; A-268, A-269; Farrell, pp. 27-28, 32-33.)

13.    In the Consulting Agreement, FIDAC and Plaintiffs agreed their relationship would be governed by Delaware law.

**Response**:  Disputed in part.  The February 2000 Letter, which only applied to the FBR REIT, stated that the relationship between FIDAC and Plaintiffs with respect to the FBR REIT would be governed by Delaware law. (A-93, A-159, A-182; Peskoff, pp. 75-76, 325, 427; A-268, A-269; Farrell, pp. 27-28, 32-33; A-35-A-37; Peskoff Ex. 6, ¶ 8.)

14.    In the Consulting Agreement, FIDAC promised to "pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable to FIDAC to Underhill monthly." [Consulting Agreement ¶ 2].

**Response**:  Disputed in part.  In the February 2000 Letter, FIDAC promised to "pay to Underhill a fee equal to per annum of the fees paid by the Accounts, payable by FIDAC

to Underhill monthly . . . ."  (A-35; Peskoff Ex. 6, ¶ 2.)  The "Accounts" referred to in the February 2000 Letter were any accounts opened by the FBR REIT, the assets that FIDAC managed for Friedman Billings Ramsey.  (A-159; Peskoff, pp. 325-26.)

15.    Pursuant to the Consulting Agreement, FIDAC paid Underhill twenty percent (20%) of the management fees received by FIDAC from its business relationship with the FBR REIT.  [*See* Exhibit "4"; Farrell Dep. at 16:14-17:4]

**Response**:  Disputed in part.  Although FIDAC paid to Underhill twenty percent of the management fees that FIDAC received from managing the FBR REIT, the February 2000 Letter did not obligate FIDAC to pay such fees.  Instead, the amount FIDAC paid to Underhill was entirely voluntary and discretionary on Farrell's behalf.  (A-99-A-100, A-155; Peskoff, pp. 100-03, 309.)  In fact, the February 2000 Letter did not even contain a price term.  (A-155, A-181; Peskoff, pp. 309, 426.)

16.    The Consulting Agreement is forward looking and contemplates its application to future accounts.  [*See* Consulting Agreement].

**Response**:  Disputed.  The February 2000 Letter was intended to apply only to accounts opened by the FBR REIT.  (A-93, A-158-A-159, A-181-A-182; Peskoff, pp. 75-76, 323-26; A-268, A-269; Farrell, pp. 27-28, 32-33.)

17.    The Consulting Agreement does not make reference to the FBR transaction, but instead refers to "accounts."

**Response**:  Undisputed.  Although the February 2000 Letter does not expressly refer to the FBR REIT transaction, it is undisputed that letter was intended to apply solely to that transaction.  (A-93, A-158-A-159; Peskoff, pp. 75-76, 323-26; A-268, A-269; Farrell, pp. 27-28, 32-33;  A-159;  A-181-A-182;  Peskoff, pp. 325-26, 426-27.)   In addition to

referring to "Accounts", the February 2000 Letter provides that "Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the 'Accounts')."  (A-35; Peskoff Ex. 6, ¶ 1.)

      18.    FIDAC only ever had one account with FBR, the FBR REIT.

**Response**:  Undisputed.

      19.    FIDAC and Peskoff agreed that the Consulting Agreement would be terminable during the life of the accounts only with the written consent of both parties. [Consulting Agreement ¶ 3].

**Response**:  Undisputed.

      20.    FIDAC has never provided notice of termination and Peskoff has never consented, orally or in writing, to the termination of the Consulting Agreement. [Farrell Dep. at 32; Peskoff Dep. at 95].

**Response**:  Disputed.  FIDAC paid $30,000 to Underhill in December 2003 as an accord and satisfaction for both the Gen Advisors and Sentry Select transactions.  That payment was made as a result of hardship entreaties made to Farrell by Peskoff and Spencer Brown.  (*See* FIDAC Brief, pp. 18-19; FIDAC Answering Brief, pp. 27-30.)  Prior to making this $30,000 payment, Farrell told Peskoff that it would be the only payment that Plaintiffs would get in connection with either transaction.  (A-83-A-84, A-129, A-130, A-142, A-154; Peskoff, pp. 35-38, 207, 209, 256-57, 305; *see* A-29; Farrell Exhibit 2 (e-mail from Farrell to Ron Kazel, cc to Kathryn Fagan, "fyi, i [sic] spoke to steve [sic] this morning and i [sic] made it clear that he would not be getting paid anything on insurance [the Gen Advisors transaction] and that i would probably make a small, one time payment to him on canada [sic] [the Sentry Select transaction] in the first quarter.")).

Even though Peskoff disagreed with Farrell's position, he did not say so; Peskoff simply cashed the check without any protest or indication that he was not accepting it on the terms upon which it was sent.  (A-130-A-131, A-154, A-158; Peskoff, pp. 210-12, 305-06, 322; *see* FIDAC Answering Brief, pp. 27-30.)

### The Gen Advisors Transaction

21.    With the Consulting Agreement in hand, and in light of the past course of dealings wherein Peskoff was paid twenty percent of FIDAC's management fees for the FBR REIT account, Peskoff introduced FIDAC to Ernie Baptista, who is a principal of Gen Advisors.  [*See* Exhibit "5"; Exhibit "6" at 37 (excerpts of deposition of Ernest P. Baptista, December 12, 2006 (hereinafter Exhibit "6" will be cited to as "Baptista Dep."); Exhibit "7" at 32-33 (excerpts of deposition of Ronald D. Kazel, December 14, 2006 (hereinafter Exhibit "7" will be cited to as "Kazel Dep."); Peskoff Dep. at 94].

**Response**:  Disputed in part.  There was no course of dealing between Plaintiffs and FIDAC relating to a simple introduction of FIDAC to a company with whom it later did business.  Instead, with respect to the FBR REIT, FIDAC paid to Plaintiffs 20% of the fees it received for managing the assets in the FBR REIT account in return for Plaintiffs' consulting services with respect to keeping the FBR REIT managers satisfied with the performance of FIDAC.  (A-140, A-180, A-181; Peskoff, pp. 249-50, 419-21, 424.)  Moreover, after receiving it, Peskoff did not even look at the February 2000 Letter again until *after* he introduced FIDAC to Gen Advisors and Sentry Select.  (A-97-A-98; Peskoff, pp. 93-94.)

22.    Baptista and his partners in Gen Advisors had special knowledge regarding insurance-based investment vehicles. [*See* Farrell Dep. at 43-44].

**Response**:  Undisputed.

23.    Peskoff thought that Baptista and his company would make good business partners for FIDAC. [*See* Baptista Dep. at 37:8-21].

**Response**:  Undisputed.

24.    Peskoff first introduced and arranged for a meeting between Baptista and Farrell. [*See* Farrell Dep. at 40; Baptista Dep. at 37].

**Response**:  Undisputed.

25.    After the initial meeting, Peskoff arranged for and attended a second meeting with Baptista, his partner Jeff Messner, Farrell and Kazel, which took place in January or February of 2002. [*See* Kazel Dep. at 32; Baptista Dep. at 52, 94 (testifying that Peskoff "ran the first full meeting with everyone, getting everyone on board")].

**Response**:  Undisputed.

26.    The purpose of the meeting was for Baptista and his partner to explain the insurance industry to FIDAC to explain "how investment vehicles fit within the insurance industry and to determine whether it was an opportunity for FIDAC to manage a product that fit inside the insurance industry." [*See* Kazel Dep. at 32-33].

**Response**:  Undisputed.

27.    At the close of this meeting, Baptista asked Farrell how Peskoff would be compensated for putting FIDAC and Gen Advisors together.

**Response**:  Undisputed.

- 10 -

28.    Farrell responded that Peskoff was FIDAC's responsibility and Gen Advisors should not pay Peskoff.  [*See* Peskoff Dep. at 145; Farrell Dep. at 55-56].

**Response**:  Disputed in part.   At the time Farrell and Gen Advisors discussed the possibility of compensating Plaintiffs, FIDAC and Gen Advisors were considering a managed account for ING, similar to FIDAC's management of the FBR REIT, rather than developing a new investment vehicle, such as Premier.   (A-272-A-273, A-275; Farrell, pp. 44-45, 55.)   Farrell's comment about not paying Peskoff related to this transaction.  (A-274-A-275; Farrell, pp. 54-56.)

29.    After several subsequent discussions, FIDAC and Gen Advisors, on October 10, 2002, signed an agreement to work together on an insurance-based investment product.  [*See* Exhibit "8" (Gen Advisors-FIDAC agreement dated October 10, 2002)].

**Response**:  Undisputed.

30.    Again, prior to signing the agreement Baptista asked Farrell about Peskoff's compensation for the deal.

**Response**:  Undisputed.

31.    Again, Farrell said Peskoff was FIDAC's responsibility and Gen Advisors should not pay Peskoff.  [*See* Baptista Dep. at 79].

**Response**:  Disputed insofar as it suggests that Farrell stated that paying Peskoff in relation to Premier was FIDAC's responsibility.  (A-275; Farrell, pp. 54-56; *see* A-206; Baptista, pp. 79-80.)

32.    Farrell wanted to make certain that Peskoff did not "double-dip" with both FIDAC and Gen Advisors paying him for putting the parties together for the transaction.  [*See id.*; Farrell Dep. at 56].

**Response**:  Disputed in part.  Farrell expressed his concern that Peskoff not "double dip" at a time when FIDAC and Gen Advisors were considering managing accounts of ING, rather than creating, marketing and managing a new investment vehicle, such as Premier. (A-275; Farrell, pp. 55-56.)

33.    The insurance-based fund FIDAC and Gen Advisors planned to launch was a ground-breaking and unique investment product.  [*See* Farrell Dep. at 69:21-24; Baptista Dep. at 56; Kazel Dep. at 52].

**Response**:  Disputed in part.  Gen Advisors and FIDAC originally intended to do business by managing accounts by ING, rather than creating an entirely new investment structure, such as Premier.  (A-275, A-285; Farrell, pp. 55, 95-96.)

34.    Therefore, it took several more months after signing the FIDAC-Gen Advisors agreement before the product went to market.  [*See* Kazel Dep. at 38-39].

**Response**:  Disputed.  It took FIDAC more than a year after signing an agreement with Gen Advisors before Premier launched; the agreement was signed in October 2002 and the first funds were not placed in Premier until December 2003.  (A-279; Farrell, pp. 70-71; A-101, A-128; Peskoff, pp. 107-08, 201; A-72; F 00292.)  At the time FIDAC and Gen Advisors executed the agreement, however, they had not finalized the structure of any investment vehicle concerning which they would do business.  (A-275; Farrell, pp. 55-56; A-205-A-206; Baptista, pp. 77-78.)

35.    During the course of those months, Peskoff received frequent calls from Farrell about the Gen Advisors deal wherein Farrell would voice his frustrations with the deal.

**Response**:  Disputed in part.  Farrell occasionally called Peskoff to complain to him about his frustrations with the transaction with Gen Advisors.  (A-273; Farrell, pp. 46-47.)

36.    For example, Peskoff was called in to help resolve interpersonal issues between FIDAC and Gen Advisors.  [*See* Baptista Dep. at 94-95 (testifying that Peskoff "acted as . . . Mike Farrell's representative when there was a problem that Mike Farrell didn't want to call [Baptista].  For about a year, when Mike got pissed off, pardon the language, about the cost or the time and this wasn't happening [fast] enough, son on and so forth, [Baptista] got a call from Steve [Peskoff], and that's usually every two weeks or at least once a month for a year.")].

**Response**:  Disputed.  During the time when Gen Advisors and FIDAC were developing Premier, Farrell and Peskoff considered themselves to be friends.  (A-85, A-123; Peskoff, pp. 42, 180; *see* A-94, A-100, A-145; Peskoff, pp. 78, 102, 268.)  Throughout the course of their friendship, Farrell occasionally complained to Peskoff about the extensive business development expenses and time expended by FIDAC executives in relation to the development of Premier.  (A-273; Farrell, pp. 46-47.)

37.    Farrell also frequently shared his frustrations with Peskoff regarding the start-up costs associated with launching the insurance-based investment product.

**Response**:  Disputed.  (*See* Response to ¶ 36, *supra*.)

38.     In response, Peskoff offered to reimburse Farrell for half of the start-up costs FIDAC had incurred in connection with the Gen Advisors transaction. [Peskoff Dep. at 196; Baptista Dep. at 176:7-9].

**Response**:  Undisputed.

39.     Ultimately, FIDAC and Gen Advisors successfully created the Premier fund, which FIDAC has managed since December 2003.

**Response**:  Undisputed.

# REDACTED

**Response**:  Disputed insofar as it attempts to characterize the management fees FIDAC continues to earn.

# REDACTED

**Response**:  Disputed.  (*See* Ex. 9 to Plaintiffs' Motion For Partial Summary Judgment.)

42.     Despite acknowledging that Peskoff made the vital introduction and promising to pay him for the same, FIDAC has refused to pay Peskoff a single dime for his crucial role in bringing Gen Advisors and Premier to FIDAC.  [*See* Farrell Dep. at 56].

**Response**: Disputed. FIDAC paid $30,000 to Underhill in December 2003 for both the Gen Advisors and Sentry Select transactions. (*See* FIDAC Brief, p. 18; FIDAC Answering Brief, pp. 27-30; Response to ¶ 20, *supra*.)

## The Sentry Select Transaction

43.    In mid-2002, several months after the Gen Advisors introduction, Peskoff introduced FIDAC to Raniero Corsini of Sentry Select Capital Corp ("Sentry Select"). [*See* Kazel Dep. at 58; Farrell Dep. at 57].

**Response**: Undisputed.

44.    Sentry Select is a Canadian wealth management company that designs and markets investment vehicles for the Canadian market.

**Response**: Undisputed.

45.    Peskoff met Corsini while traveling in Canada. After discussing Sentry Select's business with Corsini, Peskoff thought that Sentry Select would make a good business partner for FIDAC and would afford FIDAC an entry point into the Canadian money management market.

**Response**: Undisputed.

46.    Accordingly, Peskoff put Corsini in contact with Farrell. [*See* Farrell Dep. at 57; *see also* Kazel Dep. at 58 (testifying that Peskoff spoke to Kazel about Sentry Select before Kazel met with Corsini)].

**Response**: Undisputed.

47.    By September 2002, Sentry Select and FIDAC had executed an agreement to work together. [*See* Exhibit "10"].

**Response**:  Disputed in part.  FIDAC and Sentry Select did not execute an agreement until September.  (B-31-B-33.)

# REDACTED

49.    Ultimately, the Corsini introduction resulted in FIDAC serving as the manager of four investment vehicles - - (i) MBS Trust, (ii) Adjustable Rate Income Fund I, (iii) Adjustable Rate Income Fund II, and (iv) Sentry Select FIDAC Mortgage Income Fund (SSF) (collectively, "MBS Trusts" and respectively, MBS Trusts I-IV) - - that Sentry Select created and markets in Canada.  [*See* Kazel Dep. at 59].

**Response**:  Disputed insofar as it suggests that Peskoff played any role besides making the introduction.

50.    As Peskoff had envisioned, the MBS Trusts represented FIDAC's first entry into the Canadian money management market.  [*See* Farrell Dep. at 63].

**Response**:   Undisputed to the extent that was FIDAC's first entry into the Canadian money management market.

# REDACTED

**Response**:  Disputed that Peskoff's introduction resulted in FIDAC making any money.

# REDACTED

**Response**:  Undisputed.

        53.     Nevertheless, FIDAC has paid Peskoff only a single payment of $30,000 for a single year of managing MBS Trust I and <u>nothing at all</u> for MBS Trusts II-IV.  The $30,000 payment had nothing to do with the Gen Advisors transaction.  [*See* Farrell Dep. at 78].

**Response**:  Admits that FIDAC paid $30,000 to Underhill, but as part of an accord and satisfaction.  (*See* FIDAC Brief, pp. 18-19; FIDAC Answering Brief, pp. 27-30; Response to ¶¶ 20, 42, *supra*.)

        54.     At the time of FIDAC's $30,000 payment in December 2003, there was no *bona fida* dispute between Plaintiffs and FIDAC regarding FIDAC's obligation to compensate Plaintiffs for their role in the Sentry Select Transactions.

**Response**:  Disputed.  Before FIDAC paid $30,000 to Underhill in December 2003, Farrell explained to Peskoff that this was the only payment Plaintiffs would receive for the Gen Advisors and Sentry Select transactions.  At that time, Peskoff disagreed with Farrell's position that Plaintiffs were not entitled to any more compensation.  (A-130-A-131; Peskoff, pp. 210-12; *see* Response to ¶¶ 20, 42, *supra*.)

        55.     The $30,000 payment was not made as an offer to settle a disputed claim.

**Response**:  Disputed.  (*See* Response to ¶¶ 20, 42, 54, *supra*; FIDAC Answering Brief, pp. 27-30.)

56.     FIDAC did not state that the $30,000 payment was offered in settlement of any outstanding dispute and Plaintiffs were not informed that acceptance of the check would discharge the plaintiffs' claims against FIDAC. *Accord Merrill Lynch Realty/Carll Burr, Inc. v. Skinner,* 483 N.Y.S.2d 979, 982-983 (N.Y. 1984).

**Response**: Disputed. (*See* FIDAC Answering Brief, pp. 27-30.)

# REDACTED

**Response**: Disputed. FIDAC has paid to Underhill $30,000 for the Sentry Select transactions. (*See* FIDAC Answering Brief, pp. 27-30.)

## LEGAL ISSUES FOR SUMMARY JUDGMENT

58.     Plaintiffs assert claims of quantum meruit and promissory estoppel.

**Response**: Undisputed.

59.     Plaintiffs have standing to bring both claims.

**Response**: Disputed. Plaintiffs lack standing to bring either of their claims. (*See* FIDAC Answering Brief, pp. 30-33.)

60.     Plaintiffs are entitled to a finding that Delaware law governs their claims for quantum meruit and promissory estoppel.

**Response**: Disputed. New York law, rather than Delaware law, governs Plaintiffs' claims. (*See* FIDAC Brief, pp. 26-28.)

61.    Delaware courts apply the law selected by the parties unless (i) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (ii) application of the law of the chosen state (a) would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state and (b) would otherwise be the state of the applicable law.

**Response**: *See* FIDAC Brief, pp. 26-28.

62.    Here, (i) the parties chose Delaware law to govern their relationship, (ii) Delaware has a substantial relationship to the case because FIDAC (the party who drafted the agreement choosing Delaware law) is incorporated under Delaware law, (iii) application of Delaware law is not contrary to a fundamental policy of the state of New York (the state whose law Defendant contends governs this matter), and (iv) there is no actual conflict between Delaware and New York law and therefore New York law would not apply had the parties not chosen Delaware law to govern their relationship.

**Response**:  Disputed.  The presence of a statute of frauds for finder's fees in New York, and a corresponding absence in Delaware, creates an actual conflict between the laws of those two states.  New York law, unlike Delaware law, applies here because New York has substantial contacts with this dispute and Delaware's sole contact is that FIDAC is incorporated there.  Not only is New York the only state with meaningful contacts, but New York has a particularly strong interest in finder's fee claims.  (*See* FIDAC Brief, pp. 26-28.)  Therefore, New York law applies here.

63.    Thus, the Court should determine that Delaware law governs Plaintiffs' quasi-contract claims of quantum meruit and promissory estoppel.

**Response**:  Disputed.  (*See* FIDAC Brief, pp. 26-28.)

        64.    Plaintiffs are entitled to summary judgment as to liability on their claim for promissory estoppel.

**Response**:  Disputed.  (*See* FIDAC Brief, pp. 30-32; FIDAC Answering Brief, pp. 24-27.)

        65.    "To prevail on a *quantum meruit* claim, a plaintiff must show that it performed services with an expectation that the defendant would pay for them, and that the services were performed under circumstances which should have put the defendant on notice that the performing party expected to be paid by the defendant."  *State ex rel. Structa-bond, Inc. v. Mumford & Miller Concrete, Inc.,* 2002 WL 31101938, *3 & n.9, No. 98C-10-327-JEB (Del. Super. Sept. 17, 2002).

**Response**:  (*See* FIDAC Brief, pp. 30-32; FIDAC Answering Brief, pp. 24-27.)

        66.    The undisputed facts demonstrate that (i) Plaintiffs made the Gen Advisors and Sentry Select introductions with the expectation that FIDAC would compensate Plaintiffs for the introductions and (ii) under circumstances (*i.e.,* pursuant to the open-ended, forward looking consulting agreement) that should have (and in fact did) put FIDAC on notice that Plaintiffs expected to be paid by FIDAC for their services.

**Response**:  Disputed.  (*See* FIDAC Brief, pp. 30-32; FIDAC Answering Brief, pp. 24-27.)

        67.    There is no accord and satisfaction to bar Plaintiffs' quantum meruit claim.

**Response**:  Disputed.  (*See* FIDAC Answering Brief, pp. 27-30.)

68.    Thus, the Court should grant summary judgment in favor of Plaintiffs as to the issue of liability for Plaintiffs' claim for quantum meruit.

**Response**:  Disputed.  (*See* FIDAC Brief, pp. 30-32; FIDAC Answering Brief, pp. 24-27.)

69.    Plaintiffs are entitled to summary judgment as to liability on their claim for promissory estoppel.

**Response**:  Disputed.  (*See* FIDAC Brief, pp. 30-32; FIDAC Answering Brief, pp. 24-27.)

70.    To establish Defendant's liability on this claim, Plaintiffs must demonstrate: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise. *Chrysler Corp. v. Chaplake Holdings, Ltd.,* 822 A.2d 1024, 1032 (Del. 2003).

**Response**:  (*See* FIDAC Brief, pp. 30-32; FIDAC Answering Brief, pp. 24-27.)

71.    The undisputed facts establish: (i) FIDAC promised to pay Plaintiffs for their consulting services; (ii) FIDAC's reasonable expectation in making this promise was to induce Peskoff to act – *i.e.,* to provide the consulting services; (iii) Plaintiffs reasonably relied on FIDAC's promise by expending time and money to make the Gen Advisors introduction; and (iv) injustice can only be avoided by enforcing FIDAC's promise to pay Plaintiffs' for their consulting services.

**Response**:  Disputed.  (*See* FIDAC Brief, pp. 30-32; FIDAC Answering Brief, pp. 24-27.)

72.     There is no accord and satisfaction to bar Plaintiffs' promissory estoppel claim.

**Response**:  Disputed.  (*See* FIDAC Answering Brief, pp. 27-30.)


DATED:  March 21, 2008                **EDWARDS ANGELL PALMER & DODGE LLP**


 */s/ Joseph B. Cicero*
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No. 4388)
919 North Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770 (Phone)
302.777.7263 (Fax)

- and -

Gerald A. Novack (*pro hac vice*)
Sarah P. Kenney (*pro hac vice*)
**KIRKPATRICK & LOCKHART
  PRESTON GATES ELLIS** LLP
599 Lexington Avenue
New York, New York 10022
212.536.3900 (Phone)
212.536.3901 (Fax)


WLM 513048.1

- 22 -

<u>**CERTIFICATE OF SERVICE**</u>

I, Joseph B. Cicero, hereby certify that on March 27, 2008, the attached Redacted, Public Version of **DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND LEGAL ISSUES PURSUANT TO COURT ORDER OF FEBRUARY 13, 2008** was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available or viewing and downloading from CM/ECF:

Joseph Grey, Esq.
Stevens & Lee, P.C.
1105 North Market Street, Seventh Floor
Wilmington, DE 19801

DATED: March 27, 2008            **EDWARDS ANGELL PALMER & DODGE LLP**

_/s/ Joseph B. Cicero_
John L. Reed (I.D. No. 3023)
Joseph B. Cicero (I.D. No.  4388)
919 N. Market Street, 15th Floor
Wilmington, DE 19801
302.777.7770
302.777.7263
jreed@eapdlaw.com
jcicero@eapdlaw.com

WLM 513084.1