## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNDERHILL INVESTMENT<br>CORPORATION and STEPHEN D.<br>PESKOFF, | )<br>)<br>) |
| | ) |
| Plaintiffs, | )<br>) |
| v. | ) Civ. No. 06-099-SLR |
| | ) |
| FIXED INCOME DISCOUNT<br>ADVISORY COMPANY, | )<br>)<br>) |
| | ) |
| Defendant. | ) |

Joseph Grey, G. Thompson Bell, III & Todd J. Cook of Stevens & Lee, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Robert L. Ruben & Marshall F. Berman of Ruben & Aronson, LLP, Bethesda, Maryland.

John Leonard Reed & Joseph B. Cicero of Edwards Angell Palmer & Dodge, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Gerald A. Novack & Sarah P. Kenney of Kirkpatrick & Lockhart Preston Gates Ellis, LLP, New York, New York.

**MEMORANDUM OPINION**

Dated: March 31, 2008
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This is a finders' fee case arising out of two introductions provided by plaintiff, Stephen D. Peskoff ("Peskoff"), through plaintiff Underhill Investment Corporation ("Underhill") (collectively, "plaintiffs") to defendant Fixed Income Discount Advisory Company ("FIDAC"). FIDAC, as a result of Peskoff's introductions, ultimately worked with two companies, Gen Advisors, LLC ("Gen Advisors") and Sentry Select Capital Corporation ("Sentry Select"), to develop investment vehicles. Peskoff now seeks compensation based on these introductions and his consulting services provided in connection therewith under theories of quantum meruit and promissory estoppel. This court has jurisdiction pursuant to 28 U.S.C. §1332(a). Presently before the court are plaintiffs' motion for partial summary judgment (D.I. 45), defendant's motion for summary judgment (D.I. 50), and plaintiffs' motion to compel payment of discovery expenses (D.I. 59). For the reasons that follow, plaintiffs' motion for partial summary judgment is denied, defendant's motion for summary judgment is granted, and plaintiffs' motion to compel payment of discovery expenses is granted in part and denied in part.

## II. BACKGROUND

For purposes of this motion practice, the material facts are undisputed unless otherwise noted.

### A. The Parties

#### 1. FIDAC

FIDAC is a registered investment advisor, incorporated in Delaware, with offices only in New York City, New York. (D.I. 47 at 4; D.I. 51 at 4) Prior to June 2004, FIDAC

was privately held, with most of its stock owned by Michael A.J. Farrell ("Farrell"), FIDAC's chairman, chief executive officer and president. (D.I. 53, ex.18 at 5:21-25, 44:22-45:10) In June 2004, FIDAC was acquired by Annaly Capital Management, Inc., formerly known as Annaly Mortgage Management, Inc. ("Annaly"), a publicly-traded company. (Id., ex. 17 at 8:18-20, ex. 18 at 6:1-14) Farrell is also the current chairman, chief executive officer, and president for Annaly. (Id.)

As a registered investment adviser, FIDAC manages pools of capital provided by its clients. (D.I. 47 at 4; D.I. 51 at 4) FIDAC typically manages funds in one of two ways. (D.I. 53, ex. 18 at 96:10-97:10) First, the funds may be managed in a separate account at a brokerage firm in the individual client's name, with FIDAC having authority to direct trades in that account. (Id.) Alternatively, a client's funds may be invested in a particular fund or investment vehicle that FIDAC manages, where the assets of multiple investors are combined. (Id.) FIDAC earns a monthly percentage fee based on the value of its assets under its management, regardless of the management method it employs. (D.I. 51 at 4) With the exception of the two vehicles at issue in the case at bar, FIDAC does not design investment vehicles. (See D.I. 53, ex. 18 at 69:9-15) Occasionally, FIDAC enters into finder's fee arrangements with intermediaries who solicit clients to deposit their funds with FIDAC to manage. (See id., ex. 17 at 9-10) When this occurs, a finder generally receives a percentage of FIDAC's management fees, earned from the client's funds that the finder introduced to FIDAC. (Id., ex. 17 at 10:4-6)

### 2. Peskoff/Underhill

Peskoff is a Virginia resident who maintained his business offices in Virginia.

(Id., ex. 12 at ¶¶ 4, 6) Underhill is Peskoff's dissolved, closely-held corporation for which he was the sole shareholder, officer and director. (Id., ex. 12 at ¶¶ 5, 7, 8; D.I. 47 at 4) Peskoff used Underhill to provide his business and financial consulting services.[1] (D.I. 47 at 4; D.I. 53, ex. 12 at ¶¶ 5, 8) Following dissolution, Underhill attempted to distribute and assign to Peskoff, among other things, all of its rights, interests and claims against FIDAC.[2] (D.I. 53, ex. 12 at ¶ 9) Other than one assistant, Peskoff was Underhill's only employee. (Id., ex. 15 at 25:10-20)

## B. Peskoff and Farrell's Relationship

Prior to the transactions at issue in the case at bar, Peskoff and Farrell were involved in several business dealings together. (See D.I. 47 at 4; D.I. 53, ex. 15 at 42:21-24, 112-118, 180:8-14; ex. 18 at 8:13-16) As time passed, Farrell and Peskoff developed a friendship in addition to their business relationship. (See id.)

### 1. The Annaly investment banking services

In 1996 or 1997, Peskoff worked as a consultant to the Virginia-based investment banking firm of Friedman Billings Ramsey ("FBR"), which was doing a project for Annaly. (D.I. 53, ex. 15 at 53:16-54:15, 112:24-114:16) Peskoff maintained an office in the FBR office suite, although Peskoff was not an FBR employee, and it was around this time that Farrell and Peskoff first met. (Id., ex. 15 at 53:16-54:15, ex. 18 at 65:15-66:8) During the next four years, FBR did several financing projects for

---

[1]Consistent with the parties' submissions, Underhill and Peskoff are used interchangeably throughout unless otherwise noted.

[2]There is some dispute as to the adequacy, legal effect and existence of the assignment.

Annaly. (Id., ex. 15 at 113-117) These projects resulted in consulting fees of approximately one million dollars for Peskoff, paid to him by FIDAC.[3] (D.I. 64, ex. 5)

## 2. The FBR REIT

In early 2000, Peskoff called Farrell, at the request of FBR's management, to see whether Farrell would meet with FBR executives to discuss FIDAC managing a real estate investment trust that FBR held (the "FBR REIT"). (Id., ex. 15 at 73-75) Prior to 2000, the FBR REIT was managed by another money manager, Blackrock, Inc. ("Blackrock"). (D.I. 48, ex. 2 at 73-74) Peskoff arranged the call with FIDAC.[4] (D.I. 53, ex. 15 at 73-75) Shortly thereafter, Farrell met with FBR management and, in February 2000, it was agreed that FIDAC would act as the FBR REIT's investment advisor.[5] (Id., ex. 15 at 75-77) During a telephone conversation after this meeting, Farrell stated that he would contact Peskoff about compensation for Peskoff's efforts in arranging FIDAC's involvement with the FBR REIT. (Id.) Peskoff and Farrell did not discuss any terms with respect to compensation, but Peskoff testified that Farrell indicated that his payment would be "reasonable and consistent with what was done in [the] business." (Id., ex. 15 at 427:16-20; D.I. 64, ex. 2 at 77:2-10) When Farrell made the offer, it was

---

[3]Peskoff testified that the fees came from FBR; however, plaintiffs produced evidence demonstrating that FIDAC paid Peskoff's fees. (See D.I. 53, ex. 15 at 153; D.I. 64, ex. 5)

[4]Peskoff was asked to make this call because of his personal relationship with Farrell and to help assuage any hard feelings that may have been present. (D.I. 53, ex. 15 at 74:11-24) Initially, FBR had promised the management of the FBR REIT to FIDAC, but ultimately gave the account to Blackrock. (Id.)

[5]FIDAC managed the FBR REIT from May 2000 through May 2002. (D.I. 48, ex. 1 at 22:4-17, ex. 2 at 73-74; D.I. 53, ex. 15 at 121:12-14)

his belief that Peskoff could provide valuable services "because of his presence in the FBR structure," although Farrell believed that Peskoff had initiated the FBR REIT discussions on his own, not at the request of FBR's management. (D.I. 53, ex. 18 at 12:5-13:5, 17:7-17; D.I. 66 at 8)

### 3. The February 2000 Letter

On or about February 15, 2000, Farrell sent Peskoff a letter (the "Letter") with a subject labeled as "Consulting Engagement." (Id., ex. 5)  The Letter contained a series of numbered paragraphs with headings, including, but not limited to, "Consulting Services," "Compensation," "Term; Termination," and "Governing Law."[6]  (D.I. 48, ex. 3) Subsequently, FIDAC paid Underhill twenty percent of its management fees earned from its business relationship with the FBR REIT trust. (Id., ex. 1 at 16:14-17:24, ex. 4) These payments occurred between May 2000 and May 2002, while FIDAC managed the FBR REIT account. (D.I. 64, ex. 5)

### C. The Introductions

#### 1. Gen Advisors

In the fall of 2001, Peskoff met Ernie Baptista ("Baptista"), a principal of Gen Advisors[7] and an insurance broker, at an investment banking conference. (D.I. 53, ex.

---

[6]Peskoff essentially argues that this letter established a consulting agreement between Underhill and FIDAC (D.I. 47 at 5); in contrast, defendants allege that the Letter was drafted for accounting purposes only. (D.I. 53, ex. 18 at 21:19-24); (see also D.I. 47 at 1 n.1 (stating that the Letter was a valid contract except for its lack of a sufficiently definitive price term)).  This letter is the focus of much of the parties' dispute and, when necessary, is discussed in more detail infra.

[7]Gen Advisors is a Rhode Island limited liability company. (D.I. 48, ex. 8; D.I. 53, ex. 16 at 9:16-19)

5

15 at 104:2-8, ex. 16 at 5:4-14, 27:2-19) In conjunction with several business partners, Baptista worked to develop and implement private placement products for the insurance industry. (Id., ex 16 at 5:17-6:23, 18:12-19:4) Baptista, per Perskoff's suggestion of his own initiative, contacted Farrell. (D.I. 48, ex. 6 at 37:8-21, ex. 7 at 32:1-14) Peskoff, around November 2001, arranged the first meeting between Baptista and Farrell, which only Baptista and Farrell attended at FIDAC's New York offices. (D.I. 53, ex. 15 at 284:17-20, ex. 16 at 26:22-28:5, ex. 18 at 40:11-19)

After the initial meeting, Peskoff attended a second meeting with Baptista, Baptista's partner Jeffrey Messner ("Messner"), Farrell and Ronald D. Kazel ("Kazel"),[8] which took place in either January or February of 2002 at FIDAC's offices in New York.[9] (D.I. 53, ex. 16 at 94:6-22, ex. 17 at 32:6-15) At this meeting, Baptista and Messner explained the insurance industry. (Id., ex. 17 at 32:22-33:2) In particular, the meeting sought to illustrate "how investment vehicles fit within the insurance industry and to determine whether it [presented] an opportunity for FIDAC." (Id., ex. 17 at 32:22-33:2) At the close of the meeting, Baptista asked Farrell how Peskoff would be compensated for bringing FIDAC and Gen Advisors together. (D.I. 47 at 6-7; D.I. 51 at 12) Farrell acknowledged that Peskoff's compensation, if at all, would come from FIDAC and expressed concern about the potential of Peskoff to "double dip" if he also received

___

[8]Kazel currently is FIDAC's managing director. (D.I. 53, ex. 17 at 6:3-17) Prior to that, Kazel served as FIDAC's executive vice president. (Id.)

[9]The extent of Peskoff's participation in this meeting is disputed. Peskoff points to Baptista's testimony that he "ran the first full meeting with everyone, getting everyone on board." (D.I. 53, ex. 16 at 6-15) In contrast, FIDAC alleges that "Peskoff attended the meeting, but made no contribution." (D.I. 51 at 12; D.I. 53, ex. 17 at 33:9-12)

payment from Gen Advisors.[10]  (D.I. 53, ex. 18 at 54:23-56:7)  On October 10, 2002,

after several additional discussions, FIDAC and Gen Advisors entered into an

agreement to work together on an insurance-based investment product.  (D.I. 48, ex. 8)

These additional meetings, held at FIDAC's New York offices, were not attended by

Peskoff, with the exception of a January 2002 meeting and possibly one other early

meeting.  (D.I. 53, ex. 15 at 44:4-14, ex. 16 at 50:8-17, 58:21-23)

        The insurance-based fund FIDAC and Gen Advisors planned to launch was a

ground-breaking and unique investment product called Premier.  (Id., ex. 16 at 56:3-14,

ex. 17 at 52:7-13, ex. 18 at 69:21-25)  After the agreement was signed, several months

elapsed before FIDAC and Gen Advisors acquired the project's funding.  (Id., ex. 17 at

38:7-39:20)  During these months, Peskoff often acted as Farrell's "mediator" and

helped to resolve "interpersonal issues" with Gen Advisors.  (Id., ex. 16 at 95:8-23; D.I.

87 ¶ 36)  Specifically, Baptista testified that Peskoff "acted as . . . Mike Farrell's

representative when there was a problem that Mike Farrell didn't want to call [about.]"

(D.I. 53, ex. 16 at 95:8-23)  According to Baptista, Farrell used Peskoff in this way for

about a year with Baptista receiving phone calls from Peskoff on Farrell's behalf "every

two weeks or at least once a month."  (Id.)  Also during this time, Farrell often "shared

his frustrations" with Peskoff about the cost and progress of the Gen Advisors

---

[10]The parties dispute the extent of responsibility acknowledged by Farrell. Farrell, in his deposition, testified that FIDAC would compensate Peskoff if FIDAC was ultimately successful in getting money from ING, Messner's former company. (D.I. 53, ex. 18 at 54:23-56:7)  Peskoff quotes Farrell as responding with "That's not any of your responsibility. I'm taking care of that. We have a prior relationship and understanding." (Id., ex. 15 at 145:6-15)  In addition, the record indicates that, prior to signing the agreement, in an October 2002 meeting, Peskoff's compensation was discussed again, with largely the same substance as the first conversation.  (Id., ex. 16 at 79:2-80:6)

transaction.[11]  (Id., ex.15 at 194:2-21; D.I. 87 ¶¶ 35, 37)  Faced with Farrell's complaints, at a meeting in FIDAC's New York offices, Peskoff eventually offered to reimburse Farrell for half of the start-up costs incurred by FIDAC to develop the Premier fund.[12]  (D.I. 53, ex. 15 at 42:1-16, 193:13-17,  ex. 16 at 176:7-9)  Ultimately, FIDAC and Gen Advisors created the Premier fund, which FIDAC has managed since December 2003.  (Id., ex. 14)  FIDAC has earned approximately $9,000,000 in management fees (as of November 2006) since Premier's introduction to the market, and continues to earn fees each month.  (D.I. 48, ex. 9)

### 2. Sentry Select

In 2002, after the Gen Advisors' introduction, Peskoff introduced FIDAC to Raniero Corsini ("Corsini") of Sentry Select.  (D.I. 53, ex. 17 at 58:12-59:3, ex. 18 at 57:9-17)  Sentry Select, a Canadian wealth management company, designs and markets investment vehicles for the Canadian market.  (D.I. 47 at 8)  Corsini was Sentry Select's senior vice-president of global structured products whom Peskoff met while traveling in Canada.  (Id.; D.I. 51 at 15)

After discussing Sentry Select's business with Corsini, Peskoff, acting on his own initiative, suggested to Corsini that he should contact Farrell if he was interested in doing business with FIDAC.  (See D.I. 53, ex. 15 at 101:18-102:5, ex. 18 at 57:21-58:3)  Corsini called Farrell, who invited Corsini to visit FIDAC's offices in New York, which he

---

[11]From the time of Baptista's and Farrell's introduction around November 2001, it took approximately two years for FIDAC and Gen Advisors to develop and launch Premier.  (D.I. 53, ex. 14)  The first funds were not placed in Premier until December 2003.  (Id.)

[12]There is no indication in the record that Farrell accepted Peskoff's offer.

8

did.[13]  (Id., ex. 18 at 57:9-58:21)  In September 2002, Sentry Select and FIDAC executed a letter of intent evidencing their agreement to work together. (D.I. 48, ex. 10) After executing the agreement with Sentry Select but before the agreement had been made public, FIDAC sent a confidential copy of the agreement to Peskoff, explaining that "[i]f we find out anyone else knows of this agreement that shouldn't, [Peskoff] will be cut off. Literally." (See id.)

FIDAC and Sentry Select worked together over the course of a year to design, structure, market and implement a series of investment products, called the MBS Trusts, for the Canadian market. (See D.I. 47 at 9; D.I. 51 at 16)  Beyond suggesting Corsini's initial call to Farrell, Peskoff played no other role in the development or management of the MBS Trusts. (D.I. 53, ex .15 at 136:7-138:10, ex. 17 at 61:24-62:17)  The first MBS Trust launched in mid-April of 2003 and, ultimately, FIDAC served as the manager for four investment vehicles:  (1) MBS Trust I; (2) Adjustable Rate Income Fund I; (3) Adjustable Rate Income Fund II; and (4) Sentry Select FIDAC Mortgage Income Fund (collectively, the "MBS Trusts" and respectively, "MBS Trusts I–IV").  (See id., ex. 13, ex. 17 at 55:14-57:11, 59:4-7)  The MBS Trusts represented FIDAC's first entry into the Canadian money management market.  (Id., ex. 18 at 63:3-10)  Since the launch of MBS Trust I, FIDAC has made over $7,000,000 in management fees.  (D.I. 48, ex. 9)

## D. After the Introductions

In 2003, subsequent to FIDAC earning management fees on the MBS Trusts,

---

[13]Peskoff also had spoken to Kazel about Sentry Select prior to Kazel's first meeting with Corsini. (D.I. 53, ex. 17 at 58:18-21)

Peskoff started to ask Farrell for compensation. (D.I. 53, ex. 15 at 204:9-15) Peskoff
made these requests, at least in part, in person when meeting with Farrell at FIDAC's
offices. (Id., ex. 15 at 199:10-17) During these conversations with Farrell, Peskoff
often commented on his personal and financial problems. (Id., ex. 18 at 46:17-48:19,
80:18-25) Peskoff's close friend, Spencer Brown ("Brown"), an independent director on
Annaly's board, also spoke to Farrell about Peskoff's compensation on several
occasions. (Id., ex. 18 at 63:18-65:9, 68:6-11)

    In December 2003, Farrell and Peskoff discussed his compensation over the
telephone. (Id., ex. 15 at 254:2-255:14) During the December 2003 conversation,
Farrell offered to pay Peskoff $30,000.[14] (Id., ex. 15 at 254:2-255:14) That same day,
Farrell wrote an email to Kazel, with a copy sent to FIDAC's chief financial officer,
outlining his conversation with Peskoff. (Id., ex. 3) In its entirety, the email reads: "[For
your information,] I spoke to [S]teve this morning and I made it clear that he would not
be getting paid anything on [Gen Advisors] and that [I] would probably make a small,
one time payment to him on [Sentry Select] in the first quarter. [N]o dollar amount was
committed to, and [I] estimate that it will be less than [$50,000.]" (Id.) On December
22, 2003, FIDAC issued a check to Peskoff in the amount of $30,000, which Peskoff

_____

[14]The parties dispute which introductions Peskoff was compensated for and the
appropriateness of the amount paid. Specifically, defendants contend that the payment
equaled more than Peskoff's entitlement and that it applied to both the Gen Advisors
and Sentry Select introductions. (D.I. 51 at 18-19) Peskoff, in contrast, argues that the
payment only applied to the Sentry Select transaction and asserts the amount is
inappropriate because it is equivalent only to ten percent of FIDAC's management fee
on the MBS Trust 1 for a single year. (D.I. 47 at 9; D.I. 53, ex. 15 at 258:14-261:24)
This $30,000 payment also is the basis for FIDAC's accord and satisfaction defense.
(See D.I. 5 ¶ 48; D.I. 91 ¶ 20)

cashed. (Id., ex. 15 at 254:2-255:14) At the time of cashing, Peskoff's understanding was that the check was intended as a "one-time" payment from FIDAC for the Sentry Select introduction, although he ultimately disagreed with the amount. (Id., ex. 15 at 258:14-261:24)

Peskoff did not request any more money regarding the Sentry Select MBS Trusts from the time of cashing the check at the end of 2003 until the onset of this litigation in 2005. (Id., ex. 15 at 219:16-220:7) On April 12, 2004, Peskoff wrote to Kazel, after learning of Premier's "momentum," and asked that he be paid something for introducing FIDAC to Gen Advisors. (Id., ex. 9) Kazel showed Peskoff's letter to Farrell and Kazel responded by a letter dated April 20, 2004, in which he reminded Peskoff that FIDAC would not pay anything more than the $30,000 already paid to Peskoff for either Premier or the MBS Trusts. (Id., ex. 10, ex. 17 at 88:15-91:8, ex. 18 at 87:1-88:8)

### E. Underhill's Dissolution

In May 2004, Peskoff started to investigate the effects of dissolving Underhill. (Id., ex. 15 at 307:1-312:22) After making the decision to dissolve Underhill, Peskoff relied primarily on other professionals to effectuate it. (Id., ex. 15 at 374:23-375:7) Peskoff, as Underhill's creditor, received all of Underhill's assets upon its dissolution in partial satisfaction of a loan to the corporation. (Id., ex. 15 at 119:12-19, 382:3-383:6) Peskoff never mentioned to any of the professionals that he relied on to dissolve Underhill the possibility or potential of a claim against FIDAC. (Id., ex. 15 at 374-76) Peskoff explains this failure because, in his mind, there was still hope that he and Farrell would work things out so that Peskoff would receive the compensation he believed he had been promised. (Id., ex. 15 at 376:13-23)

## IV. DISCUSSION

### A. Quantum Meruit[15]

To prove a quantum meruit claim, a plaintiff must show that he "performed

services with an expectation that the defendant would pay for them, and that the

services were performed under circumstances which should have put the defendant on

notice that the performing party expected to be paid by the defendant." State ex rel.

Structa-Bond, Inc. v. Mumford & Miller Concrete, Inc., No. Civ. A. 98C-10-327, 2002

WL 31101938, at *3 (Del. Super. Sept. 17, 2002). Quantum meruit means literally "as

much as he deserves" and permits a plaintiff to recover the reasonable value of the

services he provided to the defendant in the absence of a contract, provided those

services were not gratuitous. See Gaither v. Simpson, No. Civ. A. 15140, 2001 WL

670962, at *2 (Del. Ch. May 25, 2001); Stoltz Realty Co. v. Paul, No. Civ. A. 94C-02-

208, 1995 WL 654153, at *10 (Del. Super. Sept. 20, 1995). In the case at bar, the

parties disagree as to whether Peskoff had a reasonable expectation of compensation

when he introduced Gen Advisors and Sentry Select to FIDAC.[16] For the reasons that

_____

[15]At the outset, the court notes that the parties dispute which state's law governs this action. Peskoff argues that Delaware law applies, while FIDAC urges the application of New York law. Absent an actual conflict, the court is not required to engage in a choice of law analysis. See Hammersmith v. TIG Insurance Co., 480 F.3d 220, 230 (3d Cir. 2007). Because the parties agree that New York and Delaware law essentially require the same underlying elements to establish a quantum meruit claim, the court will refer to Delaware and New York law interchangeably for this part of its discussion. See id. at 229; (D.I. 63 at 24; D.I. 66 at 24); see also Rimmax Wheels LLC v. RC Components, Inc., 477 F. Supp. 2d 670, 674 n.12 (D. Del. 2007) (stating that when there is no material difference between two states' laws, a court need not address choice of law).

[16]FIDAC admits that Peskoff introduced FIDAC to both Gen Advisors and Sentry Select. (See D.I. 80 at 4)

12

follow, FIDAC's motion for summary judgment is granted.

### 1. Peskoff's reasonable expectation of compensation

### a. Peskoff's deposition testimony

Peskoff argues that FIDAC failed to present any evidence to refute his deposition testimony which, according to Peskoff, establishes his reasonable expectation of compensation. (D.I. 78 at 4) Peskoff testified that, about the time he made the introductions, he re-read the Letter and felt that he "was totally covered in terms of a fee arrangement." (D.I. 53, ex. 15 at 95:3-22) Specifically, Peskoff points to the "Consulting Services" paragraph of the Letter, which states: "Underhill shall provide FIDAC with such consulting services as they shall agree from time to time, and the assets managed by FIDAC for those clients (the "Accounts")." (D.I. 48, ex. 3 at ¶ 1; D.I. 47 at 19-20) Even accepting as true Peskoff's testimony that he relied on this provision, his reliance was unreasonable considering that Peskoff concedes that he performed both introductions on his own initiative. (See D.I. 53, ex. 15 at 285:9-14) The Letter clearly states that Underhill's services were required only when the parties "shall agree from time to time." (Id., ex. 5 at ¶ 1) Combining the Letter's language with Peskoff's concessions that no one from FIDAC either asked or requested Peskoff to perform the introductions at issue, his expectation of compensation based on the Letter was unreasonable.[17]

### b. Course of dealing

_____

[17]Similarly, regardless of whether Peskoff relied on these provisions, Peskoff cannot establish his reasonable expectation to compensation based on the "Compensation" and "Termination" paragraphs of the Letter because their applicability was limited by the scope of the Letter, which required the parties to agree.

13

Plaintiffs also argue that the course of dealing between the parties created

Peskoff's reasonable expectation of compensation. (See D.I. 63 at 27, citing Milton

Abeles, Inc. v. Creekstone Farms Premium Beef, LLC, No. Civ. A. 06-CV-3893, 2007

WL 1434990, at *10 (E.D.N.Y. May 14, 2007) (finding plaintiff may establish recovery in

quantum meruit based on the parties' prior course of dealings)). Specifically, plaintiffs

assert that Peskoff reasonably expected compensation because the services he

provided to FIDAC for the Gen Advisors and Sentry Select transactions were "the same

type of services" as those that he performed in the FBR REIT transaction. (D.I. 63 at

26) In contrast, FIDAC asserts that there is a distinction between a client who simply

gives funds to FIDAC to manage (i.e., FBR), and a business partner who works with

FIDAC to develop the investment vehicle into which a client's funds are eventually put

to manage (i.e., Gen Advisors and Sentry Select).[18] The court agrees that, in this

context, FIDAC's interpretation of "client" is correct.[19]

Peskoff's services for the FBR REIT were very different from those that he

provided to Gen Advisors and Sentry Select. For the FBR REIT, Peskoff provided

information and advice to FIDAC during the life of the account concerning the thinking

and goals of FBR executives. (D.I. 53, ex. 18 at 17:5-18:4) With respect to the Gen

---

[18]The parties do not dispute that FBR, in connection with the FBR REIT, gave funds to FIDAC to manage, and that Gen Advisors and Sentry Select helped to construct the investment vehicles before they solicited client funds to put into those investment vehicles to manage.

[19]Using this interpretation, plaintiffs' argument that industry custom supplies Peskoff's reasonable expectation also fails because Kazel's and Peskoff's undisputed deposition testimony indicated that "finder's fees" are used when a finder procures a client, not a business partner. (D.I. 53, ex. 15 at 136:7-138:18; ex.17 at 9:4-10:6)

14

Advisors transaction, Peskoff attended two early meetings, listened to Farrell's "frustrations" with the deal and helped to resolve "interpersonal issues" between FIDAC and Gen Advisors. (See D.I. 87 ¶¶ 35-37) Regarding the Sentry Select transaction, Peskoff does not allege any services for Sentry Select other than his act of introducing Corsini and Farrell. (See D.I. 47 at 8-9) Peskoff did not provide any services regarding how money should be managed within the Premier or MBS Trusts.

Peskoff, given the above, cannot establish a reasonable expectation of compensation based on the parties' prior course of dealing.[20] Peskoff's FBR REIT services significantly differ from those he contends he provided in connection with the Gen Advisors or Sentry Select transactions and, as such, the prior course of dealing between the parties cannot serve to establish Peskoff's reasonable expectation of compensation. Because the court finds that Peskoff has failed to establish the first element of a quantum meruit claim, the court declines to address the parties arguments' regarding FIDAC's notice. Summary judgment is granted to FIDAC in this regard.

## B. Promissory Estoppel[21]

To prove a promissory estoppel claim, a plaintiff must show that: (1) a promise

---

[20]Moreover, Peskoff, at least in part, recognizes the distinction drawn by FIDAC, making his expectation of compensation unreasonable. (See D.I. 53, ex. 15 at 136:7-139-2 (Peskoff testifying that he provided the concept of the deal but agreeing that he did not provide the equity)); (see also id. at 131-32, 135 (Peskoff testifying that he did not solicit client funds for either Sentry Select or Gen Advisors))

[21]Similar to the quantum meruit claim, the parties agree that the underlying elements of promissory estoppel are the same under either Delaware or New York law and, therefore, the court will refer to those states' laws interchangeably. (See D.I. 63 at 24; D.I. 66 at 24; D.I. 80 at 3)

15

was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and took action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise. Chrysler Corp. v. Chaplake Holdings, Ltd., 822 A.2d 1024, 1032 (Del. 2003).

Plaintiffs assert that FIDAC made two separate promises to Peskoff regarding the Gen Advisors transaction. (D.I. 47 at 24-25) First, plaintiffs argue that the Letter constituted a promise by FIDAC and that Peskoff reasonably relied on this promise to his detriment. For the reasons discussed supra, any reliance by Peskoff on the Letter was unreasonable because the Letter's scope clearly limited it to those times when the parties "shall agree" and Peskoff admitted that the introductions were performed on his own initiative. Second, plaintiffs point to the conversations between Baptista and Farrell where Farrell expressed concern about Peskoff's potential to "double-dip." Even if this constituted a promise to Peskoff,[22] the court finds that Peskoff's promissory estoppel claim fails for the following reasons.

First, Farrell did not act with the "reasonable expectation" to induce action or forbearance on the part of Peskoff. The record demonstrates that Farrell's comments were made to prevent Baptista from paying Peskoff, with no regard for Peskoff's potential actions.[23] In addition, "[a]ctual reliance on the promise is necessary, and the

---

[22]The parties dispute whether this conversation constituted a promise. FIDAC asserts that this promise was made in the context of obtaining money from Messner's former company, ING, whose funds FIDAC hoped to manage. (D.I. 91 ¶ 32 )

[23]In addition, the record indicates that Farrell was not speaking to Peskoff, thus, diminishing any reasonable expectation Farrell may have had to induce Peskoff's

reliance must have been the sort to have been reasonably expected."  Ramone v. Lang,

No. Civ. A. 1592, 2006 WL 905347, at *15 (Del. Ch. Apr. 3, 2006).  Peskoff claims he

reasonably relied on FIDAC's promise by "expending time and money to make the Gen

Advisors introduction" (D.I. 87 ¶ 71); however, the conversations between Baptista and

Farrell obviously occurred after the introduction had taken place thereby precluding any

"actual reliance" in this instance.  Moreover, the circumstances of the instant case are

not such that "injustice can be avoided only by enforcement of the promise."

## C.  Plaintiffs' Motion to Compel Payment of Discovery Expenses

Plaintiffs move the court to compel payment of discovery expenses in connection

with plaintiffs' valuation expert Lee E. Buchwald ("Buchwald") pursuant to Federal Rule

of Civil Procedure 26(b)(4)(C).[24]  (D.I. 60 at 1)  Buchwald's hourly rate is $450.

Plaintiffs' assert that defense counsel orally agreed in a telephone conversation to that

rate.[25]  (D.I. 60 at 3)  After the deposition, plaintiffs' counsel forwarded two invoices to

FIDAC's counsel detailing Buchwald's time and expenses relating to the deposition as

follows:  (1) 2 hours for telephone conferences with plaintiffs' counsel regarding expert

discovery; (2) 8.5 hours responding to FIDAC's document requests; (3) 19 hours

preparing for the deposition; (4) 4 hours participating in the expert deposition; (5) 6

hours reviewing and certifying the transcript of the expert deposition; and (6) related

actions.

[24]Plaintiffs also suggest that this court should award attorney's fees and costs incurred in connection with this motion because FIDAC acted in bad faith.  (D.I. 60 at 9-10)

[25]The evidence provided and cite to by plaintiffs is a letter to defense counsel reiterating their position.  (See D.I. 61, ex. 6)

copying, telecommunication and courier expenses. (D.I. 61, exs. 2, 4) After receiving these invoices, defendant's counsel offered to pay Buchwald's fees for the four hours of deposition time only; FIDAC contends that the remaining fees are either not compensable as a matter of law or unreasonable, considering that Buchwald's deposition occurred three weeks after he issued his nine page expert report.[26] (D.I. 61 at 4; D.I. 70 at 8)

Unless manifest injustice would result, Federal Rule of Civil Procedure 26(b)(4)(C) provides that the court must require that party seeking discovery "pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (B)" and "for discovery under (B), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions." Fed. R. Civ. P. 26(b)(4)(C). FIDAC also suggests that this court may reduce the hourly rate and number of hours worked in order to make an expert's fees reasonable, but does not propose either an alternative hourly rate or compensable hour amount. (See D.I. 70 at 16)

The court finds that some of Buchwald's expenses are unreasonable. In particular, nineteen hours is excessive to prepare for a four hour deposition regarding a nine page expert report that was issued only three weeks earlier. In addition, the amount of time reviewing the deposition transcript (6 hours for 132 pages) is

---

[26]Defendant also argues that because Buchwald's report is inadmissible, based on its contention that Buchwald is not an expert, it should not be required to pay discovery expenses. The court finds that this argument lacks merit because it ignores that it seeks to disqualify Buchwald, in part, based on information obtained during Buchwald's deposition.

18

unreasonable and, in any event, is not compensable at the full hourly rate.  For these reasons, plaintiffs' motion is granted in part and denied in part.

## V. CONCLUSION

For the above stated reasons, plaintiffs' motion for partial summary judgment is denied (D.I. 45); defendant's motion for summary judgment is granted (D.I. 50); and plaintiffs' motion to compel payment of discovery expenses is granted in part and denied in part (D.I. 59).  An appropriate order shall issue.